Exhibit 2

Page 1

1                UNITED STATES DISTRICT COURT

2                EASTERN DISTRICT OF MICHIGAN

3                      SOUTHERN DIVISION

4

5     REGINA PARKS, an individual,

6              Plaintiff,

7

                              Case No. 25-cv-10409

8     -vs-                    Hon. Judge Shalina D. Kumar

9

10    WAYNE COUNTY, a political subdivision of

11    The State of Michigan, RAPHAEL "RAY"

12    WASHINGTON, in his individual and

13    Official capacities, jointly and severally,

14              Defendants.

15    _____/

16

17          VIDEO DEPOSITION of RAPHAEL WASHINGTON

18

19        Taken by the Plaintiff on the 8th day of September,

20        2025 at Deborah Gordon Law, 33 Bloomfield Hills

21        Parkway, Suite 220, Bloomfield Hills, Michigan 48304

22        commencing at 10:10 a.m.

23

24

25

```
                                                    Page 2

 1    APPEARANCES:

 2    For the Plaintiff:        DEBORAH L. GORDON (P27058)

 3                              MORRY D. HUTTON (P81188)

 4                              Deborah Gordon Law

 5                              33 Bloomfield Hills Pwy Ste 220

 6                              Bloomfield Hills, Michigan 48304

 7                              248-258-2500

 8

 9    For the Defendant:        MARIA F. DWYER (P60946)

10    Washington                Clark Hill PLC

11                              500 Woodward Ave., Ste 3500

12                              Detroit, Michigan 48226

13                              313-309-0474

14

15    For the Defendant:        ANGELINA R. DELMASTRO (P81712)

16    Wayne County              Dickinson Wright PLLC

17                              500 Woodward Ave., Ste 4000

18                              Detroit, Michigan 48226

19                              313-223-3500

20

21    Also Present:             Atty. David Melton, Jr.

22                              Mike Gurlides, Videographer

23    Reported By:              Amy Bertin, CER-3871

24                              Certified Electronic Reporter

25                              586-468-2411
```

Page 41

1    Q    So what was your title when you got hired in?

2    A    Chief.

3    Q    Chief of what?

4    A    Operations.

5    Q    And you reported to who in that?

6    A    Again, it got to be the undersheriff and there was

7         an executive chief.

8    Q    And then your next position or next title after

9         that was what?

10   A    Deputy Chief.

11   Q    And was this the title you had when you were moved

12        to Hamtramck?

13   A    Yes.

14   Q    How long did you remain deputy chief after that?

15        What was the next change?

16   A    After deputy chief, I was appointed to sheriff.

17   Q    And that was when?

18   A    In January of '21.

19   Q    And that was after the death of Benny Napoleon?

20   A    Yes.

21   Q    And you then ran in a special election? There was a

22        special election, is that correct?

23   A    In '22.

24   Q    And then there was a regular election in '24. When

25        did you first meet officer or Deputy Turner?

Page 294

1        position that he could, that he could work in.

2   Q    But it sounds like he was with executive protection

3        earlier because that was what the caller was

4        saying. That there was somebody from Executive

5        Protection who had done something inappropriate.

6   A    No. I think what she meant was somebody working in

7        executive protection here.

8   Q    Right.

9   A    But he wasn't working in executive protection in

10       the School District. I think it's, I think she's -

11       I want to make sure that you understand that.

12  Q    Yeah. That sounds confused.

13  A    He wasn't working here. He wasn't working for me

14       when she called.

15  Q    Who was he working for when she called?

16  A    No, no. He was working for me when she called. He

17       wasn't working in the community, in the school

18       district anymore. She was calling about an incident

19       that happened in the school district, allegedly.

20  Q    But she mentioned your office.

21  A    Yeah. She called because he is now working with me.

22       And I remember Regina Parks saying she called

23       concerning that he's working for me and this

24       happened in the school district.

25  Q    And she wanted somebody over there to know about it

Page 184

```
 1    A    Oh, my communications.

 2    Q    What's your communications?

 3    A    Communication directors, changing that out.

 4    Q    Who are we talking about in this case?

 5    A    Ed Foxworth, Mara MacDonald.

 6    Q    So that was just a change in personnel?

 7    A    Yeah. Restructuring, we called it.

 8    Q    Well, hang on a second, I just want to understand

 9         this. You said Mara replaced Ed Foxworth?

10    A    Yes.

11    Q    Did she have a different job than Ed Foxworth?

12    A    No.

13    Q    Different job description?

14    A    No.

15    Q    And people do have job descriptions at the county,

16         correct?

17    A    Yes.

18    Q    And my client had a job description, correct?

19         Regina had a job description?

20    A    Yes.

21    Q    So what else? You were giving your departments and

22         you said communication.

23    A    Yeah. Then I changed out our recruiting efforts,

24         which means I brought in background investigators.

25    Q    Okay. Hang on a second. What title is this under?
```

Page 185

1          You said -

2    A    They're under recruiting but they're -

3    Q    It's called recruiting?

4    A    But they are background investigators.

5    Q    So is this the same place that Felton and Diaz and

6          Maloney work, the same title?

7    A    Yeah. They work the same title. They were

8          recruiters. Under the recruiting, there's

9          background investigators, too. I added that to a

10         part of the recruiting efforts because they work

11         together.

12   Q    Well, where was it before?

13   A    We didn't have a background investigative team as I

14         put together when I became the sheriff.

15   Q    This came up in 2024 at the same time the Mara

16         MacDonald change came up?

17   A    That's a different thing. Yeah. But it was all

18         around the same time in November. I was moving

19         things around after I got reelected.

20   Q    Were you hiring investigative recruiters?

21   A    Sure.

22   Q    And when did you hire them?

23   A    I'm still hiring them. It's because some of them

24         leave, some of them -

25   Q    Okay. I'm going back to 2024 here where you made

Page 186

```
 1          some changes. Did you hire people at that time to
 2          be investigative recruiters?
 3   A      Yes.
 4   Q      Who were they?
 5   A      It's about 19 of them.
 6   Q      You brought in 19 in 2024?
 7   A      There's '25 as well, on into '25.
 8   Q      Well, I'm talking about at the time of the so-
 9          called restructuring. That's what I'm talking
10          about.
11   A      I can't tell you how many I brought in.
12   Q      At that time.
13   A      At that time.
14   Q      You don't know?
15   A      But I was bringing them in consistently because we
16          were doing major hiring and we were bringing in
17          background investigators to do the background work
18          so we could hire.
19   Q      What else was a restructuring, if anything?  Unless
20          we've covered it already.
21   A      I did my community outreach, restructured that.
22   Q      What was community outreach at that time?
23   A      It was only one person.
24   Q      That was Regina Parks?
25   A      Yes.
```

Page 198

```
 1    A    I'm not sure.
 2    Q    Did she have at least five years of media or
 3         management experience?
 4    A    Media?
 5    Q    Yeah. Media or management experience. That's the
 6         job description, sir.
 7    A    She was a - she was - yes. And she was a
 8         supervisor, a highly ranked supervisor in the city
 9         of Detroit Police Department.
10    Q    So we've now covered the changes you made.
11    A    It was another.
12    Q    Another what?
13    A    Well, it was Erica Hill who I brought over.
14    Q    Right. We've talked about her.
15    A    To do that. Okay, you did. Okay. And then the
16         fourth one was Regina Parks.
17    Q    So again, nothing in writing about the
18         restructuring. You've just described it to me
19         verbally as best you can remember, is that right?
20    A    That was it. That's exactly. I remember that.
21    Q    And this occurred in November, right?
22    A    Yes.
23    Q    And when did Regina first learn about a
24         restructuring as you understood it?
25    A    As I understood it, the day I had the meeting to do
```

1       it.

2   Q   So you called a meeting?

3   A   Sure.

4   Q   And who did you call to the meeting?

5   A   Those four. But I think it was only three because

6       Dawn wasn't here yet. But then it was Mara

7       MacDonald. It was Mike Turner, my chief of staff at

8       the time. I believe Rashaun may have been there,

9       Whitehead, my assistant. I believe that was it.

10  Q   And where did the meeting take place?

11  A   One of our conference rooms.

12  Q   Now, as of this time on November 13th, Regina Parks

13      had been reappointed for another one year period,

14      is that correct? The day before on the 13th of

15      November.

16  A   I think we were - and I'm not sure. Again, I think

17      my human resources or my staff, my executive

18      assistant, it was because I was newly reelected and

19      the year was ending, I believe they did reappoint

20      people based on my direction, obviously.

21  Q   I have a letter, Bates stamped 26, from Necole

22      Glasker, Department of Personnel.

23  A   Okay.

24  Q   From Lakeisha Solomon, what was her title?

25  A   She's a - well, she's a director now. But she was a

Page 200

1           manager in our human resources.

2    Q     So I'll hand you Bates 26.

3    A     Okay.

4    Q     And you can see that Regina Parks was reappointed

5           to Department Executive 2, effective November 18,

6           2024. Her salary was $97,243. The aforementioned

7           employee meets the qualifications of the

8           classification. Correct?

9    A     Okay. Okay.

10   Q     And her office was going to be moved, is that

11          correct, her physical office?

12   A     She was coming out of her office because I was

13          putting together four people working jointly

14          together.

15   Q     And what was her - what had her office been?

16   A     What has it been?

17   Q     Yeah. Where was her office and what was it?

18   A     In the same - right outside, right outside where

19          the cubicles are. Second floor. I mean, fourth

20          floor right outside where her office was. I mean,

21          where the cubicles were.

22   Q     And were plaintiffs' job duties being affected?

23   A     Was her job duties being affected?

24   Q     Yes, in this restructure.

25   A     Not at all.

Page 216

```
 1        her. You learned that.
 2   A    And I said something to that effect that, no, I
 3        didn't.
 4   Q    Didn't what?
 5   A    Ever hit on her.
 6   Q    I know, but you were told there was a recording,
 7        sir.
 8   A    I was told that she was walking around my section
 9        of where I work patting her vagina, talking in a
10        loud voice about -
11   Q    Okay. Your way off topic.
12             MS. DWYER: Let him finish his statement.
13             THE WITNESS: I'm just trying to explain it to
14        you.
15   BY MS. GORDON:
16   Q    I'm not asking you to -
17   A    Of why I was fired - why she was fired.
18   Q    Okay. Sheriff, I'm not asking you to explain
19        anything to me.
20   A    Well, you're telling me why I fired her. You're
21        telling me and I'm trying to tell you why I fired
22        her.
23   Q    I'm telling you what Rashaun Whitehead said.
24   A    Rashaun didn't get it - that wasn't the
25        chronological order that she, that you're trying to
```

Page 208

```
 1   Q   Hang on, hang on, hang on. You've got to stick with
 2       my question, sir.
 3   A   I was trying to go back to what you asked.
 4   Q   Okay. Just hang on. You never interviewed Regina,
 5       sat down with her.
 6   A   No.
 7   Q   And you never instructed anybody else to sit down
 8       with Regina and interview her about the so-called
 9       events you just described.
10   A   I did.
11   Q   Nobody talked to Regina?
12   A   They did.
13   Q   Who did?
14   A   Michael Turner, my chief of staff, her direct
15       report.
16   Q   When did he - when did you direct him to talk to
17       Regina?
18   A   That evening I found out.
19   Q   I'm sorry. Be specific.
20   A   The same evening I found out.
21   Q   When did you tell Michael Turner to talk to Regina?
22   A   The evening of her ranting and rage.
23   Q   What did you tell Michael Turner to do?
24   A   I said, this is what I heard that happened. You
25       need to talk to her, find out what happened. She's
```

Page 209

```
 1        going to be terminated the next day.
 2   Q    Did he get back to you with something in writing?
 3        With a statement from her or anything?
 4   A    I don't recall if it was in writing but he got back
 5        with me.
 6   Q    What did he say?
 7   A    He said he talked to her and she wouldn't
 8        apologize. He said he wanted her to apologize for
 9        her action and she said, no, I'm not going to do
10        it. She didn't say she didn't do it. She said, no,
11        I'm not going to apologize for it.
12   Q    So if she had apologized, what? She wouldn't have
13        been fired?
14   A    Not that I'm saying she would. She would have been
15        fired. She would have been fired.
16   Q    Who have you personally made the decision to fire
17        before since you've been Sheriff?
18   A    Erika Erickson.
19   Q    Who else? That's because you said she was arrested?
20   A    Yes.
21   Q    Who else?
22   A    For drunk driving.
23   Q    Who else have you terminated?
24   A    I terminated - I believe we call that termination,
25        Ed Foxworth.
```

Page 218

1    BY MS. GORDON:

2    Q    Go ahead. There's nothing in writing giving a

3         reason, correct?

4             MS. DWYER: Same objection.

5             THE WITNESS: No. I didn't put anything in

6         writing. I didn't have to put anything in writing.

7    BY MS. GORDON:

8    Q    And the reason on the form is that her - was an

9         expiration of appointment, correct?

10   A    Yes.

11   Q    But she had just been appointed the day before,

12        correct? Reappointed on the 13th of November,

13        correct?

14   A    Yes.

15   Q    So it wasn't really the expiration of the

16        appointment. It was that you think she engaged in

17        some misconduct. That's your theory in this case,

18        correct?

19            MS. DWYER: Objection to the extent it calls

20        for a legal conclusion. But go ahead and answer.

21            THE WITNESS: She was terminated because of her

22        actions.

23   BY MS. GORDON:

24   Q    That's not what it says in writing.

25   A    Well, I didn't have to say that in writing.

```
                                                     Page 12

 1    Q    So what's the number currently of that phone?

 2              MS. DWYER: And just for the record, we'll deem

 3         this confidential as well.

 4    BY MS. GORDON:

 5    Q    Well, is your work phone number confidential? Don't

 6         you give it to people?

 7    A    I mean, people have it, yes.

 8    Q    Yeah. So I don't -

 9              MS. GORDON: I hear you but I don't know if

10         that's actually - w can take that up later.

11              MS. DWYER: Sure.

12    BY MS. GORDON:

13    Q    What is that number?

14    A    313-213-5170.

15    Q    How long have you had that particular phone number?

16         All along or?

17    A    Since 2009.

18    Q    And what is the current device you use for that?

19         What's the phone make?

20    A    It's an Apple phone.

21    Q    Do you know what number it is?

22    A    I think it's AT&T.

23    Q    What number Apple phone?

24    A    I don't know.

25    Q    Like is it a newer model?
```

```
                                                   Page 13
 1    A    It's probably one of the newer models. I don't keep
 2         up with that.
 3    Q    When did you last get a new phone for your work?
 4    A    Not exactly sure but it's probably a year ago or
 5         so. Maybe a little more.
 6    Q    And you've got - is this the county that uses AT&T?
 7    A    Yes.
 8    Q    You can text on that phone, is that correct?
 9    A    Yes.
10    Q    Do you receive email on that phone?
11    A    Yes.
12    Q    You use that phone to communicate with employees of
13         the county, is that correct?
14    A    Yes.
15    Q    And you text with employees of the county, is that
16         correct?
17    A    Occasionally.
18    Q    What other phone do you have?
19    A    I have a personal phone.
20    Q    And what model is that?
21    A    It's a -
22    Q    What's the manufacturer?
23    A    It's a Verizon phone.
24    Q    Is it an Apple?
25    A    No.
```

Page 14

1    Q    What is it?

2    A    Android.

3    Q    And what's the brand?

4    A    The brand name?

5    Q    Yeah. Who manufactures the phone?

6    A    It's Verizon.

7    Q    And how long have you had that phone?

8    A    This particular one?

9    Q    Yeah.

10   A    Probably February of this year.

11   Q    What's the number on that one?

12   A    Phone number?

13        MS. DWYER: Just for the record, I'll deem this

14        confidential.

15        MS. GORDON: Fair enough. Go ahead.

16        (Confidential portion page 14, line 17.)

17        THE WITNESS: 313-570-2884.

18        (End of confidential portion page 14, line

19        17.)

20   BY MS. GORDON:

21   Q    How long have you had that number?

22   A    Forever.

23   Q    Forever?

24   A    Decades, yeah.

25   Q    And you use that phone, as I understand it, to text

Page 15

```
 1        with people, is that correct?
 2    A   Personally, yes.
 3    Q   What did you do to get ready for your deposition
 4        today? I assume you talked to legal counsel?
 5    A   Yes.
 6    Q   And when did you talk to legal counsel most
 7        recently?
 8    A   Most recently, this morning.
 9    Q   And did you have a meeting this morning or was it
10        just coming into the building?
11    A   Just coming into the building.
12    Q   So when did you meet with your counsel to get
13        prepped for your dep?
14    A   Last week.
15    Q   What day was that?
16    A   Thursday or Friday. One of the two days.
17    Q   And where did you meet?
18    A   At the Clark Hill office.
19    Q   And how long was the meeting?
20    A   Two hours, three hours.
21    Q   And did you go over documents?
22    A   Yes.
23    Q   What documents do you remember looking at?
24    A   Lawsuit documents.
25    Q   What else? Other than the lawsuit, what did you
```

```
                                                   Page 16
 1        look at?
 2   A    I think everything we were going over was from the
 3        lawsuit.
 4   Q    Have you had any other meetings with counsel other
 5        than that one?
 6   A    Might have been one before that. I think it was one
 7        before that.
 8   Q    How long before?
 9   A    Probably a few weeks or so before last week.
10   Q    And what counsel did you meet with when you met
11        last week or the few other times before?
12   A    Maria Dwyer. And Brian, can't recall his last name
13        right now. Brian.
14   Q    Who else?
15   A    And Lina was present.
16   Q    Did you have in-house counsel with you?
17   A    Yes. David Melton was there.
18   Q    So there was a group of you, is that correct?
19   A    Sure.
20   Q    So you received interrogatories from my office, is
21        that correct?
22   A    Yes.
23   Q    And you received requests to produce, is that
24        correct?
25   A    Requests for what?
```

```
                                                       Page 17
 1    Q    Requests to produce documents, is that correct?
 2    A    Yes.
 3    Q    And were you sent copies of those?
 4    A    I don't recall if I was sent them directly. Depends
 5         on what it was. I'm not sure what you're speaking
 6         of.
 7    Q    Well, what have you seen? What have you seen that
 8         would be requests from us to produce documents?
 9    A    I'm not sure. I'm not sure.
10    Q    Did you get a copy of a document that looks like
11         this? I'm reading onto the record – I'll show you
12         the front page. It says, Defendant's Objections and
13         Responses to Plaintiff's First Set of
14         Interrogatories. It's a written document. Did you
15         receive this document?
16    A    Yes.
17    Q    So this was my first request to the county and to
18         you. And we asked questions in this document. And
19         one of the questions we asked was, who assisted in
20         providing answers. And as I read the document, the
21         county states that with regard to providing answers
22         to these – interrogatories, you may already know
23         this Sheriff, are questions. And the parties send
24         each other questions. And do you understand that
25         that occurs in litigation?
```

Page 14

1    Q    What is it?

2    A    Android.

3    Q    And what's the brand?

4    A    The brand name?

5    Q    Yeah. Who manufactures the phone?

6    A    It's Verizon.

7    Q    And how long have you had that phone?

8    A    This particular one?

9    Q    Yeah.

10   A    Probably February of this year.

11   Q    What's the number on that one?

12   A    Phone number?

13          MS. DWYER: Just for the record, I'll deem this

14       confidential.

15          MS. GORDON: Fair enough. Go ahead.

16          (Confidential portion page 14, line 17.)

17          THE WITNESS: 313-570-2884.

18          (End of confidential portion page 14, line

19       17.)

20   BY MS. GORDON:

21   Q    How long have you had that number?

22   A    Forever.

23   Q    Forever?

24   A    Decades, yeah.

25   Q    And you use that phone, as I understand it, to text

Page 15

1        with people, is that correct?

2   A    Personally, yes.

3   Q    What did you do to get ready for your deposition

4        today? I assume you talked to legal counsel?

5   A    Yes.

6   Q    And when did you talk to legal counsel most

7        recently?

8   A    Most recently, this morning.

9   Q    And did you have a meeting this morning or was it

10       just coming into the building?

11  A    Just coming into the building.

12  Q    So when did you meet with your counsel to get

13       prepped for your dep?

14  A    Last week.

15  Q    What day was that?

16  A    Thursday or Friday. One of the two days.

17  Q    And where did you meet?

18  A    At the Clark Hill office.

19  Q    And how long was the meeting?

20  A    Two hours, three hours.

21  Q    And did you go over documents?

22  A    Yes.

23  Q    What documents do you remember looking at?

24  A    Lawsuit documents.

25  Q    What else? Other than the lawsuit, what did you

Page 16

1       look at?

2    A  I think everything we were going over was from the

3       lawsuit.

4    Q  Have you had any other meetings with counsel other

5       than that one?

6    A  Might have been one before that. I think it was one

7       before that.

8    Q  How long before?

9    A  Probably a few weeks or so before last week.

10   Q  And what counsel did you meet with when you met

11      last week or the few other times before?

12   A  Maria Dwyer. And Brian, can't recall his last name

13      right now. Brian.

14   Q  Who else?

15   A  And Lina was present.

16   Q  Did you have in-house counsel with you?

17   A  Yes. David Melton was there.

18   Q  So there was a group of you, is that correct?

19   A  Sure.

20   Q  So you received interrogatories from my office, is

21      that correct?

22   A  Yes.

23   Q  And you received requests to produce, is that

24      correct?

25   A  Requests for what?

Page 17

1    Q    Requests to produce documents, is that correct?

2    A    Yes.

3    Q    And were you sent copies of those?

4    A    I don't recall if I was sent them directly. Depends

5         on what it was. I'm not sure what you're speaking

6         of.

7    Q    Well, what have you seen? What have you seen that

8         would be requests from us to produce documents?

9    A    I'm not sure. I'm not sure.

10   Q    Did you get a copy of a document that looks like

11        this? I'm reading onto the record – I'll show you

12        the front page. It says, Defendant's Objections and

13        Responses to Plaintiff's First Set of

14        Interrogatories. It's a written document. Did you

15        receive this document?

16   A    Yes.

17   Q    So this was my first request to the county and to

18        you. And we asked questions in this document. And

19        one of the questions we asked was, who assisted in

20        providing answers. And as I read the document, the

21        county states that with regard to providing answers

22        to these – interrogatories, you may already know

23        this Sheriff, are questions. And the parties send

24        each other questions. And do you understand that

25        that occurs in litigation?

```
                                                   Page 18
  1    A    Yes.

  2    Q    I know you're basically on the criminal side. So

  3         I've been told in writing, in the supplemental

  4         response to the first set of interrogatories when

  5         we asked, who provided information to answer the

  6         interrogatories. I asked that question. And the

  7         answer was, defendant Raphael Washington, Wayne

  8         County Sheriff. Okay?

  9    A    Okay.

 10    Q    So do you understand what I'm telling you? You

 11         provided information in response to these questions

 12         we sent over, correct?

 13    A    Okay. Yes.

 14    Q    So when we sent over our interrogatories, we asked,

 15         obviously, for the following information. We asked

 16         on around May 2nd, 2025, I got answers from my

 17         requests. And one of my requests was this. This was

 18         number 10.

 19              Please produce all documents, emails, text

 20         messages and/or other communications sent by, to or

 21         between defendant Ray Washington, Michael Turner,

 22         any other county employee, elected official or any

 23         other employee elected or appointed. Okay?

 24    A    Okay.

 25    Q    And here's the answer I got, Sheriff. The answer I
```

```
                                                    Page 19
 1        got to this question, which you participated in
 2        answering was, subject to and without waiving their
 3        specific and general objections, defendants state
 4        they have no documents.
 5   A    Okay.
 6   Q    That's a lie, isn't it?
 7   A    No. I don't - if I said that along with my
 8        attorney -
 9   Q    Sir, I didn't ask you who said it. Stick with me
10        here. These are court documents, sir.
11   A    Okay.
12   Q    That are signed. Okay.
13   A    Okay.
14   Q    And it was a very direct question whether, that we
15        wanted emails and texts between you, Turner and
16        other people.
17   A    M'hm.
18   Q    And your answer that you participated in, according
19        to your response here, was that you have, the
20        county had none. That you had none. I'll read it
21        again. Defendants state they have no documents
22        responsive to number 10.
23            So you did have text messages between you and
24        Turner, correct?
25            MS. DWYER: I'm going to object just to the
```

```
                                                          Page 20

 1          extent it calls for legal objections. You read

 2          objections that were listed before that answer.

 3     BY MS. GORDON:

 4     Q    Go ahead. You had texted with Turner.

 5               MS. DWYER: Same objection.

 6                    THE WITNESS: Throughout the time we've

 7          been together, absolutely there were occasions.

 8     BY MS. GORDON:

 9     Q    Right. And right up until recently, correct?

10     A    I don't know about that at all. I don't recall.

11     Q    Well, sir, I have texts between you and Turner.

12     A    Well, there it is.

13     Q    So there was a lie in your - okay. Don't be shaking

14          your head at me, okay. You just wait and answer

15          because it's distracting. Okay?

16               So, when I asked for these documents, these

17          texts, the answer that was provided to me was false

18          because you did always have texts with people from

19          the county, correct?

20               MS. DWYER: I'm going to place the same

21          objection on the record to the extent that there

22          were objections placed, which you read into the

23          record, prior to that answer.

24               MS. GORDON: Okay. The objection -

25               MS. DWYER: To the extent it calls for a legal
```

Page 21

1       conclusion and documents were not provided as a
2       result of that.
3            MS. GORDON: Okay. Okay.
4            MS. DELMASTRO: I would like to place on the
5       record an objection that to the extent that you're
6       looking at the supplemental response. The
7       supplemental response indicated that responsive
8       documents were produced at numerous different –
9            MS. GORDON: You know, thanks for helping me
10      out but I was well aware of that. I know exactly
11      what's in the supplement. That was when I talked to
12      counsel for the Sheriff and I told them, your
13      client is being dishonest with you because I know
14      he sent texts, just to help you out.
15           And after I had that conversation, I received
16      the supplement, yes, because the Sheriff got caught
17      in lying. That's what happened, okay? So thank you
18      for helping me out with my own supplement. But I
19      was well aware of that.
20           I don't know if you were on the call or not.
21      Were you?
22           MS. DELMASTRO: Yes, I was on the call.
23           MS. GORDON: Okay. Well, then you must remember
24      me saying, we had a meet and confer. And the issue
25      was that we received no texts. That was one of the

Page 22

```
 1          issues. And you both, counsel here today, told me
 2          that there were no texts. And I said, that's false.
 3          Your client is giving you false information because
 4          I didn't believe the lawyers would be making false
 5          statements. And then you supplemented. So, let's
 6          all be clear about what happened here and how I
 7          wasted my time and I'm now wasting further time
 8          here. Because now I have to listen to this again.
 9          So, I'll just continue, okay? Thank you.
10    BY MS. GORDON:
11    Q    Okay. Sheriff, did you tell your counsel that you
12          had no text messages from any period of time with
13          Turner?
14             MS. DWYER: I'm going to object and instruct
15          the witness not to answer.
16             MS. GORDON: Fair enough.
17             MS. DWYER: That's attorney-client privileged
18          communications. If I could just get my objection on
19          the record.
20             MS. GORDON: Okay. I understand it.
21    BY MS. GORDON:
22    Q    So were you - did you ever look for text messages
23          on your phones? Were you asked to look for text
24          messages?
25    A    No.
```

Page 94

```
 1   Q   Was he eligible for retirement?

 2   A   Sure.

 3   Q   Roughly, how old is he?

 4   A   Roughly?

 5   Q   Right.

 6   A   Probably 66 or 67.

 7   Q   Did he tell you that Regina Parks came to him and

 8       complained about you and your conduct toward her

 9       and your sexual harassment?

10   A   He's never come to me and said that.

11   Q   Did he tell you that Erika Erickson came to him and

12       complained about you about sexual harassment?

13   A   He came to me and told me that we needed to have a

14       meeting with her but it had nothing to do with

15       sexual harassment.

16   Q   I didn't ask you about a meeting. I said, did he

17       ever tell you that Erika came to him and complained

18       about sexual harassment?

19   A   Not until we had a meeting.

20   Q   What was the meeting?

21   A   The meeting was about, she was concerned that she

22       wanted to look out for me. She didn't have a

23       harassment complaint at all, her mouth, in that

24       meeting. And that she wanted to make sure that we

25       were - that we didn't have - or I didn't say
```

Page 264

```
 1   Q    And you made repeated lewd and sexual comments
 2        about her body and appearance including that, "I
 3        didn't know you had all that back there." Remember
 4        that?
 5   A    I didn't say that. I saw that. I did not say that.
 6   Q    Well, why would Regina Parks make that up?
 7   A    You'd have to ask her.
 8   Q    That particular thing.
 9   A    You'd have to ask her.
10   Q    I'm asking you if you know a reason, a motive.
11   A    I have no reason at all.
12   Q    You don't know a motive she would have to lie about
13        you back to 2021?
14   A    I don't. I just brought her a -
15   Q    Just like all the other women.
16             MS. DWYER: Again - first of all, that's
17        Harassing, once again. And you're not letting him
18        finish answering your question. Is this you
19        testifying today or are you trying to get my client
20        to answer your question?
21   BY MS. GORDON:
22   Q    And you also stated that she would look more
23        sexually attractive if she gained weight, correct?
24   A    So I didn't say that. And I wouldn't say that. And
25        you keep asking me about, did I say this or did I
```

Page 265

1        say that. I said none of that. And you just said

2        something about since 2021. And that's troubling to

3        me as well. Because since 2021, and this is 2025,

4        she has never ever said she had a complaint against

5        me or that I was harassing her. Never.

6  Q    That's not - I didn't ask you any of that.

7  A    Well, you did. You kind of asked me that.

8  Q    Okay, Sheriff. Number one, you can't interrupt.

9        You've been told this before. And you can't -

10       unless you want to be here a very long time, you

11       need to just listen to the question and answer the

12       question.

13           The question was whether you said these things

14       to her. That was all the question was.

15  A    And I said no.

16           MS. DWYER: Objection. Asked and answered. It

17       was denied. He answered.

18  BY MS. GORDON:

19  Q    I'm not re-asking. I'm telling him what the

20       question was. And my client would swat your hands

21       away, ask him to stop making sexual conduct -

22       comments and the like, correct?

23  A    No, that's not correct.

24  Q    And in 2022, your executive assistant began keeping

25       your office door open while female employees,

Page 93

```
 1        violating a policy, correct?
 2   A    No. Because I didn't find out about it until -
 3   Q    Well, when you did find out about it you never -
 4        no. I don't mean just you but nobody from the
 5        county has put this in writing.
 6   A    I don't know what the county has done.
 7   Q    Well, you never did so, correct? You can tell me
 8        that.
 9   A    I didn't put anything in writing. I told him he
10        would have to - he was going to be terminated or
11        let go from our agency because of it.
12   Q    He ended up retiring, correct?
13   A    He did retire.
14   Q    But you can't name a policy that he violated? Just
15        to be clear.
16   A    Sure. I said -
17   Q    You can't name it.
18   A    Fraternization with a subordinate.
19   Q    Okay. Sheriff.
20   A    From his mouth.
21   Q    I hear you. But -
22   A    Yeah. So when he told me what he told me, I simply
23        - I didn't write anything down other than when it's
24        time for him to leave that, is that, it was, his
25        appointment had expired but.
```

Page 94

1    Q    Was he eligible for retirement?

2    A    Sure.

3    Q    Roughly, how old is he?

4    A    Roughly?

5    Q    Right.

6    A    Probably 66 or 67.

7    Q    Did he tell you that Regina Parks came to him and

8         complained about you and your conduct toward her

9         and your sexual harassment?

10   A    He's never come to me and said that.

11   Q    Did he tell you that Erika Erickson came to him and

12        complained about you about sexual harassment?

13   A    He came to me and told me that we needed to have a

14        meeting with her but it had nothing to do with

15        sexual harassment.

16   Q    I didn't ask you about a meeting. I said, did he

17        ever tell you that Erika came to him and complained

18        about sexual harassment?

19   A    Not until we had a meeting.

20   Q    What was the meeting?

21   A    The meeting was about, she was concerned that she

22        wanted to look out for me. She didn't have a

23        harassment complaint at all, her mouth, in that

24        meeting. And that she wanted to make sure that we

25        were - that we didn't have - or I didn't say

Page 243

1    A    Not that I recall.

2         Can I take that back? I want to add something

3         to it.

4    Q    Sure.

5    A    He did complaint to me at that time that he knew

6         that her work ethics were not what I would have

7         expected them to be. He said he knew that but he

8         was going to try to make sure that she does her

9         job. This was going to happen after the revamping

10        of what I did.

11   Q    The restructuring.

12   A    Restructuring. But it didn't get – obviously, it

13        didn't get to that point.

14   Q    And he never took any adverse employment action

15        against Regina, correct? No discipline, no write

16        ups, nothing like that?

17   A    Not that I recall. I don't know. I mean, he might

18        have counseled her.

19   Q    That's what he said.

20   A    I'm sure he counseled her. He did say that. He

21        would talk to her about the job that she was doing.

22        He did say that. So that was his form of counseling

23        that he did.

24   Q    And as far as you know, nobody from the county

25        contacted Regina Parks to find out – once you