# Exhibit 2

Page 1

1              UNITED STATES DISTRICT COURT

2              EASTERN DISTRICT OF MICHIGAN

3                   SOUTHERN DIVISION

4

5     REGINA PARKS, an individual,

6              Plaintiff,

7

                              Case No. 25-cv-10409

8     -vs-                    Hon. Judge Shalina D. Kumar

9

10    WAYNE COUNTY, a political subdivision of

11    The State of Michigan, RAPHAEL "RAY"

12    WASHINGTON, in his individual and

13    Official capacities, jointly and severally,

14              Defendants.

15    _____/

16

17         VIDEO DEPOSITION of RAPHAEL WASHINGTON

18

19         Taken by the Plaintiff on the 8th day of September,

20         2025 at Deborah Gordon Law, 33 Bloomfield Hills

21         Parkway, Suite 220, Bloomfield Hills, Michigan 48304

22         commencing at 10:10 a.m.

23

24

25

```
                                              Page 2
 1    APPEARANCES:

 2    For the Plaintiff:       DEBORAH L. GORDON (P27058)

 3                             MORRY D. HUTTON (P81188)

 4                             Deborah Gordon Law

 5                             33 Bloomfield Hills Pwy Ste 220

 6                             Bloomfield Hills, Michigan 48304

 7                             248-258-2500

 8

 9    For the Defendant:       MARIA F. DWYER (P60946)

10    Washington              Clark Hill PLC

11                             500 Woodward Ave., Ste 3500

12                             Detroit, Michigan 48226

13                             313-309-0474

14

15    For the Defendant:       ANGELINA R. DELMASTRO (P81712)

16    Wayne County            Dickinson Wright PLLC

17                             500 Woodward Ave., Ste 4000

18                             Detroit, Michigan 48226

19                             313-223-3500

20

21    Also Present:            Atty. David Melton, Jr.

22                             Mike Gurlides, Videographer

23    Reported By:             Amy Bertin, CER-3871

24                             Certified Electronic Reporter

25                             586-468-2411
```

Page 3

1

2                          TABLE OF CONTENTS

3   WITNESS                                          PAGE

4

5   RAPHAEL "RAY" WASHINGTON

6

7        Examination by Ms. Gordon                    5

8        Examination by Ms. Dwyer                    290

9        Reexamination by Ms. Gordon                 292

10

11  EXHIBITS: (Attached to transcript)        IDENTIFIED

12

13  Plaintiff's Exhibit 1    Instagram Post      101

14  Plaintiff's Exhibit 2    Instagram Post      104

15  Plaintiff's Exhibit 3    Instagram Post      107

16  Plaintiff's Exhibit 4    Instagram Post      109

17  Plaintiff's Exhibit 5    Instagram Post      123

18  Plaintiff's Exhibit 6    Instagram Post      124

19  Plaintiff's Exhibit 7    Instagram Post      125

20

21

22

23

24

25

Page 4

1    Bloomfield Hills, Michigan

2    Monday, September 8, 2025

3    10:10 a.m.

4                    RAPHAEL WASHINGTON

5    was thereupon called as a witness herein, and after

6    having first been duly sworn to tell the truth, the

7    whole truth and nothing but the truth, was examined

8    and testified as follows:

9         THE VIDEOGRAPHER: We are going on the record

10   at 10:10 a.m. on Monday, September 8th, 2025. This

11   is media unit one in the video recorded deposition

12   of Raphael Washington in the matter of Parks v.

13   Wayne County, et al. Filed in the United States

14   District Court, Eastern District of Michigan,

15   Southern Division. Case number 25-cv-10409.

16        This deposition is being held at 33 Bloomfield

17   Hills Parkway in Bloomfield Hills, Michigan. My

18   name is Mike Gurlides, legal videographer. And the

19   court reporter is Amy Bertin. Both representing

20   Veritext.

21        Counsel will now state their appearances and

22   affiliations for the record. If there are any

23   objections to proceeding, please state them at the

24   time of your appearance, beginning with the

25   noticing attorney.

Page 5

1    MS. GORDON: Deborah Gordon on behalf of the
2        plaintiff.
3    MR. HUTTON: Morry Hutton on behalf of the
4        plaintiff.
5    MS. DWYER: Maria Dwyer on behalf of the
6        defendant.
7    MS. DELMASTRO: Lina Delmastro on behalf of
8        defendant Wayne County.
9    MS. GORDON: Okay. We got everybody?
10   MR. MELTON: I'm not counsel of record so.
11   MS. GORDON: Okay. Fair enough. Why don't we
12       just say who is sitting in then.
13   MR. MELTON: David Melton, counsel to the
14       Sheriff, present.
15                       EXAMINATION
16   BY MS. GORDON:
17   Q    Good morning, Sheriff.
18   A    Good morning.
19   Q    I'm Deb Gordon. As you know, I represent Regina
20        Parks. Have you been deposed before?
21   A    Yes.
22   Q    Roughly, how many times?
23   A    Maybe three times.
24   Q    Maybe three?
25   A    Two or three times.

```
                                                      Page 6
 1    Q    Have you been sued before?
 2    A    Personally? I mean, what do -
 3    Q    Well, let's start with personally.
 4    A    No.
 5    Q    Your name has never been on a lawsuit previously?
 6    A    It probably was back in the early '80s.
 7    Q    Well, I asked you if you'd ever been sued before.
 8    A    So I was part of a -
 9    Q    So what's the answer to that?
10    A    I was a Detroit police officer at that time and I
11         was deposed and I had to speak in a court. But it
12         wasn't for me. It wasn't directed at me. I was
13         there when something happened.
14    Q    That's the only time you've been named as a
15         defendant up until this lawsuit?
16    A    That I can recall.
17    Q    Do you have a bad recollection? Do you have a
18         difficult time remembering things?
19    A    No, I don't.
20    Q    You were named as a defendant by Lacey Polderdyke.
21    A    Oh.
22    Q    I mean, it wasn't that long ago, Sheriff.
23    A    Yeah.
24    Q    So, I mean, did you just forget that?
25    A    No. I was going back to -
```

```
                                                      Page 7

 1    Q    Why were you going back? I just asked you if you'd
 2         ever been sued. It was a very simple question and
 3         you said some words.
 4    A    And I'm thinking about the whole time that I've
 5         been in law enforcement.
 6    Q    Well, I was too. I was thinking of the whole time
 7         too.
 8    A    Yeah.
 9    Q    But you didn't mention that to me.
10    A    I didn't think to mention that. It didn't cross my
11         mind. But absolutely I should mention that.
12    Q    Well, let's take a minute. Are there any other
13         times you've been sued? Take a minute that you can
14         think of where your name was on a complaint.
15    A    Okay.
16    Q    How about since you've been sheriff? Have you been
17         named for any wrongdoing while you've been sheriff?
18         Whether it was in your role as sheriff or something
19         else.
20    A    So are you asking me about suing or being mentioned
21         in something?
22    Q    Being a party, named party. As in the Polderdyke
23         matter. And as in this matter, you are a named
24         defendant. Do you understand that?
25    A    So that would be this and the Polderdyke.
```

1    Q    That's it?

2    A    That I can recall, yes.

3    Q    Have you been involved in lawsuits where you have

4         sued someone?

5    A    Not that I recall.

6    Q    What is your current address?

7    A    My home address?

8    Q    Yes.

9              MS. DWYER: I'm just going to designate any

10        portions relating to home address, telephone

11        numbers as confidential pursuant to our protective

12        order.

13             MS. GORDON: Fair enough.

14             MS. DWYER: Thank you, Deb.

15             MS. GORDON: We understand that we don't want

16        this out in the public but just for our record.

17   BY MS. GORDON:

18   Q    So you can go ahead and your lawyer has already

19        taken care of this for you.

20             MS. DWYER: Go ahead and answer.

21             (Confidential portion page 8, line 22.)

22             THE WITNESS: My home address, Confidential Subject to Protective Order


24             (End of confidential portion page 8, line 23.)

25   BY MS. GORDON:

1    Q     And what is your month and year of birth?

2    A     August ▮▮ 1960.

3    Q     And are you married?

4    A     I am.

5    Q     What is your spouse's name?

6    A     Keysha Washington.

7    Q     How long have you been married to Keysha?

8    A     13 years.

9    Q     And did you have any previous marriages?

10   A     Yes.

11   Q     How many?

12   A     Three.

13   Q     And what were the three other marriages? Just give

14         me, if you can give me a first name and a rough

15         date.

16   A     Pam in 1980.

17   Q     Okay.

18   A     Ramona in probably 1986. And Christy, October of

19         1996.

20   Q     Do you have children?

21   A     Yes.

22   Q     How many?

23   A     Two.

24   Q     And your role as sheriff, do you report to the

25         Wayne County Commissioners?

Page 10

```
 1    A    No.
 2    Q    Do you report to anybody?
 3    A    No.
 4    Q    Or any entity, as you understand it?
 5    A    The entity of the County. But I'm elected and I
 6         don't report to them on a regular basis for -
 7    Q    I didn't ask you on a regular basis. But do you
 8         report to the commission?
 9    A    If they want me to come speak to them, I do, yes.
10    Q    And do you have to get any approval from the
11         commission for anything you do in your office of
12         any nature?
13    A    Sometimes.
14    Q    What is your salary or your earnings at the county?
15         How much do you make?
16    A    $170,000.
17    Q    $170?
18    A    Yes.
19    Q    And do you have a car assigned to you or that
20         you're given to use?
21    A    Yes.
22    Q    Is it a marked car, a non-marked car or both?
23    A    An unmarked car.
24    Q    And that's provided to you by the county, gas is
25         paid for, I assume, and so on?
```

```
                                                        Page 11

 1      A    Yes.

 2      Q    What are the major benefits that you get at the

 3           county?

 4      A    Medical.

 5      Q    What else?

 6      A    Dental.

 7      Q    Do you have life insurance?

 8      A    Yes.

 9      Q    Do you have a retirement plan?

10      A    I have a retirement plan.

11      Q    What is your current cell phone number? Let me

12           retract that. How many cell phones, cellular phones

13           or devices do you have in your possession at this

14           time?

15      A    I have two.

16      Q    Let's start with number one. What's number one?

17      A    My work phone.

18      Q    When did you get this work phone?

19      A    When I came into the Sheriff's Office.

20      Q    When was that?

21      A    In 2009.

22      Q    And do you have the same phone today that you had

23           then? I assume you've upgraded perhaps?

24      A    Yeah. They've switched out phones periodically.

25           Probably twice or so.
```

```
                                                    Page 12

 1    Q     So what's the number currently of that phone?
 2              MS. DWYER: And just for the record, we'll deem
 3          this confidential as well.
 4    BY MS. GORDON:
 5    Q     Well, is your work phone number confidential? Don't
 6          you give it to people?
 7    A     I mean, people have it, yes.
 8    Q     Yeah. So I don't -
 9              MS. GORDON: I hear you but I don't know if
10          that's actually - w can take that up later.
11              MS. DWYER: Sure.
12    BY MS. GORDON:
13    Q     What is that number?
14    A     ████████-5170.
15    Q     How long have you had that particular phone number?
16          All along or?
17    A     Since 2009.
18    Q     And what is the current device you use for that?
19          What's the phone make?
20    A     It's an Apple phone.
21    Q     Do you know what number it is?
22    A     I think it's AT&T.
23    Q     What number Apple phone?
24    A     I don't know.
25    Q     Like is it a newer model?
```

Page 13

```
 1    A    It's probably one of the newer models. I don't keep

 2         up with that.

 3    Q    When did you last get a new phone for your work?

 4    A    Not exactly sure but it's probably a year ago or

 5         so. Maybe a little more.

 6    Q    And you've got - is this the county that uses AT&T?

 7    A    Yes.

 8    Q    You can text on that phone, is that correct?

 9    A    Yes.

10    Q    Do you receive email on that phone?

11    A    Yes.

12    Q    You use that phone to communicate with employees of

13         the county, is that correct?

14    A    Yes.

15    Q    And you text with employees of the county, is that

16         correct?

17    A    Occasionally.

18    Q    What other phone do you have?

19    A    I have a personal phone.

20    Q    And what model is that?

21    A    It's a -

22    Q    What's the manufacturer?

23    A    It's a Verizon phone.

24    Q    Is it an Apple?

25    A    No.
```

Page 14

1    Q    What is it?

2    A    Android.

3    Q    And what's the brand?

4    A    The brand name?

5    Q    Yeah. Who manufactures the phone?

6    A    It's Verizon.

7    Q    And how long have you had that phone?

8    A    This particular one?

9    Q    Yeah.

10   A    Probably February of this year.

11   Q    What's the number on that one?

12   A    Phone number?

13        MS. DWYER: Just for the record, I'll deem this

14   confidential.

15        MS. GORDON: Fair enough. Go ahead.

16        (Confidential portion page 14, line 17.)

17        THE WITNESS: ████████-2884.

18        (End of confidential portion page 14, line

19   17.)

20   BY MS. GORDON:

21   Q    How long have you had that number?

22   A    Forever.

23   Q    Forever?

24   A    Decades, yeah.

25   Q    And you use that phone, as I understand it, to text

Page 15

```
 1         with people, is that correct?
 2    A    Personally, yes.
 3    Q    What did you do to get ready for your deposition
 4         today? I assume you talked to legal counsel?
 5    A    Yes.
 6    Q    And when did you talk to legal counsel most
 7         recently?
 8    A    Most recently, this morning.
 9    Q    And did you have a meeting this morning or was it
10         just coming into the building?
11    A    Just coming into the building.
12    Q    So when did you meet with your counsel to get
13         prepped for your dep?
14    A    Last week.
15    Q    What day was that?
16    A    Thursday or Friday. One of the two days.
17    Q    And where did you meet?
18    A    At the Clark Hill office.
19    Q    And how long was the meeting?
20    A    Two hours, three hours.
21    Q    And did you go over documents?
22    A    Yes.
23    Q    What documents do you remember looking at?
24    A    Lawsuit documents.
25    Q    What else? Other than the lawsuit, what did you
```

```
                                                     Page 16

 1        look at?

 2    A   I think everything we were going over was from the

 3        lawsuit.

 4    Q   Have you had any other meetings with counsel other

 5        than that one?

 6    A   Might have been one before that. I think it was one

 7        before that.

 8    Q   How long before?

 9    A   Probably a few weeks or so before last week.

10    Q   And what counsel did you meet with when you met

11        last week or the few other times before?

12    A   Maria Dwyer. And Brian, can't recall his last name

13        right now. Brian.

14    Q   Who else?

15    A   And Lina was present.

16    Q   Did you have in-house counsel with you?

17    A   Yes. David Melton was there.

18    Q   So there was a group of you, is that correct?

19    A   Sure.

20    Q   So you received interrogatories from my office, is

21        that correct?

22    A   Yes.

23    Q   And you received requests to produce, is that

24        correct?

25    A   Requests for what?
```

```
                                                    Page 17
 1    Q    Requests to produce documents, is that correct?
 2    A    Yes.
 3    Q    And were you sent copies of those?
 4    A    I don't recall if I was sent them directly. Depends
 5         on what it was. I'm not sure what you're speaking
 6         of.
 7    Q    Well, what have you seen? What have you seen that
 8         would be requests from us to produce documents?
 9    A    I'm not sure. I'm not sure.
10    Q    Did you get a copy of a document that looks like
11         this? I'm reading onto the record – I'll show you
12         the front page. It says, Defendant's Objections and
13         Responses to Plaintiff's First Set of
14         Interrogatories. It's a written document. Did you
15         receive this document?
16    A    Yes.
17    Q    So this was my first request to the county and to
18         you. And we asked questions in this document. And
19         one of the questions we asked was, who assisted in
20         providing answers. And as I read the document, the
21         county states that with regard to providing answers
22         to these – interrogatories, you may already know
23         this Sheriff, are questions. And the parties send
24         each other questions. And do you understand that
25         that occurs in litigation?
```

```
                                                      Page 18

  1    A    Yes.

  2    Q    I know you're basically on the criminal side. So

  3         I've been told in writing, in the supplemental

  4         response to the first set of interrogatories when

  5         we asked, who provided information to answer the

  6         interrogatories. I asked that question. And the

  7         answer was, defendant Raphael Washington, Wayne

  8         County Sheriff. Okay?

  9    A    Okay.

 10    Q    So do you understand what I'm telling you? You

 11         provided information in response to these questions

 12         we sent over, correct?

 13    A    Okay. Yes.

 14    Q    So when we sent over our interrogatories, we asked,

 15         obviously, for the following information. We asked

 16         on around May 2nd, 2025, I got answers from my

 17         requests. And one of my requests was this. This was

 18         number 10.

 19             Please produce all documents, emails, text

 20         messages and/or other communications sent by, to or

 21         between defendant Ray Washington, Michael Turner,

 22         any other county employee, elected official or any

 23         other employee elected or appointed. Okay?

 24    A    Okay.

 25    Q    And here's the answer I got, Sheriff. The answer I
```

Page 19

```
 1        got to this question, which you participated in
 2        answering was, subject to and without waiving their
 3        specific and general objections, defendants state
 4        they have no documents.
 5   A    Okay.
 6   Q    That's a lie, isn't it?
 7   A    No. I don't - if I said that along with my
 8        attorney -
 9   Q    Sir, I didn't ask you who said it. Stick with me
10        here. These are court documents, sir.
11   A    Okay.
12   Q    That are signed. Okay.
13   A    Okay.
14   Q    And it was a very direct question whether, that we
15        wanted emails and texts between you, Turner and
16        other people.
17   A    M'hm.
18   Q    And your answer that you participated in, according
19        to your response here, was that you have, the
20        county had none. That you had none. I'll read it
21        again. Defendants state they have no documents
22        responsive to number 10.
23            So you did have text messages between you and
24        Turner, correct?
25            MS. DWYER: I'm going to object just to the
```

Page 20

1          extent it calls for legal objections. You read

2          objections that were listed before that answer.

3     BY MS. GORDON:

4     Q    Go ahead. You had texted with Turner.

5               MS. DWYER: Same objection.

6                    THE WITNESS: Throughout the time we've

7          been together, absolutely there were occasions.

8     BY MS. GORDON:

9     Q    Right. And right up until recently, correct?

10    A    I don't know about that at all. I don't recall.

11    Q    Well, sir, I have texts between you and Turner.

12    A    Well, there it is.

13    Q    So there was a lie in your – okay. Don't be shaking

14         your head at me, okay. You just wait and answer

15         because it's distracting. Okay?

16              So, when I asked for these documents, these

17         texts, the answer that was provided to me was false

18         because you did always have texts with people from

19         the county, correct?

20              MS. DWYER: I'm going to place the same

21         objection on the record to the extent that there

22         were objections placed, which you read into the

23         record, prior to that answer.

24              MS. GORDON: Okay. The objection –

25              MS. DWYER: To the extent it calls for a legal

Page 21

1       conclusion and documents were not provided as a

2       result of that.

3              MS. GORDON: Okay. Okay.

4              MS. DELMASTRO: I would like to place on the

5       record an objection that to the extent that you're

6       looking at the supplemental response. The

7       supplemental response indicated that responsive

8       documents were produced at numerous different –

9              MS. GORDON: You know, thanks for helping me

10      out but I was well aware of that. I know exactly

11      what's in the supplement. That was when I talked to

12      counsel for the Sheriff and I told them, your

13      client is being dishonest with you because I know

14      he sent texts, just to help you out.

15             And after I had that conversation, I received

16      the supplement, yes, because the Sheriff got caught

17      in lying. That's what happened, okay? So thank you

18      for helping me out with my own supplement. But I

19      was well aware of that.

20             I don't know if you were on the call or not.

21      Were you?

22             MS. DELMASTRO: Yes, I was on the call.

23             MS. GORDON: Okay. Well, then you must remember

24      me saying, we had a meet and confer. And the issue

25      was that we received no texts. That was one of the

Page 22

```
 1          issues. And you both, counsel here today, told me
 2          that there were no texts. And I said, that's false.
 3          Your client is giving you false information because
 4          I didn't believe the lawyers would be making false
 5          statements. And then you supplemented. So, let's
 6          all be clear about what happened here and how I
 7          wasted my time and I'm now wasting further time
 8          here. Because now I have to listen to this again.
 9          So, I'll just continue, okay? Thank you.
10     BY MS. GORDON:
11     Q    Okay. Sheriff, did you tell your counsel that you
12          had no text messages from any period of time with
13          Turner?
14               MS. DWYER: I'm going to object and instruct
15          the witness not to answer.
16               MS. GORDON: Fair enough.
17               MS. DWYER: That's attorney-client privileged
18          communications. If I could just get my objection on
19          the record.
20               MS. GORDON: Okay. I understand it.
21     BY MS. GORDON:
22     Q    So were you - did you ever look for text messages
23          on your phones? Were you asked to look for text
24          messages?
25     A    No.
```

Page 23

1   Q    Sitting here today, have you ever been asked to
2        look for text messages?
3   A    To look for text messages for who?
4   Q    Well, let's start with Mr. Turner.
5   A    No. I was never asked to look for text messages.
6   Q    Well, were you asked to produce text messages?
7   A    I gave my phone up to my attorneys.
8   Q    And when was that?
9   A    A month or two ago.
10  Q    And then what phone or phones did you give to your
11       counsel?
12  A    My work phone.
13  Q    How about your personal phone?
14  A    No.
15  Q    You text with employees on your personal phone,
16       don't you?
17  A    No.
18  Q    Sir, I have texts from you.
19  A    For work?
20  Q    I said, you text with employees on your personal
21       phone. That was my question.
22  A    Occasionally, yes.
23  Q    So there are texts on that personal line to and
24       from employees of the county and you. I know that
25       because I've seen them.

Page 24

1    A    Okay.

2    Q    So why did you just tell me no?

3    A    I didn't just tell you no.

4    Q    You didn't turn over your personal phone to your

5         counsel, correct?

6    A    Correct.

7    Q    Even though there is potentially relevant

8         information on your personal phone because you do

9         text from your personal phone number.

10            MS. DWYER: I'm going to object to the extent

11        it calls for –

12            MS. GORDON: I'm not done yet. I'm not done

13        yet.

14   BY MS. GORDON:

15   Q    You do text from your personal phone number, which

16        is ███████-2884 with employees of the county from

17        time to time.

18            MS. DWYER: If I could just put my

19        objection on the record. Objection to the extent it

20        calls for a legal conclusion. Also, to place that –

21        you asked for relevant information and so I'm

22        objecting to the extent it calls for a legal

23        conclusion. And I'm also placing that phone number

24        once again –

25            MS. GORDON: Okay.

Page 25

1           MS. DWYER: Can I finish my objection?

2           MS. GORDON: Yes, you can. I thought you were

3       done. I was not looking at you.

4           MS. DWYER: I was not. And to the extent that

5       the telephone number should be deemed confidential

6       on the record.

7           MS. GORDON: Okay.

8           (Confidential portion page 24, line 16.)

9   BY MS. GORDON:

10  Q    Have you taken the position in this case that your

11       personal phone does not have relevant texts on it?

12       Is that the position you're taking here?

13  A    Relevant texts to what?

14          MS. DWYER: I'm going to object again to the

15       extent it calls for a legal conclusion.

16          MS. GORDON: It doesn't call for a legal

17       conclusion.

18          MS. DWYER: Relevancy is a l0egal term of art.

19       So we can debate that but -

20          MS. GORDON: So I'll go back to -

21          MS. DWYER: If I could just please finish.

22          MS. GORDON: Okay. You're just doing a lot of

23       talking. We're going to be here a long time.

24          MS. DWYER: I'm placing my objection on the

25       Record which is why I'm here today.

Page 26

1           MS. GORDON: You're trying to protect your
2       client from what he's saying.
3           MS. DWYER: I'm not. To the extent - if I can
4       finish.
5           MS. GORDON: Please do.
6           MS. DWYER: To the extent it calls for a legal
7       conclusion. Thank you.
8           MS. GORDON: It does not call for a legal
9       conclusion.
10  BY MS. GORDON:
11  Q    You assisted in providing, you provided information
12       in response to discovery answers. You are a named
13       defendant in this case. Do you understand you have
14       a responsibility to turn over any evidence that
15       might be relevant in this case that you are asked
16       to produce? Do you understand that?
17           MS. DWYER: I'm still going to place an
18       objection on the record as it relates to the term
19       of art relevancy and to the extent -
20           MS. GORDON: You can have a standing objection
21       on that.
22           MS. DWYER: I'll just go ahead and - but thank
23       you.
24  BY MS. GORDON:
25  Q    Go ahead. Do you understand that?

Page 27

```
 1    A    Yes. I understand what you're saying.
 2    Q    Have you provided any text messages as evidence in
 3         this case from your personal phone?
 4              MS. DWYER: Asked and answered.
 5    BY MS. GORDON:
 6    Q    Go ahead.
 7    A    No.
 8    Q    We noticed your deposition for June 5th, 2025. What
 9         were you doing on June 5th, 2025?
10    A    I have no idea.
11    Q    Do you keep a calendar, Sheriff?
12    A    Yes.
13    Q    What kind of a calendar?
14    A    A work calendar.
15    Q    I'm sorry?
16    A    A work calendar.
17    Q    And what type of a calendar system do you use?
18    A    It's on my work phone.
19    Q    Is that a Microsoft calendar? Does it come on your
20         Apple phone, on your work phone?
21    A    It comes on my work phone.
22    Q    And who puts entries into your work phone?
23    A    My executive assistant, Rashaun Whitehead.
24    Q    So, I was told you were unavailable for a
25         deposition on June 5th. Do you have any knowledge
```

Page 28

```
 1         sitting here today of you not being available on
 2         June 5th?
 3              MS. DWYER: I'm just going to object to the
 4         extent it misrepresents the record evidence. But go
 5         ahead and answer.
 6    BY MS. GORDON:
 7    Q    Go ahead.
 8              MS. DWYER: If you could let me just finish my
 9         objection, that would be helpful.
10    BY MS. GORDON:
11    Q    Go ahead.
12    A    On June 5th?
13    Q    Yes. Were you in town on June 5th, 2025?
14    A    I have no idea. I don't know.
15    Q    So have you been out of town during the summer?
16    A    Occasionally, yes.
17    Q    And vacation out of town or something else?
18    A    Conferences.
19    Q    What conferences did you attend this summer?
20    A    A religious conference.
21    Q    And what was that?
22    A    That was in July.
23    Q    How long were you gone?
24    A    A week.
25    Q    And what week was that?
```

```
                                                    Page 29

1    A    I'd have to look at the calendar but it is

2         something like the 22nd to 29th, something to that

3         effect.

4    Q    Any other trips this summer?

5    A    I'm thinking about July. It was a Mackinac trip

6         this summer or late - early summer.

7    Q    Was this a personal trip?

8    A    No.

9    Q    Was it the Mackinac conference?

10   A    Yes.

11   Q    And you attended that?

12   A    Yes.

13   Q    Do you remember what month that was?

14   A    Not really. I would have to say probably May. I

15        think they're usually around that time.

16   Q    Yeah, okay. And anything, any other trips that you

17        can think of?

18   A    Not offhand. I'm sure there may have been something

19        but I don't know offhand.

20   Q    Do you know why you wouldn't have been available

21        for a deposition on July 1, 2025?

22             MS. DWYER: I'm going to object again to the -

23   BY MS. GORDON:

24   Q    Sitting here today, do you know of a reason why?

25             MS. DWYER: I'm going to object to the extent
```

```
                                                    Page 30
 1        it misrepresents the communications and record

 2        evidence.

 3   BY MS. GORDON:

 4   Q    Go ahead.

 5              MS. DWYER: Go ahead and answer.

 6              THE WITNESS: Not offhand.

 7   BY MS. GORDON:

 8   Q    Do you know of any reason you wouldn't have been

 9        available on August 13, 2025 for a deposition?

10              MS. DWYER: Same objection.

11   BY MS. GORDON:

12   Q    Do you know of any reason you wouldn't have been?

13   A    Not that I can recall.

14   Q    When were you - give me a brief review of your last

15        educational experience. High school, college, some

16        other program?

17   A    College.

18   Q    And when was that?

19   A    2021 or '22.

20   Q    And that was after you were already employed?

21   A    Yes.

22   Q    Where did you go to high school?

23   A    Henry Ford High School.

24   Q    And what year did you graduate?

25   A    1978.
```

Page 31

```
 1   Q    What was your first regular full-time employment
 2        after that?
 3   A    After high school?
 4   Q    Yeah.
 5   A    Wayne County Sheriff's Office.
 6   Q    When did you join the Sheriff's Office?
 7   A    1983.
 8   Q    Had you worked at any other police enforcement
 9        entities prior to that time?
10   A    I was on Michigan National Guard part-time.
11   Q    And how long were you at the Sheriff's Office
12        beginning in 1983?
13   A    Till 1985.
14   Q    And why did you leave in '85?
15   A    Because Detroit Police Department called me to come
16        work for them and I went.
17   Q    And did you go there in '85?
18   A    Yes.
19   Q    And how long were you there?
20   A    Till 2009.
21   Q    And what was your highest rank at Detroit?
22   A    Inspector.
23   Q    Were you investigated for any wrongdoing while you
24        were at the DPD?
25   A    I was investigated for some alleged situations.
```

Carroll Reporting & Video
A Veritext Company
www.veritext.com                                              586-468-2411
                                                             www.veritext.com

```
                                                    Page 32

 1   Q    What were the alleged situations? Sexual

 2        harassment?

 3   A    It was several, actually.

 4   Q    What do you recall? One was sexual. At least one

 5        was sexual harassment, is that correct?

 6   A    Yes.

 7   Q    And some other officers accused you of sexual

 8        harassment?

 9   A    Other officers?

10   Q    Yeah. That's what the investigation at the DPD was.

11   A    It was about, from what I remember it was a

12        civilian. Civilian.

13   Q    What did the civilian allege?

14   A    That she came to my office and I asked, I told her

15        I wanted to see her panties or something.

16   Q    And that was investigated?

17   A    Oh, sure.

18   Q    What else?

19   A    Unfounded.

20   Q    And what else were you investigated for at the DPD?

21   A    A family situation.

22   Q    And what was the family situation? Was this with

23        your ex-wife?

24   A    Yes.

25   Q    And you were peeping into her windows, is that
```

Page 33

| | | |
|---|---|---|
| 1 | | correct? |
| 2 | A | That was alleged. |
| 3 | Q | And what was the allegation? |
| 4 | A | That I was peeping in her window and I was actually |
| 5 | | picking up my son. |
| 6 | Q | Which wife was this, what was her name? |
| 7 | A | Ramona. |
| 8 | Q | And did she file a police report? |
| 9 | A | She did. She didn't follow it up. |
| 10 | Q | She dropped it. |
| 11 | A | From what I'm told. |
| 12 | Q | And did the DPD investigate that? |
| 13 | A | Sure. |
| 14 | Q | What else do you recall? |
| 15 | A | And they found it to be unfounded. |
| 16 | Q | Is that in writing somewhere? |
| 17 | A | From what I saw. |
| 18 | Q | You didn't peep in her window? |
| 19 | A | Yeah. No. I don't, I'm telling, I'm saying it was |
| 20 | | investigated. |
| 21 | Q | Did you give a statement? |
| 22 | A | And it was found to be unfounded. |
| 23 | Q | Did you give a statement? |
| 24 | A | Sure. |
| 25 | Q | Was it an IA, Internal Affairs investigation? |

Page 34

```
 1    A    Internal Affairs.

 2    Q    Were you recorded?

 3    A    I'm sure. It probably was if that's their

 4         procedure.

 5    Q    What else were you investigated for at the DPD?

 6    A    Let me make sure I think about this.

 7    Q    Sure. Take your time.

 8    A    That's what I recall.

 9    Q    There may be others but this is all you're

10         recalling right now?

11    A    That's what I'm recalling from Detroit, yes.

12    Q    So what was your rank at the Detroit? What was your

13         highest rank?

14    A    Inspector.

15              MS. DWYER: Asked and answered.

16    BY MS. GORDON:

17    Q    And did you ever get demoted from that position?

18    A    Never.

19    Q    And when did you leave Detroit?

20    A    In 2009.

21    Q    And why did you leave?

22    A    I was asked to come to the Sheriff's Office when

23         Benny Napoleon was appointed sheriff.

24    Q    Had you known Benny Napoleon previously?

25    A    Sure.
```

```
                                                    Page 35

 1    Q    And how long did you know him?

 2    A    Probably my entire time being at Detroit.

 3    Q    And so you returned to the county when?

 4    A    In 2009.

 5    Q    Do you remember the month or?

 6    A    July.

 7    Q    What did you come in as at that time?

 8    A    Chief.

 9    Q    Chief of what?

10    A    Chief of Operations.

11    Q    And who did you report to?

12    A    I would have to say the undersheriff. And there was

13         another chief there as well, Eric Smith. So I was

14         reporting up to them.

15    Q    And how long did you hold that title?

16    A    Till about -

17    Q    Roughly.

18    A    Yeah. I'm trying to see. It was 2009 I came in.

19         2012, 2013. Maybe somewhere around '12 or '13.

20    Q    What happened then?

21    A    We had - from what I was told from Benny Napoleon

22         was that he was making some changes around. He

23         wanted to put somebody else in the chief position,

24         put me in a deputy chief position and that's what

25         he did.
```

1    Q     Were you working at the jail at that time?

2    A     Yes.

3    Q     That's when you were assigned to the jail?

4    A     No. I think I had - it might have been about that

5          time.

6    Q     And that was a demotion, wasn't it?

7    A     Not according to Benny Napoleon. I didn't lose any

8          money.

9    Q     Well, that was a lower rank though, correct?

10   A     It's a lower rank than - it's the next rank from

11         chief.

12   Q     And that was because of some behavioral or conduct

13         problems you'd been accused of?

14   A     That's not what he told me.

15               MS. DWYER: You have to let me put my

16         objection.

17               MS. GORDON: Sure.

18               MS. DWYER: Objection to the extent it

19         misrepresents the record.

20               MS. GORDON: Okay. What record does it

21          misrepresent? There's no record that it

22         misrepresents.

23               MS. DWYER: It does.

24   BY MS. GORDON:

25   Q     Were you transferred to Hamtramck at some point?

Page 37

```
 1    A    Yeah. To work over at Hamtramck.
 2    Q    And where had you been working before you went to
 3         Hamtramck? Or transferred to Hamtramck?
 4    A    I might have been at the, at that point at our
 5         office building.
 6    Q    The main office building.
 7    A    The main office building.
 8    Q    So you were moved out of the main office building
 9         into the Hamtramck location?
10    A    Yeah. My position saw that I needed to do that, to
11         command that area over there.
12    Q    And at that time you'd had complaints about sexual
13         harassment made against you, hadn't you?
14    A    When I was moved?
15    Q    Yep. Before that.
16    A    I don't - I -
17    Q    Excuse me, sir. Before you were moved, correct?
18    A    I'm not sure about the timing that you're talking
19         about.
20    Q    So at or around or before the time you were moved
21         to Hamtramck, some people had made allegations
22         against you, correct?
23    A    Yeah. I don't think it was the time before I was
24         moved. It was not.
25    Q    When do you think the time was?
```

Page 38

1   A   Matter of fact, I was moved because he wanted to

2       put - the sheriff wanted to make some changes. And

3       he put someone else in the chief spot. And he said,

4       I'm going to put you in a deputy chief spot. And

5       you're not going to lose any pay. I just need you

6       to go over there and do that.

7   Q   But there were allegations that were made against

8       you?

9   A   Not that I recall before that, no.

10  Q   But you remember them shortly around that time?

11  A   It may have been after that. But it wasn't that. He

12      never said anything about that.

13  Q   But you're not a hundred percent sure of when the

14      allegations were made in juxtaposition with you

15      being moved, correct?

16  A   I do want to say it had to be after that. Because

17      he never said that during the time that he asked me

18      to go to Hamtramck to command that so he could put

19      another guy in that position.

20  Q   And when were you transferred to Hamtramck?

21  A   Can't give you the exact dates but.

22  Q   Well, give me a rough idea.

23  A   It was a time during when there was a major

24      funeral. A young man who was killed in Dallas. He

25      was working at Dallas Police Department. He was

Page 39

```
 1            killed. He used to be in the Sheriff's Office. It
 2            was right around that time the funeral came back to
 3            our agency to handle. And it was around that time
 4            but I can't give you dates. I just don't keep those
 5            kind of dates in my head.
 6   Q   Can you give me a year?
 7   A   I would be guessing.
 8   Q   Give me an idea. Just a range. Roughly, what period
 9            of time are we in here?
10   A   Maybe '15, '16. I don't know. '14. I'm just not
11            sure about the dates. But you can find that date
12            based on when that funeral was.
13   Q   So after you're moved to Hamtramck, what's the next
14            thing that happened to you with regard to your
15            position at the county?
16   A   You mean as a rank or something?
17   Q   What's the next - you made another move. You didn't
18            remain at Hamtramck. What happened next?
19            Do you not understand the question?
20   A   No. I understand the question. I'm trying to figure
21            out this move that you're talking about after
22            Hamtramck.
23   Q   I'll restate. I'll restate, Sheriff. I'll restate.
24            What was your job, what was your rank when you
25            were transferred to Hamtramck?
```

Page 40

1              MS. DWYER:  Asked and answered.

2              THE WITNESS: Deputy chief.

3    BY MS. GORDON:

4    Q    You were made deputy chief. And then you got a

5         different title, is that correct?

6    A    After deputy chief?

7    Q    Yes.

8    A    With the Sheriff's Office?

9    Q    Sir, I'm just going through your ranks.

10   A    I'm trying to understand you.

11   Q    Okay. Well, it's pretty clear. I'm just asking you

12        what your various titles have been.

13             MS. DWYER: Objection. Argumentative. He's

14        asking for clarification as to – it's appropriate.

15             MS. GORDON: No, he's not.

16             MS. DWYER: It is appropriate.

17             MS. GORDON: I didn't say it wasn't

18        appropriate.

19   BY MS. GORDON:

20   Q    So let's start from the beginning. When you were

21        hired at the sheriff, from the sheriff your first

22        title was what?

23   A    Chief.

24   Q    Deputy chief, chief, same thing?

25   A    No, two different ranks.

```
                                                    Page 41
  1    Q    So what was your title when you got hired in?
  2    A    Chief.
  3    Q    Chief of what?
  4    A    Operations.
  5    Q    And you reported to who in that?
  6    A    Again, it got to be the undersheriff and there was
  7         an executive chief.
  8    Q    And then your next position or next title after
  9         that was what?
 10    A    Deputy Chief.
 11    Q    And was this the title you had when you were moved
 12         to Hamtramck?
 13    A    Yes.
 14    Q    How long did you remain deputy chief after that?
 15         What was the next change?
 16    A    After deputy chief, I was appointed to sheriff.
 17    Q    And that was when?
 18    A    In January of '21.
 19    Q    And that was after the death of Benny Napoleon?
 20    A    Yes.
 21    Q    And you then ran in a special election? There was a
 22         special election, is that correct?
 23    A    In '22.
 24    Q    And then there was a regular election in '24. When
 25         did you first meet officer or Deputy Turner?
```

Page 42

```
 1   A    I met - he was chief of staff and I met him before
 2        we both went into the Sheriff's Office.
 3   Q    Did you know him from the DPD?
 4   A    No.
 5   Q    How did you know him?
 6   A    Various outings, golf outings, things like that,
 7        yeah.
 8   Q    Was he at the Sheriff's Department when you arrived
 9        there?
10   A    No. We walked in together.
11   Q    You arrived, both came on board at the same time?
12   A    Yes.
13   Q    And what was his title?
14   A    Chief of staff.
15   Q    And you worked closely with him ever since you both
16        joined the Sheriff's Department, correct? At Wayne
17        County Sheriff?
18             MS. DWYER: Objection to form.
19             THE WITNESS: I wouldn't - yeah. Closely, I
20        don't - I don't - I wouldn't say closely. I had a
21        job to do, he had a job to do and they both -
22   BY MS. GORDON:
23   Q    You worked together, correct?
24   A    We worked in the same building.
25   Q    Were you two friends?
```

Page 43

1    A    Friendly.

2    Q    Did you socialize periodically?

3    A    Infrequently. If there was different situations

4         going on in the office, fundraisers, things going

5         on, Christmas time events, things like that.

6    Q    Did you ever go out for a drink, out for dinner or

7         coffee?

8    A    Went to lunch occasionally.

9    Q    And you texted him often, correct?

10   A    No.

11   Q    How often?

12   A    I'm not sure.

13   Q    Was this on your personal phone and your work

14        phone?

15   A    Mainly on my work phone. We talked work situations.

16   Q    As far as you know, in that you were involved in

17        this response to my request for documents, have you

18        produced any text messages from your personal phone

19        in this case?

20   A    As far as I know, no.

21   Q    Were you investigated at the Sheriff's Department

22        for anything?

23            MS. DWYER: Objection to form.  Go ahead.

24   BY MS. GORDON:

25   Q    You can answer. Were you investigated?

Page 44

1    A    Could you repeat? Say that again. I don't -

2    Q    Were you investigated at the Sheriff's Department?

3    A    Sure.

4         MS. DWYER: Same objection.

5         THE WITNESS: When this Polderdyke situation

6         came up.

7    BY MS. GORDON:

8    Q    And who was Lacey Polderdyke?

9    A    Who was she or who was - what did - I don't

10        understand what you're saying.

11   Q    What was her title, what was her role?

12   A    I believe she was a deputy.

13   Q    You sought massages from her, is that correct?

14   A    No.

15        MS. DWYER: Objection. Assumes facts not in -

16   BY MS. GORDON:

17   Q    She said you sought -

18        MS. DWYER: Can I put my objection on the

19        record? Assumes facts not in evidence.

20        MS. GORDON: I don't know where the facts are

21        not in evidence, but okay.

22        MS. DWYER: They are allegations.

23        MS. GORDON: That's got nothing to do with this

24        case. There was a Federal lawsuit filed. So if you

25        mean, assumes facts not in evidence vis-a-vis the

Page 45

1    Federal lawsuit that the county settled and paid
2    money, that's fine. But that's got nothing to do
3    with this case. So there's no evidence in this case
4    one way or another. I'm just asking questions here.
5    If you're denying this ever happened, you can deny
6    that elsewhere. But I don't think that this dep is
7    the place.
8         MS. DWYER: I can put my objections for the
9    record.
10        MS. GORDON: Well, I heard them. I heard them.
11        Well, it's - to say, facts not in evidence
12   here does not mean anything. I'm going to ask the
13   questions of the Sheriff and we'll find out.
14        MS. DWYER: And I'll put my objection on the
15   record.
16        MS. GORDON: Okay. Because you're just trying
17   to coach the witness. That's what you're doing.
18        MS. DWYER: I'm not doing that.
19        MS. GORDON: Of course you are.
20        MS. DWYER: It's inappropriate to make that
21   suggestion.
22        MS. GORDON: Well, okay. I'm not going to get
23   into an argument with you, Lina. But it's pretty
24   obvious.
25        MS. DWYER: I'm Maria Dwyer.

Page 46

```
 1           MS. GORDON: I apologize, Maria. I'm used to
 2       talking to Lina.
 3   BY MS. GORDON:
 4   Q    Let me keep going here, Sheriff. She claimed that
 5       you sought massages from her. Do you recall that in
 6       her lawsuit?
 7   A    No.
 8   Q    Did you read her lawsuit?
 9   A    Oh, you said DID I recall in the lawsuit that she
10       said that.
11   Q    Yes. That's what I asked you.
12   A    I do.
13   Q    And had you worked with her?
14   A    No.
15   Q    Did you know Lacey Polderdyke?
16   A    I know of her. I knew of her.
17   Q    Did you ever have any interaction with her, sir?
18   A    Occasionally.
19   Q    And in what capacity would that have been?
20   A    We worked in the same building.
21   Q    And as you recall, what was her rank or title?
22   A    I believe her rank was a deputy.
23   Q    And at that time, you would have been in her chain
24       of command, is that correct?
25   A    No. She didn't report to me in my chain of command.
```

Page 47

1   Q   So she claimed that you asked her for massages. In

2        your response to her complaint - well, strike that.

3        Let me keep going.

4        And then do you remember that she left the

5        county at some point and returned?

6   A   So you don't want to go back to the massage piece.

7        You asked me about a massage, right?

8   Q   I asked you - I think I got my answer.

9   A   I didn't answer that.

10   Q   I don't know what you think I asked you but I've

11        gotten whatever I needed so I'm moving on.

12        So she left the county, is that correct? And

13        then returned?

14   A   Sure. Yes.

15   Q   And when she returned, she asked that her name be

16        added to a list of those that - of those people who

17        wanted to work in court. Do you recall that?

18   A   Yes.

19   Q   And she asked you that, didn't she?

20   A   She asked me would I transfer her back there.

21   Q   Right.

22   A   Or would I transfer her there.

23   Q   And you said you would as soon as she gave you

24        another - if she gave you a massage.

25   A   I don't recall it being that language.

Page 48

```
 1    Q    What do you recall the language being, sir?
 2    A    I said, she needed to do her job. And she would
 3         possibly be back there. It was not give me a
 4         massage and you'll get back there. Absolutely not.
 5    Q    Well, she said that was what you said, correct?
 6    A    She said a lot of things.
 7    Q    So she's a liar?
 8    A    I don't know. I'm telling you, I did not say that.
 9    Q    Is she a liar?
10    A    I don't know what she is. I'm telling you that I
11         did not say what you said she said.
12    Q    But she's saying these things to you, about you,
13         which could tarnish your reputation, correct?
14    A    It could.
15    Q    But you're not saying she's a liar?
16    A    I can't say that I can control what anybody says.
17    Q    And she texted you and said, can I be put on the
18         court list, court since I have a start date? And
19         you say, as soon as I get my massage. And then she
20         says, you better do some deputy training and read
21         the quid pro quo section. Remember her texting you
22         that?
23    A    Sure.
24    Q    So then she is texting you that you told her you'll
25         put her on the list as soon as you get your
```

Page 49

```
 1          massage.
 2    A     Can you keep reading that? Because there's some
 3          things that's going to help you with that,
 4          understanding the back and forth that we had in a
 5          friendly manner. So if you keep reading that and I
 6          would hope that you would.
 7    Q     So you're familiar with the text?
 8    A     I said I was.
 9    Q     So when I asked you earlier in this dep, Ms.
10          Polderdyke wanted to be on the list to go back to
11          the courts and that you said she would have to give
12          you a massage first, you denied that.
13    A     I don't know that I said -
14    Q     Sheriff, Sheriff, Sheriff.
15    A     I did not say that I would give her a massage
16          first.
17    Q     Please don't - hang on. Sir.
18    A     She would give me a massage first.
19    Q     Please. You can't talk over me. We have a -
20    A     I'm just trying to answer your question.
21    Q     Now, just listen to the question.
22    A     I did.
23    Q     A few minutes ago in the deposition I asked you,
24          Lucy Polderdyke returned, or Lacey, and she asked
25          you if she could go back to courts. And that you
```

Page 50

1    said, you would put her on the list after she gave

2    you a massage. You denied that to me here on the

3    record under oath. You denied that that happened.

4  A  No, I didn't deny that happened.

5  Q  Okay. Well, the record will speak for itself.

6  A  Uh-huh.

7  Q  Okay. So Ms. Polderdyke came back, wanted to be on

8    the list for the courts.

9  A  M'hm.

10 Q  And you said you would put her on the list after

11   she gave you a massage. Is that accurate?

12 A  I don't know that that's accurate or not word for

13   word.

14 Q  How about the general concept?

15 A  General concept, yes.

16 Q  That you told her, I'll put you on the list after

17   you give me the massage. Something to that effect.

18 A  Something to that effect.

19 Q  And then she said back to you, you better get some

20   quid pro quo sexual harassment training, correct?

21 A  I don't know if says sexual harassment training at

22   all. It said something about a quid pro quo.

23 Q  Do you know what quid pro quo is?

24 A  Sure. That you do something for me, I do something

25   for you.

Page 51

```
 1   Q   Right. And in sexual harassment law there is, it's
 2       a particular term where that's a type of
 3       harassment. Quid pro quo, you do a sexual favor for
 4       me and I'll do this for you.
 5   A   I would not ask for any kind of sexual favor from
 6       her at all.
 7   Q   So is it inappropriate to ask for a subordinate to
 8       give you a massage?
 9   A   You have to keep reading it and you'll understand.
10   Q   I didn't ask you - to keep reading it. I asked you,
11       is it inappropriate for a chief -
12   A   Depends on the -
13   Q   Sir, I was still talking.
14   A   Go ahead.
15   Q   Is it inappropriate for a chief to ask a
16       subordinate, female subordinate, for a massage?
17   A   It would be.
18   Q   And you did that.
19   A   Depending on the relationship and the content of
20       what it was, what we were both speaking to each
21       other about. If you keep reading that, you will see
22       that.
23   Q   And what will I see?
24   A   You'll see that it was a back-and-forth banter,
25       laughing at each other about what we were saying.
```

Page 52

1    Q    But it wasn't so funny to her because she later

2         sued you, sir. Correct?

3    A    Yeah.

4    Q    About this banter.

5    A    It was funny to her.

6    Q    Oh, was it so funny that -

7    A    She laughed at it.

8    Q    So funny that she filed a lawsuit?

9    A    You have to ask her about that.

10   Q    I've got her papers.

11   A    You have to ask her about it.

12   Q    Now, Turner then called her and said, don't do

13        anything stupid about this text with the Sheriff

14        about the massage, correct?

15   A    I don't know anything about that.

16   Q    Didn't she allege that in her complaint?

17   A    May have. I'm not, I don't know her complaint word

18        for word.

19   Q    Well, okay. She alleges that Defendant Turner

20        called Deputy Polderdyke. He said he and Defendant

21        Washington have been told she saved Defendant

22        Washington's sexually harassing text messages.

23        Defendant Turner said he was calling her that night

24        to make sure she did not "do anything stupid."

25            Do you remember Turner, you asking Turner to

Page 53

1          call her?

2     A    Absolutely not.

3     Q    You don't deny that Ms. Polderdyke has said this,

4          correct? You don't deny that?

5     A    If it's in the lawsuit that that's what she said,

6          that's what she said.

7     Q    So you had Turner call her. According to her.

8          According to her, you had Turner call her and say

9          don't do anything stupid.

10    A    I didn't have Turner call anyone.

11    Q    You don't deny he called her?

12    A    I don't know if he called her or not.

13         MS. DWYER: Objection. Foundation. How would he

14         know if called.

15         THE WITNESS: I don't know if he called her or

16         not.

17    BY MS. GORDON:

18    Q    Fair enough. Well, that's fine.

19    A    Yeah, I don't.

20    Q    You can't deny it one way or another, right?

21    A    I don't – yeah.

22    Q    Have you ever asked him about that? You ever ask

23         him, hey, you know, somebody – I heard that you

24         called her. Did you call her?

25    A    Not that I recall. I haven't asked him that.

Page 54

1    Q    Okay. Well, let's keep going and see what happened,

2          what else happened there. Who's Dunlap at this

3          time? Who was Dunlap?

4    A    He's a chief now but I think he was another rank at

5          that time.

6    Q    And you knew him, correct?

7    A    Sure.

8    Q    So Ms. Polderdyke or Officer Polderdyke's boyfriend

9          worked for the county, is that correct? You learned

10        that at some point?

11   A    I don't recall the guy's name.

12   Q    I know. But you remember she had a boyfriend or

13        something, correct?

14   A    She never told me that.

15   Q    You learned about it though, correct?

16   A    I learned that it possibly was a guy that worked in

17        our agency that she had. But she never talked about

18        who her boyfriends were.

19   Q    Well, actually, sir, on May 13, you and Dunlap met

20        with her boyfriend, didn't you?

21   A    We met with someone. He never said he was her

22        boyfriend.

23   Q    Somebody that knew Lacey Polderdyke, you met with

24        this guy, correct?

25   A    Yes.

Page 55

```
 1   Q   And he was a subordinate to you, is that correct?
 2   A   Yes, to me and Dunlap.
 3   Q   Right. And he was questioned about the text
 4       messages between you and Ms. Polderdyke, correct?
 5   A   I don't recall that.
 6   Q   Well, what else would you have been meeting with
 7       him for?
 8   A   First of all, I think he was meeting with Dunlap
 9       about whatever they were meeting about and Dunlap
10       asked me to come into the meeting.
11   Q   So you remember what it was?
12   A   Not directly, I do not. Dunlap met with, often met
13       with - and I believe he was a union person. And
14       Dunlap was talking with him about union matters as
15       well.
16   Q   Well, according to Ms. Polderdyke, after her
17       boyfriend left Dunlap's office, you called
18       Polderdyke and told her these text messages are
19       coming up again. Remember that?
20   A   If I said that, I said it. But I don't necessarily
21       remember.
22   Q   You just don't remember it today?
23   A   I don't remember the content of what he was talking
24       about, unless I said that.
25   Q   You're not denying it, though, correct?
```

```
                                                    Page 56
 1    A    Denying?
 2    Q    That you called her and said, hey, you're bringing
 3         these text messages of up again. You don't deny
 4         that, do you?
 5    A    No, I don't deny that. I probably said that.
 6    Q    And you talked to Polderdyke again and told her she
 7         needs to drop this issue with the text messages,
 8         correct?
 9    A    I never remembered - I don't remember that at all.
10    Q    You said, you need to make it go away. Do you
11         remember that?
12    A    I never remember saying that at all.
13    Q    And Ms. Polderdyke did not get a job in the courts,
14         did she?
15    A    I'm not sure.
16    Q    And she filed a lawsuit, is that correct?
17    A    Yes.
18    Q    On or around June, in June of 2017, is that right?
19    A    Somewhere in that area.
20    Q    And she named you as a defendant, is that right?
21    A    Yes.
22    Q    Is she a person that you believe to be a liar?
23              MS. DWYER: Objection. Form.
24              THE WITNESS: She's someone who if - I'll let
25         you - I'll answer that for you. She's someone who
```

Carroll Reporting & Video
www.veritext.com          A Veritext Company
586-468-2411
www.veritext.com

Page 57

```
 1          apologized to me for doing what she did because she
 2          said she shouldn't have. Now that can make her
 3          whatever you want to make her.
 4    BY MS. GORDON:
 5    Q     Now, when did she apologize to you for that?
 6    A     At Lee Smith's funeral, a guy that was killed. He
 7          was getting ready to retire. He was killed. And
 8          that funeral was at my church. And I have to look
 9          over all of that prior to the funeral. And she said
10          that to me. She said it to me that she was sorry
11          for that happening and she was forced to do it.
12    Q     Forced to do what?
13    A     Say whatever she said to cause a lawsuit. She said
14          that.
15    Q     She told you - is this after the lawsuit?
16    A     Yes.
17    Q     And after the lawsuit was settled?
18    A     Don't quite know if it was settled at that point
19          but it was during that time.
20    Q     So you're telling me a law enforcement officer told
21          you she was sorry she filed the lawsuit. Did she
22          tell you she'd made false allegations against you?
23    A     She did not say that. She did say she was forced to
24          do that through her union leadership.
25    Q     She couldn't have said that.
```

Page 58

1    A    That is exactly what she said.

2    Q    Well, you know, we'll take her dep.

3    A    Okay.

4    Q    Now, she was supposed to be involved in this

5         funeral you're talking about, is that correct?

6    A    Yes.

7    Q    She played a role?

8    A    Yes.

9    Q    And she alleged that at the funeral you sat next to

10        her, is that correct?

11   A    No.

12   Q    At the meeting for the funeral, you sat next to

13        her.

14   A    Yes.

15   Q    And she alleged that you intentionally sat close to

16        her in order to rub her thigh. Do you recall her

17        saying that?

18   A    Absolutely not.

19   Q    I said, do you recall her saying that?

20   A    In her -

21             MS. DWYER: Asked and answered.

22             THE WITNESS: I don't remember her saying that.

23   BY MS. GORDON:

24   Q    In her grievance.

25   A    You're saying to me or what?

Page 59

1    Q    No, in her lawsuit.

2    A    She could have. Again, I don't know her lawsuit

3         word for word.

4    Q    And that you moved your chair to look at her. Do

5         you remember her saying that in her lawsuit?

6    A    I do not.

7    Q    And that you talked to her afterward about her

8         performance? You were giving her criticism about

9         her performance?

10   A    I was not. Robert Dunlap spoke to her after her

11        performance. I never spoke to her after the

12        meeting.

13   Q    And the case settled in 2018?

14   A    Yeah, it was settled.

15   Q    And were you questioned by the county in an

16        Internal Affairs investigation for this?

17   A    I was questioned by another gentleman. It was, I

18        guess it was farmed out or something to.

19   Q    To an outside person?

20   A    Yeah.

21   Q    But you sat for an Internal Affairs interview, is

22        that correct?

23   A    I may have. I think I did. I'm trying to remember

24        if I did or not.

25   Q    It looks like you did from the material I have. You

Page 60

```
 1        and many others sat for Internal Affairs interviews
 2        about all of this, including Mr. Turner, Deputy
 3        Turner. Did you recall all that?
 4    A   I don't recall who was at the - at all.
 5    Q   And then you knew the case was settled by the
 6        county?
 7    A   An attorney told me that. Our house attorney told
 8        me that. And they said that - she said it had
 9        nothing to do with anything being wrong. They just
10        decided to settle. That's what I was told.
11    Q   So the county just pays people that are lying? Is
12        that what the county does is -
13    A   I don't know what the county does.
14    Q   Well, sir, you've been there a long time.
15    A   And I don't know what the county does.
16    Q   And you're now the Sheriff of the county.
17    A   I am the sheriff.
18    Q   So you're here to tell us that the county just
19        settles lawsuits -
20    A   That's not what I'm telling you.
21    Q   You've got to let me finish. You're here saying the
22        county just - she was wrong but they just settled
23        with her. That's what you're telling me.
24            MS. DWYER: Object to the form of the question.
25    BY MS. GORDON:
```

```
                                              Page 61
 1    Q    Is that what you just said?
 2              MS. DWYER: Misrepresents the testimony.
 3    BY MS. GORDON:
 4    Q    Is that what you just said?
 5    A    No, that's not what I said.
 6    Q    And she got her assignment in the courts that she
 7         wanted, didn't she, as part of the settlement?
 8    A    I have no idea.
 9    Q    And you remember there was a settlement agreement,
10         sir?
11    A    Yes. I was told there was.
12    Q    Did you ever see it?
13    A    I think I did see it. I don't recall everything
14         there was to it.
15    Q    Well, there was money paid, is that correct?
16    A    Yes.
17    Q    And in addition, she received certain assignments,
18         is that correct?
19    A    I have no idea.
20    Q    The county had to agree that Lacey Polderdyke would
21         continue to be assigned to court services.
22    A    I have no idea. Nothing - I have no idea about any
23         of that.
24    Q    For at least 12 months. And that she could not be
25         moved unless determined by the sheriff. Remember
```

Page 62

1      that?

2    A    I do not remember that.

3    Q    So the county looked at everything that happened

4         and decided that she should be in the courts and

5         that she would stay there until the sheriff himself

6         made a decision that she could be moved. She also

7         was told if she requested a transfer, that would be

8         considered by the sheriff. Did you know that?

9    A    I do not.

10        MS. DWYER: I'm going to object to the form of

11        the question. Compound. It appears you're reading

12        from a document, so the document does speak for

13        itself.

14   BY MS. GORDON:

15   Q    And she would be - part of the settlement was that

16        she would be permitted to participate in the Wayne

17        County Sheriff's Honor Guard on an equal footing

18        with all other participants.

19   A    As far as I knew, she was already doing that.

20   Q    Well, apparently there was some question about it.

21        It was put - because of you, when it was put into

22        the settlement agreement.

23   A    I don't think any of that had anything to do with

24        me.

25        MS. DWYER: Is there a question?

```
                                                        Page 63
 1    BY MS. GORDON:
 2    Q    Now, Ms. Polderdyke continued to work for the
 3         department, didn't she?
 4    A    She still works there now.
 5    Q    So this woman that you say made false allegations
 6         against you -
 7    A    I didn't say that at all. I said, she apologized to
 8         me.
 9    Q    Well, did she make false allegations or is
10         everything I went through just with you now
11         correct?
12    A    She apologized to me for doing what she did.
13    Q    Sir, you got to answer my question. Okay. Not just
14         what you want to say. Are you saying that what she
15         said was false?
16    A    Yes. Some of that that you read to me was
17         absolutely false.
18    Q    Nonetheless, she continues to work for the
19         Sheriff's Department.
20    A    Yes. Yes.
21              MS. GORDON: Let's just take a five-minute
22         break, guys.
23              (Brief pause.)
24    BY MS. GORDON:
25    Q    Sheriff, our lawsuit was filed, our Federal lawsuit
```

Page 64

```
 1          in this case was filed on February 11, 2025. Just
 2          to refresh your recollection on the date. And
 3          Channel 7, WXYZ was doing a story. You probably
 4          recall. I've got some communications from Mara
 5          MacDonald making a statement to the station that
 6          evening, February 11. Did she discuss that with
 7          you?
 8    A     Yes. She told me there was a statement, yes.
 9    Q     And so that would have been on the 11th of
10          February. The lawsuit had come in, I think she said
11          something like we haven't had a chance to review
12          the lawsuit. Does that sound familiar?
13    A     Sure.
14    Q     So and then did you see or hear of the Ross Jones
15          piece?
16    A     I heard of it.
17    Q     So that was on the 11th. About five business days
18          later, you did something with your phone that you
19          had at that time. On the 17th, February 17, 2025,
20          you apparently got a new phone. Is that correct?
21    A     I don't remember the exact date but it was in
22          February.
23    Q     I have the date. It was provided to me.
24    A     Okay.
25    Q     It was the 17th.
```

Page 65

```
 1   A    Okay.
 2   Q    And I've been told that since you got - where did
 3        you go to get the new phone?
 4   A    Verizon store.
 5   Q    And was this your - which phone was this? Your
 6        Apple or?
 7   A    No, my Android.
 8   Q    And was your information from your traded-in phone
 9        all transferred over to your new phone?
10        MS. DWYER: Objection to foundation.
11        THE WITNESS: I'm not sure if it was all
12        transferred over or not. I had to go back on and
13        put apps on, so I don't know.
14   BY MS. GORDON:
15   Q    Oh, sure. I get that. But all of your texts, your
16        emails, your contacts would have been transferred
17        over?
18   A    I'm not sure.
19   Q    You don't know what happened?
20   A    I don't know if they were all transferred over or
21        not.
22   Q    Well, I assume you would want them to be. Maybe
23        you're like me, a guy, a person into a lot of tech
24        stuff. But you know about your phones and you want
25        to be sure you have your information, correct?
```

Carroll Reporting & Video
A Veritext Company
586-468-2411
www.veritext.com
www.veritext.com

Page 66

```
 1    A    I did not have all of my information come to speak
 2         of - come to think about it. There was plenty of
 3         numbers that were missing, names and things.
 4    Q    Really? How did that happen?
 5    A    I have no idea.
 6    Q    What store did you go to for that?
 7    A    On Haggerty. Haggerty and 8 Mile.
 8    Q    And was that an AT&T store?
 9    A    No, it's a Verizon store.
10    Q    So which phone was this then? Was this your -
11    A    It wasn't my work phone.
12    Q    Pardon me?
13    A    It was not my work phone.
14    Q    This is your personal phone.
15    A    Yes.
16    Q    And this is your Verizon phone?
17    A    Yes.
18    Q    And I assume you used iCloud as your backup?
19    A    I don't know anything about how those technical
20         things go. So I'm not sure.
21    Q    So on August 27, 2025 -
22    A    August 27?
23    Q    Yes. Just giving you a date. I got a response to my
24         request to produce all text messages between you
25         and Regina Parks. Were you made aware of that? I
```

Page 67

```
 1            mean, you're the defendant in the case.
 2    A      On August 27?
 3    Q      Let's remove the date because I don't know when you
 4            would have received something. But I sent out
 5            requests seeking information. Specifically, the
 6            request was, produce all texts Defendant Raphael
 7            Washington sent to Regina Parks. Do you remember
 8            learning that I had made such a request?
 9    A      I don't recall.
10    Q      You're not denying it, of course. I assume your
11            lawyers would have told you.
12    A      They tell me a lot so they could have told me that.
13            I'm not sure.
14    Q      Again, you're listed as somebody, as I read
15            earlier, that's providing information to respond to
16            my requests.
17    A      Yes.
18    Q      So here's the answer I got when I asked for all
19            texts between Raphael Washington sent to Regina
20            Parks. Defendant Washington received a new cell
21            phone through Wayne County for work purposes in
22            September 2024. Subject to the objections noted
23            above, defendants are in the process of securing
24            and conducting a search for responsive documents
25            located from September '24 to the present.
```

Page 68

```
 1          So that's a little different. Let me withdraw
 2      that because I'm going to come back to that. I
 3      apologize. There's two different phone texts that
 4      are missing.
 5          Request number - I'm going to change this.
 6      Request number 15 was to produce all texts
 7      Defendant Raphael Washington sent to Michael
 8      Turner. And there were objections. And then the
 9      answer was this. Without waiting and subject to the
10      foregoing objections, on February 17, 2025,
11      Defendant Washington traded in his personal cell
12      phone to his mobile carrier, AT&T, for a credit
13      towards a new phone. Defendants are in the process
14      of securing and searching for text messages
15      Defendant Washington sent to Michael Turner on his
16      personal phone from February 25 to the present and
17      will produce any responsive non-objectionable
18      document located.
19          Did you understand what I just said? Are you
20      grasping?
21   A  Yeah. I'm listening.
22   Q  Fair enough. Okay. So I was told by your counsel,
23      and I presume that you provided them information,
24      but perhaps that's wrong. That you got this phone
25      on February 17. And because you got a new phone,
```

Page 69

1          they were unable to provide me with any text

2          messages. That doesn't make any sense, does it?

3    A    I don't know what my lawyers talked to you about at

4          all. I don't know.

5    Q    Sir, I'm reading to you an answer, okay?

6    A    Is that my answer?

7    Q    Yes. It's on your behalf.

8    A    It's not - okay.

9    Q    It's on your behalf. You don't answer things

10         directly. Obviously, your counsel will do that for

11         you, correct?

12   A    That's correct.

13   Q    So I have an answer.

14   A    But within my consultation is, you know, with -

15   Q    Okay. So I am just telling you that in our requests

16         to produce number five, we wanted all texts between

17         you and Turner, okay. That refer to plaintiff,

18         okay.

19   A    M'hm.

20   Q    And I was told, as I just said a minute ago, in

21         your response to plaintiff's third requests for

22         production of documents, that I couldn't get the

23         texts because you had gotten a new phone.

24              MS. DWYER: Objection to the extent -

25   BY MS. GORDON:

Page 70

1   Q     Are you with me so far?

2          MS. DWYER: - it misrepresents what you just

3          read.

4   BY MS. GORDON:

5   Q     Okay. I'll read it again. Defendant Washington

6          traded in his personal cell phone to his mobile

7          carrier, ATT, for credit towards a phone.

8          Defendants are in the process of securing and

9          searching for text messages Defendant Washington

10         sent to Michael Turner on his personal phone and

11         will produce any responsive non-objectionable

12         documents.

13         So sitting here today, I don't know of any

14         reason why you getting a new phone would have any

15         impact on whether or not text messages could be

16         produced. Do you know any reason why you getting a

17         new phone would be an impediment to obtaining texts

18         between you and Turner?

19  A     You probably have to talk to my lawyer about that.

20  Q     No, I'm asking just you, yourself as the phone's

21         owner.

22  A     And as I started out saying, I'm not familiar with

23         how these techie things go with phones.

24  Q     So let me ask you this. So were you ever asked to

25         produce text messages between you and Turner from

```
                                                      Page 71
 1         your personal phone?
 2   A     I don't recall it. I don't recall being asked that.
 3         Or if I was or not.
 4   Q     Do you know why I don't have those text messages as
 5         of today's date?
 6   A     I don't know that you don't have them or why you
 7         don't have them.
 8   Q     How old was your earlier phone that you turned in
 9         on February 17, 2025?
10   A     Which one?
11   Q     Sir, whatever phone you turned in on February 17,
12         2025, how long did you have that phone?
13   A     Not sure.
14   Q     Well, give me just an estimate. I don't want to
15         have to subpoena AT&T and Verizon if I can avoid
16         it. But we will get the info. So give me an idea.
17         Was it a newer phone you were turning in?
18   A     No. It wasn't new. It was probably older. Maybe a
19         year or two. These things change often.
20   Q     Oh, I know.
21   A     Yeah. And so I always want to keep up with what's
22         new.
23   Q     What store did you go to?
24              MS. DWYER: Asked and answered.
25              MS. GORDON: Not on this one specifically I
```

Page 72

```
 1        haven't.
 2             THE WITNESS: Same store. Haggerty and 8 Mile.
 3    BY MS. GORDON:
 4    Q    So do you know a reason that you have not produced
 5         texts for us based on the fact that you got a new
 6         phone?
 7    A    I think I -
 8             MS. DWYER: I object to the extent -
 9    BY MS. GORDON:
10    Q    Go ahead.
11             MS. DWYER: Can I put my objection on the
12         record? It misrepresents the statement that you
13         just read from once again.
14             MS. GORDON: Well, the record will cover all
15         that. That's not really an objection.
16             MS. DWYER: It misrepresents the record is an
17         objection, actually.
18    BY MS. GORDON:
19    Q    Did you lose text messages that you're aware of
20         when you bought a new phone?
21    A    I don't know.
22    Q    You may have?
23    A    No, I'm not saying that. I said I know I lost some
24         people's addresses or phone numbers but I don't
25         know anything about text messages.
```

```
                                                        Page 73

  1     Q    Sir, you have a career in law enforcement.

  2     A    I do.

  3     Q    And you're actually the elected Sheriff of a

  4          county.

  5     A    I am.

  6     Q    So you know that cellular phones and devices can

  7          contain evidence. You're well aware of that,

  8          correct?

  9     A    That's what I'm told.

 10     Q    Well, you've lived that.

 11     A    I don't know that for a fact.

 12     Q    Wait, you're the Sheriff of the county. Don't you

 13          all issue search warrants and do searches for

 14          cellular devices?

 15     A    I have people that do those things. I don't.

 16     Q    But you must be familiar if you're the sheriff and

 17          a former deputy. You're shaking your head no?

 18             MS. DWYER: Foundation.

 19             THE WITNESS: I'm telling you that I don't do

 20          the technical stuff of phones in our agency.

 21   BY MS. GORDON:

 22     Q    Okay, sir. Okay. I didn't ask that.

 23     A    Well, you sort of asked that.

 24     Q    No, I didn't.

 25     A    You said I should know.
```

Page 74

1    Q    No. I said, you should know that cellular devices

2         are subpoenaed as evidence. They can be, correct?

3    A    Correct. Yeah.

4    Q    That's what I asked you.

5    A    Sure.

6    Q    Because your office knows that cellular phones or

7         other devices can contain relevant evidence,

8         correct? You know that. It's a part of your day-to-

9         day job, correct?

10   A    So -

11   Q    Correct. You are aware of that, yes?

12   A    Yeah, that happens.

13   Q    And you also know that when you issue search

14        warrants, people can - you're sometimes looking for

15        cellular devices, correct?

16   A    Sometimes.

17   Q    And in this era, cellular devices can be important

18        in collecting all the necessary evidence to prove

19        one of your cases, right?

20            MS. DWYER: Objection. Foundation.

21   BY MS. GORDON:

22   Q    Correct?

23   A    It could.

24   Q    Sure. So when you traded in your phone on February

25        17, 2025, you knew you were being sued and you knew

Page 75

```
 1        - are you shaking your head about something here?
 2   A    Yeah. Because it's a whole thing that you're
 3        missing on that. I don't know if you have it there
 4        or not. I'm not sure.
 5   Q    Have what?
 6   A    I tried to get rid of my phone in December. It
 7        might have been in November of '24. The store told
 8        me that you can get this phone that you want at a
 9        cheaper rate if you wait till February because the
10        new phones are coming out. Facts.
11   Q    Well, who told you that?
12   A    The store workers.
13   Q    Haggerty?
14   A    Yeah, Haggerty. That's exactly what it is.
15   Q    But I'm not asking about that.
16   A    Well, I'm just telling you about when I changed my
17        phone. Why the time I changed my phone out. That's
18        what you're asking me about.
19   Q    And that's - no.
20   A    No. You just did.
21   Q    Listen, you wanted to add that, that's fine.
22   A    Because you just asked me about the time I turned
23        my phone in and why I turned it in. You asked me
24        that. And I'm telling you I turned it in on
25        February and you said 17th. Because that's when the
```

Page 76

```
1              store told me I should turn it in. In February.
2     Q    Well, we'll just subpoena the store if need be. But
3              that's not my point. That's not my point. You just
4              want to tell your story. So here's my -
5     A    I want to help you be correct on what you're asking
6              me.
7     Q    Oh, really? Okay.
8     A    Yeah.
9     Q    Well, the point is, at the time you went in on
10             February 17th, you knew you were being sued. And
11             I'm now being told that because you got a new
12             phone, I am not yet in possession of the text
13             messages. Because the answer that I guess you
14             approved says that Defendant Washington received a
15             new cell phone and - a personal phone and you are
16             in the process of trying to get these text
17             messages.
18    A    When you asked me about I knew about I was being
19             sued, I knew that from a news report. I don't
20             remember seeing any kind of document that spoke to
21             me being sued.
22    Q    You know, I didn't ask you that.
23    A    Well, I'm trying to answer your question correctly.
24    Q    You're just going to have to answer. You're not
25             here today - your lawyers will follow up with you
```

Page 77

```
1          if they want you to tell your story. You're just
2          here to answer my questions, okay?
3               MS. DWYER: He is answering your questions.
4               MS. GORDON: No, he's not.
5               MS. DWYER: Yes, he is.
6               MS. GORDON: He's adding.
7               THE WITNESS: I don't - I'm not adding. I don't
8          recall anything about me knowing -
9    BY MS. GORDON:
10   Q    I didn't ask you - I didn't ask you that, sir.
11   A    - if there was some kind of official lawsuit.
12   Q    See, I didn't ask you that.
13              MS. DWYER: You did ask that, Deb.
14              THE WITNESS: Well, you did.
15              MS. DWYER: You asked if he knew he was being
16         sued.
17              MS. GORDON: And he said yes.
18              MS. DWYER: He was answering the question. He
19         was answering the question.
20              MS. GORDON: Okay. This is nuts. He already
21         talked about he knew and that Mara MacDonald issued
22         a statement and he knew it was from Regina Parks.
23         But I'm not going to sit here and argue with you.
24   BY MS. GORDON:
25   Q    Your job here is just to answer my questions. So
```

Page 78

```
 1              let me move on here and try to keep this going.
 2                   So at the time you turned in your phone, you
 3              were being sued. And can you answer to me today why
 4              you have not produced texts between you and Turner
 5              that would have been referring to Regina Parks? Can
 6              you tell me why you've not produced the texts?
 7       A      I think my - I have produced some texts from my
 8              work phone which is between Turner and I.
 9       Q      I'm not asking about your work phone. I'm asking
10              about your - is there a reason, sir, why as of
11              today's date we have not received text messages
12              between you and Turner from your personal phone? Is
13              there -
14       A      If there's any -
15       Q      Hang on. Let me - you got to hold on.
16       A      I thought you were finished answering the question.
17       Q      No.
18       A      Asking the question.
19       Q      Just wait. Is there a reason those texts have not
20              been produced that you are aware of?
21       A      You would have to talk to my attorneys about that.
22              I don't know anything about that.
23       Q      You're the person that carries the phone around. Do
24              you have your phone today?
25       A      Yes.
```

Page 79

```
 1    Q    You're the person with the phone. Your attorneys
 2         don't have the phone. You never gave them the
 3         phone. You've already testified to that here today.
 4         So have you produced any text messages between you
 5         and Turner about plaintiff to your counsel?
 6    A    No.
 7    Q    Have you been asked by them to turn those over?
 8    A    No.
 9    Q    So you were not made aware of my request number 15
10         in our third request, produce all text Defendant
11         Raphael Washington sent to Michael Turner that
12         referred to plaintiff. You were not aware of that
13         request?
14    A    If it's there and I read it, yes, I'm aware.
15    Q    But you just said you weren't aware of it.
16    A    But I'm saying to you, I did not. You asked me had
17         I turned anything in from my personal phone.
18    Q    And you said no.
19    A    And I said from my work phone because that's where
20         Turner and I would occasionally - well, all the
21         time basically, talk from. The few times we have to
22         text - we didn't do a lot of texting.
23    Q    I can see from other people's phone records that
24         you did text on your personal phone with Turner. I
25         can see that.
```

Page 80

1   A   Okay. I don't recall any of it other than the fact
2       that we talked on our regular phone.
3   Q   Have you looked on your personal phone for texts
4       with you and Turner about the plaintiff?
5   A   There's nothing on it.
6   Q   Have you looked?
7   A   I look at my phone all the time.
8   Q   And is there something missing from your phone?
9       Like does your current phone not go back past a
10      certain date?
11  A   No, it doesn't. It - our phones, my phone deletes
12      and I delete as well older messages because it
13      won't perform in the way it should if I pile up
14      messages on my phone.
15  Q   We're going to ask you to turn over your phone,
16      personal phone for forensic review. So please do
17      not do anything with it. Okay. And do not remove
18      anything from it, okay, from this time forward.
19          And I guess you must be aware that you can
20      tamper with evidence in a case. Are you aware of
21      that?
22  A   Yes. But what evidence are we talking about?
23  Q   In addition to your personal phone, which by the
24      way your attorneys are saying your carrier - or I
25      don't know. I don't know if it's your attorneys. My

Page 81

```
 1          answer to my third request, number five, say that

 2          your personal mobile carrier is AT&T. Is that

 3          accurate?

 4    A     No.

 5    Q     Your mobile carrier for your personal phone, which

 6          you say is an Android, is that correct?

 7    A     Correct.

 8    Q     Is Verizon?

 9    A     Yes.

10    Q     And your phone for the Sheriff's Department is what

11          carrier?

12    A     AT&T.

13    Q     Now, in addition to your personal phone, I've also

14          been told in responses to defendant's responses and

15          objections to plaintiff's third request for

16          production of documents. In a response as to number

17          three, I was told in writing, "Defendant Washington

18          received a new cell phone through Wayne County for

19          work purposes in September 2024. Subject to the

20          objections noted above defendants are in the

21          process of securing and conducting a search for

22          responsive documents located from September '24 to

23          the present.

24              Were you able to stick with me on that?

25    A     M'hm.
```

Page 82

```
 1   Q    Is it correct you received a new cell phone through
 2        the county in September 2024?
 3   A    I received a new cell phone. I don't know the date
 4        or the month.
 5   Q    Who at the county is the person who sort of
 6        oversees the cell phones and securing them and
 7        doing whatever you do? Who's that?
 8   A    From my office, it's Steve Yatooma.
 9   Q    Steve Yatooma?
10   A    Yes.
11   Q    So Steve Yatooma, what's his title?
12   A    He's the IT person.
13   Q    Fair enough.
14   A    One of the IT people.
15   Q    And where does - the bills are obviously paid by
16        the county?
17   A    Yeah.
18   Q    And then do they keep the information from the
19        phones? Is there a storage site there?
20   A    I have no idea.
21   Q    So Mr. Yatooma would know?
22   A    Yes.
23   Q    So the answer I got to continue is that you
24        received a new cell phone. And then it said,
25        subject - that subject to the objections,
```

Page 83

```
 1        defendants are in the process of securing and
 2        conducting a search for responsive documents
 3        located from September '24 to the present.
 4            So do you know of any text messages or any
 5        other information from that cell phone that has
 6        been located from September 2024 to the present?
 7   A    I don't know of any. I know my phone was used but I
 8        haven't - I haven't, have any knowledge of what was
 9        there.
10   Q    Do you read these interrogatory answers and request
11        to produce answers before they're sent out?
12   A    Yes. With my counsel, yes.
13   Q    Sure. Have you been asked to look for texts between
14        you and Turner at any time on your office phone?
15   A    I think I might have been. I guess. I'm not sure.
16        I'm not sure.
17   Q    Did you find any?
18   A    No, not that I recall.
19   Q    There's an ethics ordinance at the county, is that
20        correct?
21   A    An ethics ordinance?
22   Q    Uh-huh.
23   A    Yes.
24   Q    Are you familiar with it?
25   A    Sure.
```

Page 84

1  Q   Does it apply to you?

2  A   What do you mean?

3  Q   Does the ethics ordinance apply to you?

4  A   Oh, I think it applies to everybody at the county.

5      Yes.

6  Q   Have you ever received any sexual harassment

7      training at the county?

8  A   Yes.

9  Q   When was the last time you received such training?

10 A   I think the last one I asked to put on was, I want

11     to say maybe a year ago, a little less than a year.

12 Q   And what was the training?

13 A   Sexual harassment.

14 Q   What kind of training was given and to whom?

15 A   It was given to my command officers. I sat in on it

16     and it was given by a lady named Carmen. Carmen. I

17     forgot to get her last name.

18 Q   Well, what was her position or role?

19 A   She is a person who speaks to and teaches do's and

20     don'ts of sexual harassment.

21 Q   Is she in-house or is she an outsider?

22 A   No, she's an outsider.

23 Q   And do you remember the month this occurred?

24 A   I don't.

25 Q   Do you remember what was covered in the session?

Page 85

1    A    Sure.

2    Q    What was covered?

3    A    Sexual harassment policies, do's and don'ts, things

4         that you should be careful of, things that we

5         should be aware of speaking to each other and

6         things like that.

7    Q    What are do's and don'ts?

8    A    I'm sorry?

9    Q    What are the do's and don'ts?

10   A    Well, just speaking to each other, you know, having

11        basic things that we should know about. Again,

12        having conversation, being leaders in our agency.

13        What we should be saying, things that we should be

14        talking about. Compliments that you should, that

15        you could be giving that means nothing, have no ill

16        intention but it could be something that someone

17        doesn't appreciate or things to that matter. Paying

18        attention to those kind of things. Just general

19        sexual harassment stuff.

20   Q    Is that the first time you'd had training in sexual

21        harassment?

22   A    No.

23   Q    When was the last time before that?

24   A    I'm not sure.

25   Q    What policies - well, strike that.

```
                                                    Page 86
 1            Give me your chain of command, please.
 2   A    Chain of command?
 3   Q    Yes. Your chain of command under you?
 4   A    My chief of staff.
 5   Q    Who is that today?
 6   A    Kevin Tolbert.
 7   Q    And who was before Tolbert?
 8   A    Michael Turner.
 9   Q    And you selected Michael Turner to be your chief of
10        staff, correct?
11   A    I retained him after Benny Napoleon passed away.
12   Q    That was your choice?
13   A    Sure.
14   Q    And did you select Tolbert?
15   A    Yes.
16   Q    And who else, who's under Tolbert?
17   A    There's two chiefs, Robert Dunlap, Scott Gatti.
18   Q    Did you select both of them?
19   A    I retained them.
20   Q    And who's under them?
21   A    Deputy chiefs, and there's a few of them. Deputy
22        Chief Tonya Guy, Lynnette Cain, Alan Bulifant. And
23        I think that's it.
24   Q    What policies apply to the chief of staff and
25        everybody below the chief of staff?
```

Page 87

1    A    What policies apply?

2    Q    What policies apply to your department? Let me put

3         it to you that way. What kind of policies?

4    A    Various. I mean, various.

5    Q    Tell me what you know.

6    A    County policies or?

7    Q    Sheriff's Department policies?

8    A    Yeah, I mean, law enforcement policies.

9    Q    Leaving aside law enforcement. Let's - like, in

10        other words, how you would do a search or an

11        arrest. Leave that aside. Let's just talk about

12        policies as to conduct and performance and the

13        like. What exists?

14   A    Conduct, insubordination situations.

15   Q    What policy are you talking about here?

16   A    I mean, these are policies - and I don't have

17        policy numbers in any of that.

18   Q    Can you give names of policies?

19   A    No.

20   Q    Do you know any name of any policy?

21   A    I mean, there are official names but I don't have

22        them with me. I don't - I have people who write

23        policies and we - they bring them by me. We sign

24        off on them. But I don't remember the names and

25        numbers of those policies to be exact.

Page 88

1   Q   Do the policies apply to both law enforcement and

2        civilian employees of the Sheriff's Department?

3   A   Most of them, yeah. That I recall, yes.

4   Q   And what do you do if an employee - is there a

5        policy on what you do if an employee is having a

6        performance issue?

7   A   Human resources deals with that more than I do.

8   Q   You go to human resources, you or the other

9        appropriate person to say, I'm having problem with

10       this employee's performance. And then you turn it

11       over to HR.

12   A   It depends on who the person is reporting to.

13   Q   So give me an example.

14   A   You mean me, for example? Or our chief of staff or?

15   Q   Well, let's say -

16   A   Chief of staff have direct reports.

17   Q   Let's say Turner's having performance problems.

18       What do you do?

19   A   If he's having performance problems?

20   Q   Yeah.

21   A   Himself?

22   Q   Yeah.

23   A   It would come to me. I would be that one that, to

24       deal with it.

25   Q   And what about somebody lower level? What about

Page 89

```
 1        just deputy chiefs?
 2   A    Who would they report to?
 3   Q    No. Who would handle any performance problems they
 4        had?
 5   A    Their direct report, whoever they report to.
 6   Q    How about Regina Parks? Who would handle any
 7        performance issues she was having as a civilian, to
 8        use an example?
 9   A    Michael Turner at that point, as far as that, since
10        I've been a sheriff.
11   Q    And what - is there policies he would follow?
12   A    Yeah. I'm sure they are policies that speak to
13        that.
14   Q    Do you know? What are they?
15   A    I'm not sure.
16   Q    And you use -
17   A    Depends on what it is.
18   Q    Well, so is there a range of options? Like many
19        cases that I'm involved in , people will give
20        verbal warnings.
21   A    Oh, sure.
22   Q    And then they'll give - if that doesn't work,
23        they'll give maybe a written warning.
24   A    Depends on whoever she would report to, which was
25        Michael Turner.
```

Page 90

1    Q    I'm just running through possibilities. And if you

2         don't know, that's fine. But I want to find out

3         what you, as you as the Sheriff generally

4         understand is the process for non-union employees,

5         if there's a performance problem and how you handle

6         them. Do you start typically with either coaching

7         and counseling?

8    A    I don't do any of that. It's just the person that –

9    Q    Well, have –

10   A    Let me go back to, you said Regina Parks and

11        Michael Turner. She would report to him. If there's

12        an issue, he would deal with it. It could be

13        general counseling, verbal counseling. It could be

14        written counseling. And it could be –

15   Q    A written warning?

16   A    Something that – yeah. I mean, that's counseling

17        pretty much what we call counseling warnings.

18   Q    So all these things are possibilities that can be

19        used.

20   A    Sure.

21   Q    And are there performance reviews given in your

22        department?

23   A    No.

24   Q    Nobody gets a performance review.

25   A    Not, not that I'm aware of. Not in our – in my

Page 91

```
 1          command anyway. There's not – now, there's
 2          performance reviews that could be written from
 3          lieutenants and captains on up. But - and I'm sure
 4          there's probably some, for some. But when you get
 5          up to our level, that's a direct report to, like
 6          you said, the chief of staff. Or like I said, the
 7          chief of staff or a commander or captain. That's up
 8          to them.
 9     Q    So do you know of any discipline Regina Parks ever
10          received? I assume no because I don't see any in
11          the records. I'm just asking you.
12     A    I don't know.
13     Q    Nothing you're aware of?
14     A    Not that I'm aware of. I mean, but it could be. I
15          don't know.
16     Q    I hear you. All I can ask you is what you know. I
17          have her file. Too, so I see what's there.
18               When's the last time you talked to Turner?
19     A    I happened to see him last Friday. Friday –
20     Q    Go ahead. Was he at a fundraiser for you?
21     A    Yeah. I was trying to get the date. But yeah, it
22          was, I think a week ago.
23     Q    Where was the fundraiser?
24     A    At the Hotel St. Regis.
25     Q    On –
```

```
                                                   Page 92
 1    A    The Boulevard.
 2    Q    And did he make a donation?
 3    A    I'm not sure.
 4    Q    Presumably he did.
 5    A    Not necessarily. People there didn't make
 6         donations.
 7    Q    And are you staying in touch with him?
 8    A    No.
 9    Q    Did Turner violate any county policy during the
10         time he worked for you?
11    A    Yes.
12    Q    What policy was that?
13    A    It was concerning direct reports to him and being
14         in a position where it's some kind of sexual or
15         some kind of interaction that forbidden to have
16         with your direct support or subordinate.
17    Q    And what is that policy?
18    A    What is it?
19    Q    Can you identify?
20    A    That speaks to that? I can't quote it out to you.
21         Or my attorney has one.
22    Q    Where would I find - what would I -
23    A    The county has one. And the Sheriff's Office has
24         one.
25    Q    You never put anything in writing about him
```

Carroll Reporting & Video
A Veritext Company
www.veritext.com                                    586-468-2411
www.veritext.com

Page 93

```
 1        violating a policy, correct?
 2   A    No. Because I didn't find out about it until -
 3   Q    Well, when you did find out about it you never -
 4        no. I don't mean just you but nobody from the
 5        county has put this in writing.
 6   A    I don't know what the county has done.
 7   Q    Well, you never did so, correct? You can tell me
 8        that.
 9   A    I didn't put anything in writing. I told him he
10        would have to - he was going to be terminated or
11        let go from our agency because of it.
12   Q    He ended up retiring, correct?
13   A    He did retire.
14   Q    But you can't name a policy that he violated? Just
15        to be clear.
16   A    Sure. I said -
17   Q    You can't name it.
18   A    Fraternization with a subordinate.
19   Q    Okay. Sheriff.
20   A    From his mouth.
21   Q    I hear you. But -
22   A    Yeah. So when he told me what he told me, I simply
23        - I didn't write anything down other than when it's
24        time for him to leave that, is that, it was, his
25        appointment had expired but.
```

Page 94

```
1     Q     Was he eligible for retirement?

2     A     Sure.

3     Q     Roughly, how old is he?

4     A     Roughly?

5     Q     Right.

6     A     Probably 66 or 67.

7     Q     Did he tell you that Regina Parks came to him and

8           complained about you and your conduct toward her

9           and your sexual harassment?

10    A     He's never come to me and said that.

11    Q     Did he tell you that Erika Erickson came to him and

12          complained about you about sexual harassment?

13    A     He came to me and told me that we needed to have a

14          meeting with her but it had nothing to do with

15          sexual harassment.

16    Q     I didn't ask you about a meeting. I said, did he

17          ever tell you that Erika came to him and complained

18          about sexual harassment?

19    A     Not until we had a meeting.

20    Q     What was the meeting?

21    A     The meeting was about, she was concerned that she

22          wanted to look out for me. She didn't have a

23          harassment complaint at all, her mouth, in that

24          meeting. And that she wanted to make sure that we

25          were - that we didn't have - or I didn't say
```

Page 95

```
 1          anything to her out of line that didn't mean
 2          anything malicious from my point of view but - and
 3          obviously hers either. Other than she said, look,
 4          sometimes you say babe but I hear you say it to
 5          other people, other men and women. I don't think
 6          you should do that. And if it relates to me, please
 7          don't do that. Not that I have any kind of
 8          harassment. This is her stuff because we're in a
 9          meeting. I don't have a harassment complaint at
10          all. I just want - you are my sheriff. I want to
11          look out for you. And so I just wanted you to be
12          advised of that.
13               She even spoke to the fact that I was looking
14          at someone when they were walking down the street.
15          We were doing an interview outside with a news
16          reporter. She said, I saw you looking at this lady
17          walking by. I said, Erica, I look at every single
18          person that walks by me outside. And she said, and
19          I guess it was like an ah-ha moment for her. I
20          guess you do, you're the police. Exactly. So that's
21          not something that I wouldn't do whoever it was. We
22          just had a conversation like that.
23     Q    So this was - who was participating in this
24          conversation?
25     A    Chief Staff Turner, UnderSheriff Jaafar and myself.
```

Page 96

1   Q   Why were you all having this meeting? Was it
2       because she came with concerns?
3   A   No. She wanted to have a meeting. She called the
4       meeting.
5   Q   That's what I say. She wanted the meeting.
6   A   Yeah, she wanted to.
7   Q   And she sat down with you, Jaafar, Turner?
8   A   Yes.
9   Q   And when was this, roughly?
10  A   I don't remember the date or month.
11  Q   And so she explained her concerns and then you
12      answered them?
13  A   Sure. And we finished, everybody was good. She kept
14      working with us and working, you know, as her
15      position, our community relations person. And that
16      was the end of the meeting.
17  Q   What happened to her then? When did she leave?
18  A   She left, I believe it was in November or so of a
19      year. And I can't think of the year. It was not
20      long after our meeting. She left because I had to
21      terminate her because of her third time being
22      publicly highly intoxicated. And it was my decision
23      to say she couldn't be there anymore after the
24      third time. She was arrested, as a matter of fact.
25  Q   What are your social media accounts? Let's start

Page 97

1          with your social media accounts as Sheriff.

2    A     You said, what are they?

3    Q     Yeah.

4    A     We have an official Facebook page.

5    Q     And do you post on there?

6    A     No.

7    Q     Who handles that?

8    A     Mara MacDonald.

9    Q     What else?

10   A     That's all I know of.

11   Q     And then do you have personal Facebook?

12   A     Sure.

13   Q     And Instagram and so on?

14   A     Facebook and Instagram.

15   Q     What do you have?

16   A     Facebook and Instagram.

17   Q     And your Facebook account is under what name?

18   A     ███████████

19              MS. DWYER: I'm going to just place that as

20         confidential.

21              (Confidential portion page 97, line 18.)

22              MS. GORDON: Sure.

23              THE WITNESS: Please. As long as it's not

24         public.

25   BY MS. GORDON:

Page 98

```
 1    Q    Well, it is actually public.
 2    A    Well, no. I think that one's not. I think you have
 3         to be allowed into it.
 4    Q    Well, okay.
 5    A    Yeah. You have to be allowed into it.
 6    Q    And what else under Facebook? Do you have any other
 7         accounts under Facebook?
 8    A    Under Facebook?
 9    Q    Yeah. With Facebook. Other than the Raywash826, any
10         other accounts on Facebook other than that one?
11    A    That's Instagram. The Raywash.
12    Q    I thought you said Facebook.
13    A    You asked me about Instagram.
14    Q    And what about Facebook?
15    A    Yeah. It's, I believe it's ███████████████.
16              MS. DWYER: And just to place that under.
17              (Confidential portion page 98, line 15.)
18              THE WITNESS: Please. Because that's private as
19         well. You have to be allowed. I have to allow you
20         into that.
21   BY MS. GORDON:
22    Q    And you're aware that in our complaint we make
23         several allegations against you with regard to you
24         and my client and other women as well, correct?
25    A    Yes.
```

Page 99

1   Q    You've read the complaint? Have you read the

2        complaint?

3   A    Yeah, I have read it. I don't remember everything

4        in it but I've read it.

5   Q    And you're aware that my client states that you

6        were subjected – you subjected her to sexual

7        harassment on a routine basis, correct?

8   A    Absolutely. I heard that. But it's not –

9   Q    I didn't ask you yes or no. I just said, you're

10       aware she's alleging that?

11  A    Yeah.

12  Q    And that you have shown her pornographic material,

13       correct?

14  A    Yes. I read that as well.

15  Q    Have you ever had any videos of a pornographic

16       nature on your cell phone?

17  A    No.

18  Q    Never?

19  A    Pornographic?

20  Q    Well, okay. Let's talk about any sexual activity.

21  A    No.

22  Q    What about you performing a sexual act on a person?

23  A    No.

24  Q    Are you sure about that?

25  A    Yeah.

Page 100

1   Q   My client also says you touched or struck her on
2       the buttock several times, correct?
3   A   She said that.
4   Q   Other women have complained about that with you as
5       well, correct? That you've heard of.
6   A   That particular, I haven't heard of that.
7   Q   Touching their bottom. Touching their bottoms.
8       You've heard that.
9   A   I've read that.
10  Q   And you've heard of other complaints against you,
11      correct?
12  A   They talk about touching their leg or their thigh
13      or something to that effect.
14  Q   Right. Exactly.
15  A   Same thing that other people say.
16  Q   Right.
17  A   That they probably read.
18  Q   And my client states that you made lewd and sexual
19      comments about her appearance and body, correct?
20      She's alleged that.
21  A   She said that.
22  Q   Other women have said similar things, correct?
23  A   I don't recall anybody saying something that I said
24      about their bodies.
25  Q   Well, you talk about people's bodies all the time,

Page 101

1          don't you?

2    A     No.

3    Q     You look at women's bodies all the time, don't you?

4    A     I do not talk about women's bodies all the time,

5          no.

6    Q     You look at women's bodies all the time.

7    A     What does that mean? Look at someone's body? If I'm

8          looking at you, am I looking at your body?

9    Q     You have an obsession with looking at women's rear

10         ends and seeking out material to show nude or

11         partially nude women.

12   A     Absolutely not.

13             MS. DWYER: Objection. That's just a harassing

14         statement that has no basis in fact.

15   BY MS. GORDON:

16   Q     You don't?

17   A     No.

18             (Document marked for identification as

19             Plaintiff's Deposition Exhibit Number 1.)

20   BY MS. GORDON:

21   Q     Okay. First of all, I'm going to hand you Exhibit

22         1.

23             MS. DWYER: Do you have a copy for me?

24             MS. GORDON: I don't. You'll have to share it

25         with your client. I'm sorry.

Page 102

1    BY MS. GORDON:

2    Q    Okay. So this is -

3             MS. DWYER: I need to look at it before you ask

4         any questions.

5             MS. GORDON: I'll just identify it for the

6         record while you're looking, Maria.

7    BY MS. GORDON:

8    Q    Raywash826. That's the Instagram handle you gave me

9         previously, is that correct?

10   A    Yes.

11   Q    And that's a picture. I've blown these up a bit,

12        but -

13            MS. DWYER: I want to have - share this with

14        counsel before you begin asking questions, please.

15        We have not seen it. For the record, we have not

16        seen this document before.

17            THE WITNESS: I haven't either.

18   BY MS. GORDON:

19   Q    This is on a public Instagram account.

20   A    I've never seen that.

21   Q    Okay. Sir, this -

22   A    Never. I don't know anybody in there.

23   Q    Well, you - let's wait till you get it back in your

24        hand.

25            MS. DWYER: Objection to the extent - I mean,

Page 103

```
 1        foundation.
 2   BY MS. GORDON:
 3   Q    So this is - you see where it says, followed by
 4        raywash826?
 5   A    Yeah.
 6   Q    That's all models are tagged, checked highlights
 7        for promo rates. Do you see that?
 8   A    Yes.
 9   Q    Now, you follow her. Do you understand that?
10   A    I follow who?
11   Q    This account.
12   A    No. You have to look at the top of this, Reginald's
13        Post. This was somebody named Reginald Crawford who
14        did these things often. I did not do that. They,
15        people hack your phones. They know how to get in
16        it. They know how to get into your account. I have
17        never seen this before. Ever.
18   Q    Is that that your picture of a sheriff where it
19        says -
20   A    Yeah, that's me.
21   Q    You got to let me get my questions out, okay?
22   A    Okay.
23   Q    It says, followed by raywash.
24   A    M'hm. Yes.
25   Q    And that's your picture in your sheriff's uniform,
```

Page 104

1          is that correct?

2     A    Correct.

3     Q    Now, on your Instagram account, this is your

4          personal Instagram account but you show photos of

5          yourself as a sheriff, correct? For example, on

6          your Instagram account –

7               (Document marked for identification as

8               Plaintiff's Deposition Exhibit Number 2.)

9     BY MS. GORDON:

10    Q    I'll hand you Exhibit 2. This is your raywash826

11         account. This will be Number 2. This is that same

12         account, correct?

13    A    Okay.

14              MS. DWYER: Just give me a minute to review it.

15              MS. GORDON: Sure. Take your time.

16              MS. DWYER: You don't have a copy of this for

17         me either.

18              MS. GORDON: I just made one color copy. You

19         guys are sitting right there. Take your time.

20              THE WITNESS: I didn't read any of that.

21              MS. DWYER: I'll give it back to you to review

22         before she asks her questions.

23              MS. GORDON: Are we all set? Do you have

24         questions about this?

25              MS. DWYER: I just - that's Exhibit 1. I mean,

Page 105

```
 1          there's been no - we have no idea who this
 2          individual is. It appears to just be a printout
 3          with his hashtag on there. He said he hasn't seen
 4          it.
 5                  THE WITNESS: Never.
 6                  MS. DWYER: I've objected to foundation, so.
 7                  MS. GORDON: I'll let him take a look at it for
 8          a second.
 9      BY MS. GORDON:
10      Q    So this is post - am I correct that this is
11           posted -
12                  MS. DWYER: Are you done reading it?
13                  THE WITNESS: Yeah.
14      BY MS. GORDON:
15      Q    So this is posted on what? If you look up at the
16           top, where did you post this?
17      A    It could be Instagram.
18      Q    Well, go to the -
19      A    Or -
20      Q    I'm sorry. Go ahead.
21      A    It could be Instagram but I'm not sure.
22      Q    Well, I just looked way at the top. You gave me the
23           Raywash.826. And then under - so that would be your
24           account, correct?
25      A    So it would be possibly. And I - it could be. What
```

Page 106

1       I do want to tell you is that, when I had this -

2       and I have it now. If you look on Instagram, you'll

3       see about three or four of those raywash826.

4    Q  But this is you, correct?

5    A  This is my picture, yes.

6    Q  You posted this? Is this your post?

7    A  I can't tell you that.

8    Q  So this is your photo and there's comments. Did you

9       write these down?

10   A  Did I write the comments down?

11   Q  Yeah. There's a whole - there's a picture and

12      then -

13   A  And I'm looking at that and I don't know that I did

14      this myself. I do not. I remember the situation

15      where we were having some people talk about, during

16      - this was during COVID time. But I don't know that

17      this is what I wrote.

18   Q  So you may not - somebody in your office may have

19      written it for you.

20   A  Could have.

21   Q  Sure. I understand that. But you posted it because

22      you wanted people - I think you're talking about

23      COVID. And you were trying to get the word out.

24   A  M'hm.

25   Q  Is that accurate?

Page 107

1    A    Yes. I'm sorry.

2    Q    I'm not holding you responsible for everything that

3         you wrote.

4    A    Yeah.

5    Q    So here's another one where you're posting – so

6         let's go to another one.

7              MS. GORDON: This is going to be - what exhibit

8         are we on?

9              (Document marked for identification as

10             Plaintiff's Deposition Exhibit Number 3.)

11   BY MS. GORDON:

12   Q    This is raywash826. That's you again, right?

13   A    That's my name.

14   Q    Now, underneath it says Greater Grace Temple.

15        What's that referring to, Sheriff?

16   A    It's a church.

17   Q    Well, I know that.

18   A    My church.

19   Q    I know you're involved in Greater Grace.

20   A    Oh, yeah. Heavily. Yes.

21   Q    So, but why are you referencing it? Is this

22        something about Greater Grace?

23   A    This was a funeral.

24   Q    So tell me what this picture is that you posted

25        on –

```
                                                    Page 108
 1              MS. DWYER: I just want to share it with
 2         counsel.
 3              MS. GORDON: Sure.
 4    BY MS. GORDON:
 5    Q    Can you tell us, tell me a little bit about what
 6         this, you're referring to here in your nice
 7         comments that you wrote? Our DPD brother never
 8         forgotten.
 9    A    What does that mean? Never forgotten you're saying?
10    Q    Well, that's what you wrote, Sheriff?
11    A    Yeah.
12    Q    Who was this that you're referring to?
13    A    The deceased.
14    Q    Was it another officer?
15    A    It was a DPD officer.
16    Q    Okay, I see. And so again, you're posting on your
17         Instagram account, you know, because this is
18         important, you want to share this with the
19         community, correct?
20    A    Correct.
21              But again, there were several - the account,
22         several raywash826.
23    Q    I hear you. And then this is -
24              MS. GORDON: I'm going to, what exhibit are we
25         on here?
```

Page 109

1          (Document marked for identification as

2          Plaintiff's Deposition Exhibit Number 4.)

3     BY MS. GORDON:

4     Q    So here's Number 4. That's also from rayash826, is

5          that correct?

6     A    That's what it says.

7          MS. DWYER: Hold on one second. Let me share

8          it with – you don't have another copy of this one

9          either?

10         MS. GORDON: No. I just have the one here.

11    BY MS. GORDON:

12    Q    This looks like another COVID era post that you

13         were making to keep people aware or inform people.

14    A    Okay.

15    Q    Is that accurate or not?

16    A    You mean the one we just talked about?

17    Q    Yeah.

18    A    Yeah. Let them know that we're being safe.

19    Q    And this is all on your Facebook page.

20    A    This what you just showed me?

21    Q    This is all on your Facebook account, obviously,

22         correct?

23    A    This is Instagram.

24         MS. DWYER: Objection.

25    BY MS. GORDON:

Page 110

1   Q     I keep saying Facebook. Instagram.
2           MS. DWYER: Are you talking about 4 or 3 or
3         what are you asking?
4   BY MS. GORDON:
5   Q     The last one. This is, all the ones I've showed you
6         so far are on your Instagram page, correct?
7           MS. DWYER: Look at them and see. She's asking
8         about all of them.
9           THE WITNESS: Being on Instagram?
10  BY MS. GORDON:
11  Q     Yeah.
12  A     That's where my - that raywash826, mine was placed.
13        I have to keep saying.
14  Q     Sure.
15  A     And others as well. If you go on there now, you'll
16        probably see that.
17  Q     Sure. Okay. And the first exhibit I showed you -
18        strike that.
19           It looks like from your Instagram page you are
20        following about 3000 people, is that accurate?
21  A     I don't know.
22           MS. DWYER: I'm going to object. There is no
23        foundation.
24           THE WITNESS: Oh, up here. Followers 5000
25        people out of that.

Page 111

1    BY MS. GORDON:

2    Q    I'm going to show you - we just pulled up on our

3         computer. Just for the record, I will say this

4         says, raywash.826. Ray Washington. Then you list

5         CPL pro concealed pistol license, professional

6         instructor, over 30 years of law enforcement,

7         experienced director.

8    A    Let me see it. So -

9    Q    That's your Facebook - your Instagram page,

10        correct?

11   A    So this is not my Instagram page.

12   Q    Well, all the ones I just showed you I pulled off

13        of there.

14   A    It is not. If it says, raywash.826, that is not

15        mine.

16   Q    Well, if we scroll down here we're going to see -

17   A    People are hacking my page regularly. The Reggie

18        Crawfords and all the rest of his friends.

19   Q    I don't see anybody doing that. For example -

20   A    Well, that's not my page.

21   Q    Okay. Sir, I just scrolled down. And I just showed

22        you the picture that you identified of you in a

23        mask.

24   A    Yes. And you can take a picture and put it on

25        anything you want to put it on.

Page 112

```
 1    Q    Okay. So then what is your Instagram page? If this
 2         isn't your Instagram –
 3              MS. GORDON: Okay. Hang on, Counsel. If you're
 4         showing the witness something during a dep – what
 5         were you showing him, Facebook?
 6              MS. DELMASTRO: No, Instagram.
 7              MS. GORDON: You cannot talk to the witness
 8         while we're questioning. I'm really sorry, Lina.
 9              MS. DELMASTRO: I'm sorry. I'm just –
10              MS. GORDON: You just can't. I understand you
11         want to – if there's something you want to say on
12         the record, go ahead, please. But don't be talking
13         to the witness.
14              MS. DELMASTRO: Well, I'm trying, I was trying
15         to verify that what you're showing him is the same
16         thing that I'm seeing.
17              MS. GORDON: On what?
18              MS. DELMASTRO: On Instagram.
19              MS. GORDON: What are you seeing on Instagram?
20              MS. DELMASTRO: So it looks like you're showing
21         this.
22              MS. GORDON: I just want to see what the
23         correct page is.
24              MS. DWYER: So, well, just for the record,
25         there are numerous names that show up with that
```

Page 113

1           hashtag.

2                   MS. GORDON: Yeah. I'm well aware.

3       BY MS. GORDON:

4       Q    So you're saying you're RayWash862 (sic)?

5       A    Yes. Without the dot. The dot means everything

6            between those things.

7       Q    I heard you, sir.

8       A    Yeah. I mean, this is - and I'm not the techie but

9            I know that much.

10      Q    So let's see what you've got - we'll pull that up

11           and see what you've got on that.

12                  MS. GORDON: It's the same page. It's the same

13           page. You've got the dot 862. And are you saying

14           this is the Sheriff's page?

15                  MS. DELMASTRO: No. I'm not making any

16           representation about that.

17                  MS. GORDON: All right. Yeah. I hear you.

18                  MS. DELMASTRO: I'm just - okay. Since you

19           didn't make any copies, I'm just trying to find

20           what you're showing him.

21                  MS. GORDON: Fair enough.

22                  THE WITNESS: Yeah. I'm as well -

23      BY MS. GORDON:

24      Q    So you're telling me that somebody else posted, for

25           example, the mask photo that I just showed you as

Page 114

```
 1          an Exhibit? Just to get - let me finish, Sheriff.
 2     A    Okay. I'm just trying to see the top of it.
 3     Q    Okay. I'll show you the top. The top is raywash. Do
 4          you have a CPL license?
 5     A    I do.
 6     Q    Do you have a professional instructor?
 7     A    I do.
 8     Q    Do you have an over 30 year's law enforcement?
 9     A    I am.
10     Q    Do you have experience director? And you follow
11          this, whoever this is. It looks - hang on a second,
12          sir. Tell me who some of the people you follow.
13              MS. DWYER: I'm just going to object to this
14          line of questioning. To the extent you want to ask
15          him if this this is his Facebook page or Instagram
16          page, then ask him that. I mean -
17              MS. GORDON: I did.
18              MS. DWYER: You have to verify. So foundation.
19          There's no verification that this page is his.
20              MS. GORDON: Okay. Well, we'll -
21              MS. DWYER: We're trying to help you get there.
22              MS. GORDON: You're not - I don't think you're
23          trying to help me do anything. I think the witness
24          is unclear.
25     BY MS. GORDON:
```

Page 115

1   Q    So let's go down on your page. The same page I just
2        pulled up.
3             MS. DWYER: I'm going to object to the extent
4        of foundation. It has not been established that
5        this is his page.
6             THE WITNESS: It is not my page.
7   BY MS. GORDON:
8   Q    Okay. Well, I was going to ask him. The page I've
9        pulled up, there's a picture on here of a woman in
10       a pink shirt that says, mom. Is that your mother?
11  A    It is.
12  Q    And there's the pictures of you in your mask that
13       we posted earlier.
14  A    Sure.
15            MS. DWYER: I'm going to make the same line of
16       Objection, that there is no -
17            MS. GORDON: You can go ahead.
18            MS. DWYER: We have not established that this
19       is his website page. So foundation.
20            MS. GORDON: You can have a standing objection.
21  BY MS. GORDON:
22  Q    Who is this woman in the white?
23            MS. DWYER: Excuse me. I said website page. I
24       meant Facebook page.
25            THE WITNESS: That's my wife.

Page 116

 1   BY MS. GORDON:

 2   Q    In the white?

 3            MS. DWYER: Can I please put my objection on

 4        the record?

 5            MS. GORDON: I think it's on there. But go

 6        ahead.

 7            MS. DWYER: No. I said website page. I don't

 8        know if you're looking at Facebook or Instagram.

 9        You're not showing me what you're showing the

10        witness. You haven't made copies for counsel.

11            MS. GORDON: I've given you all copies, guys.

12            MS. DWYER: No. You gave the witness one copy.

13            MS. GORDON: Fine. It's a simple thing. You can

14        read it.

15   BY MS. GORDON:

16   Q    Who's this down here, Sheriff? Next to you, that's

17        you in a yellow t-shirt, is that correct?

18            MS. DWYER: I need to look at what you're

19        showing the witness. I can't see. Same objection.

20        Foundation. I don't know what you're pulling up.

21        There's been no verification for the record. The

22        witness has indicated this is not his Facebook

23        page.

24            THE WITNESS: And it shows that it is not.

25            MS. GORDON: The witness is incorrect.

Page 117

1           THE WITNESS: It shows that it's not.

2           MS. GORDON: He is incorrect. And he's telling

3       you it is but I know it's correct.

4           MS. DWYER: How do you know it's correct?

5           THE WITNESS: If you bring it down to the name.

6           MS. GORDON: I can verify it.

7           MS. DWYER: Okay. Verify it with who?

8           MS. GORDON: Listen. I know you're all

9       concerned about this, okay.

10          MS. DWYER: No one's concerned. We're just

11      trying to -

12          MS. GORDON: I've got a lawyer standing up now

13      and two people just chatting. Lina, come on. This

14      is a one lawyer situation here.

15          MS. DWYER: That is not true.

16          MS. DELMASTRO: That is not true.

17          MS. DWYER: She represents the county and she

18      Is properly listed.

19          MS. GORDON: One person can conduct the dep.

20      You can't have two.

21          MS. DWYER: She can place objections on the

22      record.

23          MS. GORDON: No, she cannot.

24          MS. DWYER: Sure she can. She's on behalf of

25      the county. She can place objections on the record.

```
                                               Page 118

 1           MS. GORDON: Fair enough. For the county. But
 2       this is –
 3           THE WITNESS: Ma'am, I keep asking you to show
 4       me the name. Can you please show me the name of
 5       this?
 6           MS. GORDON: It's on the –
 7           MS. DWYER: I'm not going to let the witness
 8       answer any questions unless you show me the –
 9       whatever page it is that you're pulling up.
10           THE WITNESS: I'm just asking you to show me
11       what you're looking at.
12           MS. DWYER: Just wait, Sheriff.
13           MS. GORDON: Here it is. There it is.
14           THE WITNESS: I keep saying that dot means
15       everything. That is not my page.
16           MS. DWYER: Let the record reflect the witness
17       has now repeatedly stated that the page that is
18       being shown to him is not his Instagram account.
19   BY MS. GORDON:
20   Q   Sheriff, you cannot have your phone out.
21   A   Okay. I'm sorry.
22   Q   So do you agree, do you roughly follow 363 people?
23       3603 people?
24           MS. DWYER: Objection. Calls for speculation.
25           MS. GORDON: No, it doesn't. It's his Instagram
```

Page 119

1          account. Don't be ridiculous.
2               THE WITNESS: No.
3     BY MS. GORDON:
4     Q    Is that how many people you follow?
5     A    I have no idea.
6     Q    So are you denying that the Instagram page that I
7          just showed you, which we're going to now take a
8          photo of, are you saying that's definitely not your
9          page?
10    A    Yes.
11    Q    Because I'm going to have it – if – don't take any
12         Instagram pages down. Sheriff, are you listening to
13         me?
14    A    Yes.
15    Q    Don't take any pages down.
16    A    Okay.
17    Q    Because to the extent you're denying something
18         which happens to be true, I'm going to have to now
19         get a forensic expert. So do not touch this page.
20         If this page goes down –
21    A    I'm not touching that page at all. I don't even use
22         that page.
23    Q    Okay. That's false, Sheriff. You use that page.
24    A    I have used it or I use it?
25    Q    Well, who – may I have the exhibits back, please?

Page 120

1          So it's your testimony here today that on
2      Exhibit 1 in this post where it says, followed by
3      Ray Wash, you're saying somebody made this up? It's
4      in yellow.
5          MS. DWYER: I'm going to object to the extent
6      this, again, lack of foundation. The witness has
7      already testified that this is not his account.
8          THE WITNESS: Never seen it.
9          MS. GORDON: You know, that's not a real
10     objection.
11  BY MS. GORDON:
12  Q    So you're telling me, with the Sheriff's hat on,
13     somebody made that up?
14  A    Yeah. I didn't do it.
15         MS. DWYER: Calls for speculation. You can ask
16     him if it's his account.
17  BY MS. GORDON:
18  Q    So you're saying –
19         MS. DWYER: How would he know if somebody made
20     it up.
21  BY MS. GORDON:
22  Q    And so who would do that?
23  A    Reggie Crawford.
24         MS. DWYER: Calls for speculation. Objection.
25         THE WITNESS: This guy right here. Reginald's

Page 121

1          Post, as it says. Reginald's Post.

2     BY MS. GORDON:

3     Q    Do you know Reginald?

4     A    Yeah.

5     Q    Who is it?

6     A    Somebody who I used to work with in Detroit Police

7          Department. Someone who was a union leadership in

8          the Wayne County Sheriff's Office. Someone whose

9          wife told me and my wife that he's out of his mind.

10         Just so you know.

11    Q    But this doesn't mean - I mean, this just means

12         this was taken from his page. And I'm going to show

13         you in a minute how this was taken from his page

14         and it was given to people in your office. But I'm

15         just showing you that you followed the individuals

16         that are below.

17              MS. DWYER: Same objection. Foundation.

18              MS. GORDON: We're going to get to that.

19              THE WITNESS: And I'm saying that that's not my

20         page.

21              MS. DWYER: Same objection.

22    BY MS. GORDON:

23    Q    But you do agree that Exhibits 2, 3 & 4 that I gave

24         you are your posts and that's your content,

25         correct? You do agree with that? We've already

Page 122

1           covered that, correct?

2     A     No, not necessarily. And I can't say that. I have

3           to ask - it appears to be but I would like to see

4           what is between the H and the A. It appears to be a

5           dot. It appears to be a dot. And again, I'm trying

6           to look at it closely. But it appears to be a dot.

7     Q     What's your administrative assistant's name?

8     A     My administrative assistant?

9     Q     Uh-huh.

10    A     Rashaun Whitehead, my executive assistant.

11    Q     So Rashaun Whitehead was texting with Regina Parks.

12          And I'll show you Bates stamp Parks Production 591.

13          This is from Ms. Whitehead and Ms. Parks. And this

14          is being sent to your administrative assistant. It

15          is what you have in front of you as Exhibit 1. It's

16          being sent by Regina Parks to Rashaun. And Rashaun

17          writes back, I saw that. Take a look. Excuse me.

18          Just, again, for the record, Sheriff, I apologize.

19          591.

20              Do you see that? That was passed in round in

21          your office to your administrative assistant?

22    A     I've never seen it.

23    Q     I know you haven't. I'm showing - it was produced,

24          though, to your counsel.

25    A     And it also says, they are so ignorant. This is the

```
 1        page two.
 2              (Document marked for identification as
 3              Plaintiff's Deposition Exhibit Number 5.)
 4   BY MS. GORDON:
 5   Q    So now I'm going to hand you - I'm going to hand
 6        you Number 5. Do you follow somebody named
 7        msandrea.tv on Instagram?
 8   A    Msandrea?
 9   Q    I'll hand you Exhibit 5. That says, followed by
10        raywash.826.
11              MS. DWYER: Objection. Again, foundation. The
12        witness has already testified that if it says dot
13        is not his page.
14              THE WITNESS: This is not my page.
15   BY MS. GORDON:
16   Q    Okay. So again, if I go to your Instagram page and
17        I look at who you're - what I say is your Instagram
18        page and I see who you're following, it's going -
19        that individual is going to be who you are
20        following.
21   A    That's -
22              MS. DWYER: Objection to the form of the
23        question.
24   BY MS. GORDON:
25   Q    So you're telling me some unknown person has
```

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

Page 124

1        created a fake Face - Instagram page for you and is

2        now also following people. Is that what you're

3        telling me?

4   A    I'm telling you, it's the person that probably told

5        you that that says Reginald Crawford up top.

6   Q    So Reginald Crawford. Okay. And who is he?

7   A    And whoever else he -

8   Q    Who is Reginald Crawford?

9   A    He used to be a union leader at the Wayne County

10       Sheriff's Office.

11  Q    Where is he now?

12  A    Despises me. And he's retired.

13  Q    So have you ever taken up the fact with him that he

14       has a fake Facebook account for you?

15  A    No, I hadn't. But his wife came up to me and said

16       some things to me and my wife.

17  Q    Well, this seems to me like you might have a civil

18       or criminal action against him based on what you're

19       saying.

20            (Document marked for identification as

21            Plaintiff's Deposition Exhibit Number 6.)

22  BY MS. GORDON:

23  Q    I'm going to hand you Number 6. This is, again,

24       followed by raywash.826. This is a photo - I'm

25       sorry. Followed by raywash826. This is a woman

Page 125

1        named Giselle Lynette. I'm going to hand you

2        Exhibit 6.

3               MS. DWYER: Same objection, foundation. Again,

4        the witness has testified this is not his account.

5        Raywash.826 is not this witness's account.

6               (Document marked for identification as

7               Plaintiff's Deposition Exhibit Number 7.)

8    BY MS. GORDON:

9    Q    I'm going to show you Exhibit 7. Again, followed by

10        Raywash.826. Lovelynico - N-I-C-O-C-O-A. That's

11        also followed by Raywash.826, is that correct?

12               MS. DWYER: Same objection. Foundation. This

13        witness has already testified this is not his

14        account.

15    BY MS. GORDON:

16    Q    Do you see that that's followed by Raywash?

17               MS. DWYER: Counsel is looking at the singular

18        Document that's being circulated through the room.

19    BY MS. GORDON:

20    Q    You've had your, whatever your Instagram account is

21        that you say this is not it, that's been up for how

22        long?

23    A    A long time.

24               MS. DWYER: Objection, form. That's vague.

25    BY MS. GORDON:

Page 126

```
 1    Q    Is it a new account? Is it an old account?
 2    A    No.
 3    Q    So anybody that follows you on Instagram is going
 4         to have all of your posts on their account. Anybody
 5         that follows you, right?
 6    A    I don't know how that all -
 7              MS. DWYER: Objection. Foundation.
 8    BY MS. GORDON:
 9    Q    Fair enough. So you're denying Number 7.
10              MS. DWYER: You didn't ask him that question.
11         I hand - I circulated it around so if you have a
12         question.
13              MS. GORDON: Well, you took it. Okay. Then I'll
14         ask you.
15    BY MS. GORDON:
16    Q    Are you denying that that is somebody you follow on
17         your Facebook page where you identify yourself as a
18         Sheriff?
19    A    Yes.
20    Q    So you're denying that.
21    A    And this -
22              MS. DWYER: And to foundation.
23              THE WITNESS: Yeah.
24              MS. GORDON: What are you pointing to, Maria?
25              MS. DWYER: The name that's on the Instagram.
```

Page 127

1          THE WITNESS: It is followed by raywash.826.

2     That is not me.

3          MS. GORDON: You cannot be pointing things out

4     to him. I don't know what your point is here but.

5          MS. DWYER: Well, foundation. We already

6     objected to this.

7          MS. GORDON: I know you guys want to say what

8     you're going to say, but we're just going to plow

9     through here with the questions.

10         MS. DWYER: We've already indicated this is not

11    his account and you keep showing him photographs.

12         MS. GORDON: You don't know that it isn't,

13    Maria.

14         MS. DWYER: The witness has testified that this

15    is not his account.

16         MS. GORDON: Your witness has said many things

17    to you that are false.

18         THE WITNESS: Wow.

19         MS. DWYER: He gave you what the Instagram

20    account was and you're showing him documents from a

21    different Instagram account. On the record he

22    testified his account does not have a dot in it.

23    And you continue to show him photographs of an

24    incorrect Instagram account.

25         THE WITNESS: They can pull up their stuff.

Page 128

1          MS. GORDON: Raywash.826.

2          MS. DWYER: That's not what you're showing him,

3      Deb. The documents that you are showing him, for

4      the record, is raywash.826.

5  BY MS. GORDON:

6  Q    You want to go into your private account for me?

7  A    I can go to my phone now?

8  Q    Sure. Let's see it. Can you give us the password?

9          MS. DWYER: No. Absolutely not.

10         THE WITNESS: No.

11         MS. GORDON: Well, I'm going to be allowed to

12     get it anyway.

13         THE WITNESS: Well –

14         MS. GORDON: People are getting social media.

15         MS. DWYER: That's not true. Objection.

16         MS. GORDON: Well, then I'm going to have to

17     sit here and look at it on his phone. You pull up

18     your account for me, Sheriff.

19         THE WITNESS: I'm trying to get to it.

20         MS. DWYER: Before you ask any questions, we'll

21     take a break. I haven't looked at whatever it is

22     that he's pulling up. I'm not going to let the

23     witness –

24         MS. GORDON: Can he just pull up the front of

25     it and then you guys – so I can see what you're

Page 129

1          looking at?

2              MS. DWYER: What account is it that you're

3          asking about? His Instagram?

4              MS. GORDON: What he says is his actual

5          Instagram account.

6              MS. DWYER: Instagram. Okay.

7              MS. GORDON: So I'd like to see that. And then

8          you may - you want to take a break. I get it.

9              MS. DWYER: She's asking you for your official

10         Instagram.

11             MS. GORDON: Not official. His personal. It's

12         his personal account. He's already said that.

13             MR. HUTTON: His authentic account.

14             MS. GORDON: The one you say is his real one.

15             MS. DWYER: The raywash826 is what they're

16         looking for.

17             MS. GORDON: Yes. I would like him to pull it

18         up.

19             MR. HUTTON: What you are claiming is his

20         authentic account.

21             MS. GORDON: May I see it? Just the front page.

22             THE WITNESS: And you know what -

23             MS. DWYER: There's no question.

24             THE  WITNESS:

25      BY MS. GORDON:

Page 130

1    Q    Who is Sandy –

2              MS. GORDON: I'm going to ask a question.

3    BY MS. GORDON:

4    Q    Who's Sandy Danto? All right. I got it. Let's see

5         the front page so I can identify what you guys are

6         saying.

7              MS. DWYER: This is your Instagram account?

8         This is your Instagram account?

9              THE WITNESS: Oh, hold on. No. Wait a minute.

10        Yeah, it is.

11             MS. GORDON: Can I take a look, please?

12             MS. DWYER: We're not – we'll put it right

13        here. I don't want you scrolling through it.

14             MS. GORDON: Guys, I'm going to do anything. I

15        can't see it if it's laying on the table.

16             THE WITNESS: I'm going to show it to you. The

17        things that you're saying is –

18             MS. GORDON: I'm going to hold it in my hand so

19        I can see it. You can come over here and watch me

20        hold it.

21             THE WITNESS: I'll let you see the pages.

22        This is my Instagram.

23             MS. GORDON: I'm really sorry, Sheriff.

24             THE WITNESS: Can I come over there to you?

25             MS. GORDON: Yeah. You can just watch me

Page 131

```
 1          looking.
 2               THE WITNESS: I can't watch you from behind
 3          you.
 4               MS. DWYER: Just for the record, the Sheriff is
 5          walking his phone around to show plaintiff's
 6          counsel his page on his Instagram account.
 7               MS. GORDON: Let's see what you got.
 8               THE WITNESS: That the same thing you have?
 9          Here. Here.
10               MS. GORDON: I know. I just want to see the
11          name of the account.
12               THE WITNESS: Right here.
13               MS. GORDON: Let's go all the way up.
14               THE WITNESS: Raywash826. No dots. No nothing.
15               MS. GORDON: Can I scroll down here for a
16          second?
17               THE WITNESS: Sure, sure.
18               MS. GORDON: Okay. We're just going to take a
19          picture of this.
20               MS. DWYER: And for the record, because it's
21          not on camera, Counsel was scrolling through the
22          Instagram account that Sheriff Washington -
23               MS. GORDON: No. Just - I didn't open anything.
24          It was just, yeah, he showed - I went through the
25          first three pages. Okay. Thanks.
```

Page 132

```
 1              You guys go take a break.
 2              (Brief pause.)
 3      BY MS. GORDON:
 4      Q    Sheriff, so you took a break. You had a chance to
 5           look at your account. Am I correct that you have
 6           two different Instagram accounts? The one you
 7           showed me on your phone and the raywash.826?
 8      A    Yeah, that's not mine.
 9      Q    So you're continuing to say this account is not
10           yours?
11      A    Right.
12      Q    I'm going to ask you to - we're going to look at
13           the account. You can pull it up on your phone if
14           you want, if that's easier. But I've got it up on
15           the screen and we're going to go through it. So
16           this is the account you say is not yours.
17      A    Right.
18      Q    Raywash.826. It's a picture of you, a headshot. And
19           then it says 654 posts, 2249 followers, 3623
20           following. Let's start going down. So Sheriff, as I
21           understand what you're telling me, this individual
22           named, is it Reginald Crawford?
23      A    Or anyone else.
24      Q    You're not sure.
25      A    I'm not sure. Yeah.
```

Page 133

1    Q    You're not sure?

2    A    I'm not.

3    Q    But you suggested Reginald. So you're saying you're

4         not sure.

5    A    I find that right there.

6    Q    I know. Is it fair to say you'd - this is not an

7         account you created. Somebody else created but

8         you're not exactly sure who.

9    A    Yes.

10   Q    Is there anybody you would think of that had done

11        this?

12             MS. DWYER: That calls for speculation.

13             MS. GORDON: No. If he has some ideas of people

14        that might want to post his material.

15             MS. DWYER: Same objection.

16             THE WITNESS: I don't know.

17   BY MS. GORDON:

18   Q    Did you say Crawford, something about earlier he

19        might want to harm you.

20   A    He does today.

21   Q    But this Instagram page is very favorable to you.

22        Do you realize that?

23   A    I don't know. I don't look at that. Well, I just

24        want to confirm that you're a CPL pro concealed

25        pistol license, professional instructor, over 30

Page 134

1          years of law enforcement, correct?

2     A    M'hm. Yes.

3     Q    Director of security, GGT, PAW, Inc.

4     A    Yes.

5     Q    So let's start going down here. And we'll go down

6          to where your - go back up, Mo, to where your mom's

7          picture is in the pink. How would any third party

8          have gotten that photo, if you know?

9               MS. DWYER: Objection. Calls for speculation.

10    BY MS. GORDON:

11    Q    If you know.

12              MS. DWYER: Same objection.

13    BY MS. GORDON:

14    Q    If you know, how would somebody have gotten that?

15    A    I don't know. Other than going to my page and

16         taking pictures from my page and put on other

17         pages.

18    Q    So that's what your guess is.

19    A    That's common.

20    Q    And then people are posting on there by the picture

21         of your mother.

22    A    Yeah.

23    Q    And somebody who you say is impersonating you,

24         Sheriff, says, Happy Mother's Day, Mom. You will

25         always be my first love. So you think somebody made

Page 135

1         that up and posted that?

2    A    Yeah. Because I don't even talk like that.

3    Q    And then somebody else said, please tell your mom I

4         said, miss her and have a wonderful Mother's Day.

5         You don't know who - do you know who that is?

6             MS. DWYER: I'm going to continue this line of

7         - objection to this line of questioning. The

8         witness has indicated this is not his Instagram

9         account.

10            MS. GORDON: It doesn't mean I can't ask him

11        who these - if he knows who these people are that

12        are posting.

13            THE WITNESS: So I do know who the person is.

14        However, that person thinks that's me. That's why

15        they would say those kind of things.

16   BY MS. GORDON:

17   Q    Let's keep scrolling. What's the date on this?

18        Yeah. What is the date? This is May 10, 2020. So

19        let's keep going. Stop. We've got the COVID posts.

20        We've got - and is that - and the woman on the

21        right with -

22   A    Yeah.

23   Q    Who is that?

24   A    That's my wife.

25   Q    And how would someone - did you post that on

Page 136

1           another account somewhere?
2    A      I don't know.
3    Q      Well, you've got access to your personal account.
4    A      Yeah, I do.
5    Q      You're not going give me access to your personal
6           account?
7    A      This one? This right here?
8    Q      No. Your –
9    A      My personal?
10   Q      Your personal account?
11   A      No, no. I showed it you.
12              MS. DWYER: Well, I mean, Counsel has placed an
13           objection on the record as to his personal account.
14              THE WITNESS: I could've erased those things by
15           now on my personal account. I don't keep like
16           hundreds and hundreds of pictures on my account.
17   BY MS. GORDON:
18   Q      You erase your Instagram?
19   A      Occasionally. On my different pictures.
20   Q      Well, just keep your personal account because given
21           the situation, we will undoubtedly be taking
22           further steps. Let's go back. Yeah. So then here's
23           you at a dinner table, you clinking glasses. These
24           are all personal photos, agreed?
25   A      Yes.

Page 137

1    Q    And so the question then is, can you show me - and

2         I'm not asking you to do it today. But could you

3         show me that all of this already exists in the

4         public domain? Because you're telling me somebody

5         found these photos, sir. Somebody found these

6         photos and then reposted them on a fake account, I

7         guess to make you look good and saying you're

8         wishing your mother a happy Mother's Day.

9              Why would somebody do that?

10             MS. DWYER: Calls for speculation. Objection.

11             THE WITNESS: I don't know.

12   BY MS. GORDON:

13   Q    So you've known this account is out here for a

14        while, is that correct?

15   A    I didn't know it was still there.

16   Q    But you knew at some point.

17   A    I knew at some point.

18   Q    And you took no steps that somebody was allegedly

19        running a fake account of yours.

20   A    What kind of steps? Like what?

21   Q    Like I said, I mean, you can contact your providers

22        and tell this isn't your account. This is a fake

23        account.

24   A    I've never done that.

25   Q    Let's keep going back.

Page 138

1    A    I'll just erase them or something like that.

2    Q    So continue. Let's go slowly. We see - let's stop

3         here. There's you in the yellow T-shirt. Who's the

4         woman next to you on the -

5    A    That's my wife.

6    Q    Again, any idea how third parties would get these

7         photos of you and your wife?

8              MS. DWYER: Objection. Calls for speculation.

9    BY MS. GORDON:

10   Q    Any idea?

11   A    They can take them anywhere.

12             MS. GORDON: No. It's not speculation.

13        Sometimes people post other things on Facebook that

14        are accessible.

15             MS. DWYER: It calls for speculation. How would

16        he know how someone obtained photos and reposted

17        them?

18             MS. GORDON: I didn't ask that.

19             MS. DWYER: That calls for speculation.

20             MS. GORDON: I did not ask that.

21   BY MS. GORDON:

22   Q    Did you post these?

23             MS. DWYER: You did.

24             MS. GORDON: Okay. Maria, you got to let us get

25        through this dep.

Page 139

1          MS. DWYER: My job is to put objections on the

2       record. That's what I did.

3          MS. GORDON: But you're doing far more than

4       that.

5          MS. DWYER: I am not. All I said was,

6       objection, calls for speculation. How is that going

7       far beyond that?

8          MS. GORDON: Okay. It doesn't call for

9       speculation.

10   BY MS. GORDON:

11   Q    Did you post this content elsewhere where some

12        third party could get it?

13   A    Possibly.

14   Q    All this could have been posted. Where might it

15        have been posted? What are the possibilities?

16   A    I don't know. Facebook when I had a Facebook

17        account and maybe I got rid of that account, got

18        another account. I don't know.

19   Q    When did you get rid of your Facebook account?

20   A    I don't know. I'm saying I could have.

21   Q    Well, do you have a Facebook?

22   A    I don't recall doing any of this on this account.

23   Q    Do you have a Facebook account today?

24   A    Yeah.

25   Q    What's your Facebook name?

```
                                            Page 140

 1              (Confidential portion page 140, line 2.)

 2         THE WITNESS: ███████████████████.

 3         MS. DWYER: Is that your personal account?

 4         THE WITNESS: Yeah. My personal Facebook.

 5         MS. DWYER: For purposes of the record, we'll

 6    put that under confidentiality as well, please.

 7    Thank you.

 8 BY MS. GORDON:

 9 Q    How long have you had that Facebook account?

10 A    For a long time.

11 Q    That's a – roughly how long?  More than five years?

12 A    Probably, yeah, more than five years.

13 Q    Do you still post on that Facebook account?

14 A    Occasionally, yeah.

15 Q    Is that open to the public?

16 A    I don't think so but you can check it.

17 Q    Do you have any other Facebook accounts other than

18      the one you just referenced?

19 A    No.

20 Q    Do you post on any other social media? Do you post

21      on X or what used to be Twitter?

22 A    Not at all.

23 Q    Let's keep going here. So now, all right. We've

24      got, is that a picture of your home there with a

25      big screen tv?
```

Page 141

1    A    It is. M'hm.

2    Q    A video in your home. Would you have posted that in

3         a place where somebody from the public could have

4         received it?

5    A    Yeah. On Facebook.

6    Q    You're guessing. You don't recall posting it?

7    A    Yeah. I mean, I'm sure.

8    Q    We'll ask you to produce all your Facebook content.

9    A    These events that have happened.

10   Q    So here's pictures as we can see of, what is this?

11        A Super Bowl party or something like that.

12   A    Something like that, yeah. Something like that.

13   Q    Lots of, all, this is all in your home?

14   A    M'hm.

15   Q    And do you know who was taking that video?

16   A    I probably was. Or my wife.

17   Q    Why would a third party want to post this?

18            MS. DWYER: Objection. Calls for

19        speculation.

20   BY MS. GORDON:

21   Q    Is there a reason that you can think of?

22   A    I can tell you, that's not my account.

23   Q    Do you think somebody did this, created this fake

24        account to harm you?

25   A    Yeah.

Page 142

1    Q    Is there harm in seeing your nice family home with

2         a –

3    A    Yeah. Nobody should be – if I didn't post that on

4         there, nobody else should be doing it.

5    Q    Let's keep going. So now we've got a Martin Luther

6         King post. We've got a church attendance. Why would

7         somebody want to put on your account Martin Luther

8         King and church attendance? Does that harm you?

9              MS. DWYER: Objection. Calls for speculation.

10        And compound.

11             MS. GORDON: No. This man is –

12             MS. DWYER: It's compound.

13   BY MS. GORDON:

14   Q    Can you think of any reason why somebody would want

15        to post on your behalf a Martin Luther King quote?

16             MS. DWYER: Objection. Calls for –

17   BY MS. GORDON:

18   Q    Anybody you know of that would want to do that?

19             MS. DWYER: Objection. Calls for speculation

20        and compound.

21             MS. GORDON: It's not speculation. It's, does

22        he know any reason.

23             THE WITNESS: I have no idea.

24   BY MS. GORDON:

25   Q    So you can't provide any reason somebody might be

1        doing this. All right. Who's the next picture below
2        in the burgundy top? Is that you and your wife?
3    A   Yes.
4    Q   And who's Tammy?
5    A   She's a person that my wife and I know.
6    Q   Do you think that's - so she also thinks this is
7        your real account?
8    A   Yeah.
9    Q   You've never told her, hey, there's a fake account
10       out here. And the fake account shows that I'm
11       following a lot of nude people. You never told her
12       that?
13   A   No.
14           MS. DWYER: I'm going to object to the extent
15       the witness has already testified that he didn't
16       even know this was out there as he stated here
17       today.
18   BY MS. GORDON:
19   Q   Okay. Go ahead. Well, you said you knew about this
20       account.
21   A   Sometime - yeah. I mean, when it was -
22   Q   You knew about — you said you knew about this.
23   A   But I never knew it was still out there. If it's
24       still out there. I don't know if this is new or
25       not.

Page 144

1    Q    Well, you never checked.

2    A    No. I wasn't going around checking those things.

3         Once I found out it wasn't me. Some people knew.

4    Q    So you knew at some point and you – okay. So let's

5         just keep scrolling down a bit. Keep going. We're

6         continuing to scroll through pictures. Nice

7         pictures of you and your family, correct? You agree

8         these are nice pictures of you and your family.

9    A    Sure.

10   Q    Church pictures, correct?

11   A    Yes.

12   Q    Somebody on crutches. Muhammad Ali. Other pictures

13        of you and your wife. More Happy Mother's Day

14        posts. Is that the Jacksons? Looks like Michael

15        Jackson.

16   A    No. That's me and my siblings.

17   Q    Sorry. You do look a little like Michael Jackson

18        there.

19   A    That was a long time ago.

20   Q    That big smile. Okay. And then somebody put your

21        CPL pro concealed license instruction on that. What

22        is that, sir? What is the CPL that you're pro?

23   A    I'm a CPL instructor.

24              (Confidential portion page 144, line 25.)

25   Q    What's the number? ████    –

Page 145

```
 1    A    That's my number.

 2    Q    2824. That's your own phone number.

 3    A    Where's that at? Yeah, that's my number.

 4              MS. DWYER: 2884, is that your personal phone?

 5              THE WITNESS: 2884. That's how you call me to –

 6              (End of confidential portion page 145, line

 7         5.)

 8    BY MS. GORDON:

 9    Q    So this is a post from you –

10              MS. DWYER: Hold on one second, Deb. Madam

11         Court Reporter, please place that under

12         confidentiality.

13    BY MS. GORDON;

14    Q    So this is, seats still available for my CPL pro

15         class this Saturday, March 16, 9:00 to 1:00. Very

16         affordable, expert instruction. Don't procrastinate

17         any further. Contact me ASAP for details. You'll be

18         glad you did. And then that's got your phone number

19         on it, correct?

20    A    Yes.

21    Q    And then you taught that class, correct?

22    A    Yes. If someone signed up.

23    Q    And this is what date? 2019. Okay. And then we've

24         got more pictures of others. Let's hold up. Who's

25         that there with you in the blue suit and the
```

Page 146

```
 1        glasses?

 2   A    Right here?

 3   Q    Uh-huh. Who's that?

 4   A    My ex brother-in-law.

 5   Q    Who's that?

 6   A    It's my wife.

 7   Q    Next one.

 8   A    My wife. My cousin.

 9   Q    And then who's this with you, the two gentlemen?

10   A    Warren Evans and a golfer.

11   Q    Oh, that's Warren Evans. Okay. Who were those three

12        individuals in the red? Two in the red and one in

13        the dark blue.

14   A    Cousin and two friends.

15   Q    Where would that have been taken?

16   A    Probably was at the golf course. At the golf

17        outing.

18   Q    What golf course are you going to?

19   A    Detroit Golf Club.

20   Q    And then there's an honoring of the veterans. And

21        then a note saying, your vote counts. And there's

22        you and Debbie Stabenow, the senator, correct?

23   A    Yes.

24   Q    And then another CPL pro?

25   A    Yes.
```

Page 147

1    Q    So there was a bracelet on there?

2    A    Yeah.

3    Q    That's your bracelet.

4    A    Yeah.

5    Q    Why would you post? Why would - what is that about?

6    A    Somebody made that.

7    Q    Greater Grace Temple. That's your temple, Greater

8         Grace?

9    A    That's probably where I was.

10   Q    Do you belong to Greater Grace? Is that your

11        congregation?

12   A    I do.

13   Q    So whoever this is made a fake post about

14        rayash826, Greater Grace Temple. And then with you

15        with the bracelet.

16   A    Yes.

17   Q    Is there some meaning to the bracelet?

18   A    No. It's a bracelet. Just I got a bracelet on now.

19   Q    I just wondered why a photo was taken of it. Is

20        there some special meaning to it?

21   A    No. It's probably - no.

22   Q    Let's go scroll back up to the hospital bed.

23        There's a photo there of a hospital bed. Henry Ford

24        West Bloomfield Hospital.

25   A    My mother.

Page 148

1    Q    Your mother was ill obviously?

2    A    Yes.

3    Q    Do you remember posting that photo anywhere

4         publicly where somebody else that was trying to

5         impersonate you could get it? Do you remember

6         posting it elsewhere?

7              MS. DWYER: I'm just going to object. You

8         utilized the term publicly.

9              THE WITNESS: Right.

10             MS. DWYER: The witness has already testified

11        that he has a personal account that you have to be

12        let into it so it's not public.

13             MS. GORDON: I knew that. I didn't ask him

14        about that account.

15             MS. DWYER: You said publicly.

16             MS. GORDON: Yes. I said, did you post that

17        anywhere –

18             MS. DWYER: Publicly. Right.

19             MS. GORDON: I wasn't referring to his private

20        account.

21   BY MS. GORDON:

22   Q    Did you post that anywhere where somebody from the

23        public could have seen that?

24   A    Outside of here? I don't think so.

25   Q    All these comments, well-wishers to a fake person

Page 149

```
 1        that's not Ray Washington, correct?
 2   A    Again, those people think that that's me. When they
 3        pull up something and it says raywash.826 they
 4        think that it's me. They're people who know me.
 5        Does that make any sense?
 6   Q    I won't answer that.
 7   A    Okay.
 8   Q    Let's keep going. Let's go back to that. Henry
 9        Ford. Did you go to Henry Ford High School?
10   A    High School? Yes, I did.
11   Q    So where did that come from? How would a third
12        party get ahold of your Henry Ford class of 1978
13        40th reunion photo?
14            MS. DWYER: I'm going to object.
15   BY MS. GORDON:
16   Q    Do you have any ideas on how a third party would
17        get ahold of that, sir? Do you have any idea how
18        somebody would get ahold of your Henry Ford class
19        of '78 40th reunion photo that you attended? It
20        looks like you attended your reunion.
21   A    I would be guessing.
22   Q    Well, do you know of anybody that would've had
23        that, would've wanted to post it on a fake account?
24        Anybody you know of?
25            MS. DWYER: Same objection, speculation.
```

Page 150

1            THE WITNESS: I would - I don't know.

2    BY MS. GORDON:

3    Q    So I assume you went to your 40th reunion and this

4         is, you know, material what was put together. And

5         did you take that photo that is posted there?

6    A    Probably did. I keep saying over and over again, if

7         I posted that on my account, somebody - you can go

8         on my account, you can take the picture off of my

9         account and put it on another account. You can take

10        a picture of a picture, you can put it back on your

11        account, add it to yours. There's so many things

12        you can do with this stuff out here now.

13   Q    Yeah. I'm aware of that. Sheriff, are you talking,

14        when you say off of your account, are you talking

15        about your actual, what you call your actual

16        Instagram account?

17   A    Yeah, possibly could have done that.

18   Q    So is there anywhere else other than what you call

19        your own private Instagram account where this

20        would've been posted?

21   A    My account hadn't always been private.

22   Q    Which account? The other one?

23   A    My Facebook.

24   Q    This is Instagram we have up.

25   A    Yeah. Instagram as well. I had to make it private

Page 151

```
 1        because of all the things that were going on in
 2        Facebook and Instagram.
 3    Q   So you're suggesting that this third party may have
 4        had access to your other account and pulled stuff
 5        off of there, your other raywash826?
 6    A   Possibly.
 7    Q   So then you would see a list of followers of that
 8        account and you can go to all the followers. How
 9        many followers do you have on that other account?
10    A   Again, followers, I don't have - I don't know how
11        many. A lot of them. But however, if it was open -
12        if it was open, anybody can go on.
13    Q   So do you recall when it was open?
14    A   I don't.
15    Q   Do you remember if it was ever open?
16    A   Yeah, it was.
17    Q   When did that stop?
18    A   I didn't make things private until this whole
19        internet people hacking people's -
20    Q   When was that, Sheriff?
21    A   I'm not sure.
22    Q   Five years ago?
23    A   I'm not sure.
24    Q   Can you give us an estimate?
25    A   I'd be guessing. But it's definitely, I did change
```

Page 152

```
 1        it.
 2   Q    Do you take Claritin Non-Drowsy?
 3   A    What's that?
 4   Q    Claritin Non-Drowsy, it's posted up there.
 5   A    Oh, yeah. Yeah.
 6   Q    That's what something you use?
 7   A    Not anymore but when I have sinus attacks, I do.
 8   Q    Okay. Let's keep going down. Let's stop. Let's go
 9        back up to reminders. Believers only. Don't ever
10        forget when the anointing is on your life there's
11        also a bounty.
12             Okay. So again, this is a nice post, correct?
13        It says - supposed to be an inspirational post,
14        correct?
15   A    M'hm.
16             MS. DWYER: I mean, objection. I don't know but
17        it -
18             MS. GORDON: Well, I asked the witness and he
19        said, uh-huh. So that's what I'm going with. And I
20        think anybody -
21             MS. DWYER: I don't know. Objection, form.
22             MS. GORDON: I don't want to argue with you,
23        Maria. But obviously this is a nice post. It's a
24        positive post.
25   BY MS. GORDON:
```

Page 153

1    Q    Sheriff, you would agree with me, wouldn't you?

2              MS. DWYER: I mean, objection. Form. No, I

3         don't agree with you.

4              MS. GORDON: Okay. You're not under oath, my

5         friend.

6    BY MS. GORDON:

7    Q    Sheriff, this is -

8              MS. DWYER: Object to form.

9              THE WITNESS: It depends on how someone is

10        receiving it and how they're doing it.

11   BY MS. GORDON:

12   Q    You view that as a positive post, don't you?

13             MS. DWYER: Same objection.

14             MS. GORDON: Just I'll say for the record now

15        since everybody's into an argument over the

16        following post. Reminder, for believers only, don't

17        ever forget when the anointing is on your life

18        there is also a bounty!

19   BY MS. GORDON:

20   Q    So again -

21             MS. DWYER: If I can - when you're done. Go

22        ahead.

23             MS. GORDON: I just read something into the

24        record. There's nothing for you to say. Let's keep

25        going.

Page 154

1              MS. DWYER: And as a standing objection, again,

2        so I don't object to every time you show a photo

3        and ask him about it, the witness has testified

4        this is not his account.

5              MS. GORDON: That has been on this record for

6        well over an hour.

7              MS. DWYER: I just want to make sure that

8        that's clear and you're wasting time.

9              MS. GORDON: I know, you know, you feel - I'm

10       not wasting time.

11             MS. DWYER: It's not his account. It's not his.

12             MS. GORDON: You are by continuing to

13       interrupt. You have a stand - everybody knows that

14       it is your client under oath who said this is not

15       his account.

16             THE WITNESS: It is not.

17             MS. GORDON: Which will be discernible as a

18       matter of technology. So we get your point and you

19       don't have to keep saying it. I understand the

20       defendant's position here. Okay. Let's keep going.

21  BY MS. GORDON:

22  Q    Is that you on a motorcycle?

23  A    No.

24  Q    Who is that?

25  A    That's Lee Smith, deceased.

Page 155

1    Q    I'm sorry. Who is that?

2    A    Lee Smith.

3    Q    Was he a friend?

4    A    Yes.

5    Q    And what is that a photo of? It's a picture of, it

6         looks like a -

7    A    Might've been his funeral.

8    Q    It's his funeral. And there's a mounted patrol

9         there. Is that a DPD?

10   A    It was a combination of both, I believe it was.

11   Q    Very nice. You were at the funeral, I assume?

12   A    Yes.

13   Q    Let's go that keep scrolling down. Okay. Go slow.

14        Okay. So who's that in the blue and white? You're

15        in blue and white. You're with another gentleman?

16   A    Yes.

17   Q    Who is that?

18   A    His name is Dan.

19   Q    Who is he?

20   A    Friend of mine.

21   Q    Were you at the Detroit Lions event or practice?

22   A    It might have been a practice, yeah.

23   Q    We're continuing to scroll through. Again, you

24        posted none of this, that's your testimony,

25        correct?

Page 156

1    A    No. I didn't say that.

2          MS. DWYER: Objection, form.

3    BY MS. GORDON:

4    Q    On this account. On this account, is that correct?

5    A    Yes.

6    Q    Stop right there. What's the camel picture?

7    A    I was in Dubai with my wife and my family.

8    Q    So this, we are now in 2018. Did you typically post

9         on Martin Luther King Day?

10   A    Sure.

11   Q    Let's go back up. There was a, looks like maybe a

12        younger - down a little bit. A cap, a black and

13        white photo. What's this a photo of, Sheriff?

14   A    That's me.

15   Q    And what's the time period that photo would've been

16        taken? You were apparently a rookie out of the DPD

17        Academy, is that right?

18   A    Yeah. But that don't mean I took that then. I don't

19        even think we had Facebook and all that then.

20   Q    I just wondered when the photo was taken.

21   A    Yeah. It was taken but I don't think it was posted.

22        I know it wasn't posted back then.

23          MS. DWYER: Well, for the record, the photo was

24        March 29, 2018.

25          MS. GORDON: That was the post. I don't think

1      that's when the photo was taken. It was taken a

2      long time ago.

3              MS. DWYER: Yeah. To clarify it. If I didn't

4      say post, I meant post.

5  BY MS. GORDON:

6  Q    Okay. Go back up. Who's Bishop David, is it Ellis?

7  A    Yes.

8  Q    Is he a friend of yours?

9  A    It's my uncle.

10 Q    I'm sorry.

11 A    My deceased uncle.

12             MS. DWYER: And for the record, the post is

13     March 19th, 2018.

14 BY MS. GORDON:

15 Q    Okay. Let's keep going through slowly. Let's go

16     back up to the church. What church is that,

17     Sheriff? New Bethel?

18 A    New Bethel? I'm not sure.

19 Q    Well, it says at the very top under raywash, New

20     Bethel Church Ministries. Is that New Bethel, the

21     interior or is that your church?

22 A    No, that's out of town.

23 Q    Where is that?

24 A    In Kansas City. Me and Bishop Glenn Brady.

25 Q    So the fake poster writes, had the wonderful

1          opportunity to greet the congregation on Sunday.

2          New Bethel Church, Bishop Glenn Brady Pastor.

3    A    I wrote that. Now, where somebody got it from and

4          posted that -

5    Q    So you wrote that on your private account? Where

6          did you write that, sir? On your private account?

7    A    It was possibly on my private account.

8    Q    But it's posted by the fake person, the fake, the -

9          right?

10   A    Because when you write it, you can get all of that

11         off of wherever it is and put it on something else.

12   Q    So then we will ask you in a discovery request to

13         produce where you wrote those actual words that I

14         just read into the record, where you posted them

15         somewhere else with the picture where somebody got

16         a hold of it and put it down as you with your

17         picture.

18              MS. DWYER: Is there a question?

19   BY MS. GORDON:

20   Q    So just, we'll ask you for that.

21              MS. DWYER: Just for the record, this is from

22         December 24th, 2017.

23   Q    Okay. We're just continuing to scroll for the

24         record here and that we're on a videotape. So we'll

25         scroll. We're going to hurry up and go back down to

Page 159

```
 1          the bottom. This picture is at the bottom dated
 2          December 23rd, 2012. That's when the post was made.
 3          And it says, raywash. And then it says, steak night
 4          Flint. Does that say –
 5     A    Skate.
 6     Q    Oh. Skate night, Flint, Michigan. And that's a
 7          picture of you, obviously. And that goes all the
 8          way back to 2012, is that correct?
 9     A    Sure.
10     Q    That's when it was posted. And you think whoever
11          this individual is has been creating this fake
12          content, this fake Instagram site for you, for now
13          it would be, it's 15 years.
14     A    Yes.
15     Q    Is that your testimony here today?
16     A    I'm saying that, yes.
17     Q    Some person has created a fake account for you and
18          he or she has been doing it for 15 years.
19     A    And when I came on the Sheriff's Office, which was
20          about that time ago, that's when it started. Yes.
21     Q    And you haven't been able to figure out in 15
22          years –
23     A    I haven't tried to.
24     Q    Who are these individuals?
25     A    People that roller skate with me.
```

```
                                                       Page 160
 1    Q    I'm sorry?
 2    A    People that roller skate.
 3    Q    Who is the woman there in the blue sweater around
 4         your shoulders?
 5    A    I don't recall her name right now.
 6    Q    And who's the gentleman there? Who's at the table
 7         there?
 8    A    All those people are roller skaters.
 9    Q    And you were involved in a skating -
10    A    No. That was a little dinner or something. A
11         holiday something.
12    Q    And then who's that in the blue?
13    A    Same thing.
14    Q    Let's scroll up a little bit. Are these still
15         skaters that we're seeing at this point?
16    A    Yeah.
17    Q    Did you guys have a regular thing going where you'd
18         meet up and skate?
19    A    No. That was during the holiday time.
20    Q    Was this all one night or different nights?
21    A    Right here?
22    Q    With the skaters. With the skaters. Was that one
23         night or -
24    A    Yeah, one night. When you see us sitting around
25         eating.
```

Page 161

1    Q    What's this?

2    A    That was an auto show.

3    Q    And you were at the auto show, obviously, with your

4         wife, correct?

5    A    Correct.

6    Q    And again, this fake poster has created this and

7         put this up all the way back in 2013, correct?

8    A    That's when I was there.

9    Q    Okay. All right.

10            MS. GORDON: You guys want to take a break and

11        eat?

12            MS. DWYER: Yes.

13            (Whereupon a luncheon recess was taken.)

14   BY MS. GORDON:

15   Q    We're back on the record, Sheriff.

16   A    M'hm.

17   Q    Are you aware that Rashaun Whitehead, your

18        assistant, follows or did follow the Instagram

19        account that we've been talking about today? That

20        she's a follower of this account that you say is

21        not authentic?

22   A    I didn't know that at all.

23   Q    You don't know that. You said today you had a

24        Verizon account. The answers to interrogatories

25        that I received to our second set of

Page 162

1      interrogatories to defendant state that your

2      personal cell carrier is AT&T. Is that correct or

3      incorrect?

4   A   Incorrect.

5   Q   And then it also says you have an iPhone 15, which

6      is a Wayne County cell phone. Is that accurate?

7   A   I do have a Wayne County cell phone.

8   Q   Is it an iPhone 15?

9   A   I'm not sure what it is but.

10  Q   And the interrogatory answer also states that AT&T

11      is the carrier?

12  A   Correct.

13          MS. GORDON: So Maria, I'm just noting. I don't

14      know if you, I mean, if you disagree with this. But

15      it sounds like the witness is saying that for his

16      personal cell phone, in lieu of what the

17      interrogatory states, it's actually Verizon. Does

18      that seem to be accurate to you?

19          MS. DWYER: I made a note to confirm

20      personal cell carrier.

21          MS. GORDON: So if it's not Verizon, you'll let

22      me know or something like that.

23          MS. DWYER: Correct. Yes.

24  BY MS. GORDON:

25  Q   Did Ed Foxworth work for you at some point?

Page 163

1   A   Yes.

2   Q   What was his job title?

3   A   Communications director.

4   Q   What did he do in that role?

5   A   Anything dealt with media or media stories or

6       stories that we wanted to get out, he was

7       responsible for that.

8   Q   And give me the title again.

9   A   Communications director.

10  Q   Is that the same title or job that Regina Parks

11      subsequently had?

12  A   No.

13  Q   When did Ed Foxworth leave?

14  A   He left when Mara MacDonald came on board.

15  Q   So Mara MacDonald replaced Ed Foxworth?

16  A   Yes.

17  Q   And why did Ed Foxworth leave, as you understood

18      it?

19  A   Because I brought Mara on board to do that.

20  Q   But why the change?

21  A   I wanted Mara to do the job versus Ed.

22  Q   Was Ed not doing a great job?

23  A   He was doing the job.

24  Q   He was?

25  A   Yes.

Page 164

1    Q    And how long had he been in that position?

2    A    I would be guessing again but -

3    Q    Roughly. Was it some years?

4    A    Maybe a couple.

5    Q    Did you bring him on board or did -

6    A    I did.

7    Q    And were there any particular problems you had with

8         him?

9    A    Not at all.

10   Q    Was he a personal friend at one point?

11   A    I wouldn't say personal friend but we were friendly

12        and he was definitely, we worked together very

13        well.

14   Q    And do you keep in touch with him at all?

15   A    Not really.

16   Q    At all?

17   A    I mean, I see him occasionally. We're both golfers

18        and we end up at various golf outings together.

19   Q    What is your role at Greater Grace Church?

20   A    I'm director of security.

21   Q    Are you paid for that position?

22   A    Lightly, yes.

23   Q    What are you paid?

24   A    It's only about $90 every other week.

25   Q    So what is your job duties there? What services do

Page 165

1        you perform in that role?

2    A   I'm a member of the church and so it's not like I'm

3        a hired contracted person out there to do security.

4        I do it based on my job position and we call it

5        ministry. I'm in charge of the security ministry.

6        And so it's just about having the few people that

7        we have on security, a lot of, some of them law

8        enforcement to be able to protect and serve the

9        congregation as these churches have shootings. And

10       they've had them in the past and they're still

11       having them now. So just to have some kind of ideal

12       of what the congregation should be doing in the

13       event something like that happens.

14   Q   But do you - so it sounds like you do perform

15       services for them.

16   A   Well, yeah. I mean, I'm at the church regularly.

17       But I'm at the church regularly because I'm a

18       member of the church. And whether it's concerts or

19       it's church services or things like that, I'm there

20       or my staff is there as well.

21   Q   And who's your staff?

22   A   Just several people that work, that go to, attend

23       the church. It's nobody from outside. Everybody's a

24       church, is a part of the ministry, the church.

25   Q   Are they sheriff's deputies that are members?

Page 166

1   A   I have one sheriff deputy. One Sheriff's deputy.
2       And the rest are, have worked in the Michigan
3       Department of Corrections and just have some
4       security background within themselves.
5   Q   And is this something you report on a W-2?
6   A   Yes, I do.
7   Q   And you say it's $90 every other week?
8   A   Yes.
9   Q   And that's a check written to you by the church or
10      how do you get paid?
11  A   Yeah. It's direct deposit.
12  Q   Did you have to get approval of that prior to you
13      becoming sheriff from anybody at the county to work
14      elsewhere?
15  A   No. Well, I mean my predecessor knew, Benny
16      Napoleon.
17  Q   What's the chaplain's program at the county? What
18      is that?
19  A   So we have two chaplain programs. We have one
20      chaplain program that works within - I shouldn't
21      say it's two, do two separate things. Both of them
22      work within the jail system to provide services,
23      church services. And all of them at some point do
24      that. And then the chaplains that we have also are
25      ones that work in the community for us. Whether

Page 167

1         we're in the community doing various things, we

2         have the chaplains come be a part of it so that the

3         community would understand that it's not just us

4         doing community work but we have chaplains as well.

5             We have chaplains who have churches who we

6         call a safe space for the community. We have signs

7         up at their churches that say this is the Wayne

8         County Sheriff. Well, I don't know if it says Wayne

9         County Sheriff but it says safety. It's a house of

10        worship and safety where you can come in and if you

11        got a situation in the community you can see these

12        chaplains here who are pastors and let them know

13        whatever situation happened.

14   Q    When did the program start?

15   A    It's been going for years and years. Way before me.

16   Q    And who selects the chaplains?

17   A    They often ask. They'll ask me or they'll ask

18        someone within our community outreach people that,

19        hey, I would like to help and be a chaplain in any

20        way I can. Any way I can, I want to help.

21   Q    You have people that, I don't know the exact title

22        but they're sort of in charge of the chaplains?

23   A    Yeah.

24   Q    What's that title?

25   A    It's just community outreach person. I have one now

Page 168

```
 1          that's -
 2     Q    Erica Hill?
 3     A    Yeah. Erica Hill, yes.
 4     Q    And she was a person that previously worked in
 5          another capacity at the county?
 6     A    She worked for me when she came to the county.
 7          Yeah, she worked for me. But then when I did some
 8          restructuring, I put her with the community
 9          outreach people.
10     Q    And she makes about $60,000 a year?
11     A    Something like that.
12     Q    She was a person that made complaints about you,
13          correct?
14     A    She's never made a complaint about me.
15     Q    Really?
16     A    Yeah.
17     Q    Maybe not to you. But you're not aware that she's a
18          person who has said you stuck your hand up her
19          dress? Are you aware of that? Have you heard that?
20     A    I'm not aware of that at all. And I'm very
21          surprised that someone is even saying that. She
22          still works for me.
23     Q    Why did she leave?
24     A    She didn't leave. She still works for me.
25     Q    She left her regular position.
```

Page 169

1   A    Yes.

2   Q    What was her position previously?

3   A    She was working directly for me as someone who went

4        out in the street when I needed to go out in the

5        community and I'm often handed things and she was

6        with me.

7   Q    Tell me again what her title was?

8   A    Pretty much just executive assistant. She was one

9        of my assistants.

10  Q    And when did she come on board?

11  A    I don't know. A few years ago.

12  Q    Under you?

13  A    Sure, yes.

14  Q    You hired her in?

15  A    Yes.

16  Q    What was she being paid?

17  A    I'm not sure. But it was maybe $90,000 something.

18  Q    So why did she leave that position?

19  A    Because one thing, she works for the airline.

20  Q    She worked for the airline when she took the job.

21  A    She did. And she wanted more time to be able to do

22       that. And she wasn't – she didn't leave the

23       position. I asked her to move into another

24       position.

25  Q    At a lower pay cut?

Page 170

```
 1   A   She chose that lower pay. She didn't have to be
 2       there.
 3   Q   She wanted to get away from you, didn't she?
 4   A   Negative. Absolutely not.
 5   Q   When's the last time you talked to Ms. Hill?
 6   A   She was at my birthday party.
 7   Q   I don't know when that was.
 8   A   A week ago. Maybe a week ago.
 9   Q   Where was your birthday party?
10   A   St. Regis Hotel.
11   Q   Was it a fundraiser?
12   A   Yes.
13   Q   That's the one that Turner was at?
14   A   Yes.
15   Q   When you were running in 2024, you had your
16       appointees, you required your appointees to do
17       political work for you, correct?
18   A   I didn't require anybody to do political work for
19       me.
20   Q   Well, you insisted on it. I've got the text
21       messages and the emails where you're telling people
22       they need to show up and they must show up.
23           MS. DWYER: Objection.
24           THE WITNESS: I don't recall that at all.
25   BY MS. GORDON:
```

Page 171

1   Q     You don't?

2   A     No.

3   Q     You've not sent messages out to appointees or had

4         somebody send them out -

5   A     My staff might have.

6   Q     Excuse me. You got to let me finish. And telling

7         people, you must attend this event, we need you to

8         be more active, we need you to be out there on the

9         streets, we need you to be doing things for us.

10        Those communications went out, didn't they?

11  A     I'm not sure.

12  Q     And it's illegal, isn't it, to have government

13        employees do campaign work on government time?

14              MS. DWYER: Objection. Calls for a legal

15        conclusion.

16  BY MS. GORDON:

17  Q     Is that correct? Go ahead.

18  A     I never had anybody out working.

19              MS. DWYER: Same objection.

20  BY MS. GORDON:

21  Q     I didn't ask you. I said, it's illegal to have

22        government employees do campaign work on government

23        time. Am I correct?

24              MS. DWYER: Same objection.

25  BY MS. GORDON:

```
                                          Page 172

1    Q    Am I correct, Sheriff?

2    A    I would never have anyone doing it. So because -

3    Q    Can you just -

4    A    I'm saying, I would never have anyone doing it

5         because it could possibly even be illegal. I'm not

6         in the legal world.

7    Q    Sir, as an elected candidate, you have to be in the

8         legal world of knowing whether you can do campaign

9         work on government time. That's a question that

10        anybody running for office must know.

11   A    I know it for a fact.

12             MS. DWYER: Objection. Foundation.

13   BY MS. GORDON:

14   Q    And are you aware that you cannot have government

15        employees do campaign work for you on government

16        time? Are you aware of that?

17   A    I am aware of that.

18   Q    But you have had people do campaign work for you on

19        government time. That has happened, hasn't it?

20   A    No, it hasn't.

21   Q    Never?

22   A    Not for me. Not at my direction.

23   Q    So one of your staffers' directions maybe?

24   A    I'm not saying that either. I'm not saying that

25        either.
```

```
                                                    Page 173

 1    Q    When was Mara MacDonald - when did you decide to
 2         hire her? When did you start to think about it?
 3    A    After my re-election in November of '24.
 4    Q    And why did you think about hiring Mara MacDonald?
 5    A    I thought she'd be a great communications director.
 6    Q    And how has she worked out?
 7    A    She actually called me, my office, and said she was
 8         free. Because I was trying to get her before even I
 9         hired Ed Foxworth. But she wasn't available at that
10         time.
11    Q    Who replaced Erika Erickson?
12    A    Ed Foxworth.
13    Q    Did you have a restructuring in your office in
14         2024?
15    A    Yes.
16    Q    What was the restructure? First of all, let me ask
17         you this. Is there anything in writing saying,
18         we're doing a restructure?
19    A    I didn't put anything in writing.
20    Q    Anything you know of that's in writing?
21    A    I don't know of anything in writing.
22    Q    I'm sorry. I'm going to withdraw that last question
23         and go back to something else I meant to ask you
24         and we'll come back to the restructure.
25              Am I correct that you allegedly posted a video
```

Page 174

```
 1          to your Facebook showing a naked woman dancing
 2          briefly?
 3     A    Absolutely not.
 4     Q    You remember hearing about this allegation?
 5     A    I heard something about that but I - nobody knew
 6          who it was or any of that.
 7     Q    And it was apparently an eight-second video. And
 8          there was a screen recording of this showing your
 9          name and image in the top left corner. Do you
10          remember that coming out in the media?
11     A    My name and image?
12     Q    Yes. In the corner of the video.
13     A    No.
14     Q    This is after Mara MacDonald was hired.
15     A    Okay.
16     Q    You did see, though, that there was some coverage
17          of this, correct?
18     A    I never saw any coverage on the - you mean like on
19          the news or something?
20     Q    Some media covered it.
21     A    No. I've never seen that.
22     Q    Where did you hear about it?
23     A    In Mara MacDonald's office.
24     Q    What did she say to you?
25     A    She said, this is - this is - somebody put this out
```

Page 175

```
 1        here. We just wanted you to know. And that was it.
 2   Q    Did you ask her what was it?
 3   A    Yeah. She showed it to me.
 4   Q    So tell us what you saw.
 5   A    I saw a lady in a picture. Couldn't see her face.
 6        Because I said, who is this? Couldn't see her face.
 7        Couldn't see my face. None of that. And I said, I
 8        don't know why this is on, why somebody would put
 9        this on my - it's the same old thing is what I
10        remember saying.
11   Q    And meaning what?
12   A    Meaning that here's somebody else.
13   Q    Accusing you?
14   A    Yes.
15   Q    A lot of accusations.
16   A    With all being unfounded.
17   Q    So anyway, Mara MacDonald told you about this. And
18        why was she telling you this? Because it was under
19        your name? I mean -
20   A    No.
21   Q    - the video all by itself would be meaningless to
22        you unless you were connected to it somehow, right?
23             MS. DWYER: Objection, compound.
24   BY MS. GORDON:
25   Q    I mean, you were connected to this video in some
```

Page 176

```
 1        way.
 2   A    How? I don't even know. She showed it to me. I
 3        think she said somebody took this off of somewhere
 4        and showed it to her. And I don't know how I got on
 5        it.
 6   Q    And they said it involved you.
 7   A    I wasn't on it.
 8   Q    Well, again, what my understanding is that there
 9        was a piece entitled, Embattled Wayne County
10        Sheriff Posted Video of Naked Woman on Facebook.
11   A    I've never seen that.
12   Q    You remember hearing about that, though?
13   A    No. I don't even remember hearing that.
14   Q    And that there was a screen recording provided to
15        the Sheriff's Office which showed your name and
16        image in the top corner.
17   A    I don't remember that either.
18   Q    Well, Mara MacDonald did respond to the media. And
19        you must have known what she was going to say.
20   A    She does her job and I do mine.
21   Q    But she checks with you first, Sheriff.
22   A    As she did. And she showed me the picture. She
23        didn't go into, here's your name, here's this and
24        that. This has something to do with you, any of
25        that.
```

Page 177

```
 1    Q    Well, you must have known it had something to do
 2         with you or you wouldn't have been shown the video.
 3    A    Again, I asked, where's my name? Who is this? I
 4         don't know who this is. I don't know who did this.
 5         Obviously, I wouldn't do it. Why would I put a
 6         picture of a naked woman with my name on it on a -
 7         however it came out? I don't even know if, I don't
 8         know if it was social media or what.
 9    Q    It was posted to your Facebook story.
10    A    So I never saw it.
11    Q    It was posted to your Facebook story.
12    A    I'm sorry?
13    Q    Somebody saw it on your Facebook story and it was
14         taken down very quickly. That was the allegation.
15    A    Okay.
16    Q    And then Mara MacDonald responded on your behalf.
17         The Sheriff did not post this, did not know this
18         was ever on his page and does not know who this is.
19         Does that sound familiar?
20    A    That sounds familiar.
21    Q    As to her response?
22    A    Yes.
23    Q    And this was right around the time you were
24         campaigning, correct?
25    A    I don't remember. I think it was after that.
```

Page 178

```
1    Q    This was June.

2    A    I think it was after that. June?

3    Q    Yes. This was June 2024. Who's Dindi Maloney?

4    A    Someone that works for us.

5    Q    What does she do?

6    A    She's a recruiter.

7    Q    She's a what?

8    A    Recruiter.

9    Q    For?

10   A    An agency, for the Sheriff's Office.

11   Q    And did you hire her?

12   A    I did.

13   Q    When did she come on board, roughly?

14   A    Over a year ago.

15   Q    And what was she doing prior to coming on board

16        with the Sheriff's Office?

17   A    She was doing some communication stuff.

18   Q    And how long had you known her, roughly?

19   A    Not very long.

20   Q    But you knew her before you hired her, obviously.

21   A    Yes.

22   Q    You've been, what, friends with her or something?

23   A    No. Met her. No friends, nothing like that.

24   Q    How did you know her?

25   A    She said she brought in a resume and I looked it
```

```
 1         over. We had a conversation. She was actually

 2         considering being hired when Benny Napoleon was

 3         here.

 4    Q    So how did she happen to - did she come directly to

 5         your office?

 6    A    She sent resumes and we follow up.

 7    Q    And you met with her?

 8    A    Sure.

 9    Q    And tell me again what her job was.

10    A    What her job is now? Is this the same job?

11    Q    No. What her job was that she first came in with.

12    A    She came in as a recruiter.

13    Q    Were there other recruits already on board? Were

14         there other recruiters in the Sheriff's Department?

15    A    Yes.

16    Q    How many?

17    A    Two, three.

18    Q    What do they do in their job?

19    A    They go out in the community and they recruit.

20    Q    For?

21    A    For people who want to become a part of the

22         Sheriff's Office.

23    Q    What type of positions are you recruiting for?

24    A    Deputy positions.

25    Q    And how do they do that?
```

Page 180

1    A    They fill out an application.

2    Q    No, no. How do you recruit for deputies? Where do

3         you go?

4    A    Again, they go to schools. They go to various

5         community groups. People, they get information from

6         the internet on our internet system where we

7         recruit from there as well.

8    Q    So since you've been sheriff, who have been the

9         recruiters?

10   A    David Felton, Dindi Maloney, Mark Diaz. I believe

11        they were the main three.

12   Q    And then Ms. Maloney came in when?

13   A    Again, about a year ago or so.

14   Q    And how long has Felton been there?

15   A    Felton's been there for a long time. He was a

16        deputy within AIG.

17   Q    Is he still there?

18   A    Yes, he is.

19   Q    And is Diaz still there?

20   A    Yes.

21   Q    So Dindi Maloney was an addition to the recruiters?

22   A    She was. And then there was - because there was one

23        before her. Christina. What's her name? Her name

24        escapes me. But she was a recruiter as well for a

25        little while.

Page 181

1    Q    When did she leave?

2    A    She had some illnesses or illness and she left. I

3         can't tell you exactly when.

4    Q    And did Dindi Maloney have any background in

5         recruiting?

6    A    Not necessarily. Not exclusively, I should say.

7    Q    Did she need some training?

8    A    Yeah. Everyone pretty much who comes in needs

9         training.

10   Q    What does she earn roughly?

11   A    I'm sorry?

12   Q    What does she earn roughly?

13   A    Oh, they just, they had gotten raises in November.

14        So it's somewhere around $90,000 or so. That's how

15        we pay our people.

16   Q    How many hours a week does she work?

17   A    How many hours a week?

18   Q    M'hm.

19   A    She works 40 hours minimum a week.

20   Q    Does she work overtime?

21   A    I'm not sure. That would be a Mark Diaz question.

22   Q    Does somebody in her position get overtime?

23   A    No. It's really salary.

24   Q    Strictly salary?

25   A    It is strictly salary.

Page 182

1   Q   Are you sure? Sounds like you're not sure.

2   A   No. I'm saying they're salaried positions and

3       they're hired as salary.

4   Q   Have you ever had any kind of a sexual relationship

5       with her of any kind?

6   A   No. No. Absolutely not. Absolutely not.

7   Q   How long has Rashaun Whitehead been with you?

8   A   I became sheriff in 2021 January. Probably right

9       about '22, as '22 came. I switched her out from my

10      chief of staff, Mike Turner, who she worked for and

11      brought her to me. And gave Mike Turner the person

12      who was working for me, Olivia Townsend.

13  Q   And how long has she been with the county at that

14      point, roughly?

15  A   She probably came in - you're talking about Rashaun

16      Whitehead?

17  Q   Yes. Yes, I am.

18  A   She probably came into the county, it was

19      definitely when Benny Napoleon was still alive so I

20      don't know. But it was prior to his passing and,

21      again, I would be guessing.

22  Q   How'd you get along with - how do you get along

23      with her?

24  A   With who? Rashaun?

25  Q   Ms. Whitehead.

Page 183

1    A    Perfectly.

2    Q    How did she get along with Regina Parks?

3    A    How did she?

4    Q    Yeah. When Regina worked there.

5    A    As far as I know, she got along with her. She gets

6         along with everyone. That's pretty much why I

7         brought her to me.

8    Q    Do you know that she and Regina communicated via

9         text or - periodically?

10   A    I did not know. She didn't tell me. She didn't tell

11        me that. She didn't have to tell me that.

12   Q    Did you text with Ms. Whitehead yourself? Did you

13        text with her?

14   A    On our phones, she might text me in the morning or,

15        you know. But her office was right next to mine. We

16        didn't do a lot of texting.

17   Q    Let's go back to the restructuring. There's nothing

18        in writing saying there's going to be a

19        restructure, correct?

20   A    M'hm.

21   Q    We've already covered that. So what was being

22        restructured?

23   A    I was restructuring several of my entities in the

24        office.

25   Q    So what are the entities we're referring to here?

Page 184

1    A    Oh, my communications.

2    Q    What's your communications?

3    A    Communication directors, changing that out.

4    Q    Who are we talking about in this case?

5    A    Ed Foxworth, Mara MacDonald.

6    Q    So that was just a change in personnel?

7    A    Yeah. Restructuring, we called it.

8    Q    Well, hang on a second, I just want to understand

9         this. You said Mara replaced Ed Foxworth?

10   A    Yes.

11   Q    Did she have a different job than Ed Foxworth?

12   A    No.

13   Q    Different job description?

14   A    No.

15   Q    And people do have job descriptions at the county,

16        correct?

17   A    Yes.

18   Q    And my client had a job description, correct?

19        Regina had a job description?

20   A    Yes.

21   Q    So what else? You were giving your departments and

22        you said communication.

23   A    Yeah. Then I changed out our recruiting efforts,

24        which means I brought in background investigators.

25   Q    Okay. Hang on a second. What title is this under?

Page 185

1           You said -

2    A      They're under recruiting but they're -

3    Q      It's called recruiting?

4    A      But they are background investigators.

5    Q      So is this the same place that Felton and Diaz and

6           Maloney work, the same title?

7    A      Yeah. They work the same title. They were

8           recruiters. Under the recruiting, there's

9           background investigators, too. I added that to a

10          part of the recruiting efforts because they work

11          together.

12   Q      Well, where was it before?

13   A      We didn't have a background investigative team as I

14          put together when I became the sheriff.

15   Q      This came up in 2024 at the same time the Mara

16          MacDonald change came up?

17   A      That's a different thing. Yeah. But it was all

18          around the same time in November. I was moving

19          things around after I got reelected.

20   Q      Were you hiring investigative recruiters?

21   A      Sure.

22   Q      And when did you hire them?

23   A      I'm still hiring them. It's because some of them

24          leave, some of them -

25   Q      Okay. I'm going back to 2024 here where you made

Page 186

```
 1          some changes. Did you hire people at that time to
 2          be investigative recruiters?
 3     A    Yes.
 4     Q    Who were they?
 5     A    It's about 19 of them.
 6     Q    You brought in 19 in 2024?
 7     A    There's '25 as well, on into '25.
 8     Q    Well, I'm talking about at the time of the so-
 9          called restructuring. That's what I'm talking
10          about.
11     A    I can't tell you how many I brought in.
12     Q    At that time.
13     A    At that time.
14     Q    You don't know?
15     A    But I was bringing them in consistently because we
16          were doing major hiring and we were bringing in
17          background investigators to do the background work
18          so we could hire.
19     Q    What else was a restructuring, if anything?  Unless
20          we've covered it already.
21     A    I did my community outreach, restructured that.
22     Q    What was community outreach at that time?
23     A    It was only one person.
24     Q    That was Regina Parks?
25     A    Yes.
```

Page 187

```
 1    Q    And who would have been before Regina?
 2    A    I didn't even have one. We didn't even have one.
 3         She came in under, in that title under Benny
 4         Napoleon.
 5    Q    And so what were you doing with community outreach?
 6    A    I was bringing more in, approximately four of them.
 7         There was definitely four of them.
 8    Q    Four what?
 9    A    Four what?
10    Q    Four. You said I was bringing four of them in.
11    A    Yeah. I wanted it to be a team of four.
12    Q    Team of four what?
13    A    Community outreach or community engagement people
14         because there was only one.
15    Q    And that was my client?
16    A    That was Regina Parks.
17    Q    So did you actually hire people?
18    A    Sure, I did.
19    Q    Well, who did you hire?
20    A    And I moved people.
21    Q    Who did you hire?
22    A    I hired Stephanie Richards.
23    Q    When was that?
24    A    That was in '24, right during the time when I was
25         restructuring.
```

Page 188

1    Q    When in 2024?

2    A    In November.

3    Q    Who else did you bring in?

4    A    Dawn Johnson.

5    Q    And what was she going to do?

6    A    She was doing community outreach, community

7         engagement as well.

8    Q    She was a new hire?

9    A    Yes.

10   Q    So how much were these people making?

11   A    Right around that same $90,000 range as well.

12   Q    So you were adding quite a bit of – quite a bit to

13        the county payroll.

14   A    It was our budget. We could do it.

15   Q    I didn't say it wasn't your budget. You were just

16        using a lot of money. And what is community

17        outreach? Is it just getting your name out there?

18   A    It's letting the community know what the Wayne

19        County Sheriff's Office does.

20   Q    And specifically what you do, correct?

21   A    Not specifically what I do. I'm a Sheriff.

22   Q    Okay. So who else did you hire?

23   A    I moved Erica Hill who worked for me as one of my

24        executive assistants to community outreach. She had

25        some real good experience with that.

Page 189

```
 1   Q    Was that before she was - I'm sorry to interrupt
 2        you. Was that before she was overseeing the
 3        chaplains or after?
 4   A    The same time.
 5   Q    I don't know what you mean by that.
 6   A    She was doing that as well. Community engagement,
 7        overseeing the chaplains like she was doing for me
 8        when she worked directly for me as my executive
 9        assistant.
10   Q    That's before she moved to the chaplain job where
11        she got $90,000.
12   A    No.
13   Q    She moved from a -
14   A    She never left the chaplain job.
15   Q    But before she became in charge of the chaplains,
16        she had a different title.
17   A    She was working for me.
18   Q    Well, what was her title?
19   A    Executive assistant.
20   Q    So you gave her additional duties in addition to
21        the -
22   A    Yes.
23   Q    And what were those duties?
24   A    Community engagement and overseeing the chaplains.
25   Q    And did she get additional money for this?
```

Page 190

1   A   No.

2   Q   Is she in that job today?

3   A   She's overseeing the chaplains and she does

4       whatever I -

5   Q   Excuse me. Is she in this community development

6       position today?

7   A   No. Community engagement, no.

8   Q   Did she ever take that role on?

9   A   Yes, she did.

10  Q   Why did she leave?

11  A   Because she wanted to have some more time, from

12      what I'm told, to not have to be traveling and then

13      have to get back to work and try to be there for

14      the next day. She thought it would be best for her

15      to be able to oversee the chaplains and do whatever

16      I needed her to do without her being on a Monday,

17      Tuesday, Wednesday, Thursday, Friday schedule

18      because she flies at the same time.

19  Q   Is the chaplain's job a full-time job?

20  A   Chaplain's job?

21  Q   Yes. You already told us earlier -

22  A   She's working part-time.

23  Q   Excuse me. You already told us earlier today that

24      she moved into a new position which was overseeing

25      the chaplains.

Page 191

```
 1    A    Yes.

 2    Q    And you said she was paid $60,000 for that job.

 3    A    Yes.

 4    Q    Was that a full-time job?

 5    A    It's a part-time job.

 6    Q    How many hours a week?

 7    A    It's enough to be part-time. She doesn't report to

 8         me. She reports to my chief of staff currently now.

 9         He probably would have that answer for you.

10    Q    Well, you selected though?

11    A    Yeah. I asked her to - actually, she asked could

12         she do that.

13    Q    So how many hours roughly did you understand she

14         was working?

15    A    Part-time work.

16    Q    You got to let me finish my question, okay? How

17         many hours roughly was she working when she was

18         just overseeing the chaplains?

19    A    She's not just overseeing the chaplains.

20    Q    There was a time when that was her job.

21    A    That was not her only job.

22    Q    Sheriff, hang on a second. Your testimony is

23         already on the record.

24    A    Of course.

25    Q    And you already said she left her position and then
```

Page 192

1      you moved her over to or she came back, I don't

2      remember which it was, and she was over the

3      chaplains. That's what you said on the record. And

4      you said she was being paid $60,000 a year.

5          MS. DWYER: Objection to the extent it

6      misrepresents the testimony.

7  BY MS. GORDON:

8  Q    That's what you said. That's what you said. So as

9      to the chaplain job, was it a full-time job?

10 A    No.

11 Q    Roughly, how many hours a week was she expected to

12     work on that job?

13         MS. DWYER: Asked and answered.

14 BY MS. GORDON:

15 Q    Go ahead.

16 A    She had other duties as well.

17 Q    How many hours a week was she expected to work on

18     the chaplains?

19 A    A part-time salary. And I said, you probably want

20     to ask my chief of staff who she oversees, who

21     oversees her and he could probably give you the

22     exact amount of hours she works because he follows

23     that. And he, I believe, even signs her time card.

24 Q    So now you move her into an additional position in

25     November 2024, is that what you're saying?

Page 193

```
1    A    At that point she moves into community outreach as
2         well.
3    Q    As well as what?
4    A    As well as the chaplain, overseeing the chaplains.
5         Because she wanted to continue to oversee the
6         chaplains.
7    Q    And what does she get paid in this community
8         relations job?
9    A    She gets paid $60,000.
10   Q    And then she also gets 60 for the chaplains?
11   A    Not the community relations. I'm sorry. Community
12        relations, when she was doing that, when I moved
13        her over, that was in the same $90,000 range as
14        well. She chose to take a reduction in pay because
15        she didn't want to work the full-time positions.
16        She wanted to be able to fly. And so she wanted to
17        do chaplains as well as whatever I needed her to do
18        for me. Whether it was outside, in the office, what
19        outside, in the office. Whatever it is I needed her
20        to do, she wanted to do that. And then she said,
21        and she understood that it would be a pay cut. She
22        wanted it to be.
23   Q    And you text with her, don't you?
24   A    No, I don't. I haven't texted with Erica in a long
25        time.
```

Page 194

1    Q    You've texted with Erica, is that correct?

2    A    I have in the past.

3    Q    How long ago, sir?

4    A    I'm not sure when my last text with her was. I

5         think it might have been - it may have been even

6         concerning our - my Christmas - I mean, not

7         Christmas, my birthday party. It may have been that

8         recent.

9    Q    Okay. Well, you just said it was a long time ago.

10   A    Well, I'm saying when we were working together, she

11        was my executive assistant, things like that. I'm

12        asking you, when are you talking. What, that's why

13        I asked you about time frame.

14   Q    Will you tell me, when is the time frame that you

15        were texting with Erica Hill? Give me the time

16        frame, sir.

17   A    I just gave you when the last time I probably did.

18        I can't –

19   Q    Okay. I didn't ask you –

20   A    When I was texting with her periodically when she

21        was working just as my executive assistant, that

22        was in the past. I can't tell you how many times we

23        were texting.

24   Q    Did you regularly text with her at that point?

25   A    Not regularly. I would text with her when she would

Page 195

1          text with me and I would text with her. But it was

2          for various work reasons.

3     Q    I didn't ask you what it was for, did I?

4     A    I understand. I'm just saying, it's work.

5     Q    You sound a little defensive.

6     A    Not at all. Not at all.

7     Q    What else went on with this so-called

8          reorganization? Or have we covered it all now?

9     A    No, we haven't covered it.

10    Q    What else is there?

11    A    We were talking about the outreach, community

12         outreach. I was changing that.

13    Q    Yeah, you said that.

14    A    I brought in four people. I wanted four of them to

15         work together. Regina Parks being one of them. And

16         she wasn't going to have a title of director. She

17         had a title of director. She directed no one. It

18         was only one person. It didn't make sense to me as

19         the sheriff. So I had to make sense that I bring

20         four people together and they reported to the chief

21         of staff. Because I didn't have a director. I

22         didn't want a director necessarily at that point

23         while restructuring that.

24              Well, when that happened, and I had the

25         conversation with all four. Well, it was three of

Page 196

```
 1              them. The fourth wasn't here yet. But I had that
 2              conversation. And when I got finished with the
 3              conversation, I'm told that Regina Parks, your
 4              client, left out of the meeting, came into my area,
 5              my suite area, and began to yell out and make
 6              various comments about the meeting and about the
 7              fact that she made more money in her second job
 8              than being here in this job. She was thoroughly
 9              upset, looking for chief of staff who she had
10              direct report to.
11      Q       Excuse me for interrupting you. I didn't ask you
12              about this. I just wanted -
13      A       You asked me about the restructuring.
14      Q       I didn't - I asked you who you were adding. You
15              were telling me who you were adding. I didn't ask
16              you about Regina coming in and talking to you.
17                   Was there anybody - what else was part of the
18              restructuring, if anything, other than what you've
19              already testified to?
20      A       You asked me about the restructuring, the
21              restructuring of what I was doing.
22      Q       Was there anything to the restructuring, any new
23              people brought in or people -
24      A       Yeah, I said that.
25      Q       Hang on. Or moved out other than what you've
```

Page 197

1         already testified to?

2    A    No. Not at the time of my restructuring.

3    Q    And was the people that you brought in under

4         community outreach, did they have job descriptions?

5    A    Sure.

6    Q    And were they newly created job descriptions?

7    A    Well, no. They were the same job descriptions that

8         Regina had. I was just going to add more people.

9    Q    And I'm sorry. Give me the names again of the

10        people you brought in. You said, was it Stephanie?

11   A    Stephanie Richards.

12   Q    And tell me where she came from.

13   A    She came from the city of Detroit.

14   Q    Did she have a bachelor's degree?

15   A    I'm not sure.

16   Q    Did she have five years of media experience or

17        management experience?

18   A    Stephanie?

19   Q    Yeah.

20   A    I have to look at her resume again. I would be

21        guessing.

22   Q    And the other person you said you brought in was

23        Ms. Johnson?

24   A    Yes, Dawn Johnson.

25   Q    And did she have a bachelor's degree?

Page 198

```
 1    A    I'm not sure.
 2    Q    Did she have at least five years of media or
 3         management experience?
 4    A    Media?
 5    Q    Yeah. Media or management experience. That's the
 6         job description, sir.
 7    A    She was a - she was - yes. And she was a
 8         supervisor, a highly ranked supervisor in the city
 9         of Detroit Police Department.
10    Q    So we've now covered the changes you made.
11    A    It was another.
12    Q    Another what?
13    A    Well, it was Erica Hill who I brought over.
14    Q    Right. We've talked about her.
15    A    To do that. Okay, you did. Okay. And then the
16         fourth one was Regina Parks.
17    Q    So again, nothing in writing about the
18         restructuring. You've just described it to me
19         verbally as best you can remember, is that right?
20    A    That was it. That's exactly. I remember that.
21    Q    And this occurred in November, right?
22    A    Yes.
23    Q    And when did Regina first learn about a
24         restructuring as you understood it?
25    A    As I understood it, the day I had the meeting to do
```

Page 199

1              it.

2        Q     So you called a meeting?

3        A     Sure.

4        Q     And who did you call to the meeting?

5        A     Those four. But I think it was only three because

6              Dawn wasn't here yet. But then it was Mara

7              MacDonald. It was Mike Turner, my chief of staff at

8              the time. I believe Rashaun may have been there,

9              Whitehead, my assistant. I believe that was it.

10       Q     And where did the meeting take place?

11       A     One of our conference rooms.

12       Q     Now, as of this time on November 13th, Regina Parks

13             had been reappointed for another one year period,

14             is that correct? The day before on the 13th of

15             November.

16       A     I think we were - and I'm not sure. Again, I think

17             my human resources or my staff, my executive

18             assistant, it was because I was newly reelected and

19             the year was ending, I believe they did reappoint

20             people based on my direction, obviously.

21       Q     I have a letter, Bates stamped 26, from Necole

22             Glasker, Department of Personnel.

23       A     Okay.

24       Q     From Lakeisha Solomon, what was her title?

25       A     She's a - well, she's a director now. But she was a

Page 200

1            manager in our human resources.

2    Q      So I'll hand you Bates 26.

3    A      Okay.

4    Q      And you can see that Regina Parks was reappointed

5           to Department Executive 2, effective November 18,

6           2024. Her salary was $97,243. The aforementioned

7           employee meets the qualifications of the

8           classification. Correct?

9    A      Okay. Okay.

10   Q      And her office was going to be moved, is that

11          correct, her physical office?

12   A      She was coming out of her office because I was

13          putting together four people working jointly

14          together.

15   Q      And what was her - what had her office been?

16   A      What has it been?

17   Q      Yeah. Where was her office and what was it?

18   A      In the same - right outside, right outside where

19          the cubicles are. Second floor. I mean, fourth

20          floor right outside where her office was. I mean,

21          where the cubicles were.

22   Q      And were plaintiffs' job duties being affected?

23   A      Was her job duties being affected?

24   Q      Yes, in this restructure.

25   A      Not at all.

Page 201

1    Q    Not at all?

2    A    No.

3    Q    Well, your answer to the complaint says that her

4         job duties were being modified. So was that a false

5         statement?

6    A    You said was it being affected.

7    Q    Was that a –

8    A    I took your affected to mean, was it being

9         effective in some kind of negative way.

10   Q    Well, that's not the definition of the word

11        affected so –

12   A    Okay. Well, it could be.

13   Q    Please don't talk over me. We have a court reporter

14        here. The word affected has a specific meaning. I

15        think everybody in the room understands what

16        affected means. It doesn't mean something negative.

17        I just wanted to know if her job was affected. You

18        said, no, not at all. That was your testimony.

19   A    Okay.

20   Q    But your answer to the complaint says that as a

21        result of the restructuring, some of plaintiff's

22        job duties were modified. So is that accurate?

23   A    Modified, yes.

24   Q    Well, what was modified?

25   A    She was no longer a director for the community

Page 202

```
 1              engagement, community outreach team. I didn't have
 2              a director at that point. I wanted it to be a team
 3              of four.
 4      Q    Okay. Sir, that's a title change. I asked you if
 5              her duty, what about her duties were modified, if
 6              any, as you say in your answer to the complaint.
 7      A    None.
 8      Q    So the complaint is wrong when it says her duties.
 9              Your answer to the complaint is incorrect, then,
10              because you say her job duties were modified.
11      A    I said that to who?
12      Q    The answer to the complaint says her duties were
13              modified.
14      A    That's what she said. Is that what you're saying? I
15              don't, I'm trying to understand what you're saying.
16      Q    We filed a complaint.
17      A    I filed a complaint?
18      Q    No. Just stick with me.
19      A    Okay.
20      Q    We filed a complaint in the United States District
21              Court for the Eastern District of Michigan.
22      A    Okay.
23      Q    You are named as a defendant. The county is named
24              as a defendant. Under law you have to respond to
25              the complaint. Are you with me? Okay. In your
```

Carroll Reporting & Video
A Veritext Company
586-468-2411
www.veritext.com
www.veritext.com

Page 203

1       answer to my complaint you state that on November

2       13th, 2024 the Sheriff's Office at the Community

3       Recruitment Meeting announced a restructuring. And

4       as a result of restructuring, some of the

5       plaintiff's job duties were modified. That's what

6       your answer filed with the Federal court states. Is

7       that a false statement?

8    A  I don't recall making that statement even.

9    Q  Well, it's in writing. It's in writing. So is it an

10      accurate statement or not an accurate statement?

11   A  I think if I said that, it was an accurate

12      statement as far as I'm concerned because it was

13      modified. How?

14   Q  Well, why did you -

15   A  Because she did not have a director's position in

16      the Human Resources Department.

17   Q  But you've already - I don't want to argue with

18      you. The record will speak -

19   A  I don't want to argue either. I just want to help

20      you understand what I'm saying when I say modified.

21   Q  It's hard to understand what you're saying.

22   A  When I say modified -

23          MS.  DWYER: It's hard to understand your

24      questions.

25          THE WITNESS: You're asking me about

Page 204

```
 1        modification.
 2    BY MS. GORDON:
 3    Q    No. I asked you about were her job duties affected.
 4    A    Okay.
 5    Q    And you went down a long road but we're not going
 6         to get back into that. Let's keep going, okay?
 7    A    Okay.
 8    Q    And Regina Parks was upset the day of the meeting
 9         when she was told she was being moved out of her
10         office and so on, correct?
11    A    I'm told, yes.
12    Q    Yes. And I'm sure that didn't come as a surprise to
13         you, correct?
14    A    It came as a huge surprise.
15    Q    Really?
16    A    Absolutely.
17    Q    You hadn't given her a heads up. You've got a
18         meeting with a bunch of people there and she's
19         learning for the first time that her, according to
20         you, her position is going to be modified and she's
21         going to be moved out of her office. So you
22         couldn't have been surprised that she was upset.
23    A    Thoroughly surprised.
24             MS. DWYER: Object to form.
25    BY MS. GORDON:
```

Page 205

1    Q    So she was then terminated on the 15th of November,
2         correct?
3    A    Yes.
4    Q    And that was entirely your decision, correct?
5    A    Yes.
6    Q    You have nothing in writing as to the reason she
7         was terminated, do you?
8    A    I don't.
9    Q    Nobody does at the county, is that correct?
10   A    I'm not sure.
11   Q    Well, you were the decision maker, sir. The sole
12        decision maker, according to the county. So you put
13        nothing in writing as to the reason, correct?
14   A    Yes. We did put something in writing as the reason
15        she was no longer employed.
16   Q    As of November 15, the day you fired her, you did
17        not place anything in writing about the reason you
18        fired her.
19   A    I didn't personally, no.
20   Q    Neither did anybody else from the county, correct?
21   A    I'm not sure of that.
22   Q    Well, I am sure.
23   A    I'm not sure of the date that her letter went out.
24   Q    I am sure. What letter?
25   A    Explaining to her that she no longer was going to

Page 206

1       be a part of the Wayne County Sheriff's Office.

2   Q   There's no reason set forth in any letter she ever

3       received. So you put nothing in writing, it was

4       your decision, you did not bring human resources in

5       to discuss the termination with you in advance,

6       correct?

7           MS. DWYER: Objection foundation.

8           THE WITNESS: No. No. That's not correct. The

9       human resources person knew.

10  BY MS. GORDON:

11  Q   Okay. I didn't ask that. Knew when?

12  A   Before she was officially terminated.

13  Q   And who was the human resources person, sir?

14  A   Vernita Terry.

15  Q   And what did Ms. Terry - did you give her a reason?

16  A   I think she knew. I think she knew. I don't know if

17      she put it in writing but she knew that this

18      person -

19  Q   Did you give her an official reason for the

20      termination? Here's why I'm terminating Regina

21      Parks. Did you give her that?

22  A   I think I told her that.

23  Q   And what was the reason?

24  A   Because she came in after the meeting, she came

25      into the suite area, was yelling and screaming

Page 207

1        about how she had to go. How she was patting her

2        vagina, written by three people and making a

3        statement, where is Michael Turner? I'm waiting for

4        Chief Turner. I'm waiting for Michael Turner. He

5        never showed back up at that point. But for what

6        I'm told to be about 30 minutes, ranting and

7        raving, raving about, raging about this - I make

8        more money than this place. I don't have to be

9        here. I got to go, while she was patting her

10       vagina, walking up and down, yelling. And when I

11       got that information - I got the information and I

12       said she would no longer work here.

13    Q  Because I'm sure you've never had anybody yell in

14       the Sheriff's Department before, right?

15    A  And not patting their vagina and walking up and

16       down the -

17    Q  She wasn't patting her vagina.

18    A  Okay. Three people told me that and so that's what

19       I went on.

20    Q  You never interviewed Regina to ask her about what

21       occurred, correct?

22    A  No. I did not.

23    Q  Am I correct? Okay. And HR never interviewed Regina

24       to ask her what happened?

25    A  Let me say this. My chief of staff -

Page 208

1    Q    Hang on, hang on, hang on. You've got to stick with

2         my question, sir.

3    A    I was trying to go back to what you asked.

4    Q    Okay. Just hang on. You never interviewed Regina,

5         sat down with her.

6    A    No.

7    Q    And you never instructed anybody else to sit down

8         with Regina and interview her about the so-called

9         events you just described.

10   A    I did.

11   Q    Nobody talked to Regina?

12   A    They did.

13   Q    Who did?

14   A    Michael Turner, my chief of staff, her direct

15        report.

16   Q    When did he – when did you direct him to talk to

17        Regina?

18   A    That evening I found out.

19   Q    I'm sorry. Be specific.

20   A    The same evening I found out.

21   Q    When did you tell Michael Turner to talk to Regina?

22   A    The evening of her ranting and rage.

23   Q    What did you tell Michael Turner to do?

24   A    I said, this is what I heard that happened. You

25        need to talk to her, find out what happened. She's

Page 209

```
 1         going to be terminated the next day.
 2    Q    Did he get back to you with something in writing?
 3         With a statement from her or anything?
 4    A    I don't recall if it was in writing but he got back
 5         with me.
 6    Q    What did he say?
 7    A    He said he talked to her and she wouldn't
 8         apologize. He said he wanted her to apologize for
 9         her action and she said, no, I'm not going to do
10         it. She didn't say she didn't do it. She said, no,
11         I'm not going to apologize for it.
12    Q    So if she had apologized, what? She wouldn't have
13         been fired?
14    A    Not that I'm saying she would. She would have been
15         fired. She would have been fired.
16    Q    Who have you personally made the decision to fire
17         before since you've been Sheriff?
18    A    Erika Erickson.
19    Q    Who else? That's because you said she was arrested?
20    A    Yes.
21    Q    Who else?
22    A    For drunk driving.
23    Q    Who else have you terminated?
24    A    I terminated - I believe we call that termination,
25         Ed Foxworth.
```

Page 210

1    Q    Well, what was he terminated for? Was he just not
2         re-upped? Was he just, his contract expired?
3    A    I changed - everybody's contract expires.
4    Q    But that's the reason he left.
5    A    Yes.
6    Q    It's not because he did something wrong.
7    A    Yes.
8    Q    So who else have you terminated for doing something
9         wrong other than Erika Erickson and my client?
10   A    I don't know if it's doing something wrong but I
11        let go Pageant Atterberry.
12   Q    Who was that?
13   A    She was, I think she was Benny Napoleon's latest
14        community relations person. I mean, not community.
15        His press person.
16   Q    Why was she terminated?
17   A    Because I was going to bring another one in.
18   Q    So it wasn't anything about misconduct on her part?
19        Just a change?
20   A    Yeah, a change.
21   Q    I asked you who you fired for misconduct.
22             MS. DWYER: I think she said wrongdoing, just
23        for the record.
24   BY MS. GORDON:
25   Q    I think they're similar terms, either one,

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

Page 211

1          wrongdoing or misconduct. What is it? Anybody else?

2    A     Not that I can recall right now.

3    Q     How about prior to you becoming Sheriff? Did you

4          fire anybody for misconduct or wrongdoing?

5    A     I didn't have that responsibility of firing people

6          prior to becoming sheriff.

7    Q     Well, did you recommend anybody be fired?

8    A     Not that I recall.

9    Q     So as of the 15th, you say you'd heard things. Well

10         after Regina left, people made statements about

11         what had happened after, long after you'd fired

12         her, correct?

13   A     No.

14              MS. DWYER: Objection. Misrepresents the

15         testimony.

16              THE WITNESS: No.

17   BY MS. GORDON:

18   Q     No, what?

19   A     It wasn't long after.

20   Q     Well, how long was it?

21   A     The next day.

22   Q     No, it wasn't.

23   A     The next day people –

24   Q     It was 10 days later before you got written

25         statements, Sheriff. Why are you laughing?

1    A    Because you're talking about dates. I'm telling you

2         - you asked me when did people know or when did I

3         say something to people about her conduct.

4    Q    I didn't ask you when you said to people.

5    A    Well, it wasn't maybe those exact words. But you

6         wanted to know when did people know.

7    Q    No. Please listen carefully. I never asked you when

8         did people know. I said, you got written statements

9         from people long after Regina was fired. You didn't

10        have anything in writing from anybody on the 15th.

11   A    I don't know. I don't recall it being 10 days

12        before she got a written statement.

13   Q    I didn't say that.

14        MS. DWYER: You did.

15        THE WITNESS: I thought you did. I thought you

16        just said.

17   BY MS. GORDON:

18   Q    I said, you didn't receive any written statements

19        from anybody, from any witnesses until 10 days

20        later.

21   A    And what I'm saying to you is that I don't believe

22        it was 10 days. Now, if it was, it was. But I don't

23        believe that at all. If it's there, it's there. But

24        I know what I said is I wanted it to happen the

25        next day. So it might have been two days.

Page 213

1   Q    I'm sure of that. That we all know.

2   A    Yeah.

3            MS. DWYER: Argumentative.

4            MS. GORDON: It's not argumentative.

5            MS. DWYER: I'm just responding, agreeing with

6        the witness.

7   BY MS. GORDON:

8   Q    So what happened is, on the night of the meeting,

9        Regina Parks contacted Ms. Whitehead. Were you

10       aware of that?

11  A    Yes.

12  Q    How did you find that out?

13  A    I think Ms. Whitehead said that to me.

14  Q    And what happened is that Ms. Whitehead returned

15       Regina's phone call, correct?

16  A    Yes. That's what she said.

17  Q    And Ms. Whitehead asked Regina if she was better.

18       She knew she'd been upset during the day. And she

19       said, are you better? And she felt that Regina

20       sounded calm. Do you remember that?

21  A    She didn't say all of that to me when she called

22       me.

23  Q    She said she was fine. And she said, she told Ms.

24       Whitehead, Ray can't fire me anyway. I hold all the

25       cards. I got him by the balls. I have him recorded

Page 214

1           hitting on me.

2      A    Okay.

3      Q    She told Whitehead that and the next day you fired

4           her, correct?

5      A    I don't know if she told me that on the phone.

6      Q    Hang on.

7              MS. DWYER: Let him answer the question.

8              THE WITNESS: She told me about Regina Parks'

9           actions after the meeting and that's why I fired

10          her.

11     BY MS. GORDON:

12     Q    Well, here's what Ms. Whitehead says. At that

13          point, I hung up and I called Sheriff Washington. I

14          asked if Regina had a recording of him hitting on

15          her. And he said, no.

16     A    Right.

17     Q    I asked if he had ever hit on her. And he said, no.

18          I then informed the Sheriff of what Regina Parks

19          had stated. That she had a tape.

20     A    And what did she say then?

21     Q    You're not here to ask me questions, sir. The point

22          is that the day before you decided to fire Regina,

23          your secretary was told by Regina that she had a

24          recording of you hitting on her. Your secretary

25          then called you and said, Regina says she has a

Page 215

1          recording of you hitting on her. Immediately

2          thereafter, you fire Regina Parks. That's the

3          chronology.

4               MS. DWYER: Objection. Form of the question.

5               THE WITNESS: It's not what she said. She

6          definitely didn't say all of that in that

7          chronological order to me.

8     BY MS. GORDON:

9     Q    Okay, sir.

10    A    She told me that Regina was acting the way she was

11         acting. And I said, I'm going to have to let her

12         go. It had nothing to do with what she said I did.

13         It was what she did.

14    Q    Well, then maybe Ms. Whitehead is lying in her

15         statement.

16    A    She's not lying at all.

17    Q    Well, she's saying much different than what you're

18         - not much different but - and you can look at her

19         letter. It's basically -

20    A    I've seen it.

21    Q    So you know that she specifically was told by

22         Regina Parks that Regina had a recording of you and

23         that she immediately, Rashaun Whitehead,

24         immediately called you and said, Regina has a

25         recording of you saying that you were hitting on

Page 216

1            her. You learned that.

2     A     And I said something to that effect that, no, I

3            didn't.

4     Q     Didn't what?

5     A     Ever hit on her.

6     Q     I know, but you were told there was a recording,

7            sir.

8     A     I was told that she was walking around my section

9            of where I work patting her vagina, talking in a

10           loud voice about -

11    Q     Okay. Your way off topic.

12              MS. DWYER: Let him finish his statement.

13              THE WITNESS: I'm just trying to explain it to

14           you.

15    BY MS. GORDON:

16    Q     I'm not asking you to -

17    A     Of why I was fired - why she was fired.

18    Q     Okay. Sheriff, I'm not asking you to explain

19           anything to me.

20    A     Well, you're telling me why I fired her. You're

21           telling me and I'm trying to tell you why I fired

22           her.

23    Q     I'm telling you what Rashaun Whitehead said.

24    A     Rashaun didn't get it - that wasn't the

25           chronological order that she, that you're trying to

Page 217

```
 1       make it that she -
 2   Q   Well, it's in writing.
 3   A   Well, that people write what happened doesn't mean
 4       it happened like that.
 5   Q   So do you deny Rashaun Whitehead told you on the
 6       night of the meeting that Regina Parks had a tape
 7       of you hitting on her? Do you deny that she -
 8   A   I don't -
 9   Q   Hang on. You got to let me finish the question,
10       okay.
11   A   Go ahead.
12   Q   Do you deny that you got a call from Whitehead the
13       night of the meeting telling you that Regina Parks
14       said she had a tape of you hitting on her? Do you
15       disagree with that statement?
16   A   I don't disagree with that at all.
17   Q   And nowhere in writing on the 15 - there's nothing
18       that exists in writing anywhere. I've already asked
19       for this in my request for production and I've not
20       received anything in writing that gives a reason
21       for the termination of Regina Parks. I'm just
22       confirming with you that you don't know of
23       anything.
24           MS. DWYER: Well, that misrepresents the record
25       evidence. Objection to form.
```

Page 218

1    BY MS. GORDON:

2    Q    Go ahead. There's nothing in writing giving a

3         reason, correct?

4              MS. DWYER: Same objection.

5              THE WITNESS: No. I didn't put anything in

6         writing. I didn't have to put anything in writing.

7    BY MS. GORDON:

8    Q    And the reason on the form is that her - was an

9         expiration of appointment, correct?

10   A    Yes.

11   Q    But she had just been appointed the day before,

12        correct? Reappointed on the 13th of November,

13        correct?

14   A    Yes.

15   Q    So it wasn't really the expiration of the

16        appointment. It was that you think she engaged in

17        some misconduct. That's your theory in this case,

18        correct?

19             MS. DWYER: Objection to the extent it calls

20        for a legal conclusion. But go ahead and answer.

21             THE WITNESS: She was terminated because of her

22        actions.

23   BY MS. GORDON:

24   Q    That's not what it says in writing.

25   A    Well, I didn't have to say that in writing.

```
                                            Page 219
```

1  Q    Well, now you do because you're sitting here and

2       you have no evidence of what you allegedly say your

3       real reason is. There's no evidence at all in this

4       record.

5           MS. DWYER: Objection to form and calls for a

6       legal conclusion.

7  BY MS. GORDON:

8  Q    To the contrary.

9  A    I have people, three or four people who said that

10      to me, including I think the chief of staff.

11 Q    Who said it? Let's find out who said it.

12 A    Rashaun.

13 Q    Rashaun said what?

14 A    What her conduct was after the meeting.

15 Q    Did she say she should be fired?

16 A    No, she didn't say that.

17 Q    Who else?

18 A    I mean, I said that. I'm telling you, you're asking

19      me who, how did I know or something to that effect

20      or why did I fire her.

21 Q    No. You said you have four people, you say, what,

22      that you talked to.

23 A    In writing.

24 Q    And that's - okay, sir, these things are written on

25      November 25. That's ten days afterward. Okay. Ms.

Page 220

```
 1          Gamble's statement is November 25th. Are you with
 2          me?
 3     A    Sure.
 4     Q    That's ten days after you fired Regina.
 5     A    But I knew what they said because they told me what
 6          they said before they put it in writing.
 7     Q    Did you meet with all of them?
 8     A    Yeah. They wanted to meet with me.
 9     Q    Well, if you - listen, if you met with them why did
10          they - did you tell them to put all these
11          statements in writing?
12     A    They were told that they needed to have it in
13          writing. Chief of staff even told them that.
14     Q    Who else, other than Ms. Whitehead?
15     A    Ms. Gamble, Rashidah Gamble and Danielle.
16     Q    What did Ms. Gamble say?
17     A    To the same effect, that she was upset, walking
18          around the place patting on her vagina, talking
19          about whatever she was saying. I don't have it
20          word-for-word but it was all there.
21     Q    What's the concept of patting on her vagina?
22     A    You have to ask her.
23     Q    Can you let me just get my question out?
24          MS. DWYER: If you could let him get his
25          statement out so he can answer your question. You
```

Page 221

1          keep talking over him.

2     BY MS. GORDON:

3     Q    What was the impact to you of her patting her

4          vagina? What did that mean to you, if anything?

5     A    That means nothing to me. It means but she's in a

6          disorderly conduct kind of situation in my office

7          area and I wasn't going to have that.

8     Q    And she also said out loud that she had potentially

9          damaging information about you, correct?

10    A    That's what she said.

11             MS. DWYER: For the record, you didn't let him

12         finish his answer. You had asked him who the names

13         were. He gave three.

14    BY MS. GORDON:

15    Q    Yeah. You talked to Gamble. You talked to

16         Whitehead.

17    A    Danielle Stevens.

18    Q    Who else?

19    A    Danielle Stevens.

20    Q    Well, Danielle Stevens walked over to Regina and

21         gave her a hug. She wasn't angry with her. She just

22         saw she was very upset and she went over and gave

23         her a hug. Do you recall that?

24    A    I didn't say anybody was angry with her.

25    Q    Okay, good.

Page 222

```
 1    A    While that was going on. And I'm glad they did try
 2         to console her and get her to come to her senses
 3         before it was too late.
 4    Q    And Regina told Danielle Stevens that she was fine,
 5         correct?
 6    A    Yeah. I guess if that's what she wrote. I think she
 7         said some other things as well.
 8    Q    Who else did you talk to? Gamble, Stevens,
 9         Whitehead and who else? Anybody else?
10    A    Michael Turner.
11    Q    Did he write a statement?
12    A    I'm not sure.
13    Q    Did you ask these people to write statements?
14    A    I said that they were going to have to have
15         statements. If that's what they were saying about
16         her and her conduct, they should put it in writing.
17    Q    And when did you say that?
18    A    The next day.
19    Q    In a meeting?
20    A    I don't know if it was in a meeting. Their offices
21         are right next to mine, right outside mine.
22    Q    Gamble, Stevens.
23    A    Their offices are right outside mine.
24    Q    So you just said to them, you all need to put this
25         in writing?
```

Page 223

```
 1   A    If that's what you're saying that happened, you
 2        need to put it in writing.
 3   Q    And why did it take so long for everybody? Why did
 4        it take 10 days then if you told them the next day?
 5   A    I'm not sure. At that point, my counsel had gotten
 6        involved.
 7   Q    Your counsel?
 8   A    Yeah.
 9   Q    Who's that?
10   A    David Melton.
11   Q    Why was he involved at that point?
12   A    He sits right outside the office. I don't know if
13        he had anything to do with it or not. But
14        nevertheless - if he heard it or anything. But
15        nevertheless, he has a lot to do with it when we
16        were talking about it.
17   Q    Well, he didn't put a written statement together,
18        did he?
19   A    I don't know if he did or not. Those written
20        statements went to Vernita Terry. I did not look at
21        them.
22   Q    You've never seen these written statements?
23   A    I've seen them now, yeah. I've seen them since
24        then. I'm talking about the day they wrote them.
25   Q    Why did you get a lawyer involved? Because why?
```

Page 224

```
 1   A   My lawyer's involved in everything we do in my
 2       agency.
 3   Q   Really?
 4   A   Absolutely.
 5   Q   How many community outreach individuals do you have
 6       today?
 7   A   We have three with a fourth one coming.
 8   Q   Who's the fourth one coming?
 9   A   Carrie. Carrie - I have her last name.
10   Q   Where does she come from?
11   A   Carrie Moore.
12   Q   Where does she come from?
13   A   Detroit Police Department as a community outreach
14       leader.
15   Q   How long have you known her?
16   A   Probably about 20 years.
17   Q   How much is she being paid?
18   A   I'm not sure.
19   Q   What's your estimate on it or guesstimate?
20   A   The same that the others are being paid.
21           (Brief pause.)
22   BY MS. GORDON:
23   Q   Sheriff, we were talking a few minutes ago about
24       the Rashaun Whitehead conversation with Regina
25       Parks at the time of the meeting that we've been
```

Page 225

1         discussing for the restructuring. And I asked you

2         about the memo that Ms. Whitehead had sent stating

3         that she called Regina back and she said, Ray can't

4         fire me anyway. I hold all the cards. I got him by

5         the balls. I have him recorded hitting on me.

6              Do you remember that from a few minutes ago?

7    A    Yes.

8    Q    We covered that. And at that - she then writes, Ms.

9         Whitehead, at that point I hung up and called

10        Sheriff Washington. Remember that?

11   A    Yes.

12   Q    But in your answer to the complaint, sir, you deny

13        that. You filed an answer to this complaint that we

14        filed. And in paragraph 59 we say, defendant

15        Washington's executive assistant immediately

16        informed Defendant Washington of her conversation

17        with plaintiff.

18             Are you with me?

19   A    I hear you.

20   Q    You deny that. Defendant denies as untrue the

21        allegations. This is the defendant, not the county.

22        Defendant denies as untrue the allegations

23        complained in paragraph 59.

24             MS. DWYER: Objection to the extent it calls

25        for a legal conclusion or a legal statement.

Page 226

1          MS. GORDON: It's got nothing to do with a

2     legal statement. It's facts.

3          MS. DWYER: And I don't have the complaint in

4     front of me. It appears that there's additional

5     language there.

6          MS. GORDON: There's not.

7          MS. DWYER: You read the whole statement?

8          MS. GORDON: Read 59, Maria. And then hand it

9     right back to me. Okay. Thank you.

10    BY MS. GORDON:

11    Q    I'll read the allegation in 59. Defendant

12         Washington's executive assistant immediately

13         informed Defendant Washington of her conversation

14         with plaintiff. You say defendant denies as untrue

15         the allegation.

16    A    Yes.

17    Q    Why did you say that? You said here today she did

18         call you and tell you.

19    A    She told me what Regina said about me hitting on

20         her. When I said it's not true, that's what I'm

21         referring to. You said, you just asked me, you said

22         what I said was not true.

23    Q    Now, try to listen to the question. I mean, I guess

24         your answers here today speak for themselves. But

25         you were asked in the complaint, there was a

Page 227

1           statement made that Ms. Whitehead had informed you

2           of what Regina Parks said. And in your complaint,

3           in your answer to the complaint, you deny it.

4           That's different than what you said here today.

5    A      Can I ask you what are you saying that I'm denying?

6    Q      You're denying that your executive assistant called

7           you, Ms. Whitehead, and informed you of her

8           conversation with plaintiff.

9    A      I never denied that. I said she actually, she did

10          call me.

11   Q      Well, read paragraph 59 into the record. That's the

12          question. What's that say? Read it into the record.

13   A      "Defendant denies as untrue the allegations

14          contained in paragraph 59."

15   Q      Okay,

16   A      I still deny that. It's untrue.

17   Q      That's not what you said here today.

18   A      Okay. It's untrue. And I thought I said that

19          earlier today because the allegations are untrue. I

20          never would have said anything different.

21   Q      Read paragraph 59.

22   A      Is this a different 59?

23   Q      That's my allegation. Let's read that into the

24          record, sir. Read it out loud.

25   A      "Defendant Washington's executive assistant

Page 228

```
 1        immediately informed Defendant Washington of her
 2        conversation with plaintiff."
 3   Q    Did she do that?
 4   A    That evening, she did.
 5   Q    Read your answer out loud.
 6           MS. DWYER: Again objection to the extent it
 7        calls for a legal conclusion.
 8           MS. GORDON: That's ridiculous.
 9   BY MS. GORDON:
10   Q    Go ahead.
11   A    "Defendant denies as untrue the allegations
12        contained in 59."
13   Q    Thank you, Sheriff. You can hand those both back to
14        me. You can hand those both back to me, please.
15   A    She informed me of it.
16   Q    There's no question on the record.
17   A    I don't know how -
18   Q    There's no question on the record, Sheriff. Okay.
19           On February 11, 2025, this lawsuit was filed
20        as we previously covered today. Has there been a
21        human resources investigation into the allegations
22        made against you with regard to sexually harassing
23        employees and others? Has human resources from
24        Wayne County looked into this?
25   A    Only thing I know them to have looked into was that
```

Page 229

```
 1              Polderdyke lawsuit. I don't know anything else.
 2     Q    I said since my – I said to you my complaint was
 3              filed on February 11, 2025. That's what I said. So
 4              then I asked you after I told you about the
 5              lawsuit, there's many allegations in the lawsuit
 6              about wrongful conduct by you, as you've, I assume,
 7              seen, correct?
 8     A    Yes.
 9     Q    So my question was, since the lawsuit was filed,
10              this actually got out into the news and it's on the
11              Federal docket, has anybody from human resources
12              contacted you to find out about the allegations
13              made and whether they're true?
14     A    I would have to say my attorneys, that's it.
15     Q    No. I'm not asking about any of your attorneys. I'm
16              talking about your internal HR.
17     A    No.
18     Q    Has there been more than one settlement agreement
19              you've entered into since you've been with the
20              county with regard to a sexual harassment claim?
21     A    I don't know of any others.
22     Q    And during the time you've been at the Sheriff's
23              Department, one or more female employees have made
24              complaints to a supervisor or human resources about
25              your unwanted conduct, correct?
```

Page 230

```
 1   A    Yes.

 2   Q    Who are the people you know that have made

 3        complaints?

 4   A    So, when we say complaints, I probably want to take

 5        that back. There hasn't been complaints. There have

 6        been some allegations that were rescinded that were

 7        never complaints.

 8   Q    What were the allegations that were rescinded?

 9   A    I think there was one where a young lady said that

10        she was, she was, we were at a holiday party and

11        she said I said something to her concerning that is

12        she married or does she want to date or something

13        to that effect. She happened to mention it to

14        someone, from what I understand. And she said they

15        tried to force her into making a complaint, which

16        she said she never had a complaint.

17   Q    Who was they? Who tried -

18   A    She said, I guess, I think it was chief of staff at

19        the time. I think it was Chief Turner.

20   Q    He tried to force her into making a complaint?

21   A    She said several people did. I don't know if it was

22        him or if it was the attorney that was in our

23        office at the same time, at that point. But she has

24        told me purposely that she has never had a

25        complaint and she was tried, they were trying to
```

Page 231

1        force her into that.
2  Q  So a lawyer was trying to force her to make a false
3        complaint?
4  A  You'd have to ask her about that.
5  Q  Well, I'm just basing it on what you said.
6  A  I'm just saying what she told me.
7  Q  Okay, please. Let's try not to talk over each
8        other, okay? It's just hard.
9           So you went - so she told you or somebody told
10       you that she'd gone to make a complaint to the
11       counsel and he recommended she make a complaint.
12  A  No, nobody ever - she didn't never - she didn't say
13       that to me.
14  Q  Well, you just said that on the record.
15  A  No. I said she told me that she was being forced to
16       try to, I think she mentioned it to someone. And
17       mentioning, just having a conversation.
18  Q  Yes.
19  A  And then she said, well, you need to make a
20       complaint. She said, no, I'm just letting you know.
21       I'm not making a complaint.
22  Q  And who -
23  A  I'm just saying, I don't know who she was talking
24       to exactly.
25  Q  Well, you mentioned Turner and you mentioned -

Page 232

1  A   I said possibly Turner.

2  Q   Hang on. Please don't interrupt. You mentioned

3      Turner and you mentioned legal counsel. That's who

4      you mentioned.

5  A   Possibly, yes. She didn't go into detail with me on

6      who that was. She just said, can you believe they

7      tried to make me, force me into making a complaint.

8  Q   Well, what did she complain to them about?

9  A   I guess she just told them what I said that she

10     said, what she figured that, hey, I think you were

11     trying to say something to me or ask me was I

12     married or was I still married or something to

13     that.

14 Q   Dating?

15 A   Yes. Did you want to date. And I don't remember any

16     of that either, having that kind of conversation

17     deep down with her.

18 Q   You're not denying it. You're not denying it. You

19     just don't recall.

20 A   I'm denying it.

21 Q   Let's not talk over each other. You're not denying

22     it, you just can't recall it.

23 A   No, I'm denying it. I'm denying that.

24 Q   So then she was making it up when she went to -

25     hang on. Hang on, Sheriff. I know it's hard.

Carroll Reporting & Video
A Veritext Company
www.veritext.com                                          586-468-2411
                                                          www.veritext.com

Page 233

1          So then she was making up something when she
2     went and talked to whoever she talked to. She's
3     making up a lie, maybe to Turner, maybe to the
4     counsel, maybe somebody else, you're not sure. She
5     lied to those people.
6   A  I'm saying she probably mis - she obviously
7     misunderstood me.
8   Q  So it's not that she was lying but maybe she -
9   A  Well -
10  Q  Hang on. But maybe she misunderstood you or was she
11     lying to whoever it is she went to? Could be
12     Turner, could be general counsel or legal counsel.
13  A  I don't know.
14          MS. DWYER: Objection to the extent it calls
15     for speculation.
16  BY MS. GORDON:
17  Q  Well, what's your - I mean -
18  A  I don't know who she was really talking to.
19  Q  You've already said that.
20  A  I did.
21  Q  And you've already explained that and it's already
22     on our record.
23  A  Okay.
24  Q  I'm just trying to find out now, when she went to
25     these people that you say she went to, was it - is

Page 234

1           it your position that she was just lying about you?

2    A      I don't know exactly what she said.

3    Q      So is it possible you asked her, you want a date?

4    A      No.

5    Q      Not possible at all?

6    A      No.

7    Q      Have you ever had a private date, encounter,

8           meeting with a county employee outside of work

9           purposes?

10   A      No.

11   Q      Really?

12   A      Not that I recall.

13   Q      You go out with a lot of women, don't you?

14   A      No, I don't. No, I don't. I'm married.

15   Q      Therefore what?

16   A      So I haven't been out with a lot of women.

17   Q      Oh, really?

18   A      No.

19   Q      That's the reason for it?

20          MS. DWYER: This is harassing behavior in the

21          questioning.

22   BY MS. GORDON:

23   Q      Well, it's not an answer. It's not a - being

24          married, as far as I've last checked in the world,

25          is not a bar to men going out with women. It's just

Page 235

1        not a, it's not an answer that really answers the

2        question. You can be married, not married, single,

3        not single.

4    A   The answer is no.

5    Q   You can go out with a bunch of different people.

6        And so who are the other women? You've admitted

7        that other women made complaints about you other

8        than my client. Who else can you think of?

9            MS. DWYER: I'm going to object to the extent

10       it misrepresents the testimony.

11   BY MS. GORDON:

12   Q   Go ahead.

13   A   We've already discussed those people. The same

14       people that -

15   Q   Who are they? Just -

16   A   Polderdyke.

17           MS. DWYER: If it's nothing further than what

18       you've testified to, then that's your answer.

19           THE WITNESS: Yeah. Polderdyke.

20   BY MS. GORDON:

21   Q   Polderdyke? I just want to be sure I know who he's

22       talking about.

23   A   Same thing.

24   Q   Erika Erickson, is that who you're talking about?

25   A   Erika Erickson never had a complaint.

Page 236

1    Q    She made a complaint to Turner.

2    A    I don't know.

3    Q    And she made complaints to you.

4    A    No, she didn't. She never made a complaint to me.

5         Matter of fact, she told me she didn't have a

6         complaint.

7    Q    You told me a little bit earlier about some things

8         she said but we're not going to recover that again.

9             Who else?

10   A    I don't recall anyone else.

11   Q    And you also had complaints against you at the

12        Detroit Police Department. We know that.

13   A    Yeah, there was a complaint and it was unfounded.

14   Q    And that person was lying?

15   A    Yeah. That's why it was unfounded.

16   Q    How often did you meet with Turner, your chief?

17        Typically in, let's say, 2023, 2024, 2025.

18   A    Often.

19   Q    What does that mean in your world?

20   A    Well, help me with what meet with. What are you

21        saying? Every time we ran into each other?

22   Q    No. Not running in.

23   A    Is that meet with?

24   Q    Anytime - not to say hi but anytime you sat down to

25        discuss whatever was happening.

Page 237

1    A    Out of a week, it might have been whatever's
2         happening with our agency. Various things going on
3         with our agency.
4    Q    Whatever, sure.
5    A    Yeah. During the week it probably was two, three
6         times maybe.
7    Q    Was his office near your office?
8    A    It was near mine, yes.
9    Q    Did you work remotely at all?
10   A    No.
11   Q    Did he?
12   A    He had some back trouble, so he did occasionally.
13   Q    Was Turner married?
14   A    Yeah, he's married.
15   Q    And were you concerned when you learned he had a
16        relationship with my client and that he was her
17        boss?
18   A    Was I concerned?
19   Q    Yes, about his conduct.
20   A    About his marriage?
21   Q    No. About the fact that you had a very high-level
22        individual who was having a relationship or an
23        affair with a subordinate employee. Did that
24        concern you?
25   A    Yes.

Page 238

1    Q    Did you contact HR?

2    A    I contacted Turner.

3    Q    Did you contact HR, sir, and tell them, we have a

4         situation here where a high-level executive is

5         having an affair with somebody who he's

6         supervising?

7    A    Yes.

8    Q    And that's a big, could be a big problem. You did

9         not contact HR, am I correct?

10   A    No.

11            MS. DWYER: I'm just going to object to the

12        form of the question.

13   BY MS. GORDON:

14   Q    Am I correct, you did not contact HR?

15   A    I did. Vernita Terry knew all about it.

16   Q    She knew all about it?

17   A    After I told her.

18   Q    When did you tell her?

19   A    After I find out. After I found out.

20   Q    When did you find out?

21   A    Sometime toward the end of March. I mean, February,

22        early March. Sometime around in there.

23   Q    February, early March of 2025?

24   A    Yes.

25   Q    And how did you find this out?

Page 239

1    A    He told me.

2    Q    How'd it come up?

3    A    He said he wanted to have lunch. And we went to

4         lunch and he told me everything that had happened,

5         had been happening since, since 2021.

6    Q    And so what else did he say? Did you ask him any

7         other questions?

8    A    No. He just told me he had been having a sexual

9         relationship with Regina Parks since 2021. And he

10        said this had nothing to do with me. It had

11        everything to do with the relationship that he had

12        with her and that he wasn't able to save her from

13        being fired.

14   Q    Well, she'd already been fired by the time you had

15        this conversation.

16   A    Yeah. But I mean, he said that she was upset about

17        it.

18   Q    So did you say to him, have you had relationships

19        with other employees?

20   A    No.

21   Q    So when did you tell, who's the person from HR you

22        said you told?

23   A    Vernita Terry.

24   Q    When did you talk to Vernita Terry?

25   A    After I found out. But I don't know if it was a day

Page 240

1    or two, I can't tell.

2  Q   How did you contact her?

3  A   She works in the office. I had a conversation with

4    her.

5  Q   I didn't ask you that. I just said that -

6  A   Yeah. Personally.

7  Q   Okay. And did you put anything - did she ask you to

8    put anything in writing?

9  A   No.

10  Q   Did she ask Turner to put anything in writing?

11  A   I'm not sure.

12  Q   Did anybody tell Turner that what he had done was a

13    violation of an important rule?

14  A   I did.

15  Q   Was it a violation of a rule?

16  A   Sure.

17  Q   What's the rule?

18  A   The fraternization and having a relationship with

19    your subordinate, your direct report subordinate.

20  Q   But none of that was ever put in writing.

21  A   I didn't put it in writing.

22  Q   Nobody did as far as you know. There's no record of

23    that having happened in the files.

24  A   The writing or it being a violation?

25  Q   There's nothing in writing anywhere in the files of

Page 241

1           the county that says that Turner had a relationship

2           with his subordinate, am I correct?

3     A     I'm not sure.

4     Q     Nothing you know of, sir.

5     A     That I know of.

6     Q     Now, you discussed the allegations in this lawsuit

7           with Turner, is that correct? This lawsuit, when

8           you read it or you saw what was being complained

9           of, you discussed it with Turner, is that correct?

10    A     I haven't had - I think the only discussion I had

11          with him was, I asked him did he have - because I

12          saw the lawsuit that said he told someone to, or he

13          told Parks to, you get a chance, something to that

14          effect of taking, you need to report to Sheriff. I

15          asked him about that. He said he absolutely did not

16          ever say that. And that was the gist of whatever I

17          talked to him about this whole thing.

18    Q     Did you ask him any other questions about Regina?

19    A     Not that I recall.

20    Q     So he wrote this declaration. Have you seen the

21          declaration he wrote? That Turner wrote?

22    A     I may have. I need to see it.

23    Q     So did you discuss with him that he was going to

24          write a declaration making statements?

25    A     Absolutely not.

Page 242

1    Q    Did you ever see his declaration?

2    A    I'm not sure. I need to see it.

3    Q    Well, it's a list of comments he's making. I just

4         want to know if you saw it. And it was, let's see,

5         his last day of work was what?

6    A    I believe it was sometime in June.

7    Q    So you learned about Turner's relationship with

8         Regina Parks when?

9    A    It was late February, early March when we had

10        lunch.

11   Q    So did he make any complaints to you about Regina

12        Parks? I realize he was sharing with you that he

13        had a relationship with some subordinate. Did you

14        discuss her termination with him at that time?

15   A    Well, he knew she had been terminated.

16   Q    Right.

17   A    We didn't discuss a lot of her, we didn't discuss

18        her termination. That had happened. He wanted me to

19        know so my family would know that this had nothing

20        to do with me. It had everything to do with him and

21        the relationship. And he wanted to emphasize the

22        sexual relationship that he was having with her

23        since 2021.

24   Q    Did he make any other complaints about her to you?

25        Or any complaints at all?

Page 243

```
 1    A    Not that I recall.
 2              Can I take that back? I want to add something
 3         to it.
 4    Q    Sure.
 5    A    He did complaint to me at that time that he knew
 6         that her work ethics were not what I would have
 7         expected them to be. He said he knew that but he
 8         was going to try to make sure that she does her
 9         job. This was going to happen after the revamping
10         of what I did.
11    Q    The restructuring.
12    A    Restructuring. But it didn't get – obviously, it
13         didn't get to that point.
14    Q    And he never took any adverse employment action
15         against Regina, correct? No discipline, no write
16         ups, nothing like that?
17    A    Not that I recall. I don't know. I mean, he might
18         have counseled her.
19    Q    That's what he said.
20    A    I'm sure he counseled her. He did say that. He
21         would talk to her about the job that she was doing.
22         He did say that. So that was his form of counseling
23         that he did.
24    Q    And as far as you know, nobody from the county
25         contacted Regina Parks to find out – once you
```

Page 244

1         learned about the sexual relationship, nobody

2         contacted Regina Parks to find out whether, because

3         this was her boss, she had been pressured in any

4         way, as far as you know.

5    A    I don't know.

6    Q    Nothing you knew of, correct?

7    A    No. Right. I didn't know of any of that.

8    Q    Have you ever made a comment of a sexual nature to

9         any female employee in the County of Wayne?

10   A    No.

11   Q    Never?

12   A    No, never.

13   Q    Have you ever touched a female employee in the

14        County of - at the County of Wayne?

15   A    No. In some kind of sexual manner or we talking

16        about -

17   Q    Well, you know, one person's sexual manner is

18        another person's something else.

19   A    No.

20   Q    Have you ever touched the body of a female at the

21        County of Wayne? Other than in passing, brushing

22        against somebody inadvertently, shaking hands,

23        leaving those things aside where you would

24        literally go up and touch somebody?

25   A    No.

Page 245

1  Q  Stick your hand on their leg, rub your leg against

2     a leg, rub against an arm, try to touch a breast,

3     stick a hand down a shirt.

4  A  No.

5  Q  A lot of people say you've done stuff like that.

6  A  I don't know a lot of people said that.

7  Q  Well, we'll cover it. Are they all lying?

8  A  If they said I stuck my hand down a shirt.

9  Q  Why do people want to lie about you? These are

10    people that worked to help you get elected.

11 A  Not all of them.

12 Q  Well, I think everybody I'm going to mention to you

13    tried to help you get elected, Sheriff.

14 A  They said I stuck my hand down their shirt?

15 Q  Yeah.

16 A  Well, I don't know why they would do that. Because

17    they never told me that.

18 Q  I don't know. Because you never did any of those

19    things.

20 A  They never told me any of that.

21 Q  Well, maybe they're afraid to tell you because,

22    guess what, you're an elected sheriff, sir.

23 A  I don't know.

24       MS. DWYER: This line of questioning is

25    harassing.

Page 246

1    BY MS. GORDON:

2    Q    You're not what?

3    A    No.

4    Q    You're not what?

5              MS. DWYER: Argumentative.

6              MS. GORDON: That's incorrect.

7              MS. DWYER: It is. It's harassing.

8              MS. GORDON: Okay. Please.

9    BY MS. GORDON:

10   Q    What were you saying, Sheriff? Your counsel

11        interrupted you.

12   A    Nobody's afraid of me.

13   Q    How do you know that?

14   A    Because I know how I treat my people.

15   Q    Well, sir, you can fire anybody on a dime. You just

16        did it to my client. What do you mean nobody's

17        afraid of you? You can fire anybody you want.

18        That's what you've said here today.

19              MS. DWYER: Objection. Misrepresenting the

20        testimony.

21   BY MS. GORDON:

22   Q    You can fire anybody you want. You fired Regina and

23        you got rid of Turner and you didn't get anybody

24        else's approval on that.

25              MS. DWYER: Objection. Misrepresenting the

Page 247

1          record testimony.

2     BY MS. GORDON:

3     Q     Is that correct?

4              MS. DWYER: Can I put my objection on the

5          record? You're misrepresenting the testimony.

6              MS. GORDON: You already did. Coaching big

7          time.

8              MS. DWYER: Your questioning is misrepresenting

9          his testimony so I'm placing it on the record.

10             MS. GORDON: Well, I'm sure you'll go back with

11         him then.

12             MS. DWYER: Which is my job. That's why I'm

13         here, literally.

14             THE WITNESS: We can go to your question. No.

15    BY MS. GORDON:

16    Q     So you have the ability to fire anybody. We already

17         know that. You've already said that today, correct?

18             MS. DWYER: Misrepresents his testimony.

19             THE WITNESS: I don't think I said it like that

20         but.

21    BY MS. GORDON:

22    Q     Well, it's true, isn't it? You're the elected

23         sheriff. You report to no one.

24    A     I can.  I can.

25    Q     Yes, you can.

Page 248

1   A    I can.

2   Q    Yes. Thank you. So when you say nobody's afraid of

3        you.

4   A    Right.

5   Q    And you know somebody has control over your

6        paycheck and your job, you don't know what they're

7        thinking, do you? You don't know what these people

8        are thinking, correct?

9   A    I know what people have said to me. I know what

10       they've said to me.

11  Q    People lie to the boss man often, don't they? To

12       make them feel good.

13           MS. DWYER: Objection. Argumentative.

14  BY MS. GORDON:

15  Q    We you see that every day in the White House, don't

16       we?

17  A    No.

18  Q    We see it. We know that Ms. Polderdyke accused you

19       of asking her for a massage. And she says in her

20       paper, she actually did massage your neck a bit.

21  A    And I stopped her. She attempted to.

22  Q    That was her idea?

23  A    Absolutely. She told me she was a masseuse and she

24       said, let me show you. And I stopped her. Fact.

25  Q    That's not what you said earlier in your dep. You

Page 249

1          said there was no massage.

2     A    There wasn't.

3     Q    You've referred to women as babe, correct?

4     A    I have.

5     Q    You've asked women out on a date, correct? Or to go

6          out with you, correct?

7     A    No.

8     Q    Were you ever charged with lying to law

9          enforcement?

10    A    No.

11    Q    How about the city of Detroit or the city of

12         Southfield Police Department?

13    A    I wasn't charged with lying at all. Matter of fact,

14         it was unfounded.

15    Q    My client's job required her to work closely with

16         you, is that correct? Because you were out in the

17         community together, attending events, talking to

18         citizens and the like, correct?

19    A    It wasn't required that she work closely with me.

20    Q    It was part of her job, wasn't it?

21    A    She was at various events that I had to be at when

22         I would let her know I need her to be at that

23         event. But her job was to be in the community, not

24         necessarily, not with me but to be engaging the

25         community.

Page 250

1   Q   Well, she was at a lot of events with you, correct?

2   A   She was at some, not a lot.

3   Q   How many would you say in a given year?

4   A   I can't even tell you.

5   Q   Well, give me an estimate. You say not a lot. That

6       means different things to different people. Go

7       ahead.

8   A   I'm trying to give you a rightful answer.

9   Q   Please do.

10  A   Best I could say is occasionally.

11  Q   What does that mean to you?

12  A   That means here and there. It means if I - it means

13      if I have to go out in the community and I need you

14      there, then that -

15  Q   How often does that occur?

16  A   Not very often.

17  Q   Once a month, once every six months? What would you

18      say?

19          MS. DWYER: You got to let him finish his

20      answer.

21  BY MS. GORDON:

22  Q   Go ahead.

23          MS. GORDON: It's hard because he keeps talking

24      but go ahead.

25          MS. DWYER: He's trying to answer the question.

Page 251

1          You have to let him get his answer.

2     BY MS. GORDON:

3     Q    Often? Just be specific. A little more specific.

4     A    I can't be specific because it's not an every

5          Monday, Tuesday and Wednesday you have to be with

6          me in the community.

7     Q    I know that, Sheriff. I know that.

8               MS. DWYER: You did it again. Can you please

9          let him answer the question?

10    BY MS. GORDON:

11    Q    And if somebody asks me how often do I go to court

12         in a month, I'm sure I could give them an answer.

13    A    Totally different.

14    Q    It's not totally different.

15    A    Those are scheduled things.

16    Q    Well, these are scheduled events you attend.

17    A    Yeah. But they're not scheduled in advance.

18    Q    So for example, Ray Washington at the Lava Grille.

19         What's that?

20    A    It's an agency get together. I believe that's what

21         that was.

22    Q    Why were you there?

23    A    Because I'm the Sheriff.

24    Q    So what does that mean? I don't know what the Lava

25         Grille is?

Page 252

1    A    If it's what I'm thinking about -

2    Q    Was it a fundraiser?

3    A    No. I don't think it, I don't think it was a

4         fundraiser for me. It was, I think it was something

5         for our honor guard. They were having something

6         there.

7    Q    And were you campaigning in July of 2022?

8    A    July of 2022?

9    Q    M'hm.

10   A    Yeah. But I wasn't campaigning there.

11   Q    Well, I'll show you one Bates 1625. It's an event

12        you were at with Regina Parks.

13   A    M'hm.

14   Q    What's that event? It's got a sign out in front.

15        That's what made me think it was a political event.

16        It's something about electing you as sheriff. What

17        was that event, Sheriff?

18             MS. DWYER: I said, hold on a second. Are you

19        going to be marking this as an exhibit?

20             MS. GORDON: No. I just read the Bates stamp

21        in.

22   BY MS. GORDON:

23   Q    Go ahead, Sheriff. What was -

24             MS. DWYER: Hold on, please. I'd like to take a

25        look at the document.

Page 253

1    BY MS. GORDON:

2    Q    What's that event, Sheriff?

3    A    I'm not sure. I'm not sure.

4    Q    What's that sign say?

5    A    That's a sign that I have all over Northville

6         because that's in the -

7    Q    I just said, what does it say? That's all I asked

8         you.

9    A    Oh. It says, reelect Raphael Washington Sheriff.

10   Q    Are you in that photo on that document?

11   A    I am.

12   Q    Is Ms. Parks on that document in a photo with you?

13   A    Yes.

14   Q    By the way, as I understood it, you got along

15        pretty well with Regina Parks, is that correct?

16   A    I didn't have an issue with her. Had issue with

17        some of her work ethic but I didn't have a personal

18        issue.

19   Q    Like what? Anything you ever put in writing?

20   A    Oh, her direct report would do that.

21   Q    Nobody ever put anything in writing that you know

22        of, correct?

23   A    I don't know.

24   Q    Here's 1644. This is May 14th, 2022. I'll hand it

25        to your counsel. This says WCSO Family Love and

Page 254

1       Support for the Wayne County Sheriff. Join my

2       Family. Do you know what that is? Do you know what

3       support my family is?

4    A    I haven't seen it.

5    Q    Do you know what the Wayne County - I'm sorry.

6       What's the, Join my Family mean, Sheriff? Is this a

7       fundraiser?

8    A    I haven't seen it yet.

9            MS. DWYER: Once again, he hasn't seen the

10       document. It's still down at the end of the table.

11           MS. GORDON: Okay. It's not that much to look

12       at, guys.

13   BY MS. GORDON:

14   Q    What is this? Is this an election event?

15   A    I don't know that this was an election event at

16       all. It was something - it was written, something

17       written by Michelle, someone that works for me.

18       Just works in our agency. But I don't know. I

19       really can't tell you what this was.

20   Q    What do all the T-shirts say, sir?

21   A    Yeah. I mean, that's a -

22   Q    Just tell me what they say. Read them into the

23       record, please.

24   A    They say, Reelect or Reelect Sheriff Raphael

25       Washington.

Page 255

1   Q   I think it says, Retain, doesn't it?

2   A   Oh, maybe. Yeah. Maybe it says retain. I can't see

3       it.

4   Q   Retain Sheriff Washington. And those t-shirts were

5       given out?

6   A   Yes.

7   Q   And you were there with Regina Parks, correct?

8   A   Yes. She's in the picture. I wasn't there with her.

9   Q   Here's 1649. Who's, by the way, while your counsel

10      is looking, who's Michelle Leanne?

11  A   She's the someone that works in our agency.

12  Q   What's her job?

13  A   She's in charge of our classification unit.

14  Q   And why is she sending this around, if you know?

15  A   Sending it around?

16  Q   Yeah. She's the one that put this together, this

17      post. She put this post together.

18  A   Okay.

19  Q   Is that her job to do that?

20  A   She does it when she - occasionally when she thinks

21      she wants to do it. It's not a job.

22  Q   This one is dated April 13th. And what is this

23      event?

24  A   This one?

25  Q   Yeah. The one in front of you. 1649. April 13th,

Page 256

```
 1        2022. There's a canopy that says, Sheriff Rafael
 2        Washington. And then there's people in uniform or
 3        jackets.
 4    A   Okay. We were –
 5    Q   You're in here and my client's in here so -
 6    A   It appears to be an Easter -
 7    Q   Do you know what this is?
 8    A   Appears to be a Easter function.
 9    Q   Is this on work time?
10    A   We were – no.
11    Q   What time of day was this?
12    A   I have no idea. But we don't -
13    Q   So you don't know?
14    A   We don't do this on work time. It was probably, I
15        think it may have been even, I want to say - I
16        don't know if it was on the holiday, the day before
17        the holiday which is a holiday. I'm not sure. But
18        it definitely wasn't -
19    Q   We can look it up. No problem.
20    A   Definitely wasn't work hours.
21    Q   We'll look it up.
22    A   Because I don't even see a time on here.
23    Q   And then you handed out blankets to the homeless
24        community with Regina Parks. Do you remember that,
25        in 2022?
```

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

Page 257

1    A    Yes, I believe so.

2    Q    That was on February 11th, 2022.

3    A    Is that a picture?

4    Q    Yeah.

5    A    Can I see that?

6    Q    Handing out blankets. This is what we do at the

7         Wayne County Sheriff's Office. Continue to hand out

8         blankets to the homeless. That's you and Regina,

9         correct?

10   A    Sure. And there's others. Mark Diaz I see and

11        others.

12   Q    That's right. Then I've got one on April 8th, 2022,

13        43rd Annual Salute to Distinguished Warriors.

14        Dinner held on Thursday, March 31st, 2022. And

15        you're there and Regina Parks is there. Do you

16        recall that?

17   A    I have to see it. Sure. I see myself, my wife and

18        Regina Park sitting next to my wife.

19   Q    So again, she's attending an event with you?

20   A    She's not with me. She's at an event I'm attending.

21   Q    But she's there in her role as part of your team,

22        correct?

23   A    She's there as somebody else who works with all

24        these people. Pretty much. Not all of them but they

25        work with me as well. So it wasn't a function that

Carroll Reporting & Video
www.veritext.com
A Veritext Company
586-468-2411
www.veritext.com

Page 258

1          she's working at all.

2    Q    I can keep going here. You attended Tiger's opening

3          day, correct, with Regina? Remember that?

4    A    I don't remember.

5    Q    April 8, 2022.

6    A    I have to see the picture because you keep saying

7          with her.

8    Q    You two are there together. That's what I mean, sir

9          by with. Let me be very clear.

10   A    I think we need to be clear.

11   Q    Please, just give me a second. When I say you're

12         there with her, I mean you're both at the same

13         event, okay. Fair?

14   A    I prefer you say that so it'll be clear that -

15   Q    That's what I've been saying.

16   A    No. You've been saying she's with me.

17   Q    Just keep going.

18              MS. DWYER: You have been saying with me. He's

19         trying to clarify. You're insinuating that they

20         attended together and he's clarifying.

21              MS. GORDON: It's to the contrary.

22              MS. DWYER: It's exactly what you're doing and

23         he's clarifying.

24              THE WITNESS: Exactly what you're doing.

25   BY MS. GORDON:

Page 259

1   Q    It was a work event. Go ahead. What's that?

2           MS. DWYER: But they weren't with each other.

3           THE WITNESS: No.

4           MS. DWYER: Which is what you're insinuating.

5           MS. GORDON: Well, in some of these pictures

6        they're right next to each other.

7           MS. DWYER: So he's clarifying. With his wife?

8           THE WITNESS: With my wife being there.

9   BY MS. GORDON:

10  Q    Okay. I didn't – that's not - I don't know what

11       you're doing over there but I'll just take an

12       answer to my question.

13          MS. DWYER: I know what you're doing, which is

14       why I'm clarifying for the record.

15          THE WITNESS: She takes a picture with me at

16       Tiger Stadium and she takes the picture with the

17       chief of staff at Tiger Stadium in 2022.

18          MS. GORDON: Actually, Maria, just to be clear

19       here. You and/or the Sheriff have taken the

20       position elsewhere that my client does not spend

21       much time at events with the Sheriff. That's what

22       you've said. Hence, this is why I'm showing this.

23       So this is on you for you guys denying that they

24       had to, they were attending things together.

25  BY MS. GORDON:

Page 260

1    Q    So what's that last thing you got?

2         MS. DWYER: He's explaining that they're not

3         attending together. They're at an event at the same

4         time. They're at a community event.

5         THE WITNESS: This is Tiger Stadium.

6         MS. GORDON: You guys can explain all this to

7         the jury.

8         THE WITNESS: Chief Turner is there.

9         MS. DWYER: You're insinuating that they are

10        there together with each other and he's explaining.

11        MS. GORDON: You can explain to the jury what

12        you meant by the word with.

13        THE WITNESS: By the word what?

14        MS. DWYER: I think he's explaining that on the

15        record now. This is the time for him to do that.

16   BY MS. GORDON:

17   Q    What is that a picture of?

18   A    This is the picture at Tiger Stadium. It might have

19        been opening day.

20   Q    Looks like it. It says, Congratulations, Tigers.

21   A    She's there with myself. She's there, looks like

22        Chief Turner is there. And I don't know who else

23        was there from our agency. But she wasn't with me.

24        That had nothing to do with the work.

25   Q    Let me try to make this very clear.

Page 261

```
 1    A    I'm trying to talk to you.
 2              MS. DWYER: Let him finish his statement. You
 3         keep cutting him off all day.
 4              THE WITNESS: It has nothing to do with me and
 5         her at a work situation. This is not work.
 6    BY MS. GORDON:
 7    Q    Let me have that back here. This is just a social
 8         event that she was invited.
 9    A    It's opening day. I didn't invite her.
10    Q    See, now you're interrupting me.
11              MS. DWYER: Perhaps both of you could do a
12         better job of not interrupting one another.
13              MS. GORDON: I'm sure we could.
14    BY MS. GORDON:
15    Q    So she was at the Tigers game with you. And how did
16         that come to be? Did she buy her own ticket and
17         just bump into you or would you go as a group?
18    A    I know how she got there.
19              MS. DWYER: Objection to form of the question.
20    BY MS. GORDON:
21    Q    Then on October 10th, 2021, there was an event
22         where the Wayne County Sheriff's Office raised
23         money for the Wayne County Sheriff Youth and Senior
24         Education Fund. And you attended that with Ms.
25         Parks, do you remember that?
```

Page 262

1    A    No.

2    Q    Here it is 10/10/21.

3    A    This is a -

4    Q    I didn't ask you what it was. I just said, do you

5         see that.

6    A    I see it. You wanted to ask me about it.

7              MS. DWYER: That's not what you asked. You

8         asked him if he - and we can read the question

9         back. You asked if he was with her and he's

10        attempting to answer that question.

11             MS. GORDON: That's not what I said.

12             MS. DWYER: That is what you asked.

13             THE WITNESS: And this is a fundraiser that she

14        is not with me. She's there and the chief of staff

15        was kind of running this. And she's there holding a

16        gun, holding one of the prizes. She's not with me.

17        I'm the Sheriff. I'm with everybody out there.

18   BY MS. GORDON:

19   Q    Yeah. And she's -

20   A    She's not with me. It's not a work situation.

21   Q    That's not a work situation?

22   A    She's there to do whatever the chief of staff asked

23        her to do.

24   Q    Then it is a work situation for her.

25   A    It's nothing that I needed her to be at.

Page 263

1    Q    Well, somebody told her -

2    A    I did not ask her to be there.

3    Q    Somebody asked her to go there.

4    A    It wasn't me. You're talking about me.

5    Q    No. I'm not talking -

6    A    Yes, you are.

7    Q    Wow.

8              MS. DWYER: The question you asked was, she was

9         with you. It's not you guys. This is your question.

10   BY MS. GORDON:

11   Q    I've got many, many more events you're at with

12        Regina Parks and I guess they speak for themselves.

13        But you were out and about at events with Ms. Parks

14        on a regular basis, per the documentation I have

15        accumulated.

16   A    That's not a regular basis.

17             MS. DWYER: The testimony speaks for itself and

18        object to the form of the question.

19   BY MS. GORDON:

20   Q    Do you deny touching plaintiff on the rear end?

21   A    Yes. I deny that.

22   Q    In 2021?

23   A    Whenever the date was.

24   Q    2022 and 2023.

25   A    Never.

Page 264

```
 1    Q    And you made repeated lewd and sexual comments
 2         about her body and appearance including that, "I
 3         didn't know you had all that back there." Remember
 4         that?
 5    A    I didn't say that. I saw that. I did not say that.
 6    Q    Well, why would Regina Parks make that up?
 7    A    You'd have to ask her.
 8    Q    That particular thing.
 9    A    You'd have to ask her.
10    Q    I'm asking you if you know a reason, a motive.
11    A    I have no reason at all.
12    Q    You don't know a motive she would have to lie about
13         you back to 2021?
14    A    I don't. I just brought her a -
15    Q    Just like all the other women.
16              MS. DWYER: Again - first of all, that's
17         Harassing, once again. And you're not letting him
18         finish answering your question. Is this you
19         testifying today or are you trying to get my client
20         to answer your question?
21    BY MS. GORDON:
22    Q    And you also stated that she would look more
23         sexually attractive if she gained weight, correct?
24    A    So I didn't say that. And I wouldn't say that. And
25         you keep asking me about, did I say this or did I
```

Page 265

1          say that. I said none of that. And you just said

2          something about since 2021. And that's troubling to

3          me as well. Because since 2021, and this is 2025,

4          she has never ever said she had a complaint against

5          me or that I was harassing her. Never.

6     Q    That's not - I didn't ask you any of that.

7     A    Well, you did. You kind of asked me that.

8     Q    Okay, Sheriff. Number one, you can't interrupt.

9          You've been told this before. And you can't -

10         unless you want to be here a very long time, you

11         need to just listen to the question and answer the

12         question.

13              The question was whether you said these things

14         to her. That was all the question was.

15    A    And I said no.

16              MS. DWYER: Objection. Asked and answered. It

17         was denied. He answered.

18    BY MS. GORDON:

19    Q    I'm not re-asking. I'm telling him what the

20         question was. And my client would swat your hands

21         away, ask him to stop making sexual conduct -

22         comments and the like, correct?

23    A    No, that's not correct.

24    Q    And in 2022, your executive assistant began keeping

25         your office door open while female employees,

Page 266

```
 1         including plaintiff, met with you. Do you recall
 2         that?
 3    A    No. It's not something that she, somebody said
 4         that, that she should do.
 5    Q    Did you talk –
 6    A    She talked, she told me that she saw that and she
 7         was highly upset that it mentioned or it sounded,
 8         alluded to the fact, her words, that Regina Parks
 9         asked her to do that.
10    Q    Right.
11    A    She said that did not happen. And I know it didn't
12         happen because she came to me prior to that, prior
13         to - because she didn't trust Regina Parks or
14         anybody else because of these previous allegations.
15         She said, I'm going to keep your door open. I'm
16         going to come into your office when females or
17         males were in your office. I'm going to come do
18         that. I want to do that because I don't trust these
19         people. She said that. And she does it today. Even
20         though she started that three, four years ago.
21    Q    So this was Ms. Whitehead who came up with the idea
22         that you should have your door open during
23         meetings?
24    A    That she should, she should be involved in that
25         because she didn't trust people coming in.
```

Page 267

1    Q    Ms. Whitehead should be involved in that?

2    A    Yes.

3    Q    And she still does that as of today's date?

4    A    Because I want her to.

5    Q    And is there any other executive in the building

6         whose door is left open during meetings or that you

7         know of?

8    A    I don't know. They could.

9    Q    So in paragraph 23 of the complaint we allege that

10        it was well-known by employees in leadership in the

11        Sheriff's Office that another female executive

12        employee that worked for the Sheriff's Office had

13        been repeatedly sexually harassed by you.

14             The county says, they can neither admit nor

15        deny this. They don't know whether that's true or

16        not.

17             Did the county ever ask you whether you had

18        sexually - repeatedly sexually harassed another

19        employee, in this case, Erika Erickson for seven

20        months? Did anybody from the county ask you that?

21   A    The county never asked me that.

22   Q    Did you attend some black-tie galas with my client

23        also in attendance?

24   A    Yes.

25   Q    Which ones do you recall?

Page 268

1    A    There was a - I know there was a school function.
2         And then there was another function but I don't
3         remember the name of the organization that asked me
4         to be there.
5    Q    And what was the - where was the location?
6    A    I think one was on Woodward, Garden Theater, I
7         believe. And then the other was with Mumford High
8         School.
9    Q    I'm showing that one of these events was on May
10        22nd, 2022. Does that sound correct to you?
11   A    I don't know the dates. I don't remember the dates.
12   Q    There was a black-tie gala, the MACC Development
13        12-year Anniversary.
14   A    Yeah. That's the one I was talking about.
15   Q    That was at the Garden Theater in Detroit, is that
16        correct?
17   A    That's it, yes.
18   Q    And Ms. Parks was there, is that correct?
19   A    Yes.
20   Q    And then there was another event I believe also in
21        May of 2022, the Cine Home Alumni Black Tie Gala at
22        Huntington Place.
23   A    Okay.
24   Q    You were there, do you recall that?
25   A    I don't really know if it was - I'm trying to

Page 269

```
 1        remember something at Huntington Place. A black tie
 2        event?
 3   Q    Let's call it a gala. I don't know for sure if it
 4        was black tie.
 5   A    Okay. Like I said, yeah, I don't recall a black
 6        tie.
 7   Q    It was a dressy affair.
 8   A    Does it say what type of organization it was?
 9   Q    What's the C-I-N-E Home Alumni? What's that?
10   A    I don't know. I don't know. Is there any docu –
11        paper. I mean, pictures or anything?
12   Q    I don't have it in front of me right this minute.
13        And do you remember Rashaun Whitehead being at that
14        event, too?
15   A    The Cine?
16   Q    Yeah.
17   A    I can't remember the event.
18   Q    You don't know one way or another?
19   A    No.
20   Q    You just don't recall?
21   A    No.
22   Q    It was for the Detroit Public Schools. Does that
23        help?
24   A    Only one I remember at Detroit Public Schools were
25        the one that was at the Detroit Public School at
```

Page 270

1          Mumford High School.

2     Q    Did you ever text with my client? Text?

3     A    Yeah. I believe so.

4     Q    Have you produced any texts with my client?

5     A    I have not. I have not produced any texts with your

6          client.

7     Q    And have you - you haven't - you've already said

8          you haven't given anybody your personal phone, nor

9          have you produced any texts from your personal

10         phone, correct?

11    A    I produced them from my work phone.

12    Q    Only from your work phone?

13    A    Yes.

14    Q    So any texts you might have had with Regina from

15         your personal phone, those wouldn't have been

16         turned over, as I understand it.

17    A    I haven't turned my personal phone over. But my

18         texts were from my work phone.

19    Q    My client alleges that on February 21, 2023, you

20         called her cell phone. Do you deny that? Calling

21         her cell phone at night on February 21, 2023?

22    A    I don't recall.

23    Q    Now, February 22 was a storm came through Detroit.

24         February 22, 2023 and you sent employees home from

25         work. Do you recall that?

Page 271

1    A    Yes.

2    Q    And you texted my client saying you wanted her to

3         come into work. Do you remember that?

4    A    I never did that.

5    Q    You don't deny that if there's text messages to

6         that effect?

7    A    I deny it. I haven't seen any text messages. I deny

8         it.

9    Q    I didn't ask you that. I just said, you're denying

10        - is it just that you don't remember for sure?

11   A    No. I'm denying that I would do that.

12   Q    And you weren't aware that my client reported this

13        to Chief of Staff Turner?

14   A    No, I was not aware of that.

15   Q    And you weren't aware that Chief of Staff Turner

16        suggested to my client and some other women

17        possibly as well that she recorded you?

18   A    I'm not aware of that at all.

19   Q    Are you aware that my client did record one

20        conversation with you?

21   A    I'm not aware that she did. However, I wouldn't

22        have been surprised.

23   Q    And that in that conversation you said, all I want

24        is - this isn't word for word. All I want is a few

25        kisses.

Page 272

1    A    I would never have said that.

2    Q    And when you go to - you've gone to - you're a

3         consumer of alcoholic beverages, correct?

4    A    Not really. Every now and then I will have a drink.

5         But no, I'm not a drinker.

6    Q    You've become drunk in the last three years,

7         correct?

8    A    No. I don't get drunk.

9    Q    Do you remember attending the film premiere of

10        First Lady of BMF, the Tonesa Welch Story?

11   A    Yes.

12   Q    And Regina Parks was there as well, is that

13        correct?

14   A    Yes.

15   Q    And why were you there?

16   A    I was invited.

17   Q    Was there a reason you wanted to attend this

18        particular event?

19   A    I was invited. I believe I was - Judge Greg Mathis

20        invited me and I went.

21   Q    There was a VIP event before the film, is that

22        correct?

23   A    I don't know that there was. I was in an area where

24        it was just a waiting area but it was never, it was

25        nothing to me like a VIP event.

Page 273

1  Q   And you were drinking that night, as I understand
2      it, is that correct? Had some drinks?
3  A   I don't recall drinking that night at all.
4  Q   You're not denying it, though, correct?
5  A   I'm going to deny that.
6  Q   In April of '24 a phone call came into the office
7      from a woman who claimed she had made a report of
8      sexual harassment to your executive protection
9      officer. Do you recall that?
10 A   Yes.
11 Q   And this woman informed Regina Parks that she had
12     been sexually harassed by a subordinate of you, of
13     yours. Do you recall that?
14 A   You said Regina Parks got that information from
15     somebody else?
16 Q   There was a call that came in that Regina picked
17     up. And Regina was told that she had been sexually
18     harassed by a subordinate of yours in the Executive
19     Protection Office?
20 A   Yeah. Regina Parks said that to me.
21 Q   And Regina - you called her a few days later,
22     didn't you, about that contact that came in, is
23     that right?
24 A   I called her?
25 Q   Yeah. You called Regina.

Page 274

1    A    I don't know if I called her or she came to me.
2         I'm not sure.
3    Q    You're not sure if you called her or who?
4    A    No. Yeah. Or she called me or told me. I don't, you
5         know, I remember her telling me.
6    Q    She'd already told Turner about it.
7    A    I don't know.
8    Q    And did the woman ever file a report?
9    A    Not with us. This was something that happened
10        before my executive protection person even came to
11        work in our agency. So I don't know what kind of
12        report.
13   Q    Sir, this was early April '24.
14   A    It wasn't - I don't think that - I don't remember
15        any report that came to us. Because I'm sure it was
16        been something that was when he was with the
17        Detroit Public Schools Community District.
18   Q    The report was about an individual in your
19        executive protection group?
20             MS. DWYER: Objection to the form.
21             THE WITNESS: It wasn't sent to me. A report
22        was never sent to me.
23   BY MS. GORDON:
24   Q    You were notified of it.
25   A    I said I was notified by Regina Parks what someone

Page 275

1          called and told her. The only notification I had or

2          even to have to even speak of.

3    Q    Who's Rory Gamble.

4    A    Rory Gamble?

5    Q    Yes.

6    A    Rory Gamble is a retired former UAW director or

7          even vice president maybe.

8    Q    And his daughter works for the county, correct?

9    A    Yes.

10   Q    And you know Lakeisha Solomon, is that correct?

11   A    Yes.

12              MS. GORDON: I'm going to take a break.

13         Hopefully, I don't have too much more.

14              (Brief pause.)

15   BY MS. GORDON:

16   Q    Sheriff, do you have a - I assume you have a

17         computer or a laptop you use at your office?

18   A    Computer.

19   Q    And is it a county issued computer?

20   A    Yes.

21   Q    It's not a laptop, it's a desktop?

22   A    Yeah, it's a desktop.

23   Q    And what software do you use on that computer? Do

24         you use Google, for example? What do you use to

25         access the internet?

Page 276

```
 1    A    Is Outlook something that - Outlook?
 2    Q    Yeah.
 3    A    Outlook. Yeah. I see that.
 4    Q    Do you use Google?
 5    A    So my assistant uses my, uses the computer more
 6         than I do.
 7    Q    Your computer?
 8    A    Yeah. Well, no. She uses hers and she uses mine
 9         sometimes.
10    Q    Does she have a login to yours so she can check
11         your email and stuff?
12    A    She does. Yes. Yes.
13    Q    So you have a desktop which Ms. Whitehead, can
14         access through her own computer and log in and just
15         see what you need to do.
16    A    Sure.
17    Q    Anybody else other than Ms. Whitehead that has
18         access to your laptop?
19    A    No, not that I know of.
20    Q    So back to internet browsers. Do you use Google
21         Chrome, Yahoo, Bing. Do you know what you use if
22         you're browsing on the internet for something?
23    A    Yeah. I'm never browsing on that, on my desktop
24         about anything other than work. So whatever the
25         work thing. Outlook is what I do.
```

Page 277

```
 1   Q    But it could be something you need for work that
 2        you have to look up on the internet. I mean, you
 3        could easily be looking up a map or directions or
 4        who knows what.
 5   A    She would do that. Rashaun would do that.
 6   Q    Are you not internet savvy, would you say?
 7   A    I'm, you know, medium. I can get around but I'm not
 8        the - I am not the techie and they do the work. You
 9        know, a lot of, my assistant does a lot of that
10        before I get a chance to.
11   Q    And what about a computer at home? Do you have a
12        computer at home?
13   A    I have my personal laptop.
14   Q    Is that connected up to your computer at the
15        office?
16   A    No, it's not.
17   Q    So do you have a separate username for that?
18   A    Yeah, I do. I - it would be separate.
19   Q    And do you have a separate user email address? I
20        assume you must?
21   A    It would be my, the Gmail address.
22   Q    The what?
23   A    A Gmail.
24   Q    You use a Gmail address?
25   A    Yeah.
```

Page 278

```
 1   Q    And do you communicate with people from the office

 2        on Gmail from time to time?

 3   A    No. I do some work. Zoom calls on that sometime but

 4        not much at all.

 5   Q    The county, as part of this case, has subpoenaed

 6        telephone records. Were you aware of that? They've

 7        had a list of telephone numbers that they've

 8        subpoenaed.

 9   A    I wasn't aware of that.

10   Q    So you haven't looked at any of the documents

11        produced by the county or rather obtained by the

12        county with regard to telephone numbers?

13   A    I have not. I have not seen that.

14   Q    Are there things that you are aware of that are

15        important to your defense of this case that are in

16        the possession of Regina Parks?

17   A    I don't know what she's in possession of.

18   Q    Well, I'm asking you whether you can think of

19        anything. She worked with you for a long time,

20        she's made allegations. Is there anything that

21        would be in her possession that you would be

22        interested in seeing?

23   A    No. I don't know what she could - I don't know what

24        that could be.

25   Q    Have you discussed this matter with Warren Evans,
```

Page 279

1           the executive of the county?

2    A      No.

3    Q      You haven't discussed anything about this lawsuit?

4    A      He and I have not had a discussion. He says he

5           knows about it but we have not had a discussion

6           about it.

7    Q      And what did he say when he said he knew about it?

8    A      It's a lawsuit. Deal with it.

9    Q      That's what he said or that's just.

10   A      I'm paraphrasing. But, you know, it - no

11          discussion.

12   Q      How often are you in contact with Mike Jaafar?

13   A      Every day we work together.

14   Q      And what is - remind me what his role is.

15   A      He's an undersheriff.

16   Q      Have you discussed this lawsuit with him?

17   A      We've discussed it. He knows about it.

18   Q      Have you discussed with him any of the allegations

19          being made against you by my client or other women?

20   A      No. We don't get that deep into the woods on that

21          stuff.

22   Q      Who do you understand are going to be the witnesses

23          for you in this case that are going to support your

24          testimony?

25   A      I don't know a bunch of witnesses. I know my

Page 280

```
 1          executive assistant is going to be talking.
 2    Q     Ms. Whitehead?
 3    A     Yes.
 4    Q     Who else?
 5    A     After that, I don't know.
 6    Q     Who else do you think has knowledge about the, all
 7          these accusations against you are false and that
 8          you haven't done any of this? Who do you intend to
 9          use as a witness for those things?
10    A     I don't know that we've gotten to that yet.
11    Q     But just sitting here today, who would be those
12          people who would be supportive of you that would
13          have knowledge about this?
14    A     Again, I don't know who would have knowledge of it
15          to be a witness of this stuff that has come up. I
16          don't know who that would be.
17    Q     Do you know of anybody that's going to say Regina
18          Parks is lying?
19    A     I know Rashaun Whitehead is going to say something
20          to that effect.
21    Q     Well, what's she going to say?
22    A     Well, as I said earlier, she's very upset that
23          Regina Parks said that it was her idea to ask
24          Rashaun to have my door open because she felt some
25          kind of way.
```

Page 281

```
 1    Q    But aside from that.
 2    A    She's very upset with that.
 3    Q    Aside from that, is there anything she's going to
 4         say about - that you're aware of that Ms. Parks is
 5         not telling the truth or is lying about all this?
 6    A    I don't know what she will say.
 7    Q    Nothing other - you don't know anything other than
 8         what you've already said?
 9    A    Yes.
10    Q    And what about Turner? Is he going to say anything
11         about Regina lying about you?
12    A    I'm not sure.
13    Q    I notice in some of the responses about what
14         Turner's going to say, the county says, you know,
15         basically we neither admit nor deny. Which is, in
16         other words, we're not sure. So you're not sure of
17         what Turner may say?
18    A    No.
19    Q    About what he knew about all this?
20    A    I'm not sure what he might say.
21    Q    Do you have any business relationship with him at
22         this point of any kind?
23    A    No.
24    Q    But he did come to your fundraiser. Is he still
25         supporting you in your election campaign as far as
```

Page 282

```
 1        you know?
 2    A   He was at my birthday party.
 3    Q   Have you discussed this case with Mara MacDonald?
 4    A   No. Not - not - no, I haven't. I haven't. Not since
 5        the first thing that went out.
 6    Q   She is your communications person?
 7    A   Yeah. When that communication went out we had a
 8        discussion about it. But we didn't have much
 9        because it was just a news story.
10    Q   But you haven't discussed with her, I mean, you
11        know, what the claims are and so on.
12    A   We did not.
13    Q   Have you discussed anything with Assad Turfe, T-U-
14        R-F-E?
15    A   No, I haven't.
16    Q   So there's nobody else you can think of that's
17        going to - what about your spouse? Would she have
18        anything to say as a witness in this case with
19        regard to your actions or anything she knows if she
20        would called as a witness?
21    A   No. She doesn't have anything. She doesn't get into
22        my work stuff.
23    Q   Does she know about the lawsuit?
24    A   Yes.
25    Q   And what do you think Rashidah Gamble is going to
```

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

Page 283

1              testify to, if anything?

2     A    What she knew that happened that day that Regina

3           Parks was disorderly.

4     Q    What do you think Ed Foxworth is going to testify

5           to?

6     A    I have no idea what he could testify to other than

7           I was a good boss for him.

8     Q    Did you ask Turner whether he ever saw or heard you

9           say anything inappropriate to Regina?

10    A    I didn't ask him that. No, I didn't ask him that.

11    Q    Something similar to that?

12    A    I was just thinking about what he said, but no. I

13          haven't, I didn't ask him any of that.

14    Q    So you don't know whether or not Regina said things

15          to him about you?

16    A    According to what I read, he said that that didn't

17          - and it didn't happen. When I asked him, did he

18          tell her to record me, he said absolutely not.

19    Q    We already talked about the Polderdyke complaint.

20          There was a media report that there was another

21          complaint by a different female made against you in

22          2010, that he persistently asked her out on a date

23          during an offsite party even though he knew she was

24          married. Who's that referring to?

25    A    I can only recall that being, referring to Lakeisha

Page 284

```
 1          Solomon that we talked about.
 2      Q   So she would've made a complaint in 2010. You
 3          mentioned her somewhat earlier?
 4      A   No. She didn't make a complaint. She did not make a
 5          complaint.
 6      Q   The complaint was made then withdrawn, is that
 7          accurate?
 8      A   I don't even know that there was even a complaint,
 9          period.
10      Q   This news report says that you were interviewed
11          about the claim by Internal Affairs, about the
12          Lakeisha Solomon complaint. Is that accurate?
13      A   I may have been.
14      Q   And that you denied the allegation, of course?
15      A   Correct.
16      Q   So I guess the question is - so if you were
17          interviewed, at least it got that far before it was
18          dropped, correct?
19      A   Yeah.
20      Q   So why would she make up this claim, from what you
21          could tell?
22      A   Again, I can't tell you that. I don't know why. I
23          don't know why.
24      Q   Well, she's still with the county though, right?
25      A   Yes, she is.
```

Page 285

1  Q    Have you ever asked her, why would you lie about me
2       or?
3  A    I did not.
4  Q    She's not a person that would generally lie as far
5       as you know her, correct?
6  A    As far as I know. I don't know why people do what
7       they do.
8  Q    You thought she was a friend of yours, actually,
9       correct?
10 A    I think she's still a friend of mine.
11 Q    And after - and she did withdraw it. She is saying
12      it was not necessary but she said she stood by her
13      complaint. Do you recall that?
14 A    I don't recall that but.
15 Q    But you're not denying it either.
16 A    I mean, I don't know what she said.
17 Q    There was another allegation that when you worked
18      for the Detroit Police Department a girlfriend of
19      one of the DPD officers came to visit a boyfriend
20      up at work and that she ran into you.
21           And apparently there was an internal affairs
22      investigation of this. And the girlfriend said she
23      had met you about a year earlier after reporting a
24      domestic abuse altercation with the boyfriend. And
25      you supervised the boyfriend. You recall this,

Page 286

```
 1        don't you?
 2   A    Yes.
 3   Q    And she said that on the day at issue, she was
 4        waiting to see her boyfriend. And while she was
 5        alone in a room with you, you commented her skirt
 6        and told her over and over again that she looked
 7        good. She uses that in quotes. Do you recall that?
 8   A    So she wasn't in a room with me alone. The person
 9        who was in there may have left out and come back.
10        But we weren't - didn't start out alone. We were in
11        a room where we were alone together.
12   Q    And she said that you placed your hand on her leg,
13        later moving it up to her thigh. You recall that
14        allegation?
15   A    The allegation, yes.
16   Q    And then she said that you asked her to see her
17        panties and asked her to bend over and she refused.
18   A    I saw that allegation. Didn't happen.
19   Q    So do you have any reason to say why she would say
20        these things?
21   A    Yeah. I had suspended her boyfriend.
22   Q    When did you suspend her boyfriend?
23   A    It was prior to that.
24   Q    But he was back.
25   A    He had been back. Yes, he had come back.
```

Page 287

1   Q   But for her to make complaints about you would make

2       it worse for her boyfriend because he reported to

3       you?

4   A   No. No. Not really, no.

5   Q   So you think the reason she did this was because –

6       okay. I guess you've already said it.

7           And she actually gave a witness statement. Do

8       you recall that?

9   A   I don't. I recall it being unfounded, again, from

10      the Internal Affairs section.

11  Q   There was a woman that – a witness statement

12      involving an April 2008 matter where she filed

13      something with the Office of Internal Affairs. She

14      obtained a written and audio – who obtained a

15      written and audio taped statement from her.

16          The complainant said she came to the traffic

17      enforcement base to visit an individual. And she

18      observed when she arrived you were there and you

19      were sitting behind the desk. You told the

20      complainant that she looked really nice at the auto

21      show charity preview that you had recently been at.

22      Do you recall telling her that?

23  A   That's the same one we just talked about? Yeah,

24      same thing.

25  Q   I'm giving you more detail then.

Page 288

1   A   No, I don't recall that at all.

2   Q   You talked earlier about that video clip that

3       allegedly had appeared on your Facebook page. I

4       didn't ask you at the time but that matter went up

5       to the spokesperson for the Wayne County Sheriff's

6       Office, didn't it? Who issued a statement saying

7       you didn't know the video had appeared on your

8       Facebook page?

9   A   Mara MacDonald, you're speaking of.

10  Q   Is that who it was, Mara?

11  A   That's who told me about it.

12  Q   And there was an article in the newspaper about it,

13      is that correct?

14  A   No. I don't know anything about it being in the

15      newspaper.

16  Q   Did you ever ask Regina Parks if she was pregnant?

17  A   No.

18  Q   What knowledge does Mara MacDonald have of this

19      case against you and these allegations?

20  A   I'm not sure how much she knows.

21  Q   Have you discussed the case with her?

22  A   No.

23  Q   Other than what you've already said here today?

24  A   No.

25  Q   Does Lakeisha Solomon have anything to say with

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

Page 289

1       regard to testimony that you think is going to be

2       helpful to you?

3   A   I'm not sure. I don't know.

4   Q   Okay.

5           MS. GORDON:  That's all I have for you. I do

6       want to say, I'm going to leave this record open

7       because it's been made obvious that there are many

8       documents we have not yet obtained from electronic

9       devices and perhaps other formats, too. I've been

10      told that things don't exist and there was some

11      information today that they do and on other dates.

12      So for that purpose, I'll leave the record open.

13          MS. DWYER: Okay. Well, I have some questions.

14      But object to the record being left open. The rules

15      require completion in one day unless determined

16      otherwise by the court.

17          MS. GORDON: Well, no, obviously I can't finish

18      the dep if I don't have the documents because

19      you've withheld them.

20          MS. DWYER: They were not withheld. The

21      discovery was –

22          MS. GORDON: It was –

23          MS. DWYER: If I could put my statement on the

24      record. The discovery was provided. In the

25      discovery it was indicated that the phone, in

Page 290

1        particular, had been secured and that the county

2        was in the process and Defendant Washington was in

3        the process of reviewing that phone. You had that

4        information but decided to go forward today. So

5        nothing today that I'm aware of is new or different

6        than what was already provided to you.

7             MS. GORDON: No. There's new and different

8        stuff but I'm not going to waste my time or time on

9        the record with that. Go ahead.

10                          EXAMINATION

11   BY MS. DWYER:

12   Q    Just a couple of follow up questions, Sheriff.

13        You were asked some questions about your cell

14        phones, both your work cell phone and your personal

15        cell phone.

16   A    M'hm. Yes.

17   Q    When you updated your phone in February of 2025,

18        had you been served with a copy of this lawsuit?

19   A    No.

20   Q    When you updated your phone in February of 2025,

21        had you read a copy of this lawsuit?

22   A    No.

23   Q    At that point when you updated your phone, had

24        anyone told you that you should not delete or

25        destroy or change your phone before you turned it

Page 291

1           in?

2     A     No.

3     Q     In fact, I believe you just testified, just to

4           clarify. When Mara MacDonald provided a statement

5           to the press, that was just in response to a news

6           story, was that your understanding?

7     A     Yes.

8     Q     You were asked some questions about a phone

9           complaint that Ms. Parker (sic) received. Do you

10          recall that line of questioning?

11    A     Ms. Parks?

12    Q     Ms. Parks. I'm sorry. Yes.

13    A     Say it again now?

14    Q     Yes. You were asked some questions just recent

15          about some, about a phone complaint that Ms. Regina

16          Parks received?

17    A     Yes.

18    Q     Did it have anything to do with an employee of the

19          Sheriff's Department? The complaint that Ms. Parks

20          received and reported to you?

21    A     It had nothing to do with the Sheriff's Office. It

22          was about someone that works for me now but it had

23          nothing to do with the Sheriff's Office. Follow me?

24          Or it had nothing - it was not concerning the

25          Sheriff's Office.

```
 1    Q    Did that individual work for the Sheriff's Office
 2         at that time?
 3    A    No. No.
 4    Q    There were a lot of questions about you attending
 5         various events. And some of the questioning
 6         suggested that you attended the events with, and I
 7         say that in quotes, Ms. Parks. Do you remember all
 8         of those events that counsel went over?
 9    A    No. I don't remember all of them.
10    Q    She went through some events with you?
11    A    Yeah. She went through some. Yes.
12    Q    Did you ever drive with Ms. Parks to any event?
13    A    Never.
14    Q    While you were both at the same event, were you
15         there with each other?
16    A    No.
17    Q    In fact, was your wife with you at some of the
18         events you attended where Ms. Parks was also in
19         attendance?
20    A    Yes, she was.
21              MS. DWYER: I don't have any other questions.
22                       REEXAMINATION
23   BY MS. GORDON:
24    Q    I have a follow up. Who was the person that works
25         for you now that was involved in that phone
```

Page 293

| | | |
|---|---|---|
| 1 | | complaint? |
| 2 | A | I don't know that he was involved. I don't know how |
| 3 | | much he was involved. His name was mentioned and - |
| 4 | Q | Who is it? |
| 5 | A | His name is Ronald Johnson. Ron Johnson. |
| 6 | Q | And you said he works for you now? |
| 7 | A | Yes. |
| 8 | Q | And what's his role now? |
| 9 | A | He's an executive protection person. |
| 10 | Q | How long has he been employed? |
| 11 | A | I want to say over a year. Maybe over a year. |
| 12 | Q | When did you first meet Ron Johnson? |
| 13 | A | I've been knowing him for a long time. |
| 14 | Q | Did you work with him in another law enforcement |
| 15 | | world? |
| 16 | A | We worked in the Detroit Police Department but we |
| 17 | | never worked together. |
| 18 | Q | Is that where you connected up? |
| 19 | A | Yes. |
| 20 | Q | And then you maintained some contact of some kind? |
| 21 | A | Yes. |
| 22 | Q | And was he looking for a job? Was he out of a job |
| 23 | | or how did he come to work for you guys? |
| 24 | A | Yeah.  He was retiring from Detroit Public Schools |
| 25 | | Community District and he asked me if I had a |

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

Page 294

1           position that he could, that he could work in.
2    Q    But it sounds like he was with executive protection
3           earlier because that was what the caller was
4           saying. That there was somebody from Executive
5           Protection who had done something inappropriate.
6    A    No. I think what she meant was somebody working in
7           executive protection here.
8    Q    Right.
9    A    But he wasn't working in executive protection in
10          the School District. I think it's, I think she's -
11          I want to make sure that you understand that.
12   Q    Yeah. That sounds confused.
13   A    He wasn't working here. He wasn't working for me
14          when she called.
15   Q    Who was he working for when she called?
16   A    No, no. He was working for me when she called. He
17          wasn't working in the community, in the school
18          district anymore. She was calling about an incident
19          that happened in the school district, allegedly.
20   Q    But she mentioned your office.
21   A    Yeah. She called because he is now working with me.
22          And I remember Regina Parks saying she called
23          concerning that he's working for me and this
24          happened in the school district.
25   Q    And she wanted somebody over there to know about it

Page 295

1      or something.

2   A  Yeah. That's what I figured.

3   Q  And do you remember what she said he had done

4      wrong?

5   A  I do not. I didn't get into do that with Regina

6      Parks.

7   Q  Thank you for explaining that.

8   A  Sure.

9   Q  Okay.

10         MS. GORDON: I don't have anything else. Thank

11     you, guys.

12         MS. DWYER: Thank you so much.

13         (Deposition concluded at 5:29 p.m.)

14                         - - -

15

16

17

18

19

20

21

22

23

24

25

Page 296

1                    CERTIFICATE OF NOTARY

2

3    STATE OF MICHIGAN    )

4                         )

5    COUNTY OF OAKLAND    )

6

7              I certify that this transcript, consisting

8    of 296 pages, is a complete, true, and correct record of

9    the testimony of RAPHAEL WASHINGTON, held in this case on

10   Monday, September 8th, 2025.

11             I also certify that prior to taking this

12   deposition, RAPHAEL WASHINGTON, was duly sworn to tell

13   the truth.

14             I also certify that I am not a relative or

15   employee of or an attorney for a party or financially

16   interested in the action.

17

18

19                      Amy Bertin, CER-3871

20                      Notary Public

21                      Oakland County, Michigan

22                      My Commission Expires: 08-12-30

23

24

25

**[& - 2025]**

**&**

**&**   121:23

**0**

**08-12-30**
 296:22

**1**

**1**   3:13 29:21
 101:19,22
 104:25 120:2
 122:15
**10**   18:18 19:22
 135:18 211:24
 212:11,19,22
 223:4
**10/10/21**   262:2
**101**   3:13
**104**   3:14
**10409**   1:7 4:15
**107**   3:15
**109**   3:16
**10:10**   1:22 4:3
 4:10
**10th**   261:21
**11**   64:1,6
 228:19 229:3
**11th**   64:9,17
 257:2
**12**   35:19 61:24
 268:13
**123**   3:17
**124**   3:18

**125**   3:19
**13**   9:8 30:9
 35:19 54:19
**13th**   199:12,14
 203:2 218:12
 255:22,25
**14**   14:16,18
 39:10
**140**   140:1
**144**   144:24
**145**   145:6
**14th**   253:24
**15**   39:10 68:6
 79:9 98:17
 159:13,18,21
 162:5,8 205:16
 217:17
**15th**   205:1
 211:9 212:10
**16**   25:8 39:10
 145:15
**1625**   252:11
**1644**   253:24
**1649**   255:9,25
**17**   14:16,19
 64:19 68:10,25
 71:9,11 74:25
**170**   10:17
**170,000**   10:16
**17th**   64:19,25
 75:25 76:10
**18**   97:21 200:5
**19**   186:5,6

**1960**   9:2
**1978**   30:25
 149:12
**1980**   9:16
**1983**   31:7,12
**1985**   31:13
**1986**   9:18
**1996**   9:19
**19th**   157:13
**1:00**   145:15

**2**

**2**   3:14 104:8,10
 104:11 121:23
 140:1 166:5
 200:5
**20**   224:16
**2008**   287:12
**2009**   11:21
 12:17 31:20
 34:20 35:4,18
**2010**   283:22
 284:2
**2012**   35:19
 159:2,8
**2013**   35:19
 161:7
**2017**   56:18
 158:22
**2018**   59:13
 156:8,24
 157:13
**2019**   145:23

**2020**   135:18
**2021**   30:19
 182:8 239:5,9
 242:23 261:21
 263:22 264:13
 265:2,3
**2022**   252:7,8
 253:24 256:1
 256:25 257:2
 257:12,14
 258:5 259:17
 263:24 265:24
 268:10,21
**2023**   236:17
 263:24 270:19
 270:21,24
**2024**   67:22
 81:19 82:2
 83:6 170:15
 173:14 178:3
 185:15,25
 186:6 188:1
 192:25 200:6
 203:2 236:17
**2025**   1:20 4:2
 4:10 18:16
 27:8,9 28:13
 29:21 30:9
 64:1,19 66:21
 68:10 71:9,12
 74:25 228:19
 229:3 236:17
 238:23 265:3
 290:17,20

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

**[2025 - able]**

296:10

**21** 41:18
270:19,21

**22** 8:21 30:19
41:23 182:9,9
270:23,24

**220** 1:21 2:5

**2249** 132:19

**22nd** 29:2
268:10

**23** 8:24 267:9

**23rd** 159:2

**24** 25:8 41:24
67:25 75:7
81:22 83:3
173:3 187:24
273:6 274:13

**248-258-2500**
2:7

**24th** 158:22

**25** 1:7 4:15
68:16 144:24
186:7,7 219:25

**25th** 220:1

**26** 9:2 199:21
200:2

**26738** 296:18

**27** 66:21,22
67:2

**2824** 145:2

**2884** 145:4,5

**29** 156:24

**290** 3:8

**292** 3:9

**296** 296:8

**29th** 29:2

**2nd** 18:16

**3**

**3** 3:15 107:10
110:2 121:23

**30** 111:6 114:8
133:25 207:6

**3000** 110:20

**313-213-5170**
12:14

**313-223-3500**
2:19

**313-309-0474**
2:13

**313-570** 144:25

**313-570-2884**
14:17 24:16

**31st** 257:14

**33** 1:20 2:5
4:16

**33323** 8:22

**3500** 2:11

**3603** 118:23

**3623** 132:19

**363** 118:22

**3871** 2:23
296:19

**4**

**4** 3:16 109:2,4
110:2 121:23

**40** 181:19

**4000** 2:17

**40th** 149:13,19
150:3

**43rd** 257:13

**48152** 8:23

**48226** 2:12,18

**48304** 1:21 2:6

**5**

**5** 3:7,17 123:3
123:6,9 145:7

**500** 2:11,17

**5000** 110:24

**586-468-2411**
2:25

**59** 225:14,23
226:8,11
227:11,14,21
227:22 228:12

**591** 122:12,19

**5:29** 295:13

**5th** 27:8,9,25
28:2,12,13

**6**

**6** 3:18 124:21
124:23 125:2

**60** 193:10

**60,000** 168:10
191:2 192:4
193:9

**654** 132:19

**66** 94:6

**67** 94:6

**7**

**7** 3:19 64:3
125:7,9 126:9

**78** 149:19

**8**

**8** 4:2 8:21,24
66:7 72:2
258:5

**80s** 6:6

**85** 31:14,17

**862** 113:13

**8th** 1:19 4:10
257:12 296:10

**9**

**90** 164:24
166:7

**90,000** 169:17
181:14 188:11
189:11 193:13

**97** 97:21

**97,243** 200:6

**98** 98:17

**9:00** 145:15

**a**

**a.m.** 1:22 4:3
4:10

**ability** 247:16

**able** 81:24
159:21 165:8
169:21 190:15
193:16 239:12

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

**above**   67:23
81:20
**absolutely**   7:11
20:7 48:4 53:2
58:18 63:17
99:8 101:12
128:9 170:4
174:3 182:6,6
204:16 224:4
241:15,25
248:23 283:18
**abuse**   285:24
**academy**
156:17
**access**   136:3,5
151:4 275:25
276:14,18
**accessible**
138:14
**account**   97:17
102:19 103:11
103:16 104:3,4
104:6,11,12
105:24 108:17
108:21 109:21
118:18 119:1
120:7,16
124:14 125:4,5
125:14,20
126:1,1,4
127:11,15,20
127:21,22,24
128:6,18 129:2
129:5,12,13,20

130:7,8 131:6
131:11,22
132:5,9,13,16
133:7 135:9
136:1,3,6,10,13
136:15,16,20
137:6,13,19,22
137:23 139:17
139:17,18,19
139:22,23
140:3,9,13
141:22,24
142:7 143:7,9
143:10,20
148:11,14,20
149:23 150:7,8
150:9,9,11,14
150:16,19,21
150:22 151:4,8
151:9 154:4,11
154:15 156:4,4
158:5,6,7
159:17 161:19
161:20,24
**accounts**   96:25
97:1 98:7,10
132:6 140:17
**accumulated**
263:15
**accurate**   50:11
50:12 81:3
106:25 109:15
110:20 162:6
162:18 201:22

203:10,10,11
284:7,12
**accusations**
175:15 280:7
**accused**   32:7
36:13 248:18
**accusing**
175:13
**act**   99:22
**acting**   215:10
215:11
**action**   124:18
209:9 243:14
296:16
**actions**   214:9
218:22 282:19
**active**   171:8
**activity**   99:20
**actual**   129:4
150:15,15
158:13
**actually**   12:10
32:3 33:4
54:19 72:17
73:3 98:1
162:17 173:7
179:1 187:17
191:11 227:9
229:10 248:20
259:18 285:8
287:7
**add**   75:21
150:11 197:8
243:2

**added**   47:16
185:9
**adding**   77:6,7
188:12 196:14
196:15
**addition**   61:17
80:23 81:13
180:21 189:20
**additional**
189:20,25
192:24 226:4
**address**   8:6,7
8:10,22 277:19
277:21,24
**addresses**
72:24
**administrative**
122:7,8,14,21
**admit**   267:14
281:15
**admitted**   235:6
**advance**   206:5
251:17
**adverse**   243:14
**advised**   95:12
**affair**   237:23
238:5 269:7
**affairs**   33:25
34:1 59:16,21
60:1 284:11
285:21 287:10
287:13
**affected**   200:22
200:23 201:6,8

**[affected - answer]**

201:11,14,16
201:17 204:3
**affiliations**
4:22
**affordable**
145:16
**aforemention...**
200:6
**afraid**  245:21
246:12,17
248:2
**afterward**  59:7
219:25
**agency**  39:3
54:17 73:20
85:12 93:11
178:10 224:2
237:2,3 251:20
254:18 255:11
260:23 274:11
**ago**  6:22 13:4
23:9 49:23
69:20 84:11
91:22 144:19
151:22 157:2
159:20 169:11
170:8,8 178:14
180:13 194:3,9
224:23 225:6
266:20
**agree**  61:20
118:22 121:23
121:25 144:7
153:1,3

**agreed**  136:24
**agreeing**  213:5
**agreement**  61:9
62:22 229:18
**ah**  95:19
**ahead**  8:18,20
14:15 20:4
26:22,25 27:6
28:5,7,11 30:4
30:5 43:23
51:14 72:10
91:20 105:20
112:12 115:17
116:6 143:19
153:22 171:17
192:15 217:11
218:2,20
228:10 235:12
250:7,22,24
252:23 259:1
290:9
**ahold**  149:12
149:17,18
**aig**  180:16
**airline**  169:19
169:20
**al**  4:13
**alan**  86:22
**alcoholic**  272:3
**ali**  144:12
**alive**  182:19
**allegation**  33:3
174:4 177:14
226:11,15

227:23 284:14
285:17 286:14
286:15,18
**allegations**
37:21 38:7,14
44:22 57:22
63:5,9 98:23
225:21,22
227:13,19
228:11,21
229:5,12 230:6
230:8 241:6
266:14 278:20
279:18 288:19
**allege**  32:13
52:16 267:9
**alleged**  31:25
32:1 33:2 58:9
58:15 100:20
**allegedly**
137:18 173:25
219:2 288:3
294:19
**alleges**  52:19
270:19
**alleging**  99:10
**allow**  98:19
**allowed**  98:3,5
98:19 128:11
**alluded**  266:8
**altercation**
285:24
**alumni**  268:21
269:9

**amount**  192:22
**amy**  2:23 4:19
296:19
**android**  14:2
65:7 81:6
**angelina**  2:15
**angry**  221:21
221:24
**anniversary**
268:13
**announced**
203:3
**annual**  257:13
**anointing**
152:10 153:17
**answer**  6:9
8:20 18:5,7,25
18:25 19:18
20:2,14,17,23
22:15 28:5
30:5 43:25
47:8,9 49:20
56:25 63:13
67:18 68:9
69:5,6,9,13
76:13,23,24
77:2,25 78:3
81:1 82:23
118:8 149:6
162:10 191:9
201:3,20 202:6
202:9,12 203:1
203:6 214:7
218:20 220:25

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

221:12 225:12
225:13 227:3
228:5 234:23
235:1,4,18
250:8,20,25
251:1,9,12
259:12 262:10
264:20 265:11
**answered** 27:4
34:15 40:1
58:21 71:24
96:12 192:13
265:16,17
**answering** 19:2
77:3,18,19
78:16 264:18
**answers** 17:20
17:21 18:16
26:12 83:10,11
161:24 226:24
235:1
**anybody** 10:2
48:16 100:23
102:22 111:19
126:3,4 133:10
142:18 149:22
149:24 151:12
152:20 166:13
170:18 171:18
172:10 196:17
205:20 207:13
208:7 211:1,4
211:7 212:10
212:19 221:24

222:9 229:11
240:12 246:15
246:17,22,23
247:16 266:14
267:20 270:8
276:17 280:17
**anymore** 96:23
152:7 294:18
**anytime** 236:24
236:24
**anyway** 91:1
128:12 175:17
213:24 225:4
**apologize** 46:1
57:5 68:3
122:18 209:8,8
209:11
**apologized**
57:1 63:7,12
209:12
**apparently**
62:20 64:20
156:16 174:7
285:21
**appearance**
4:24 100:19
264:2
**appearances**
2:1 4:21
**appeared** 288:3
288:7
**appears** 62:11
105:2 122:3,4
122:5,6 226:4

256:6,8
**apple** 12:20,23
13:24 27:20
65:6
**application**
180:1
**applies** 84:4
**apply** 84:1,3
86:24 87:1,2
88:1
**appointed**
18:23 34:23
41:16 218:11
**appointees**
170:16,16
171:3
**appointment**
93:25 218:9,16
**appreciate**
85:17
**appropriate**
40:14,16,18
88:9
**approval** 10:10
166:12 246:24
**approved**
76:14
**approximately**
187:6
**apps** 65:13
**april** 255:22,25
257:12 258:5
273:6 274:13
287:12

**area** 37:11
56:19 196:4,5
206:25 221:7
272:23,24
**argue** 77:23
152:22 203:17
203:19
**argument**
45:23 153:15
**argumentative**
40:13 213:3,4
246:5 248:13
**arm** 245:2
**arrest** 87:11
**arrested** 96:24
209:19
**arrived** 42:8,11
287:18
**art** 25:18 26:19
**article** 288:12
**asap** 145:17
**aside** 87:9,11
244:23 281:1,3
**asked** 6:7 7:1
17:18,19 18:5
18:6,14,15
20:16 22:23
23:1,5,6 24:21
26:15 27:4
32:14 34:15,22
38:17 40:1
46:11 47:1,7,8
47:10,15,19,20
49:9,23,24

51:10 53:22,25
55:10 58:21
67:18 70:24
71:2,24 73:23
74:4 75:22,23
76:18 77:15
79:7,16 83:13
84:10 98:13
152:18 169:23
177:3 191:11
191:11 192:13
194:13 196:13
196:14,20
202:4 204:3
208:3 210:21
212:2,7 213:17
214:14,17
217:18 221:12
225:1 226:21
226:25 229:4
234:3 241:11
241:15 249:5
253:7 262:7,8
262:9,12,22
263:3,8 265:7
265:16 266:9
267:21 268:3
283:17,22
285:1 286:16
286:17 290:13
291:8,14
293:25
**asking**   7:20
40:11,14 45:4

52:25 70:20
75:15,18 76:5
78:9,9,18
91:11 102:14
110:3,7 118:3
118:10 129:3,9
137:2 194:12
203:25 216:16
216:18 219:18
229:15 248:19
264:10,25
265:19 278:18
**asks**   104:22
251:11
**assad**   282:13
**assigned**   10:19
36:3 61:21
**assignment**
61:6
**assignments**
61:17
**assistant**   27:23
122:8,10,14,21
161:18 169:8
189:9,19
194:11,21
199:9,18
225:15 226:12
227:6,25
265:24 276:5
277:9 280:1
**assistant's**
122:7

**assistants**
169:9 188:24
**assisted**   17:19
26:11
**assume**   10:25
11:23 15:4
65:22 66:18
67:10 91:10
150:3 155:11
229:6 275:16
277:20
**assumes**   44:15
44:19,25
**at&t**   12:22
13:6 66:8
68:12 71:15
81:2,12 162:2
162:10
**att**   70:7
**attached**   3:11
**attacks**   152:7
**attempted**
248:21
**attempting**
262:10
**attend**   28:19
165:22 171:7
251:16 267:22
272:17
**attendance**
142:6,8 267:23
292:19
**attended**   29:11
149:19,20

258:2,20
261:24 292:6
292:18
**attending**
249:17 257:19
257:20 259:24
260:3 272:9
292:4
**attention**   85:18
**atterberry**
210:11
**attorney**   4:25
19:8 22:17
60:7,7 92:21
230:22 296:15
**attorneys**   23:7
78:21 79:1
80:24,25
229:14,15
**attractive**
264:23
**atty**   2:21
**audio**   287:14
287:15
**august**   9:2 30:9
66:21,22 67:2
**authentic**
129:13,20
161:21
**auto**   161:2,3
287:20
**available**   28:1
29:20 30:9
145:14 173:9

ave  2:11,17
avoid  71:15
aware  21:10,19
  66:25 72:19
  73:7 74:11
  78:20 79:9,12
  79:14,15 80:19
  80:20 85:5
  90:25 91:13,14
  98:22 99:5,10
  109:13 113:2
  150:13 161:17
  168:17,19,20
  172:14,16,17
  213:10 271:12
  271:14,15,18
  271:19,21
  278:6,9,14
  281:4 290:5

**b**

babe  95:4
  249:3
bachelor's
  197:14,25
back  6:6,25 7:1
  25:20 39:2
  47:6,20 48:3,4
  49:4,10,25
  50:7,19 51:24
  65:12 68:2
  80:9 90:10
  102:23 104:21
  119:25 122:17

  134:6 136:22
  137:25 147:22
  149:8 150:10
  152:9 156:11
  156:22 157:6
  157:16 158:25
  159:8 161:7,15
  173:23,24
  183:17 185:25
  190:13 192:1
  204:6 207:5
  208:3 209:2,4
  225:3 226:9
  228:13,14
  230:5 237:12
  243:2 247:10
  261:7 262:9
  264:3,13
  276:20 286:9
  286:24,25,25
background
  166:4 181:4
  184:24 185:4,9
  185:13 186:17
  186:17
backup  66:18
bad  6:17
balls  213:25
  225:5
banter  51:24
  52:4
bar  234:25
base  287:17

based  39:12
  72:5 124:18
  165:4 199:20
basic  85:11
basically  18:2
  79:21 215:19
  281:15
basing  231:5
basis  10:6,7
  99:7 101:14
  263:14,16
bates  122:12
  199:21 200:2
  252:11,20
becoming
  166:13 211:3,6
bed  147:22,23
began  196:5
  265:24
beginning  4:24
  31:12 40:20
behalf  5:1,3,5,7
  69:7,9 117:24
  142:15 177:16
behavior
  234:20
behavioral
  36:12
believe  22:4
  44:12 46:22
  55:13 56:22
  96:18 98:15
  155:10 180:10
  192:23 199:8,9

  199:19 209:24
  212:21,23
  232:6 242:6
  251:20 257:1
  268:7,20 270:3
  272:19 291:3
believers  152:9
  153:16
belong  147:10
bend  286:17
benefits  11:2
benny  34:23,24
  35:21 36:7
  41:19 86:11
  166:15 179:2
  182:19 187:3
  210:13
bertin  2:23
  4:19 296:19
best  190:14
  198:19 250:10
bethel  157:17
  157:18,20,20
  158:2
better  48:20
  50:19 213:17
  213:19 261:12
beverages
  272:3
beyond  139:7
big  140:25
  144:20 238:8,8
  247:6

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

**bills** 82:15
**bing** 276:21
**birth** 9:1
**birthday** 170:6
170:9 194:7
282:2
**bishop** 157:6
157:24 158:2
**bit** 102:11
108:5 144:5
156:12 160:14
188:12,12
236:7 248:20
**black** 156:12
267:22 268:12
268:21 269:1,4
269:5
**blankets**
256:23 257:6,8
**bloomfield**
1:20,21 2:5,6
4:1,16,17
147:24
**blown** 102:11
**blue** 145:25
146:13 155:14
155:15 160:3
160:12
**bmf** 272:10
**board** 42:11
163:14,19
164:5 169:10
178:13,15
179:13

**bodies** 100:24
100:25 101:3,4
101:6
**body** 100:19
101:7,8 244:20
264:2
**boss** 237:17
244:3 248:11
283:7
**bottom** 100:7
159:1,1
**bottoms** 100:7
**bought** 72:20
**boulevard** 92:1
**bounty** 152:11
153:18
**bowl** 141:11
**boyfriend** 54:8
54:12,20,22
55:17 285:19
285:24,25
286:4,21,22
287:2
**boyfriends**
54:18
**bracelet** 147:1
147:3,15,17,18
147:18
**brady** 157:24
158:2
**brand** 14:3,4
**break** 63:22
128:21 129:8
132:1,4 161:10

275:12
**breast** 245:2
**brian** 16:12,13
**brief** 30:14
63:23 132:2
224:21 275:14
**briefly** 174:2
**bring** 87:23
117:5 164:5
188:3 195:19
206:4 210:17
**bringing** 56:2
186:15,16
187:6,10
**brother** 108:7
146:4
**brought** 163:19
178:25 182:11
183:7 184:24
186:6,11
195:14 196:23
197:3,10,22
198:13 264:14
**browsers**
276:20
**browsing**
276:22,23
**brushing**
244:21
**budget** 188:14
188:15
**building** 15:10
15:11 37:5,6,7
37:8 42:24

46:20 267:5
**bulifant** 86:22
**bump** 261:17
**bunch** 204:18
235:5 279:25
**burgundy**
143:2
**business** 64:17
281:21
**buttock** 100:2
**buy** 261:16

**c**

**c** 125:10,10
269:9
**cain** 86:22
**calendar** 27:11
27:13,14,16,17
27:19 29:1
**call** 21:20,22
25:16 26:8
53:1,7,8,10,24
90:17 139:8
145:5 150:15
150:18 165:4
167:6 199:4
209:24 213:15
217:12 226:18
227:10 269:3
273:6,16
**called** 4:5 31:15
52:12,20 53:11
53:12,14,15,24
55:17 56:2

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

96:3 173:7
184:7 185:3
186:9 195:7
199:2 208:8
213:21 214:13
214:25 215:24
225:3,9 227:6
270:20 273:21
273:24,25
274:1,3,4
275:1 282:20
294:14,15,16
294:21,22
**caller** 294:3
**calling** 52:23
270:20 294:18
**calls** 20:1,25
24:11,20,22
25:15 26:6
118:24 120:15
120:24 133:12
134:9 137:10
138:8,15,19
139:6 141:18
142:9,16,19
171:14 218:19
219:5 225:24
228:7 233:14
278:3
**calm** 213:20
**camel** 156:6
**camera** 131:21
**campaign**
171:13,22

172:8,15,18
281:25
**campaigning**
177:24 252:7
252:10
**candidate**
172:7
**canopy** 256:1
**can't** 49:19
117:20 130:15
255:2
**cap** 156:12
**capacities** 1:13
**capacity** 46:19
168:5
**captain** 91:7
**captains** 91:3
**car** 10:19,22,22
10:23
**card** 192:23
**cards** 213:25
225:4
**care** 8:19
**career** 73:1
**careful** 85:4
**carefully** 212:7
**carmen** 84:16
84:16
**carrie** 224:9,9
224:11
**carrier** 68:12
70:7 80:24
81:2,5,11
162:2,11,20

**carries** 78:23
**case** 1:7 4:15
25:10 26:13,15
27:3 43:19
44:24 45:3,3
59:13 60:5
64:1 67:1
80:20 184:4
218:17 267:19
278:5,15
279:23 282:3
282:18 288:19
288:21 296:9
**cases** 74:19
89:19
**caught** 21:16
**cause** 57:13
**cell** 11:11,12
67:20 68:11
70:6 76:15
81:18 82:1,3,6
82:24 83:5
99:16 162:2,6
162:7,16,20
270:20,21
290:13,14,15
**cellular** 11:12
73:6,14 74:1,6
74:15,17
**cer** 2:23 296:19
**certain** 61:17
80:10
**certificate**
296:1

**certified** 2:24
**certify** 296:7,11
296:14
**chain** 46:23,25
86:1,2,3
**chair** 59:4
**chance** 64:11
132:4 241:13
277:10
**change** 41:15
68:5 71:19
151:25 163:20
184:6 185:16
202:4 210:19
210:20 290:25
**changed** 75:16
75:17 184:23
210:3
**changes** 35:22
38:2 186:1
198:10
**changing** 184:3
195:12
**channel** 64:3
**chaplain**
166:19,20
167:19 189:10
189:14 192:9
193:4
**chaplain's**
166:17 190:19
190:20
**chaplains**
166:24 167:2,4

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

167:5,12,16,22
189:3,7,15,24
190:3,15,25
191:18,19
192:3,18 193:4
193:6,10,17
**charge** 165:5
167:22 189:15
255:13
**charged** 249:8
249:13
**charity** 287:21
**chatting** 117:13
**cheaper** 75:9
**check** 140:16
166:9 276:10
**checked** 103:6
144:1 234:24
**checking** 144:2
**checks** 176:21
**chief** 35:8,9,10
35:13,23,24
36:11 38:3,4
40:2,4,6,23,24
40:24 41:2,3,7
41:10,14,16
42:1,14 51:11
51:15 54:4
86:4,9,22,24,25
88:14,16 91:6
91:7 95:25
182:10 191:8
192:20 195:20
196:9 199:7

207:4,25
208:14 219:10
220:13 230:18
230:19 236:16
259:17 260:8
260:22 262:14
262:22 271:13
271:15
**chiefs** 86:17,21
89:1
**children** 9:20
**choice** 86:12
**chose** 170:1
193:14
**christina**
180:23
**christmas** 43:5
194:6,7
**christy** 9:18
**chrome** 276:21
**chronological**
215:7 216:25
**chronology**
215:3
**church** 57:8
107:16,18
142:6,8 144:10
157:16,16,20
157:21 158:2
164:19 165:2
165:16,17,18
165:19,23,24
165:24 166:9
166:23

**churches** 165:9
167:5,7
**cine** 268:21
269:15
**circulated**
125:18 126:11
**citizens** 249:18
**city** 157:24
197:13 198:8
249:11,11
**civil** 124:17
**civilian** 32:12
32:12,13 88:2
89:7
**claim** 229:20
284:11,20
**claimed** 46:4
47:1 273:7
**claiming**
129:19
**claims** 282:11
**clarification**
40:14
**clarify** 157:3
258:19 291:4
**clarifying**
258:20,23
259:7,14
**claritin** 152:2,4
**clark** 2:10
15:18
**class** 145:15,21
149:12,18

**classification**
200:8 255:13
**clear** 22:6
40:11 93:15
154:8 258:9,10
258:14 259:18
260:25
**client** 21:13
22:3,17 26:2
98:24 99:5
100:1,18
101:25 154:14
184:18 187:15
196:4 210:9
235:8 237:16
246:16 259:20
264:19 265:20
267:22 270:2,4
270:6,19 271:2
271:12,16,19
279:19
**client's** 249:15
256:5
**clinking** 136:23
**clip** 288:2
**close** 58:15
**closely** 42:15
42:19,20 122:6
249:15,19
**club** 146:19
**coach** 45:17
**coaching** 90:6
247:6

Carroll Reporting & Video
www.veritext.com          A Veritext Company          586-468-2411
www.veritext.com

**coffee** 43:7
**collecting**
74:18
**college** 30:15
30:17
**color** 104:18
**combination**
155:10
**come** 10:9
27:19 31:15
34:22 35:7
55:10 64:10
66:1,2 68:2
88:23 94:10
117:13 130:19
130:24 149:11
167:2,10
169:10 173:24
178:13 179:4
204:12 222:2
224:10,12
239:2 261:16
266:16,17
271:3 280:15
281:24 286:9
286:25 293:23
**comes** 27:21
181:8
**coming** 15:10
15:11 55:19
75:10 174:10
178:15 196:16
200:12 224:7,8
266:25

**command**
37:11 38:18
46:24,25 84:15
86:1,2,3 91:1
**commander**
91:7
**commencing**
1:22
**comment** 244:8
**commented**
286:5
**comments**
100:19 106:8
106:10 108:7
148:25 196:6
242:3 264:1
265:22
**commission**
10:8,11 296:22
**commissioners**
9:25
**common**
134:19
**communicate**
13:12 278:1
**communicated**
183:8
**communication**
178:17 184:3
184:22 282:7
**communicati...**
18:20 22:18
30:1 64:4
163:3,9 171:10

173:5 184:1,2
282:6
**community**
96:15 108:19
166:25 167:1,3
167:4,6,11,18
167:25 168:8
169:5 179:19
180:5 186:21
186:22 187:5
187:13,13
188:6,6,16,18
188:24 189:6
189:24 190:5,7
193:1,7,11,11
195:11 197:4
201:25 202:1
203:2 210:14
210:14 224:5
224:13 249:17
249:23,25
250:13 251:6
256:24 260:4
274:17 293:25
294:17
**complain** 232:8
**complainant**
287:16,20
**complained**
94:8,12,17
100:4 225:23
241:8
**complaint** 7:14
47:2 52:16,17

94:23 95:9
98:22 99:1,2
168:14 201:3
201:20 202:6,8
202:9,12,16,17
202:20,25
203:1 225:12
225:13 226:3
226:25 227:2,3
229:2 230:15
230:16,20,25
231:3,10,11,20
231:21 232:7
235:25 236:1,4
236:6,13 243:5
265:4 267:9
283:19,21
284:2,4,5,6,8
284:12 285:13
291:9,15,19
293:1
**complaints**
37:12 100:10
168:12 229:24
230:3,4,5,7
235:7 236:3,11
242:11,24,25
287:1
**complete** 296:8
**completion**
289:15
**compliments**
85:14

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

compound
62:11 142:10
142:12,20
175:23
computer
111:3 275:17
275:18,19,23
276:5,7,14
277:11,12,14
concealed
111:5 133:24
144:21
concept 50:14
50:15 220:21
concern 237:24
concerned
94:21 117:9,10
203:12 237:15
237:18
concerning
92:13 194:6
230:11 291:24
294:23
concerns 96:2
96:11
concerts
165:18
concluded
295:13
conclusion 21:1
24:20,23 25:15
25:17 26:7,9
171:15 218:20
219:6 225:25

228:7
conduct 36:12
87:12,14 94:8
117:19 212:3
219:14 221:6
222:16 229:6
229:25 237:19
265:21
conducting
67:24 81:21
83:2
confer 21:24
conference
28:20 29:9
199:11
conferences
28:18,19
confidential
8:11,21,24
12:3,5 14:14
14:16,18 25:5
25:8 97:20,21
98:17 140:1
144:24 145:6
confidentiality
140:6 145:12
confirm 133:24
162:19
confirming
217:22
confused
294:12
congratulations
260:20

congregation
147:11 158:1
165:9,12
connected
175:22,25
277:14 293:18
considered
62:8
considering
179:2
consistently
186:15
consisting
296:7
console 222:2
consultation
69:14
consumer
272:3
contact 137:21
145:17 238:1,3
238:9,14 240:2
273:22 279:12
293:20
contacted
213:9 229:12
238:2 243:25
244:2
contacts 65:16
contain 73:7
74:7
contained
227:14 228:12

content 51:19
55:23 121:24
139:11 141:8
159:12
contents 3:2
continue 22:9
61:21 82:23
127:23 135:6
138:2 193:5
257:7
continued 63:2
continues
63:18
continuing
132:9 144:6
154:12 155:23
158:23
contract 210:2
210:3
contracted
165:3
contrary 219:8
258:21
control 48:16
248:5
conversation
21:15 85:12
95:22,24 179:1
195:25 196:2,3
224:24 225:16
226:13 227:8
228:2 231:17
232:16 239:15
240:3 271:20

Carroll Reporting & Video
A Veritext Company
www.veritext.com                                                586-468-2411
www.veritext.com

| | | | |
|---|---|---|---|
| 271:23 | 82:1 83:20 | 206:6,8 207:21 | 69:10 79:5 |
| **copies** 17:3 | 86:10 93:1,7 | 207:23 211:12 | 83:12 102:14 |
| 113:19 116:10 | 93:12 98:24 | 213:15 214:4 | 108:2 112:3 |
| 116:11 | 99:7,13 100:2 | 218:3,9,12,13 | 116:10 122:24 |
| **copy** 17:10 | 100:5,11,19,22 | 218:18 221:9 | 125:17 131:6 |
| 101:23 104:16 | 102:9 104:1,2 | 222:5 229:7,25 | 131:21 136:12 |
| 104:18 109:8 | 104:5,12 | 238:9,14 241:2 | 223:5,7 231:11 |
| 116:12 290:18 | 105:10,24 | 241:7,9 243:15 | 232:3 233:4,12 |
| 290:21 | 106:4 108:19 | 244:6 247:3,17 | 233:12 246:10 |
| **corner** 174:9 | 108:20 109:5 | 248:8 249:3,5 | 253:25 255:9 |
| 174:12 176:16 | 109:22 110:6 | 249:6,16,18 | 292:8 |
| **correct** 13:8,13 | 111:10 112:23 | 250:1 253:15 | **counseled** |
| 13:16 15:1 | 116:17 117:3,4 | 253:22 255:7 | 243:18,20 |
| 16:18,21,24 | 121:25 122:1 | 257:9,22 258:3 | **counseling** 90:7 |
| 17:1 18:12 | 125:11 132:5 | 264:23 265:22 | 90:13,13,14,16 |
| 19:24 20:9,19 | 134:1 137:14 | 265:23 268:10 | 90:17 243:22 |
| 24:5,6 32:5 | 144:7,10 | 268:16,18 | **counts** 146:21 |
| 33:1 36:9 | 145:19,21 | 270:10 272:3,7 | **county** 1:10 |
| 37:17,22 38:15 | 146:22 149:1 | 272:13,22 | 2:16 4:13 5:8 |
| 40:5 41:22 | 152:12,14 | 273:2,4 275:8 | 9:25 10:5,14 |
| 42:16,23 43:9 | 155:25 156:4 | 275:10 284:15 | 10:24 11:3 |
| 44:13 46:24 | 159:8 161:4,5 | 284:18 285:5,9 | 13:6,13,15 |
| 47:12 48:5,13 | 161:7 162:2,12 | 288:13 296:8 | 17:17,21 18:8 |
| 50:20 52:2,14 | 162:23 168:13 | **corrections** | 18:22 19:20 |
| 53:4 54:6,9,13 | 170:17 171:17 | 166:3 | 20:19 23:24 |
| 54:15,24 55:1 | 171:23 172:1 | **correctly** 76:23 | 24:16 31:5 |
| 55:4,25 56:8 | 173:25 174:17 | **could've** | 35:3 39:15 |
| 56:16 58:5,10 | 177:24 183:19 | 136:14 | 42:17 45:1 |
| 59:22 61:15,18 | 184:16,18 | **counsel** 4:21 | 47:5,12 54:9 |
| 63:11 64:20 | 188:20 194:1 | 5:10,13 15:4,6 | 59:15 60:6,11 |
| 65:25 69:11,12 | 199:14 200:8 | 15:12 16:4,10 | 60:12,13,15,16 |
| 73:8 74:2,3,8,9 | 200:11 204:10 | 16:16 21:12 | 60:18,22 61:20 |
| 74:11,15,22 | 204:13 205:2,4 | 22:1,11 23:11 | 62:3,17 67:21 |
| 76:5 81:6,7 | 205:9,13,20 | 24:5 68:22 | 73:4,12 81:18 |

Carroll Reporting & Video
A Veritext Company
www.veritext.com                                                   586-468-2411
www.veritext.com

82:2,5,16
83:19 84:4,7
87:6 92:9,23
93:5,6 117:17
117:25 118:1
121:8 124:9
162:6,7 166:13
166:17 167:8,9
168:5,6 176:9
182:13,18
184:15 188:13
188:19 202:23
205:9,12,20
206:1 225:21
228:24 229:20
234:8 241:1
243:24 244:9
244:14,14,21
254:1,5 257:7
261:22,23
267:14,17,20
267:21 275:8
275:19 278:5
278:11,12
279:1 281:14
284:24 288:5
290:1 296:5,21
**couple** 164:4
290:12
**course** 45:19
67:10 146:16
146:18 191:24
284:14

**court** 1:1 4:14
4:19 6:11 8:23
19:10 47:17
48:18,18 61:21
145:11 201:13
202:21 203:6
251:11 289:16
**courts** 49:11,25
50:8 56:13
61:6 62:4
**cousin** 146:8,14
**cover** 72:14
245:7
**coverage**
174:16,18
**covered** 84:25
85:2 122:1
174:20 183:21
186:20 195:8,9
198:10 225:8
228:20
**covid** 106:16
106:23 109:12
135:19
**cpl** 111:5 114:4
133:24 144:21
144:22,23
145:14 146:24
**crawford**
103:13 120:23
124:5,6,8
132:22 133:18
**crawfords**
111:18

**created** 124:1
133:7,7 141:23
159:17 161:6
197:6
**creating** 159:11
**credit** 68:12
70:7
**criminal** 18:2
124:18
**criticism** 59:8
**cross** 7:10
**crutches**
144:12
**cubicles** 200:19
200:21
**current** 8:6
11:11 12:18
80:9
**currently** 12:1
191:8
**cut** 169:25
193:21
**cutting** 261:3
**cv** 1:7 4:15

**d**

**d** 1:8 2:3
**dallas** 38:24,25
**damaging**
221:9
**dan** 155:18
**dancing** 174:1
**danielle** 220:15
221:17,19,20

222:4
**danto** 130:4
**dark** 146:13
**date** 9:15 39:11
48:18 64:2,21
64:23 66:23
67:3 71:5
78:11 80:10
82:3 91:21
96:10 135:17
135:18 145:23
205:23 230:12
232:15 234:3,7
249:5 263:23
267:3 283:22
**dated** 159:1
255:22
**dates** 38:21
39:4,5,11
212:1 268:11
268:11 289:11
**dating** 232:14
**daughter** 275:8
**david** 2:21 5:13
16:17 157:6
180:10 223:10
**dawn** 188:4
197:24 199:6
**day** 1:19 15:15
74:8,9 134:24
135:4 137:8
144:13 156:9
190:14 198:25
199:14 204:8

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

| | | | |
|---|---|---|---|
| 205:16 209:1 | **december** 75:6 | **defendant's** | 227:13 228:11 |
| 211:21,23 | 158:22 159:2 | 17:12 81:14 | **dental** 11:6 |
| 212:25 213:18 | **decide** 173:1 | 154:20 | **deny** 45:5 50:4 |
| 214:3,22 | **decided** 60:10 | **defendants** | 53:3,4,11,20 |
| 218:11 222:18 | 62:4 214:22 | 1:14 19:3,21 | 56:3,5 217:5,7 |
| 223:4,24 | 290:4 | 67:23 68:13 | 217:12 225:12 |
| 239:25 242:5 | **decision** 62:6 | 70:8 81:20 | 225:20 227:3 |
| 248:15 256:11 | 96:22 205:4,11 | 83:1 | 227:16 263:20 |
| 256:16 258:3 | 205:12 206:4 | **defense** 278:15 | 263:21 267:15 |
| 260:19 261:3,9 | 209:16 | **defensive** 195:5 | 270:20 271:5,7 |
| 279:13 283:2 | **declaration** | **definitely** 119:8 | 271:7 273:5 |
| 286:3 289:15 | 241:20,21,24 | 151:25 164:12 | 281:15 |
| **days** 15:16 | 242:1 | 182:19 187:7 | **denying** 45:5 |
| 64:17 211:24 | **deem** 12:2 | 215:6 256:18 | 55:25 56:1 |
| 212:11,19,22 | 14:13 | 256:20 | 67:10 119:6,17 |
| 212:25 219:25 | **deemed** 25:5 | **definition** | 126:9,16,20 |
| 220:4 223:4 | **deep** 232:17 | 201:10 | 227:5,6 232:18 |
| 273:21 | 279:20 | **degree** 197:14 | 232:18,20,21 |
| **deal** 88:24 | **defendant** 2:9 | 197:25 | 232:23,23 |
| 90:12 279:8 | 2:15 5:6,8 6:15 | **delete** 80:12 | 259:23 271:9 |
| **deals** 88:7 | 6:20 7:24 18:7 | 290:24 | 271:11 273:4 |
| **dealt** 163:5 | 18:21 26:13 | **deletes** 80:11 | 285:15 |
| **death** 41:19 | 52:19,20,21,23 | **delmastro** 2:15 | **dep** 15:13 45:6 |
| **deb** 5:19 8:14 | 56:20 67:1,6 | 5:7,7 21:4,22 | 49:9 58:2 |
| 77:13 128:3 | 67:20 68:7,11 | 112:6,9,14,18 | 112:4 117:19 |
| 145:10 | 68:15 70:5,9 | 112:20 113:15 | 138:25 248:25 |
| **debate** 25:19 | 76:14 79:10 | 113:18 117:16 | 289:18 |
| **debbie** 146:22 | 81:17 162:1 | **demoted** 34:17 | **department** |
| **deborah** 1:20 | 202:23,24 | **demotion** 36:6 | 31:15 38:25 |
| 2:2,4 5:1 | 225:14,16,20 | **denied** 49:12 | 42:8,16 43:21 |
| **decades** 14:24 | 225:21,22 | 50:2,3 227:9 | 44:2 63:3,19 |
| **deceased** | 226:11,13,14 | 265:17 284:14 | 81:10 87:2,7 |
| 108:13 154:25 | 227:13,25 | **denies** 225:20 | 88:2 90:22 |
| 157:11 | 228:1,11 290:2 | 225:22 226:14 | 121:7 166:3 |

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

179:14 198:9
199:22 200:5
203:16 207:14
224:13 229:23
236:12 249:12
285:18 291:19
293:16
**departments**
184:21
**depending**
51:19
**depends** 17:4
51:12 88:12
89:17,24 153:9
**deposed** 5:20
6:11
**deposit** 166:11
**deposition** 1:17
4:11,16 15:3
27:8,25 29:21
30:9 49:23
101:19 104:8
107:10 109:2
123:3 124:21
125:7 295:13
296:12
**deputies**
165:25 180:2
**deputy** 35:24
38:4 40:2,4,6
40:24 41:10,14
41:16,25 44:12
46:22 48:20
52:20 60:2

73:17 86:21,21
89:1 166:1,1
179:24 180:16
**described**
198:18 208:9
**description**
184:13,18,19
198:6
**descriptions**
184:15 197:4,6
197:7
**designate** 8:9
**desk** 287:19
**desktop** 275:21
275:22 276:13
276:23
**despises** 124:12
**destroy** 290:25
**detail** 232:5
287:25
**details** 145:17
**determined**
61:25 289:15
**detroit** 2:12,18
6:10 31:15,21
34:11,12,19
35:2 121:6
146:19 155:21
197:13 198:9
224:13 236:12
249:11 268:15
269:22,24,25
270:23 274:17
285:18 293:16

293:24
**development**
190:5 268:12
**device** 12:18
**devices** 11:13
73:6,14 74:1,7
74:15,17 289:9
**diaz** 180:10,19
181:21 185:5
257:10
**dickinson** 2:16
**didn't** 77:10
120:14 183:10
194:19 231:12
259:10 284:4
**different** 21:8
40:5,25 43:3
68:1,3 127:21
132:6 136:19
160:20 184:11
184:13 185:17
189:16 215:17
215:18 227:4
227:20,22
235:5 250:6,6
251:13,14
283:21 290:5,7
**difficult** 6:18
**dime** 246:15
**dindi** 178:3
180:10,21
181:4
**dinner** 43:6
136:23 160:10

257:14
**direct** 19:14
88:16 89:5
91:5 92:13,16
166:11 196:10
208:14,16
240:19 253:20
**directed** 6:12
195:17
**direction**
172:22 199:20
**directions**
172:23 277:3
**directly** 17:4
55:12 69:10
169:3 179:4
189:8
**director** 111:7
114:10 134:3
163:3,9 164:20
173:5 195:16
195:17,21,22
199:25 201:25
202:2 275:6
**director's**
203:15
**directors** 184:3
**disagree**
162:14 217:15
217:16
**discernible**
154:17
**discipline** 91:9
243:15

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

**discovery**
  26:12 158:12
  289:21,24,25
**discuss** 64:6
  206:5 236:25
  241:23 242:14
  242:17,17
**discussed**
  235:13 241:6,9
  278:25 279:3
  279:16,17,18
  282:3,10,13
  288:21
**discussing**
  225:1
**discussion**
  241:10 279:4,5
  279:11 282:8
**dishonest** 21:13
**disorderly**
  221:6 283:3
**distinguished**
  257:13
**distracting**
  20:15
**district** 1:1,2
  4:14,14 202:20
  202:21 274:17
  293:25 294:10
  294:18,19,24
**division** 1:3
  4:15
**do's** 84:19 85:3
  85:7,9

**docket** 229:11
**docu** 269:10
**document**
  17:10,14,15,18
  17:20 62:12,12
  68:18 76:20
  101:18 102:16
  104:7 107:9
  109:1 123:2
  124:20 125:6
  125:18 252:25
  253:10,12
  254:10
**documentation**
  263:14
**documents**
  15:21,23,24
  17:1,8 18:19
  19:4,10,21
  20:16 21:1,8
  43:17 67:24
  69:22 70:12
  81:16,22 83:2
  127:20 128:3
  278:10 289:8
  289:18
**doing** 25:22
  27:9 45:17,18
  57:1 62:19
  63:12 64:3
  82:7 95:15
  111:19 139:3
  139:22 142:4
  143:1 153:10

  159:18 163:22
  163:23 165:12
  167:1,4 171:9
  172:2,4 173:18
  178:15,17
  186:16 187:5
  188:6 189:6,7
  193:12 196:21
  210:8,10
  243:21 258:22
  258:24 259:11
  259:13
**domain** 137:4
**domestic**
  285:24
**don's** 84:20
  85:3,7,9
**donation** 92:2
**donations** 92:6
**don't** 5:11 12:8
  20:10 29:19
  37:16 42:20,20
  44:1,9 49:17
  52:17 53:21
  69:4 77:7
  87:22 101:16
  102:22 109:8
  114:22 130:13
  151:10 152:21
  167:8 170:7
  177:7 226:3
  245:18,23
  269:10,10
  274:14 275:13

**door** 265:25
  266:15,22
  267:6 280:24
**dot** 113:5,5,13
  118:14 122:5,5
  122:6 123:12
  127:22
**dots** 131:14
**dpd** 31:24
  32:10,20 33:12
  34:5 42:3
  108:7,15 155:9
  156:16 285:19
**dress** 168:19
**dressy** 269:7
**drink** 43:6
  272:4
**drinker** 272:5
**drinking** 273:1
  273:3
**drinks** 273:2
**drive** 292:12
**driving** 209:22
**drop** 56:7
**dropped** 33:10
  284:18
**drowsy** 152:2,4
**drunk** 209:22
  272:6,8
**dubai** 156:7
**duly** 4:6 296:12
**dunlap** 54:2,3
  54:19 55:2,8,9
  55:12,14 59:10

86:17

**dunlap's** 55:17

**duties** 164:25
189:20,23
192:16 200:22
200:23 201:4
201:22 202:5,8
202:10,12
203:5 204:3

**duty** 202:5

**dwyer** 2:9 3:8
5:5,5 8:9,14,20
12:2,11 14:13
16:12 19:25
20:5,20,25
22:14,17 24:10
24:18 25:1,4
25:14,18,21,24
26:3,6,17,22
27:4 28:3,8
29:22,25 30:5
30:10 34:15
36:15,18,23
40:1,13,16
42:18 43:23
44:4,15,18,22
45:8,14,18,20
45:25,25 53:13
56:23 58:21
60:24 61:2
62:10,25 65:10
69:24 70:2
71:24 72:8,11
72:16 73:18

74:20 77:3,5
77:13,15,18
97:19 98:16
101:13,23
102:3,13,25
104:14,16,21
104:25 105:6
105:12 108:1
109:7,24 110:2
110:7,22
112:24 114:13
114:18,21
115:3,15,18,23
116:3,7,12,18
117:4,7,10,15
117:17,21,24
118:7,12,16,24
120:5,15,19,24
121:17,21
123:11,22
125:3,12,17,24
126:7,10,22,25
127:5,10,14,19
128:2,9,15,20
129:2,6,9,15,23
130:7,12 131:4
131:20 133:12
133:15 134:9
134:12 135:6
136:12 137:10
138:8,15,19,23
139:1,5 140:3
140:5 141:18
142:9,12,16,19

143:14 145:4
145:10 148:7
148:10,15,18
149:14,25
152:16,21
153:2,8,13,21
154:1,7,11
156:2,23 157:3
157:12 158:18
158:21 161:12
162:19,23
170:23 171:14
171:19,24
172:12 175:23
192:5,13
203:23 204:24
206:7 210:22
211:14 212:14
213:3,5 214:7
215:4 216:12
217:24 218:4
218:19 219:5
220:24 221:11
225:24 226:3,7
228:6 233:14
234:20 235:9
235:17 238:11
245:24 246:5,7
246:19,25
247:4,8,12,18
248:13 250:19
250:25 251:8
252:18,24
254:9 258:18

258:22 259:2,4
259:7,13 260:2
260:9,14 261:2
261:11,19
262:7,12 263:8
263:17 264:16
265:16 274:20
289:13,20,23
290:11 292:21
295:12

### e

**e** 269:9 282:14

**earlier** 49:9
67:15 71:8
115:13 133:18
190:21,23
227:19 236:7
248:25 280:22
284:3 285:23
288:2 294:3

**early** 6:6 29:6
238:22,23
242:9 274:13

**earn** 181:10,12

**earnings** 10:14

**easier** 132:14

**easily** 277:3

**easter** 256:6,8

**eastern** 1:2
4:14 202:21

**eat** 161:11

**eating** 160:25

**ed** 162:25
163:13,15,17
163:21,22
173:9,12 184:5
184:9,11
209:25 283:4
**education**
261:24
**educational**
30:15
**effect** 29:3
50:17,18
100:13 216:2
219:19 220:17
230:13 241:14
271:6 280:20
**effective** 200:5
201:9
**efforts** 184:23
185:10
**eight** 174:7
**either** 90:6 95:3
102:17 104:17
109:9 172:24
172:25 176:17
203:19 210:25
232:16 285:15
**elected** 10:5
18:22,23 73:3
172:7 245:10
245:13,22
247:22
**electing** 252:16

**election** 41:21
41:22,24 173:3
254:14,15
281:25
**electronic** 2:24
289:8
**eligible** 94:1
**ellis** 157:6
**else's** 246:24
**email** 13:10
276:11 277:19
**emails** 18:19
19:15 65:16
170:21
**embattled**
176:9
**emphasize**
242:21
**employed**
30:20 205:15
293:10
**employee** 18:22
18:23 88:4,5
200:7 234:8
237:23 244:9
244:13 267:12
267:19 291:18
296:15
**employee's**
88:10
**employees**
13:12,15 23:15
23:20,24 24:16
88:2 90:4

171:13,22
172:15 228:23
229:23 239:19
265:25 267:10
270:24
**employment**
31:1 243:14
**encounter**
234:7
**ended** 93:12
**ends** 101:10
**enforcement**
7:5 31:8 57:20
73:1 87:8,9
88:1 111:6
114:8 134:1
165:8 249:9
287:17 293:14
**engaged** 218:16
**engagement**
187:13 188:7
189:6,24 190:7
202:1
**engaging**
249:24
**entered** 229:19
**entire** 35:2
**entirely** 205:4
**entities** 31:9
183:23,25
**entitled** 176:9
**entity** 10:4,5
**entries** 27:22

**equal** 62:17
**era** 74:17
109:12
**erase** 136:18
138:1
**erased** 136:14
**eric** 35:13
**erica** 95:17
168:2,3 188:23
193:24 194:1
194:15 198:13
**erickson** 94:11
173:11 209:18
210:9 235:24
235:25 267:19
**erika** 94:11,17
173:11 209:18
210:9 235:24
235:25 267:19
**escapes** 180:24
**established**
115:4,18
**estimate** 71:14
151:24 224:19
250:5
**et** 4:13
**ethic** 253:17
**ethics** 83:19,21
84:3 243:6
**evans** 146:10
146:11 278:25
**evening** 64:6
208:18,20,22
228:4

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

event 155:21
165:13 171:7
249:23 252:11
252:14,15,17
253:2 254:14
254:15 255:23
257:19,20
258:13 259:1
260:3,4 261:8
261:21 268:20
269:2,14,17
272:18,21,25
292:12,14
events 43:5
141:9 208:9
249:17,21
250:1 251:16
259:21 263:11
263:13 268:9
292:5,6,8,10,18
everybody 5:9
84:4 86:25
96:13 154:13
201:15 223:3
245:12 262:17
everybody's
153:15 165:23
210:3
evidence 26:14
27:2 28:4 30:2
44:19,21,25
45:3,11 73:7
74:2,7,18
80:20,22

217:25 219:2,3
ex 32:23 146:4
exact 38:21
64:21 87:25
167:21 192:22
212:5
exactly 13:4
21:10 58:1
75:14 95:20
100:14 133:8
181:3 198:20
231:24 234:2
258:22,24
examination
3:7,8 5:15
290:10
examined 4:7
example 88:13
88:14 89:8
104:5 111:19
113:25 251:18
275:24
exclusively
181:6
excuse 37:17
115:23 122:17
171:6 190:5,23
196:11
executive 27:23
41:7 122:10
169:8 188:24
189:8,19
194:11,21
199:17 200:5

225:15 226:12
227:6,25 238:4
265:24 267:5
267:11 273:8
273:18 274:10
274:19 279:1
280:1 293:9
294:2,4,7,9
exhibit 3:13,14
3:15,16,17,18
3:19 101:19,21
104:8,10,25
107:7,10
108:24 109:2
110:17 114:1
120:2 122:15
123:3,9 124:21
125:2,7,9
252:19
exhibits 3:11
119:25 121:23
exist 289:10
exists 87:13
137:3 217:18
expected
192:11,17
243:7
experience
30:15 114:10
188:25 197:16
197:17 198:3,5
experienced
111:7

expert 119:19
145:16
expiration
218:9,15
expired 93:25
210:2
expires 210:3
296:22
explain 216:13
216:18 260:6
260:11
explained
96:11 233:21
explaining
205:25 260:2
260:10,14
295:7
extent 20:1,21
20:25 21:5
24:10,19,22
25:4,15 26:3,6
26:19 28:4
29:25 36:18
69:24 72:8
102:25 114:14
115:3 119:17
120:5 143:14
192:5 218:19
225:24 228:6
233:14 235:9

**f**

**f** 2:9 282:14

www.veritext.com | Carroll Reporting & Video
A Veritext Company | 586-468-2411
www.veritext.com

**face** 124:1
175:5,6,7
**facebook** 97:4
97:11,14,16,17
98:6,7,8,9,10
98:12,14
109:19,21
110:1 111:9
112:5 114:15
115:24 116:8
116:22 124:14
126:17 138:13
139:16,16,19
139:21,23,25
140:4,9,13,17
141:5,8 150:23
151:2 156:19
174:1 176:10
177:9,11,13
288:3,8
**fact** 38:1 72:5
73:11 80:1
95:13 96:24
101:14 124:13
172:11 196:7
236:5 237:21
248:24 249:13
266:8 291:3
292:17
**facts** 44:15,19
44:20,25 45:11
75:10 226:2
**fair** 5:11 8:13
14:15 22:16

53:18 68:22
82:13 113:21
118:1 126:9
133:6 258:13
**fake** 124:1,14
137:6,19,22
141:23 143:9
143:10 147:13
148:25 149:23
157:25 158:8,8
159:11,12,17
161:6
**false** 20:17 22:2
22:3,4 57:22
63:5,9,15,17
119:23 127:17
201:4 203:7
231:2 280:7
**familiar** 49:7
64:12 70:22
73:16 83:24
177:19,20
**family** 32:21,22
142:1 144:7,8
156:7 242:19
253:25 254:2,3
254:6
**far** 43:16,20
62:19 70:1
89:9 110:6
139:3,7 183:5
203:12 234:24
240:22 243:24
244:4 281:25

284:17 285:4,6
**farmed** 59:18
**favor** 51:3,5
**favorable**
133:21
**february** 14:10
64:1,6,10,19,22
68:10,16,25
71:9,11 74:24
75:9,25 76:1
76:10 228:19
229:3 238:21
238:23 242:9
257:2 270:19
270:21,23,24
290:17,20
**federal** 44:24
45:1 63:25
203:6 229:11
**feel** 154:9
248:12
**felt** 213:19
280:24
**felton** 180:10
180:14 185:5
**felton's** 180:15
**female** 51:16
229:23 244:9
244:13,20
265:25 267:11
283:21
**females** 266:16
**figure** 39:20
159:21

**figured** 232:10
295:2
**file** 33:8 91:17
274:8
**filed** 4:13 44:24
52:8 56:16
57:21 63:25
64:1 202:16,17
202:20 203:6
225:13,14
228:19 229:3,9
287:12
**files** 240:23,25
**fill** 180:1
**film** 272:9,21
**financially**
296:15
**find** 39:11
45:13 83:17
90:2 92:22
93:2,3 113:19
133:5 208:25
213:12 219:11
229:12 233:24
238:19,20,25
243:25 244:2
**fine** 45:2 53:18
75:21 90:2
116:13 213:23
222:4
**finish** 25:1,21
26:4 28:8
60:21 114:1
171:6 191:16

**[finish - fourth]**

216:12 217:9
221:12 250:19
261:2 264:18
289:17
**finished**  78:16
96:13 196:2
**fire**  209:16
211:4 213:24
214:22 215:2
219:20 225:4
246:15,17,22
247:16
**fired**  205:16,18
209:13,15,15
210:21 211:7
211:11 212:9
214:3,9 216:17
216:17,20,21
219:15 220:4
239:13,14
246:22
**firing**  211:5
**first**  4:6 9:14
17:13,17 18:4
31:1 40:21
41:25 49:12,16
49:18 55:8
85:20 101:21
110:17 131:25
134:25 173:16
176:21 179:11
198:23 204:19
264:16 272:10
282:5 293:12

**five**  63:21
64:17 69:16
81:1 140:11,12
151:22 197:16
198:2
**flies**  190:18
**flint**  159:4,6
**floor**  200:19,20
**fly**  193:16
**follow**  33:9
76:25 89:11
103:9,10
114:10,12
118:22 119:4
123:6 126:16
161:18 179:6
290:12 291:23
292:24
**followed**  103:3
103:23 120:2
121:15 123:9
124:24,25
125:9,11,16
127:1
**follower**  161:20
**followers**
110:24 132:19
151:7,8,9,10
**following**  18:15
110:20 123:18
123:20 124:2
132:20 143:11
153:16

**follows**  4:8
126:3,5 161:18
192:22
**footing**  62:17
**forbidden**
92:15
**force**  230:15,20
231:1,2 232:7
**forced**  57:11,12
57:23 231:15
**ford**  30:23
147:23 149:9,9
149:12,18
**foregoing**
68:10
**forensic**  80:16
119:19
**forever**  14:22
14:23
**forget**  6:24
152:10 153:17
**forgot**  84:17
**forgotten**  108:8
108:9
**form**  42:18
43:23 56:23
60:24 62:10
123:22 125:24
152:21 153:2,8
156:2 204:24
215:4 217:25
218:8 219:5
238:12 243:22
261:19 263:18

274:20
**formats**  289:9
**former**  73:17
275:6
**forth**  49:4
51:24 206:2
**forward**  80:18
290:4
**found**  33:15,22
137:5,5 144:3
208:18,20
238:19 239:25
**foundation**
53:13 65:10
73:18 74:20
103:1 105:6
110:23 114:18
115:4,19
116:20 120:6
121:17 123:11
125:3,12 126:7
126:22 127:5
172:12 206:7
**four**  106:3
187:6,7,8,9,10
187:10,11,12
195:14,14,20
195:25 199:5
200:13 202:3
219:9,21
266:20
**fourth**  196:1
198:16 200:19
224:7,8

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

**foxworth**
162:25 163:13
163:15,17
173:9,12 184:5
184:9,11
209:25 283:4
**frame** 194:13
194:14,16
**fraternization**
93:18 240:18
**free** 173:8
**friday** 15:16
91:19,19
190:17
**friend** 153:5
155:3,20 157:8
164:10,11
285:8,10
**friendly** 43:1
49:5 164:11
**friends** 42:25
111:18 146:14
178:22,23
**front** 17:12
122:15 128:24
129:21 130:5
226:4 252:14
255:25 269:12
**full** 31:1 190:19
191:4 192:9
193:15
**function** 256:8
257:25 268:1,2

**fund** 261:24
**fundraiser**
91:20,23
170:11 252:2,4
254:7 262:13
281:24
**fundraisers**
43:4
**funeral** 38:24
39:2,12 57:6,8
57:9 58:5,9,12
107:23 155:7,8
155:11
**funny** 52:1,5,6
52:8
**further** 22:7
136:22 145:17
235:17

**g**

**gained** 264:23
**gala** 268:12,21
269:3
**galas** 267:22
**gamble** 220:15
220:15,16
221:15 222:8
222:22 275:3,4
275:6 282:25
**gamble's** 220:1
**game** 261:15
**garden** 268:6
268:15

**gas** 10:24
**gatti** 86:17
**general** 19:3
50:14,15 85:18
90:13 233:12
**generally** 90:3
285:4
**gentleman**
59:17 155:15
160:6
**gentlemen**
146:9
**getting** 57:7
70:14,16
128:14 188:17
**ggt** 134:3
**girlfriend**
285:18,22
**giselle** 125:1
**gist** 241:16
**give** 9:13,14
12:6 23:10
30:14 33:21,23
38:21,22 39:4
39:6,8 48:3
49:11,15,18
50:17 51:8
71:14,16 86:1
87:18 88:13
89:19,22,23
104:14,21
128:8 136:5
151:24 163:8
192:21 194:15

197:9 206:15
206:19,21
250:5,8 251:12
258:11
**given** 10:20
84:14,15,16
90:21 116:11
121:14 136:20
204:17 250:3
255:5 270:8
**gives** 217:20
**giving** 22:3
59:8 66:23
85:15 184:21
218:2 287:25
**glad** 145:18
222:1
**glasker** 199:22
**glasses** 136:23
146:1
**glenn** 157:24
158:2
**gmail** 277:21
277:23,24
278:2
**go** 8:18,20
14:15 15:21
20:4 25:20
26:22,25 27:6
28:4,7,11 30:4
30:5,22 31:17
38:6,18 43:6
43:23 47:6
49:10,25 51:14

| | | | |
|---|---|---|---|
| 56:10 65:3,12 | 251:11 252:23 | 132:12,15,20 | 290:8 |
| 66:6,20 70:23 | 259:1 261:17 | 134:5,15 135:6 | **golf** 42:6 |
| 71:23 72:10 | 263:3 272:2 | 135:19 136:5 | 146:16,16,18 |
| 80:9 88:8 | 290:4,9 | 137:25 139:6 | 146:19 164:18 |
| 90:10 91:20 | **goes** 119:20 | 140:23 142:5 | **golfer** 146:10 |
| 93:11 105:18 | 159:7 | 143:14 144:2,5 | **golfers** 164:17 |
| 105:20 107:6 | **going** 4:9 6:25 | 146:18 148:7 | **good** 5:17,18 |
| 110:15 112:12 | 7:1 8:9 16:2 | 149:8,14 151:1 | 96:13 137:7 |
| 115:1,17 116:5 | 19:25 20:20 | 152:8,19 | 188:25 221:25 |
| 123:16 128:6,7 | 22:14 24:10 | 153:25 154:20 | 248:12 283:7 |
| 131:13 132:1 | 25:14,23 26:17 | 157:15 158:25 | 286:7 |
| 132:15 134:5,6 | 28:3 29:22,25 | 160:17 167:15 | **google** 275:24 |
| 136:22 138:2 | 38:4,5 40:9 | 173:22 176:19 | 276:4,20 |
| 143:19 147:22 | 43:4,4 45:12 | 183:18 185:25 | **gordon** 1:20 |
| 149:8,9 150:7 | 45:22 46:4 | 188:5 195:16 | 2:2,4 3:7,9 5:1 |
| 151:8,12 152:8 | 47:3 49:3 54:1 | 197:8 200:10 | 5:1,9,11,16,19 |
| 153:21 155:13 | 62:10 68:2,5 | 204:5,6,20,21 | 8:13,15,17,25 |
| 155:13 156:11 | 76:24 77:23 | 205:25 209:1,9 | 12:4,9,12 |
| 157:6,15 | 78:1 80:15 | 209:11 210:17 | 14:15,20 20:3 |
| 158:25 165:22 | 93:10 97:19 | 215:11 221:7 | 20:8,24 21:3,9 |
| 169:4 171:17 | 101:21 107:7 | 222:1,14 | 21:23 22:10,16 |
| 173:23 176:23 | 108:24 110:22 | 234:25 235:9 | 22:20,21 24:12 |
| 179:19 180:3,4 | 111:2,16 | 236:8 237:2 | 24:14,25 25:2 |
| 180:4 183:17 | 114:13 115:3,8 | 238:11 241:23 | 25:7,9,16,20,22 |
| 192:15 207:1,9 | 115:15 118:7 | 243:8,9 245:12 | 26:1,5,8,10,20 |
| 208:3 210:11 | 119:7,11,18 | 252:19 258:2 | 26:24 27:5 |
| 215:12 217:11 | 120:5 121:12 | 258:17 266:15 | 28:6,10 29:23 |
| 218:2,20 | 121:18 123:5,5 | 266:16,17 | 30:3,7,11 |
| 228:10 232:5 | 123:18,19 | 273:5 275:12 | 34:16 36:17,20 |
| 234:13 235:5 | 124:23 125:1,9 | 279:22,23 | 36:24 40:3,15 |
| 235:12 244:24 | 126:3 127:8,8 | 280:1,17,19,21 | 40:17,19 42:22 |
| 247:10,14 | 128:11,16,22 | 281:3,10,14 | 43:24 44:7,16 |
| 249:5 250:6,13 | 130:2,14,16,18 | 282:17,25 | 44:20,23 45:10 |
| 250:22,24 | 131:18 132:12 | 283:4 289:1,6 | 45:16,19,22 |

| | | | |
|---|---|---|---|
| 46:1,3 53:17 | 121:2,18,22 | 156:25 157:5 | 264:21 265:18 |
| 57:4 58:23 | 123:4,15,24 | 157:14 158:19 | 274:23 275:12 |
| 60:25 61:3 | 124:22 125:8 | 161:10,14 | 275:15 289:5 |
| 62:14 63:1,21 | 125:15,19,25 | 162:13,21,24 | 289:17,22 |
| 63:24 65:14 | 126:8,13,15,24 | 170:25 171:16 | 290:7 292:23 |
| 69:25 70:4 | 127:3,7,12,16 | 171:20,25 | 295:10 |
| 71:25 72:3,9 | 128:1,5,11,14 | 172:13 175:24 | **gotten** 47:11 |
| 72:14,18 73:21 | 128:16,24 | 192:7,14 204:2 | 69:23 134:8,14 |
| 74:21 77:4,6,9 | 129:4,7,11,14 | 204:25 206:10 | 181:13 223:5 |
| 77:17,20,24 | 129:17,21,25 | 210:24 211:17 | 280:10 |
| 97:22,25 98:21 | 130:2,3,11,14 | 212:17 213:4,7 | **government** |
| 101:15,20,24 | 130:18,23,25 | 214:11 215:8 | 171:12,13,22 |
| 102:1,5,7,18 | 131:7,10,13,15 | 216:15 218:1,7 | 171:22 172:9 |
| 103:2 104:9,15 | 131:18,23 | 218:23 219:7 | 172:14,15,19 |
| 104:18,23 | 132:3 133:13 | 221:2,14 | **grace** 107:14 |
| 105:7,9,14 | 133:17 134:10 | 224:22 226:1,6 | 107:19,22 |
| 107:7,11 108:3 | 134:13 135:10 | 226:8,10 228:8 | 147:7,8,10,14 |
| 108:4,24 109:3 | 135:16 136:17 | 228:9 233:16 | 164:19 |
| 109:10,11,25 | 137:12 138:9 | 234:22 235:11 | **graduate** 30:24 |
| 110:4,10 111:1 | 138:12,18,20 | 235:20 238:13 | **grasping** 68:20 |
| 112:3,7,10,17 | 138:21,24 | 246:1,6,8,9,21 | **great** 163:22 |
| 112:19,22 | 139:3,8,10 | 247:2,6,10,15 | 173:5 |
| 113:2,3,12,17 | 140:8 141:20 | 247:21 248:14 | **greater** 107:14 |
| 113:21,23 | 142:11,13,17 | 250:21,23 | 107:19,22 |
| 114:17,20,22 | 142:21,24 | 251:2,10 | 147:7,7,10,14 |
| 114:25 115:7 | 143:18 145:8 | 252:20,22 | 164:19 |
| 115:17,20,21 | 145:13 148:13 | 253:1 254:11 | **greet** 158:1 |
| 116:1,5,11,13 | 148:16,19,21 | 254:13 258:21 | **greg** 272:19 |
| 116:15,25 | 149:15 150:2 | 258:25 259:5,9 | **grievance** |
| 117:2,6,8,12,19 | 152:18,22,25 | 259:18,25 | 58:24 |
| 117:23 118:1,6 | 153:4,6,11,14 | 260:6,11,16 | **grille** 251:18,25 |
| 118:13,19,25 | 153:19,23 | 261:6,13,14,20 | **group** 16:18 |
| 119:3 120:9,11 | 154:5,9,12,17 | 262:11,18 | 261:17 274:19 |
| 120:17,21 | 154:21 156:3 | 263:10,19 | |

| | | | |
|---|---|---|---|
| **groups** 180:5 | **h** | **hang** 49:17 | **happens** 74:12 |
| **guard** 31:10 | | 78:15 112:3 | 119:18 165:13 |
| 62:17 252:5 | **h** 122:4 | 114:11 184:8 | **happy** 134:24 |
| **guess** 59:18 | **ha** 95:19 | 184:25 191:22 | 137:8 144:13 |
| 76:13 80:19 | **hack** 103:15 | 196:25 208:1,1 | **harassed** |
| 83:15 95:19,20 | **hacking** 111:17 | 208:1,4 214:6 | 267:13,18 |
| 134:18 137:7 | 151:19 | 217:9 232:2,25 | 273:12,18 |
| 222:6 226:23 | **haggerty** 66:7,7 | 232:25 233:10 | **harassing** |
| 230:18 232:9 | 72:2 75:13,14 | **happen** 66:4 | 52:22 101:13 |
| 245:22 263:12 | **hamtramck** | 179:4 212:24 | 228:22 234:20 |
| 284:16 287:6 | 36:25 37:1,3,3 | 243:9 266:11 | 245:25 246:7 |
| **guessing** 39:7 | 37:9,21 38:18 | 266:12 283:17 | 264:17 265:5 |
| 141:6 149:21 | 38:20 39:13,18 | 286:18 | **harassment** |
| 151:25 164:2 | 39:22,25 41:12 | **happened** 6:13 | 32:2,5,8 37:13 |
| 182:21 197:21 | **hand** 101:21 | 21:17 22:6 | 50:20,21 51:1 |
| **guesstimate** | 102:24 104:10 | 35:20 39:14,18 | 51:3 84:6,13 |
| 224:19 | 123:5,5,9 | 45:5 50:3,4 | 84:20 85:3,19 |
| **gun** 262:16 | 124:23 125:1 | 54:1,2 62:3 | 85:21 94:9,12 |
| **gurlides** 2:22 | 126:11 130:18 | 65:19 91:19 | 94:15,18,23 |
| 4:18 | 168:18 200:2 | 96:17 141:9 | 95:8,9 99:7 |
| **guy** 38:19 | 226:8 228:13 | 167:13 172:19 | 229:20 273:8 |
| 54:16,24 57:6 | 228:14 245:1,3 | 195:24 207:24 | **hard** 203:21,23 |
| 65:23 86:22 | 245:8,14 | 208:24,25 | 231:8 232:25 |
| 120:25 | 253:24 257:7 | 211:11 213:8 | 250:23 |
| **guy's** 54:11 | 286:12 | 213:14 217:3,4 | **harm** 133:19 |
| **guys** 63:22 | **handed** 169:5 | 223:1 230:13 | 141:24 142:1,8 |
| 104:19 116:11 | 256:23 | 239:4 240:23 | **hashtag** 105:3 |
| 127:7 128:25 | **handing** 257:6 | 242:18 274:9 | 113:1 |
| 130:5,14 132:1 | **handle** 39:3 | 283:2 294:19 | **hat** 120:12 |
| 160:17 161:10 | 89:3,6 90:5 | 294:24 | **haven't** 53:25 |
| 254:12 259:23 | 102:8 | **happening** | 83:8 270:7 |
| 260:6 263:9 | **handles** 97:7 | 57:11 236:25 | 282:4 |
| 293:23 295:11 | **hands** 244:22 | 237:2 239:5 | **head** 20:14 |
| | 265:20 | | 39:5 73:17 |

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

[head - human]                                                Page 27

75:1
**heads** 204:17
**headshot**
132:18
**hear** 12:9 64:14
91:16 93:21
95:4 108:23
113:17 174:22
225:19
**heard** 45:10,10
53:23 64:16
99:8 100:5,6,8
100:10 113:7
168:19 174:5
208:24 211:9
223:14 283:8
**hearing** 174:4
176:12,13
**heavily** 107:20
**held** 4:16
257:14 296:9
**help** 21:14 49:3
76:5 114:21,23
167:19,20
203:19 236:20
245:10,13
269:23
**helpful** 28:9
289:2
**helping** 21:9,18
**henry** 30:23
147:23 149:8,9
149:12,18

**here's** 107:5
**hey** 53:23 56:2
143:9 167:19
232:10
**he's** 26:2 40:15
235:21 258:18
258:20 259:7
260:10,14
**hi** 236:24
**high** 30:15,22
30:23 31:3
149:9,10
237:21 238:4
268:7 270:1
**highest** 31:21
34:13
**highlights**
103:6
**highly** 96:22
198:8 266:7
**hill** 2:10 15:18
168:2,3 170:5
188:23 194:15
198:13
**hills** 1:20,21
2:5,6 4:1,17,17
**hire** 173:2
178:11 185:22
186:1,18
187:17,19,21
188:8,22
**hired** 40:21
41:1 165:3
169:14 173:9

174:14 178:20
179:2 182:3
187:22
**hiring** 173:4
185:20,23
186:16
**hit** 214:17
216:5
**hitting** 214:1
214:14,24
215:1,25 217:7
217:14 225:5
226:19
**hold** 35:15
78:15 109:7
130:9,18,20
145:10,24
158:16 213:24
225:4 252:18
252:24
**holding** 107:2
262:15,16
**holiday** 160:11
160:19 230:10
256:16,17,17
**home** 8:7,10,22
140:24 141:2
141:13 142:1
268:21 269:9
270:24 277:11
277:12
**homeless**
256:23 257:8

**hon** 1:8
**honor** 62:17
252:5
**honoring**
146:20
**hope** 49:6
**hopefully**
275:13
**hospital** 147:22
147:23,24
**hotel** 91:24
170:10
**hour** 154:6
**hours** 15:20,20
181:16,17,19
191:6,13,17
192:11,17,22
256:20
**house** 16:16
60:7 84:21
167:9 248:15
**how'd** 182:22
239:2
**hr** 88:11
207:23 229:16
238:1,3,9,14
239:21
**hug** 221:21,23
**huge** 204:14
**huh** 50:6 83:22
122:9 146:3
152:19
**human** 88:7,8
199:17 200:1

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

203:16 206:4,9
206:13 228:21
228:23 229:11
229:24
**hundred**  38:13
**hundreds**
136:16,16
**hung**  214:13
225:9
**huntington**
268:22 269:1
**hurry**  158:25
**hutton**  2:3 5:3
5:3 129:13,19

**i**

**ia**  33:25
**icloud**  66:18
**idea**  27:10
28:14 38:22
39:8 61:8,19
61:22,22 66:5
71:16 82:20
105:1 119:5
138:6,10
142:23 149:17
248:22 256:12
266:21 280:23
283:6
**ideal**  165:11
**ideas**  133:13
149:16
**identification**
101:18 104:7

107:9 109:1
123:2 124:20
125:6
**identified**  3:11
111:22
**identify**  92:19
102:5 126:17
130:5
**ignorant**
122:25
**illegal**  171:12
171:21 172:5
**illness**  181:2
**illnesses**  181:2
**image**  174:9,11
176:16
**immediately**
215:1,23,24
225:15 226:12
228:1
**impact**  70:15
221:3
**impediment**
70:17
**impersonate**
148:5
**impersonating**
134:23
**important**
74:17 108:18
240:13 278:15
**inadvertently**
244:22

**inappropriate**
45:20 51:7,11
51:15 283:9
294:5
**incident**  294:18
**including**  60:2
219:10 264:2
266:1
**incorrect**
116:25 117:2
127:24 162:3,4
202:9 246:6
**indicated**  21:7
116:22 127:10
135:8 289:25
**individual**  1:5
1:12 105:2
123:19 132:21
159:11 237:22
274:18 287:17
292:1
**individuals**
121:15 146:12
159:24 224:5
**info**  71:16
**inform**  109:13
**information**
18:5,11,15
22:3 24:8,21
26:11 65:8,25
66:1 67:5,15
68:23 82:18
83:5 180:5
207:11,11

221:9 273:14
289:11 290:4
**informed**
214:18 225:16
226:13 227:1,7
228:1,15
273:11
**infrequently**
43:3
**insinuating**
258:19 259:4
260:9
**insisted**  170:20
**inspector**  31:22
34:14
**inspirational**
152:13
**instagram**  3:13
3:14,15,16,17
3:18,19 97:13
97:14,16 98:11
98:13 102:8,19
104:3,4,6
105:17,21
106:2 108:17
109:23 110:1,6
110:9,19 111:9
111:11 112:1,2
112:6,18,19
114:15 116:8
118:18,25
119:6,12 123:7
123:16,17
124:1 125:20

126:3,25
127:19,21,24
129:3,5,6,10
130:7,8,22
131:6,22 132:6
133:21 135:8
136:18 150:16
150:19,24,25
151:2 159:12
161:18
**instruct** 22:14
**instructed**
208:7
**instruction**
144:21 145:16
**instructor**
111:6 114:6
133:25 144:23
**insubordinati...**
87:14
**insurance** 11:7
**intend** 280:8
**intention** 85:16
**intentionally**
58:15
**interaction**
46:17 92:15
**interested**
278:22 296:16
**interior** 157:21
**internal** 33:25
34:1 59:16,21
60:1 229:16
284:11 285:21

287:10,13
**internet** 151:19
180:6,6 275:25
276:20,22
277:2,6
**interrogatories**
16:20 17:14,22
18:4,6,14
161:24 162:1
**interrogatory**
83:10 162:10
162:17
**interrupt**
154:13 189:1
232:2 265:8
**interrupted**
246:11
**interrupting**
196:11 261:10
261:12
**interview** 59:21
95:15 208:8
**interviewed**
207:20,23
208:4 284:10
284:17
**interviews** 60:1
**intoxicated**
96:22
**investigate**
33:12
**investigated**
31:23,25 32:16
32:20 33:20

34:5 43:21,25
44:2
**investigation**
32:10 33:25
59:16 228:21
285:22
**investigative**
185:13,20
186:2
**investigators**
184:24 185:4,9
186:17
**invite** 261:9
**invited** 261:8
272:16,19,20
**involved** 8:3
43:16 58:4
89:19 107:19
160:9 176:6
223:6,11,25
224:1 266:24
267:1 292:25
293:2,3
**involving**
287:12
**iphone** 162:5,8
**issue** 21:24
56:7 73:13
74:13 88:6
90:12 253:16
253:16,18
286:3
**issued** 77:21
275:19 288:6

**issues** 22:1 89:7
**it'll** 258:14
**it's** 13:21 40:14
69:9 118:6
120:3 130:15
142:12,21
154:11,11
165:6 181:23
185:3 203:23
210:6 213:4
215:19 235:1
242:3 252:16
258:21 279:8
294:10
**i'd** 29:1
**i'll** 17:11 45:14
56:24 104:21
138:1
**i'm** 5:10 25:25
26:3 37:18
45:18,25 49:20
52:17 101:21
105:20 113:18
115:15 118:7
118:10 125:1
128:19 130:16
130:18,23
132:25 150:13
247:10 261:1
261:13 275:12
291:12

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

| j | | | |
| --- | --- | --- | --- |

**jaafar** 95:25 96:7 279:12
**jackets** 256:3
**jackson** 144:15 144:17
**jacksons** 144:14
**jail** 36:1,3 166:22
**january** 41:18 182:8
**job** 39:24 42:21 42:21 48:2 56:13 74:9 77:25 139:1 163:2,10,21,22 163:23 164:25 165:4 169:20 176:20 179:9 179:10,10,11 179:18 184:11 184:13,15,18 184:19 189:10 189:14 190:2 190:19,19,20 191:2,4,5,20,21 192:9,9,12 193:8 196:7,8 197:4,6,7 198:6 200:22 200:23 201:4 201:17,22

202:10 203:5 204:3 243:9,21 247:12 248:6 249:15,20,23 255:12,19,21 261:12 293:22 293:22
**johnson** 188:4 197:23,24 293:5,5,12
**join** 31:6 254:1 254:6
**joined** 42:16
**jointly** 1:13 200:13
**jones** 64:14
**jr** 2:21
**judge** 1:8 272:19
**july** 28:22 29:5 29:21 35:6 252:7,8
**june** 27:8,9,25 28:2,12,13 56:18,18 178:1 178:2,3 242:6
**jury** 260:7,11
**juxtaposition** 38:14

| k | | | |
| --- | --- | --- | --- |

**kansas** 157:24
**keep** 13:1 27:11 39:4 46:4 47:3

49:2,5 51:9,10 51:21 54:1 71:21 78:1 82:18 109:13 110:1,13 118:3 118:14 127:11 135:17,19 136:15,20 137:25 140:23 142:5 144:5,5 149:8 150:6 152:8 153:24 154:19,20 155:13 157:15 164:14 204:6 221:1 258:2,6 258:17 261:3 264:25 266:15
**keeping** 265:24
**keeps** 250:23
**kept** 96:13
**kevin** 86:6
**keysha** 9:6,7
**killed** 38:24 39:1 57:6,7
**kind** 27:13 39:5 51:5 76:20 77:11 84:14 85:18 87:3 92:14,15 95:7 135:15 137:20 165:11 182:4,5 201:9 221:6 232:16 244:15

262:15 265:7 274:11 280:25 281:22 293:20
**king** 142:6,8,15 156:9
**kisses** 271:25
**knew** 46:16 54:6,23 60:5 62:19 74:25,25 76:10,18,19 77:15,21,22 137:16,17 143:19,22,22 143:23 144:3,4 148:13 166:15 174:5 178:20 206:9,11,16,16 206:17 213:18 220:5 238:15 238:16 242:15 243:5,7 244:6 279:7 281:19 283:2,23
**know** 5:19 12:9 12:21,24 17:22 18:2 20:10 21:9,10,13,20 23:24 28:14 29:19,20,24 30:8,12 35:1 39:10 42:3,5 43:16,20 44:20 46:15,16 47:10 48:8,10 49:13

| | | | |
|---|---|---|---|
| 50:12,21,23 | 133:16,23 | 229:1,21 230:2 | 280:5,10,14,16 |
| 52:15,17 53:12 | 134:8,11,14,15 | 230:21 231:20 | 280:17,19 |
| 53:14,15,23 | 135:5,5,13 | 231:23 232:25 | 281:6,7,14 |
| 54:12 57:18 | 136:2 137:11 | 233:13,18 | 282:1,11,23 |
| 58:2 59:2 | 137:15 138:16 | 234:2 235:21 | 283:14 284:8 |
| 60:13,15 62:8 | 139:16,18,20 | 236:2,12 | 284:22,23 |
| 65:13,19,20,24 | 141:15 142:18 | 239:25 240:22 | 285:5,6,6,16 |
| 66:19 67:3 | 142:22 143:5 | 241:4,5 242:4 | 288:7,14 289:3 |
| 69:3,4,14 | 143:16,24 | 242:19,19 | 293:2,2 294:25 |
| 70:13,16 71:4 | 149:4,22,24 | 243:17,24 | **knowing** 77:8 |
| 71:6,20 72:4 | 150:1,4 151:10 | 244:4,5,7,17 | 172:8 293:13 |
| 72:21,23,25 | 152:16,21 | 245:6,16,18,23 | **knowledge** |
| 73:6,11,25 | 154:9,9 156:22 | 246:13,14 | 27:25 83:8 |
| 74:1,8,13 75:3 | 161:22,23 | 247:17 248:5,6 | 280:6,13,14 |
| 76:22 78:22 | 162:14,22 | 248:7,9,9,18 | 288:18 |
| 80:25,25 82:3 | 167:8,12,21 | 249:22 251:7,7 | **known** 34:24 |
| 82:21 83:4,7,7 | 169:11 170:7 | 251:24 253:21 | 137:13 176:19 |
| 85:10,11 87:5 | 172:10,11 | 253:23 254:2,2 | 177:1 178:18 |
| 87:20 89:14 | 173:20,21 | 254:5,15,18 | 224:15 267:10 |
| 90:2 91:9,12 | 175:1,8 176:2 | 255:14 256:7 | **knows** 74:6 |
| 91:15,16 93:6 | 176:4 177:4,4 | 256:13,16 | 135:11 154:13 |
| 96:14 97:10 | 177:7,8,17,18 | 259:10,13 | 277:4 279:5,17 |
| 102:22 103:15 | 178:24 182:20 | 260:22 261:18 | 282:19 288:20 |
| 103:16 106:13 | 183:5,8,10,15 | 264:3,10,12 | **kumar** 1:8 |
| 106:16 107:17 | 186:14 188:18 | 266:11 267:7,8 | |
| 107:19 108:17 | 189:5 201:17 | 267:15 268:1 | **l** |
| 109:18 110:21 | 206:16 210:10 | 268:11,25 | **l** 2:2 |
| 113:9 116:8,20 | 212:2,6,6,8,11 | 269:3,10,10,18 | **l0egal** 25:18 |
| 117:3,4,8 | 212:24 213:1 | 272:23 274:1,5 | **lacey** 6:20 44:8 |
| 120:9,19 121:3 | 214:5 215:21 | 274:7,11 | 46:15 49:24 |
| 121:10 122:23 | 216:6 217:22 | 275:10 276:19 | 54:23 61:20 |
| 126:6 127:4,7 | 219:19 222:20 | 276:21 277:7,9 | **lack** 120:6 |
| 127:12 129:22 | 223:12,19 | 278:17,23,23 | **lady** 84:16 |
| 131:10 133:6 | 228:17,25 | 279:10,25,25 | 95:16 175:5 |

230:9 272:10
**lakeisha** 199:24
  275:10 283:25
  284:12 288:25
**language** 47:25
  48:1 226:5
**laptop** 275:17
  275:21 276:18
  277:13
**late** 29:6 222:3
  242:9
**latest** 210:13
**laughed** 52:7
**laughing** 51:25
  211:25
**lava** 251:18,24
**law** 1:20 2:4
  7:5 51:1 57:20
  73:1 87:8,9
  88:1 111:6
  114:8 134:1
  146:4 165:7
  202:24 249:8
  293:14
**lawsuit** 6:5,15
  15:24,25 16:3
  44:24 45:1
  46:6,8,9 52:8
  53:5 56:16
  57:13,15,17,21
  59:1,2,5 63:25
  63:25 64:10,12
  77:11 228:19
  229:1,5,5,9

241:6,7,12
  279:3,8,16
  282:23 290:18
  290:21
**lawsuits** 8:3
  60:19
**lawyer** 8:18
  70:19 117:12
  117:14 223:25
  231:2
**lawyer's** 224:1
**lawyers** 22:4
  67:11 69:3
  76:25
**laying** 130:15
**leader** 124:9
  224:14
**leaders** 85:12
**leadership**
  57:24 121:7
  267:10
**leanne** 255:10
**learn** 198:23
**learned** 54:9,15
  54:16 216:1
  237:15 242:7
  244:1
**learning** 67:8
  204:19
**leave** 31:14
  34:19,21 87:11
  93:24 96:17
  163:13,17
  168:23,24

169:18,22
  181:1 185:24
  190:10 289:6
  289:12
**leaving** 87:9
  244:23
**lee** 57:6 154:25
  155:2
**left** 47:4,12
  55:17 96:18,20
  163:14 168:25
  174:9 181:2
  189:14 191:25
  196:4 210:4
  211:10 267:6
  286:9 289:14
**leg** 100:12
  245:1,1,2
  286:12
**legal** 4:18 15:4
  15:6 20:1,25
  24:20,22 25:15
  25:16 26:6,8
  171:14 172:6,8
  218:20 219:6
  225:25,25
  226:2 228:7
  232:3 233:12
**letter** 199:21
  205:23,24
  206:2 215:19
**letting** 188:18
  231:20 264:17

**let's** 107:6
  135:17 142:5
  219:11
**level** 88:25 91:5
  237:21 238:4
**lewd** 100:18
  264:1
**liar** 48:7,9,15
  56:22
**license** 111:5
  114:4 133:25
  144:21
**lie** 19:6 20:13
  233:3 245:9
  248:11 264:12
  285:1,4
**lied** 233:5
**lieu** 162:16
**lieutenants**
  91:3
**life** 11:7 152:10
  153:17
**lightly** 164:22
**lina** 5:7 16:15
  45:23 46:2
  112:8 117:13
**line** 8:21,24
  14:16,18 23:23
  25:8 95:1
  97:21 98:17
  114:14 115:15
  135:6,7 140:1
  144:24 145:6
  245:24 291:10

**lions** 155:21

**list** 47:16 48:18
48:25 49:10
50:1,8,10,16
111:4 151:7
242:3 278:7

**listed** 20:2
67:14 117:18

**listen** 22:8
49:21 75:21
117:8 212:7
220:9 226:23
265:11

**listening** 68:21
119:12

**literally** 244:24
247:13

**litigation** 17:25

**little** 13:5 68:1
84:11 108:5
144:17 156:12
160:10,14
180:25 195:5
236:7 251:3

**lived** 73:10

**livonia** 8:23

**located** 67:25
68:18 81:22
83:3,6

**location** 37:9
268:5

**log** 276:14

**login** 276:10

**long** 6:22 9:7
12:15 14:7,21
15:19 16:8
25:23 28:23
31:11,19 35:1
35:15 41:14
60:14 71:12
96:20 97:23
125:22,23
140:9,10,11
144:19 157:2
164:1 178:18
178:19 180:14
180:15 182:7
182:13 193:24
194:3,9 204:5
211:11,19,20
212:9 223:3
224:15 265:10
278:19 293:10
293:13

**longer** 201:25
205:15,25
207:12

**look** 16:1 22:22
22:23 23:2,3,5
29:1 57:8 59:4
80:7 83:13
94:22 95:3,11
95:17 101:3,6
101:7 102:3
103:12 105:7
105:15 106:2
110:7 116:18

122:6,17
123:17 128:17
130:11 132:5
132:12 133:23
137:7 144:17
197:20 215:18
223:20 252:25
254:11 256:19
256:21 264:22
277:2

**looked** 62:3
80:3,6 105:22
128:21 178:25
228:24,25
278:10 286:6
287:20

**looking** 15:23
21:6 25:3
74:14 95:13,16
101:8,8,9
102:6 106:13
116:8 118:11
125:17 129:1
129:16 131:1
196:9 255:10
277:3 293:22

**looks** 17:10
59:25 109:12
110:19 112:20
114:11 144:14
149:20 155:6
156:11 260:20
260:21

**lose** 36:7 38:5
72:19

**lost** 72:23

**lot** 25:22 48:6
65:23 67:12
79:22 143:11
151:11 165:7
175:15 183:16
188:16 223:15
234:13,16
242:17 245:5,6
250:1,2,5
277:9,9 292:4

**lots** 141:13

**loud** 216:10
221:8 227:24
228:5

**love** 134:25
253:25

**lovelynico**
125:10

**lower** 36:9,10
88:25 169:25
170:1

**lucy** 49:24

**lunch** 43:8
239:3,4 242:10

**luncheon**
161:13

**luther** 142:5,7
142:15 156:9

**lying** 21:17
60:11 215:14
215:16 233:8

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

233:11 234:1
236:14 245:7
249:8,13
280:18 281:5
281:11
**lynette** 125:1
**lynnette** 86:22

**m**

**macc** 268:12
**macdonald**
64:5 77:21
97:8 163:14,15
173:1,4 174:14
175:17 176:18
177:16 184:5
185:16 199:7
282:3 288:9,18
291:4
**macdonald's**
174:23
**mackinac** 29:5
29:9
**madam** 145:10
**made** 37:13,21
38:7,14 39:17
40:4 57:22
62:6 63:5
66:25 67:8
79:9 100:18
104:18 116:10
120:3,13,19
134:25 147:6
147:13 159:2

162:19 168:12
168:14 185:25
196:7 198:10
209:16 211:10
227:1 228:22
229:13,23
230:2 235:7
236:1,3,4
244:8 252:15
264:1 273:7
278:20 279:19
283:21 284:2,6
289:7
**main** 37:6,7,8
180:11
**maintained**
293:20
**major** 11:2
38:23 186:16
**make** 10:15
12:19 34:6
38:2 45:20
52:24 56:10
57:2,3 63:9
69:2 92:2,5
94:24 98:22
113:19 115:15
137:7 149:5
150:25 151:18
154:7 195:18
195:19 196:5
207:7 217:1
231:2,10,11,19
232:7 242:11

242:24 243:8
248:12 260:25
264:6 284:4,4
284:20 287:1,1
294:11
**maker** 205:11
205:12
**makes** 168:10
**making** 22:4
35:22 64:5
109:13 113:15
188:10 203:8
207:2 230:15
230:20 231:21
232:7,24 233:1
233:3 241:24
242:3 265:21
**males** 266:17
**malicious** 95:2
**maloney** 178:3
180:10,12,21
181:4 185:6
**man** 38:24
142:11 248:11
**management**
197:17 198:3,5
**manager** 200:1
**manner** 49:5
244:15,17
**manufacturer**
13:22
**manufactures**
14:5

**map** 277:3
**mara** 64:4
77:21 97:8
163:14,15,19
163:21 173:1,4
174:14,23
175:17 176:18
177:16 184:5,9
185:15 199:6
282:3 288:9,10
288:18 291:4
**march** 145:15
156:24 157:13
238:21,22,23
242:9 257:14
**maria** 2:9 5:5
16:12 45:25
46:1 102:6
126:24 127:13
138:24 152:23
162:13 226:8
259:18
**mark** 180:10
181:21 257:10
**marked** 10:22
10:22 101:18
104:7 107:9
109:1 123:2
124:20 125:6
**marking**
252:19
**marriage**
237:20

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

| | | | |
|---|---|---|---|
| **marriages** 9:9 9:13 | **matters** 55:14 | 285:16 | 59:12 94:14,16 94:19,20,21,24 |
| **married** 9:3,7 230:12 232:12 232:12 234:14 234:24 235:2,2 237:13,14 283:24 | **ma'am** 118:3 **mean** 6:2,22,24 12:7 39:16 44:25 45:12 67:1 84:2 87:4 87:8,16,21 88:14 90:16 | **meaning** 147:17,20 175:11,12 201:14 **meaningless** 175:21 | 95:9 96:1,3,4,5 96:16,20 196:4 196:6 198:25 199:2,4,10 203:3 204:8,18 206:24 213:8 |
| **martin** 142:5,7 142:15 156:9 | 91:14 93:4 95:1 101:7 | **means** 85:15 113:5 118:14 121:11 184:24 | 214:9 217:6,13 219:14 222:19 222:20 224:25 |
| **mask** 111:23 113:25 115:12 | 102:25 104:25 108:9 109:16 | 201:16 221:5,5 250:6,12,12,12 | 234:8 **meetings** 16:4 |
| **massage** 47:6,7 47:24 48:4,19 49:1,12,15,18 50:2,11,17 51:8,16 52:14 248:19,20 249:1 | 113:8 114:16 121:11,11 135:10 136:12 137:21 141:7 143:21 152:16 153:2 156:18 162:14 164:17 | **meant** 115:24 157:4 173:23 260:12 294:6 **media** 4:11 96:25 97:1 128:14 140:20 163:5,5 174:10 | 266:23 267:6 **meets** 200:7 **melton** 2:21 5:10,13,13 16:17 223:10 **member** 165:2 165:18 |
| **massages** 44:13 46:5 47:1 | 165:16 166:15 174:18 175:19 | 174:20 176:18 177:8 197:16 | **members** 165:25 |
| **masseuse** 248:23 | 175:25 189:5 194:6 200:19 | 198:2,4,5 283:20 | **memo** 225:2 **men** 95:5 |
| **material** 59:25 99:12 101:10 133:14 150:4 | 200:20 201:8 201:16 210:14 217:3 219:18 | **medical** 11:4 **medium** 277:7 **meet** 15:12,17 | 234:25 **mention** 7:9,10 7:11 230:13 |
| **mathis** 272:19 | 221:4 226:23 | 16:10 21:24 | 245:12 |
| **matter** 4:12 7:23,23 38:1 85:17 96:24 154:18 236:5 249:13 278:25 287:12 288:4 | 233:17 236:19 238:21 239:16 243:17 246:16 250:11 251:24 254:6,21 258:8 258:12 269:11 277:2 282:10 | 41:25 160:18 220:7,8 236:16 236:20,23 293:12 **meeting** 15:9 15:19 55:6,8,9 55:10 58:12 | **mentioned** 7:20 231:16,25,25 232:2,3,4 266:7 284:3 293:3 294:20 |

Carroll Reporting & Video
A Veritext Company
www.veritext.com                                    586-468-2411
www.veritext.com

**[mentioning - motorcycle]** Page 36

mentioning
  231:17
messages  18:20
  19:23 22:12,22
  22:24 23:2,3,5
  23:6 27:2
  43:18 52:22
  55:4,18 56:3,7
  66:24 68:14
  69:2 70:9,15
  70:25 71:4
  72:19,25 76:13
  76:17 78:11
  79:4 80:12,14
  83:4 170:21
  171:3 271:5,7
met  16:10 42:1
  42:1 54:19,21
  54:23 55:12,12
  178:23 179:7
  220:9 266:1
  285:23
michael  18:21
  68:7,15 70:10
  79:11 86:8,9
  89:9,25 90:11
  144:14,17
  207:3,4 208:14
  208:21,23
  222:10
michelle  254:17
  255:10
michigan  1:2
  1:11,21 2:6,12

2:18 4:1,14,17
  8:23 31:10
  159:6 166:2
  202:21 296:3
  296:21
microsoft
  27:19
might've  155:7
mike  2:22 4:18
  182:10,11
  199:7 279:12
mile  66:7 72:2
mind  7:11
  121:9
mine  110:12
  111:15 132:8
  155:20 176:20
  183:15 222:21
  222:21,23
  237:8 276:8
  285:10
minimum
  181:19
ministries
  157:20
ministry  165:5
  165:5,24
minute  7:12,13
  63:21 69:20
  104:14 121:13
  130:9 269:12
minutes  49:23
  207:6 224:23
  225:6

mis  233:6
misconduct
  210:18,21
  211:1,4 218:17
misrepresent
  36:21
misrepresenti...
  246:19,25
  247:5,8
misrepresents
  28:4 30:1
  36:19,22 61:2
  70:2 72:12,16
  192:6 211:14
  217:24 235:10
  247:18
missing  66:3
  68:4 75:3 80:8
misunderstood
  233:7,10
mo  134:6
mobile  68:12
  70:6 81:2,5
model  12:25
  13:20
models  13:1
  103:6
modification
  204:1
modified  201:4
  201:22,23,24
  202:5,10,13
  203:5,13,20,22
  204:20

mom  115:10
  134:24 135:3
mom's  134:6
moment  95:19
monday  4:2,10
  190:16 251:5
  296:10
money  36:8
  45:2 61:15
  188:16 189:25
  196:7 207:8
  261:23
month  9:1 23:9
  29:13 35:5
  82:4 84:23
  96:10 250:17
  251:12
months  61:24
  250:17 267:20
moore  224:11
morning  5:17
  5:18 15:8,9
  183:14
morry  2:3 5:3
mother  115:10
  134:21 137:8
  147:25 148:1
mother's
  134:24 135:4
  137:8 144:13
motive  264:10
  264:12
motorcycle
  154:22

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

mounted 155:8
mouth 93:20
94:23
move 39:17,21
78:1 169:23
192:24
moved 37:8,14
37:17,20,24
38:1,15 39:13
41:11 59:4
61:25 62:6
187:20 188:23
189:10,13
190:24 192:1
193:12 196:25
200:10 204:9
204:21
moves 193:1
moving 47:11
185:18 286:13
msandrea
123:8
msandrea.tv
123:7
muhammad
144:12
mumford 268:7
270:1
m'hm 19:17
50:9 69:19
81:25 103:24
106:24 134:2
141:1,14
152:15 161:16

181:18 183:20
252:9,13
290:16

**n**

n 125:10 269:9
naked 174:1
176:10 177:6
name 4:18 6:5
7:14 9:5,14
14:4 16:12
33:6 47:15
54:11 84:17
87:20 93:14,17
97:17 107:13
117:5 118:4,4
122:7 126:25
131:11 139:25
155:18 160:5
174:9,11
175:19 176:15
176:23 177:3,6
180:23,23
188:17 224:9
268:3 293:3,5
named 6:14,20
7:17,22,23
26:12 56:20
84:16 103:13
123:6 125:1
132:22 202:23
202:23
names 66:3
87:18,21,24

112:25 197:9
221:12
napoleon 34:23
34:24 35:21
36:7 41:19
86:11 166:16
179:2 182:19
187:4
napoleon's
210:13
national 31:10
nature 10:12
99:16 244:8
navin 8:22
near 237:7,8
necessarily
55:20 92:5
122:2 181:6
195:22 249:24
necessary
74:18 285:12
neck 248:20
necole 199:21
need 38:5 56:10
76:2 102:3
116:18 170:22
171:7,8,9
181:7 208:25
222:24 223:2
231:19 241:14
241:22 242:2
249:22 250:13
258:10 265:11
276:15 277:1

needed 37:10
47:11 48:2
94:13 169:4
190:16 193:17
193:19 220:12
262:25
needs 56:7
181:8
negative 170:4
201:9,16
neither 205:20
267:14 281:15
never 6:5 23:5
34:18 38:12,17
54:14,17,21
56:9,12 59:11
79:2 92:25
93:3,7 94:10
99:18 102:20
102:22 103:17
105:5 108:7,9
120:8 122:22
137:24 143:9
143:11,23
144:1 168:14
171:18 172:2,4
172:21 174:18
174:21 176:11
177:10 189:14
207:5,13,20,23
208:4,7 212:7
223:22 227:9
227:20 230:7
230:16,24

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

**[never - objection]**                                               Page 38

| | | | **o** |
|---|---|---|---|
| 231:12 235:25 | **nice** 108:6 | 181:13 185:18 | |
| 236:4 243:14 | 142:1 144:6,8 | 188:2 192:25 | **o** 125:10,10 |
| 244:11,12 | 152:12,23 | 198:21 199:12 | **oakland** 296:5 |
| 245:17,18,20 | 155:11 287:20 | 199:15 200:5 | 296:21 |
| 263:25 265:4,5 | **night** 52:23 | 203:1 205:1,16 | **oath** 50:3 153:4 |
| 267:21 271:4 | 159:3,6 160:20 | 218:12 219:25 | 154:14 |
| 272:1,24 | 160:23,24 | 220:1 | **object** 19:25 |
| 274:22 276:23 | 213:8 217:6,13 | **nude** 101:10,11 | 22:14 24:10 |
| 292:13 293:17 | 270:21 273:1,3 | 143:11 | 25:14 28:3 |
| **nevertheless** | **nights** 160:20 | **number** 4:15 | 29:22,25 60:24 |
| 223:14,15 | **nobody's** | 11:11,16,16 | 62:10 72:8 |
| **new** 13:3 64:20 | 246:12,16 | 12:1,5,13,15,21 | 110:22 114:13 |
| 65:3,9 67:20 | 248:2 | 12:23 14:11,12 | 115:3 120:5 |
| 68:13,25 69:23 | **non** 10:22 | 14:21 18:18 | 143:14 148:7 |
| 70:14,17 71:18 | 68:17 70:11 | 19:22 24:9,15 | 149:14 153:8 |
| 71:22 72:5,20 | 90:4 152:2,4 | 24:23 25:5 | 154:2 204:24 |
| 75:10 76:11,15 | **northville** | 68:5,6 69:16 | 235:9 238:11 |
| 81:18 82:1,3 | 253:5 | 79:9 81:1,16 | 263:18 289:14 |
| 82:24 126:1 | **notary** 296:1 | 101:19 104:8 | **objected** 105:6 |
| 143:24 157:17 | 296:20 | 104:11 107:10 | 127:6 |
| 157:18,19,20 | **note** 146:21 | 109:2,4 123:3 | **objecting** 24:22 |
| 158:2 188:8 | 162:19 | 123:6 124:21 | **objection** 20:5 |
| 190:24 196:22 | **noted** 67:22 | 124:23 125:7 | 20:21,24 21:5 |
| 290:5,7 | 81:20 | 126:9 144:25 | 22:18 24:19,19 |
| **newer** 12:25 | **notice** 281:13 | 145:1,2,3,18 | 25:1,24 26:18 |
| 13:1 71:17 | **noticed** 27:8 | 265:8 | 26:20 28:9 |
| **newly** 197:6 | **noticing** 4:25 | **numbers** 8:11 | 30:10 36:16,18 |
| 199:18 | **notification** | 66:3 72:24 | 40:13 42:18 |
| **news** 76:19 | 275:1 | 87:17,25 278:7 | 43:23 44:4,15 |
| 95:15 174:19 | **notified** 274:24 | 278:12 | 44:18 45:14 |
| 229:10 282:9 | 274:25 | **numerous** 21:8 | 53:13 56:23 |
| 284:10 291:5 | **noting** 162:13 | 112:25 | 65:10 69:24 |
| **newspaper** | **november** 75:7 | **nuts** 77:20 | 72:11,15,17 |
| 288:12,15 | 96:18 173:3 | | |

Carroll Reporting & Video
A Veritext Company
www.veritext.com                                                      586-468-2411
www.veritext.com

74:20 101:13
102:25 109:24
115:16,20
116:3,19
118:24 120:10
120:24 121:17
121:21 123:11
123:22 125:3
125:12,24
126:7 128:15
133:15 134:9
134:12 135:7
136:13 137:10
138:8 139:6
141:18 142:9
142:16,19
149:25 152:16
152:21 153:2
153:13 154:1
156:2 170:23
171:14,19,24
172:12 175:23
192:5 206:7
211:14 215:4
217:25 218:4
218:19 219:5
225:24 228:6
233:14 246:19
246:25 247:4
248:13 261:19
265:16 274:20

**objectionable**
68:17 70:11

**objections** 4:23
17:12 19:3
20:1,2,22 45:8
67:22 68:8,10
81:15,20 82:25
117:21,25
139:1

**observed**
287:18

**obsession** 101:9

**obtained**
138:16 278:11
287:14,14
289:8

**obtaining**
70:17

**obvious** 45:24
289:7

**obviously**
18:15 69:10
82:15 95:3
109:21 148:1
152:23 159:7
161:3 177:5
178:20 199:20
233:6 243:12
289:17

**occasionally**
13:17 23:22
28:16 43:8
46:18 79:20
136:19 140:14
164:17 237:12
250:10 255:20

**occasions** 20:7

**occur** 250:15

**occurred** 84:23
198:21 207:21

**occurs** 17:25

**october** 9:18
261:21

**offhand** 29:18
29:19 30:6

**office** 10:11
11:19 15:18
16:20 31:5,6
31:11 32:14
34:22 37:5,6,7
37:8 39:1 40:8
42:2 43:4
55:17 74:6
82:8 83:14
92:23 106:18
121:8,14
122:21 124:10
159:19 172:10
173:7,13
174:23 176:15
178:10,16
179:5,22
183:15,24
188:19 193:18
193:19 200:10
200:11,12,15
200:17,20
203:2 204:10
204:21 206:1
221:6 223:12

230:23 237:7,7
240:3 257:7
261:22 265:25
266:16,17
267:11,12
273:6,19
275:17 277:15
278:1 287:13
288:6 291:21
291:23,25
292:1 294:20

**officer** 6:10
41:25 54:8
57:20 108:14
108:15 273:9

**officers** 32:7,9
84:15 285:19

**offices** 222:20
222:23

**official** 1:13
18:22 77:11
87:21 97:4
129:9,11
206:19

**officially**
206:12

**offsite** 283:23

**oh** 6:21 32:17
46:9 52:6
65:15 71:20
76:7 84:4
89:21 107:20
110:24 130:9
146:11 152:5

159:6 181:13
184:1 234:17
253:9,20 255:2
**okay**   5:9,11
7:15 9:17 18:8
18:9,13,23,24
19:5,11,12,13
20:13,14,15,24
21:3,3,17,23
22:9,11,20
24:1,25 25:7
25:22 29:16
36:20 40:11
44:21 45:16,22
50:5,7 52:19
54:1 58:3
63:13 64:24
65:1 68:22
69:5,8,15,17,18
70:5 73:22,22
76:7 77:2,20
80:1,17,18
93:19 98:4
99:20 101:21
102:2,21
103:21,22
104:13 108:16
109:14 110:17
111:21 112:1,3
113:18 114:2,3
114:20 115:8
117:7,9 118:21
119:16,23
123:16 124:6

126:13 129:6
131:18,25
138:24 139:8
143:19 144:4
144:20 145:23
146:11 149:7
152:8,12 153:4
154:20 155:13
155:14 157:6
157:15 158:23
161:9 174:15
177:15 184:25
185:25 188:22
191:16 194:9
194:19 198:15
198:15 199:23
200:3,9,9
201:12,19
202:4,19,22,25
204:4,6,7
206:11 207:18
207:23 208:4
214:2 215:9
216:11,18
217:10 219:24
219:25 221:25
226:9 227:15
227:18 228:18
231:7,8 233:23
240:7 246:8
254:11 255:18
256:4 258:13
259:10 265:8
268:23 269:5

287:6 289:4,13
295:9
**old**   71:8 94:3
126:1 175:9
**older**   71:18
80:12
**olivia**   182:12
**once**   24:24
72:13 144:3
243:25 250:17
250:17 254:9
264:17
**one's**   98:2
117:10
**ones**   110:5
111:12 166:25
267:25
**open**   131:23
140:15 151:11
151:12,13,15
265:25 266:15
266:22 267:6
280:24 289:6
289:12,14
**opening**   258:2
260:19 261:9
**operations**
35:10 41:4
**opportunity**
158:1
**options**   89:18
**order**   8:12
58:16 215:7
216:25

**ordinance**
83:19,21 84:3
**organization**
268:3 269:8
**outing**   146:17
**outings**   42:6,6
164:18
**outlook**   276:1,1
276:3,25
**outreach**
167:18,25
168:9 186:21
186:22 187:5
187:13 188:6
188:17,24
193:1 195:11
195:12 197:4
202:1 224:5,13
**outside**   59:19
95:15,18
148:24 165:23
193:18,19
200:18,18,20
222:21,23
223:12 234:8
**outsider**   84:21
84:22
**oversee**   190:15
193:5
**overseeing**
189:2,7,24
190:3,24
191:18,19
193:4

Carroll Reporting & Video
A Veritext Company
www.veritext.com                                    586-468-2411
www.veritext.com

**oversees** 82:6
  192:20,21
**overtime**
  181:20,22
**own** 21:18
  145:2 150:19
  261:16 276:14
**owner** 70:21

**p**

**p.m.** 295:13
**p27058** 2:2
**p60946** 2:9
**p81188** 2:3
**p81712** 2:15
**page** 3:3 8:21
  8:24 14:16,18
  17:12 25:8
  97:4,21 98:17
  109:19 110:6
  110:19 111:9
  111:11,17,20
  112:1,23
  113:12,13,14
  114:15,16,19
  115:1,1,5,6,8
  115:19,23,24
  116:7,23 118:9
  118:15,17
  119:6,9,19,20
  119:21,22,23
  121:12,13,20
  123:1,13,14,16
  123:18 124:1

  126:17 129:21
  130:5 131:6
  133:21 134:15
  134:16 140:1
  144:24 145:6
  177:18 288:3,8
**pageant** 210:11
**pages** 119:12
  119:15 130:21
  131:25 134:17
  296:8
**paid** 10:25 45:1
  61:15 82:15
  164:21,23
  166:10 169:16
  191:2 192:4
  193:7,9 224:17
  224:20
**pam** 9:16
**panties** 32:15
  286:17
**paper** 248:20
  269:11
**papers** 52:10
**paragraph**
  225:14,23
  227:11,14,21
  267:9
**paraphrasing**
  279:10
**pardon** 66:12
**park** 257:18
**parker** 291:9

**parks** 1:5 4:12
  5:20 66:25
  67:7,20 77:22
  78:5 89:6
  90:10 91:9
  94:7 122:11,12
  122:13,16
  163:10 183:2
  186:24 187:16
  195:15 196:3
  198:16 199:12
  200:4 204:8
  206:21 213:9
  214:18 215:2
  215:22 217:6
  217:13,21
  224:25 227:2
  239:9 241:13
  242:8,12
  243:25 244:2
  252:12 253:12
  253:15 255:7
  256:24 257:15
  261:25 263:12
  263:13 264:6
  266:8,13
  268:18 272:12
  273:11,14,20
  274:25 278:16
  280:18,23
  281:4 283:3
  288:16 291:11
  291:12,16,19
  292:7,12,18

  294:22 295:6
**parks'** 214:8
**parkway** 1:21
  4:17
**part** 6:8 31:10
  61:7 62:15
  74:8 165:24
  167:2 179:21
  185:10 190:22
  191:5,7,15
  192:19 196:17
  206:1 210:18
  249:20 257:21
  278:5
**partially**
  101:11
**participants**
  62:18
**participate**
  62:16
**participated**
  19:1,18
**participating**
  95:23
**particular**
  12:15 14:8
  51:2 100:6
  164:7 264:8
  272:18 290:1
**parties** 17:23
  138:6
**party** 7:22,22
  134:7 139:12
  141:11,17

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

[party - person's]

Page 42

149:12,16
151:3 170:6,9
194:7 230:10
282:2 283:23
296:15
**passed**  86:11
122:20
**passing**  182:20
244:21
**password**
128:8
**past**  80:9
165:10 194:2
194:22
**pastor**  158:2
**pastors**  167:12
**patrol**  155:8
**patting**  207:1,9
207:15,17
216:9 220:18
220:21 221:3
**pause**  63:23
132:2 224:21
275:14
**paw**  134:3
**pay**  38:5
169:25 170:1
181:15 193:14
193:21
**paycheck**  248:6
**paying**  85:17
**payroll**  188:13
**pays**  60:11

**peep**  33:18
**peeping**  32:25
33:4
**people**  12:6,7
15:1 19:16
20:18 37:21
47:16 60:11
73:15 74:14
82:14 87:22
89:19 92:5
95:5 100:15
103:15 106:15
106:22 109:13
109:13 110:20
110:25 111:17
114:12 117:13
118:22,23
119:4 121:14
124:2 128:14
133:13 134:20
135:11 138:13
143:11 144:3
149:2,4 151:19
159:25 160:2,8
165:6,22
167:18,21
168:9 170:21
171:7 172:18
179:21 180:5
181:15 184:15
186:1 187:13
187:17,20
188:10 195:14
195:20 196:23

196:23 197:3,8
197:10 199:20
200:13 204:18
207:2,18 211:5
211:10,23
212:2,3,4,6,8,9
217:3 219:9,9
219:21 222:13
230:2,21 233:5
233:25 235:5
235:13,14
245:5,6,9,10
246:14 248:7,9
248:11 250:6
256:2 257:24
266:19,25
278:1 280:12
285:6
**people's**  72:24
79:23 100:25
151:19
**percent**  38:13
**perfectly**  183:1
**perform**  80:13
165:1,14
**performance**
59:8,9,11
87:12 88:6,10
88:17,19 89:3
89:7 90:5,21
90:24 91:2
**performing**
99:22

**period**  22:12
39:8 156:15
199:13 284:9
**periodically**
11:24 43:2
183:9 194:20
**permitted**
62:16
**persistently**
283:22
**person**  55:13
56:22 59:19
65:23 78:23
79:1 82:5,12
84:19 88:9,12
90:8 95:18
96:15 99:22
117:19 123:25
124:4 135:13
135:14 143:5
148:25 158:8
159:17 165:3
167:25 168:4
168:12,18
182:11 186:23
195:18 197:22
206:9,13,18
210:14,15
236:14 239:21
274:10 282:6
285:4 286:8
292:24 293:9
**person's**
244:17,18

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

**personal**  13:19
23:13,15,20,23
24:4,8,9,15
25:11 27:3
29:7 43:13,18
66:14 68:11,16
70:6,10 71:1
76:15 78:12
79:17,24 80:3
80:16,23 81:2
81:5,13 97:11
104:4 129:11
129:12 136:3,5
136:9,10,13,15
136:20,24
140:3,4 145:4
148:11 162:2
162:16,20
164:10,11
253:17 270:8,9
270:15,17
277:13 290:14
**personally**  6:2
6:3 15:2
205:19 209:16
240:6
**personnel**
184:6 199:22
**phone**  11:11,17
11:18,22 12:1
12:5,15,19,20
12:23 13:3,8
13:10,12,18,19
13:23 14:5,7

14:12,25 23:7
23:10,12,13,15
23:21 24:4,8,9
24:15,23 25:11
27:3,18,20,20
27:21,22 43:13
43:14,15,18
64:18,20 65:3
65:5,8,9 66:10
66:11,13,14,16
67:21 68:3,12
68:13,16,24,25
69:23 70:6,7
70:10,14,17
71:1,8,11,12,17
72:6,20,24
74:24 75:6,8
75:17,17,23
76:12,15,15
78:2,8,9,12,23
78:24 79:1,2,3
79:17,19,23,24
80:2,3,7,8,9,11
80:14,15,16,23
81:5,10,13,18
82:1,3,24 83:5
83:7,14 99:16
118:20 128:7
128:17 131:5
132:7,13 145:2
145:4,18 162:6
162:7,16
213:15 214:5
270:8,10,11,12

270:15,17,18
270:20,21
273:6 289:25
290:3,14,15,17
290:20,23,25
291:8,15
292:25
**phone's**  70:20
**phones**  11:12
11:12,24 22:23
23:10 65:24
70:23 73:6,20
74:6 75:10
80:11 82:6,19
103:15 183:14
290:14
**photo**  106:8
113:25 119:8
124:24 134:8
147:19,23
148:3 149:13
149:19 150:5
154:2 155:5
156:13,13,15
156:20,23
157:1 253:10
253:12
**photographs**
127:11,23
**photos**  104:4
136:24 137:5,6
138:7,16
**physical**  200:11

**picked**  273:16
**picking**  33:5
**picture**  102:11
103:18,25
106:5,11
107:24 111:22
111:24 115:9
131:19 132:18
134:7,20
140:24 143:1
150:8,10,10
155:5 156:6
158:15,17
159:1,7 175:5
176:22 177:6
255:8 257:3
258:6 259:15
259:16 260:17
260:18
**pictures**  115:12
134:16 136:16
136:19 141:10
144:6,7,8,10,12
145:24 259:5
269:11
**piece**  47:6
64:15 176:9
**pile**  80:13
**pink**  115:10
134:7
**pistol**  111:5
133:25
**place**  20:20
21:4 24:20

26:17 45:7
97:19 98:16
117:21,25
141:3 145:11
185:5 199:10
205:17 207:8
220:18 268:22
269:1
**placed** 20:22
110:12 136:12
286:12
**placing** 24:23
25:24 247:9
**plaintiff** 1:6,19
2:2 5:2,4 69:17
79:5,12 80:4
225:17 226:14
227:8 228:2
263:20 266:1
**plaintiff's**
17:13 69:21
81:15 131:5
201:21 203:5
**plaintiffs**
200:22
**plaintiff's** 3:13
3:14,15,16,17
3:18,19 101:19
104:8 107:10
109:2 123:3
124:21 125:7
**plan** 11:9,10
**played** 58:7

**plc** 2:10
**please** 4:23
18:19 25:21
26:5 49:17,19
80:16 86:1
95:6 97:23
98:18 102:14
112:12 116:3
118:4 119:25
130:11 135:3
140:6 145:11
201:13 212:7
228:14 231:7
232:2 246:8
250:9 251:8
252:24 254:23
258:11
**plenty** 66:2
**pllc** 2:16
**plow** 127:8
**point** 36:25
37:4 47:5
54:10 57:18
76:3,3,9 89:9
95:2 127:4
137:16,17
144:4 154:18
160:15 162:25
164:10 166:23
182:14 193:1
194:24 195:22
202:2 207:5
214:13,21
223:5,11 225:9

230:23 243:13
281:22 290:23
**pointing**
126:24 127:3
**polderdyke**
6:20 7:22,25
44:5,8 46:15
49:10,24 50:7
52:20 53:3
54:8,23 55:4
55:16,18 56:6
56:13 61:20
63:2 229:1
235:16,19,21
248:18 283:19
**polderdyke's**
54:8
**police** 6:10 31:8
31:15 33:8
38:25 95:20
121:6 198:9
224:13 236:12
249:12 285:18
293:16
**policies** 85:3,25
86:24 87:1,2,3
87:6,7,8,12,16
87:18,23,25
88:1 89:11,12
**policy** 87:15,17
87:20 88:5
92:9,12,17
93:1,14

**political** 1:10
170:17,18
252:15
**pornographic**
99:12,15,19
**portion** 8:21,24
14:16,18 25:8
97:21 98:17
140:1 144:24
145:6
**portions** 8:10
**position** 25:10
25:12 34:17
35:23,24 37:10
38:19 39:15
41:8 84:18
92:14 96:15
154:20 164:1
164:21 165:4
168:25 169:2
169:18,23,24
181:22 190:6
190:24 191:25
192:24 203:15
204:20 234:1
259:20 294:1
**positions**
179:23,24
182:2 193:15
**positive** 152:24
153:12
**possession**
11:13 76:12
278:16,17,21

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

**possibilities**
90:1,18 139:15
**possible** 234:3
234:5
**possibly** 48:3
54:16 105:25
139:13 150:17
151:6 158:7
172:5 232:1,5
271:17
**post** 3:13,14,15
3:16,17,18,19
97:5 103:13
105:10,16
106:6 109:12
120:2 121:1,1
133:14 135:25
138:13,22
139:11 140:13
140:20,20
141:17 142:3,6
142:15 145:9
147:5,13
148:16,22
149:23 152:12
152:13,23,24
153:12,16
156:8,25 157:4
157:4,12 159:2
177:17 255:17
255:17
**posted** 105:11
105:15 106:6
106:21 107:24

113:24 115:13
135:1 139:14
139:15 141:2
150:5,7,20
152:4 155:24
156:21,22
158:4,8,14
159:10 173:25
176:10 177:9
177:11
**poster** 157:25
161:6
**posting** 107:5
108:16 134:20
135:12 141:6
148:3,6
**posts** 121:24
126:4 132:19
135:19 144:14
**potentially**
24:7 221:8
**practice** 155:21
155:22
**predecessor**
166:15
**prefer** 258:14
**pregnant**
288:16
**premiere** 272:9
**prepped** 15:13
**present** 2:21
5:14 16:15
67:25 68:16
81:23 83:3,6

**president** 275:7
**press** 210:15
291:5
**pressured**
244:3
**presumably**
92:4
**presume** 68:23
**pretty** 40:11
45:23 90:17
169:8 181:8
183:6 253:15
257:24
**preview** 287:21
**previous** 9:9
266:14
**previously** 6:5
34:24 102:9
168:4 169:2
228:20
**printout** 105:2
**prior** 20:23
31:9 57:9
166:12 178:15
182:20 211:3,6
266:12,12
286:23 296:11
**private** 98:18
128:6 148:19
150:19,21,25
151:18 158:5,6
158:7 234:7
**privileged**
22:17

**prizes** 262:16
**pro** 48:21
50:20,22,23
51:3 111:5
133:24 144:21
144:22 145:14
146:24
**probably** 6:6
9:18 11:25
13:1,4 14:10
16:9 29:14
34:3 35:2 56:5
64:3 70:19
71:18 91:4
94:6 100:17
110:16 124:4
140:12 141:16
146:16 147:9
147:21 150:6
182:8,15,18
191:9 192:19
192:21 194:17
224:16 230:4
233:6 237:5
256:14
**problem** 88:9
90:5 238:8
256:19
**problems** 36:13
88:17,19 89:3
164:7
**procedure** 34:4
**proceeding**
4:23

process 67:23
68:13 70:8
76:16 81:21
83:1 90:4
290:2,3
procrastinate
145:16
produce 16:23
17:1,8 18:19
23:6 26:16
66:24 67:6
68:6,17 69:16
70:11,25 79:10
83:11 141:8
158:13
produced 21:8
43:18 70:16
72:4 78:4,6,7
78:20 79:4
122:23 270:4,5
270:9,11
278:11
production
69:22 81:16
122:12 217:19
professional
111:5 114:6
133:25
program 30:16
166:17,20
167:14
programs
166:19

promo 103:7
properly
117:18
protect 26:1
165:8
protection
273:8,19
274:10,19
293:9 294:2,5
294:7,9
protective 8:11
prove 74:18
provide 69:1
142:25 166:22
provided 10:24
18:5,11 20:17
21:1 26:11
27:2 64:23
68:23 176:14
289:24 290:6
291:4
providers
137:21
providing
17:20,21 26:11
67:15
public 8:16
97:24 98:1
102:19 137:4
140:15 141:3
148:12,23
269:22,24,25
274:17 293:24
296:20

publicly 96:22
148:4,8,15,18
pull 113:10
127:25 128:17
128:24 129:17
132:13 149:3
pulled 111:2,12
115:2,9 151:4
pulling 116:20
118:9 128:22
purpose 289:12
purposely
230:24
purposes 67:21
81:19 140:5
234:9
pursuant 8:11
put 24:18 35:23
35:24 36:15
38:2,3,4,18
44:18 45:8,14
48:17,25 50:1
50:10,16 62:21
62:21 65:13
72:11 84:10
87:2 92:25
93:5,9 111:24
111:25 116:3
130:12 134:16
139:1 140:6
142:7 144:20
150:4,9,10
158:11,16
161:7 168:8

173:19 174:25
175:8 177:5
185:14 205:12
205:14 206:3
206:17 218:5,6
220:6,10
222:16,24
223:2,17 240:7
240:8,10,20,21
247:4 253:19
253:21 255:16
255:17 289:23
puts 27:22
putting 200:13
pwy 2:5

q

qualifications
200:7
question 7:2
18:6 19:1,14
23:21 39:19,20
49:20,21 60:24
62:11,20,25
63:13 76:23
77:18,19 78:16
78:18 123:23
126:10,12
129:23 130:2
137:1 158:18
172:9 173:22
181:21 191:16
208:2 214:7
215:4 217:9

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

220:23,25
226:23 227:12
228:16,18
229:9 235:2
238:12 247:14
250:25 251:9
259:12 261:19
262:8,10 263:8
263:9,18
264:18,20
265:11,12,13
265:14,20
284:16
**questioned**
55:3 59:15,17
**questioning**
112:8 114:14
135:7 234:21
245:24 247:8
291:10 292:5
**questions**   17:18
17:19,23,24
18:11 45:4,13
77:2,3,25
102:4,14
103:21 104:22
104:24 118:8
127:9 128:20
203:24 214:21
239:7 241:18
289:13 290:12
290:13 291:8
291:14 292:4
292:21

**quickly**   177:14
**quid**   48:21
50:20,22,23
51:3
**quite**   57:18
188:12,12
**quo**   48:21
50:20,22,23
51:3
**quote**   92:20
142:15
**quotes**   286:7
292:7

**r**

**r**   2:15 282:14
**rafael**   256:1
**rage**   208:22
**raging**   207:7
**raised**   261:22
**raises**   181:13
**ramona**   9:18
33:7
**ran**   41:21
236:21 285:20
**range**   39:8
89:18 188:11
193:13
**rank**   31:21
34:12,13 36:9
36:10,10 39:16
39:24 46:21,22
54:4

**ranked**   198:8
**ranks**   40:9,25
**ranting**   207:6
208:22
**raphael**   1:11,17
3:5 4:4,12 18:7
67:6,19 68:7
79:11 98:15
140:2 253:9
254:24 296:9
296:12
**rashaun**   27:23
122:10,11,16
122:16 161:17
182:7,15,24
199:8 215:23
216:23,24
217:5 219:12
219:13 224:24
269:13 277:5
280:19,24
**rashidah**
220:15 282:25
**rate**   75:9
**rates**   103:7
**rather**   278:11
**raving**   207:7,7
**ray**   1:11 3:5
18:21 98:15
111:4 120:3
140:2 149:1
213:24 225:3
251:18

**rayash826**
109:4 147:14
**raywash**   98:11
103:23 114:3
125:16 157:19
159:3
**raywash.826**
111:14 125:5
125:11 132:7
149:3
**raywash.826.**
105:23 111:4
123:10 124:24
125:10 127:1
128:1,4 132:18
**raywash826**
97:18 98:9
102:8 103:4
104:10 106:3
107:12 108:22
110:12 124:25
129:15 131:14
151:5
**raywash862**
113:4
**read**   17:20
19:20 20:1,22
46:8 48:20
63:16 67:14
70:3,5 72:13
79:14 83:10
99:1,1,3,4,14
100:9,17
104:20 116:14

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

153:23 158:14
226:7,8,11
227:11,12,21
227:23,24
228:5 241:8
252:20 254:22
262:8 283:16
290:21
**reading** 17:11
49:2,5 51:9,10
51:21 62:11
69:5 105:12
**ready** 15:3 57:7
**real** 120:9
129:14 143:7
188:25 219:3
**realize** 133:22
242:12
**really** 29:14
66:4 72:15
76:7 112:8
130:23 164:15
168:15 181:23
204:15 218:15
224:3 233:18
234:11,17
235:1 254:19
268:25 272:4
287:4,20
**reappoint**
199:19
**reappointed**
199:13 200:4
218:12

**rear** 101:9
263:20
**reason** 29:24
30:8,12 70:14
70:16 72:4
78:10,19
141:21 142:14
142:22,25
205:6,13,14,17
206:2,15,19,23
210:4 217:20
218:3,8 219:3
234:19 264:10
264:11 272:17
286:19 287:5
**reasons** 195:2
**recall** 6:16 8:2
8:5 16:12 17:4
20:10 30:13
32:4 33:14
34:8 38:9 46:5
46:9,21 47:17
47:25 48:1
53:25 54:11
55:5 58:16,19
60:3,4 61:13
64:4 67:9 71:2
71:2 77:8 80:1
83:18 88:3
100:23 139:22
141:6 151:13
160:5 170:24
203:8 209:4
211:2,8 212:11

221:23 232:19
232:22 234:12
236:10 241:19
243:1,17
257:16 266:1
267:25 268:24
269:5,20
270:22,25
273:3,9,13
283:25 285:13
285:14,25
286:7,13 287:8
287:9,22 288:1
291:10
**recalling** 34:10
34:11
**receive** 13:10
17:15 212:18
**received** 16:20
16:23 21:15,25
61:17 67:4,20
76:14 78:11
81:18 82:1,3
82:24 84:6,9
91:10 141:4
161:25 206:3
217:20 291:9
291:16,20
**receiving**
153:10
**recent** 194:8
291:14
**recently** 15:7,8
20:9 287:21

**recess** 161:13
**recollection**
6:17 64:2
**recommend**
211:7
**recommended**
231:11
**record** 4:9,22
5:10 8:16 12:2
14:13 17:11
20:21,23 21:5
22:19 24:19
25:6,25 26:18
28:4 30:1
36:19,20,21
44:19 45:9,15
50:3,5 72:12
72:14,16 102:6
102:15 111:3
112:12,24
116:4,21
117:22,25
118:16 122:18
127:21 128:4
131:4,20
136:13 139:2
140:5 153:14
153:24 154:5
156:23 157:12
158:14,21,24
161:15 191:23
192:3 203:18
210:23 217:24
219:4 221:11

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

227:11,12,24
228:16,18
231:14 233:22
240:22 247:1,5
247:9 254:23
259:14 260:15
271:19 283:18
289:6,12,14,24
290:9 296:8
**recorded** 4:11
34:2 213:25
225:5 271:17
**recording**
174:8 176:14
214:14,24
215:1,22,25
216:6
**records** 79:23
91:11 278:6
**recover** 236:8
**recruit** 179:19
180:2,7
**recruiter** 178:6
178:8 179:12
180:24
**recruiters**
179:14 180:9
180:21 185:8
185:20 186:2
**recruiting**
179:23 181:5
184:23 185:2,3
185:8,10

**recruitment**
203:3
**recruits** 179:13
**red** 146:12,12
**reduction**
193:14
**reelect** 253:9
254:24,24
**reelected**
185:19 199:18
**reexamination**
3:9 292:22
**refer** 69:17
**referenced**
140:18
**referencing**
107:21
**referred** 79:12
249:3
**referring** 78:5
107:15 108:6
108:12 148:19
183:25 226:21
283:24,25
**reflect** 118:16
**refresh** 64:2
**refused** 286:17
**regard** 17:21
39:14 98:23
228:22 229:20
278:12 282:19
289:1
**reggie** 111:17
120:23

**regina** 1:5 5:19
66:25 67:7,19
77:22 78:5
89:6 90:10
91:9 94:7
122:11,16
163:10 183:2,4
183:8 184:19
186:24 187:1
187:16 195:15
196:3,16 197:8
198:16,23
199:12 200:4
204:8 206:20
207:20,23
208:4,8,11,17
208:21 211:10
212:9 213:9,17
213:19 214:8
214:14,18,22
214:23,25
215:2,10,22,22
215:24 217:6
217:13,21
220:4 221:20
222:4 224:24
225:3 226:19
227:2 239:9
241:18 242:8
242:11 243:15
243:25 244:2
246:22 252:12
253:15 255:7
256:24 257:8

257:15,18
258:3 263:12
264:6 266:8,13
270:14 272:12
273:11,14,16
273:17,20,21
273:25 274:25
278:16 280:17
280:23 281:11
283:2,9,14
288:16 291:15
294:22 295:5
**regina's** 213:15
**reginald**
103:13 121:3
124:5,6,8
132:22 133:3
**reginald's**
103:12
**reginald's**
120:25 121:1
**regis** 91:24
170:10
**regular** 10:6,7
31:1 41:24
80:2 160:17
168:25 263:14
263:16
**regularly**
111:17 165:16
165:17 194:24
194:25
**relates** 26:18
95:6

**[relating - resources]** Page 50

| | | | |
|---|---|---|---|
| **relating** 8:10 | 76:20 84:23,25 | **repeat** 44:1 | **reposted** 137:6 |
| **relations** 96:15 | 87:24 96:10 | **repeated** 264:1 | 138:16 |
| 193:8,11,12 | 99:3 106:14 | **repeatedly** | **represent** 5:19 |
| 210:14 | 148:3,5 151:15 | 118:17 267:13 | **representation** |
| **relationship** | 174:4,10 | 267:18 | 113:16 |
| 51:19 182:4 | 175:10 176:12 | **replaced** | **representing** |
| 237:16,22 | 176:13,17 | 163:15 173:11 | 4:19 |
| 239:9,11 | 177:25 192:2 | 184:9 | **represents** |
| 240:18 241:1 | 198:19,20 | **report** 9:24 | 117:17 |
| 242:7,13,21,22 | 213:20 225:6 | 10:2,6,8 33:8 | **reputation** |
| 244:1 281:21 | 225:10 232:15 | 35:11 46:25 | 48:13 |
| **relationships** | 256:24 258:3,4 | 76:19 89:2,5,5 | **request** 17:17 |
| 239:18 | 261:25 264:3 | 89:24 90:11 | 43:17 66:24 |
| **relative** 296:14 | 268:3,11 269:1 | 91:5 166:5 | 67:6,8 68:5,6 |
| **relevancy** | 269:13,17,24 | 191:7 196:10 | 79:9,10,13 |
| 25:18 26:19 | 271:3,10 272:9 | 208:15 240:19 | 81:1,15 83:10 |
| **relevant** 24:7 | 274:5,14 292:7 | 241:14 247:23 | 158:12 217:19 |
| 24:21 25:11,13 | 292:9 294:22 | 253:20 273:7 | **requested** 62:7 |
| 26:15 74:7 | 295:3 | 274:8,12,15,18 | **requests** 16:23 |
| **religious** 28:20 | **remembered** | 274:21 283:20 | 16:25 17:1,8 |
| **remain** 39:18 | 56:9 | 284:10 | 18:17,17 67:5 |
| 41:14 | **remembering** | **reported** 2:23 | 67:16 69:15,21 |
| **remember** | 6:18 | 41:5 195:20 | **require** 170:18 |
| 15:23 21:23 | **remind** 279:14 | 271:12 287:2 | 289:15 |
| 29:13 32:11 | **reminder** | 291:20 | **required** |
| 35:5 38:10 | 153:16 | **reporter** 2:24 | 170:16 249:15 |
| 47:4 48:21 | **reminders** | 4:19 95:16 | 249:19 |
| 52:25 54:12 | 152:9 | 145:11 201:13 | **rescinded** |
| 55:11,19,21,22 | **remotely** 237:9 | **reporting** | 230:6,8 |
| 55:23 56:9,11 | **remove** 67:3 | 35:14 88:12 | **resources** 88:7 |
| 56:12 58:22 | 80:17 | 285:23 | 88:8 199:17 |
| 59:5,23 61:9 | **reorganization** | **reports** 88:16 | 200:1 203:16 |
| 61:25 62:2 | 195:8 | 92:13 191:8 | 206:4,9,13 |
| 64:21 67:7 | | | 228:21,23 |

Carroll Reporting & Video
www.veritext.com
A Veritext Company
586-468-2411
www.veritext.com

229:11,24
**respond** 67:15
176:18 202:24
**responded**
177:16
**responding**
213:5
**response** 18:4
18:11 19:19
21:6,7 26:12
43:17 47:2
66:23 69:21
81:16 177:21
291:5
**responses**
17:13 81:14,14
281:13
**responsibility**
26:14 211:5
**responsible**
107:2 163:7
**responsive**
19:22 21:7
67:24 68:17
70:11 81:22
83:2
**rest** 111:18
166:2
**restate** 39:23
39:23,23
**restructure**
173:16,18,24
183:19 200:24

**restructured**
183:22 186:21
**restructuring**
168:8 173:13
183:17,23
184:7 186:9,19
187:25 195:23
196:13,18,20
196:21,22
197:2 198:18
198:24 201:21
203:3,4 225:1
243:11,12
**result** 21:2
201:21 203:4
**resume** 178:25
197:20
**resumes** 179:6
**retain** 255:1,2
255:4
**retained** 86:11
86:19
**retire** 57:7
93:13
**retired** 124:12
275:6
**retirement** 11:9
11:10 94:1
**retiring** 93:12
293:24
**retract** 11:12
**returned** 35:3
47:5,13,15
49:24 213:14

**reunion** 149:13
149:19,20
150:3
**revamping**
243:9
**review** 30:14
64:11 80:16
90:24 104:14
104:21
**reviewing**
290:3
**reviews** 90:21
91:2
**richards**
187:22 197:11
**rid** 75:6 139:17
139:19 246:23
**ridiculous**
119:1 228:8
**right** 16:13
20:9,9 34:10
39:2 47:7,21
51:1 53:20
55:3 56:18,20
74:19 94:5
100:14,16
104:19 107:12
113:17 120:25
126:5 130:4,12
131:12 132:11
132:17 133:5
135:21 136:7
140:23 143:1
146:2 148:9,18

156:6,17 158:9
160:5,21 161:9
175:22 177:23
182:8 183:15
187:24 188:11
198:14,19,21
200:18,18,20
207:14 211:2
214:16 222:21
222:21,23
223:12 226:9
242:16 244:7
248:4 257:12
259:6 266:10
269:12 273:23
284:24 294:8
**rightful** 250:8
**road** 204:5
**robert** 59:10
86:17
**role** 7:18 9:24
44:11 58:7
84:18 163:4
164:19 165:1
190:8 257:21
279:14 293:8
**roller** 159:25
160:2,8
**ron** 293:5,12
**ronald** 293:5
**rookie** 156:16
**room** 125:18
201:15 286:5,8
286:11

rooms  199:11
rory  275:3,4,6
ross  64:14
rough  9:14
38:22
roughly  5:22
35:17 39:8
94:3,4 96:9
118:22 140:11
164:3 178:13
178:18 181:10
181:12 182:14
191:13,17
192:11
round  122:20
routine  99:7
rub  58:16
245:1,2
rule  240:13,15
240:17
rules  289:14
running  90:1
137:19 170:15
172:10 236:22
262:15

**s**

safe  109:18
167:6
safety  167:9,10
salaried  182:2
salary  10:14
181:23,24,25
182:3 192:19

200:6
salute  257:13
sandy  130:1,4
sat  58:9,12,15
59:21 60:1
84:15 96:7
208:5 236:24
saturday
145:15
save  239:12
saved  52:21
savvy  277:6
saw  33:17
37:10 95:16
122:17 174:18
175:4,5 177:10
177:13 221:22
241:8,12 242:4
264:5 266:6
283:8 286:18
saying  21:24
26:2 27:1
33:19 44:10
48:12,15 51:25
56:12 58:17,19
58:22,25 59:5
60:21 63:14
70:22 72:23
79:16 80:24
85:13 100:23
108:9 110:1,13
113:4,13
118:14 119:8
120:3,18

121:19 124:19
130:6,17 133:3
137:7 139:20
146:21 150:6
154:19 159:16
162:15 168:21
172:4,24,24
173:17 175:10
182:2 183:18
192:25 194:10
195:4 202:14
202:15 203:20
203:21 209:14
212:21 215:17
215:25 220:19
222:15 223:1
227:5 231:6,23
233:6 236:21
246:10 258:6
258:15,16,18
271:2 285:11
288:6 294:4,22
says  17:12
48:16,20 50:21
76:14 100:1
103:3,19,23
107:14 109:6
111:4,14
115:10 120:2
121:1 122:25
123:9,12 124:5
129:4 132:19
134:24 149:3
152:13 157:19

159:3,3 162:5
167:8,9 201:3
201:20 202:8
202:12 214:12
214:25 218:24
241:1 248:19
253:9,25 255:1
255:2 256:1
260:20 267:14
279:4 281:14
284:10
schedule
190:17
scheduled
251:15,16,17
school  30:15,22
30:23 31:3
149:9,10 268:1
268:8 269:25
270:1 294:10
294:17,19,24
schools  180:4
269:22,24
274:17 293:24
scott  86:17
screaming
206:25
screen  132:15
140:25 174:8
176:14
scroll  111:16
131:15 144:6
147:22 155:23
158:23,25

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

160:14
scrolled 111:21
scrolling
130:13 131:21
135:17 144:5
155:13
search 67:24
73:13 74:13
81:21 83:2
87:10
searches 73:13
searching
68:14 70:9
seats 145:14
second 105:8
109:7 114:11
131:16 145:10
161:25 174:7
184:8,25
191:22 196:7
200:19 252:18
258:11
secretary
214:23,24
section 48:21
216:8 287:10
secured 290:1
securing 67:23
68:14 70:8
81:21 82:6
83:1
security 134:3
164:20 165:3,5
165:7 166:4

see 32:15 35:18
51:21,23,24
54:1 61:12,13
64:14 77:12
79:23,25 91:10
91:17,19 103:3
103:7 106:3
108:16 110:7
110:16 111:8
111:16,19
112:22 113:10
113:11 114:2
116:19 122:3
122:20 123:18
125:16 128:8
128:25 129:7
129:21 130:4
130:15,19,21
131:7,10 138:2
141:10 151:7
160:24 164:17
167:11 174:16
175:5,6,7
200:4 241:22
242:1,2,4
248:15,18
255:2 256:22
257:5,10,17,17
258:6 261:10
262:5,6 276:3
276:15 286:4
286:16
seeing 76:20
112:16,19

142:1 160:15
278:22
seeking 67:5
101:10
seem 162:18
seems 124:17
seen 17:7,7
23:25 102:15
102:16,20
103:17 105:3
120:8 122:22
148:23 174:21
176:11 215:20
223:22,23,23
229:7 241:20
254:4,8,9
271:7 278:13
select 86:14,18
selected 86:9
191:10
selects 167:16
senator 146:22
send 17:23
171:4
sending 255:14
255:15
senior 261:23
sense 69:2
149:5 195:18
195:19
senses 222:2
sent 17:3,4
18:12,14,20
21:14 67:4,7

67:19 68:7,15
70:10 79:11
83:11 122:14
122:16 171:3
179:6 225:2
270:24 274:21
274:22
separate
166:21 277:17
277:18,19
september 1:19
4:2,10 67:22
67:25 81:19,22
82:2 83:3,6
296:10
serve 165:8
served 290:18
services 61:21
164:25 165:15
165:19 166:22
166:23
session 84:25
set 17:13 18:4
104:23 161:25
206:2
settle 60:10
settled 45:1
57:17,18 59:13
59:14 60:5,22
settlement 61:7
61:9 62:15,22
229:18
settles 60:19

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

seven 267:19
several 32:3
  98:23 100:2
  108:21,22
  165:22 183:23
  230:21
severally 1:13
sexual 32:1,4,5
  32:7 37:12
  50:20,21 51:1
  51:3,5 84:6,13
  84:20 85:3,19
  85:20 92:14
  94:9,12,15,18
  99:6,20,22
  100:18 182:4
  229:20 239:8
  242:22 244:1,8
  244:15,17
  264:1 265:21
  273:8
sexually 52:22
  228:22 264:23
  267:13,18,18
  273:12,17
shaking 20:13
  73:17 75:1
  244:22
shalina 1:8
share 101:24
  102:13 108:1
  108:18 109:7
sharing 242:12

she'd 57:22
  173:5 213:18
  231:10 239:14
  274:6
sheriff 5:14,17
  6:22 7:16,17
  7:18 9:24
  17:23 18:8,25
  21:12,16 22:11
  27:11 34:23
  38:2 39:23
  40:21,21 41:16
  42:17 45:13
  46:4 49:14,14
  49:14 52:13
  60:16,17 61:25
  62:5,8 63:25
  73:3,12,16
  89:10 90:3
  93:19 95:10
  97:1 103:18
  104:5 107:15
  108:10 114:1
  116:16 118:12
  118:20 119:12
  119:23 122:18
  126:18 128:18
  130:23 131:4
  131:22 132:4
  132:20 134:24
  150:13 151:20
  153:1,7 156:13
  157:17 161:15
  166:1,13 167:8

167:9 172:1
  176:10,21
  177:17 180:8
  182:8 185:14
  188:21 191:22
  195:19 209:17
  211:3,6,25
  214:13,18
  216:18 224:23
  225:10 228:13
  228:18 232:25
  241:14 245:13
  245:22 246:10
  247:23 251:7
  251:23 252:16
  252:17,23
  253:2,9 254:1
  254:6,24 255:4
  256:1 259:19
  259:21 261:23
  262:17 265:8
  275:16 290:12
sheriff's 11:19
  31:5,6,11
  34:22 39:1
  40:8 42:2,8,16
  43:21 44:2
  62:17 63:19
  81:10 87:7
  88:2 92:23
  103:25 113:14
  120:12 121:8
  124:10 159:19
  165:25 166:1

176:15 178:10
  178:16 179:14
  179:22 188:19
  203:2 206:1
  207:14 229:22
  257:7 261:22
  267:11,12
  288:5 291:19
  291:21,23,25
  292:1
she's 110:7
  117:24 199:25
  262:19
shirt 115:10
  116:17 138:3
  245:3,8,14
shirts 254:20
  255:4
shootings 165:9
shortly 38:10
shoulders
  160:4
show 17:11
  101:10 104:4
  111:2 112:25
  114:3 118:3,4
  118:8,10
  121:12 122:12
  125:9 127:23
  130:16 131:5
  137:1,3 154:2
  161:2,3 170:22
  170:22 248:24
  252:11 287:21

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

**[showed - somebody]**                                        Page 55

| | | | |
|---|---|---|---|
| **showed** 109:20 | **simple** 7:2 | **site** 82:19 | **smith's** 57:6 |
| 110:5,17 | 116:13 | 159:12 | **social** 96:25 |
| 111:12,21 | **simply** 93:22 | **sits** 223:12 | 97:1 128:14 |
| 113:25 119:7 | **single** 95:17 | **sitting** 5:12 | 140:20 177:8 |
| 131:24 132:7 | 235:2,3 | 23:1 28:1 | 261:7 |
| 136:11 175:3 | **singular** 125:17 | 29:24 70:13 | **socialize** 43:2 |
| 176:2,4,15,22 | **sinus** 152:7 | 104:19 160:24 | **software** |
| 207:5 | **sir** 19:9,10 | 219:1 257:18 | 275:23 |
| **showing** 112:4 | 20:11 23:18 | 280:11 287:19 | **sole** 205:11 |
| 112:5,15,20 | 37:17 40:9 | **situation** 32:21 | **solomon** |
| 113:20 116:9,9 | 46:17 48:1 | 32:22 44:5 | 199:24 275:10 |
| 116:19 121:15 | 49:17 51:13 | 106:14 117:14 | 284:1,12 |
| 122:23 127:11 | 52:2 54:19 | 136:21 167:11 | 288:25 |
| 127:20 128:2,3 | 60:14 61:10 | 167:13 221:6 | **somebody** |
| 174:1,8 259:22 | 63:13 69:5 | 238:4 261:5 | 35:23 53:23 |
| 268:9 | 71:11 73:1,22 | 262:20,21,24 | 54:23 67:14 |
| **shown** 99:12 | 77:10 78:10 | **situations** | 88:25 103:13 |
| 118:18 177:2 | 102:21 111:21 | 31:25 32:1 | 106:18 113:24 |
| **shows** 116:24 | 113:7 114:12 | 43:3,15 87:14 | 120:3,13,19 |
| 117:1 143:10 | 137:5 144:22 | **six** 250:17 | 121:6 123:6 |
| **siblings** 144:16 | 149:17 158:6 | **skate** 159:5,6 | 126:16 133:7 |
| **sic** 113:4 291:9 | 172:7 194:3,16 | 159:25 160:2 | 134:14,23,25 |
| **side** 18:2 | 198:6 202:4 | 160:18 | 135:3 137:4,5 |
| **sign** 87:23 | 205:11 206:13 | **skaters** 160:8 | 137:9,18 141:3 |
| 252:14 253:4,5 | 208:2 214:21 | 160:15,22,22 | 141:23 142:7 |
| **signature** | 215:9 216:7 | **skating** 160:9 | 142:14,25 |
| 296:18 | 219:24 225:12 | **skirt** 286:5 | 144:12,20 |
| **signed** 19:12 | 227:24 238:3 | **slow** 155:13 | 147:6 148:4,22 |
| 145:22 | 241:4 245:22 | **slowly** 138:2 | 149:18 150:7 |
| **signs** 167:6 | 246:15 254:20 | 157:15 | 158:3,15 171:4 |
| 192:23 | 258:8 274:13 | **smile** 144:20 | 174:25 175:8 |
| **similar** 100:22 | **sit** 77:23 | **smith** 35:13 | 175:12 176:3 |
| 210:25 283:11 | 128:17 208:7 | 154:25 155:2 | 177:13 181:22 |
| | | | 231:9 233:4 |

Carroll Reporting & Video
A Veritext Company
www.veritext.com                                                586-468-2411
www.veritext.com

238:5 244:22
244:24 248:5
251:11 257:23
263:1,3 266:3
273:15 294:4,6
294:25
**someone's**
101:7
**somewhat**
284:3
**son** 33:5
**soon** 47:23
48:19,25
**sorry** 27:15
57:10,21 85:8
101:25 105:20
107:1 112:8,9
118:21 124:25
130:23 144:17
155:1 157:10
160:1 173:22
177:12 181:11
189:1 193:11
197:9 208:19
254:5 291:12
**sort** 73:23 82:5
167:22
**sought** 44:13
44:17 46:5
**sound** 64:12
177:19 195:5
268:10
**sounded**
213:20 266:7

**sounds** 162:15
165:14 177:20
182:1 294:2,12
**southern** 1:3
4:15
**southfield**
249:12
**space** 167:6
**speak** 6:11 10:9
50:5 62:12
66:1 89:12
203:18 226:24
263:12 275:2
**speaking** 17:5
51:20 85:5,10
288:9
**speaks** 84:19
92:20 263:17
**special** 41:21
41:22 147:20
**specific** 19:3
201:14 208:19
251:3,3,4
**specifically**
67:5 71:25
188:20,21
215:21
**speculation**
118:24 120:15
120:24 133:12
134:9 137:10
138:8,12,15,19
139:6,9 141:19
142:9,19,21

149:25 233:15
**spend** 259:20
**spoke** 59:10,11
76:20 95:13
**spokesperson**
288:5
**spot** 38:3,4
**spouse** 282:17
**spouse's** 9:5
**st** 91:24 170:10
**stabenow**
146:22
**stadium** 259:16
259:17 260:5
260:18
**staff** 42:1,14
86:4,10,24,25
88:14,16 91:6
91:7 95:25
165:20,21
171:5 182:10
191:8 192:20
195:21 196:9
199:7,17
207:25 208:14
219:10 220:13
230:18 259:17
262:14,22
271:13,15
**staffers** 172:23
**stamp** 122:12
252:20
**stamped**
199:21

**stand** 154:13
**standing** 26:20
115:20 117:12
154:1
**start** 6:3 11:16
23:4 40:20
48:18 90:6
96:25 132:20
134:5 167:14
173:2 286:10
**started** 70:22
159:20 266:20
**state** 1:11 4:21
4:23 19:3,21
162:1 203:1
296:3
**stated** 118:17
143:16 214:19
264:22
**statement**
33:21,23 64:5
64:8 72:12
77:22 101:14
201:5 203:7,8
203:10,10,12
207:3 209:3
212:12 215:15
216:12 217:15
220:1,25
222:11 223:17
225:25 226:2,7
227:1 261:2
287:7,11,15
288:6 289:23

291:4
**statements**
22:5 211:10,25
212:8,18
220:11 222:13
222:15 223:20
223:22 241:24
**states** 1:1 4:13
17:21 99:5
100:18 162:10
162:17 202:20
203:6
**stating** 225:2
**station** 64:5
**stay** 62:5
**staying** 92:7
**ste** 2:5,11,17
**steak** 159:3
**stephanie**
187:22 197:10
197:11,18
**steps** 136:22
137:18,20
**steve** 82:8,9,11
**stevens** 221:17
221:19,20
222:4,8,22
**stick** 19:9 81:24
202:18 208:1
245:1,3
**stood** 285:12
**stop** 135:19
138:2 151:17
152:8 156:6

265:21
**stopped** 248:21
248:24
**storage** 82:19
**store** 65:4 66:6
66:8,9 71:23
72:2 75:7,12
76:1,2
**stories** 163:5,6
**storm** 270:23
**story** 64:3 76:4
77:1 177:9,11
177:13 272:10
282:9 291:6
**street** 95:14
169:4
**streets** 171:9
**strictly** 181:24
181:25
**strike** 47:2
85:25 110:18
**struck** 100:1
**stuck** 168:18
245:8,14
**stuff** 65:24
73:20 85:19
95:8 127:25
150:12 151:4
178:17 245:5
276:11 279:21
280:15 282:22
290:8
**stupid** 52:13,24
53:9

**subdivision**
1:10
**subject** 19:2
67:22 68:9
81:19 82:25,25
**subjected** 99:6
99:6
**subordinate**
51:7,16,16
55:1 92:16
93:18 237:23
240:19,19
241:2 242:13
273:12,18
**subpoena**
71:15 76:2
**subpoenaed**
74:2 278:5,8
**subsequently**
163:11
**sued** 6:1,7 7:2
7:13 8:4 52:2
74:25 76:10,19
76:21 77:16
78:3
**suggested**
133:3 271:16
292:6
**suggesting**
151:3
**suggestion**
45:21
**suing** 7:20

**suit** 145:25
**suite** 1:21
196:5 206:25
**summer** 28:15
28:19 29:4,6,6
**sunday** 158:1
**super** 141:11
**supervised**
285:25
**supervising**
238:6
**supervisor**
198:8,8 229:24
**supplement**
21:11,16,18
**supplemental**
18:3 21:6,7
**supplemented**
22:5
**support** 92:16
254:1,3 279:23
**supporting**
281:25
**supportive**
280:12
**supposed** 58:4
152:13
**sure** 12:11 13:4
16:19 17:5,9,9
29:18 32:17
33:13,24 34:3
34:6,7,25
36:17 37:18
38:13 39:11

43:12 44:3
47:14 48:23
50:24 52:24
54:7 56:15
64:13 65:11,15
65:18,25 66:20
67:13 71:13
74:5,24 75:4
83:13,15,16,25
85:1,24 86:13
89:12,15,21
90:20 91:3
92:3 93:16
94:2,24 96:13
97:12,22 99:24
104:15 105:21
106:21 108:3
110:14,17
115:14 117:24
128:8 131:17
131:17 132:24
132:25 133:1,4
133:8 141:7
144:9 151:21
151:23 154:7
156:10 157:18
159:9 162:9
169:13,17
171:11 179:8
181:21 182:1,1
185:21 187:18
194:4 197:5,15
198:1 199:3,16
204:12 205:10

205:21,22,23
205:24 207:13
213:1 220:3
222:12 223:5
224:18 233:4
235:21 237:4
240:11,16
241:3 242:2
243:4,8,20
247:10 251:12
253:3,3 256:17
257:10,17
261:13 269:3
271:10 274:2,3
274:15 276:16
281:12,16,16
281:20 288:20
289:3 294:11
295:8
**surprise** 204:12
204:14
**surprised**
168:21 204:22
204:23 271:22
**suspend** 286:22
**suspended**
286:21
**swat** 265:20
**sweater** 160:3
**switched** 11:24
182:9
**sworn** 4:6
296:12

**system** 27:17
166:22 180:6

**t**

**t** 116:17 138:3
254:20 255:4
282:13
**table** 3:2
130:15 136:23
160:6 254:10
**tagged** 103:6
**take** 7:12,13
12:10 34:7
58:2 63:21
104:15,19
105:7 111:24
119:7,11,15
122:17 128:21
129:8 130:11
131:18 132:1
138:11 150:5,8
150:9 152:2
161:10 190:8
193:14 199:10
223:3,4 230:4
243:2 252:24
259:11 275:12
**taken** 1:19 8:19
25:10 121:12
121:13 124:13
146:15 147:19
156:16,20,21
157:1,1 161:13
177:14 259:19

**takes** 259:15,16
**talk** 15:6 49:19
70:19 78:21
79:21 87:11
99:20 100:12
100:25 101:4
106:15 112:7
135:2 201:13
208:16,21,25
222:8 231:7
232:21 239:24
243:21 261:1
266:5
**talked** 15:4
21:11 43:15
54:17 56:6
59:7 69:3
77:21 80:2
91:18 109:16
170:5 198:14
208:11 209:7
219:22 221:15
221:15 233:2,2
241:17 266:6
283:19 284:1
287:23 288:2
**talking** 25:23
37:18 39:21
46:2 51:13
55:14,23 58:5
80:22 85:14
87:15 106:22
110:2 112:12
150:13,14

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

161:19 182:15
184:4 186:8,9
194:12 195:11
196:16 212:1
216:9 220:18
221:1 223:16
223:24 224:23
229:16 231:23
233:18 235:22
235:24 244:15
249:17 250:23
263:4,5 268:14
280:1
**tammy** 143:4
**tamper** 80:20
**tape** 214:19
217:6,14
**taped** 287:15
**tarnish** 48:13
**taught** 145:21
**teaches** 84:19
**team** 185:13
187:11,12
202:1,2 257:21
**tech** 65:23
**techie** 70:23
113:8 277:8
**technical** 66:19
73:20
**technology**
154:18
**telephone** 8:10
25:5 278:6,7
278:12

**tell** 4:6 22:11
24:2,3 57:22
60:18 67:12
76:4 77:1 78:6
87:5 93:7 94:7
94:11,17 106:1
106:7 107:24
108:5,5 114:12
135:3 137:22
141:22 169:7
175:4 179:9
181:3 183:10
183:10,11
186:11 194:14
194:22 197:12
208:21,23
216:21 220:10
226:18 238:3
238:18 239:21
240:1,12
245:21 250:4
254:19,22
283:18 284:21
284:22 296:12
**telling** 18:10
33:19 48:8,10
57:20 60:20,23
69:15 73:19
75:16,24
113:24 117:2
120:12 123:25
124:3,4 132:21
137:4 170:21
171:6 175:18

196:15 212:1
216:20,21,23
217:13 219:18
265:19 274:5
281:5 287:22
**temple** 107:14
147:7,7,14
**ten** 219:25
220:4
**term** 25:18
26:18 51:2
148:8
**terminate**
96:21
**terminated**
93:10 205:1,7
206:12 209:1
209:23,24
210:1,8,16
218:21 242:15
**terminating**
206:20
**termination**
206:5,20
209:24 217:21
242:14,18
**terms** 210:25
**terry** 206:14,15
223:20 238:15
239:23,24
**testified** 4:8
79:3 120:7
123:12 125:4
125:13 127:14

127:22 143:15
148:10 154:3
196:19 197:1
235:18 291:3
**testify** 283:1,4
283:6
**testifying**
264:19
**testimony** 61:2
120:1 155:24
159:15 191:22
192:6 201:18
211:15 235:10
246:20 247:1,5
247:9,18
263:17 279:24
289:1 296:9
**text** 13:8,15
14:25 18:19
19:23 22:12,22
22:23 23:2,3,5
23:6,15,20
24:9,15 27:2
43:18 49:7
52:13,22 55:3
55:18 56:3,7
66:24 68:14
69:1 70:9,15
70:25 71:4
72:19,25 76:12
76:16 78:11
79:4,10,22,24
83:4 170:20
183:9,12,13,14

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

| | | | |
|---|---|---|---|
| 193:23 194:4 | 143:6 147:3 | 135:15 136:14 | 152:20 156:19 |
| 194:24,25 | 154:8 168:1 | 138:13 144:2 | 156:21,25 |
| 195:1,1 270:2 | 229:14 235:18 | 150:11 151:1 | 159:10 173:2,4 |
| 270:2 271:5,7 | 248:25 259:10 | 151:18 165:19 | 176:3 177:25 |
| **texted**  20:4 | **theater**  268:6 | 166:21 167:1 | 178:2 194:5 |
| 43:9 48:17 | 268:15 | 169:5 171:9 | 199:5,16,16 |
| 193:24 194:1 | **theory**  218:17 | 185:19 194:11 | 201:15 203:11 |
| 271:2 | **they're**  129:15 | 211:9 219:24 | 206:16,16,22 |
| **texting**  48:21 | 149:4 259:6 | 222:7 236:7 | 210:13,22,25 |
| 48:24 79:22 | 260:3,4 | 237:2 244:23 | 213:13 218:16 |
| 122:11 183:16 | **thigh**  58:16 | 245:19 250:6 | 219:10 222:6 |
| 194:15,20,23 | 100:12 286:13 | 251:15 259:24 | 230:9,18,19 |
| **texts**  19:15 | **thing**  39:14 | 265:13 278:14 | 231:16 232:10 |
| 20:11,17,18 | 40:24 75:2 | 280:9 283:14 | 235:8 241:10 |
| 21:14,25 22:2 | 100:15 112:16 | 286:20 289:10 | 245:12 247:19 |
| 23:18,23 25:11 | 116:13 131:8 | **think**  7:10,14 | 252:3,3,4,15 |
| 25:13 65:15 | 160:13,17 | 12:22 16:2,6 | 255:1 256:15 |
| 67:6,19 68:3,6 | 169:19 175:9 | 29:15,17 34:6 | 258:10 260:14 |
| 69:16,23 70:17 | 185:17 228:25 | 36:4 37:23,25 | 268:6 274:14 |
| 72:5 78:4,6,7 | 235:23 241:17 | 45:6 47:8,10 | 278:18 280:6 |
| 78:19 80:3 | 260:1 264:8 | 54:4 55:8 | 282:16,25 |
| 83:13 270:4,5 | 276:25 282:5 | 59:23 61:13 | 283:4 285:10 |
| 270:9,14,18 | 287:24 | 62:23 64:10 | 287:5 289:1 |
| **thank**  8:14 | **things**  6:18 | 66:2 72:7 78:7 | 294:6,10,10 |
| 21:17 22:9 | 42:6 43:4,5 | 83:15 84:4,10 | **thinking**  7:4,6 |
| 26:7,22 140:7 | 48:6,12 49:3 | 86:23 91:22 | 29:5 248:7,8 |
| 226:9 228:13 | 66:3,20 69:9 | 95:5 96:19 | 252:1 283:12 |
| 248:2 295:7,10 | 70:23 71:19 | 98:2,2 106:22 | **thinks**  135:14 |
| 295:12 | 73:15 85:3,4,6 | 114:22,23 | 143:6 255:20 |
| **thanks**  21:9 | 85:11,13,17,18 | 116:5 133:10 | **third**  69:21 |
| 131:25 | 90:18 100:22 | 134:25 140:16 | 79:10 81:1,15 |
| **that's**  75:19 | 103:14 113:6 | 141:21,23 | 96:21,24 134:7 |
| 123:21 135:14 | 124:16 127:3 | 142:14 143:6 | 138:6 139:12 |
| 139:2 140:11 | 127:16 130:17 | 148:24 149:2,4 | 141:17 149:11 |

**[third - together]** Page 61

149:16 151:3
**thoroughly**
  196:8 204:23
**thought**  25:2
  78:16 98:12
  173:5 190:14
  212:15,15
  227:18 285:8
**three**  5:23,24
  5:25 9:12,13
  15:20 81:17
  106:3 131:25
  146:11 179:17
  180:11 195:25
  199:5 207:2,18
  219:9 221:13
  224:7 237:5
  266:20 272:6
**thursday**  15:16
  190:17 257:14
**ticket**  261:16
**tie**  267:22
  268:12,21
  269:1,4,6
**tiger**  259:16,17
  260:5,18
**tiger's**  258:2
**tigers**  260:20
  261:15
**till**  31:13,20
  35:16 75:9
  102:23
**time**  4:24 6:10
  6:14,18 7:4,6

11:14 20:6
22:7,7,12
24:17,17 25:23
29:15 31:1,9
31:10 34:7
35:2,7 36:1,5
37:12,20,23,25
38:10,17,23
39:2,3,9 42:11
43:5 46:23
54:3,5 57:19
60:14 64:19
75:17,22 76:9
78:2 79:21
80:7,18 83:14
84:9 85:20,23
91:18 92:10
93:24 96:21,24
100:25 101:3,4
101:6 104:15
104:19 106:16
125:23 140:10
144:19 154:2,8
154:10 156:15
157:2 159:20
160:19 169:21
170:5 171:13
171:23 172:9
172:16,19
173:10 177:23
180:15 185:15
185:18 186:1,8
186:12,13,22
187:24 189:4

190:11,18,19
190:22 191:4,5
191:7,15,20
192:9,19,23
193:15,25
194:9,13,14,15
194:17 197:2
199:8,12
204:19 224:25
229:22 230:19
230:23 236:21
239:14 242:14
243:5 247:7
256:9,11,14,22
259:21 260:4
260:15 265:10
278:2,2,19
288:4 290:8,8
292:2 293:13
**times**  5:22,23
  5:25 7:13
  16:11 79:21
  100:2 194:22
  237:6
**timing**  37:18
**title**  35:15 40:5
  40:22 41:1,8
  41:11 42:13
  44:11 46:21
  82:11 163:2,8
  163:10 167:21
  167:24 169:7
  184:25 185:6,7
  187:3 189:16

189:18 195:16
195:17 199:24
202:4
**titles**  40:12
**today**  11:22
  15:4 22:1 23:1
  25:25 28:1
  29:24 55:22
  70:13 76:25
  78:3,24 79:3
  86:5 120:1
  133:20 137:2
  139:23 143:17
  159:15 161:19
  161:23 190:2,6
  190:23 224:6
  226:17,24
  227:4,17,19
  228:20 246:18
  247:17 264:19
  266:19 280:11
  288:23 289:11
  290:4,5
**today's**  71:5
  78:11 267:3
**together**  20:7
  42:10,23 150:4
  164:12,18
  185:11,14
  194:10 195:15
  195:20 200:13
  200:14 223:17
  249:17 251:20
  255:16,17

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

[together - trying]

Page 62

258:8,20
259:24 260:3
260:10 279:13
286:11 293:17
**tolbert**  86:6,7
86:14,16
**told**  18:3 21:12
22:1 27:24
32:14 33:11
35:21 36:14
48:24 50:16
52:21 54:14
55:18 56:6
57:15,20 60:7
60:7,10 61:11
62:7 64:8 65:2
67:11,12 68:22
69:20 73:9
75:7,11 76:1
76:11 81:14,17
93:9,22,22
94:13 121:9
124:4 143:9,11
175:17 190:12
190:21,23
196:3 204:9,11
206:22 207:6
207:18 213:23
214:3,5,8,23
215:10,21
216:6,8 217:5
220:5,12,13
222:4 223:4
226:19 229:4

230:24 231:6,9
231:9,15 232:9
236:5,7 238:17
239:1,4,8,22
241:12,13
245:17,20
248:23 263:1
265:9 266:6
273:17 274:4,6
275:1 286:6
287:19 288:11
289:10 290:24
**tonesa**  272:10
**tonya**  86:22
**took**  126:13
132:4 137:18
156:18 169:20
176:3 201:8
243:14
**top**  103:12
105:16,22
114:2,3,3
124:5 143:2
157:19 174:9
176:16
**topic**  216:11
**totally**  251:13
251:14
**touch**  92:7
119:19 164:14
244:24 245:2
**touched**  100:1
244:13,20

**touching**  100:7
100:7,12
119:21 263:20
**toward**  94:8
238:21
**towards**  68:13
70:7
**town**  28:13,15
28:17 157:22
**townsend**
182:12
**traded**  65:8
68:11 70:6
74:24
**traffic**  287:16
**training**  48:20
50:20,21 84:7
84:9,12,14
85:20 181:7,9
**transcript**  3:11
296:7
**transfer**  47:20
47:22 62:7
**transferred**
36:25 37:3
38:20 39:25
65:9,12,16,20
**traveling**
190:12
**treat**  246:14
**tried**  75:6
159:23 230:15
230:17,20,25
232:7 245:13

**trip**  29:5,7
**trips**  29:4,16
**trouble**  237:12
**troubling**  265:2
**true**  117:15,16
119:18 128:15
226:20,22
229:13 247:22
267:15 296:8
**trust**  266:13,18
266:25
**truth**  4:6,7,7
281:5 296:13
**try**  78:1 190:13
222:1 226:23
231:7,16 243:8
245:2 260:25
**trying**  26:1
35:18 39:20
40:10 45:16
49:20 59:23
76:16,23 91:21
106:23 112:14
112:14 113:19
114:2,21,23
117:11 122:5
128:19 148:4
173:8 202:15
208:3 216:13
216:21,25
230:25 231:2
232:11 233:24
250:8,25
258:19 261:1

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

264:19 268:25
**tuesday** 190:17
251:5
**turfe** 282:13
**turn** 24:4 26:14
76:1 79:7
80:15 88:10
**turned** 71:8,11
75:22,23,24
78:2 79:17
270:16,17
290:25
**turner** 18:21
19:15,24 20:4
20:11 22:13
23:4 41:25
52:12,19,23,25
52:25 53:7,8
53:10 60:2,3
68:8,15 69:17
70:10,18,25
78:4,8,12 79:5
79:11,20,24
80:4 83:14
86:8,9 89:9,25
90:11 91:18
92:9 95:25
96:7 170:13
182:10,11
199:7 207:3,4
207:4 208:14
208:21,23
222:10 230:19
231:25 232:1,3

233:3,12 236:1
236:16 237:13
238:2 240:10
240:12 241:1,7
241:9,21
246:23 260:8
260:22 271:13
271:15 274:6
281:10,17
283:8
**turner's** 88:17
242:7 281:14
**turning** 71:17
**tv** 140:25
**twice** 11:25
**twitter** 140:21
**two** 5:25 9:23
11:15 15:16,20
23:9 40:25
42:25 68:3
71:19 86:17
117:13,20
123:1 132:6
146:9,12,14
166:19,21,21
179:17 212:25
237:5 240:1
258:8
**type** 27:17 51:2
179:23 269:8
**typically** 90:6
156:8 236:17

**u**

**u** 282:13
**uaw** 275:6
**uh** 50:6 83:22
122:9 146:3
152:19
**unable** 69:1
**unavailable**
27:24
**uncle** 157:9,11
**unclear** 114:24
**under** 50:3
86:3,16,20
97:17 98:6,7,8
98:16 105:23
140:6 145:11
153:4 154:14
157:19 169:12
175:18 184:25
185:2,8 187:3
187:3 197:3
202:24
**underneath**
107:14
**undersheriff**
35:12 41:6
95:25 279:15
**understand**
7:24 8:15 10:4
14:25 17:24
18:10 22:20
26:13,16,25
27:1 39:19,20

40:10 44:10
51:9 68:19
90:4 103:9
106:21 112:10
132:21 154:19
167:3 184:8
191:13 195:4
202:15 203:20
203:21,23
230:14 270:16
273:1 279:22
294:11
**understanding**
49:4 176:8
291:6
**understands**
201:15
**understood**
163:17 193:21
198:24,25
253:14
**undoubtedly**
136:21
**unfounded**
32:19 33:15,22
175:16 236:13
236:15 249:14
287:9
**uniform** 103:25
256:2
**union** 55:13,14
57:24 90:4
121:7 124:9

Carroll Reporting & Video
A Veritext Company
www.veritext.com                    586-468-2411
                                    www.veritext.com

**unit** 4:11 255:13
**united** 1:1 4:13 202:20
**unknown** 123:25
**unmarked** 10:23
**untrue** 225:20 225:22 226:14 227:13,16,18 227:19 228:11
**unwanted** 229:25
**updated** 290:17 290:20,23
**upgraded** 11:23
**upped** 210:2
**ups** 243:16
**upset** 196:9 204:8,22 213:18 220:17 221:22 239:16 266:7 280:22 281:2
**use** 10:20 12:18 13:12 14:25 27:17 89:8,16 119:21,23,24 152:6 275:17 275:23,24,24 276:4,20,21 277:24 280:9

**used** 39:1 46:1 66:18 83:7 90:19 119:24 121:6 124:9 140:21
**user** 277:19
**username** 277:17
**uses** 13:6 276:5 276:5,8,8 286:7
**using** 188:16
**usually** 29:15
**utilized** 148:8

**v**

**v** 4:12
**vacation** 28:17
**vagina** 207:2 207:10,15,17 216:9 220:18 220:21 221:4
**vague** 125:24
**various** 40:12 42:6 87:4,4 164:18 167:1 180:4 195:2 196:6 237:2 249:21 292:5
**verbal** 89:20 90:13
**verbally** 198:19
**verification** 114:19 116:21

**verify** 112:15 114:18 117:6,7
**veritext** 4:20
**verizon** 13:23 14:6 65:4 66:9 66:16 71:15 81:8 161:24 162:17,21
**vernita** 206:14 223:20 238:15 239:23,24
**versus** 163:21
**veterans** 146:20
**vice** 275:7
**video** 1:17 4:11 141:2,15 173:25 174:7 174:12 175:21 175:25 176:10 177:2 288:2,7
**videographer** 2:22 4:9,18
**videos** 99:15
**videotape** 158:24
**view** 95:2 153:12
**violate** 92:9
**violated** 93:14
**violating** 93:1
**violation** 240:13,15,24

**vip** 272:21,25
**vis** 44:25,25
**visit** 285:19 287:17
**voice** 216:10
**vote** 146:21
**vs** 1:8

**w**

**w** 12:10 166:5
**wait** 20:14 73:12 75:9 78:19 102:23 118:12 130:9
**waiting** 68:9 207:3,4 272:24 286:4
**waiving** 19:2
**walked** 42:10 221:20
**walking** 95:14 95:17 131:5 207:10,15 216:8 220:17
**walks** 95:18
**want** 8:15 10:9 38:16 47:6 57:3 63:14 65:22,24 71:14 71:21 75:8 76:4,5 77:1 84:10 90:2 95:10,10 102:13 106:1

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

108:1,18
111:25 112:11
112:11,22
114:14 127:7
128:6 129:8
130:13 131:10
132:14 133:14
133:19,24
141:17 142:7
142:14,18
152:22 154:7
161:10 167:20
179:21 184:8
192:19 193:15
195:22 203:17
203:19,19
230:4,12
232:15 234:3
235:21 242:4
243:2 245:9
246:17,22
256:15 265:10
266:18 267:4
271:23,24
289:6 293:11
294:11
**wanted** 19:15
32:15 35:23
38:1,2 47:17
49:10 50:7
61:7 69:16
75:21 94:22,24
95:11 96:3,5,6
106:22 149:23

163:6,21
169:21 170:3
175:1 187:11
190:11 193:5
193:16,16,20
193:22 195:14
196:12 201:17
202:2 209:8
212:6,24 220:8
239:3 242:18
242:21 262:6
271:2 272:17
294:25
**wants** 255:21
**warning** 89:23
90:15
**warnings** 89:20
90:17
**warrants** 73:13
74:14
**warren** 146:10
146:11 278:25
**warriors**
257:13
**wash** 120:3
**washington**
1:12,17 2:10
3:5 4:4,12 9:6
18:7,21 52:21
67:7,19,20
68:7,11,15
70:5,9 76:14
79:11 81:17
98:15 111:4

131:22 140:2
149:1 214:13
225:10,16
226:13 228:1
251:18 253:9
254:25 255:4
256:2 290:2
296:9,12
**washington's**
52:22 225:15
226:12 227:25
**wasn't** 169:22
249:20 255:8
256:18 274:14
**waste** 290:8
**wasted** 22:7
**wasting** 22:7
154:8,10
**watch** 130:19
130:25 131:2
**way** 45:4 53:20
80:13,24 87:3
105:22 131:13
159:8 161:7
167:15,20,20
176:1 201:9
215:10 216:11
244:4 253:14
255:9 269:18
280:25
**wayne** 1:10
2:16 4:13 5:8
9:25 18:7 31:5
42:16 62:16

67:21 81:18
121:8 124:9
162:6,7 167:7
167:8 176:9
188:18 206:1
228:24 244:9
244:14,21
254:1,5 257:7
261:22,23
288:5
**wcso** 253:25
**we've** 20:6
121:25 127:10
135:19,20
140:23 142:5,6
145:23 161:19
183:21 186:20
198:10,14
224:25 235:13
279:17 280:10
**website** 115:19
115:23 116:7
**wednesday**
190:17 251:5
**week** 15:14
16:9,11 28:24
28:25 91:22
164:24 166:7
170:8,8 181:16
181:17,19
191:6 192:11
192:17 237:1,5
**weeks** 16:9

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

| | | | |
|---|---|---|---|
| **weight** 264:23 | **whitehead** | **withdrawn** | 131:2,8,12,14 |
| **welch** 272:10 | 27:23 122:10 | 284:6 | 131:17 133:16 |
| **went** 31:16 | 122:11,13 | **withheld** | 135:8,13 |
| 37:2 42:2 43:8 | 161:17 182:7 | 289:19,20 | 136:14 137:11 |
| 63:10 76:9 | 182:16,25 | **witness** 3:3 4:5 | 140:2,4 142:23 |
| 131:24 150:3 | 183:12 199:9 | 8:22 14:17 | 143:15 145:5 |
| 169:3 171:10 | 213:9,13,14,17 | 20:6 22:15 | 148:9,10 150:1 |
| 195:7 204:5 | 213:24 214:3 | 30:6 40:2 | 152:18 153:9 |
| 205:23 207:19 | 214:12 215:14 | 42:19 44:5 | 154:3,16 |
| 221:22 223:20 | 215:23 216:23 | 45:17 53:15 | 162:15 170:24 |
| 231:9 232:24 | 217:5,12 | 56:24 58:22 | 203:25 206:8 |
| 233:2,11,24,25 | 220:14 221:16 | 65:11 72:2 | 211:16 212:15 |
| 239:3 272:20 | 222:9 224:24 | 73:19 77:7,14 | 213:6 214:8 |
| 282:5,7 288:4 | 225:2,9 227:1 | 97:23 98:18 | 215:5 216:13 |
| 292:8,10,11 | 227:7 266:21 | 102:17 104:20 | 218:5,21 |
| **weren't** 286:10 | 267:1 269:13 | 105:5,13 110:9 | 235:19 247:14 |
| **west** 147:24 | 276:13,17 | 110:24 112:4,7 | 247:19 258:24 |
| **we'll** 114:20 | 280:2,19 | 112:13 113:22 | 259:3,8,15 |
| 130:12 158:20 | **wife** 32:23 33:6 | 114:23 115:6 | 260:5,8,13 |
| 256:21 | 115:25 121:9,9 | 115:25 116:10 | 261:4 262:13 |
| **we're** 114:21 | 124:15,16 | 116:12,19,22 | 274:21 280:9 |
| 130:12 161:15 | 135:24 138:5,7 | 116:24,25 | 280:15 282:18 |
| 164:17 | 141:16 143:2,5 | 117:1,5 118:3 | 282:20 287:7 |
| **whatever's** | 144:13 146:6,8 | 118:7,10,14,16 | 287:11 |
| 237:1 | 156:7 161:4 | 119:2 120:6,8 | **witness's** 125:5 |
| **what's** 180:23 | 257:17,18 | 120:25 121:19 | **witnesses** |
| **when's** 91:18 | 259:7,8 292:17 | 123:12,14 | 212:19 279:22 |
| 170:5 | **window** 33:4 | 125:4,13 | 279:25 |
| **where's** 145:3 | 33:18 | 126:23 127:1 | **woman** 63:5 |
| **white** 115:22 | **windows** 32:25 | 127:14,16,18 | 115:9,22 |
| 116:2 155:14 | **wishers** 148:25 | 127:25 128:10 | 124:25 135:20 |
| 155:15 156:13 | **wishing** 137:8 | 128:13,19,23 | 138:4 160:3 |
| 248:15 | **withdraw** 68:1 | 129:22,24 | 174:1 176:10 |
| | 173:22 285:11 | 130:9,16,21,24 | 177:6 273:7,11 |

**[woman - writing]**

274:8 287:11
**women** 95:5
98:24 100:4,22
101:11 234:13
234:16,25
235:6,7 249:3
249:5 264:15
271:16 279:19
**women's** 101:3
101:4,6,9
**wondered**
147:19 156:20
**wonderful**
135:4 157:25
**woods** 279:20
**woodward** 2:11
2:17 268:6
**word** 50:12,13
52:17,18 59:3
59:3 106:23
201:10,14
220:20,20
260:12,13
271:24,24
**words** 7:3
87:10 158:13
212:5 266:8
281:16
**work** 11:17,18
12:5 13:3
23:12,19 27:14
27:16,18,20,21
27:22 31:16
37:1 43:13,15

43:15 47:17
63:2,18 66:11
66:13 67:21
78:8,9 79:19
81:19 89:22
121:6 162:25
165:22 166:13
166:22,25
167:4 170:17
170:18 171:13
171:22 172:9
172:15,18
181:16,20
185:6,7,10
186:17 190:13
191:15 192:12
192:17 193:15
195:2,4,15
207:12 216:9
234:8 237:9
242:5 243:6
249:15,19
253:17 256:9
256:14,20
257:25 259:1
260:24 261:5,5
262:20,21,24
270:11,12,18
270:25 271:3
274:11 276:24
276:25 277:1,8
278:3 279:13
282:22 285:20
290:14 292:1

293:14,23
294:1
**worked** 31:8
42:15,23,24
46:13,20 54:9
54:16 92:10
164:12 166:2
168:4,6,7
169:20 173:6
182:10 183:4
188:23 189:8
245:10 267:12
278:19 285:17
293:16,17
**workers** 75:12
**working** 36:1
37:2 38:25
96:14,14 169:3
171:18 182:12
189:17 190:22
191:14,17
194:10,21
200:13 258:1
294:6,9,13,13
294:15,16,17
294:21,23
**works** 63:4
166:20 168:22
168:24 169:19
178:4 181:19
192:22 240:3
254:17,18
255:11 257:23
275:8 291:22

292:24 293:6
**world** 172:6,8
234:24 236:19
293:15
**worse** 287:2
**worship** 167:10
**would've**
149:22,23
150:20 156:15
284:2
**wouldn't** 42:20
153:1
**wow** 127:18
263:7
**wright** 2:16
**write** 87:22
93:23 106:9,10
158:6,10 217:3
222:11,13
241:24 243:15
**writes** 122:17
157:25 225:8
**writing** 18:3
33:16 81:17
92:25 93:5,9
173:17,19,20
173:21 183:18
198:17 203:9,9
205:6,13,14,17
206:3,17 209:2
209:4 212:10
217:2,17,18,20
218:2,6,6,24,25
219:23 220:6

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

220:11,13
222:16,25
223:2 240:8,10
240:20,21,24
240:25 253:19
253:21
**written** 17:14
89:23 90:14,15
91:2 106:19
166:9 207:2
211:24 212:8
212:12,18
219:24 223:17
223:19,22
254:16,17
287:14,15
**wrong** 60:9,22
68:24 202:8
210:6,9,10
295:4
**wrongdoing**
7:17 31:23
210:22 211:1,4
**wrongful** 229:6
**wrote** 106:17
107:3 108:7,10
158:3,5,13
222:6 223:24
241:20,21,21
**wxyz** 64:3

**x**

**x** 140:21

**y**

**yahoo** 276:21
**yatooma** 82:8,9
82:11,21
**yeah** 6:23 7:8
11:24 12:8
14:5,9,24
29:16 31:4
32:10 33:19
35:18 37:1,10
37:23 42:7,19
52:3 53:19,21
59:14,20 68:21
71:21 74:3,12
75:2,14 76:8
82:17 87:8
88:3,20,22
89:12 90:16
91:21,21 93:22
96:6 97:3 98:5
98:9,15 99:3
99:11,25 103:5
103:20 105:13
106:11 107:4
107:20 108:11
109:17,18
110:11 113:2,8
113:17,22
120:14 121:4
126:23 130:10
130:25 131:24
132:8,25
134:22 135:2

135:18,22
136:4,22
139:24 140:4
140:12,14
141:5,7,12,25
142:3 143:8,21
145:3 147:2,4
150:13,17,25
151:16 152:5,5
155:22 156:18
156:21 157:3
160:16,24
165:16 166:11
167:23 168:3,7
168:16 175:3
181:8 183:4
184:7,23 185:7
185:17 187:11
191:11 195:13
196:24 197:19
198:5 200:17
210:20 213:2
220:8 221:15
222:6 223:8,23
235:19 236:13
236:15 237:5
237:14 239:16
240:6 245:15
251:17 252:10
254:21 255:2
255:16,25
257:4 262:19
268:14 269:5
269:16 270:3

273:20,25
274:4 275:22
276:2,3,8,23
277:18,25
282:7 284:19
286:21 287:23
292:11 293:24
294:12,21
295:2
**year** 9:1 13:4
14:10 30:24
39:6 71:19
84:11,11 96:19
96:19 168:10
178:14 180:13
192:4 199:13
199:19 250:3
268:13 285:23
293:11,11
**years** 9:8 111:6
134:1 140:11
140:12 151:22
159:13,18,22
164:3 167:15
167:15 169:11
197:16 198:2
224:16 266:20
272:6
**year's** 114:8
**yell** 196:5
207:13
**yelling** 206:25
207:10

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

**[yellow - zoom]**

| | |
|---|---|
| **yellow** | 116:17 |
| 120:4 138:3 | |
| **yep** 37:15 | |
| **young** 38:24 | |
| 230:9 | |
| **younger** 156:12 | |
| **youth** 261:23 | |
| **you'd** 231:4 | |
| 264:7 | |
| **you'll** 247:10 | |
| **you're** 39:13,21 | |
| 44:10 108:9 | |
| 114:22,22 | |
| 118:9,11 | |
| 130:17 133:24 | |
| 144:22 203:25 | |
| 260:9 288:9 | |
| **you've** 13:6 | |
| 203:17 229:6 | |
| 272:2 289:19 | |

| z |
|---|
| **zoom** 278:3 |

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

Federal Rules of Civil Procedure

Rule 30

(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2)  Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.