# Exhibit 3

```
                                              Page 1

 1               UNITED STATES DISTRICT COURT
                 EASTERN DISTRICT OF MICHIGAN
 2                   SOUTHERN DIVISION
 3   REGINA PARKS,
 4            Plaintiff,
                              CASE NO. 25-cv-10409
 5   vs
 6   WAYNE COUNTY, a political subdivision
     of the State of Michigan, RAPHAEL "RAY"
 7   WASHINGTON, in his individual and official
     capacities, Jointly and Severally,
 8
              Defendants.
 9   _____/
10         The Deposition of MICHAEL TURNER, taken before me,
11   Jennifer Wall, CSR-4183, a Notary Public within and for the
12   County of Oakland, Acting in Oakland, at 33 Bloomfield Hills
13   Parkway, Suite 220, Bloomfield Hills, State of Michigan, on
14   Wednesday, November 19, 2025.
15   APPEARANCES:
16       DEBORAH GORDON, ESQ.
         ELIZABETH MARZOTTO TAYLOR, ESQ.
17       Deborah Gordon Law
         33 Bloomfield Hills Parkway, Suite 220
18       Bloomfield Hills, Michigan 48304
         (248) 258-2500
19
20           Appearing on behalf of Plaintiff.
21       AARON V. BURRELL, ESQ.
         Dickinson Wright, PLLC
22       500 Woodward Avenue, Suite 4000
         Detroit, Michigan 48226
23       (313) 223-3500
24           Appearing on behalf of Defendant Wayne County.
25
```

Page 2

1  APPEARANCES, CONTINUING:
2        NINA M. JANKOWSKI, ESQ.
           Clark Hill PLLC
3        500 Woodward Avenue, Suite 3500
           Detroit, Michigan 48226
4        (313) 309-9474
5        Appearing on behalf of Defendant Washington.
6  Also Present:  Regina Parks
7              David Melton, Esq.
8              Claire Mason Lee
9           W I T N E S S   I N D E X
10  Witness        Examined by           Page
11  MICHAEL TURNER      Ms. Gordon            3
12              Mr. Burrell         128
13           E X H I B I T   I N D E X
14  Exhibit No.      Description        Page
15              (None marked)
16
17                   *   *   *   *   *
18
19
20
21
22
23
24
25

Page 3

1        Wednesday, November 19, 2025
2        10:20 a.m.
3              ** ** **
4              MICHAEL TURNER
5  was thereupon called as a witness herein, and after having been
6  first duly sworn to tell the truth, the whole truth and nothing
7  but the truth, was examined and testified as follows:
8              EXAMINATION
9  BY MS. GORDON:
10  Q.  Is it Mr. Turner, do I have that -- what's your official --
11      a title or do you just go by a certain --
12  A.  I don't have a title.  I just have a name.  I am retired.
13  Q.  I know you are.  Sometimes --
14  A.  You can call me Michael.  You can call me Mr. Turner, or you
15      can call me Mike.
16  Q.  Sometimes with the judges, they continue to use the judge.
17      So I am just double checking.
18          All right.  I am going to call you
19      Mr. Turner, I think.  I am Deb.
20          Let's start by having you give us your
21      current address.  Your current home address.
22  A.  ████████████████████████████████████████
23  Q.  And when is the last time you were employed by the County of
24      Wayne?
25  A.  May 16.

Page 4

1  Q.  Year?
2  A.  This year.
3  Q.  2025.  And at that time, your title was what?
4  A.  Chief of staff.
5  Q.  How long had you held that title?
6  A.  Roughly 16 years.
7  Q.  And you were first brought in under what sheriff?
8  A.  Benny Napolean.
9  Q.  And when Sheriff Naploean passed, you continued on, is that
10      correct?
11  A.  Correct.
12  Q.  And you worked under Sheriff Washington?
13  A.  Correct.
14  Q.  Were there any other sheriffs you worked under as chief of
15      staff or those were the two?  You worked --
16  A.  I don't hear very well, so you are going to --
17  Q.  Fair enough.
18  A.  I got a 40 percent hearing loss and no hearing aid.
19  Q.  I am sorry.  Let me know if you are not hearing me.
20          Did you serve under any other Wayne County
21      sheriffs other than Benny Napolean and Sheriff
22      Washington?
23  A.  No.
24  Q.  And during your time with the County, was your title always
25      chief of staff or did you hold any other titles?

Page 5

1  A.  I have held other titles.
2  Q.  What other titles at the County?
3  A.  Executive assistant to the county executive and deputy
4      director, human relations.
5  Q.  Was that Warren Evans --
6  A.  No --
7  Q.  -- that you worked under?
8  A.  No, Bob Ficano.
9  Q.  When is the last --
10  A.  McNamara.
11  Q.  What is your date of birth, Mr. Turner?
12  A.  June 13, 1958.
13  Q.  Are you working at this time?
14  A.  I am retired.
15  Q.  Have you looked at any documents to get ready for your dep
16      or to refresh your recollection?
17  A.  I read that.  I read that piece of --
18  Q.  So what you're pointing to -- this is just the caption.
19  A.  I don't know what you call it.  It's a summary or whatever.
20  Q.  Was it the complaint that was filed in the case in court?
21  A.  Yes, the complaint.
22  Q.  When did you read that?
23  A.  I don't remember the date, it was this year.
24  Q.  Are you represented by counsel here today?
25  A.  I am.

Carroll Reporting & Video
A Veritext Company

586-468-2411

Page 6

1  Q.  Who is your counsel?
2  A.  Sitting at this table.
3  Q.  Well, I just need to know for the record, because --
4  A.  I don't know their names.
5  Q.  You're not a party to the case?
6  A.  I don't know their names.
7        MR. BURRELL:  Aaron Burrell from Dickinson
8  Wright.
9        THE WITNESS:  Aaron Burrell.  I know his
10  name.  I have met them before, but I don't remember their
11  names.
12        MS. GORDON:  The reason I ask, guys, is
13  there was a limited appearance from your law firm at one
14  point for the sheriff.
15        MR. BURRELL:  I understand.
16        MS. GORDON:  Just didn't know if you were
17  representing him on a regular basis?
18        THE WITNESS:  I just think I am represented
19  by David Melton.
20        MR. BURRELL:  For the record, Dickinson
21  Wright is representing Mr. Turner today.  David Melton is
22  county sheriff's general counsel, and then we also have
23  representatives from the County and from Clark Hill, who are
24  also representing the sheriff.  But Dickinson Wright is
25  assuming today's representation.

Page 7

1        MS. GORDON:  Thank you for purposes of the
2  dep, that's helpful, Aaron.
3  BY MS. GORDON:
4  Q.  When was the last time you talked to Sheriff Washington?
5  A.  Probably his birthday party, I made -- went by there for a
6  minute.
7  Q.  When was that?
8  A.  This summer, in August.
9  Q.  That was a fundraiser, as I understand it, is that correct?
10  A.  Yes, I guess, I didn't pay any money.  I just appeared, went
11  through there and kept going.
12  Q.  Do you stay in touch with the sheriff in any kind of way?
13  A.  No.
14  Q.  You have known him for a long time though, correct?
15  A.  Yes.
16  Q.  And you used to stay in touch with him regularly, correct,
17  during the time --
18  A.  Define stay in touch.  I worked for him.  We are not
19  friends.  We don't talk after work unless it's work related.
20  Q.  Were you ever friends with the sheriff?
21  A.  No.
22  Q.  It was strictly a working relationship?
23  A.  Correct.
24  Q.  How did you get along with him?
25  A.  I get -- okay.

Page 8

1  Q.  You received a subpoena from your office, Mr. Turner, and,
2  we did ask you to bring certain documents with you.
3  A.  I don't recall seeing a subpoena.
4  Q.  Okay.  This subpoena was --
5  A.  I wasn't asked to bring anything.
6  Q.  So, we did serve you with a subpoena for your deposition,
7  and we requested -- do you remember receiving a subpoena?
8  A.  No.
9  Q.  You don't remember being served with a subpoena for a
10  deposition?
11  A.  No.
12        MS. GORDON:  So let's go off the record.
13        (A short discussion was held off the record.)
14        MS. GORDON:  Back on the record.  Go ahead,
15  Aaron, why don't you explain.
16        MR. BURRELL:  Dickinson Wright received
17  service of the subpoena, certainly we forwarded it to the
18  chief.  That's why the chief is here today.
19        He provided us documents that we
20  produced to you guys through the course of discovery,
21  but he has no additional documents.
22        MS. GORDON:  I will find out from him.
23  BY MS. GORDON:
24  Q.  Your counsel has now explained that his law firm accepted
25  service on your behalf, and that the subpoena was sent onto

Page 9

1  you.  And attached to the subpoena, Mr. Turner, was a list
2  of documents that we were asking you to bring to the dep
3  today.  You may or may not remember that.  Okay.  But I am
4  going to ask you some questions about it.
5        Do you understand what I am saying?
6  A.  I do.
7  Q.  So, Exhibit A to the subpoena, the first item was all
8  documents, emails, text messages, call logs or other
9  communications between you and Sheriff Washington regarding
10  the plaintiff in this case.
11        Do you have any such documents?
12  A.  No.
13  Q.  Have you ever had such documents?
14  A.  No, I mean, emails, as far as what?
15  Q.  The question is whether you had any communications by and
16  between yourself and the sheriff with regard to the
17  plaintiff in this case, Regina Parks?
18  A.  Before or after her employment?
19  Q.  Between January 1, 2021 and the present, which would have
20  been after the lawsuit was filed, this was dated June 17,
21  2025?
22  A.  I don't recall specifically.  I got 1,000 emails now.  I
23  can't remember every single email.
24  Q.  Okay.  But did you make any attempt to look for any emails
25  or communications you would have had with regard to Regina

1    Parks between you and the sheriff, did you ever look for any
2    of those?
3  A.  I don't recall being asked to.
4  Q.  Okay.  So you're saying you never did look for them, I
5    guess that's an accurate statement?
6  A.  Maybe.
7  Q.  I am sorry?
8  A.  Could be.
9  Q.  I do need an answer.  I mean, you're saying you have never
10    looked for any documents, text messages, call logs or other
11    communications between yourself and Ray Washington
12    concerning the plaintiff between January 1, 2021 and the
13    present?
14  A.  I don't have any that I recall other than -- I can't
15    remember every email.
16  Q.  I understand that, but it sounds like once you got this
17    subpoena, you never went and looked, that's what it sounds
18    like to me, am I correct?
19        MR. BURRELL:  Object to the form of the
20    question.
21  BY MS. GORDON:
22  Q.  Is that correct, you have not looked for any?
23  A.  Did you pull my emails?
24  Q.  You're just here to answer my questions.  Once you got the
25    subpoena, did you look for anything?

1        MR. BURRELL:  Object to the form.
2        THE WITNESS:  I looked.  I don't recall
3    having any that was pertaining to this.
4  BY MS. GORDON:
5  Q.  Well, it's not pertaining to this.  It's pertaining to the
6    plaintiff in this matter, not just this.  This is a lawsuit,
7    there is a lot of elements to it.  I am just trying to find
8    out -- I don't want to belabor this, but it sounds to me
9    like once you got the subpoena, you did not make any attempt
10    to seek material that we requested in Exhibit A, is that
11    correct?
12        MR. BURRELL:  Object to the form of the
13    question.
14        MS. GORDON:  Go ahead.
15        MR. BURRELL:  You can answer.
16        THE WITNESS:  I looked.  I didn't see
17    anything pertaining to this.
18  BY MS. GORDON:
19  Q.  How did you look?  Excuse me for a second.
20  A.  I scrolled, I searched.  I don't recall anything other than
21    a task or two --
22  Q.  A what --
23  A.  We didn't communicate about employees through email.
24  Q.  Well, I also asked for text messages.
25  A.  No.

1  Q.  No, what?
2  A.  No text messages regarding Regina Parks.
3  Q.  You're telling us here today you have no text messages with
4    the sheriff regarding Regina Parks, is that what you're
5    saying?
6  A.  That I can recall.
7  Q.  I am trying to find out whether you looked for any text
8    messages.  If you didn't, you can just say so.
9  A.  I looked for whatever I was asked for.
10  Q.  Are you guessing or do you have a specific recollection of
11    that?
12  A.  Excuse you?
13  Q.  Are you guessing or do you have a clear recollection of
14    actually looking for something?
15  A.  I'm responding to the best of my recollection.
16  Q.  Let me ask you this.  Do you have any current medical issues
17    that are effecting your memory?
18  A.  I don't think so.
19  Q.  Do you have any diagnoses or condition that effects your
20    ability to answer questions here today?
21  A.  No.
22  Q.  Do you feel you're mentally competent --
23  A.  Yes.
24  Q.  -- to answer questions here today?
25  A.  Yes.

1  Q.  So, after you -- is it correct that you and defendant
2    Raphael Washington texted one another about plaintiff during
3    the time you were chief of staff, that you texted with the
4    sheriff about Regina Parks, is that an accurate statement?
5  A.  I am sure at some point, yes.
6  Q.  Okay.  And what would you have been texting with the sheriff
7    about as to Regina Parks?
8  A.  I don't recall specifically.
9  Q.  Well --
10  A.  It was probably a task for her to do.
11  Q.  Okay.  And the sheriff sent texts to you about Regina Parks,
12    is that accurate?
13  A.  I suppose.
14  Q.  What is your personal cellphone number?
15  A.  ███████-4361.
16  Q.  How long have you had that number, a long time?
17  A.  Long time.
18  Q.  And who is your carrier?
19  A.  What?
20  Q.  Who is your carrier, your phone carrier?
21  A.  AT & T.
22  Q.  And you still have that phone?
23  A.  I do.
24  Q.  Did you have a phone from the County?
25  A.  I did.

Page 14

1 Q. And did you use that phone to text?
2 A. I did.
3 Q. What was the number or is the number of that phone?
4 A. I don't remember.
5 Q. Did you communicate often with the sheriff via text about
6    any matters concerning the County and your job?
7 A. Yes.
8 Q. Was that a normal way you communicated with him, was that a
9    regular form of communication?
10 A. What?
11 Q. Texting with the sheriff?
12 A. No.
13 Q. How did you typically communicate --
14 A. Verbal.
15 Q. Hang on. How long did you typically -- how did you
16    typically communicate with the sheriff?
17 A. Verbal.
18 Q. And when you say verbal, was that by phone or in person?
19 A. Both.
20 Q. How often did you see the sheriff or talk to him on any
21    given day?
22 A. I don't know. I didn't count.
23 Q. Well, I am sure you didn't count, but give me a rough idea?
24 A. Often.
25 Q. Several times a day?

Page 15

1 A. That's good.
2 Q. In your role as chief of staff, how many people reported
3    directly to you?
4 A. Eight.
5 Q. Who were they?
6 A. The director of administration, the director of technology,
7    director of community outreach, my executive assistant,
8    director of court services, director of recruitment, that's
9    it.
10 Q. Who was the director of administration that you last oversaw
11    before you left?
12 A. Venita Terry.
13 Q. What was her job?
14 A. To oversee personnel, human resources.
15 Q. What did that include as you understood it?
16 A. Just that.
17 Q. Well, give me an idea what her duties were, her day-to-day
18    duties?
19 A. To oversee the staff of human resources and finance.
20 Q. Give me an idea what the human resources part included.
21    What were her day-to-day job duties?
22 A. I don't know the day-to-day job description.
23 Q. I asked for her duties. You're her boss, correct? You were
24    her boss, am I right?
25 A. And I told you, to oversee human resources and finance.

Page 16

1 Q. Leave the finance out. What did she do to oversee human
2    resources, what were her --
3 A. She --
4 Q. Hang on. Mr. Turner, you got to wait for me to finish,
5    okay. Because we have got a court reporter here.
6       I want to know what her duties as an HR
7    director or administrator were, what were her
8    day-to-day duties? How did she oversee HR?
9 A. Talking to them, reporting to them.
10 Q. Who?
11 A. Her staff.
12 Q. For what purpose?
13 A. For what purpose?
14 Q. Uh-huh.
15 A. To do the work of the County.
16 Q. Did she have a job description?
17 A. Excuse me?
18 Q. Did Ms. Terry have a job description during --
19 A. I am sure she did.
20 Q. Hang on. You have got to let me finish. We have got a
21    court reporter here.
22       Did she have a job description during the
23    time she reported to you?
24 A. Yes.
25 Q. What was on the written job description?

Page 17

1 A. I don't recall it verbatim.
2 Q. Okay. I don't need verbatim. What do you recall about the
3    job description?
4 A. To oversee finance and human resources.
5 Q. Okay. That's a one sentence line. I am sure her job
6    description was more lengthy.
7 A. That's the best I can give you.
8 Q. So do you -- sitting here today are you telling us you do
9    not know what Ms. Terry did to oversee human resources, you
10    can't give me any of her responsibilities, is that your
11    testimony?
12       MR. BURRELL: Objection. Form of the
13    question.
14 BY MS. GORDON:
15 Q. Go ahead.
16 A. I answered it.
17 Q. No, you didn't.
18 A. Yes, I answered to the best of my ability.
19 Q. Give me --
20 A. I am not giving you anything.
21 Q. I am sorry?
22 A. I gave it to you.
23 Q. Did you say I am not giving you anything, is that what you
24    just said?
25 A. I gave it to you, to the best of my ability --

Page 18

1  Q. Sir, you haven't given me a single job function that she
2     performed. Okay. So, HR is a very broad title. What were
3     some of her day-to-day responsibilities?
4  A. It would be to check payments, to pay vendors, to process
5     transfers, to oversee the process of transfers, to oversee
6     the process of people coming in, people going out.
7  Q. Anything else you can think of?
8  A. No.
9  Q. Was she at all responsible for policies and procedures that
10    applied to county employees?
11 A. If she not directly, her staff.
12 Q. And who in the County was Ms. Terry responsible for handling
13    complaints made by employees for violations of the law?
14 A. She would process that.
15 Q. And what would she do to process it? What was the process,
16    if somebody -- let's say a discrimination complaint,
17    somebody had a discrimination complaint that worked for the
18    County, let's say the sheriff's department, did Ms. Terry
19    have a role in a complaint of discrimination, if you know?
20 A. Yes, she would look at it and turn it over to internal
21    affairs.
22 Q. And what was internal affairs' role with regard to
23    complaints of discrimination?
24 A. Investigate it.
25 Q. Are you sure about that?

Page 19

1  A. Yes.
2  Q. And so internal affairs investigated every complaint of
3     discrimination, whether it was a sheriff's deputy or any
4     other employee at the County, is that what you're saying?
5  A. Yep.
6  Q. Okay. And where does that exist in writing?
7  A. Excuse me?
8  Q. Where does that exist in writing? Is there a policy that
9     says this?
10 A. That's just the practice, I don't know.
11 Q. Sounds like you are guessing. Are you guessing that that's
12    who investigated it?
13 A. I can't answer that question.
14        MR. BURRELL: Object to the form of the
15    question.
16 BY MS. GORDON:
17 Q. Who -- you can't answer what question?
18 A. If it's a policy in writing.
19 Q. Do you know whether there was a policy in writing about
20    reporting discrimination in the workplace?
21 A. I can't recall.
22 Q. Again, you're not telling us you have an issue with memory
23    problems today, you're just saying you can't recall?
24 A. Correct.
25 Q. Who investigated Lacey Polderdyke's complaints of

Page 20

1     discrimination at the County?
2  A. Internal affairs.
3  Q. Are you guessing or do you have some specific knowledge of
4     this?
5  A. Specific knowledge.
6  Q. And what was -- what did that investigation consist of?
7  A. I don't know. I am not in internal affairs. I didn't
8     conduct it.
9  Q. Well, you were responsible for the HR function of the
10    County, correct?
11 A. I was not -- indirectly.
12 Q. And who in internal affairs was responsible for these
13    investigations?
14 A. The captain.
15 Q. Who was that?
16 A. We had multiples. I don't recall who the captain was at the
17    time.
18 Q. Who was the last one you recall?
19 A. Chakrabarty.
20 Q. Can you spell that for the court reporter?
21 A. No.
22 Q. Were you made aware of complaints of discrimination made to
23    the HR department?
24 A. Complaints?
25 Q. Yes.

Page 21

1  A. If there was one. I would have been made aware.
2  Q. Do you remember any complaints of discrimination made to HR?
3  A. No.
4  Q. And you don't remember ever being yourself questioned about
5     any complaints of discrimination, correct?
6  A. No.
7  Q. And do you know who investigated the Lacey Polderdyke
8     discrimination complaints?
9  A. No.
10 Q. You were aware of that, weren't you?
11 A. Yes.
12 Q. And you knew that she was complaining of sexual harassment
13    by the sheriff, correct?
14 A. Excuse me?
15 Q. You knew that Lacey Polderdyke was complaining about sexual
16    harassment by the sheriff, correct?
17 A. No, I didn't know.
18 Q. You became aware of that?
19 A. I became aware. I didn't know.
20 Q. You did learn of her complaints at some point, correct?
21 A. Yes.
22 Q. You knew that she reached a settlement with the County based
23    on her complaints against the sheriff of sexual harassment,
24    correct?
25        MR. BURRELL: Objection. Form.

6 (Pages 18 - 21)

Carroll Reporting & Video
A Veritext Company
www.veritext.com                                    586-468-2411
www.veritext.com

Page 22

1 BY MS. GORDON:
2 Q.  You learned about that?
3           MR. BURRELL:  And foundation.
4 BY MS. GORDON:
5 Q.  Correct?
6 A.  Correct.
7 Q.  Were you questioned as part of that investigation?
8 A.  No.
9 Q.  All right.  As far as you -- strike that.
10      Who were you overseeing, who was in charge of
11  tech, the director of tech that you were overseeing?
12 A.  What?
13 Q.  One of the people you were responsible for in your job,
14  Mr. Turner, was the administrator of tech or the person that
15  was the head of tech.
16 A.  Tech? Technology?
17 Q.  That's what you said, you said tech or technology, yes, who
18  was that?
19 A.  Steve Yatooma.
20 Q.  What was his role?
21 A.  IT.
22 Q.  I don't know what that meant in your world.  What does it
23  mean?
24 A.  It means anything related to IT, he oversaw.
25 Q.  What relates to IT at the sheriff's department?

Page 23

1 A.  Computers breaking down, the replacement of, issues.
2 Q.  What other than computers?
3 A.  Telephones, internet.
4 Q.  Did you have an opportunity to review his performance as his
5  boss?
6 A.  We don't review performance.
7 Q.  What did you do if an employee is having a performance
8  problem, is there something written in writing as to what
9  you're supposed to do?
10 A.  No.
11 Q.  So what was your process if somebody had a performance
12  issue, that you observed?
13 A.  Talk to them about it.
14 Q.  If it didn't improve, then what?
15 A.  Sheriff had the decision, at-will employee.
16 Q.  I didn't ask you that.  I just wanted to know what you did
17  if you observed or became aware that one of the employees
18  that reported to you, was now performing or had a
19  performance issue.
20      You have already said you would talk to the
21  person?
22 A.  Uh-huh.
23 Q.  If the problem continued, what would be your next step, if
24  any?
25 A.  Take it to the sheriff.

Page 24

1 Q.  And how -- would you put something in writing to the
2  sheriff?
3 A.  No.
4 Q.  So did you have an employee that ever had a significant
5  performance problem, wasn't getting the job done?
6 A.  Not that with -- I took it to the sheriff, no.
7 Q.  I am sorry, not what?
8 A.  Not that I had to not -- of which I took it to the sheriff,
9  no.
10 Q.  Okay.  So during the time you were chief of staff, if one of
11  the people that was in your chain of command had a problem,
12  there was nobody that you had to escalate it to the sheriff?
13 A.  No.
14 Q.  Am I correct?
15 A.  Correct.
16 Q.  But you used coaching and counseling or just gave the
17  employee with the problem some advice or told them what to
18  do differently?
19 A.  Yes.
20 Q.  Did you typically make a record of having talked to the
21  employee or that wasn't necessary?
22 A.  It wasn't necessary.
23 Q.  Communications and outreach, that was also an area that
24  reported to you.  Who was responsible for that?
25 A.  Multiple people.

Page 25

1 Q.  At the time you left, who was reporting to you in that role?
2 A.  The lady from Channel 4.
3 Q.  Mara MacDonald?
4 A.  Yep.
5 Q.  And prior to that Mara MacDonald, who was reporting to you,
6  would that have been Regina Parks?
7 A.  She was never communications, she was just outreach.  Before
8  that was Ed Foxworth.
9 Q.  She reported to you though after Ed Foxworth left though,
10  correct?
11 A.  Yes.
12 Q.  I thought communications and outreach were the same thing.
13  Are those two different areas, two different departments?
14 A.  They were when I was chief of staff.
15 Q.  They were?
16 A.  Yes.
17 Q.  So when Regina Parks was there, she was the head of what,
18  outreach?
19 A.  Yes.
20 Q.  Who was the head of communications?
21 A.  Multiple people.
22 Q.  Who was the last one before Mara MacDonald?
23 A.  Ed Foxworth.
24 Q.  When did Ed Foxworth leave?
25 A.  I don't know, sometime in '24.

7 (Pages 22 - 25)

Carroll Reporting & Video
A Veritext Company

586-468-2411
www.veritext.com

www.veritext.com

Page 26

1  Q.  Why did he leave?
2  A.  Sheriff wanted to get rid of him.
3  Q.  Why?
4  A.  Didn't like his performance.
5  Q.  What was wrong with his performance?
6  A.  You have to ask the sheriff.
7  Q.  Well, he reported to you, though?
8  A.  I said the sheriff didn't like his performance.
9  Q.  I know that, but Foxworth reported to you, Mr. Turner, and
10      then you reported to the sheriff.
11          So, I assume the sheriff must have told you
12      what he did not like about Ed Foxworth?
13  A.  Just didn't think he was getting the job done.
14  Q.  Did you think he wasn't getting the job done?
15  A.  I agree with the sheriff.
16  Q.  What was his job, what was Foxworth's job?
17  A.  Communication.
18  Q.  What does that mean in your world?
19  A.  Wasn't particularly fond of the way he wrote and didn't like
20      the way he handled media.
21  Q.  Did he have a job description, Ed Foxworth?
22  A.  I am sure he did.
23  Q.  How long was he with the County?
24  A.  Two to three years.
25  Q.  So give me your understanding of what his job duties were,

Page 27

1      was it to communicate with the media as needed?
2  A.  External communication coming from the sheriff's office.
3  Q.  So that includes to who, any like announcements the sheriff
4      is making?
5  A.  Yes.
6  Q.  What else would the director of communication or the head of
7      communications?
8  A.  To deal with the media, and to deal with press conferences
9      and to put together marketing materials for the agency.
10  Q.  Okay.  And who hired Ed Foxworth?
11  A.  The sheriff.
12  Q.  Were you involved in that decision?
13  A.  No.
14  Q.  I'm sorry?
15  A.  No.
16  Q.  Did you know -- when did you first meet Ed Foxworth?
17  A.  Years ago.
18  Q.  Years ago.  In what capacity did you first meet him?
19  A.  I don't recall.
20  Q.  Well, how would you guys have --
21  A.  I don't recall meeting him.
22  Q.  I heard you say that.  But how -- did you have some kind of
23      a -- you met him some way and then did you stay in touch
24      with him?
25  A.  When I run into him, I didn't pick up the phone and call.

Page 28

1  Q.  Okay.  Was he somebody you ever got together with socially?
2  A.  No.
3  Q.  Ever in your entire life?
4  A.  No.
5  Q.  And how did he end up getting hired into that position, what
6      happened?
7  A.  The sheriff.
8  Q.  Well, where did he come from -- was there a job -- hang on.
9          Was there a job opening and he applied for it
10      or did somebody reach out to him, or something else?
11  A.  There was a job opening, he applied for it.
12  Q.  Was it a posted job opening?
13  A.  No.
14  Q.  So how would he have known about a job opening?
15          MR. BURRELL:  Objection.  Foundation.
16          THE WITNESS:  He was an appointee, reached
17      out to the sheriff.
18  BY MS. GORDON:
19  Q.  And as far as you --
20  A.  We don't --
21  Q.  As far as --
22  A.  Appointees job openings don't get posted --
23  Q.  Okay.
24  A.  -- in the sheriff's office.
25  Q.  How did he come to learn, as far as you know --

Page 29

1  A.  I have no idea.
2  Q.  You have got to let me finish my question.  I know it's
3      hard.
4          Have you been deposed before, by the way?
5  A.  Yes.
6  Q.  Okay.  So you know there is -- we got to do a question and
7      answer format here.  So, as far as you knew, how did Ed
8      Foxworth realize there was an opening, did somebody reach
9      out to him?
10          MR. BURRELL:  Same objection.
11          THE WITNESS:  Not that I am aware of.
12  BY MS. GORDON:
13  Q.  Did you discuss with Ed --
14  A.  No.
15  Q.  You have got to let me finish.
16          Did you discuss with Ed Foxworth his coming
17      on board to work for the sheriff?
18  A.  No.
19  Q.  When did you learn that he was going to be the appointee or
20      that the sheriff was talking to --
21  A.  Sheriff told me.
22  Q.  What did he say?
23  A.  He said, I am hiring -- bring in Foxworth.
24  Q.  And did you know when he said I am bringing in Foxworth who
25      Foxworth was?

8 (Pages 26 - 29)

Carroll Reporting & Video
A Veritext Company

586-468-2411
www.veritext.com

www.veritext.com

Page 30

1 A. Yes.
2 Q. Did you know what his background was?
3 A. Yes.
4 Q. What was it?
5 A. Marketing and communications.
6 Q. And how did you know that?
7 A. I was familiar with his work.
8 Q. And how was that, how did you know what his work was?
9 A. I knew where he worked.
10 Q. Where did he work?
11 A. He worked for Channel 20 and he worked at the museum.
12 Q. And so you were familiar with his work from those jobs that
13     he had?
14 A. Yes.
15 Q. And were you involved in talking to him about taking this
16     position, being employed with the communications?
17 A. No.
18 Q. Did you meet with him at all before the sheriff made him an
19     appointee?
20 A. No.
21 Q. You sure about it?
22 A. I am positive.
23 Q. But then you became his boss, is that correct?
24 A. I signed his time card. He mostly reported directly to the
25     sheriff.

Page 31

1 Q. But technically, you were the person he reported to,
2     correct?
3 A. Correct.
4 Q. Did you ever have any difficulties with Ed Foxworth?
5 A. No.
6 Q. Did the sheriff ever tell you he was having difficulties
7     with Ed Foxworth?
8 A. Yes.
9 Q. What did he tell you?
10 A. Said he didn't -- wasn't pleased with his performance.
11 Q. In what way?
12 A. Just didn't think he was -- handled the media, didn't like
13     the way he wrote.
14 Q. For example, what?
15 A. Just didn't like the way he wrote articles or his press
16     releases. He was just unhappy.
17 Q. Did the sheriff tell you that? Did he say, I don't like the
18     way he writes press releases or did he say something else?
19 A. As best I recall, yes.
20 Q. When was the decision made to terminate Ed Foxworth?
21 A. Back in November '24, '23, somewhere around there.
22 Q. Is there anything in writing that exists as to the reason Ed
23     Foxworth was terminated?
24 A. No.
25 Q. And when was the decision made to terminate him?

Page 32

1 A. When he was terminated.
2 Q. It was like the day of?
3 A. Basically.
4 Q. Were you there when he was told he was being terminated?
5 A. I was told to let him go.
6 Q. The sheriff told you that, correct?
7 A. Yes.
8 Q. You got along with him, didn't you?
9 A. I did.
10 Q. You weren't a decision maker in the termination, as I
11     understand it, you just were told to --
12 A. Correct.
13 Q. -- tell him?
14      Have you talked with Ed Foxworth since then?
15 A. No.
16 Q. And then after Ed Foxworth left, Mara McDonald came in and
17     you supervised her, correct?
18 A. Yes.
19 Q. What are her duties as of today's date?
20 A. The same as Ed Foxworth was. Well, no, they got changed.
21     The sheriff decided that he wanted to do a reorganization as
22     he prepared for his new term, and he wanted to incorporate
23     community outreach and communications and make Mara over it.
24 Q. He wanted to coordinate communications and community
25     outreach?

Page 33

1 A. Uh-huh.
2 Q. That's a yes, for the record? Got to say, yes --
3      MR. BURRELL: You have to say yes.
4      THE WITNESS: Yes.
5 BY MS. GORDON:
6 Q. You can't just say uh-huh.
7 A. Yes.
8 Q. What was the outreach role prior to Mara MacDonald coming
9     in? You had Ed Foxwroth on communications, and then you had
10     Regina Parks.
11      So, what was the outreach role during the
12     time Regina Parks was there, and then I think before
13     her, it was Erica Erickson, is that correct -- I'm
14     sorry, Erica Erickson worked there in what job title?
15 A. Communications.
16 Q. Was she gone when Ed Foxworth was hired?
17 A. Was who gone?
18 Q. Ericka Erickson?
19 A. Yes.
20 Q. Did the sheriff not like Ericka Erickson's work or how did
21     he get along with her, as you understand it?
22      MR. BURRELL: Object to the form. You can
23     answer.
24 BY MS. GORDON:
25 Q. I will withdraw the question. You oversaw Ericka Erickson's

9 (Pages 30 - 33)

Carroll Reporting & Video
A Veritext Company
www.veritext.com

586-468-2411
www.veritext.com

Page 34

1  day-to-day job duties, is that correct?
2  A.  Yep.
3  Q.  How did you get along with her?
4  A.  All right.
5  Q.  She confided in you with concerns she had about the sheriff,
6     correct?
7  A.  Yes.
8  Q.  She didn't like the way sometimes some of the ways he
9     approached her and acted around her, correct?
10          MR. BURRELL:  Objection to the form of the
11    question.
12 BY MS. GORDON:
13 Q.  Correct?
14          MR. BURRELL:  I object to the form.  You
15    can answer.
16          THE WITNESS:  Yes.
17 BY MS. GORDON:
18 Q.  And she was upset about his conduct and she explained that
19    to you, correct?
20 A.  I don't know about his conduct.  She was upset about some
21    words, his choice of words.
22 Q.  And what was the choice of words?
23 A.  Sweetie, baby.
24 Q.  And what did you advise her on when she told you about that?
25    What was your advice to her, if any?

Page 35

1  A.  We would talk to him about it.
2  Q.  So you let her know, listen, we will talk to him about it
3     and see if he will improve, something --
4  A.  Correct.
5  Q.  Something to that effect?
6  A.  Correct.
7  Q.  Did you talk to him about it?
8  A.  Yes.
9  Q.  And what did he say when you said -- I assume what you said
10    is something along the lines of, Ericka Erickson has told me
11    she is concerned about some of your conduct or behavior,
12    what did he -- what was his response when you explained this
13    to him?
14          MR. BURRELL:  Object to the form.
15          THE WITNESS:  His response was he didn't
16    agree, but understood the sensitivity and worked on it.
17 BY MS. GORDON:
18 Q.  The sensitivity was, she felt she was being -- he was not
19    acting in an appropriate manner around her, correct?
20          MR. BURRELL:  Same objection.
21 BY MS. GORDON:
22 Q.  That was part of it, is that correct?
23 A.  No.
24 Q.  Well, sweetie, baby --
25 A.  She felt that those words were inappropriate in 2024, and

Page 36

1  could get in trouble or had an effect, so he said he would
2     work on stopping using those words.
3  Q.  And how long or how often were you in contact with Ericka
4     Erickson during the time you were overseeing her
5     performance?
6  A.  How often?
7  Q.  Yes, did you talk to her daily?
8  A.  Fairly.
9  Q.  Did you give her assignments?
10 A.  Not really.
11 Q.  Okay.  So who gave her assignments or directed her as to
12    what she was to do?
13 A.  I gave her assignments, but, you know, her assignment
14    primarily was to just deal with media and press releases,
15    and communications the same as Foxworth.
16 Q.  You never had any problem with her performance, is that
17    correct?  Nothing of any significance, correct?
18 A.  Yeah, nothing of any significance.
19 Q.  She told you that the sheriff had asked her to stay in his
20    hotel room, correct?  She was upset about that?
21 A.  I don't recall that.
22 Q.  You're not denying it, you just don't recall?
23 A.  I don't recall that.
24 Q.  She complained that -- she felt she was -- that he referred
25    to her as babe, correct?

Page 37

1  A.  She did complain about that.
2  Q.  So then the sheriff was the one that decided Ericka Erickson
3     was going to be removed from her position, correct?
4  A.  Yes.
5  Q.  And were you the one that told her, he had made that
6     decision and she was out?
7  A.  No.
8  Q.  Who told her?
9  A.  Direct or administration.
10 Q.  Who was that?
11 A.  Venita Terry.  No, that wasn't her.  At the time it was
12    Soumaya.  I forget her last name.
13 Q.  This was the sheriff's decision, correct?
14 A.  Yes.
15 Q.  Who was in that role prior to Ericka Erickson?
16 A.  Paula Bridges.
17 Q.  I am sorry, Paula Bridges?
18 A.  Uh-huh.
19 Q.  That's a yes?
20 A.  Yes.
21 Q.  And how long was she there?
22 A.  Off and on.  She was there twice.
23 Q.  But was she the person that was there immediately prior to
24    Ericka Erickson coming in?
25 A.  Yes.

Page 38

1  Q.  How long was she with the County in this role?
2  A.  First time probably around seven, eight years.
3  Q.  And did she report to you?
4  A.  She did.
5  Q.  And how was her performance?
6  A.  Good.
7  Q.  Why did she leave?
8  A.  She got married and moved out of state.  She got divorced
9      and came back and we rehired her.
10 Q.  Do you remember roughly when that was?
11 A.  Excuse me?
12 Q.  Do you remember roughly when she returned?
13 A.  Somewhere around 2018.
14 Q.  And she took her previous job back?
15 A.  No, she came back as another position.
16 Q.  What was that?
17 A.  Director of court service.
18 Q.  Director of court service?
19 A.  Yes.
20 Q.  Did she report to you?
21 A.  Yes.
22 Q.  And how long did she remain at the County after that?
23 A.  Until she left again.
24 Q.  When was that?
25 A.  When Ericka Erickson came in.  I don't remember the year.

Page 39

1  Q.  Was she terminated --
2  A.  I am guessing around '22.  No, she was not terminated.
3  Q.  And how did you -- how did the sheriff or you become aware
4      of Ericka Erickson as a possible candidate for this role?
5  A.  Sheriff.
6  Q.  The sheriff knew of her?
7  A.  Yes.
8  Q.  And it was his idea to offer her the position as I
9      understand it, is that correct?
10 A.  Yes.
11 Q.  You're overseeing Mara MacDonald in both of these positions
12     today, is that accurate?
13 A.  Both of what positions?
14 Q.  Community outreach -- I am sorry, communications and
15     outreach?
16 A.  Yes.
17        MR. BURRELL:  Did you say today?
18 BY MS. GORDON:
19 Q.  As of the last date --
20 A.  She did say today, but I assumed what she meant because she
21     know I am not still there.
22 Q.  Thank you.  How much interaction did you have with Mara
23     MacDonald during the time she was still working under you?
24 A.  Significant.
25 Q.  And what would be the nature of your interaction with her?

Page 40

1  A.  Well, we were looking at reorganization.
2  Q.  I don't know what that means.  I am just going to ask you
3      with regard to her day-to-day duties.  Let's say with the
4      media --
5  A.  We were assessing the agency, and we were looking at
6      reorganizing the sheriff's office and she was playing an
7      intimate role.
8  Q.  When did that begin those discussions?
9  A.  In November of '24.
10 Q.  And who was involved in that?
11 A.  She and I.
12 Q.  Whose idea was this?
13 A.  And the sheriff, the sheriff wanted to do it.
14 Q.  And what was the concept, he wanted to do what?
15 A.  He wanted to reorganize as he saw fit as opposed to the
16     inheritance that he inherited.
17 Q.  But reorganize what?
18 A.  The agency, community outreach specifically.
19 Q.  You're calling it an agency?
20 A.  He was looking at other areas in the agency.
21 Q.  What agency?
22 A.  The sheriff's agency.
23 Q.  Okay.  The sheriff's department?
24 A.  We don't call it a department.  We call it an office and an
25     agency.  A department falls up under the county execs.  He

Page 41

1      is an elected official.
2  Q.  I assume you must have some communications with him then, if
3      there were this restructuring discussion going on, is that
4      true or not true?
5  A.  Not written communication.
6  Q.  So there is nothing in writing that exists that you're aware
7      of, at least, where you were discussing a restructuring with
8      the sheriff in 2024, is that right?
9  A.  Yes.
10 Q.  Okay.  And so he first brought this to your attention in
11     2024?
12 A.  Yes.
13 Q.  And how did he bring it to your attention, was it verbally?
14 A.  Yes.
15 Q.  A text, what was it?
16 A.  Verbally.
17 Q.  And were you having a meeting or was it just a casual
18     conversation?
19 A.  Conversation.
20 Q.  And what did he say about this new concept?
21 A.  It was -- he wanted an opportunity to put his staff on it.
22     He inherited an agency that had the stamp of Benny Napolean.
23     He wanted to put his stamp on it as he saw it, how it should
24     be ran.
25 Q.  But what did he want to do as to a restructure?

11 (Pages 38 - 41)

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

Page 42

1  A.  He wanted to change some things that he wasn't happy with.
2  Q.  What was he not happy with?
3  A.  He wasn't happy with community outreach, he wasn't happy
4      with communications.
5  Q.  And what his -- what did the community outreach area handle,
6      what were those responsibilities?
7  A.  We had certain key initiatives that we did as well as going
8      out and representing the agency at various community
9      functions and meetings.
10 Q.  What were the key events?
11 A.  At Easter we would do something with baskets, at Christmas,
12     we would do something, and then we would try to do
13     something.  We would also do a golf tournament.
14 Q.  So Easter, you would do baskets, there was a golf
15     tournament, is that correct?
16 A.  Yes.
17 Q.  What else -- I am sorry.  I might have missed one.  What
18     else were --
19 A.  Christmas, adopt a child.
20 Q.  Okay.  And what happened at Christmas with adopt a child?
21 A.  We raised money and we picked families and we took them
22     shopping.
23 Q.  And who worked on those projects?
24 A.  Regina Parks.
25 Q.  And what were her responsibilities in doing that?

Page 43

1  A.  To coordinate the point person to coordinate.
2  Q.  And what else went along -- you said there were some major
3      events and then there was other outreach.  What was the
4      other outreach?
5  A.  Whatever we noticed coming up, that the sheriff wanted a
6      presence at or community meetings.
7  Q.  Give me some examples, where you would have a presence?
8  A.  Community groups have meetings.  He might want a presence
9      there.  Like the precincts have community relation meetings.
10     He might want a presence there.
11 Q.  What would the outreach person do, set that up?
12 A.  Depends, each case is different.
13 Q.  Give me some examples then.
14 A.  If it was our event, they would set it up.  If it was
15     someone else's event, they would attend and represent.
16 Q.  And go with the sheriff?
17 A.  Sometimes.
18 Q.  Yes, okay.  So when was the last major event, was it the
19     sheriff -- before you left?
20 A.  You need to be specific.
21 Q.  Before you left, you gave me a couple of different main
22     events that occurred here, including Easter and Christmas
23     and a couple of others.
24        What was the last major event that was there
25     when you still employed?

Page 44

1  A.  Easter.
2  Q.  That was what month?
3  A.  Whatever month Easter came in.  Because sometimes it comes
4      in April, sometimes it come in March.
5  Q.  Who handled the Christmas event in 2024?
6  A.  It should have been Regina Parks.  She was the point person.
7  Q.  And what was the -- what were the activities in the run-up
8      to the Christmas program?
9  A.  Excuse me?
10 Q.  What was involved in setting up the Christmas program?
11 A.  Identifying and coordinating with the families, setting up
12     at Meijers store.
13 Q.  Do you know whether Mara MacDonald did that in 2024?
14 A.  Excuse me?
15 Q.  Do you know whether Mara MacDonald was involved in that
16     event in 2024?
17 A.  Yes.
18 Q.  What was her role?
19 A.  She just came on.  So she really didn't play a big role.
20 Q.  I want to go back to the restructuring concept you mentioned
21     earlier.  And you said the sheriff wanted to restructure.
22     You have nothing in writing about that, but you did talk to
23     him about it.  That's what you have testified to so far.
24        So, I want to go back to when these
25     discussions started about the restructuring.

Page 45

1  A.  You got a question?
2  Q.  Yes.  I want to know when the discussions started?
3  A.  In '24.
4  Q.  What month?
5  A.  I don't remember.
6  Q.  Do you have any idea?
7  A.  I am guessing somewhere around the end of the summer.
8  Q.  And did you have meetings about this or was this just casual
9      conversation?
10 A.  Both.
11 Q.  Tell me what the sheriff told you he wanted to do?
12 A.  He wanted to reorganize.  He wasn't pleased with a number of
13     things.
14 Q.  What was he not pleased with?
15 A.  Wasn't pleased with how we were doing in some of the
16     community events.
17 Q.  Like what?
18 A.  I don't remember specifically.
19 Q.  What else wasn't he pleased with other than how the
20     community events were being handled?
21 A.  He wasn't real fond of how the media -- we were dealing with
22     the media.
23 Q.  And what was he not fond of in that regard?
24 A.  Lack of.
25 Q.  Lack of what?

12 (Pages 42 - 45)

Carroll Reporting & Video
A Veritext Company

586-468-2411

www.veritext.com
www.veritext.com

Page 46

1  A.  Media, just -- you know, just didn't -- wasn't pleased with
2      the way things were being handled.
3  Q.  Can you be more specific --
4  A.  I cannot.
5  Q.  Well, the media guy was reporting directly to you?
6  A.  Well, on paper, but mostly he reported to the sheriff.
7  Q.  But you're now talking to the sheriff, but you don't have
8      any specifics.  You can't remember any specifics about the
9      concerns about how the media was being handled, is that
10     right?
11 A.  That's right.
12 Q.  What else did the sheriff say to you other than the couple
13     of things you have mentioned, at which is that there was
14     something about community events, he wasn't happy with, and
15     something about the media, he wasn't happy with.
16         Anything else that he talked to you about
17     with regard to this restructure?
18 A.  We needed to tighten it up.
19 Q.  Okay.  What did that mean?
20 A.  There were places he felt we wasn't there that we should
21     have been.
22 Q.  Like what?
23 A.  Places he went to that he didn't see anywhere -- he didn't
24     see anyone there.
25 Q.  What are you talking about?  Can you give me an example?

Page 47

1  A.  Events.
2  Q.  Give me an example.  What events did he go to when he didn't
3      see anyone there?
4  A.  I would have to be looking at the calendar.  This is --
5  Q.  I'm sorry?
6  A.  This is multiple events.  I would have to be looking at a
7      calendar.
8  Q.  What calendar?
9  A.  His.  If you want me to be accurate, and tell you
10     specifically, but there was events he would go to.
11 Q.  What was his issue with the events he went to, what was his
12     concern?
13 A.  Well, in some instances, it was -- he didn't see anyone
14     there, i.e., specifically Regina Parks and some times he
15     would show up and felt like she wasn't doing anything.  She
16     should be out engaging with the community, talking about
17     what the sheriff's office is doing, hiring, et cetera.
18 Q.  I am not understanding what you're saying.  Are you
19     saying --
20 A.  I can't help --
21 Q.  Hang on a second.  He went to an event, is that what you're
22     saying, and he didn't see anybody there, is that what you
23     just said?
24 A.  That's in part.
25 Q.  What event would this have been or what type of event?

Page 48

1  A.  A community event.
2  Q.  So, tell me what that would be.  He would go and nobody was
3      there.
4         Where would he be going in this -- in your
5      world, what's the community event, what's the nature of
6      it, you said a precinct?
7             MR. BURRELL:  Just object to the
8      foundation.
9  BY MS. GORDON:
10 Q.  Go ahead.
11 A.  What he said.
12 Q.  You're answering.  I don't know what -- you have used the
13     term event.  I don't know in your world what this means.
14     You said he would go to events, there wouldn't be people
15     there --
16 A.  In the community, or community organization, they have
17     events, they have block clubs, they have community groups.
18     You have other elected officials doing events.  And the
19     sheriff would -- the sheriff was a very active person, far
20     more active than the previous sheriff.  He would want to see
21     somebody wherever he was going.
22         He felt that Regina wasn't at enough events,
23     so that was part of the reorganization we needed to add
24     more people.
25 Q.  Mara MacDonald didn't start going to these events, did she?

Page 49

1  A.  Mara MacDonald --
2             MR. BURRELL:  Object to the form of the
3      question.  Now you can answer the question.
4  BY MS. GORDON:
5  Q.  You're telling me Mara MacDonald was running around to these
6      community events, is that your testimony here today?
7             MR. BURRELL:  Same objection.
8             THE WITNESS:  No, she -- they were under
9      the reorganization, they were to report to her.
10 BY MS. GORDON:
11 Q.  Who was?
12 A.  The community outreach.
13 Q.  Okay.
14 A.  It's not my fault you can't stick with me.
15 Q.  Kind of is your fault, but okay, we have a difference of the
16     opinion there.
17 A.  Oh, we going to do that all day.
18 Q.  That's fine.  I make my living having differences of
19     opinions with people.
20 A.  I do that, too.
21 Q.  I don't know that you do, but I am going to get back to this
22     event that there wasn't somebody there for, and that the
23     sheriff told you this.
24 A.  I need to go to the bathroom.
25 Q.  Okay.

Page 50

1  A.  Stick a fork in that.
2        MS. GORDON:  Off the record.
3        (Short recess taken.)
4  BY MS. GORDON:
5  Q.  So, am I correct that you -- well, you said, Mr. Turner, you
6        started discussing restructuring with the sheriff.  Would
7        that have been in around November --
8  A.  No.
9  Q.  -- 2024?
10  A.  It was sooner than that, more like August, September.
11  Q.  But you have got nothing in writing, you have already said
12       that about any of these discussions, it was all verbal?
13  A.  Correct.
14  Q.  When did you learn that there was actually a change that was
15       going to be officially now made?
16  A.  I have got nothing in writing.
17  Q.  You have said that.  It was all verbal.
18  A.  Probably a couple days before he did it.
19  Q.  You have a job description, is that correct, at the County,
20       or you did?
21  A.  Excuse me?
22  Q.  A job description?
23  A.  What about it?
24  Q.  You had one, is that accurate, a written job description?
25  A.  From me?

Page 51

1  Q.  Yes.
2  A.  I suppose.
3  Q.  Are you familiar with it?
4  A.  Not really.
5  Q.  I will hand you what was produced to us by defendant, as
6        Bates No. 289.
7  A.  A job description?
8  Q.  Yes.
9  A.  For me?
10  Q.  Yes.
11  A.  Given to you by the defendant?
12  Q.  Yes.  We asked them for documents --
13  A.  They don't know my damn job description.
14  Q.  Fair enough.  I am just going to hand you what I got from
15       them.  This is Bates 289.  And that's what I received, chief
16       of staff, sheriff, County of Wayne.  Have you seen that
17       before?
18  A.  I am sure I have.
19  Q.  You're sure you have, you just don't -- you know, don't
20       specifically recall it?
21  A.  Not at all.  I ain't seen this.
22  Q.  I am sorry?
23  A.  I haven't seen this one.
24  Q.  Have you seen a similar one?
25  A.  Not that I can recall.  Where did you get this from?

Page 52

1  Q.  I got this from the County.  Do you see on the bottom where
2        it says defendant, that means that it came from the County
3        to us.  We asked for your job description.  That's what we
4        got.
5        Take a minute and just take a look at --
6  A.  Why?
7  Q.  -- it and tell me if you think that's your job description.
8        Are you familiar with that at all,
9        Mr. Turner?
10  A.  Vaguely.
11  Q.  Vaguely, okay, fair enough.  Do you have any potential
12       business dealings with the County of Wayne at this time
13       or --
14  A.  No.
15  Q.  Have you had any potential business dealings?
16  A.  No.
17  Q.  Have you discussed any business relationships with the
18       County?
19  A.  Define business dealings.
20  Q.  Well, have you discussed with anybody at the County
21       regarding you or somebody you know doing business with the
22       County?
23  A.  No.
24  Q.  When was the last time you talked to Rashaun Whitehead?
25  A.  Hell, I don't remember.  A couple months ago.

Page 53

1  Q.  Is she a friend?
2  A.  Yes.
3  Q.  Her sister Rashida Gamble as well?  Her sister Rashida is
4        also a friend of yours?
5  A.  Somebody I know.  A friend?  I wouldn't say a friend.  Never
6        been in my house.
7  Q.  Well, she testified that you were in the -- at the time of
8        deposition, she testified that you had recently had a
9        meeting with the sheriff about a tech company that was doing
10       business with the sheriff's department.  What was that?
11  A.  I didn't have a meeting with the sheriff --
12  Q.  That's what Ms. Whitehead said.
13  A.  I had a conversation about a tech company that at the time
14       that I was leaving, they were trying to come in and make a
15       pitch to the sheriff's office on a -- something for
16       potential revenue, but I personally don't have any
17       involvement with them.
18  Q.  Who is the tech company?
19  A.  I don't remember their name.
20  Q.  Why did you mention after you were gone from your position
21       with the County, why were you talking to the sheriff about
22       this tech company?
23  A.  First of all, if I recall correctly, it was not the sheriff,
24       it was the sheriff's office, and I was trying to facilitate
25       something that had initially started with me.  That's why.

Carroll Reporting & Video
A Veritext Company
www.veritext.com                                    586-468-2411
www.veritext.com

Page 54

1  So I am not affiliated with this company at all.
2  Q.  What was -- what's the tech company we are talking about
3  here?
4  A.  I told you, I don't remember the name.
5  Q.  So, explain to me why after you were gone from the
6  department, you were discussing this tech company with the
7  sheriff?
8  A.  Because the tech company had reached out to me because I was
9  their only initial contact, and I told them, number one, I
10  am no longer there, they need to work through Rashaun.  And
11  number two, when you come in for the presentation, they
12  wanted me -- that's not -- I am not part of this.  I am not
13  a part of you.  I am not a part of the agency anymore, so I
14  see no need for me to be there, and I wasn't.  And that was
15  it.
16  Q.  Ms. Whitehead said you recently met with the sheriff to talk
17  about this.  Was that a false statement by her?
18  A.  You interpreted that wrong --
19  Q.  Hang on.
20  A.  I did not recently meet with anyone about a tech company.
21  Q.  Okay.  Ms. Whitehead testified under oath, that you had met
22  with the sheriff regarding a tech company that's doing
23  business with the sheriff.  Is that a false statement?
24  A.  No, but we would have to have been referring to while I was
25  still there.

Page 55

1  Q.  She wasn't.
2  A.  Well --
3  Q.  She clearly was not.
4  A.  Well, I didn't meet with him.  I might have had a
5  conversation, but I have not met with the sheriff since I
6  left.
7  Q.  Why would you be in conversation with him about a tech
8  company after you left?
9  A.  Are you listening to me?
10  Q.  Yes, I am listening to you.  In fact, I have a record of
11  what you're saying.
12  MR. BURRELL:  Object.  The question was
13  asked and answered.  The witness has answered the question.
14  MS. GORDON:  No, he hasn't.
15  BY MS. GORDON:
16  Q.  Why would you have been meeting with the sheriff or calling
17  him or talking to him --
18  A.  I am going to say this --
19  Q.  Hang on, Mr. Turner.  We can only talk one at a time.
20  A.  Quit asking me the same question.
21  Q.  Okay.  I am going to ask you a question until I get an
22  answer that's understandable to me.
23  I have got a witness --
24  A.  We will be here all day.
25  Q.  Okay.

Page 56

1  A.  Understandable -- it's not okay to me, but it's okay.
2  Q.  So, is Rashaun Whitehead somebody that you have been in
3  touch with recently?
4  A.  No.
5  Q.  When was the last time you talked to her?
6  A.  I don't remember.
7  Q.  Is it more than a month ago?
8  A.  Yep.
9  Q.  More than two months ago?
10  A.  At least two to three.
11  Q.  And what were you talking with her about two or three months
12  ago?
13  A.  It was this tech company coming in to do a presentation with
14  the sheriff's office that they had been trying to get
15  scheduled since January, February.
16  Q.  Okay.  And why was the tech company reaching out to you as
17  you understood it?
18  A.  Because I was the only one they had been in contact with.
19  Q.  Did they have your personal phone number?
20  A.  His email.
21  Q.  Were you still using the sheriff's email address or was this
22  a personal email address you were using?
23  A.  No, actually it was a phonecall.  They had my phone, they
24  called my phone.
25  Q.  And did you go in and meet with the sheriff about this?

Page 57

1  A.  No.
2  Q.  So, Rashaun Whitehead said something incorrect under oath,
3  is that your testimony?
4  MR. BURRELL:  Objection to the form of the
5  question.
6  BY MS. GORDON:
7  Q.  Is that correct?
8  A.  I don't know what she said, but all I know is what I said.
9  You have to make that interpretation.
10  Q.  You don't know the name of this tech company?
11  A.  I do not recall.
12  Q.  Have you had any communication with them since then?
13  A.  I have not.
14  Q.  Do you have any family members that work for the sheriff's
15  department?
16  A.  No.
17  Q.  Have you in the past had any family members that worked for
18  the sheriff's department?
19  A.  No.
20  Q.  You have had nobody that's a family member ever work for the
21  County?
22  A.  Not that I can recall.
23  Q.  I am sorry?
24  A.  Not that I recall.
25  Q.  Do you have family members that work for the City of

15 (Pages 54 - 57)

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

Page 58

1 Detroit?
2 A. Nope.
3 Q. Do you have a nephew that's involved with Mary Sheffield,
4 employment-wise?
5 MR. BURRELL: Object to the form of the
6 question.
7 THE WITNESS: Nope.
8 BY MS. GORDON:
9 Q. Do you have a nephew?
10 A. Yep.
11 Q. As far as you know does he do any work for Mary Sheffield?
12 A. Nope.
13 Q. What does he do, as you understand it?
14 A. I mean, I got a lot of nephews, you need to be more
15 specific.
16 Q. Any one of them. I don't know who all your nephews are. I
17 understand that one of your nephews --
18 A. You understand that incorrect.
19 Q. You got to let me finish, okay, because we really will be
20 here all day. I know it's difficult in a dep, but in any
21 event, do you have a nephew that works for Mary Sheffield,
22 any nephew?
23 A. No.
24 Q. Do you have any nephews that are potentially going to be
25 working for Mary Sheffield once she is sworn in as mayor?

Page 59

1 A. I don't know. If they do, they ain't tell me.
2 Q. Have spoken to Ms. Whitehead in the last couple months?
3 A. You asked me that question.
4 Q. What's the answer?
5 A. It's been about two to three months.
6 Q. What did you discuss?
7 A. The technology company coming in to do a presentation.
8 Q. Ms. Whitehead said that you asked her to assist in setting
9 up a meeting with the sheriff about the tech company, is
10 that accurate?
11 A. Repeat that.
12 Q. Yes. She testified --
13 A. I asked you to repeat it.
14 Q. I know. I am about to do that. I am reading from a
15 document.
16 Is it correct that you asked Ms. Whitehead to
17 assist in setting up a meeting with the sheriff about
18 the tech company?
19 A. Yes.
20 Q. And is it correct that you were going to be attending the
21 meeting?
22 A. Yes.
23 Q. Did you attend the meeting?
24 A. No.
25 Q. Why not?

Page 60

1 A. Because I decided my attendance wasn't required. I am not
2 involved with the tech company, and I am no longer
3 associated with the sheriff's office.
4 Q. Do you have any employment relationships today, are you
5 employed with anybody or --
6 A. Yes.
7 Q. -- receiving income?
8 A. Yes.
9 Q. Where were you employed?
10 A. I am employed with Social Security. They send me a check
11 every month.
12 Q. All right.
13 A. I am employed with Morgan Stanley. They send me a check
14 every month, too.
15 Q. That's from your investments I assume?
16 A. Yes. That's it. That's the only money I have coming in.
17 Q. Okay. So you're not employed elsewhere, you're not involved
18 with any other consulting arrangements or the like?
19 A. No.
20 Q. You're retired?
21 A. Correct.
22 Q. Why did you leave the County, did you retire or was there
23 another reason you left?
24 A. (Indicating).
25 Q. You're showing your cane?

Page 61

1 A. I have severe back issues. I have had two back surgeries.
2 I am about to have a third.
3 Q. Sorry to hear that.
4 A. If I sit here looking irritated, it's not because of you, or
5 your client, it's because of my back.
6 Q. Okay. Does it help to stand up?
7 A. It helps to lay down and stretch out. Sometimes it does
8 help to stand up, but I have had severe back problems for
9 five years. And the one thing that's not -- doesn't look
10 good is a person in uniform on a cane.
11 Q. Fair enough.
12 A. Been wanting to retire for two years.
13 Q. So this is why you are no longer with the County?
14 A. Yes.
15 Q. Are you aware of any female employee filing a claim against
16 the sheriff of harassment?
17 A. A who?
18 Q. Of a female employee that was in your chain of command --
19 strike that.
20 A female employee of the County who filed a
21 claim of harassment against the sheriff?
22 A. Can you be more specific?
23 Q. I assumed you are aware that Lakeisha Solomon filed a
24 complaint, is that accurate?
25 A. I don't know if it was exactly filed.

16 (Pages 58 - 61)

Carroll Reporting & Video
A Veritext Company
www.veritext.com

586-468-2411
www.veritext.com

Page 62

1  Q.  Fair enough.  You're aware that there was a complaint that
2      was moved forward, you're not sure if it was filed, fair
3      enough?
4  A.  Yes.
5  Q.  Okay.  I mean, I have deposed many people before you,
6      Mr. Turner, so I have learned something about these things.
7          My understanding is that Ms. Solomon did file
8      a complaint, then it was withdrawn.  Does that sound
9      familiar?
10 A.  Yes.
11 Q.  Did you know what she was complaining about?
12 A.  I don't recall specifically.
13 Q.  Something to do with improper sexual contact or language by
14     the --
15 A.  What I do recall is that it was withdrawn.
16 Q.  And my client, Ms. Parks, told you from time to time that,
17     for example, the sheriff had showed you -- showed her a film
18     on his cellphone of oral sex.
19         Do you remember her telling you that?
20 A.  I don't know nothing about that.
21 Q.  You don't recall that?
22 A.  At all.
23 Q.  You knew the sheriff talked about women quite a bit,
24     correct, in general?
25         MR. BURRELL:  Objection to form and

Page 63

1      foundation.
2          THE WITNESS:  No.
3  BY MS. GORDON:
4  Q.  Well, you were aware that the sheriff was -- had a lot of
5      interest in females, correct --
6          MR. BURRELL:  Object to the form of the
7      question.
8  BY MS. GORDON:
9  Q.  He had a lot of interest in females, and he talked about
10     females and he talked about their bodies, and he talked
11     about sex.  You were with him, in your job you heard some of
12     this from him, didn't you?
13         MR. BURRELL:  Same objection, please.
14         THE WITNESS:  No.  I never had a sex
15     conversation with the sheriff.
16 BY MS. GORDON:
17 Q.  Well, I don't know what you mean by sex conversation.  You
18     heard him talk about women's bodies.  You heard him talk
19     about women's rear ends, you heard him talk about how women
20     looked.  You heard some of that, didn't you?
21         MR. BURRELL:  Same objection, please.
22 BY MS. GORDON:
23 Q.  Go ahead.  You heard some of that out of the sheriff's
24     mouth, correct?
25         MR. BURRELL:  Same objection.

Page 64

1  BY MS. GORDON:
2  Q.  You're under oath here.
3  A.  He object, I don't have to answer.
4  Q.  No, you do.  You are under oath here, so go ahead.
5  A.  I am trying to -- it's back and forth.  I am trying to
6      understand --
7  Q.  Here is how it works.  As lawyers, lawyers make objections,
8      that they may want to take up with the court later, but, you
9      still go ahead and answer over the objection.
10         MR. BURRELL:  Unless I direct you not to
11     answer.
12         THE WITNESS:  I don't understand your
13     question.
14 BY MS. GORDON:
15 Q.  It's pretty clear.
16 A.  No, it's not.  To me it's not.
17 Q.  As I say, Mr. Turner --
18 A.  I have not had sex conversations with the sheriff.  I have
19     not heard numerous times that the sheriff made comments, no.
20 Q.  Okay.  We all know.  We have --
21 A.  We all don't know anything.
22 Q.  We now have to get a question out, then you can comment or
23     answer my question.
24 A.  Go ahead.
25 Q.  We have all heard -- we are not -- there is testimony about

Page 65

1      the sheriff looking at women, about the sheriff looking at
2      women's bodies, about the sheriff commenting on women's
3      bodies, about the sheriff commenting on women's rear ends,
4      about the sheriff commenting on wanting to have sex with
5      women.
6          You were present when you heard some of him
7      bantering about this?
8  A.  I don't recall that.
9          MR. BURRELL:  Same objection.  You can
10     answer.
11         MS. GORDON:  Unfortunately, Aaron, you are
12     not -- I don't know if you are intentionally just coaching
13     here now, but you're stopping -- you have already objected
14     to this over and over again.  Hang on.  Every time you
15     object, I have to start from scratch, okay.
16         So, you have a standing objection to
17     this question.  I am going to take an answer.
18 BY MS. GORDON:
19 Q.  Go ahead.
20 A.  No.
21 Q.  Oh, you have never heard the sheriff talk about a female's
22     body in your entire time with this guy?
23 A.  Not that I recall.
24 Q.  You're under oath here.
25 A.  I know.

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

Page 66

1 Q. The sheriff said he talks about women's bodies.
2 A. He don't talk about it to me.
3 Q. He has done it in your presence, hasn't he, Mr. Turner?
4 A. Not that I recall, Attorney Gordon.
5 Q. Is there a reason you want to protect the sheriff here
6    today?
7          MR. BURRELL: I object to that.
8          THE WITNESS: I am not here to protect
9    anyone.
10         MR. BURRELL: Form and foundation.
11    Argumentative --
12 BY MS. GORDON:
13 Q. Anybody that comes in here and says Sheriff Turner did not
14    talk about women --
15 A. Sheriff Turner?
16 Q. I'm sorry, Sheriff Washington did not talk about women, I
17    have to assume you're trying to --
18         MR. BURRELL: Object to the form and
19    argumentative nature of the question, please. You can
20    answer.
21         THE WITNESS: Sorry.
22 BY MS. GORDON:
23 Q. You go ahead. And my client complained to you about the
24    sheriff's activities towards her, didn't she?
25 A. Excuse you?

Page 67

1 Q. My client, Regina Parks, complained to you about the
2    sheriff's actions, from time to time, is that correct?
3 A. No.
4 Q. You have texts with her?
5 A. What?
6 Q. Do you have text messages with Ms. Parks?
7 A. I do.
8 Q. Okay. Have you produced those to your counsel or the
9    county's counsel?
10 A. I think you have seen them. I don't think there is no text
11    messages in there from her to me, complaining about the
12    sheriff.
13 Q. Okay. Have you seen what she has produced?
14 A. Excuse me?
15 Q. Have you seen her production of text messages?
16 A. Not interested, no.
17 Q. Not interested. I didn't ask if you were interested.
18 A. No.
19 Q. If a person at the County comes to work -- did you ever come
20    to work intoxicated or having smoked weed?
21 A. No.
22 Q. If an employee came to work intoxicated or having recently
23    smoked weed, and you're aware of it, what do you do?
24 A. Every case is different.
25 Q. Well, give me some examples.

Page 68

1 A. I haven't -- well, I have not had anyone come to work for
2    me, smelling like weed.
3 Q. Okay.
4 A. But probably send them home. There was allegations that
5    your client came to work smelling like alcohol.
6 Q. But you never saw that, you heard allegations?
7 A. Correct.
8 Q. Who did you hear them from?
9 A. Staff.
10 Q. Who?
11 A. Executive assistants.
12 Q. Who?
13 A. Olivia Townsend, Rashaun Whitehead.
14 Q. When did you hear these allegations --
15 A. When they brought it to me, I said, go talk to them and tell
16    them they need to go home.
17 Q. Okay. But there was nothing you had personal information or
18    knowledge of, correct?
19 A. No.
20 Q. Did anybody put anything in writing to you --
21 A. No.
22 Q. -- about my client being intoxicated?
23 A. No.
24 Q. And you had a good relationship with Regina Parks, is that
25    correct?

Page 69

1 A. I did.
2 Q. Do you recall Ms. Parks coming to you because she had
3    received a call regarding a sexual harassment incident that
4    had involved an employee of another municipality?
5 A. Vaguely.
6 Q. What do you recall about that?
7 A. You need to be more specific so I know what I am talking
8    about.
9 Q. Well, this is 2024. My client received a phonecall and the
10    caller was complaining about an individual who engaged in
11    sexual harassment --
12 A. The individual got a name?
13 Q. Hang on. Who worked for the County. Do you recall any
14    such --
15 A. The individual got a name?
16 Q. -- information? I'm not sure.
17 A. Is there a name?
18 Q. You're just here answering my questions. Do you remember
19    any such event?
20 A. Excuse you?
21 Q. Do you remember any such call, you being advised of any such
22    call?
23 A. Can I get a specific?
24 Q. Well, I was hoping you could provide it. The caller was
25    harassed by somebody from the sheriff's executive protection

18 (Pages 66 - 69)

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

Page 70

1 team, and my client picked up the call and told you about
2 it. Does that sound right?
3 A.  Are you speaking of Ron Johnson?
4 Q.  It's possible.  Yes, Ron Johnson.
5 A.  It was an anonymous call.  I vaguely recall him coming to
6 me.  I don't deal with anonymous calls.
7 Q.  It was Ron Johnson?
8 A.  It was --
9 Q.  If somebody calls -- just see if I understand what you are
10 saying here.
11        An anonymous person, at least as far as you
12 knew it was anonymous, called and said, Ron Johnson had
13 sexually harassed an individual, and it was being
14 reported to the sheriff's department, correct?
15 A.  If I have a little recollection, but I think it was a DPS
16 issue.  I told them that's a DPS issue, they need to take it
17 to DPS.
18 Q.  What's DPS?
19 A.  Detroit Public Schools.
20 Q.  But the person that was engaged in the harassment, was a
21 sheriff's department employee, were you aware of that?
22 A.  I wasn't aware.  I have heard allegations.
23 Q.  Okay.  And you learned about it from Regina Parks, is that
24 correct?
25 A.  It was very vague.  She was very vague.  And so I told her

Page 71

1 she had to take it to the sheriff.
2 Q.  You directed her to take no further action, is that what you
3 told her, correct?
4 A.  Because --
5        MR. BURRELL:  Objection as to the form of
6 the question.
7 BY MS. GORDON:
8 Q.  Is that correct?
9 A.  It was very vague.  No, I told her to take it to the
10 sheriff, because I didn't -- there was no information.  It
11 was very vague.
12 Q.  Told her the matter did not concern the sheriff's office and
13 she should take no further action, isn't that what you told
14 her?
15        MR. BURRELL:  Objection to the form of the
16 question.
17        THE WITNESS:  That is not what I told her.
18 BY MS. GORDON:
19 Q.  Sir, you signed an affidavit in this case, are you aware of
20 that?
21 A.  Yes.
22 Q.  Hang on.  Are you aware --
23 A.  I am.
24 Q.  I am going to read you what you said in the affidavit.
25 A.  Read it.

Page 72

1 Q.  I am going to.  It's defendant's Bate stamped 147, paragraph
2 25 and 26.  In April 2024, plaintiff accepted a call
3 regarding a sexual harassment incident that allegedly
4 involved an employee of another municipality.
5        After plaintiff accepted the call, I spoke
6 with plaintiff.  I informed her that the matter did not
7 concern the sheriff's office and I directed her to take
8 no further action.
9 A.  Thank you for the recollection.  I stand by that.
10 Q.  You just told me under oath something different?
11 A.  I stand by that.
12 Q.  By what?
13 A.  What you just said?
14 Q.  So then what you said to me two minutes ago was false.
15        MS. JANKOWSKI:  Objection.
16 BY MS. GORDON:
17 Q.  Record speaks for itself.  You're now -- you have now been
18 read back your affidavit, so your testimony you gave me a
19 few minutes ago, was not accurate.  That's just what the
20 record is going to be.
21        MR. BURRELL:  The record should reflect he
22 doesn't have the affidavit in front of him.  If you are
23 going to reference it, I will ask you to provide him a copy.
24        MS. GORDON:  He has already answered the
25 question.

Page 73

1 BY MS. GORDON:
2 Q.  All right.  Let's go back to the restructuring.  At or
3 around the time of this restructuring, plaintiff Regina
4 Parks received a pay increase, is that correct?
5 A.  Yes.
6 Q.  And her new -- there was a new role that was going to be
7 created for her, allegedly in this restructuring, correct?
8 A.  Yes.
9 Q.  What was the new position?
10 A.  It was going to be a team.
11 Q.  What is her new position going to be?
12 A.  Community outreach.
13 Q.  Was she going to have the same title?
14 A.  No.
15 Q.  What was her new title going to be?
16 A.  I don't know.  Community outreach, that was it.
17 Q.  Okay.  So I thought these positions were going to be
18 combined?
19 A.  What are you talking about?
20 Q.  I am talking about what you said, the restructuring.  And
21 you said, that the communications piece of it and the
22 outreach piece of it, community outreach piece of it were
23 going to be combined, that's what you and the sheriff were
24 talking about.  Is that accurate?
25 A.  Barely.

Page 74

1 Q. I am sorry?
2 A. Barely.
3 Q. So, what did that mean with regard to Regina Parks'
4   position?
5 A. What that meant with Regina Parks' position, instead of
6   being director of community outreach, director of one,
7   herself, it was my opinion that one of the reasons why the
8   sheriff thought that her work was so subpar was because we
9   felt, as I pointed out to him, that it was too much for one
10   person.
11 Q. So what was her new position or title going to be?
12 A. It was going to be community outreach, and we were going to
13   create a team. It's a big county, and we only had one
14   person, so --
15 Q. Go ahead.
16 A. You let me finish?
17 Q. Yes, please do.
18 A. The concept thought process was to create a team for this
19   large county, hadn't gotten to the title, as I understood
20   it, just community outreach.
21 Q. When was the -- so this was -- was there ever a time when my
22   client was going to get a new position or a new title, was a
23   decision made on that?
24 A. Yes.
25 Q. When was that?

Page 75

1 A. When they had the meeting that it was going to be -- just
2   the title was community outreach.
3 Q. So was that a different title than Regina had previously
4   had?
5 A. Yes, before director of community outreach, dropping the
6   word director and just community outreach dividing the
7   County up.
8 Q. Were new employees going to be brought on?
9 A. Yes.
10 Q. How many new employees were going to be brought on?
11 A. The sheriff had envisioned four.
12 Q. And what did you need four people to do as you understood
13   it?
14 A. Community outreach.
15 Q. Can you be more specific? I don't know --
16 A. I thought I have been.
17 Q. No, you haven't been. You have given me no specific
18   community outreach activities, you said there were events
19   that occur and somebody needs to go there --
20 A. Well --
21 Q. Hang on a second. So what were these four new people, as
22   you understood it, if you did, going to be doing once they
23   were hired, what were their job duties going to be?
24 A. Community outreach.
25 Q. So you needed four people to do what you're calling

Page 76

1   community outreach?
2 A. Yes.
3 Q. And previously you had how many people doing community
4   outreach?
5 A. One.
6 Q. So what were these three additional people going to be
7   doing?
8 A. The exact same thing, except for they would be responsible
9   for various areas of the County.
10 Q. So, I want you to explain to me what these additional three
11   people specifically were going to be doing?
12 A. I can't give you specifics, didn't get that far.
13 Q. So at the time you left the County, had there been three new
14   community outreach people added?
15 A. Yes.
16 Q. Who were they?
17 A. I don't recall their names. One was Stephanie. I don't
18   recall the last name. Another lady, I can't recall her
19   name, two other ladies, I don't recall their names.
20 Q. And they had come on board?
21 A. Two had, one hadn't.
22 Q. And who had selected these people?
23 A. Excuse me?
24 Q. Who had selected these individuals?
25 A. The sheriff.

Page 77

1 Q. Did he interview them, if you know?
2 A. I believe so.
3 Q. Did you interview them?
4 A. No.
5 Q. Did they have job descriptions?
6 A. I believe so.
7 Q. And what -- were you involved in putting together a job
8   description?
9 A. I was not.
10 Q. Even though they would be reporting to you, correct?
11 A. They weren't reporting to me.
12 Q. Well, your area --
13 A. It was a reorganization. They were reporting to Mara
14   MacDonald.
15 Q. But Mara MacDonald reported to you?
16 A. She did.
17 Q. Hence, you were in their chain of command?
18 A. I wasn't that far down in the weeds.
19 Q. Doesn't matter whether you were or not. I just want to know
20   what -- are you telling me Mara MacDonald was deciding what
21   their job duties were going to be?
22 A. Correct.
23 Q. How long had she been with the County at that point, a few
24   weeks?
25 A. I don't recall.

20 (Pages 74 - 77)

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

Page 78

1 Q. Well, not --
2 A. You have to take that up with the sheriff.
3 Q. I am asking you because you were definitely on board, how
4   much were you earning when you were with the County, by the
5   way, what was your salary in November 2024?
6 A. 170.
7 Q. You were making $170,000?
8 A. Excuse me?
9 Q. You were making $170,000 at the County and I am asking you
10   questions, about your job duties for which you were being
11   paid 170,000 and one of them was that Mara MacDonald
12   reported to you.
13       So, hence, did you discuss with Mara
14   MacDonald that she was hiring new people?
15       MR. BURRELL: Object to the form of the
16   question.
17       THE WITNESS: No.
18 BY MS. GORDON:
19 Q. When did you learn there were going to be new people hired?
20 A. From the sheriff. He said he was bringing on new people.
21 Q. Did he have the names at that time?
22 A. I don't recall if he had the names at that time.
23 Q. Did the sheriff personally select these people?
24 A. He did.
25 Q. And was one of them Erica Hill?

Page 79

1 A. Yes.
2 Q. And she had had complaints about the sheriff herself in the
3   past, is that accurate?
4 A. Not that I am aware of.
5 Q. You're not denying it, you just don't know?
6       MR. BURRELL: Objection. Form.
7       THE WITNESS: To my knowledge, no.
8 BY MS. GORDON:
9 Q. Keith Williams, who was he?
10 A. He is a contract employee.
11 Q. How was he connected to the County? What was he doing prior
12   to being brought on --
13 A. He was doing outreach.
14 Q. I'm sorry?
15 A. Outreach.
16 Q. For who?
17 A. For the sheriff's office.
18 Q. He's been a contract employee?
19 A. Yes.
20 Q. So now he is being put on a salary?
21 A. No.
22 Q. So I am unclear on this. Had Keith Williams already been an
23   employee or a contractor of the County by November 2024?
24 A. Yes.
25 Q. What was he doing?

Page 80

1 A. Outreach.
2 Q. And was he going to be anything new under the so-called
3   restructuring?
4 A. No.
5 Q. He was going to have the same job he always had?
6 A. Yep.
7 Q. So that's not a new additional person?
8 A. No.
9 Q. So you said three people were going to be added?
10 A. Yes.
11 Q. So we have got Erica Hill, we have got Stephanie. What was
12   she going to be doing?
13 A. Outreach.
14 Q. Was she already working for the County?
15 A. No, she was new.
16 Q. And did she come on board during the time you were still
17   there?
18 A. Yes.
19 Q. What was she being paid?
20 A. I don't recall, I believe, 90 some thousand.
21 Q. What was she doing for 90 some thousand?
22 A. Outreach. You asked me three times.
23 Q. I am really sorry. Outreach is a very broad term.
24 A. Exactly.
25 Q. So Stephanie came on at 90K, Erica Hill came at 90K, is that

Page 81

1   correct?
2 A. Yes.
3 Q. What were their specific job duties, other than the word
4   outreach --
5 A. That's all I can give you.
6 Q. Sir, you were their boss.
7 A. No, I wasn't their boss. I was indirectly.
8 Q. Did they have job descriptions?
9 A. I didn't see it.
10 Q. I would like you to tell me in -- you're the person that
11   testified here under oath that you had been discussing a
12   restructuring with the sheriff. I want you to tell me what
13   you understood these new people's day-to-day job duties
14   would be? If you know. If you don't have any idea what
15   they were going to be doing, you can tell me?
16 A. I don't have any idea.
17 Q. So that was all the sheriff's doing then, what they would be
18   doing day-to-day?
19 A. Sheriff and Mara.
20 Q. Why were you left out of the loop, if they were --
21 A. I choose to.
22 Q. Hang on. If they were in your chain of command. You chose
23   to?
24 A. Yes.
25 Q. Okay. Did you ever discuss sexual harassment by the sheriff

21 (Pages 78 - 81)

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

Page 82

1    with Ericka Erickson, where she made a complaint to you?
2 A.  She never made a sexual harassment complaint to me.
3 Q.  Are you positive of that?  You're under oath here today.
4 A.  Excuse me?
5 Q.  Are you positive of that, you're under oath here today.
6 A.  I know I am under oath.
7 Q.  Okay.
8 A.  She never made a sexual --
9 Q.  Never, not a single comment?
10 A.  You didn't say comment.  You said complaint.
11 Q.  Did she make a comment?
12 A.  Well, sexual harassment.
13 Q.  What was it?
14 A.  Her concern was words that the sheriff was using.
15 Q.  You have already talked about.
16 A.  That could lead to that.  That was it.
17 Q.  The sheriff testified that -- the sheriff testified that
18    there was a quote, young lady, closed quote that said that
19    she was out at a holiday party with the sheriff, and that he
20    had said something to her about whether she wanted to date
21    him.  Was she married and did she want to date him.
22         MS. JANKOWSKI:  Objection.  Foundation.
23         MS. GORDON:  I'm sorry?
24         MS. JANKOWSKI:  Objection.  Foundation.
25         MS. GORDON:  I am not done.  I am reading

Page 83

1    something -- what do you mean no foundation.  I am reading
2    something to a witness, okay.
3 BY MS. GORDON:
4 Q.  I am reading to you from the sheriff's testimony.  And you
5    come up in this, so, please, you know, just focus on what I
6    am reading here.
7         Sheriff testified that there was a young lady
8    that said that she was at a holiday party with the
9    sheriff, and that the sheriff said something to her
10    concerning that is she married or does she want to
11    date.  Okay.  And she said, that someone tried to --
12    suggested to her that she file a complaint and he said,
13    he thought it was you.  Does that sound familiar?
14 A.  No.
15 Q.  She said, several people told her to make a complaint about
16    me.
17 A.  I don't know what you are talking about.
18 Q.  Okay.  Do you recall that you were involved or became aware
19    of a female who the sheriff had approached at a holiday
20    party and she said something to the effect that the sheriff
21    was coming onto her and that you suggested that this woman
22    make a complaint about the sheriff?  He used your name at
23    his deposition as somebody that suggested she file a
24    complaint, is that accurate?
25         MR. BURRELL:  Object to the form of the

Page 84

1    question.
2         THE WITNESS:  I don't know.  You need to be
3    more specific.  I don't recall.
4 BY MS. GORDON:
5 Q.  Okay.  Did you ever suggest to somebody who the sheriff
6    approached at a party and asked whether she was married and
7    whether she wanted to date him, did you ever suggest that
8    such a person make a complaint about the sheriff?
9 A.  I don't recall.  Are you speaking of Lakeisha Solomon?
10 Q.  I'm not sure who it was.  This is the sheriff testifying to
11    this under oath.
12 A.  Umm.
13 Q.  Is that what happened with Lakeisha Solomon?
14 A.  Vaguely.
15 Q.  That he approached her about dating him?
16 A.  I don't recall how the approach was.  All I know is she was
17    through -- she did not follow through.  That was a long time
18    ago.
19 Q.  We have talked about the restructuring.  Was there a meeting
20    that was scheduled to discuss with the people involved?
21 A.  Yes.
22 Q.  Did you attend the meeting?
23 A.  Yes.
24 Q.  Who set the meeting up?
25 A.  The sheriff.

Page 85

1 Q.  Who was in attendance?
2 A.  That was -- best I recall, the sheriff, myself, Mara
3    MacDonald, Regina Parks, I believe Rashaun Whitehead, I
4    believe Stephanie.  I don't recall her last name, and I
5    believe Erica Hill.
6 Q.  Who was the last one?
7 A.  Erica Hill.
8 Q.  These were the new people that were coming on board to help
9    with communication?
10 A.  The only one that was new.
11 Q.  Was outreach?
12 A.  Was Stephanie.  Erica Hill was already on board.
13 Q.  And what was said at the meeting?  Did you speak at the
14    meeting?
15 A.  If I did, it was very little.
16 Q.  Did the sheriff speak at the meeting?
17 A.  He conducted the meeting.
18 Q.  What did he say at the meeting?
19 A.  Just said that he was getting ready to start four years
20    under his term and he wanted to change things, make some
21    changes as he saw fit.
22 Q.  What else did he say?
23 A.  I don't remember verbatim.
24 Q.  What else do you remember?
25 A.  Basically, that was it.  He just laid out what he thought

Page 86

1    would be an outreach team.
2  Q.  And what did he say the outreach team would be?
3  A.  I just said it.
4  Q.  Was Dindi Maloney at the meeting?
5  A.  I don't recall.
6  Q.  Would she have had a reason to be there?
7  A.  She might have been part of the new team.  I don't recall.
8  Q.  What was her job at the time?
9  A.  Chief of staff.
10 Q.  I am sorry?
11 A.  Chief of staff.
12 Q.  Of what staff?
13 A.  Excuse me?
14 Q.  Dindi Maloney was chief of staff --
15 A.  Oh, you said what was her job at the time.
16 Q.  Yes.
17 A.  I thought you said what was my job at the time.
18 Q.  What was Dindi Maloney's job at the time?
19 A.  She was doing recruiting.
20 Q.  Recruiting for what?
21 A.  Sheriff's office.
22 Q.  For officers or for what?
23 A.  Officers.
24 Q.  And was she in your chain of command?
25 A.  Excuse me?

Page 87

1  Q.  Was she in your chain of command?
2  A.  No.
3  Q.  Whose chain of command was she in?
4  A.  She reported to the director.
5  Q.  Who was that?
6  A.  Mark Diaz.
7  Q.  Was Mark Diaz at this meeting, this restructuring meeting?
8  A.  I don't recall him being there, no.
9  Q.  Was Rashida Whitehead at this meeting?
10 A.  Yes.  I already said that.
11 Q.  I'm sorry, Rashida Campbell.  I get the sisters mixed up.
12      Rashida Campbell?
13 A.  I don't know who that is.
14 Q.  Rashida Gamble?
15 A.  I don't think so.
16 Q.  Was Rashaun Whitehead at the meeting?
17 A.  I do believe so.
18 Q.  How long did the meeting last?
19 A.  Roughly an hour.
20 Q.  And did anybody talk at the meeting other than the sheriff?
21 A.  If I recall, I think I may have made some remarks.
22 Q.  You made some remarks?
23 A.  I think I may have.
24 Q.  What did you say?
25 A.  I don't recall.  I am sure it was something to the lines of

Page 88

1    the realignment.
2  Q.  What was Dindi Maloney's new position going to be?  Was she
3    going to the assistant -- act as Mara MacDonald's assistant?
4  A.  I think so.
5  Q.  That was a new position that was being created?
6  A.  Yes.
7  Q.  So Mara MacDonald was going to have an assistant now on the
8    communication side and she was also going to oversee
9    outreach?
10 A.  Correct.
11 Q.  What was she earning?
12 A.  Excuse me?
13 Q.  What was her salary?
14 A.  About 130.
15 Q.  About 130?
16 A.  Yes.
17 Q.  Was she getting a pay increase for these new duties?
18 A.  She came in at that with the new duties.
19 Q.  So at the time she came in, this was already decided?
20 A.  Yes.
21 Q.  How long did the meeting last, you said about an hour?
22 A.  Yes.
23 Q.  Where did you go after that?
24 A.  I don't recall.
25 Q.  Did you go home, did you stay in the building?

Page 89

1  A.  I don't recall.  I think -- I don't know if -- I think I
2    went to another meeting in the building.
3  Q.  And do you know --
4  A.  Either that or go home.
5  Q.  Do you know where that was?
6  A.  Excuse me?
7  Q.  Do you know where that was located?
8  A.  I don't -- I think I had another meeting in the conference
9    room.
10 Q.  In the conference room.
11 A.  Yes, but I am not certain.
12 Q.  What's the conference room?
13 A.  Excuse me?
14 Q.  What is the conference room you were referring to?
15 A.  In the sheriff's office.
16 Q.  So, I have heard the sheriff's group of offices called the
17    suite.  Is that a term that's familiar to you?
18 A.  Yes.
19 Q.  Does that sound right?
20 A.  It sounds right, but that's not where it was.
21 Q.  So let's first ask where was your office?
22 A.  My office was in the suite.
23 Q.  Who else's office was in the suite?
24 A.  The sheriff, the undersheriff, and general counsel to the
25    sheriff and our executive assistant.

23 (Pages 86 - 89)

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

Page 90

1  Q.  Who were they?
2  A.  Rashaun Whitehead, Olivia Townsend and Danielle Stevenson.
3  Q.  Your office was where?
4  A.  In the suite.
5  Q.  Where was the conference room at issue?  Isn't there a
6      conference room in that suite?
7  A.  It is, but we weren't in that conference room.
8  Q.  What conference room were you in?
9  A.  We were in the large conference room.  The new structure
10     came with multiple conference rooms.  We were in the large
11     conference room for the initial meeting.
12 Q.  And who was in that room?
13 A.  I told you.
14 Q.  Tell me again.  This is after the restructuring meeting.
15     You said you now go to another meeting.
16         MR. BURRELL:  Object.  That question was
17     asked and he gave you a list of people.
18 BY MS. GORDON:
19 Q.  This is after the meeting, the restructure meeting?
20 A.  Okay.  What are you talking about?  You know, you asked the
21     same question five different times, so I am trying to keep
22     up with, are you asking the same question the sixth time or
23     are you asking a new question?
24 Q.  Listen to the questions, okay?
25 A.  I am doing my best.

Page 91

1  Q.  You attended a restructuring meeting, it was about an hour?
2  A.  Yes.
3  Q.  Where did you go after that?
4  A.  Into another meeting.
5  Q.  What was that meeting called?
6  A.  Meeting.
7  Q.  Who attended that meeting?
8  A.  I don't recall.
9  Q.  So, the names you gave me earlier that we discussed, were
10     for the restructuring meeting?
11 A.  Correct.
12 Q.  So now I am on the second meeting, and why were you going to
13     another meeting?
14 A.  Because it was on my schedule.
15 Q.  Was it about the restructuring or something --
16 A.  No.
17 Q.  Hang on.
18 A.  It was totally different.
19 Q.  Do you remember who you met with?
20 A.  I think it was Mark Diaz, but I would have to look at the
21     schedule and the day of.
22 Q.  Why were you in a different conference room and not in the
23     one in your suite?  You said you went to the big conference
24     room.  Why is that?
25 A.  That's where the sheriff wanted to meet.

Page 92

1  Q.  So the sheriff was in this meeting as well, is that correct?
2  A.  Yes.
3  Q.  So after restructure -- where did the restructuring meeting
4      take place?
5  A.  Excuse me?
6  Q.  Where did the restructuring discussion take place?
7  A.  In the big conference room.
8  Q.  So then you left and went to a different conference room.
9      Was the sheriff in that meeting?
10 A.  No.
11 Q.  What was the topic of the meeting in the smaller conference
12     room?
13 A.  I do not -- I would have to look at my schedule.
14 Q.  You have no recollection at all of what it was?
15 A.  I was very busy.  I had a lot going on back then.
16 Q.  What --
17 A.  Do you know what you had to eat three months ago, on the
18     24th of said month?
19 Q.  I didn't ask what you were eating.
20 A.  I understand that, but I don't remember all my meetings.  I
21     would have to look at the schedule.
22 Q.  How many meetings --
23 A.  That's all.
24 Q.  So, we will get to your schedule in a minute.  But did the
25     sheriff attend this other meeting you had?

Page 93

1  A.  No.
2  Q.  When is the next time you talked to the sheriff that day?
3  A.  I don't recall.
4  Q.  Did you talk to the sheriff?
5  A.  I think it might have been that evening he called.
6  Q.  Okay.  What was the reason he was calling?
7  A.  He was irate that he had been told about Ms. Parks going off
8      on her episode.
9  Q.  What time did he call?
10 A.  Wasn't looking at my watch.  It was in the evening.
11 Q.  Well, had you been home for a while?
12 A.  Yes.
13 Q.  So, we will get back to the sheriff.
14 A.  I am going to have to put you on hold.  I have to go to the
15     bathroom.
16         MS. GORDON:  Go ahead.
17         (Short recess taken.)
18         MS. GORDON:  Back on the record.
19 BY MS. GORDON:
20 Q.  We were back on the date of November 13, which was the
21     restructuring meeting.  There was a group meeting in the
22     large conference room, in your suite.  You have listed the
23     people that were there.  How long did that meeting last?
24 A.  The large meeting?
25 Q.  Yes.

Carroll Reporting & Video
A Veritext Company

586-468-2411
www.veritext.com

www.veritext.com

Page 94

1 A. About an hour. And it was not in the suite.
2 Q. I thought you said it was in the big conference room?
3 A. I did say that.
4 Q. Is the big conference room in the suite?
5 A. No.
6 Q. It's in a different location?
7 A. Yes.
8 Q. And so just -- I know I keep asking you about this
9 conference room, but I am confused on it.
10 A. That's okay.
11 Q. What's the conference room that's in the suite? What do you
12 call that conference room?
13 A. The sheriff's private conference room.
14 Q. Where did you go to, you said you had another meeting, which
15 conference room was that in?
16 A. That was in -- the new structure had at least four
17 conference rooms. I was in one of the new conference -- one
18 of the smaller conference rooms.
19 Q. So you weren't --
20 A. I believe it was a recruiting meeting.
21 Q. So you weren't in the suite, you weren't in the big
22 conference room. This is a different conference room that
23 you had your meeting in?
24 A. Correct.
25 Q. How long were you in that meeting roughly?

Page 95

1 A. About an hour.
2 Q. And then you have learned that Regina went back to the suite
3 and she was waiting for -- she thought you were returning to
4 talk to you? Is that your understanding that Regina, when
5 this restructuring meeting, she went back to the suite?
6 A. I don't know what Regina did.
7 Q. Well, did you get any information about her returning to the
8 suite after the restructuring meeting?
9 A. I think -- you know, I could have even left the building
10 because -- what I recall is that I got a phonecall at around
11 4:00, 4:30, explaining what happened.
12 Q. From who?
13 A. Rashaun Whitehead.
14 Q. What did she say to you on that call?
15 A. She told me that Regina Parks came in and had a meltdown and
16 grabbed herself between her crotch and said that, I hold all
17 the cards right here, and went onto rant and rave and said
18 she had the sheriff -- had made allegation towards the
19 sheriff, and I believe that she even shouted out that she
20 had him on tape. And after that phonecall from Rashaun
21 Whitehead, I called Regina Parks.
22 Q. Just so I am clear on this. You got a call about 4:00,
23 4:30?
24 A. Don't -- somewhere around there.
25 Q. Somewhere around there?

Page 96

1 A. Yeah, it was.
2 Q. Later that afternoon?
3 A. Yes.
4 Q. You got a call, I realize you don't know the time, from
5 Ms. Whitehead, and she gives you this report on what
6 happened in the suite?
7 A. Correct.
8 Q. Okay. You have described for me what she said to you?
9 A. Huh?
10 Q. You just covered more or less what she said?
11 A. Yes.
12 Q. Okay. And so you're now hearing this. Do you take any
13 action at that point with regard to Regina? Do you call
14 her?
15 A. I called her.
16 Q. What do you do?
17 A. I called her and --
18 Q. What do you remember -- roughly how long after you talked to
19 Ms. Whitehead?
20 A. Relatively immediately.
21 Q. Okay. What did you say?
22 A. Oh, roughly along the lines of what happened, and I think --
23 not I think, I know, I tried -- told her, that I need her to
24 apologize to the sheriff or to Rashaun otherwise I can't be
25 responsible for what the consequences may be.

Page 97

1 Q. What -- how long did you understand Regina was in the
2 sheriff's suite with -- doing what Ms. Whitehead said she
3 was doing. How long did that last?
4 A. I was led to believe, ten to 15 minutes.
5 Q. Then she exited the suite?
6 A. To the best of my knowledge.
7 Q. Okay. And do you know what time she would have exited, this
8 would have all happened?
9 A. I do not.
10 Q. So you called -- did you get -- when you called Regina, did
11 you get ahold of her?
12 A. I did.
13 Q. And did you know or realize that -- this idea about her
14 grabbing her vaginal area, was that she had a vest on, a
15 long vest and she had a phone in her pocket?
16 A. I'm sorry?
17 MR. BURRELL: Objection. Foundation.
18 BY MS. GORDON:
19 Q. Did you know that Regina had a long vest on and she had a
20 phone in her pocket, that's --
21 A. No, I did not know.
22 Q. You didn't observe any of this?
23 A. No.
24 Q. And you didn't get anything in writing in the next few days
25 about what happened, correct, nobody gave you any

25 (Pages 94 - 97)

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

Page 98

1 information about it?
2 A. No.
3 Q. Okay. So you contact Regina, 4:30, and you say, something
4 along the lines of, don't do anything crazy, correct?
5 A. I think so, something like that.
6 Q. All right. And you asked her to apologize. What were you
7 asking her to apologize -- I think you have already answered
8 what she said in the suite?
9 A. Yes.
10 Q. And as far as you knew, what she did in the suite was she
11 upset and she was saying things, correct?
12 A. Yes.
13 Q. What's the next thing that happened from your end of this,
14 with regard to Regina? You called her, you have discussed
15 the conversation, did you talk to her again that day or not?
16 A. I think -- I am sure I did.
17 Q. And why are you sure of that?
18 A. Because I was trying to get her to apologize. She was
19 refusing to.
20 Q. Did you learn that Rashida (sic) had called Rashaun
21 Whitehead after the workday was over?
22 A. If -- I don't know. I don't recall that. I don't know
23 nothing about that.
24 Q. With regard to Rashida's -- excuse me, Regina's conduct,
25 that you were told about, it was described to you by

Page 99

1 Ms. Whitehead, was that the only person who described her
2 conduct, or did somebody else describe it?
3 A. To the best of my recollection, that's the only person.
4 Danielle Stevens might have been there, and Olivia Townsend
5 to my knowledge wasn't there.
6 Q. And specifically what was -- well, you said what she said,
7 but, you knew Rashida was upset about the change in her
8 position that had just been discussed in --
9 A. Rashida, you mean, Regina?
10 Q. I am sorry, Regina, yes. Regina was upset you knew that,
11 about the restructuring?
12 A. Yes.
13 Q. And that her things had been moved out of her office, you
14 knew that, correct?
15 A. No.
16 Q. Did you know that she was being told to move things out of
17 her office?
18 A. I knew that, yes.
19 Q. That she was going to lose that office, did you know that?
20 I assume you did?
21 A. I did.
22 Q. And Mara MacDonald was going to take that office?
23 A. I don't think it was identified at the time when it was
24 going to take the office, but she was told it was only
25 temporary.

Page 100

1 Q. Who told her that?
2 A. I did.
3 Q. When did you tell her that?
4 A. When I told her she had to move out of the office.
5 Q. When was that?
6 A. I don't remember the day and date.
7 Q. Several days earlier or what?
8 A. That she was given the head's up it was coming.
9 Q. So what -- by the way, have you ever terminated an employee
10 in your chain of command, you ever terminated anybody?
11 A. Unfortunately, yes.
12 Q. Who else have you terminated or who did you terminate?
13 A. I remember a few people.
14 Q. Who do you remember?
15 A. Ed Foxworth.
16 Q. We have talked about that already. I think you said that
17 was the sheriff's decision, correct?
18 A. All terminations are the sheriff's decision. Let me be
19 clear. He is the only one who officially hire, fire.
20 Q. So Ed Foxworth. Who else has been terminated, that -- have
21 you been involved with the termination?
22 A. Kerry Pettus, executive protection.
23 Q. What was the reason there?
24 A. Excuse me?
25 Q. What was the reason for that termination?

Page 101

1 A. Sheriff didn't like his performance and he wanted a chance.
2 Q. Okay. Anybody else?
3 A. A former communications person. I can't remember her name,
4 some years ago.
5 Q. Is that it?
6 A. Yes.
7 Q. If you can remember?
8 A. That I can recall.
9 Q. Did you know that Ms. Whitehead and Regina Parks were very
10 friendly with one another, I assume you did?
11 A. Yes.
12 Q. That they texted back and forth very frequently, they called
13 each other sis or mom?
14 A. I can't recall. I can't speak to that.
15 Q. You knew they were close though?
16 A. I can't speak to what they call each other.
17 Q. You knew they were friendly?
18 A. Yes.
19 Q. Worked well together, as far as you knew?
20 A. For the most part.
21 Q. Were these stressful jobs?
22 A. Excuse me?
23 Q. Were these jobs you guys were in, you and Ms. Whitehead and
24 Regina, were these stressful jobs, did a lot of stress come
25 with the job?

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

Page 102

1 A. It depends whose job it is, what came with my job, didn't
2    come with her job.
3 Q. How about Ms. Whitehead, did it come with her job?
4 A. Yes, she is on-call pretty much 24/7. So any time you
5    on-call 24/7, it's going to come with a degree of stress.
6 Q. She says that --
7 A. She is who?
8 Q. Ms. Whitehead says that when she entered the suite, after
9    the restructuring meeting, she did so because she was
10   looking for you, did you know that?
11 A. No.
12 Q. She -- according to Ms. Whitehead, Regina entered the
13   sheriff's office suite to speak to Michael Turner, however,
14   he was in a meeting. That's what Ms. Whitehead says.
15          MR. BURRELL: Are you referencing a
16   document right now?
17          MS. GORDON: Yes, I am.
18          MR. BURRELL: What's the name of the
19   document?
20          MS. GORDON: It's Bates 22. It's a
21   statement from Ms. Whitehead.
22          MR. BURRELL: Thanks.
23          MS. GORDON: Defendant produced document.
24 BY MS. GORDON:
25 Q. So, that's what she said. She said she came to the suite to

Page 103

1    talk to you. You obviously weren't there, you were
2    somewhere else. You have already described it to us. You
3    had another meeting.
4           She said that then she was waiting for you to
5    return, waited about ten or 15 minutes and left.
6           Sounds like something, what you have already
7    testified here to today, that Regina was in the office
8    for ten or 15 minutes and then left, correct?
9 A. I have no -- I couldn't tell you what happened in that suite
10   or how long she was in that suite. I was not there.
11 Q. So you had no firsthand knowledge of what happened?
12 A. I have zero.
13 Q. Did anybody give you a written report of what Rashida --
14   excuse me, what Regina's conduct was, until after -- I know
15   something was circulated after she was fired?
16 A. Right.
17 Q. Prior to her being fired, as I understand it, there was no
18   written description of any conduct --
19 A. I didn't see one.
20 Q. -- by her?
21 A. I didn't see one.
22 Q. And nobody asked -- as far as you know, nobody asked that
23   anybody that observed any of this write down a statement
24   prior to the termination, correct?
25 A. Yes.

Page 104

1 Q. Okay. So, Ms. Whitehead says when she got home at about
2    9:00 p.m. that night, she noticed she had missed a call from
3    Regina and she called Regina back.
4           Did you talk to Ms. Whitehead on the night of
5    November 13?
6 A. Is that the said night?
7 Q. Yes, it is.
8 A. I am sure I did.
9 Q. Tell me why you're sure of that.
10 A. I am trying to get to the bottom of it, what happened.
11 Q. Okay. And did Ms. Whitehead -- I think you said
12   Ms. Whitehead already told you what happened, you have
13   already described that, what she told you happened. So, did
14   you need additional information?
15 A. Probably.
16 Q. Okay. But you do think you talked to Ms. Whitehead again on
17   the night of the 13th of November 2024?
18 A. Yes.
19 Q. Now, she learned, Ms. Whitehead learned that she had not
20   already known on the night of November 21, 2024, she learned
21   that Regina had recorded the sheriff making an inappropriate
22   comment or comments to her, did you learn that night?
23          MR. BURRELL: Objection. Form and
24   foundation.
25          THE WITNESS: No.

Page 105

1 BY MS. GORDON:
2 Q. I apologize. I am talking about November 13.
3 A. No.
4 Q. So according to Ms. Whitehead, when she did -- she called
5    Regina back. When she called Regina back, she asked her,
6    Regina, are you feeling better, are you okay, and Regina
7    told her, I recorded the sheriff hitting on me, that Regina
8    Parks told that to Ms. Whitehead.
9           Okay. You learned that, correct?
10          MR. BURRELL: Same objection.
11          THE WITNESS: No, I didn't learn it. I
12   never learned it.
13 BY MS. GORDON:
14 Q. You never learned it?
15 A. No.
16 Q. You didn't read her statement --
17 A. Well, that's when I learned it. I didn't learn it from
18   nobody saying it. I have read it. That's my first time
19   hearing it.
20 Q. Well, do you know if the sheriff learned about it that night
21   on November 13th?
22          MR. BURRELL: Objection.
23          THE WITNESS: I am not aware of that.
24          MS. GORDON: You know, it's a question.
25   You're trying to coach. But I asked him a very --

27 (Pages 102 - 105)

Page 106

1       THE WITNESS: I am not aware.
2 BY MS. GORDON:
3 Q. I said are you aware. Did the sheriff learn that as far as
4    you were aware?
5 A. I don't know when he learned.
6 Q. You don't when he learned?
7 A. No.
8 Q. He didn't call you right up and tell you, I just learned
9    tonight that she has got a recording of me, now what am I
10   going to do?
11 A. No.
12       MR. BURRELL: Same objection.
13 BY MS. GORDON:
14 Q. You don't dispute that he learned that night, do you?
15 A. I don't even know -- I don't know.
16 Q. Come on.
17 A. Come on.
18 Q. Maybe you don't remember, but this all happened -- this is
19   somebody you like, Regina Parks, she is a long time
20   employee, you get along with her, you have a good
21   relationship with her, and now she is telling the sheriff's
22   administrative assistant, hey, I got a recording on him.
23       MR. BURRELL: Same objection.
24 BY MS. GORDON:
25 Q. Did you talk to the sheriff about that that night?

Page 107

1 A. No.
2 Q. Did he call you that night?
3 A. Yes.
4 Q. What time?
5 A. I don't recall.
6 Q. What was the nature of the call?
7 A. He was upset that one of his appointees did what she did.
8 Q. What was he upset about specifically, what did he say she
9   did?
10 A. I told you.
11 Q. Well, repeat it because you told me what Whitehead told you,
12   but I don't know what the sheriff was told.
13 A. The same thing.
14 Q. Well, the sheriff wasn't in the premises when this so-called
15   event occurred. Anything he got about Regina's conduct came
16   from somebody else, right?
17 A. Correct.
18 Q. So, what did he tell you he had heard about what Regina did
19   in the suite?
20 A. That she walked into the suite, she grabbed her privates,
21   she said, I hold all the cards, to that nature, that she was
22   rambling.
23 Q. Did he get anymore specifics than that?
24 A. Not that I recall.
25 Q. So therefore, what, why was this a big deal?

Page 108

1 A. Excuse you. What if your person came in and here and did
2   that?
3 Q. Did what?
4 A. That's conduct unbecoming, first of all.
5 Q. Did what? What did she do?
6 A. She grabbed herself between the legs -- you want me to say
7   it, her vagina.
8 Q. No, she didn't grab her vagina.
9 A. That's what I was told.
10 Q. I know, but nobody asked Regina --
11 A. Well, how do you know? You weren't there.
12 Q. Hang on. Did anybody ask Regina, Regina, what were you
13   doing in that office, please give us a statement. Did you
14   ask her to do that on the 13th?
15 A. No, not that I recall.
16 Q. Did the sheriff ask Regina -- hang on. I just got to make
17   my record here.
18      As far as you know, the sheriff didn't say to
19   Regina, hey, I have heard you did stuff, we want your
20   statement.
21      As far as you know, nobody asked Regina Parks
22   what happened at that meeting, correct, as far as you
23   know?
24 A. As far as I know.
25 Q. And nobody said to her, hey, were you grabbing your vagina,

Page 109

1   nobody asked her that, up until today's date, nobody has
2   asked her that, have they, that you're aware of?
3 A. That I am aware of.
4 Q. So something about grabbing her vagina, what was the --
5 A. I am sure I -- after that she didn't deny it either.
6 Q. Well, she did deny it because she said under oath that
7   her --
8 A. I don't know what she said under oath.
9 Q. Hang on, sir. Have you ever seen Regina Parks walk around
10   grabbing her vagina?
11 A. Yes.
12 Q. You have never seen that before?
13 A. You don't know what I have seen.
14 Q. You have never seen that?
15 A. I have.
16 Q. What was the context?
17 A. Do you really want to know?
18 Q. Yes, I want to know -- give me a date and a situation.
19 A. I can't give you a date.
20 Q. What's the situation?
21 A. I have seen her grab herself.
22 Q. What was the purpose of it?
23 A. Talking stuff.
24 Q. I'm sorry?
25 A. Talking garbage.

Page 110

1  Q.  Talking what?
2  A.  Talking randomly.  She was drinking.
3  Q.  Okay.  This is -- okay.  So, what -- how do you know she was
4      grabbing her vagina?
5  A.  I saw it.
6  Q.  Were her pants pulled down?
7  A.  No.
8  Q.  Did she have a coat on, a vest?
9  A.  No.
10 Q.  Was her cellphone in her pocket?
11 A.  No.
12 Q.  Okay.  So what would be -- what was the purpose when she was
13     with you of grabbing her vagina, what was the message you
14     were receiving from that, if any?
15 A.  She was showing off.
16 Q.  To you, somebody that she was in a relationship with, is
17     that what it was?
18 A.  It wasn't in a relationship.
19 Q.  You weren't in a relationship?
20 A.  No.
21 Q.  When was all this, then?
22 A.  You call it a relationship, I call it having sex.  I don't
23     call it a relationship.
24 Q.  Okay.  Well, I call having sex with somebody a relationship,
25     so this is where we differ.

Page 111

1  A.  Well, we differ on that.
2  Q.  So, in any event, you have already said you had a good work
3      relationship with her.  You already --
4  A.  I didn't say it was good.  I said I liked her.
5  Q.  Okay, fine.  You never said it was bad, there is nothing you
6      ever put --
7  A.  You didn't ask.
8  Q.  Okay.  Well, listen, you're the boss, you were capable of
9      writing, making any record you wanted to, you made zero
10     record of any other issues with Regina Parks, that's true
11     right up until today's date.  So --
12         (Overlapping speakers, unintelligible.)
13 A.  When you --
14 Q.  Ultimately --
15 A.  We don't evaluate.
16 Q.  Well, you may not, but you know how to read and write and
17     use a computer and send people texts and emails.
18         MR. BURRELL:  Argumentative.
19         THE WITNESS:  Is there a question --
20         (Overlapping speakers, unintelligible.)
21         MR. BURRELL:  I'll object --
22 BY MS. GORDON:
23 Q.  You got on a weird tangent, but my point is, nobody asked
24     Regina.  We have already covered this, what happened.
25         Now I am going to go back to the sheriff

Page 112

1      calling you, and he says what to you on the night of
2      the 13th?
3  A.  I don't recall specifically, but he was very upset and he
4      said, he cannot have appointees conducting themselves in her
5      behavior and I agree with him.
6  Q.  Oh, did you?
7  A.  Yes.  So I told her she needed to apologize.
8  Q.  Okay.  And then when Ms. Whitehead called Regina back to see
9      if she was okay, Regina told Ms. Whitehead, I have recorded
10     the sheriff hitting on me.  Did the sheriff tell you he had
11     learned that that night?
12 A.  No, I don't recall that.
13 Q.  Do you know that he learned that that night?
14 A.  I don't recall that.
15 Q.  Do you know that on the night of November 13th, Sheriff
16     Washington was told, Regina Parks has recorded you doing
17     something inappropriate.  Did you know that he learned that
18     on the night of the 13th?  That's a yes or no.
19 A.  No.
20 Q.  When did you learn that the sheriff had been told on the
21     13th, that Regina Parks had a recording of him?
22 A.  I never learned that he was told on the 13th.
23 Q.  You have never learned that?  You have never learned that,
24     that is your testimony here today?
25 A.  I don't know.

Page 113

1  Q.  Sir --
2  A.  I don't know that he was told on the 13th.  You keep
3      wanting to put a specific date.
4  Q.  Yeah, I have a very specific date.
5  A.  I can't speak to that.
6  Q.  So he never told you on the night of --
7  A.  No.
8  Q.  -- the 13th or the 14th or anything, hey, she has got a
9      recording on me, what is in it.
10         MR. BURRELL:  I'm going to object.  He's
11     already answered this question.
12 BY MS. GORDON:
13 Q.  He never asked you about that.  Sheriff never asked you?
14         MR. BURRELL:  Asked and answered.
15 BY MS. GORDON:
16 Q.  I will take an answer.  Sheriff never asked you about the
17     recording?
18 A.  I am not going to keep repeating myself.
19 Q.  I'll ask a different question.  The sheriff never asked you
20     about the recording, is that your testimony or not?
21 A.  No.
22 Q.  He never asked you about it?
23 A.  Not on the 13th.
24 Q.  Did he ever ask you about the recording?
25 A.  Yes.

29 (Pages 110 - 113)

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

Page 114

1  Q.  When was that?
2  A.  I don't recall the date.  It was after the episode.  It
3      could have been the next day or the day -- whenever we found
4      out allegedly that there was one.
5  Q.  And how did we find out there was one?
6  A.  I heard about it.
7  Q.  From who?
8  A.  I never knew -- I can't speak to that.  I never had a
9      conversation with him on the 13th or the day after about any
10     recording.
11 Q.  So, but at some point you learned that there was a -- Regina
12     was saying there was a recording.  At some point you learned
13     that?
14 A.  At some point, that is correct.
15 Q.  Once you learned that, the County had a responsibility to
16     investigate whether or not there was a recording of the
17     sheriff making sexual advances to his subordinate,
18     unwelcomed sexual advances, correct?
19         MR. BURRELL:  Objection as to form.
20 BY MS. GORDON:
21 Q.  Correct?  Once you learned that, it's now being talked about
22     by people at the County, including you?
23 A.  Nobody is talking about it.
24 Q.  Well, you just got done saying you learned it?
25 A.  I said I learned it when I read about it, when we got that

Page 115

1      statement.  That's when I learned about it.
2  Q.  You just said the sheriff asked you about it.
3  A.  I did, but I didn't tell you when.
4  Q.  Your record is what your record is, okay.
5          Well, Ms. Whitehead certainly knew about it
6      on the 13th.  Let me ask you this.
7          Have you ever had sexual harassment training
8      since you have been with the County?
9  A.  Yes.
10 Q.  When was the last time you had sexual harassment training?
11 A.  I don't know, couple years ago.
12 Q.  Did it cover what sexual harassment is?
13 A.  It did.
14 Q.  And do you understand that sexual harassment is unwelcome
15     conduct of a sexual nature?
16 A.  Yes.
17         MR. BURRELL:  Object to the form, but you
18     can answer.
19 BY MS. GORDON:
20 Q.  Do you understand that?
21 A.  I do.
22 Q.  And do you understand that Regina Parks' position was that
23     the sheriff had made unwelcome overtures to her of a sexual
24     nature, did you come to learn that that was her claim?
25         MR. BURRELL:  Objection.  Form.

Page 116

1          THE WITNESS:  Yes.
2  BY MS. GORDON:
3  Q.  And the recording that you learned about on the 13th, or
4      somebody --
5  A.  I did not learn about a recording on the 13th.  Quit saying
6      that.
7  Q.  Well, your testimony is on the record.
8  A.  It is not on the record for that.
9  Q.  I said your testimony is on the record.  We will all be able
10     to revisit it in the transcript.
11         But in any event, certainly Ms. Whitehead
12     knew on the 13th, that the sheriff -- that Regina said
13     she had a recording of the sheriff.  That's
14     uncontested.  Ms. Whitehead has that in writing.
15         MR. BURRELL:  Is that a question, counsel?
16 BY MS. GORDON:
17 Q.  I am about to ask the question, Aaron.
18         So that Ms. Whitehead knew on the night of
19     the 13th, that Regina took the position that she had
20     been sexually harassed by the sheriff and she recorded
21     it.  The County would have had an obligation to
22     investigate this, wouldn't they?
23         MR. BURRELL:  Objection as to form.
24         THE WITNESS:  If it happened.
25 BY MS. GORDON:

Page 117

1  Q.  Well, nobody asked whether it happened, nobody investigated
2      whether it happened, did they?
3          MR. BURRELL:  Objection.  Form.
4  BY MS. GORDON:
5  Q.  Instead my client was fired, correct?
6          MR. BURRELL:  Objection as to form.
7          THE WITNESS:  Is there a question here?
8  BY MS. GORDON:
9  Q.  Yes.
10 A.  What's the question?
11 Q.  My client -- nobody investigated it, my client was fired, is
12     that correct?
13 A.  Your client never made or filed a complaint while she was
14     working --
15 Q.  She was fired --
16 A.  -- at Wayne County, that she was sexually harassed.  She
17     never made a complaint.
18 Q.  She told Ms. Whitehead.  She told you.  You're denying it --
19 A.  She didn't tell me.
20 Q.  Okay, fine.  You know, you can say what you want under oath.
21 A.  So can you.
22 Q.  I am not under oath, sir.  I am here questioning --
23 A.  I am telling you the truth, counselor.
24 Q.  Okay.  Well, you can tell it to the jury.  You can tell your
25     story to the jury.

Page 118

1 A. You can tell your client that also. People can be
2   countersued for lying. But continue.
3 Q. All right. So, my question was -- first of all, just to go
4   to your point, my client is not the only person who is going
5   to testify that the sheriff sexually harassed them, you must
6   know that?
7 A. I don't know anything about that.
8        MR. BURRELL: Object. Argumentative.
9 BY MS. GORDON:
10 Q. For being with this guy for all these years, you apparently
11   know very little about him?
12        MR. BURRELL: Same objection.
13        THE WITNESS: Get to the core question.
14 BY MS. GORDON:
15 Q. Is that what you're telling us --
16 A. Get to the question.
17 Q. -- you're just naive, you're there --
18 A. Yes, I am.
19 Q. You got women coming to you, you see him in action. You
20   know nothing, that's your position here today, you're just
21   innocent?
22        MR. BURRELL: Same objection.
23 BY MS. GORDON:
24 Q. In any event, I will go back to my question.
25        Now, the County learns on November 13th, that

Page 119

1   Regina Parks says she has a recording of the sheriff
2   sexually harassing her.
3        Am I correct that under County policy that
4   should have been investigated, as far as you know? I
5   know you wouldn't have been the person responsible for
6   it, but that's the County's policy that when you
7   learned somebody has been sexually harassed, it needs
8   to be investigated, true?
9 A. If it may, yes.
10 Q. Well, yes, if you tell somebody that you were sexual
11   harassed, it should be investigated, true?
12 A. If you make the complaint, it will be investigated.
13 Q. Sir, under the law, you don't have to make a formal
14   complaint, you can just tell somebody, are you aware of
15   that?
16        MR. BURRELL: Objection. Form.
17 BY MS. GORDON:
18 Q. Or you don't know the answer? I realize you're not an HR
19   specialist, but you said you had training. So do you know
20   that it's not necessary that somebody make a formal
21   complaint, all they have to do is tell somebody else and the
22   matter should be looked into. Are you aware of that?
23        MR. BURRELL: Objection. Form and
24   foundation.
25        THE WITNESS: Get to the question.

Page 120

1 BY MS. GORDON:
2 Q. Are you aware of that?
3 A. Yes.
4 Q. All right. So on the night of the 13th, Regina tells
5   Whitehead, I recorded him, I have got a recording.
6        Did you learn that as soon as Whitehead hung
7   up with Regina, she called the sheriff and said, Regina
8   has a recording, she said she has a recording. Did you
9   know that?
10 A. No.
11 Q. Is this the first time you're learning of it here today?
12 A. No.
13 Q. When did you first learn of that?
14 A. That she alleged she had a recording, when I read --
15 Q. No, not that she alleged that she had a recording, that
16   Whitehead immediately called the sheriff --
17 A. When I read the court filing. I didn't learn it until I
18   read the court filing.
19 Q. So, who was the person that had statements, that decided
20   that they would take statements from people who saw these
21   events that occurred on the 13th where Regina supposedly,
22   you know, did certain things? Statements were taken. Are
23   you aware of that?
24 A. No.
25 Q. By Venita Terry, who reports to you? Venita Terry

Page 121

1   apparently got statements from people who allegedly had
2   knowledge of or were at the scene of, Regina coming into the
3   suite and making comments. Are you aware that she did that?
4 A. I am.
5 Q. Did you direct her to do that?
6 A. I beg your pardon?
7 Q. Did you direct your subordinate, Ms. Terry, to get a
8   statement from employees?
9 A. I believe she was directed by the sheriff to do that.
10 Q. Did you read the statements that she obtained?
11 A. I reviewed them.
12 Q. So, these statements are all dated November 21, 2024.
13        When was she directed -- when was Terry
14   directed to get these statements?
15 A. I don't know. Wasn't my me.
16 Q. Weren't you on the conversation that she reports to you
17   as to what she was doing, when she was doing it?
18 A. The directive wasn't given my me.
19 Q. Weren't you told that she was being directed to do this and
20   that she was going to go interviewing people?
21 A. Yes.
22 Q. So you knew she was going to be doing interviews?
23 A. Yes.
24 Q. And were you interested in the results of the interviews?
25 A. Of course.

Page 122

1 Q. Did you read them?
2 A. I did.
3 Q. Did you read them on or around November 21, 2024?
4 A. I don't recall the date that I read it on.
5 Q. What was the purpose, as you understood it, in obtaining
6 these statements on November 21?
7 A. I would assume the purpose was because a conduct unbecoming
8 to an employee, an appointee of the sheriff was conducted
9 and that's why the sheriff did his follow-up on what
10 happened.
11 Q. I don't understand. What was the reason --
12 A. I can't help if you don't understand. That's my
13 explanation. If you not understanding, I can't help that.
14 Q. Well, I didn't ask you to help me. I was about to ask you
15 another question, but you kept talking.
16        I said, I don't understand, and here is my
17 next question to you.
18        Why were statements taken over a week after
19 Regina was fired?
20        MR. BURRELL: Objection. Foundation.
21 BY MS. GORDON:
22 Q. Why?
23 A. I can't answer that. I didn't get a directive. You have to
24 ask the sheriff.
25 Q. You don't know --

Page 123

1 A. Or Regina.
2 Q. You don't know why statements were taken after --
3 A. No.
4 Q. As long as you have been in your role, you don't remember
5 anybody else going around after somebody had bad conduct and
6 collecting written statements, correct, you don't remember
7 that ever happening?
8 A. I don't understand what you are talking about or where you
9 going. You seem to be going in circles.
10 Q. Well, that's your perception, which is fine. You said you
11 saw the statements, you said you reviewed them.
12        Are you still taking that position, you
13 reviewed all these statements?
14 A. Yes. And?
15 Q. You had never before been given a packet of statements to
16 review about some employee's wrongdoing?
17 A. I never had an appointee do what she did.
18 Q. I am sure you had appointees do a heck of a lot worse?
19 A. No, I haven't.
20        MR. BURRELL: Objection.
21 BY MS. GORDON:
22 Q. I didn't ask you whether you had ever seen anybody do
23 something worse. You didn't really see anything. Let's be
24 clear about it. You saw nothing?
25        MR. BURRELL: Objection. That's

Page 124

1 argumentative.
2 BY MS. GORDON:
3 Q. You saw nothing?
4 A. Counsel, you can't tell me what I did or didn't do. You
5 just met me today. That is so unprofessional of you.
6 Q. You just told me you didn't -- you weren't there for the
7 event at issue, the ten to 15 minute --
8 A. I read the statement.
9 Q. Okay. We passed that. My question to you is, since you
10 have been in your position, you have never been given a
11 packet of statements similar to this where employees were
12 interviewed after they were fired. That's never happened
13 before that you can recall?
14 A. I only get them on appointees.
15 Q. I'm sorry?
16 A. Correct.
17 Q. Okay. Do you know who wrote these statements out?
18 A. The person that made them.
19 Q. How do you know that, do you know whether it was --
20 A. That's what you do.
21 Q. Did Ms. Terry do a verbal -- if you know. I mean, she does
22 report to you. I understand you're saying you weren't all
23 that involved in this. But, if you know, did Ms. Terry do
24 an interview with these individuals and then type something
25 up for them based on the interview?

Page 125

1 A. Yes.
2 Q. So, Ms. Terry wrote -- typed up these documents, is that
3 what you're telling me?
4 A. I believe so.
5 Q. All right. I am going to -- you don't have one in front of
6 you. Maybe it will help just to see one, but -- I will just
7 hand you Ms. Whitehead's -- let's see here. I will hand you
8 Rashida Gamble. She was one of the interviewees.
9        Is it your belief that --
10 A. I don't have beliefs.
11 Q. Do you have understandings or do you have knowledge? You
12 have knowledge about these documents?
13 A. I do.
14 Q. So I am handing you Defendant's 20, is it your
15 understanding, that's one of the documents, you said you
16 reviewed them. That Ms. Terry would have interviewed
17 Ms. Gamble and then typed that up and asked her to sign it,
18 is that your understanding?
19        MR. BURRELL: Object. Foundation.
20        MS. GORDON: My question was, is it your
21 understanding that that document was typed up by Ms. Terry,
22 put together, and then Ms. Gamble was asked to sign it, is
23 that your understanding?
24        THE WITNESS: I don't have an understanding
25 of it. You would have to ask Ms. Terry.

Page 126

1 BY MS. GORDON:

2 Q.  You never discussed it with her?

3 A.  No.

4 Q.  Did you talk to Regina Parks after she was terminated?

5 A.  Yes.

6 Q.  When was the first time you talked to her after she was

7     terminated?

8 A.  Maybe a day or a couple of days afterwards.

9 Q.  Did you continue to keep in touch with her?

10 A.  No.

11 Q.  Now, just a few more questions, Mr. Turner.  Just to be sure

12    I have covered everything as to these events.

13        You have the restructuring meeting, you went

14    to another meeting.  My client went into the suite,

15    some things happened there.

16        The next time you talked to Regina was on the

17    phone, is that correct?

18 A.  Yes.

19 Q.  By this time, who had you talked to about what occurred in

20    the suite?

21 A.  I had talked to Rashaun and the sheriff.

22 Q.  Well, the sheriff wasn't there for the events, so you had

23    talked to Rashaun Whitehead at the time you talked to

24    Rashida later on the 13th?

25 A.  I don't recall talking to Rashida.

Page 127

1 Q.  Rashaun.  I am sorry.  There is a lot of R names in here.

2        You talked to Rashaun Washington (sic) about

3    what happened in -- Whitehead, also a lot of Ws.

4        You talked to Ms. Whitehead about my client's

5    conduct in the suite, that's what I understand your

6    testimony to be, is that correct?

7 A.  Yes.

8 Q.  Did you talk to anybody else about my client's conduct in

9    the suite other than Ms. Whitehead?

10 A.  Talked to the sheriff.

11 Q.  But he wasn't in the suite?

12 A.  You have that we still talked about it.

13 Q.  I want to know who you talked to that actually was --

14        (Overlapping speakers, unintelligible.)

15 A.  That --

16 Q.  I will change it.  Did you talk to anybody else that was a

17    witness?

18 A.  No.

19 Q.  Just strictly Ms. Whitehead?

20 A.  To my knowledge, that was the only witness.  I think

21    Danielle Stevens may have been there, but I don't think she

22    gave a statement.

23 Q.  Not whether she gave a statement, but just on the 13th, who

24    you had talked to about what Regina did or didn't do.

25 A.  It was just Rashaun Whitehead.

Page 128

1        MS. GORDON:  Okay.  That's all I have for

2    you.  I appreciate your time today.

3        THE WITNESS:  I appreciate yours as well.

4        MS. GORDON:  Thanks for coming.  Hope all

5    goes well with your surgery.

6        MR. BURRELL:  Two quick follow-ups.

7            EXAMINATION

8 BY MR. BURRELL:

9 Q.  You testified earlier that when someone complains of

10    discrimination at the County, they would go to, I think you

11    said internal affairs.  Was that your testimony earlier?

12 A.  Depends who the complaint is.

13 Q.  When would someone go to internal affairs?

14 A.  If it's a deputy, they would go to internal affairs.  If

15    it's a civilian, they will go to administration or -- at

16    either the sheriff's office or the County.

17 Q.  Who made the decision as to whether or not something would

18    go to internal affairs or not, was that you?

19 A.  No, that's the sheriff.

20 Q.  When would a complaint go to the EEOC coordinator?

21 A.  The who?

22 Q.  The EEO coordinator?

23 A.  That would be up to HR administration.

24 Q.  Were there times --

25 A.  Ms. Terry.

Page 129

1 Q.  I don't want to interrupt.  Are there times where you

2    received complaints that went to the EEO coordinator?

3 A.  No.  Complaint didn't come to me.  They went to

4    administration.

5 Q.  When you say administration, who are you referring to?

6 A.  Venita Terry.

7 Q.  You never addressed the complaint directly submitted to you

8    for discrimination?

9 A.  No.

10 Q.  You mentioned earlier in testimony also about a gentleman

11    named Ron Johnson.  Do you recall that testimony?

12 A.  I do.

13 Q.  Was Mr. Johnson a County employee?

14 A.  He wasn't at the time that the alleged complaint was taken,

15    that they were accusing the complaint.  He was not working

16    for the County.

17 Q.  When was Mr. Johnson an employee of the County?

18 A.  I can't remember the exact date and year that he came in,

19    but it was after he retired from Detroit Public Schools.

20    Somewhere around the year '22, I believe.

21 Q.  Was he an employee of the County at the time the complaint

22    was made against him?

23 A.  No.  Well, wait a minute.  The complaint or the phonecall.

24    I don't know anything about the complaint.  All I know is

25    about an anonymous phonecall.

33 (Pages 126 - 129)

Page 130

1 Q. I appreciate that. At the time the phonecall was made, was
2    Mr. Johnson a County employee?
3 A. He was.
4 Q. What was his position?
5 A. Executive protection to the sheriff.
6 Q. Prior to that, he was an employee of the County as well?
7 A. Prior to that he was the public safety chief of Detroit
8    Public Schools.
9 Q. You know the time that he was the public safety chief, do
10    you know that time frame?
11 A. I don't know anything. I don't know the time frame. I know
12    nothing about any complaint.
13 Q. Did you ever take an adverse employment action against
14    Ms. Parks?
15 A. Excuse me?
16 Q. Do you know what an adverse employment action is?
17 A. Describe it so I can be --
18 Q. Did you ever write Ms. Parks up?
19 A. No.
20 Q. Did you ever reduce her compensation?
21 A. No.
22 Q. Did you ever take job responsibilities from her?
23 A. Probably.
24 Q. For what reason?
25 A. She wasn't getting it done.

Page 131

1 Q. Do you recall the specific instance?
2        MS. GORDON: Object. This goes beyond my
3    exam.
4 BY MR. BURRELL:
5 Q. I think he answered. At this point we talked about --
6        MS. GORDON: Go ahead. I am just going to
7    make a record of that, you know, this is beyond the scope of
8    the examination.
9 BY MR. BURRELL:
10 Q. You can answer.
11 A. What was the question again?
12 Q. The question is, what was the instance where she failed, you
13    mentioned this a moment ago that there were times when she
14    didn't get the job done or something to that effect. What
15    was an example of that?
16 A. Our event adopt a child. She didn't notify Meijers in a
17    timely manner to get our gift cards. I took that
18    responsibility away from her.
19 Q. Who did you give it to?
20 A. Myself.
21 Q. Did you notify Ms. Parks that --
22 A. Verbally.
23 Q. What did you tell her?
24 A. I mean, I don't recall if I told her that verbally or I just
25    did it, to be honest. I don't recall.

Page 132

1 Q. All right. Any other instances, top of mind, where
2    Ms. Parks did not meet your expectations?
3        MS. GORDON: We have already covered this.
4    He already said no.
5        THE WITNESS: There were multiple times
6    that she didn't meet my expectations, but we don't -- we
7    don't do evaluations. We are not allowed to do performance
8    evaluations.
9        MR. BURRELL: I think we are done.
10        MS. GORDON: Thanks everybody.
11        (The deposition was concluded at 1:51 p.m.)
12                ** ** **
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 133

1
2 STATE OF MICHIGAN  )
3            )   ss.
4 COUNTY OF OAKLAND  )
5        I, Jennifer L. Wall, Notary Public within and for the
6 County of Oakland, State of Michigan, do hereby certify that the
7 witness whose attached deposition was taken before me in the
8 above entitled matter was by me duly sworn at the aforementioned
9 time and place; that the testimony given by said witness was
10 stenographically recorded in the presence of said witness and
11 afterward transcribed by computer under my personal supervision,
12 and that the said deposition is a full, true and correct
13 transcript of the testimony given by the witness.
14     I further certify that I am not connected by blood or
15 marriage with any of the parties or their attorneys, and that I
16 am not an employee of either of them, nor financially interested
17 in the action.
18     IN WITNESS THEREOF, I have hereunto set my hand at the
19 City of Walled Lake, County of Oakland, State of Michigan.
20
21 12-4-2025
                _Jennifer Wall_
22 _____
        Date        Jennifer L. Wall CSR-4183
23                Oakland County, Michigan
                My Commission Expires 11/12/28
24
25

Carroll Reporting & Video
A Veritext Company
www.veritext.com                                    586-468-2411
www.veritext.com

[& - activities]

**&**

**&** 13:21

**1**

**1** 9:19 10:12
**1,000** 9:22
**10409** 1:4
**10:20** 3:2
**11/12/28**
  133:23
**12-4-2025**
  133:21
**128** 2:12
**13** 5:12 93:20
  104:5 105:2
**130** 88:14,15
**13th** 104:17
  105:21 108:14
  112:2,15,18,21
  112:22 113:2,8
  113:23 114:9
  115:6 116:3,5
  116:12,19
  118:25 120:4
  120:21 126:24
  127:23
**147** 72:1
**14th** 113:8
**15** 97:4 103:5,8
  124:7
**16** 3:25 4:6
**17** 9:20
**170** 78:6

**170,000** 78:7,9
  78:11
**19** 1:14 3:1
**1958** 5:12
**1:51** 132:11

**2**

**20** 30:11
  125:14
**2018** 38:13
**2021** 9:19
  10:12
**2024** 35:25
  41:8,11 44:5
  44:13,16 50:9
  69:9 72:2 78:5
  79:23 104:17
  104:20 121:12
  122:3
**2025** 1:14 3:1
  4:3 9:21
**21** 104:20
  121:12 122:3,6
**22** 39:2 102:20
  129:20
**220** 1:13,17
**223-3500** 1:23
**23** 31:21
**24** 25:25 31:21
  40:9 45:3
**24/7** 102:4,5
**248** 1:18
**24th** 92:18

**25** 1:4 72:2
**258-2500** 1:18
**26** 72:2
**26781** 133:21
**28718** 3:22
**289** 51:6,15

**3**

**3** 2:11
**309-9474** 2:4
**313** 1:23 2:4
  13:15
**33** 1:12,17
**3500** 2:3

**4**

**4** 25:2
**40** 4:18
**4000** 1:22
**4183** 1:11
  133:22
**48226** 1:22 2:3
**48304** 1:18
**4:00** 95:11,22
**4:30** 95:11,23
  98:3

**5**

**500** 1:22 2:3

**6**

**623-4361** 13:15

**9**

**90** 80:20,21
**90k** 80:25,25

**9:00** 104:2

**a**

**a.m.** 3:2
**aaron** 1:21 6:7
  6:9 7:2 8:15
  65:11 116:17
**ability** 12:20
  17:18,25
**able** 116:9
**above** 133:8
**accepted** 8:24
  72:2,5
**accurate** 10:5
  13:4,12 39:12
  47:9 50:24
  59:10 61:24
  72:19 73:24
  79:3 83:24
**accusing**
  129:15
**act** 88:3
**acted** 34:9
**acting** 1:12
  35:19
**action** 71:2,13
  72:8 96:13
  118:19 130:13
  130:16 133:17
**actions** 67:2
**active** 48:19,20
**activities** 44:7
  66:24 75:18

Carroll Reporting & Video
A Veritext Company
586-468-2411
www.veritext.com
www.veritext.com

**[actually - appreciate]** Page 2

| | | | |
|---|---|---|---|
| **actually** 12:14 | 128:11,13,14 | **alcohol** 68:5 | **anybody** 47:22 |
| 50:14 56:23 | 128:18 | **allegation** | 52:20 60:5 |
| 127:13 | **affidavit** 71:19 | 95:18 | 66:13 68:20 |
| **add** 48:23 | 71:24 72:18,22 | **allegations** | 87:20 100:10 |
| **added** 76:14 | **affiliated** 54:1 | 68:4,6,14 | 101:2 103:13 |
| 80:9 | **aforemention...** | 70:22 | 103:23 108:12 |
| **additional** 8:21 | 133:8 | **alleged** 120:14 | 123:5,22 127:8 |
| 76:6,10 80:7 | **afternoon** 96:2 | 120:15 129:14 | 127:16 |
| 104:14 | **afterward** | **allegedly** 72:3 | **anymore** 54:13 |
| **address** 3:21,21 | 133:11 | 73:7 114:4 | 107:23 |
| 56:21,22 | **agency** 27:9 | 121:1 | **apologize** 96:24 |
| **addressed** | 40:5,18,19,20 | **allowed** 132:7 | 98:6,7,18 |
| 129:7 | 40:21,22,25 | **announcements** | 105:2 112:7 |
| **administration** | 41:22 42:8 | 27:3 | **apparently** |
| 15:6,10 37:9 | 54:13 | **anonymous** | 118:10 121:1 |
| 128:15,23 | **ago** 27:17,18 | 70:5,6,11,12 | **appearance** |
| 129:4,5 | 52:25 56:7,9 | 129:25 | 6:13 |
| **administrative** | 56:12 72:14,19 | **answer** 10:9,24 | **appearances** |
| 106:22 | 84:18 92:17 | 11:15 12:20,24 | 1:15 2:1 |
| **administrator** | 101:4 115:11 | 19:13,17 29:7 | **appeared** 7:10 |
| 16:7 22:14 | 131:13 | 33:23 34:15 | **appearing** 1:20 |
| **adopt** 42:19,20 | **agree** 26:15 | 49:3 55:22 | 1:24 2:5 |
| 131:16 | 35:16 112:5 | 59:4 64:3,9,11 | **applied** 18:10 |
| **advances** | **ahead** 8:14 | 64:23 65:10,17 | 28:9,11 |
| 114:17,18 | 11:14 17:15 | 66:20 113:16 | **appointee** |
| **adverse** 130:13 | 48:10 63:23 | 115:18 119:18 | 28:16 29:19 |
| 130:16 | 64:4,9,24 | 122:23 131:10 | 30:19 122:8 |
| **advice** 24:17 | 65:19 66:23 | **answered** | 123:17 |
| 34:25 | 74:15 93:16 | 17:16,18 55:13 | **appointees** |
| **advise** 34:24 | 131:6 | 55:13 72:24 | 28:22 107:7 |
| **advised** 69:21 | **ahold** 97:11 | 98:7 113:11,14 | 112:4 123:18 |
| **affairs** 18:21 | **aid** 4:18 | 131:5 | 124:14 |
| 18:22 19:2 | **ain't** 51:21 59:1 | **answering** | **appreciate** |
| 20:2,7,12 | | 48:12 69:18 | 128:2,3 130:1 |

Carroll Reporting & Video
www.veritext.com        A Veritext Company
586-468-2411
www.veritext.com

approach
  84:16
approached
  34:9 83:19
  84:6,15
appropriate
  35:19
april  44:4 72:2
area  24:23 42:5
  77:12 97:14
areas  25:13
  40:20 76:9
argumentative
  66:11,19
  111:18 118:8
  124:1
arrangements
  60:18
articles  31:15
asked  8:5 10:3
  11:24 12:9
  15:23 36:19
  51:12 52:3
  55:13 59:3,8
  59:13,16 80:22
  84:6 90:17,20
  98:6 103:22,22
  105:5,25
  108:10,21
  109:1,2 111:23
  113:13,13,14
  113:16,19,22
  115:2 117:1
  125:17,22

asking  9:2
  55:20 78:3,9
  90:22,23 94:8
  98:7
assessing  40:5
assignment
  36:13
assignments
  36:9,11,13
assist  59:8,17
assistant  5:3
  15:7 88:3,3,7
  89:25 106:22
assistants
  68:11
associated  60:3
assume  26:11
  35:9 41:2
  60:15 66:17
  99:20 101:10
  122:7
assumed  39:20
  61:23
assuming  6:25
attached  9:1
  133:7
attempt  9:24
  11:9
attend  43:15
  59:23 84:22
  92:25
attendance
  60:1 85:1

attended  91:1,7
attending
  59:20
attention  41:10
  41:13
attorney  66:4
attorneys
  133:15
august  7:8
  50:10
avenue  1:22 2:3
aware  20:22
  21:1,10,18,19
  23:17 29:11
  39:3 41:6
  61:15,23 62:1
  63:4 67:23
  70:21,22 71:19
  71:22 79:4
  83:18 105:23
  106:1,3,4
  109:2,3 119:14
  119:22 120:2
  120:23 121:3

**b**

b  2:13
babe  36:25
baby  34:23
  35:24
back  8:14
  31:21 38:9,14
  38:15 44:20,24
  49:21 61:1,1,5

61:8 64:5
  72:18 73:2
  92:15 93:13,18
  93:20 95:2,5
  101:12 104:3
  105:5,5 111:25
  112:8 118:24
background
  30:2
bad  111:5
  123:5
bantering  65:7
barely  73:25
  74:2
based  21:22
  124:25
basically  32:3
  85:25
basis  6:17
baskets  42:11
  42:14
bate  72:1
bates  51:6,15
  102:20
bathroom
  49:24 93:15
beg  121:6
behalf  1:20,24
  2:5 8:25
behavior  35:11
  112:5
belabor  11:8
belief  125:9

Carroll Reporting & Video
A Veritext Company
www.veritext.com                    586-468-2411
                                    www.veritext.com

beliefs   125:10
believe   77:2,6
  80:20 85:3,4,5
  87:17 94:20
  95:19 97:4
  121:9 125:4
  129:20
benny   4:8,21
  41:22
best   12:15 17:7
  17:18,25 31:19
  85:2 90:25
  97:6 99:3
better   105:6
beyond   131:2,7
big   44:19 74:13
  91:23 92:7
  94:2,4,21
  107:25
birth   5:11
birthday   7:5
bit   62:23
block   48:17
blood   133:14
bloomfield
  1:12,13,17,18
board   29:17
  76:20 78:3
  80:16 85:8,12
bob   5:8
bodies   63:10,18
  65:2,3 66:1
body   65:22

boss   15:23,24
  23:5 30:23
  81:6,7 111:8
bottom   52:1
  104:10
breaking   23:1
bridges   37:16
  37:17
bring   8:2,5 9:2
  29:23 41:13
bringing   29:24
  78:20
broad   18:2
  80:23
brought   4:7
  41:10 68:15
  75:8,10 79:12
building   88:25
  89:2 95:9
burrell   1:21
  2:12 6:7,7,9,15
  6:20 8:16
  10:19 11:1,12
  11:15 17:12
  19:14 21:25
  22:3 28:15
  29:10 33:3,22
  34:10,14 35:14
  35:20 39:17
  48:7 49:2,7
  55:12 57:4
  58:5 62:25
  63:6,13,21,25
  64:10 65:9

66:7,10,18
71:5,15 72:21
78:15 79:6
83:25 90:16
97:17 102:15
102:18,22
104:23 105:10
105:22 106:12
106:23 111:18
111:21 113:10
113:14 114:19
115:17,25
116:15,23
117:3,6 118:8
118:12,22
119:16,23
122:20 123:20
123:25 125:19
128:6,8 131:4
131:9 132:9
business   52:12
52:15,17,19,21
53:10 54:23
busy   92:15

**c**

calendar   47:4,7
  47:8
call   3:14,14,15
  3:18 5:19 9:8
  10:10 27:25
  40:24,24 69:3
  69:21,22 70:1
  70:5 72:2,5

93:9 94:12
95:14,22 96:4
96:13 101:16
102:4,5 104:2
106:8 107:2,6
110:22,22,23
110:24
called   3:5 56:24
70:12 80:2
89:16 91:5
93:5 95:21
96:15,17 97:10
97:10 98:14,20
101:12 104:3
105:4,5 107:14
112:8 120:7,16
caller   69:10,24
calling   40:19
55:16 75:25
93:6 112:1
calls   70:6,9
campbell   87:11
87:12
candidate   39:4
cane   60:25
61:10
capable   111:8
capacities   1:7
capacity   27:18
captain   20:14
20:16
caption   5:18
card   30:24

Carroll Reporting & Video
A Veritext Company
www.veritext.com                                                586-468-2411
www.veritext.com

**[cards - communications]** Page 5

cards  95:17
 107:21 131:17
carrier  13:18
 13:20,20
case  1:4 5:20
 6:5 9:10,17
 43:12 67:24
 71:19
casual  41:17
 45:8
cellphone
 13:14 62:18
 110:10
certain  3:11 8:2
 42:7 89:11
 120:22
certainly  8:17
 115:5 116:11
certify  133:6,14
cetera  47:17
chain  24:11
 61:18 77:17
 81:22 86:24
 87:1,3 100:10
chakrabarty
 20:19
chance  101:1
change  42:1
 50:14 85:20
 99:7 127:16
changed  32:20
changes  85:21
channel  25:2
 30:11

charge  22:10
check  18:4
 60:10,13
checking  3:17
chief  4:4,14,25
 8:18,18 13:3
 15:2 24:10
 25:14 51:15
 86:9,11,14
 130:7,9
child  42:19,20
 131:16
choice  34:21,22
choose  81:21
chose  81:22
christmas
 42:11,19,20
 43:22 44:5,8
 44:10
circles  123:9
circulated
 103:15
city  57:25
 133:19
civilian  128:15
claim  61:15,21
 115:24
claire  2:8
clark  2:2 6:23
clear  12:13
 64:15 95:22
 100:19 123:24
clearly  55:3

client  61:5
 62:16 66:23
 67:1 68:5,22
 69:9 70:1
 74:22 117:5,11
 117:11,13
 118:1,4 126:14
client's  127:4,8
close  101:15
closed  82:18
clubs  48:17
coach  105:25
coaching  24:16
 65:12
coat  110:8
collecting
 123:6
combined
 73:18,23
come  28:8,25
 44:4 53:14
 54:11 67:19
 68:1 76:20
 80:16 83:5
 101:24 102:2,3
 102:5 106:16
 106:17 115:24
 129:3
comes  44:3
 66:13 67:19
coming  18:6
 27:2 29:16
 33:8 37:24
 43:5 56:13

59:7 60:16
 69:2 70:5
 83:21 85:8
 100:8 118:19
 121:2 128:4
command
 24:11 61:18
 77:17 81:22
 86:24 87:1,3
 100:10
comment  64:22
 82:9,10,11
 104:22
commenting
 65:2,3,4
comments
 64:19 104:22
 121:3
commission
 133:23
communicate
 11:23 14:5,13
 14:16 27:1
communicated
 14:8
communication
 14:9 26:17
 27:2,6 41:5
 57:12 85:9
 88:8
communicati...
 9:9,15,25
 10:11 24:23
 25:7,12,20

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

27:7 30:5,16
32:23,24 33:9
33:15 36:15
39:14 41:2
42:4 73:21
101:3
**community**
15:7 32:23,24
39:14 40:18
42:3,5,8 43:6,8
43:9 45:16,20
46:14 47:16
48:1,5,16,16,17
49:6,12 73:12
73:16,22 74:6
74:12,20 75:2
75:5,6,14,18,24
76:1,3,14
**company** 53:9
53:13,18,22
54:1,2,6,8,20
54:22 55:8
56:13,16 57:10
59:7,9,18 60:2
**compensation**
130:20
**competent**
12:22
**complain** 37:1
**complained**
36:24 66:23
67:1
**complaining**
21:12,15 62:11

67:11 69:10
**complains**
128:9
**complaint** 5:20
5:21 18:16,17
18:19 19:2
61:24 62:1,8
82:1,2,10
83:12,15,22,24
84:8 117:13,17
119:12,14,21
128:12,20
129:3,7,14,15
129:21,23,24
130:12
**complaints**
18:13,23 19:25
20:22,24 21:2
21:5,8,20,23
79:2 129:2
**computer**
111:17 133:11
**computers** 23:1
23:2
**concept** 40:14
41:20 44:20
74:18
**concern** 47:12
71:12 72:7
82:14
**concerned**
35:11
**concerning**
10:12 14:6

83:10
**concerns** 34:5
46:9
**concluded**
132:11
**condition** 12:19
**conduct** 20:8
34:18,20 35:11
98:24 99:2
103:14,18
107:15 108:4
115:15 122:7
123:5 127:5,8
**conducted**
85:17 122:8
**conducting**
112:4
**conference**
89:8,10,12,14
90:5,6,7,8,9,10
90:11 91:22,23
92:7,8,11
93:22 94:2,4,9
94:11,12,13,15
94:17,17,18,22
94:22
**conferences**
27:8
**confided** 34:5
**confused** 94:9
**connected**
79:11 133:14
**consequences**
96:25

**consist** 20:6
**consulting**
60:18
**contact** 36:3
54:9 56:18
62:13 98:3
**context** 109:16
**continue** 3:16
118:2 126:9
**continued** 4:9
23:23
**continuing** 2:1
**contract** 79:10
79:18
**contractor**
79:23
**conversation**
41:18,19 45:9
53:13 55:5,7
63:15,17 98:15
114:9 121:16
**conversations**
64:18
**coordinate**
32:24 43:1,1
**coordinating**
44:11
**coordinator**
128:20,22
129:2
**copy** 72:23
**core** 118:13
**correct** 4:10,11
4:13 7:9,14,16

**[correct - deal]**

7:23 10:18,22
11:11 13:1
15:23 19:24
20:10 21:5,13
21:16,20,24
22:5,6 24:14
24:15 25:10
30:23 31:2,3
32:6,12,17
33:13 34:1,6,9
34:13,19 35:4
35:6,19,22
36:17,17,20,25
37:3,13 39:9
42:15 50:5,13
50:19 57:7
59:16,20 60:21
62:24 63:5,24
67:2 68:7,18
68:25 70:14,24
71:3,8 73:4,7
77:10,22 81:1
88:10 91:11
92:1 94:24
96:7 97:25
98:4,11 99:14
100:17 103:8
103:24 105:9
107:17 108:22
114:14,18,21
117:5,12 119:3
123:6 124:16
126:17 127:6
133:12

**correctly** 53:23
**counsel** 5:24
6:1,22 8:24
67:8,9 89:24
116:15 124:4
**counseling**
24:16
**counselor**
117:23
**count** 14:22,23
**countersued**
118:2
**county** 1:6,12
1:24 3:23 4:20
4:24 5:2,3 6:22
6:23 13:24
14:6 16:15
18:10,12,18
19:4 20:1,10
21:22 26:23
38:1,22 40:25
50:19 51:16
52:1,2,12,18,20
52:22 53:21
57:21 60:22
61:13,20 67:19
69:13 74:13,19
75:7 76:9,13
77:23 78:4,9
79:11,23 80:14
114:15,22
115:8 116:21
117:16 118:25
119:3 128:10

128:16 129:13
129:16,17,21
130:2,6 133:4
133:6,19,23
**county's** 67:9
119:6
**couple** 43:21,23
46:12 50:18
52:25 59:2
115:11 126:8
**course** 8:20
121:25
**court** 1:1 5:20
15:8 16:5,21
20:20 38:17,18
64:8 120:17,18
**cover** 115:12
**covered** 96:10
111:24 126:12
132:3
**crazy** 98:4
**create** 74:13,18
**created** 73:7
88:5
**crotch** 95:16
**csr** 1:11 133:22
**current** 3:21,21
12:16
**cv** 1:4

**d**

**d** 2:9,13
**daily** 36:7

**damn** 51:13
**danielle** 90:2
99:4 127:21
**date** 5:11,23
32:19 39:19
82:20,21 83:11
84:7 93:20
100:6 109:1,18
109:19 111:11
113:3,4 114:2
122:4 129:18
133:22
**dated** 9:20
121:12
**dating** 84:15
**david** 2:7 6:19
6:21
**day** 14:21,25
15:17,17,21,21
15:22,22 16:8
16:8 18:3,3
32:2 34:1,1
40:3,3 49:17
55:24 58:20
81:13,13,18,18
91:21 93:2
98:15 100:6
114:3,3,9
126:8
**days** 50:18
97:24 100:7
126:8
**deal** 27:8,8
36:14 70:6

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

[deal - division]                                                                 Page 8

107:25
**dealing**  45:21
**dealings**  52:12
  52:15,19
**deb**  3:19
**deborah**  1:16
  1:17
**decided**  32:21
  37:2 60:1
  88:19 120:19
**deciding**  77:20
**decision**  23:15
  27:12 31:20,25
  32:10 37:6,13
  74:23 100:17
  100:18 128:17
**defendant**  1:24
  2:5 13:1 51:5
  51:11 52:2
  102:23
**defendant's**
  72:1 125:14
**defendants**  1:8
**define**  7:18
  52:19
**definitely**  78:3
**degree**  102:5
**deny**  109:5,6
**denying**  36:22
  79:5 117:18
**dep**  5:15 7:2
  9:2 58:20
**department**
  18:18 20:23

22:25 40:23,24
  40:25 53:10
  54:6 57:15,18
  70:14,21
**departments**
  25:13
**depends**  43:12
  102:1 128:12
**deposed**  29:4
  62:5
**deposition**  1:10
  8:6,10 53:8
  83:23 132:11
  133:7,12
**deputy**  5:3 19:3
  128:14
**describe**  99:2
  130:17
**described**  96:8
  98:25 99:1
  103:2 104:13
**description**
  2:14 15:22
  16:16,18,22,25
  17:3,6 26:21
  50:19,22,24
  51:7,13 52:3,7
  77:8 103:18
**descriptions**
  77:5 81:8
**detroit**  1:22 2:3
  58:1 70:19
  129:19 130:7

**diagnoses**
  12:19
**diaz**  87:6,7
  91:20
**dickinson**  1:21
  6:7,20,24 8:16
**differ**  110:25
  111:1
**difference**
  49:15
**differences**
  49:18
**different**  25:13
  25:13 43:12,21
  67:24 72:10
  75:3 90:21
  91:18,22 92:8
  94:6,22 113:19
**differently**
  24:18
**difficult**  58:20
**difficulties**  31:4
  31:6
**dindi**  86:4,14
  86:18 88:2
**direct**  37:9
  64:10 121:5,7
**directed**  36:11
  71:2 72:7
  121:9,13,14,19
**directive**
  121:18 122:23
**directly**  15:3
  18:11 30:24

**46:5 129:7**
**director**  5:4
  15:6,6,7,8,8,10
  16:7 22:11
  27:6 38:17,18
  74:6,6 75:5,6
  87:4
**discovery**  8:20
**discrimination**
  18:16,17,19,23
  19:3,20 20:1
  20:22 21:2,5,8
  128:10 129:8
**discuss**  29:13
  29:16 59:6
  78:13 81:25
  84:20
**discussed**  52:17
  52:20 91:9
  98:14 99:8
  126:2
**discussing**  41:7
  50:6 54:6
  81:11
**discussion**  8:13
  41:3 92:6
**discussions**
  40:8 44:25
  45:2 50:12
**dispute**  106:14
**district**  1:1,1
**dividing**  75:6
**division**  1:2

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

**divorced** 38:8
**document**
  59:15 102:16
  102:19,23
  125:21
**documents**
  5:15 8:2,19,21
  9:2,8,11,13
  10:10 51:12
  125:2,12,15
**doing** 42:25
  45:15 47:15,17
  48:18 52:21
  53:9 54:22
  75:22 76:3,7
  76:11 79:11,13
  79:25 80:12,21
  81:15,17,18
  86:19 90:25
  97:2,3 108:13
  112:16 121:17
  121:17,22
**double** 3:17
**dps** 70:15,16,17
  70:18
**drinking** 110:2
**dropping** 75:5
**duly** 3:6 133:8
**duties** 15:17,18
  15:21,23 16:6
  16:8 26:25
  32:19 34:1
  40:3 75:23
  77:21 78:10

81:3,13 88:17
88:18

**e**

**e** 2:9,9,13,13
**earlier** 44:21
  91:9 100:7
  128:9,11
  129:10
**earning** 78:4
  88:11
**easter** 42:11,14
  43:22 44:1,3
**eastern** 1:1
**eat** 92:17
**eating** 92:19
**ed** 25:8,9,23,24
  26:12,21 27:10
  27:16 29:7,13
  29:16 31:4,7
  31:20,22 32:14
  32:16,20 33:9
  33:16 100:15
  100:20
**eeo** 128:22
  129:2
**eeoc** 128:20
**effect** 35:5 36:1
  83:20 131:14
**effecting** 12:17
**effects** 12:19
**eight** 15:4 38:2
**either** 89:4
  109:5 128:16

133:16
**elected** 41:1
  48:18
**elements** 11:7
**elizabeth** 1:16
**else's** 43:15
  89:23
**email** 9:23
  10:15 11:23
  56:20,21,22
**emails** 9:8,14
  9:22,24 10:23
  111:17
**employed** 3:23
  30:16 43:25
  60:5,9,10,13,17
**employee** 19:4
  23:7,15 24:4
  24:17,21 61:15
  61:18,20 67:22
  69:4 70:21
  72:4 79:10,18
  79:23 100:9
  106:20 122:8
  129:13,17,21
  130:2,6 133:16
**employee's**
  123:16
**employees**
  11:23 18:10,13
  23:17 75:8,10
  121:8 124:11
**employment**
  9:18 58:4 60:4

130:13,16
**ends** 63:19 65:3
**engaged** 69:10
  70:20
**engaging** 47:16
**entered** 102:8
  102:12
**entire** 28:3
  65:22
**entitled** 133:8
**envisioned**
  75:11
**episode** 93:8
  114:2
**erica** 33:13,14
  78:25 80:11,25
  85:5,7,12
**ericka** 33:18,20
  33:25 35:10
  36:3 37:2,15
  37:24 38:25
  39:4 82:1
**erickson** 33:13
  33:14,18 35:10
  36:4 37:2,15
  37:24 38:25
  39:4 82:1
**erickson's**
  33:20,25
**escalate** 24:12
**esq** 1:16,16,21
  2:2,7
**et** 47:17

Carroll Reporting & Video
A Veritext Company
www.veritext.com                                              586-468-2411
                                                              www.veritext.com

**evaluate** 111:15

**evaluations** 132:7,8

**evans** 5:5

**evening** 93:5,10

**event** 43:14,15 43:18,24 44:5 44:16 47:21,25 47:25 48:1,5 48:13 49:22 58:21 69:19 107:15 111:2 116:11 118:24 124:7 131:16

**events** 42:10 43:3,22 45:16 45:20 46:14 47:1,2,6,10,11 48:14,17,18,22 48:25 49:6 75:18 120:21 126:12,22

**everybody** 132:10

**exact** 76:8 129:18

**exactly** 61:25 80:24

**exam** 131:3

**examination** 3:8 128:7 131:8

**examined** 2:10 3:7

**example** 31:14 46:25 47:2 62:17 131:15

**examples** 43:7 43:13 67:25

**except** 76:8

**excuse** 11:19 12:12 16:17 19:7 21:14 38:11 44:9,14 50:21 66:25 67:14 69:20 76:23 78:8 82:4 86:13,25 88:12 89:6,13 92:5 98:24 100:24 101:22 103:14 108:1 130:15

**execs** 40:25

**executive** 5:3,3 15:7 68:11 69:25 89:25 100:22 130:5

**exhibit** 2:14 9:7 11:10

**exist** 19:6,8

**exists** 31:22 41:6

**exited** 97:5,7

**expectations** 132:2,6

**expires** 133:23

**explain** 8:15 54:5 76:10

**explained** 8:24 34:18 35:12

**explaining** 95:11

**explanation** 122:13

**external** 27:2

**f**

**facilitate** 53:24

**fact** 55:10

**failed** 131:12

**fair** 4:17 51:14 52:11 61:11 62:1,2

**fairly** 36:8

**falls** 40:25

**false** 54:17,23 72:14

**familiar** 30:7 30:12 51:3 52:8 62:9 83:13 89:17

**families** 42:21 44:11

**family** 57:14,17 57:20,25

**far** 9:14 22:9 28:19,21,25 29:7 44:23 48:19 58:11

70:11 76:12 77:18 98:10 101:19 103:22 106:3 108:18 108:21,22,24 119:4

**farmington** 3:22

**fault** 49:14,15

**february** 56:15

**feel** 12:22

**feeling** 105:6

**felt** 35:18,25 36:24 46:20 47:15 48:22 74:9

**female** 61:15 61:18,20 83:19

**female's** 65:21

**females** 63:5,9 63:10

**ficano** 5:8

**file** 62:7 83:12 83:23

**filed** 5:20 9:20 61:20,23,25 62:2 117:13

**filing** 61:15 120:17,18

**film** 62:17

**finance** 15:19 15:25 16:1 17:4

Carroll Reporting & Video
www.veritext.com          A Veritext Company          586-468-2411
www.veritext.com

| | | | |
|---|---|---|---|
| **financially** | **fork** 50:1 | **foxworth** 25:8 | 125:22 |
| 133:16 | **form** 10:19 | 25:9,23,24 | **garbage** 109:25 |
| **find** 8:22 11:7 | 11:1,12 14:9 | 26:9,12,21 | **general** 6:22 |
| 12:7 114:5 | 17:12 19:14 | 27:10,16 29:8 | 62:24 89:24 |
| **fine** 49:18 | 21:25 33:22 | 29:16,23,24,25 | **gentleman** |
| 111:5 117:20 | 34:10,14 35:14 | 31:4,7,20,23 | 129:10 |
| 123:10 | 49:2 57:4 58:5 | 32:14,16,20 | **getting** 24:5 |
| **finish** 16:4,20 | 62:25 63:6 | 33:16 36:15 | 26:13,14 28:5 |
| 29:2,15 58:19 | 66:10,18 71:5 | 100:15,20 | 85:19 88:17 |
| 74:16 | 71:15 78:15 | **foxworth's** | 130:25 |
| **fire** 100:19 | 79:6 83:25 | 26:16 | **gift** 131:17 |
| **fired** 103:15,17 | 104:23 114:19 | **foxwroth** 33:9 | **give** 3:20 14:23 |
| 117:5,11,15 | 115:17,25 | **frame** 130:10 | 15:17,20 17:7 |
| 122:19 124:12 | 116:23 117:3,6 | 130:11 | 17:10,19 26:25 |
| **firm** 6:13 8:24 | 119:16,23 | **frequently** | 36:9 43:7,13 |
| **first** 3:6 4:7 9:7 | **formal** 119:13 | 101:12 | 46:25 47:2 |
| 27:16,18 38:2 | 119:20 | **friend** 53:1,4,5 | 67:25 76:12 |
| 41:10 53:23 | **format** 29:7 | 53:5 | 81:5 103:13 |
| 89:21 105:18 | **former** 101:3 | **friendly** 101:10 | 108:13 109:18 |
| 108:4 118:3 | **forth** 64:5 | 101:17 | 109:19 131:19 |
| 120:11,13 | 101:12 | **friends** 7:19,20 | **given** 14:21 |
| 126:6 | **forward** 62:2 | **front** 72:22 | 18:1 51:11 |
| **firsthand** | **forwarded** 8:17 | 125:5 | 75:17 100:8 |
| 103:11 | **found** 114:3 | **full** 133:12 | 121:18 123:15 |
| **fit** 40:15 85:21 | **foundation** | **function** 18:1 | 124:10 133:9 |
| **five** 61:9 90:21 | 22:3 28:15 | 20:9 | 133:13 |
| **focus** 83:5 | 48:8 63:1 | **functions** 42:9 | **gives** 96:5 |
| **follow** 84:17 | 66:10 82:22,24 | **fundraiser** 7:9 | **giving** 17:20,23 |
| 122:9 128:6 | 83:1 97:17 | **further** 71:2,13 | **go** 3:11 8:12,14 |
| **follows** 3:7 | 104:24 119:24 | 72:8 133:14 | 11:14 17:15 |
| **fond** 26:19 | 122:20 125:19 | | 32:5 43:16 |
| 45:21,23 | **four** 75:11,12 | **g** | 44:20,24 47:2 |
| **forget** 37:12 | 75:21,25 85:19 | **gamble** 53:3 | 47:10 48:2,10 |
| | 94:16 | 87:14 125:8,17 | 48:14 49:24 |

[go - happened]

56:25 63:23
64:4,9,24
65:19 66:23
68:15,16 73:2
74:15 75:19
88:23,25 89:4
90:15 91:3
93:14,16 94:14
111:25 118:3
118:24 121:20
128:10,13,14
128:15,18,20
131:6
**goes**   128:5
131:2
**going**   3:18 4:16
7:11 9:4 18:6
29:19 37:3
40:2 41:3 42:7
48:4,21,25
49:17,21 50:15
51:14 55:18,21
58:24 59:20
65:17 71:24
72:1,20,23
73:6,10,11,13
73:15,17,23
74:11,12,12,22
75:1,8,10,22,23
76:6,11 77:21
78:19 80:2,5,9
80:12 81:15
88:2,3,7,8
91:12 92:15

93:7,14 99:19
99:22,24 102:5
106:10 111:25
113:10,18
118:4 121:20
121:22 123:5,9
123:9 125:5
131:6
**golf**   42:13,14
**good**   15:1 38:6
61:10 68:24
106:20 111:2,4
**gordon**   1:16,17
2:11 3:9 6:12
6:16 7:1,3 8:12
8:14,22,23
10:21 11:4,14
11:18 17:14
19:16 22:1,4
28:18 29:12
33:5,24 34:12
34:17 35:17,21
39:18 48:9
49:4,10 50:2,4
55:14,15 57:6
58:8 63:3,8,16
63:22 64:1,14
65:11,18 66:4
66:12,22 71:7
71:18 72:16,24
73:1 78:18
79:8 82:23,25
83:3 84:4
90:18 93:16,18

93:19 97:18
102:17,20,23
102:24 105:1
105:13,24
106:2,13,24
111:22 113:12
113:15 114:20
115:19 116:2
116:16,25
117:4,8 118:9
118:14,23
119:17 120:1
122:21 123:21
124:2 125:20
126:1 128:1,4
131:2,6 132:3
132:10
**gotten**   74:19
**grab**   108:8
109:21
**grabbed**   95:16
107:20 108:6
**grabbing**   97:14
108:25 109:4
109:10 110:4
110:13
**group**   89:16
93:21
**groups**   43:8
48:17
**guess**   7:10 10:5
**guessing**   12:10
12:13 19:11,11
20:3 39:2 45:7

**guy**   46:5 65:22
118:10
**guys**   6:12 8:20
27:20 101:23

**h**

**h**   2:13
**hand**   51:5,14
125:7,7 133:18
**handing**   125:14
**handle**   42:5
**handled**   26:20
31:12 44:5
45:20 46:2,9
**handling**   18:12
**hang**   14:15
16:4,20 28:8
47:21 54:19
55:19 65:14
69:13 71:22
75:21 81:22
91:17 108:12
108:16 109:9
**happened**   28:6
42:20 84:13
95:11 96:6,22
97:8,25 98:13
103:9,11
104:10,12,13
106:18 108:22
111:24 116:24
117:1,2 122:10
124:12 126:15
127:3

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

**[happening - information]**                                                Page 13

**happening**
   123:7
**happy**   42:1,2,3
   42:3 46:14,15
**harassed**   69:25
   70:13 116:20
   117:16 118:5
   119:7,11
**harassing**
   119:2
**harassment**
   21:12,16,23
   61:16,21 69:3
   69:11 70:20
   72:3 81:25
   82:2,12 115:7
   115:10,12,14
**hard**   29:3
**head**   22:15
   25:17,20 27:6
**head's**   100:8
**hear**   4:16 61:3
   68:8,14
**heard**   27:22
   63:11,18,18,19
   63:20,23 64:19
   64:25 65:6,21
   68:6 70:22
   89:16 107:18
   108:19 114:6
**hearing**   4:18,18
   4:19 96:12
   105:19

**heck**   123:18
**held**   4:5 5:1
   8:13
**hell**   52:25
**help**   47:20 61:6
   61:8 85:8
   122:12,13,14
   125:6
**helpful**   7:2
**helps**   61:7
**hereunto**
   133:18
**hey**   106:22
   108:19,25
   113:8
**hidden**   3:22
**hill**   2:2 6:23
   78:25 80:11,25
   85:5,7,12
**hills**   1:12,13,17
   1:18 3:22
**hire**   100:19
**hired**   27:10
   28:5 33:16
   75:23 78:19
**hiring**   29:23
   47:17 78:14
**hitting**   105:7
   112:10
**hold**   4:25 93:14
   95:16 107:21
**holiday**   82:19
   83:8,19

**home**   3:21 68:4
   68:16 88:25
   89:4 93:11
   104:1
**honest**   131:25
**hope**   128:4
**hoping**   69:24
**hotel**   36:20
**hour**   87:19
   88:21 91:1
   94:1 95:1
**house**   53:6
**hr**   16:6,8 18:2
   20:9,23 21:2
   119:18 128:23
**huh**   16:14
   23:22 33:1,6
   37:18 96:9
**human**   5:4
   15:14,19,20,25
   16:1 17:4,9
**hung**   120:6

**i**

**i.e.**   47:14
**idea**   14:23
   15:17,20 29:1
   39:8 40:12
   45:6 81:14,16
   97:13
**identified**
   99:23
**identifying**
   44:11

**immediately**
   37:23 96:20
   120:16
**improper**   62:13
**improve**   23:14
   35:3
**inappropriate**
   35:25 104:21
   112:17
**incident**   69:3
   72:3
**include**   15:15
**included**   15:20
**includes**   27:3
**including**   43:22
   114:22
**income**   60:7
**incorporate**
   32:22
**incorrect**   57:2
   58:18
**increase**   73:4
   88:17
**indicating**
   60:24
**indirectly**
   20:11 81:7
**individual**   1:7
   69:10,12,15
   70:13
**individuals**
   76:24 124:24
**information**
   68:17 69:16

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

71:10 95:7
98:1 104:14
**informed** 72:6
**inheritance**
40:16
**inherited** 40:16
41:22
**initial** 54:9
90:11
**initially** 53:25
**initiatives** 42:7
**innocent**
118:21
**instance** 131:1
131:12
**instances** 47:13
132:1
**intentionally**
65:12
**interaction**
39:22,25
**interest** 63:5,9
**interested**
67:16,17,17
121:24 133:16
**internal** 18:20
18:22 19:2
20:2,7,12
128:11,13,14
128:18
**internet** 23:3
**interpretation**
57:9

**interpreted**
54:18
**interrupt** 129:1
**interview** 77:1
77:3 124:24,25
**interviewed**
124:12 125:16
**interviewees**
125:8
**interviewing**
121:20
**interviews**
121:22,24
**intimate** 40:7
**intoxicated**
67:20,22 68:22
**investigate**
18:24 114:16
116:22
**investigated**
19:2,12,25
21:7 117:1,11
119:4,8,11,12
**investigation**
20:6 22:7
**investigations**
20:13
**investments**
60:15
**involved** 27:12
30:15 40:10
44:10,15 58:3
60:2,17 69:4
72:4 77:7

83:18 84:20
100:21 124:23
**involvement**
53:17
**irate** 93:7
**irritated** 61:4
**issue** 19:22
23:12,19 47:11
70:16,16 90:5
124:7
**issues** 12:16
23:1 61:1
111:10
**item** 9:7

**j**

**jankowski** 2:2
72:15 82:22,24
**january** 9:19
10:12 56:15
**jennifer** 1:11
133:5,22
**job** 14:6 15:13
15:21,22 16:16
16:18,22,25
17:3,5 18:1
22:13 24:5
26:13,14,16,16
26:21,25 28:8
28:9,11,12,14
28:22 33:14
34:1 38:14
50:19,22,24
51:7,13 52:3,7

63:11 75:23
77:5,7,21
78:10 80:5
81:3,8,13 86:8
86:15,17,18
101:25 102:1,1
102:2,3 130:22
131:14
**jobs** 30:12
101:21,23,24
**johnson** 70:3,4
70:7,12 129:11
129:13,17
130:2
**jointly** 1:7
**judge** 3:16
**judges** 3:16
**june** 5:12 9:20
**jury** 117:24,25

**k**

**keep** 90:21 94:8
113:2,18 126:9
**keith** 79:9,22
**kept** 7:11
122:15
**kerry** 100:22
**key** 42:7,10
**kind** 7:12 27:22
49:15
**knew** 21:12,15
21:22 29:7
30:9 39:6
62:23 70:12

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

98:10 99:7,10
99:14,18
101:15,17,19
114:8 115:5
116:12,18
121:22
**know** 3:13 4:19
5:19 6:3,4,6,9
6:16 14:22
15:22 16:6
17:9 18:19
19:10,19 20:7
21:7,17,19
22:22 23:16
25:25 26:9
27:16 28:25
29:2,6,24 30:2
30:6,8 34:20
35:2 36:13
39:21 40:2
44:13,15 45:2
46:1 48:12,13
49:21 51:13,19
52:21 53:5
57:8,8,10
58:11,16,20
59:1,14 61:25
62:11,20 63:17
64:20,21 65:12
65:25 69:7
73:16 75:15
77:1,19 79:5
81:14 82:6
83:5,17 84:2

84:16 87:13
89:1,3,5,7
90:20 92:17
94:8 95:6,9
96:4,23 97:7
97:13,19,21
98:22,22 99:16
99:19 101:9
102:10 103:14
103:22 105:20
105:24 106:5
106:15,15
107:12 108:10
108:11,18,21
108:23,24
109:8,13,17,18
110:3 111:16
112:13,15,17
112:25 113:2
115:11 117:20
118:6,7,11,20
119:4,5,18,19
120:9,22
121:15 122:25
123:2 124:17
124:19,19,21
124:23 127:13
129:24,24
130:9,10,11,11
130:11,16
131:7
**knowledge**
20:3,5 68:18
79:7 97:6 99:5

103:11 121:2
125:11,12
127:20
**known** 7:14
28:14 104:20

**l**

**l** 133:5,22
**lacey** 19:25
21:7,15
**lack** 45:24,25
**ladies** 76:19
**lady** 25:2 76:18
82:18 83:7
**laid** 85:25
**lake** 133:19
**lakeisha** 61:23
84:9,13
**language** 62:13
**large** 74:19
90:9,10 93:22
93:24
**law** 1:17 6:13
8:24 18:13
119:13
**lawsuit** 9:20
11:6
**lawyers** 64:7,7
**lay** 61:7
**lead** 82:16
**learn** 21:20
28:25 29:19
50:14 78:19
98:20 104:22

105:11,17
106:3 112:20
115:24 116:5
120:6,13,17
**learned** 22:2
62:6 70:23
95:2 104:19,19
104:20 105:9
105:12,14,17
105:20 106:5,6
106:8,14
112:11,13,17
112:22,23,23
114:11,12,15
114:21,24,25
115:1 116:3
119:7
**learning**
120:11
**learns** 118:25
**leave** 16:1
25:24 26:1
38:7 60:22
**leaving** 53:14
**led** 97:4
**lee** 2:8
**left** 15:11 25:1
25:9 32:16
38:23 43:19,21
55:6,8 60:23
76:13 81:20
92:8 95:9
103:5,8

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

[legs - matters]

Page 16

legs 108:6
lengthy 17:6
life 28:3
liked 111:4
limited 6:13
line 17:5
lines 35:10 87:25 96:22 98:4
list 9:1 90:17
listed 93:22
listen 35:2 90:24 111:8
listening 55:9 55:10
little 70:15 85:15 118:11
living 49:18
located 89:7
location 94:6
logs 9:8 10:10
long 4:5 7:14 13:16,16,17 14:15 26:23 36:3 37:21 38:1,22 77:23 84:17 87:18 88:21 93:23 94:25 96:18 97:1,3,15,19 103:10 106:19 123:4
longer 54:10 60:2 61:13

look 9:24 10:1 10:4,25 11:19 18:20 52:5 61:9 91:20 92:13,21
looked 5:15 10:10,17,22 11:2,16 12:7,9 63:20 119:22
looking 12:14 40:1,5,20 47:4 47:6 61:4 65:1 65:1 93:10 102:10
loop 81:20
lose 99:19
loss 4:18
lot 11:7 58:14 63:4,9 92:15 101:24 123:18 127:1,3
lying 118:2

m

m 2:2
macdonald 25:3,5,22 33:8 39:11,23 44:13 44:15 48:25 49:1,5 77:14 77:15,20 78:11 78:14 85:3 88:7 99:22

macdonald's 88:3
made 7:5 18:13 20:22,22 21:1 21:2 30:18 31:20,25 37:5 50:15 64:19 74:23 82:1,2,8 87:21,22 95:18 111:9 115:23 117:13,17 124:18 128:17 129:22 130:1
main 43:21
major 43:2,18 43:24
make 9:24 11:9 24:20 32:23 49:18 53:14 57:9 64:7 82:11 83:15,22 84:8 85:20 108:16 119:12 119:13,20 131:7
maker 32:10
making 27:4 78:7,9 104:21 111:9 114:17 121:3
maloney 86:4 86:14
maloney's 86:18 88:2

manner 35:19 131:17
mara 25:3,5,22 32:16,23 33:8 39:11,22 44:13 44:15 48:25 49:1,5 77:13 77:15,20 78:11 78:13 81:19 85:2 88:3,7 99:22
march 44:4
mark 87:6,7 91:20
marked 2:15
marketing 27:9 30:5
marriage 133:15
married 38:8 82:21 83:10 84:6
mary 58:3,11 58:21,25
marzotto 1:16
mason 2:8
material 11:10
materials 27:9
matter 11:6 71:12 72:6 77:19 119:22 133:8
matters 14:6

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

**mayor** 58:25
**mcdonald** 32:16
**mcnamara** 5:10
**mean** 9:14 10:9 22:23 26:18 46:19 58:14 62:5 63:17 74:3 83:1 99:9 124:21 131:24
**means** 22:24 40:2 48:13 52:2
**meant** 22:22 39:20 74:5
**media** 26:20 27:1,8 31:12 36:14 40:4 45:21,22 46:1 46:5,9,15
**medical** 12:16
**meet** 27:16,18 30:18 54:20 55:4 56:25 91:25 132:2,6
**meeting** 27:21 41:17 53:9,11 55:16 59:9,17 59:21,23 75:1 84:19,22,24 85:13,14,16,17 85:18 86:4 87:7,7,9,16,18

87:20 88:21 89:2,8 90:11 90:14,15,19,19 91:1,4,5,6,7,10 91:12,13 92:1 92:3,9,11,25 93:21,21,23,24 94:14,20,23,25 95:5,8 102:9 102:14 103:3 108:22 126:13 126:14
**meetings** 42:9 43:6,8,9 45:8 92:20,22
**meijers** 44:12 131:16
**meltdown** 95:15
**melton** 2:7 6:19 6:21
**member** 57:20
**members** 57:14 57:17,25
**memory** 12:17 19:22
**mentally** 12:22
**mention** 53:20
**mentioned** 44:20 46:13 129:10 131:13
**message** 110:13
**messages** 9:8 10:10 11:24

12:2,3,8 67:6 67:11,15
**met** 6:10 27:23 54:16,21 55:5 91:19 124:5
**michael** 1:10 2:11 3:4,14 102:13
**michigan** 1:1,6 1:13,18,22 2:3 3:22 133:2,6 133:19,23
**mike** 3:15
**mind** 132:1
**minute** 7:6 52:5 92:24 124:7 129:23
**minutes** 72:14 72:19 97:4 103:5,8
**missed** 42:17 104:2
**mixed** 87:11
**mom** 101:13
**moment** 131:13
**money** 7:10 42:21 60:16
**month** 44:2,3 45:4 56:7 60:11,14 92:18
**months** 52:25 56:9,11 59:2,5 92:17

**morgan** 60:13
**mouth** 63:24
**move** 99:16 100:4
**moved** 38:8 62:2 99:13
**multiple** 24:25 25:21 47:6 90:10 132:5
**multiples** 20:16
**municipality** 69:4 72:4
**museum** 30:11

**n**

**n** 2:9,9,13
**naive** 118:17
**name** 3:12 6:10 37:12 53:19 54:4 57:10 69:12,15,17 76:18,19 83:22 85:4 101:3 102:18
**named** 129:11
**names** 6:4,6,11 76:17,19 78:21 78:22 91:9 127:1
**naploean** 4:9
**napolean** 4:8 4:21 41:22
**nature** 39:25 48:5 66:19

**[nature - occurred]** Page 18

107:6,21
115:15,24
**necessary**
24:21,22
119:20
**need** 6:3 10:9
17:2 43:20
49:24 54:10,14
58:14 68:16
69:7 70:16
75:12 84:2
96:23 104:14
**needed** 27:1
46:18 48:23
75:25 112:7
**needs** 75:19
119:7
**nephew** 58:3,9
58:21,22
**nephews** 58:14
58:16,17,24
**never** 10:4,9,17
25:7 36:16
53:5 63:14
65:21 68:6
82:2,8,9
105:12,14
109:12,14
111:5 112:22
112:23,23
113:6,13,13,16
113:19,22
114:8,8 117:13
117:17 123:15

123:17 124:10
124:12 126:2
129:7
**new** 32:22
41:20 73:6,6,9
73:11,15 74:11
74:22,22 75:8
75:10,21 76:13
78:14,19,20
80:2,7,15
81:13 85:8,10
86:7 88:2,5,17
88:18 90:9,23
94:16,17
**night** 104:2,4,6
104:17,20,22
105:20 106:14
106:25 107:2
112:1,11,13,15
112:18 113:6
116:18 120:4
**nina** 2:2
**nope** 58:2,7,12
**normal** 14:8
**notary** 1:11
133:5
**noticed** 43:5
104:2
**notify** 131:16
131:21
**november** 1:14
3:1 31:21 40:9
50:7 78:5
79:23 93:20

104:5,17,20
105:2,21
112:15 118:25
121:12 122:3,6
**number** 13:14
13:16 14:3,3
45:12 54:9,11
56:19
**numerous**
64:19

**o**

**oakland** 1:12
1:12 133:4,6
133:19,23
**oath** 54:21 57:2
64:2,4 65:24
72:10 81:11
82:3,5,6 84:11
109:6,8 117:20
117:22
**object** 10:19
11:1,12 19:14
33:22 34:14
35:14 48:7
49:2 55:12
58:5 63:6 64:3
65:15 66:7,18
78:15 83:25
90:16 111:21
113:10 115:17
118:8 125:19
131:2

**objected** 65:13
**objection** 17:12
21:25 28:15
29:10 34:10
35:20 49:7
57:4 62:25
63:13,21,25
64:9 65:9,16
71:5,15 72:15
79:6 82:22,24
97:17 104:23
105:10,22
106:12,23
114:19 115:25
116:23 117:3,6
118:12,22
119:16,23
122:20 123:20
123:25
**objections** 64:7
**obligation**
116:21
**observe** 97:22
**observed** 23:12
23:17 103:23
**obtained**
121:10
**obtaining**
122:5
**obviously**
103:1
**occur** 75:19
**occurred** 43:22
107:15 120:21

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

126:19
**offer** 39:8
**office** 8:1 27:2
28:24 40:6,24
47:17 53:15,24
56:14 60:3
71:12 72:7
79:17 86:21
89:15,21,22,23
90:3 99:13,17
99:19,22,24
100:4 102:13
103:7 108:13
128:16
**officers** 86:22
86:23
**offices** 89:16
**official** 1:7 3:10
41:1
**officially** 50:15
100:19
**officials** 48:18
**oh** 49:17 65:21
86:15 96:22
112:6
**okay** 7:25 8:4
9:3,24 10:4
13:6,11 16:5
17:2,5 18:2
19:6 24:10
27:10 28:1,23
29:6 36:11
40:23 41:10
42:20 43:18

46:19 49:13,15
49:25 52:11
54:21 55:21,25
56:1,1,16
58:19 60:17
61:6 62:5
64:20 65:15
67:8,13 68:3
68:17 70:23
73:17 81:25
82:7 83:2,11
83:18 84:5
90:20,24 93:6
94:10 96:8,12
96:21 97:7
98:3 101:2
104:1,11,16
105:6,9 110:3
110:3,12,24
111:5,8 112:8
112:9 115:4
117:20,24
124:9,17 128:1
**olivia** 68:13
90:2 99:4
**once** 10:16,24
11:9 58:25
75:22 114:15
114:21
**opening** 28:9
28:11,12,14
29:8
**openings** 28:22

**opinion** 49:16
74:7
**opinions** 49:19
**opportunity**
23:4 41:21
**opposed** 40:15
**oral** 62:18
**organization**
48:16
**outreach** 15:7
24:23 25:7,12
25:18 32:23,25
33:8,11 39:14
39:15 40:18
42:3,5 43:3,4
43:11 49:12
73:12,16,22,22
74:6,12,20
75:2,5,6,14,18
75:24 76:1,4
76:14 79:13,15
80:1,13,22,23
81:4 85:11
86:1,2 88:9
**overlapping**
111:12,20
127:14
**oversaw** 15:10
22:24 33:25
**oversee** 15:14
15:19,25 16:1
16:8 17:4,9
18:5,5 88:8

**overseeing**
22:10,11 36:4
39:11
**overtures**
115:23

**p**

**p.m.** 104:2
132:11
**packet** 123:15
124:11
**page** 2:10,14
**paid** 78:11
80:19
**pants** 110:6
**paper** 46:6
**paragraph**
72:1
**pardon** 121:6
**parks** 1:3 2:6
9:17 10:1 12:2
12:4 13:4,7,11
25:6,17 33:10
33:12 42:24
44:6 47:14
62:16 67:1,6
68:24 69:2
70:23 73:4
74:3,5 85:3
93:7 95:15,21
101:9 105:8
106:19 108:21
109:9 111:10
112:16,21

Carroll Reporting & Video
A Veritext Company
www.veritext.com                                586-468-2411
www.veritext.com

[parks - position]

Page 20

115:22 119:1
126:4 130:14
130:18 131:21
132:2
**parkway** 1:13
1:17
**part** 15:20 22:7
35:22 47:24
48:23 54:12,13
54:13 86:7
101:20
**particularly**
26:19
**parties** 133:15
**party** 6:5 7:5
82:19 83:8,20
84:6
**passed** 4:9
124:9
**past** 57:17 79:3
**paula** 37:16,17
**pay** 7:10 18:4
73:4 88:17
**payments** 18:4
**people** 15:2
18:6,6 22:13
24:11,25 25:21
48:14,24 49:19
62:5 75:12,21
75:25 76:3,6
76:11,14,22
78:14,19,20,23
80:9 83:15
84:20 85:8

90:17 93:23
100:13 111:17
114:22 118:1
120:20 121:1
121:20
**people's** 81:13
**percent** 4:18
**perception**
123:10
**performance**
23:4,6,7,11,19
24:5 26:4,5,8
31:10 36:5,16
38:5 101:1
132:7
**performed** 18:2
**performing**
23:18
**person** 14:18
22:14 23:21
31:1 37:23
43:1,11 44:6
48:19 61:10
67:19 70:11,20
74:10,14 80:7
81:10 84:8
99:1,3 101:3
108:1 118:4
119:5 120:19
124:18
**personal** 13:14
56:19,22 68:17
133:11

**personally**
53:16 78:23
**personnel**
15:14
**pertaining** 11:3
11:5,5,17
**pettus** 100:22
**phone** 13:20,22
13:24 14:1,3
14:18 27:25
56:19,23,24
97:15,20
126:17
**phonecall**
56:23 69:9
95:10,20
129:23,25
130:1
**pick** 27:25
**picked** 42:21
70:1
**piece** 5:17
73:21,22,22
**pitch** 53:15
**place** 92:4,6
133:9
**places** 46:20,23
**plaintiff** 1:4,20
9:10,17 10:12
11:6 13:2 72:2
72:5,6 73:3
**play** 44:19
**playing** 40:6

**please** 63:13,21
66:19 74:17
83:5 108:13
**pleased** 31:10
45:12,14,15,19
46:1
**pllc** 1:21 2:2
**pocket** 97:15
97:20 110:10
**point** 6:14 13:5
21:20 43:1
44:6 77:23
96:13 111:23
114:11,12,14
118:4 131:5
**pointed** 74:9
**pointing** 5:18
**polderdyke**
21:7,15
**polderdyke's**
19:25
**policies** 18:9
**policy** 19:8,18
19:19 119:3,6
**political** 1:6
**position** 28:5
30:16 37:3
38:15 39:8
53:20 73:9,11
74:4,5,11,22
88:2,5 99:8
115:22 116:19
118:20 123:12
124:10 130:4

Carroll Reporting & Video
www.veritext.com          A Veritext Company          586-468-2411
www.veritext.com

**positions** 39:11 39:13 73:17
**positive** 30:22 82:3,5
**possible** 39:4 70:4
**posted** 28:12 28:22
**potential** 52:11 52:15 53:16
**potentially** 58:24
**practice** 19:10
**precinct** 48:6
**precincts** 43:9
**premises** 107:14
**prepared** 32:22
**presence** 43:6,7 43:8,10 66:3 133:10
**present** 2:6 9:19 10:13 65:6
**presentation** 54:11 56:13 59:7
**press** 27:8 31:15,18 36:14
**pretty** 64:15 102:4
**previous** 38:14 48:20

**previously** 75:3 76:3
**primarily** 36:14
**prior** 25:5 33:8 37:15,23 79:11 103:17,24 130:6,7
**private** 94:13
**privates** 107:20
**probably** 7:5 13:10 38:2 50:18 68:4 104:15 130:23
**problem** 23:8 23:23 24:5,11 24:17 36:16
**problems** 19:23 61:8
**procedures** 18:9
**process** 18:4,5 18:6,14,15,15 23:11 74:18
**produced** 8:20 51:5 67:8,13 102:23
**production** 67:15
**program** 44:8 44:10
**projects** 42:23
**protect** 66:5,8

**protection** 69:25 100:22 130:5
**provide** 69:24 72:23
**provided** 8:19
**public** 1:11 70:19 129:19 130:7,8,9 133:5
**pull** 10:23
**pulled** 110:6
**purpose** 16:12 16:13 109:22 110:12 122:5,7
**purposes** 7:1
**put** 24:1 27:9 41:21,23 68:20 79:20 93:14 111:6 113:3 125:22
**putting** 77:7

**q**

**question** 9:15 10:20 11:13 17:13 19:13,15 19:17 29:2,6 33:25 34:11 45:1 49:3,3 55:12,13,20,21 57:5 58:6 59:3 63:7 64:13,22 64:23 65:17

66:19 71:6,16 72:25 78:16 84:1 90:16,21 90:22,23 105:24 111:19 113:11,19 116:15,17 117:7,10 118:3 118:13,16,24 119:25 122:15 122:17 124:9 125:20 131:11 131:12
**questioned** 21:4 22:7
**questioning** 117:22
**questions** 9:4 10:24 12:20,24 69:18 78:10 90:24 126:11
**quick** 128:6
**quit** 55:20 116:5
**quite** 62:23
**quote** 82:18,18

**r**

**r** 127:1
**raised** 42:21
**rambling** 107:22
**ran** 41:24

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

Case 4:25-cv-10409-SDK-CI   ECF No. 33-4, PageID.889   Filed 01/14/26   Page 56 of 70

**randomly**
  110:2
**rant**  95:17
**raphael**  1:6
  13:2
**rashaun**  52:24
  54:10 56:2
  57:2 68:13
  85:3 87:16
  90:2 95:13,20
  96:24 98:20
  126:21,23
  127:1,2,25
**rashida**  53:3,3
  87:9,11,12,14
  98:20 99:7,9
  103:13 125:8
  126:24,25
**rashida's**  98:24
**rave**  95:17
**ray**  1:6 10:11
**reach**  28:10
  29:8
**reached**  21:22
  28:16 54:8
**reaching**  56:16
**read**  5:17,17,22
  71:24,25 72:18
  105:16,18
  111:16 114:25
  120:14,17,18
  121:10 122:1,3
  122:4 124:8

**reading**  59:14
  82:25 83:1,4,6
**ready**  5:15
  85:19
**real**  45:21
**realignment**
  88:1
**realize**  29:8
  96:4 97:13
  119:18
**really**  36:10
  44:19 51:4
  58:19 80:23
  109:17 123:23
**rear**  63:19 65:3
**reason**  6:12
  31:22 60:23
  66:5 86:6 93:6
  100:23,25
  122:11 130:24
**reasons**  74:7
**recall**  8:3 9:22
  10:3,14 11:2
  11:20 12:6
  13:8 17:1,2
  19:21,23 20:16
  20:18 27:19,21
  31:19 36:21,22
  36:23 51:20,25
  53:23 57:11,22
  57:24 62:12,15
  62:21 65:8,23
  66:4 69:2,6,13
  70:5 76:17,18

  76:18,19 77:25
  78:22 80:20
  83:18 84:3,9
  84:16 85:2,4
  86:5,7 87:8,21
  87:25 88:24
  89:1 91:8 93:3
  95:10 98:22
  101:8,14 107:5
  107:24 108:15
  112:3,12,14
  114:2 122:4
  124:13 126:25
  129:11 131:1
  131:24,25
**received**  8:1,16
  51:15 69:3,9
  73:4 129:2
**receiving**  8:7
  60:7 110:14
**recently**  53:8
  54:16,20 56:3
  67:22
**recess**  50:3
  93:17
**recollection**
  5:16 12:10,13
  12:15 70:15
  72:9 92:14
  99:3
**record**  6:3,20
  8:12,13,14
  24:20 33:2
  50:2 55:10

  72:17,20,21
  93:18 108:17
  111:9,10 115:4
  115:4 116:7,8
  116:9 131:7
**recorded**
  104:21 105:7
  112:9,16
  116:20 120:5
  133:10
**recording**
  106:9,22
  112:21 113:9
  113:17,20,24
  114:10,12,16
  116:3,5,13
  119:1 120:5,8
  120:8,14,15
**recruiting**
  86:19,20 94:20
**recruitment**
  15:8
**reduce**  130:20
**reference**  72:23
**referencing**
  102:15
**referred**  36:24
**referring**  54:24
  89:14 129:5
**reflect**  72:21
**refresh**  5:16
**refusing**  98:19
**regard**  9:16,25
  18:22 40:3

45:23 46:17
74:3 96:13
98:14,24
**regarding** 9:9
12:2,4 52:21
54:22 69:3
72:3
**regina** 1:3 2:6
9:17,25 12:2,4
13:4,7,11 25:6
25:17 33:10,12
42:24 44:6
47:14 48:22
67:1 68:24
70:23 73:3
74:3,5 75:3
85:3 95:2,4,6
95:15,21 96:13
97:1,10,19
98:3,14 99:9
99:10,10 101:9
101:24 102:12
103:7 104:3,3
104:21 105:5,5
105:6,6,7
106:19 107:18
108:10,12,12
108:16,19,21
109:9 111:10
111:24 112:8,9
112:16,21
114:11 115:22
116:12,19
119:1 120:4,7

120:7,21 121:2
122:19 123:1
126:4,16
127:24
**regina's** 98:24
103:14 107:15
**regular** 6:17
14:9
**regularly** 7:16
**rehired** 38:9
**related** 7:19
22:24
**relates** 22:25
**relation** 43:9
**relations** 5:4
**relationship**
7:22 68:24
106:21 110:16
110:18,19,22
110:23,24
111:3
**relationships**
52:17 60:4
**relatively** 96:20
**releases** 31:16
31:18 36:14
**remain** 38:22
**remarks** 87:21
87:22
**remember** 5:23
6:10 8:7,9 9:3
9:23 10:15
14:4 21:2,4
38:10,12,25

45:5,18 46:8
52:25 53:19
54:4 56:6
62:19 69:18,21
85:23,24 91:19
92:20 96:18
100:6,13,14
101:3,7 106:18
123:4,6 129:18
**removed** 37:3
**reorganization**
32:21 40:1
48:23 49:9
77:13
**reorganize**
40:15,17 45:12
**reorganizing**
40:6
**repeat** 59:11,13
107:11
**repeating**
113:18
**replacement**
23:1
**report** 38:3,20
49:9 96:5
103:13 124:22
**reported** 15:2
16:23 23:18
24:24 25:9
26:7,9,10
30:24 31:1
46:6 70:14
77:15 78:12

87:4
**reporter** 16:5
16:21 20:20
**reporting** 16:9
19:20 25:1,5
46:5 77:10,11
77:13
**reports** 120:25
121:16
**represent**
43:15
**representation**
6:25
**representatives**
6:23
**represented**
5:24 6:18
**representing**
6:17,21,24
42:8
**requested** 8:7
11:10
**required** 60:1
**resources**
15:14,19,20,25
16:2 17:4,9
**responding**
12:15
**response** 35:12
35:15
**responsibilities**
17:10 18:3
42:6,25 130:22

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

**[responsibility - selected]**                              Page 24

**responsibility**
  114:15 131:18
**responsible**
  18:9,12 20:9
  20:12 22:13
  24:24 76:8
  96:25 119:5
**restructure**
  41:25 44:21
  46:17 90:19
  92:3
**restructuring**
  41:3,7 44:20
  44:25 50:6
  73:2,3,7,20
  80:3 81:12
  84:19 87:7
  90:14 91:1,10
  91:15 92:3,6
  93:21 95:5,8
  99:11 102:9
  126:13
**results**  121:24
**retire**  60:22
  61:12
**retired**  3:12
  5:14 60:20
  129:19
**return**  103:5
**returned**  38:12
**returning**  95:3
  95:7
**revenue**  53:16

**review**  23:4,6
  123:16
**reviewed**
  121:11 123:11
  123:13 125:16
**revisit**  116:10
**rid**  26:2
**right**  3:18
  15:24 22:9
  34:4 41:8
  46:10,11 60:12
  70:2 73:2
  89:19,20 95:17
  98:6 102:16
  103:16 106:8
  107:16 111:11
  118:3 120:4
  125:5 132:1
**role**  15:2 18:19
  18:22 22:20
  25:1 33:8,11
  37:15 38:1
  39:4 40:7
  44:18,19 73:6
  123:4
**ron**  70:3,4,7,12
  129:11
**room**  36:20
  89:9,10,12,14
  90:5,6,7,8,9,11
  90:12 91:22,24
  92:7,8,12
  93:22 94:2,4,9
  94:11,12,13,15

  94:22,22
**rooms**  90:10
  94:17,18
**rough**  14:23
**roughly**  4:6
  38:10,12 87:19
  94:25 96:18,22
**run**  27:25 44:7
**running**  49:5

**s**

**s**  2:9,9
**safety**  130:7,9
**salary**  78:5
  79:20 88:13
**saw**  40:15
  41:23 68:6
  85:21 110:5
  120:20 123:11
  123:24 124:3
**saying**  9:5 10:4
  10:9 12:5 19:4
  19:23 47:18,19
  47:22 55:11
  70:10 98:11
  105:18 114:12
  114:24 116:5
  124:22
**says**  19:9 52:2
  66:13 102:6,8
  102:14 104:1
  112:1 119:1
**scene**  121:2

**schedule**  91:14
  91:21 92:13,21
  92:24
**scheduled**
  56:15 84:20
**schools**  70:19
  129:19 130:8
**scope**  131:7
**scratch**  65:15
**scrolled**  11:20
**searched**  11:20
**second**  11:19
  47:21 75:21
  91:12
**security**  60:10
**see**  11:16 14:20
  35:3 46:23,24
  47:3,13,22
  48:20 52:1
  54:14 70:9
  81:9 103:19,21
  112:8 118:19
  123:23 125:6,7
**seeing**  8:3
**seek**  11:10
**seem**  123:9
**seen**  51:16,21
  51:23,24 67:10
  67:13,15 109:9
  109:12,13,14
  109:21 123:22
**select**  78:23
**selected**  76:22
  76:24

**send** 60:10,13 68:4 111:17
**sensitivity** 35:16,18
**sent** 8:25 13:11
**sentence** 17:5
**september** 50:10
**serve** 4:20 8:6
**served** 8:9
**service** 8:17,25 38:17,18
**services** 15:8
**set** 43:11,14 84:24 133:18
**setting** 44:10 44:11 59:8,17
**settlement** 21:22
**seven** 38:2
**several** 14:25 83:15 100:7
**severally** 1:7
**severe** 61:1,8
**sex** 62:18 63:11 63:14,17 64:18 65:4 110:22,24
**sexual** 21:12,15 21:23 62:13 69:3,11 72:3 81:25 82:2,8 82:12 114:17 114:18 115:7 115:10,12,14 115:15,23 119:10
**sexually** 70:13 116:20 117:16 118:5 119:2,7
**sheffield** 58:3 58:11,21,25
**sheriff** 4:7,9,12 4:21 6:14,24 7:4,12,20 9:9 9:16 10:1 12:4 13:4,6,11 14:5 14:11,16,20 21:13,16,23 23:15,25 24:2 24:6,8,12 26:2 26:6,8,10,11,15 27:3,11 28:7 28:17 29:17,20 29:21 30:18,25 31:6,17 32:6 32:21 33:20 34:5 36:19 37:2 39:3,5,6 40:13,13 41:8 43:5,16,19 44:21 45:11 46:6,7,12 48:19,19,20 49:23 50:6 51:16 53:9,11 53:21,23 54:7 54:16,22,23 55:5,16 56:25 59:9,17 61:16 61:21 62:17,23 63:4,15 64:18 64:19 65:1,1,2 65:3,4,21 66:1 66:5,13,15,16 67:12 71:1,10 73:23 74:8 75:11 76:25 78:2,20,23 79:2 81:12,19 81:25 82:14,17 82:17,19 83:7 83:9,9,19,20,22 84:5,8,10,25 85:2,16 87:20 89:24,25 91:25 92:1,9,25 93:2 93:4,13 95:18 95:19 96:24 101:1 104:21 105:7,20 106:3 106:25 107:12 107:14 108:16 108:18 111:25 112:10,10,15 112:20 113:13 113:16,19 114:17 115:2 115:23 116:12 116:13,20 118:5 119:1 120:7,16 121:9 122:8,9,24 126:21,22 127:10 128:19 130:5
**sheriff's** 6:22 18:18 19:3 22:25 27:2 28:24 37:13 40:6,22,23 47:17 53:10,15 53:24 56:14,21 57:14,18 60:3 63:23 66:24 67:2 69:25 70:14,21 71:12 72:7 79:17 81:17 83:4 86:21 89:15,16 94:13 97:2 100:17,18 102:13 106:21 128:16
**sheriffs** 4:14,21
**shopping** 42:22
**short** 8:13 50:3 93:17
**shouted** 95:19
**show** 47:15
**showed** 62:17 62:17
**showing** 60:25 110:15
**sic** 98:20 127:2
**side** 88:8

| | | | |
|---|---|---|---|
| **sign** 125:17,22 | **somebody** | 19:11 89:20 | **spoken** 59:2 |
| **signature** | 18:16,17 23:11 | 103:6 | **ss** 133:3 |
| 133:21 | 28:1,10 29:8 | **southern** 1:2 | **staff** 4:4,15,25 |
| **signed** 30:24 | 48:21 49:22 | **speak** 85:13,16 | 13:3 15:2,19 |
| 71:19 | 52:21 53:5 | 101:14,16 | 16:11 18:11 |
| **significance** | 56:2 69:25 | 102:13 113:5 | 24:10 25:14 |
| 36:17,18 | 70:9 75:19 | 114:8 | 41:21 51:16 |
| **significant** 24:4 | 83:23 84:5 | **speakers** | 68:9 86:9,11 |
| 39:24 | 99:2 106:19 | 111:12,20 | 86:12,14 |
| **similar** 51:24 | 107:16 110:16 | 127:14 | **stamp** 41:22,23 |
| 124:11 | 110:24 116:4 | **speaking** 70:3 | **stamped** 72:1 |
| **single** 9:23 18:1 | 119:7,10,14,20 | 84:9 | **stand** 61:6,8 |
| 82:9 | 119:21 123:5 | **speaks** 72:17 | 72:9,11 |
| **sir** 18:1 71:19 | **soon** 120:6 | **specialist** | **standing** 65:16 |
| 81:6 109:9 | **sooner** 50:10 | 119:19 | **stanley** 60:13 |
| 113:1 117:22 | **sorry** 4:19 10:7 | **specific** 12:10 | **start** 3:20 |
| 119:13 | 17:21 24:7 | 20:3,5 43:20 | 48:25 65:15 |
| **sis** 101:13 | 27:14 33:14 | 46:3 58:15 | 85:19 |
| **sister** 53:3,3 | 37:17 39:14 | 61:22 69:7,23 | **started** 44:25 |
| **sisters** 87:11 | 42:17 47:5 | 75:15,17 81:3 | 45:2 50:6 |
| **sit** 61:4 | 51:22 57:23 | 84:3 113:3,4 | 53:25 |
| **sitting** 6:2 17:8 | 61:3 66:16,21 | 131:1 | **state** 1:6,13 |
| **situation** | 74:1 79:14 | **specifically** | 38:8 133:2,6 |
| 109:18,20 | 80:23 82:23 | 9:22 13:8 | 133:19 |
| **sixth** 90:22 | 86:10 87:11 | 40:18 45:18 | **statement** 10:5 |
| **smaller** 92:11 | 97:16 99:10 | 47:10,14 51:20 | 13:4 54:17,23 |
| 94:18 | 109:24 124:15 | 62:12 76:11 | 102:21 103:23 |
| **smelling** 68:2,5 | 127:1 | 99:6 107:8 | 105:16 108:13 |
| **smoked** 67:20 | **soumaya** 37:12 | 112:3 | 108:20 115:1 |
| 67:23 | **sound** 62:8 | **specifics** 46:8,8 | 121:8 124:8 |
| **social** 60:10 | 70:2 83:13 | 76:12 107:23 | 127:22,23 |
| **socially** 28:1 | 89:19 | **spell** 20:20 | **statements** |
| **solomon** 61:23 | **sounds** 10:16 | **spoke** 72:5 | 120:19,20,22 |
| 62:7 84:9,13 | 10:17 11:8 | | 121:1,10,12,14 |

122:6,18 123:2
123:6,11,13,15
124:11,17
**states** 1:1
**stay** 7:12,16,18
27:23 36:19
88:25
**stenographic...**
133:10
**step** 23:23
**stephanie**
76:17 80:11,25
85:4,12
**steve** 22:19
**stevens** 99:4
127:21
**stevenson** 90:2
**stick** 49:14 50:1
**stopping** 36:2
65:13
**store** 44:12
**story** 117:25
**stress** 101:24
102:5
**stressful**
101:21,24
**stretch** 61:7
**strictly** 7:22
127:19
**strike** 22:9
61:19
**structure** 90:9
94:16

**stuff** 108:19
109:23
**subdivision** 1:6
**submitted**
129:7
**subordinate**
114:17 121:7
**subpar** 74:8
**subpoena** 8:1,3
8:4,6,7,9,17,25
9:1,7 10:17,25
11:9
**suggest** 84:5,7
**suggested**
83:12,21,23
**suite** 1:13,17,22
2:3 89:17,22
89:23 90:4,6
91:23 93:22
94:1,4,11,21
95:2,5,8 96:6
97:2,5 98:8,10
102:8,13,25
103:9,10
107:19,20
121:3 126:14
126:20 127:5,9
127:11
**summary** 5:19
**summer** 7:8
45:7
**supervised**
32:17

**supervision**
133:11
**suppose** 13:13
51:2
**supposed** 23:9
**supposedly**
120:21
**sure** 13:5 14:23
16:19 17:5
18:25 26:22
30:21 51:18,19
62:2 69:16
84:10 87:25
98:16,17 104:8
104:9 109:5
123:18 126:11
**surgeries** 61:1
**surgery** 128:5
**sweetie** 34:23
35:24
**sworn** 3:6
58:25 133:8

**t**

**t** 2:9,13 13:21
**table** 6:2
**take** 23:25 52:5
52:5 64:8
65:17 70:16
71:1,2,9,13
72:7 78:2 92:4
92:6 96:12
99:22,24
113:16 120:20

130:13,22
**taken** 1:10 50:3
93:17 120:22
122:18 123:2
129:14 133:7
**talk** 7:19 14:20
23:13,20 35:1
35:2,7 36:7
44:22 54:16
55:19 63:18,18
63:19 65:21
66:2,14,16
68:15 87:20
93:4 95:4
98:15 103:1
104:4 106:25
126:4 127:8,16
**talked** 7:4
24:20 32:14
46:16 52:24
56:5 62:23
63:9,10,10
82:15 84:19
93:2 96:18
100:16 104:16
114:21 126:6
126:16,19,21
126:23,23
127:2,4,10,12
127:13,24
131:5
**talking** 16:9
29:20 30:15
46:7,25 47:16

**[talking - think]** Page 28

53:21 54:2
55:17 56:11
69:7 73:19,20
73:24 83:17
90:20 105:2
109:23,25
110:1,2 114:23
122:15 123:8
126:25
**talks** 66:1
**tangent** 111:23
**tape** 95:20
**task** 11:21
13:10
**taylor** 1:16
**team** 70:1
73:10 74:13,18
86:1,2,7
**tech** 22:11,11
22:14,15,16,17
53:9,13,18,22
54:2,6,8,20,22
55:7 56:13,16
57:10 59:9,18
60:2
**technically**
31:1
**technology**
15:6 22:16,17
59:7
**telephones** 23:3
**tell** 3:6 31:6,9
31:17 32:13
45:11 47:9

48:2 52:7 59:1
68:15 81:10,12
81:15 90:14
100:3 103:9
104:9 106:8
107:18 112:10
115:3 117:19
117:24,24
118:1 119:10
119:14,21
124:4 131:23
**telling** 12:3
17:8 19:22
49:5 62:19
77:20 106:21
117:23 118:15
125:3
**tells** 120:4
**temporary**
99:25
**ten** 97:4 103:5
103:8 124:7
**term** 32:22
48:13 80:23
85:20 89:17
**terminate**
31:20,25
100:12
**terminated**
31:23 32:1,4
39:1,2 100:9
100:10,12,20
126:4,7

**termination**
32:10 100:21
100:25 103:24
**terminations**
100:18
**terry** 15:12
16:18 17:9
18:12,18 37:11
120:25,25
121:7,13
124:21,23
125:2,16,21,25
128:25 129:6
**testified** 3:7
44:23 53:7,8
54:21 59:12
81:11 82:17,17
83:7 103:7
128:9
**testify** 118:5
**testifying** 84:10
**testimony**
17:11 49:6
57:3 64:25
72:18 83:4
112:24 113:20
116:7,9 127:6
128:11 129:10
129:11 133:9
133:13
**text** 9:8 10:10
11:24 12:2,3,7
14:1,5 41:15
67:6,10,15

**texted** 13:2,3
101:12
**texting** 13:6
14:11
**texts** 13:11
67:4 111:17
**thank** 7:1 39:22
72:9
**thanks** 102:22
128:4 132:10
**thereof** 133:18
**thing** 25:12
61:9 76:8
98:13 107:13
**things** 42:1
45:13 46:2,13
62:6 85:20
98:11 99:13,16
120:22 126:15
**think** 3:19 6:18
12:18 18:7
26:13,14 31:12
33:12 52:7
67:10,10 70:15
87:15,21,23
88:4 89:1,1,8
91:20 93:5
95:9 96:22,23
98:5,7,16
99:23 100:16
104:11,16
127:20,21
128:10 131:5
132:9

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

Case 4:25-cv-10409-SDK-CI   ECF No. 33-4, PageID.897   Filed 01/14/26   Page 64 of 70

**third** 61:2
**thought** 25:12
73:17 74:8,18
75:16 83:13
85:25 86:17
94:2 95:3
**thousand** 80:20
80:21
**three** 26:24
56:10,11 59:5
76:6,10,13
80:9,22 92:17
**tighten** 46:18
**time** 3:23 4:3
4:24 5:13 7:4
7:14,17 13:3
13:16,17 16:23
20:17 24:10
25:1 30:24
33:12 36:4
37:11 38:2
39:23 52:12,24
53:7,13 55:19
56:5 62:16,16
65:14,22 67:2
67:2 73:3
74:21 76:13
78:21,22 80:16
84:17 86:8,15
86:17,18 88:19
90:22 93:2,9
96:4 97:7
99:23 102:4
105:18 106:19

107:4 115:10
120:11 126:6
126:16,19,23
128:2 129:14
129:21 130:1,9
130:10,11
133:9
**timely** 131:17
**times** 14:25
47:14 64:19
80:22 90:21
128:24 129:1
131:13 132:5
**title** 3:11,12 4:3
4:5,24 18:2
33:14 73:13,15
74:11,19,22
75:2,3
**titles** 4:25 5:1,2
**today** 5:24 6:21
8:18 9:3 12:3
12:20,24 17:8
19:23 39:12,17
39:20 49:6
60:4 66:6 82:3
82:5 103:7
112:24 118:20
120:11 124:5
128:2
**today's** 6:25
32:19 109:1
111:11
**together** 27:9
28:1 77:7

101:19 125:22
**told** 15:25
24:17 26:11
29:21 32:4,5,6
32:11 34:24
35:10 36:19
37:5,8 45:11
49:23 54:4,9
62:16 70:1,16
70:25 71:3,9
71:12,13,17
72:10 83:15
90:13 93:7
95:15 96:23
98:25 99:16,24
100:1,4 104:12
104:13 105:7,8
107:10,11,11
107:12 108:9
112:7,9,16,20
112:22 113:2,6
117:18,18
121:19 124:6
131:24
**tonight** 106:9
**took** 24:6,8
38:14 42:21
116:19 131:17
**top** 132:1
**topic** 92:11
**totally** 91:18
**touch** 7:12,16
7:18 27:23
56:3 126:9

**tournament**
42:13,15
**towards** 66:24
95:18
**townsend**
68:13 90:2
99:4
**trail** 3:22
**training** 115:7
115:10 119:19
**transcribed**
133:11
**transcript**
116:10 133:13
**transfers** 18:5
18:5
**tried** 83:11
96:23
**trouble** 36:1
**true** 41:4,4
111:10 119:8
119:11 133:12
**truth** 3:6,6,7
117:23
**try** 42:12
**trying** 11:7
12:7 53:14,24
56:14 64:5,5
66:17 90:21
98:18 104:10
105:25
**turn** 18:20
**turner** 1:10
2:11 3:4,10,14

| | | | v |
|---|---|---|---|
| 3:19 5:11 6:21 8:1 9:1 16:4 22:14 26:9 50:5 52:9 55:19 62:6 64:17 66:3,13 66:15 102:13 126:11 | **under** 4:7,12 4:14,20 5:7 39:23 40:25 49:8 54:21 57:2 64:2,4 65:24 72:10 80:2 81:11 82:3,5,6 84:11 85:20 109:6,8 117:20,22 119:3,13 133:11 | **understandings** 125:11 **understood** 15:15 35:16 56:17 74:19 75:12,22 81:13 122:5 **unfortunately** 65:11 100:11 **unhappy** 31:16 | **v** 1:21 **vagina** 108:7,8 108:25 109:4 109:10 110:4 110:13 **vaginal** 97:14 **vague** 70:25,25 71:9,11 |

**twice** 37:22
**two** 4:15 11:21 25:13,13 26:24 54:11 56:9,10 56:11 59:5 61:1,12 72:14 76:19,21 128:6
**type** 47:25 124:24
**typed** 125:2,17 125:21
**typically** 14:13 14:15,16 24:20

**u**

**uh** 16:14 23:22 33:1,6 37:18
**ultimately** 111:14
**umm** 84:12
**unbecoming** 108:4 122:7
**unclear** 79:22
**uncontested** 116:14

**undersheriff** 89:24
**understand** 6:15 7:9 9:5 10:16 32:11 33:21 39:9 58:13,17,18 64:6,12 70:9 92:20 97:1 103:17 115:14 115:20,22 122:11,12,16 123:8 124:22 127:5
**understandable** 55:22 56:1
**understanding** 26:25 47:18 62:7 95:4 122:13 125:15 125:18,21,23 125:24

**uniform** 61:10
**unintelligible** 111:12,20 127:14
**united** 1:1
**unprofessional** 124:5
**unwelcome** 115:14,23
**unwelcomed** 114:18
**ups** 128:6
**upset** 34:18,20 36:20 98:11 99:7,10 107:7 107:8 112:3
**use** 3:16 14:1 111:17
**used** 7:16 24:16 48:12 83:22
**using** 36:2 56:21,22 82:14

**vaguely** 52:10 52:11 69:5 70:5 84:14
**various** 42:8 76:9
**vendors** 18:4
**venita** 15:12 37:11 120:25 120:25 129:6
**verbal** 14:14,17 14:18 50:12,17 124:21
**verbally** 41:13 41:16 131:22 131:24
**verbatim** 17:1 17:2 85:23
**vest** 97:14,15 97:19 110:8
**violations** 18:13
**vs** 1:5

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

[w - work]                                                       Page 31

| w | wanting   61:12 | 129:2,3 | 49:8 55:13,23 |
|---|---|---|---|
| **w**   2:9 | 65:4 113:3 | **whitehead** | 58:7 63:2,14 |
| **wait**   16:4 | **warren**   5:5 | 52:24 53:12 | 64:12 66:8,21 |
| 129:23 | **washington**   1:7 | 54:16,21 56:2 | 71:17 78:17 |
| **waited**   103:5 | 2:5 4:12,22 7:4 | 57:2 59:2,8,16 | 79:7 83:2 84:2 |
| **waiting**   95:3 | 9:9 10:11 13:2 | 68:13 85:3 | 104:25 105:11 |
| 103:4 | 66:16 112:16 | 87:9,16 90:2 | 105:23 106:1 |
| **walk**   109:9 | 127:2 | 95:13,21 96:5 | 111:19 116:1 |
| **walked**   107:20 | **watch**   93:10 | 96:19 97:2 | 116:24 117:7 |
| **wall**   1:11 133:5 | **way**   7:12 14:8 | 98:21 99:1 | 118:13 119:25 |
| 133:22 | 26:19,20 27:23 | 101:9,23 102:3 | 125:24 127:17 |
| **walled**   133:19 | 29:4 31:11,13 | 102:8,12,14,21 | 127:20 128:3 |
| **want**   11:8 16:6 | 31:15,18 34:8 | 104:1,4,11,12 | 132:5 133:7,9 |
| 41:25 43:8,10 | 46:2 78:5 | 104:16,19 | 133:10,13,18 |
| 44:20,24 45:2 | 100:9 | 105:4,8 107:11 | **woman**   83:21 |
| 47:9 48:20 | **wayne**   1:6,24 | 112:8,9 115:5 | **women**   62:23 |
| 64:8 66:5 | 3:24 4:20 | 116:11,14,18 | 63:19 65:1,5 |
| 76:10 77:19 | 51:16 52:12 | 117:18 120:5,6 | 66:14,16 |
| 81:12 82:21 | 117:16 | 120:16 126:23 | 118:19 |
| 83:10 108:6,19 | **ways**   34:8 | 127:3,4,9,19,25 | **women's**   63:18 |
| 109:17,18 | **wednesday** | **whitehead's** | 63:19 65:2,2,3 |
| 117:20 127:13 | 1:14 3:1 | 125:7 | 66:1 |
| 129:1 | **weed**   67:20,23 | **williams**   79:9 | **woodward**   1:22 |
| **wanted**   23:16 | 68:2 | 79:22 | 2:3 |
| 26:2 32:21,22 | **weeds**   77:18 | **wise**   58:4 | **word**   75:6 81:3 |
| 32:24 40:13,14 | **week**   122:18 | **withdraw** | **words**   34:21,21 |
| 40:15 41:21,23 | **weeks**   77:24 | 33:25 | 34:22 35:25 |
| 42:1 43:5 | **weird**   111:23 | **withdrawn** | 36:2 82:14 |
| 44:21 45:11,12 | **went**   7:5,10 | 62:8,15 | **work**   7:19,19 |
| 54:12 82:20 | 10:17 43:2 | **witness**   2:10 | 16:15 29:17 |
| 84:7 85:20 | 46:23 47:11,21 | 3:5 6:9,18 11:2 | 30:7,8,10,12 |
| 91:25 101:1 | 89:2 91:23 | 11:16 28:16 | 33:20 36:2 |
| 111:9 | 92:8 95:2,5,17 | 29:11 33:4 | 54:10 57:14,20 |
| | 126:13,14 | 34:16 35:15 | 57:25 58:11 |

**[work - zero]**                                                    Page 32

| | | z |
|---|---|---|

67:19,20,22
68:1,5 74:8
111:2
**workday** 98:21
**worked** 4:12,14
4:15 5:7 7:18
18:17 30:9,11
30:11 33:14
35:16 42:23
57:17 69:13
101:19
**working** 5:13
7:22 39:23
58:25 80:14
117:14 129:15
**workplace**
19:20
**works** 58:21
64:7
**world** 22:22
26:18 48:5,13
**worse** 123:18
123:23
**wright** 1:21 6:8
6:21,24 8:16
**write** 103:23
111:16 130:18
**writes** 31:18
**writing** 19:6,8
19:18,19 23:8
24:1 31:22
41:6 44:22
50:11,16 68:20
97:24 111:9

116:14
**written** 16:25
23:8 41:5
50:24 103:13
103:18 123:6
**wrong** 26:5
54:18
**wrongdoing**
123:16
**wrote** 26:19
31:13,15
124:17 125:2
**ws** 127:3

**x**

**x** 2:9,13,13

**y**

**yatooma** 22:19
**yeah** 36:18
96:1 113:4
**year** 4:1,2 5:23
38:25 129:18
129:20
**years** 4:6 26:24
27:17,18 38:2
61:9,12 85:19
101:4 115:11
118:10
**yep** 19:5 25:4
34:2 56:8
58:10 80:6
**young** 82:18
83:7

**zero** 103:12
111:9

Michigan Court Rules

Chapter 2: Civil Procedure

Subchapter 2.300 Discovery Rule 2.306

(f)  Certification and Transcription; Filing;
Copies.

(1)  If transcription is requested by a party, the
person conducting the examination or the
stenographer must certify on the deposition that
the witness was duly sworn and that the deposition
is a true record of the testimony given by the
witness. A deposition transcribed and certified in
accordance with sub-rule (F) need not be submitted
to the witness for examination and signature.

DISCLAIMER:  THE FOREGOING CIVIL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE STATE RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the

foregoing transcript is a true, correct and complete

transcript of the colloquies, questions and answers

as submitted by the court reporter. Veritext Legal

Solutions further represents that the attached

exhibits, if any, are true, correct and complete

documents as submitted by the court reporter and/or

attorneys in relation to this deposition and that

the documents were processed in accordance with

our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining

the confidentiality of client and witness information,

in accordance with the regulations promulgated under

the Health Insurance Portability and Accountability

Act (HIPAA), as amended with respect to protected

health information and the Gramm-Leach-Bliley Act, as

amended, with respect to Personally Identifiable

Information (PII). Physical transcripts and exhibits

are managed under strict facility and personnel access

controls. Electronic files of documents are stored

in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.