## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

**REGINA PARKS,**
*an individual,*

Plaintiff,

vs.

Case No: 25-cv-10409
Hon. Judge Shalina D. Kumar

**WAYNE COUNTY,** *a political subdivision of the State of Michigan,* **RAPHAEL "RAY" WASHINGTON,** *in his individual and official capacities, Jointly and severally*

Defendants.

---

**DEBORAH GORDON LAW**
Deborah L. Gordon (P27058)
Elizabeth Marzotto Taylor (P82061)
Sarah Gordon Thomas (P83935)
Morry Daniel Hutton (P81188)
33 Bloomfield Hills Parkway, Suite 220
Bloomfield Hills, Michigan 48304
(248) 258-2500
dgordon@deborahgordonlaw.com
emarzottotaylor@deborahgordonlaw.com
sthomas@deborahgordonlaw.com
mhutton@deborahgordonlaw.com
***Attorneys for Plaintiff***

**DICKINSON WRIGHT PLLC**
Aaron V. Burrell (P73708)
Angelina R. Delmastro (P81712)
Davina A. Bridges (P85597)
500 Woodward Avenue, Suite 4000
Detroit, MI 48226
(313) 223-3500
(844) 670-6009 (fax)
aburrell@dickinsonwright.com
adelmastro@dickinsonwright.com
dbridges@dickinsonwright.com
***Attorneys for Defendant Wayne County***

**CLARK HILL PLC**
Maria F. Dwyer (P60946)
Brian D. Shekell (P75327)
Nina M. Jankowski (P80558)
500 Woodward Avenue, Ste. 3500
Detroit, MI 48826 (313) 309-9474
mdwyer@clarkhill.com
bshekell@clarkhill.com
njankowski@clarkhill.com
***Attorneys for Defendant Raphael Washington***

# TABLE OF CONTENTS

INDEX OF AUTHORITIES ---------------------------------------------------------------- iv

I.    FACTS---------------------------------------------------------------------------1

    A. Plaintiff Regina Parks Was Employed By the Wayne County
    Sheriff's Office Between 2019 and 2024 ------------------------------------------1

    B. Defendant Sheriff "Ray" Washington Routinely Verbally and
    Physically Sexually Harassed Plaintiff and Other Female Employees---------2
    C. On November 13, 2024, Defendants Demoted Plaintiff and
    Removed her Private Office------------------------------------------------------ 15

    D. When Plaintiff Threatened to Expose Defendant Washington's
    Sexual Harassment, She Was Immediately Terminated ---------------------- 17

    E. Defendants Later Fabricated their Proffered Reason for Plaintiff's
    Termination-------------------------------------------------------------------- 21

II.   LAW AND ARGUMENT-------------------------------------------------------- 22
    A. Plaintiff's Retaliation Claim Should Go to a Jury-------------------------- 23

        1. Plaintiff Engaged in Protected Activity Under Title VII and
           ELCRA ------------------------------------------------------------- 23

           a. Plaintiff's Repeated Reports to Turner and of her Recording
           are Protected Activity ------------------------------------------- 23

           b. Plaintiff Engaged in Protected Activity When She Resisted
           Defendant Washington's Advances

           c. Plaintiff's November 13, 2024 Statements Were Protected
           Activity-------------------------------------------------------------- 26

        2. Both Defendant Washington and the County had Notice of
           Plaintiff's Protected Activity----------------------------------------- 27

        3. Demoting Plaintiff and Removing Her Office Are Adverse
           Employment Actions ----------------------------------------------- 33

        4. There is a Causal Nexus Between Plaintiff's Protected Activity
           and Plaintiff's Demotion, Loss of Office, and Termination--------- 31

        5. Plaintiff has Ample Evidence of Pretext -------------------------- 35

        6. The "Honestly-Held Belief" Rule is Irrelevant Here ------------------ 36

B. Plaintiff's Hostile Work Environment Claim Should Go to a Jury ------ 41

   1. Plaintiff Experienced a Hostile Work Environment-------------------- 42

   2. Plaintiff Subjectively Perceived the Working Environment as Hostile and Abusive --------------------------------------------------------- 46

   3. Defendant Washington's Harassment Culminated in Plaintiff's Termination, Which Results in Strict Liability Against the County -------------------------------------------------------------------------- 47

   4. Defendant County's Decision to Ignore Plaintiff's Complaints Eliminates the Faragher-Ellerth Affirmative Defense----------------- 49

      a. Defendant County Did Not Exercise Reasonable Care to Prevent and Correct Washington's Harassment------------------------ 49

      b. Plaintiff Properly Complained to her Supervisor as Contemplated Under Defendant's Sexual Harassment Policy ------- 53

   5. Defendant County Had Actual Notice of the Harassment Under ELCRA ---------------------------------------------------------------- 55

   6. Defendant County Had Constructive Notice Under ELCRA -------- 57

C. Plaintiff's Assault and Battery Claims Should Go to a Jury --------------- 58

# INDEX OF AUTHORITIES

## Cases

*Aplin v. Faurecia Interior Sys., Inc.,*
  No. 18-10703, 2020 WL 7017385 (E.D. Mich. July 30, 2020) ..................................... 30

*Barrett v Kirtland Community College,*
  245 Mich App 306 (2001) ............................................................................................. 32

*Barrett v. Kirtland Cmty. Coll.,*
  245 Mich. App. 306 (2001) .......................................................................................... 23

*Bell v. Ohio State Univ.,*
  351 F.3d 240 (6th Cir. 2003) ....................................................................................... 25

*Berryman v. SuperValu Holdings, Inc.,*
  669 F.3d 714 (6th Cir.2012) ........................................................................................ 42

*Blizzard v. Marion Tech. Coll.,*
  698 F.3d 275 (6th Cir. 2012) ....................................................................................... 35

*Boxill v. O'Grady,*
  935 F.3d 510 (6th Cir. 2019) ....................................................................................... 42

*Burlington Industries v. Ellerth,*
  524 U.S. 742 (1998) ..................................................................................................... 48

*Burlington Northern,*
  126 S. Ct. at 2415) ....................................................................................................... 30

*Burnett v. Tyco Corp.,*
  203 F.3d 980 (6th Cir. 2000) ....................................................................................... 43

*Carter v. Toyota Tsusho Am., Inc.,*
  529 F. App'x 601 (6th Cir. 2013) ................................................................................ 40

*Cf Clark v. United Parcel Serv., Inc.,*
  400 F.3d 341 (6th Cir. 2005) ....................................................................................... 43

*Chambers v. Trettco, Inc.,*
  463 Mich. 297 (2000) ................................................................................................... 57

*Chandler v. Regions Bank,*
    573 F. App'x 525, 530 (6th Cir. 2014) ........................................................ 25

*Chattman v. Toho Tenax Am., Inc.,*
    686 F.3d 339 (6th Cir.2012) ...................................................................... 35

*Clark v. United Parcel Serv., Inc.,*
    400 F.3d 341 (6th Cir. 2005). ................................................................... 47

*Clark, Inc.,*
    400 F.3d 341 (6th Cir. 2005) ..................................................................... 50

*Coburn v. Rockwell Automation, Inc.,*
    238 F. App'x 112 (6th Cir. 2007) ............................................................... 39

*Conway v. Electro Switch Corp.,*
    825 F.2d 593 (1st Cir. 1987) ...................................................................... 46

*Darnell v. Campbell County Fiscal Court,*
    731 F. Supp. 1309 (E.D. Ky. 1990) ............................................................ 30

*Davis v. Monsanto Chem. Co.,*
    858 F.2d 345 (6th Cir.1988) ....................................................................... 47

*Deboer v. Musashi Auto Parts, Inc.,*
    124 F. App'x 387 (6th Cir. 2005) ............................................................... 39

*Doe v. Grand Co., LLC,*
    No. 18-CV-13123, 2020 WL 806031 (E.D. Mich. Feb. 18, 2020) ............................. 43

*Dubey v Stroh Brewery Co,*
    185 Mich App 561 (1990) .......................................................................... 35

*E.E.O.C. v. New Breed Logistics,*
    783 F.3d 1057 (6th Cir. 2015) ................................................................... 26

*Elezovic v. Ford Motor Co.,*
    472 Mich. 408 (2005), ............................................................................... 57

*Ercegovich v. Goodyear Tire & Rubber Co.,*

154 F.3d 344 (6th Cir.1998) ........................................................................... 40

*Faragher v. City of Boca Raton,*
  524 U.S. 775 (1998) ................................................................................... 48

*Ferris v. Delta Air Lines, Inc.,*
  277 F.3d 128 (2d Cir.2001) ........................................................................ 52

*Free v. Fed. Express Corp.,*
  2019 WL 332810 (W.D. Tenn. Jan. 25, 2019) ............................................. 39

*Gaines v. FCA US LLC,*
  No. CV 18-11879, 2020 WL 1502010 (E.D. Mich. Mar. 30, 2020) ........... 33

*Hawkins v. Anheuser-Busch, Inc.,*
  517 F.3d 321 (6th Cir. 2008) ................................................................43,11,44

*Huang v. Ohio State Univ.,*
  116 F.4th 541 (6th Cir. 2024) .................................................................... 26

*In re Lewis,*
  845 F.2d 624 (6th Cir. 1988) ...................................................................... 39

*Jackson v. Genesee Cnty. Rd. Comm'n,*
  999 F.3d 333 (6th Cir. 2021) ...................................................................... 23

*Jackson v. Quanex Corp.,*
  191 F.3d 647 (6th Cir. 1999) ...................................................................... 53

*Jordan v. City of Cleveland,*
  464 F.3d 584 (6th Cir.2006) ....................................................................... 42

*Keller v. Clean Harbors, Inc.,*
  No. CV 17-11807, 2019 WL 5800290 (E.D. Mich. Apr. 30, 2019) ......27, 28

*Kennedy v. Smith,*
  No. 2:23-CV-13185, 2025 WL 2504839 (E.D. Mich. Sept. 2, 2025) .......... 32

*Kenney v. Aspen Techs., Inc.,*
  965 F.3d 443 (6th Cir. 2020) ...................................................................... 34

vi

*Khalaf v. Ford Motor Co.*,
   973 F.3d 469 (6th Cir. 2020) ................................................................ 41

*Kinnard v. Rutherford Cnty. Bd. of Educ.*,
   109 F. App'x 85 (6th Cir. 2004) ........................................................... 25

*Kuhn v. Washtenaw Cnty.*,
   709 F.3d 612 (6th Cir. 2013) ................................................................ 35

*Laster v. City of Kalamazoo*,
   746 F.3d 714 (6th Cir. 2014) ................................................................ 30

*Leahy v. Trans Jones, Inc.*,
   996 F.2d 136 (6th Cir. 1993) ................................................................ 25

*Marotta v. Ford Motor Co.*,
   119 F. Supp. 3d 676 (E.D. Mich. 2015) ............................................... 42

*Matthews v. Detroit Pub. Schs. Cmty. Dist.*,
   2021 WL 4427176 (E.D. Mich. Sept. 27, 2021) .................................. 47

*Matthews v. Detroit Pub. Schs. Cmty. Dist.*,
   No. 19-13277, 2021 WL 4427176 (E.D. Mich. Sept. 27, 2021) ................................ 56

*Maxwell v. FCA US, LLC*,
   2023 WL 2636586 (6th Cir. Mar. 21, 2023) ........................................ 33

*McPherson v. Kelsey*,
   125 F.3d 989 (6th Cir.1997) .................................................................. 32

*Meadows v. Wahler Auto. Sys., Inc.*,
   45 F.Supp.3d 645 (E.D.Mich.2014) ...................................................... 45

*Meyer v. City of Ctr. Line*,
   242 Mich.App. 560, 619 N.W.2d 182 (Mich. Ct. App. 2000) ................ 33

*Michael v. Caterpillar Fin. Servs. Corp.*,
   496 F.3d 584 (6th Cir. 2007) ................................................................ 30

*Mickey v Zeidler Tool & Die Co*,
   516 F3d 516 (6th Cir 2008) .................................................................. 33

*Moore v. KUKA Welding Sys. & Robot Corp.*,
    171 F.3d 1073 (6th Cir. 1999) ...................................... 58

*Morris v. Oldham Cty. Fiscal Ct.*,
    201 F.3d 784 (6th Cir. 2000) ...................................... 33

*Mulaj v. Sweeping Corp. of Am.*,
    728 F. Supp. 3d 672 (E.D. Mich. 2024) ........................ 24

*Muldrow v. City of St. Louis*,
    601 U.S. 346 (2024) ................................................. 29

*Mumm v. Charter Twp. of Superior*,
    727 F. App'x 110 (6th Cir. 2018), ............................... 27

*Neview v. D.O.C. Optics Corp.*,
    382 F. App'x 451 (6th Cir. 2010) ................................ 56

*Nguyen v. City of Cleveland*,
    229 F.3d 559 (6th Cir.2000) ...................................... 33

*O'Shea v. Yellow Tech. Servs., Inc.*,
    185 F.3d 1093 (10th Cir.1999) ................................... 42

*Patterson v. Kent State Univ.*,
    155 F.4th 635 (6th Cir. 2025) .................................... 29

*Pelcha v MW Bancorp, Inc*,
    988 F 3d 318 (6th Cir 2021) ...................................... 35

*Pennsylvania State Police v. Suders*,
    542 U.S. 129 (2004) ................................................. 49

*People v. Nickens*,
    470 Mich. 622 (2004) ............................................... 59

*Radtke v. Everett*,
    442 Mich. 368 (1993) ............................................... 56

Randolph v. Ohio Dep't of Youth Servs.,

453 F.3d 724 (6th Cir. 2006) ........................................................................ 42

*Reeves v. Sanderson Plumbing Prods., Inc.*,
530 U.S. 133 (2000). ..................................................................................... 25

Render v. *FCA* US, LLC,
53 F.4th 905 (6th Cir. 2022) ........................................................................ 33

*Risch v. Royal Oak Police Dep't*,
581 F.3d 383 (6th Cir. 2009) ........................................................................ 40

*Robinson v. Runyon*,
149 F.3d 507 (6th Cir. 1998) ........................................................................ 40

*Rymal v Baergen*,
262 Mich App 274 (2004) ............................................................................ 32

*Scharp v. Van Buren Pub. Schs.*,
2022 WL 480238 (E.D. Mich. Feb. 16, 2022) ............................................. 44

*Seay v. TVA*,
339 F.3d 454 (6th Cir.2003) ......................................................................... 37

*Sharp v. City of Houston*,
164 F.3d 923 (5th Cir.1999) ......................................................................... 52

*Sheridan v. Forest Hills Public Sch.*,
637 N.W.2d 536 (Mich. Ct. App. 2001); ..................................................... 56

*Smith v. Chrysler Corp.*,
155 F.3d 799 (6th Cir. 1998) ........................................................................ 36

*Sommers-Wilson v Samsung SDI Am, Inc*,
2019 WL 3244611 (ED Mich Jan 4 2019) ................................................... 39

*Spees v. James Marine, Inc.*,
617 F.3d 380 (6th Cir. 2010) ........................................................................ 30

*Strickland v. City of Detroit*,
995 F.3d 495 (6th Cir. 2021) ........................................................................ 44

*Torres v. Pisano,*
    116 F.3d 625 (2d Cir.1997) ............................................................ 49

*Town v Michigan Bell Tel Co,*
    455 Mich 688 (1997) ...................................................................... 32

*Varner v. Nat'l Super Markets, Inc.,*
    94 F.3d 1209 (8th Cir.1996)) .......................................................... 50

*Vincent v. Brewer Co.,*
    514 F.3d 489 (6th Cir.2007) ............................................................ 40

*Waldo v. Consumers Energy Co.,*
    726 F.3d 802 (6th Cir. 2013) ........................................................... 42

*Wanchik v. Great Lakes Health Plan, Inc.,*
    6 F. App'x 252 (6th Cir. 2001) ........................................................ 40

*Williams v. CSX Transp. Co.,*
    533 F. App'x 637 (6th Cir. 2013) ..................................................... 42

*Williams v. Gen. Motors Corp.,*
    187 F.3d 553 (6th Cir. 1999) ...................................................... 42, 45

*Williams v. Gen. Motors Corp.,*
    187 F.3d 553 (6th Cir. 1999) ........................................................... 43

*Wright v. Cellular Sales Mgmt. Grp., LLC,* ............................................ 34

*Wyatt v. Nissan N. Am., Inc.,*
    999 F.3d 400 (6th Cir. 2021) ........................................................... 51

*Young v. McHugh,*
    24 F. Supp. 3d 658 (E.D. Mich. 2014) ............................................. 32

## Other Authorities

Elizabeth Jubin Fujiwara & Joyce M. Brown, *Causes of Action for Post–Ellerth/Faragher Title VII Employment Sexual Harassment Claims,* § 53, (2008), *available at* 27 COA.2d 1 (Westlaw). ........................................................................................ 52

I.      **FACTS**

   A. **Plaintiff Regina Parks Was Employed By the Wayne County Sheriff's Office Between 2019 and 2024**

Plaintiff Regina Parks, 51-years-old, holds a Bachelor of Arts Degree in Industrial Management. **Ex. 1**, Parks Resume [DEF 48-51]. Before becoming employed by Wayne County, she had a successful career in business and workforce development and community outreach. *Id.* In March 2019, former Wayne County Sheriff Benny Napoleon hired Plaintiff as a Department Executive for Jail Compliance for the Wayne County Sheriff's Office. **Ex. 2**, Requisition for Personnel [DEF 73]. **Ex. 3**, Parks 15:20-16:1. Three months later, on June 20, 2019, he appointed Plaintiff as the Director of Community Outreach for the Sheriff's Office. **Ex. 4**, Appointment Letter.

After former Sheriff Napoleon's death in 2020, Defendant Raphael "Ray" Washington (hereinafter "Defendant Washington" or "Washington") was appointed to the position of Sheriff of Wayne County[1] on January 15, 2021. **Ex. 3**, Parks 20:4-13. Plaintiff maintained her position as Director of Community Outreach under Sheriff Washington.  She held this role until Defendants terminated her employment on November 14, 2024, one day after she reported that she was sexually harassed by Defendant Washington, and that she had recorded him harassing her. *Id.* at 16:18-23. The only reason offered for Plaintiff's termination in Defendants' official records is that

_____

[1] Defendant Washington was subsequently elected to the position of Sheriff in a special general election on November 8, 2022 and a general election on November 5, 2024.

her "appointed expired". **Ex. 5**, Expiration of Appointment [DEF 25]. At the time of her termination, her personnel record was devoid of any performance or conduct issues.

As Director of Community Outreach, Plaintiff was the sole liaison between the Sheriff's office and the community at large. She represented the Sheriff at events when he could not be present, facilitated every community event and partnership that the Sheriff's office had within and outside Wayne County, in addition to other duties, such as creating proclamations, resolutions, certificates and letters for citizens being recognized by the Sheriff's Office. **Ex. 3**, Parks, 17:1-15; 252:3-6;  **Ex. 6**, Washington, 186:21-25. As a director, Plaintiff led a group of employees who would commonly assist with these duties. **Ex. 3**, Parks 84:7-21.

## B. Defendant Sheriff "Ray" Washington Routinely Verbally and Physically Sexually Harassed Plaintiff and Other Female Employees

When Plaintiff began working for Defendant Washington in January 2021, he had a long and well-known history of sexual harassment. Under oath at his deposition, Washington denied ever making a sexual comment to any female employee of Wayne County. **Ex. 6**, Washington 244:8:12. He likewise denied touching any female employee in a sexual manner. *Id.* at 244:13-245:4.

In 2002, Defendant Washington, then a Lieutenant with the Detroit Police Department, was investigated and charged with misconduct for conduct unbecoming

2

an officer and lying to the Southfield Police[2], after his ex-wife reported him for "peeping in [her] windows" and then becoming "abusive, screaming at her and cursing":

IAS CASE #03 007/MISCONDUCT SUMMARY
LIEUTENANT RAPHAEL WASHINGTON, BADGE L-148, PENSION # ▮▮▮
ASSIGNED:          TRAFFIC ENFORCEMENT UNIT

CHARGE I:          CONDUCT UNBECOMING AN OFFICER

SPECIFICATION:  That he, Lieutenant Raphael Washington, badge L-248, assigned to the Traffic Enforcement Unit, did, on December 13, 2002, while off duty and in civilian attire, trespass by entering the backyard of ▮▮▮, Southfield, the home of his ex-wife, Ms. ▮▮▮, and Mr. ▮▮▮, such conduct which tends to bring the department into disrepute and reflect discredit upon the individual as an officer and is contrary to the Law Enforcement Code of Ethics; this being in violation of General Order 72-17, Section K, Subsection 65.

CHARGE II:        WILLFULLY MAKING A FALSE ORAL OR WRITTEN STATEMENT OR REPORT

SPECIFICATION I:  That he, Lieutenant Raphael Washington, badge L-248, assigned to the Traffic Enforcement Unit, did, on February 28, 2003, while on duty and in uniform attire, at the office of the Internal Affairs Section, state during a Garrity interview ▮▮▮ when in fact he had entered the backyard of the home; this being in violation of General Order 72-17, Section K, Subsection 7.

SPECIFICATION II:  That he, Lieutenant Raphael Washington, badge L-248, assigned to the Traffic Enforcement Unit, did, on February 28, 2003, while on duty and in uniform attire, at the office of the Internal Affairs Section, state during a Garrity interview that ▮▮▮ when in fact he did tell them he had been out jogging, this being in violation of General Order 72-17, Section K, Subsection 7.

**Ex. 7**, Ross Jones, *Wayne County Sheriff Raphael Washington ducks questions over harassment claims* (WXYZ Detroit, June 8, 2022). https://www.wxyz.com/news/local-news/investigations/wayne-county-sheriff-raphael-washington-ducks-questions-over-harassment-claims.

---

[2] Washington denied this at his deposition. **Ex. 6**, Washington 249:8-14.

In 2008, a member of the public complained that when she visited a Detroit Police Department office where Washington worked he made lewd comments to her about her appearance, touched her leg and thigh, asked to see her "panties" and for her to bend over:

**WITNESS STATEMENTS**

On April 29, 2008, at 11:30 A.M., at the office of Internal Affairs writer obtained a written and audio taped statement from the complainant. The complainant stated that she came to the Traffic Enforcement base to visit Officer ███ When the complainant entered the roll call room she observed Lieutenant Washington and Officer ███ Lieutenant Washington was sitting behind the desk. Lieutenant Washington told the complainant that she really looked nice at the Auto Show Charity Preview (January 2008). Officer ███ walked out of the room. Lieutenant Washington came over to the chair where the complainant was seated. The complainant was wearing a skirt. Lieutenant Washington stated over and over again that the complainant looked good, and that he had never seen her dressed like that before. The complainant informed Lieutenant Washington that she always wears skirts to work. Lieutenant Washington then placed his hand on the complainant's leg and proceeded to move his hand up to her thigh. Lieutenant Washington asked the complainant if he could see her panties. The complainant pushed back in her chair and stood up. The complainant asked Lieutenant Washington if he could call Officer ███ on the radio again and advise him that she was waiting on him. Lieutenant Washington complied and Officer ███ responded and indicated that he was approaching the base. The complainant then walked out the roll call room through a dark office to reach the exit door. Lieutenant Washington followed her into the office. When the complainant reached the exit door, Lieutenant Washington asked the

Commander Br●R. Stair, Internal Affairs (T. C.)                    October 22, 2008

**IA CASE #08 057**                                                      **Page 3**

Sergeant Lisa Collins, Internal Affairs

complainant to bend over. The complainant refused and opened the exit door. When the complainant opened the door she observed Officer ███ in the garage but he did not see her. Lieutenant Washington asked the complainant to close the door and requested that she bend over a second time. The complainant refused, pushed open the door and exited the office and joined Officer ███

*Id.*

4

In 2010, LaKeisha Solomon, an employee of the Sheriff's Office, complained that Washington persistently asked her out on a date during a work event.

Name(s) of individual(s) initiating the comments or conduct:
*Chief Raphael Washington*

Specific conduct, words, or offensive action (if offensive behavior or words occurred more than once, please state date, place, and specifics for each time):
*Chief Washington Persistently asked me to go out a number of times. Sometimes he became very close to me in his asking.*

Where did the offensive behavior or comments occur? *Roostertail -*
*Jenkins Construction Christmas Party*

*Id.* Under oath at his deposition, Defendant Washington denied this undisputed fact: "Q: [Solomon] would've made a complaint in 2010…A: No. She didn't make a complaint. She did not make a complaint. Q: The complaint was made then withdrawn, is that accurate? A: I don't even know that there was even a complaint, period." **Ex. 6**, Washington 284:1-9. Washington later conceded that he was, in fact, interviewed by Internal Affairs about Solomon's complaint against him. *Id.* at 284:10-19. He denied her allegations. *Id.*

In 2016, an employee of the Sheriff's Office, Lacey Polderdyke, sued Washington, claiming that he repeatedly asked her for massages at work. Polderdyke attached screenshots of Washington's text messages to her Complaint, showing that

5

asked for a massage in exchange for considering her for an assignment. **Ex. 8**, Polderdyke Complaint at p. 5, ¶ 29. Under oath at his deposition. Defendant Washington denied seeking massages from Polderdyke. **Ex. 6**, Washington 44:13-14. 47:15-48:4. He later conceded that he, in fact, told Polderdyke he would place her on the list for a court assignment after she gave him a massage. *Id.* at 48:17-23. 50:7-18. Washington admitted that it would be inappropriate for him to ask a subordinate employee for a massage. *Id.* at 51:7-17. When Turner, Washington's Chief of Staff, learned of Polderdyke's allegations, he immediately moved to suppress them, telling her to "make sure she did not do anything stupid." **Ex. 8** at p. 6, ¶ 31. The case was later settled for $85,000. **Ex. 9**, Polderdyke Settlement Agreement.

During Plaintiff's tenure with the Sheriff's Office, Washington's harassment of Plaintiff and other female directors was widespread, and common knowledge at the County. In May 2022, at a Detroit Public Schools gala event, Defendant Washington put his hand up the slit in Plaintiff's dress. She swatted his hand away. According to Plaintiff, at least one other Sheriff's appointee, Rashaun Whitehead, Defendant Washington's executive assistant, saw this occur. **Ex. 3**, Parks 29:13-31:8. Plaintiff reported the incident to her immediate supervisor, Chief of Staff Michael Turner, in the summer of 2022. *Id.*

Also in 2022, as Plaintiff and Turner were walking out of his office, Defendant Washington told Plaintiff, "You're wearing those pants" and put his hand down the top of her pants, touching the skin of her back near her belt loop. Because Turner heard

Washington's comment, he then said, "Oops, I wasn't supposed to say that." Turner "corrected him and said, "No, you [weren't]." *Id.* at 77:5-78:6.

Washington's conduct continued throughout 2022. On another occasion, he told Plaintiff, "You're really wearing that outfit." *Id.* at 119: 11-16; 121:1-15. During an event, he told Plaintiff, "I don't even know how I even got [his child's mother] pregnant" because "I don't know how I got my dick through her scar tissue". *Id.* at 101:16-21; 114:3-115:7. Plaintiff testified that her responding expression made it clear that the comment was inappropriate. *Id.* at 115:9-11. She reported the comment to Turner, and two other Sheriff's appointees, Rashidah Gamble, and Rashaun Whitehead. *Id.* at 115:12-21.

In late 2022, Defendant Washington swatted Plaintiff on her buttocks as she entered his office suite. Plaintiff raised her hand, as if to strike him, and said "MF". *Id.* at 20:24-22:2; 23:9-15. Plaintiff reported this incident to Turner in 2023. *Id.* at 22:5-22. Turner responded by calling Defendant Washington "a stupid motherfucker". *Id.* at 24:15-18. Plaintiff also disclosed this incident to Whitehead in 2023, during a larger discussion they had about the Sheriff's harassment of Plaintiff and others. *Id.* at 28:23-29:10.

Turner took no action; Washington's conduct continued in 2023. In February or March of 2023, Defendant Washington touched Plaintiff's stomach inappropriately, and stated "Can I feel the baby?" She was not pregnant. She reported the incident to Turner and Whitehead. *Id.* at 77:5-15.

7

On or about February 21, 2023, Washington called Plaintiff and propositioned her for sex. Washington told Plaintiff, "I want to fuck you." The next day, he repeatedly called and texted her. *Id.* at 132:17-133:12. **Ex. 10**, Washington Texts [PARKS 964].[3] On or about February 22, 2023, Plaintiff reported the incident to Turner. He advised her to record Defendant Washington harassing her. **Ex. 3, Parks** 94:14-95:13. Plaintiff did so, on February 27, 2023.

On February 27, 2023, Plaintiff recorded Defendant Washington sexually harassing her. While in Defendant Washington's office, he hugged Plaintiff and kissed her on the lips. Plaintiff was in shock. She tried to move away from him and put space between them by sitting down at a table in his office. He sat next to her and rubbed her thigh. *Id.* at 25:1-25; 26:10-23. Plaintiff told Washington that he scared her when he said he wanted to "fuck" her. Washington told Plaintiff, "I'm sorry. I didn't mean to scare you." *Id.* at 136:19-138:5. Washington explained, "It's just as simple as that. I just want a kiss from you from time to time." *Id.* at 98:21-99:2. 138:5-7. When Washington made another reference to having sex with Plaintiff, she said, "No." *Id.* at 138:7-13. Plaintiff reported this incident to Turner, who still took no action. *Id.* at 25:1-25; 26:10-23.

---

[3] Plaintiff and Washington each had two cell phone numbers, a work number and a personal number. In pertinent part, Defendants' subpoena sought "all records of all incoming and outgoing phone calls sent or received from Jan. 1, 2021 – Nov. 30, 2024 between the following phone numbers: (a) -0889; (b) -5750; (e) -2884; and (f) -5170. Defendants attached, in their Exhibit 4, records of the calls between Washington's work phone and Plaintiff's personal phone; and Plaintiff's work phone and Washington's personal phone. Missing from Exhibit 4 are records of calls between Plaintiff and Washington's work phones, and Plaintiff and Washington's personal phones.

In approximately March 2023, just a week or two after the incident in his office, Defendant Washington came up behind Plaintiff as she was getting some water and grabbed her buttocks. *Id.* at 58:17-59:16. 60:6-7, 60:14-15.

On October 3, 2023, Plaintiff and Defendant Washington attended an event at the Imagine Theater in Royal Oak. As they walked out of the elevator, Defendant Washington hit Plaintiff on the buttocks. *Id.* at 62:12-20. Plaintiff swatted his hand away. *Id.* at 63:9-11. When Plaintiff and Defendant Washington were seated, Defendant Washington took out his phone and showed Plaintiff a video of a woman performing oral sex on him. Disgusted, and in shock, Plaintiff asked him, "Why are you showing me this?" He responded, "You got to share the love." *Id.* at 63:24-66:24.

Plaintiff reported the incidents to Turner immediately after the event. He again called Defendant Washington a "stupid motherfucker" and said his conduct was "just getting out of hand…I'm going to have to talk to his cousin, Bishop Ellis" because "maybe [Ellis] could talk some sense into him." *Id.* at 43:6-20; 44:21-45:5. 63:24-64:11.

On October 31, 2023, Washington again swatted Plaintiff on the buttocks as she was getting into his vehicle to attend a community outreach event. *Id.* at 61:6-19. This was the last incident of non-consensual sexual touching by Washington that Plaintiff could recall at her deposition. *Id.* at 75:20-22. She testified that there were likely other incidents that predated it. *Id.* Washington continued to make sexual comments to Plaintiff throughout 2023, including "You're wearing that suit," "I [didn't] know you had it all back there," and other comments about her body, including that she was "so

9

thin". *Id.* at 118:13-21. In December 2023, Defendant Washington also made "very explicit remarks" about a member of the public at an event, leaving Plaintiff and Ed Foxworth, former Communications Director, "disturbed by what we heard and saw". *Id.* at 170:14-21.

In April 2024, Plaintiff received a phone call from a woman who claimed that she had been sexually harassed by a subordinate of Defendant Washington's Executive Protection Officer. **Ex. 11**, Sworn Declaration of Regina Parks. The woman told Plaintiff that she had reported the incident to the Executive Protection Officer, but he had done nothing. *Id.* Plaintiff advised the caller to place her concerns in writing. *Id.* After the call ended, Plaintiff informed Turner of the employee's report of sexual harassment. *Id.* **Ex. 12**, Turner 69:2-71:11. A few days later, Defendant Washington questioned her about the call. *Id.* **Ex. 6**, Washington 273:6-275:2. He was angry that Plaintiff took the caller's information and told Plaintiff she should have immediately hung up on her. **Ex. 11.**

In light of Washington's reaction, Plaintiff feared retaliation. *Id.* She also needed relief from his conduct. *Id.* As a result, between April and November 2024, Plaintiff did her best to avoid being alone with Washington. *Id.* However, his conduct continued as before when they did have contact. *Id.* He continued to sexually harass Plaintiff and other female employees, including by making sexual comments on a routine basis. *Id.* By November 2024, Plaintiff's frustration with and opposition to Washington's conduct was clear. *Id.*

Throughout 2022, 2023, and 2024, Plaintiff learned of numerous incidents of similar harassment experienced by other female employees of the Sheriff's Office. She also witnessed sexual comments Defendant Washington directed at others, including members of the public. These acts also contributed to the hostile work environment Plaintiff experienced. *Hawkins v. Anheuser-Busch, Inc.,* 517 F.3d 321, 335 (6th Cir. 2008).

In June 2022, Erika Erickson, then the Director of Communications for the Sheriff's Office, made a sexual harassment complaint against Defendant Washington with Turner. At his deposition, Turner denied this. He falsely claimed she merely took umbrage at Washington using terms like "babe" and "baby". **Ex. 12**, Turner 34:5-36:2; 36:19-37:1. 82:1-16. However, Erickson recorded their conversation, wherein she complained about Washington using these terms and other issues, including telling her she "looked fine", asking why she didn't wear dresses and heels to work; and attempting to look at a woman's breasts at an event. **Ex. 13**, Erickson Recording. Erickson explained that Washington's behavior was escalating. *Id.*

Turner admitted to Erickson that Washington was a "womanizer" and that his conduct with female employees was sexually inappropriate. *Id.;* **Ex. 14**, Erickson 27:6-19; 28:2-29:19. 31:19-33:12. When Erickson stated that she believed Washington's behavior would worsen if it was not addressed immediately, Turner agreed, "It will. He will get more comfortable with the words and behavior. And that's what we don't want." **Ex. 13**, Erickson Recording. Turner's admission contradicts his testimony, in which he falsely denied knowledge of Washington's conduct, including that Washington

11

discussed sexual topics at work. **Ex. 12**, Turner 62:23-65:8. 65:21-23. In his June 2022 conversation with Erickson, he admitted, "Yeah, [he] did get caught peeping in the motherfucking window. Yeah, [he] did get a sexual harassment charge and it cost the County $85,000. That's true. Everything they've said is true…He can't help himself." **Ex. 13**, Erickson Recording.

Turner gave Erickson the impression that he would speak to Washington about his behavior but then put off the conversation "because of the election and the stress that the sheriff was under". **Ex. 14**, Erickson 73:6-74:5. Undersheriff Michael Jaafar was also informed of Erickson's complaint and led her to believe he would address the Sheriff's conduct but failed to do so. *Id.* at 74:8-22.

When Washington's behavior did not change, on July 27, 2022, Ms. Erickson complained in writing to Turner and Jaafar. *Id.* at 33:16-25. 75:15-17. Erickson reiterated her "concerns about the Sheriff's sexually harassing behavior" and implored them to address Washington's conduct:

> "I came to you, Chief, on June 24th, with what I felt like were legitimate concerns about the Sheriff's sexually harassing behavior. I was under the impression that you both felt like it posed a problem and still does. We've talked several times about his comments and how much I wish the best for him, this agency and the people who work for him. I do not want to cause any unnecessary stress to anyone, but I also have to look out for myself and this agency. I feel like I am carrying a burden now, alone. I have spoken to you both about this extensively and nothing has been resolved. I've been willing to overlook comments from the Sheriff like calling me Baby and Babe on numerous occasions (and as recently as Saturday) and by asking me to stay in his room in Mackinac with him several times, or asking me to wear certain clothing, etc. I understand its campaign season and a delicate time, but I did not ask for this. I feel like I am being backed into a corner. Driving home from work today was very unsettling. I felt alarmed

that I had to even ask again if he had been talked to. I though this could have been taking care of, and now it's a snowball that has grown over the course of a month. Please remember that I am around the Sheriff a lot. It's very difficult. I'm sincerely asking you both for your help in this matter as soon as possible. I have been understanding to this point, but considering the degrading comments and looks that were made to me by the Sheriff on Saturday at the Expungement Fair, it is reasonable for me to expect a conversation with the Sheriff about this no later than the end of the week. I appreciate in advance your help in resolving this matter and confirmation once the conversation has taken place." **Ex. 15**, Erickson Complaint.

Erickson received no response. Instead, she was forced to attend a meeting with Washington, Turner, and Jaafar, where she was prompted to list her concerns with Washington's conduct in front of him. **Ex. 14**, Erickson 80:1-7. He became "very defensive", denied her claims, asserted he was only "joking" and that "it wasn't a big deal". *Id.* at 80:6-83:14. 85:6-86:25. 89:13-17. At the conclusion of the meeting, Washington emphasized that it was Erickson's duty to "protect him" and that her "job" required her to bring any future complaints about his conduct to him directly. *Id.* at 89:22-90:10. No one from HR was present for the meeting. No documentation of the meeting was made. No one followed up with Erickson about her complaint. No investigation was performed, nor was she ever privately interviewed about her claims. *Id.* at 141:2-142:3. Erickson felt "ambushed" and "terrified" by the meeting and left "defeated". *Id.* at 80:18; 81:21.

Erickson's accusations against Washington were common knowledge in the Sheriff's Office. During a conversation between Plaintiff, Turner and Whitehead about Erickson's sexual harassment complaint, Plaintiff advised Turner that Washington had

put his hand up her dress at the Detroit Public Schools gala. Whitehead confirmed she had witnessed the incident. **Ex. 3**, Parks 37:1-9. 46:23-47:8. 49:22-50:5. 131:18-25. After Erickson complained to Turner, Plaintiff saw Defendant Washington "staring Erika down" during a meeting for his reelection campaign and observed that Erickson looked "petrified". *Id.* at 111:1-112:11.

According to Plaintiff, everyone in the Sheriff's Office also knew that Defendant Washington sexually harassed LaKeisha Solomon. *Id.* at 48:1-8. **Ex. 14**, Erickson 27:16-19, 28:229:19. Turner confirmed that Solomon filed a complaint of sexual harassment against Defendant Washington. **Ex. 12**, Turner, 61:20-62:15. Solomon complained that Washington approached her at a party and "persistently" asked whether she was married and wanted to date him. *Id.* at 84:1-18. During the time they worked together, Solomon told Plaintiff about at least one incident where Washington sexually harassed her. **Ex. 3**, Parks 48:12-14.

Sheriff's Office employees Rasheeda Gamble and Erica Hill were also harassed by Washington. *Id.* at 101:22-102:2. Plaintiff witnessed Defendant Washington put his arm around Gamble in the lobby of his office in a way that made Gamble look "very uncomfortable". *Id.* at 102:1-15. She heard Defendant Washington make a comment to Gamble about a member of the public that made Gamble uncomfortable. *Id.* at 108:1-13. Gamble told Plaintiff of a few other incidents of harassment by Washington during 2022 and 2023. Whitehead, Gamble's sister, confirmed that Washington harassed Gamble. *Id.* at 103:25-104:16. 105:17-21.

14

Defendant Washington frequently made lewd comments to his appointees. *Id.* at 107:25-108:13. His conduct was so well known that "it was like a watercooler of the things that, you know, the sheriff says to you." *Id.* at 115:14-21. On multiple occasions, Gamble, Whitehead, Turner, Plaintiff and other appointees discussed inappropriate sexual comments and actions by Washington. *Id.* at 121:24-122:13. The appointees would "sit[] around listening to people talk about the sheriff's behavior." *Id.* at 123:1-14. Plaintiff also heard appointees talk about Washington's sexually explicit behavior toward members of the public. *Id.* at 128:12-129:23.

Defendant Washington's conduct did not change in 2024. In 2024, Turner told Plaintiff that Defendant Washington had sexually harassed appointee Erica Hill[4] by putting his hand down her dress. *Id.* at 113:10-20. In the summer of 2024 Solomon told Plaintiff that Washington made a "disgusting" comment to her that the Sheriff's Office did not need a lactation room because "The ladies that's working up here in this office have powder coming out of their breast." *Id.* at 117:8-25.

### C. On November 13, 2024, Defendants Demoted Plaintiff and Removed her Private Office

Defendants claim that sometime between August and November 2024, Defendant Washington decided he wanted to "reorganize" the Sheriff's Office. Turner began "assessing" and "looking at reorganizing" the Community Outreach team. **Ex.**

---

[4] Hill, who, like Plaintiff, complained of harassment by Washington, also had her office removed. **Ex. 3**, Parks 143:15-18.

**12,** Turner, 40:5-18. 50:11-18. There is no documentation of any aspect of the so-called "reorganization. *Id.* at 41:2-9.

On November 13, 2024, Plaintiff was called to a "community and recruiting" meeting, with Defendant Washington, Turner, and Mark Diaz, Director of Recruitment. Plaintiff and Mr. Diaz were the only directors who would be in attendance. Immediately prior, Plaintiff asked Turner whether there was anything she needed to know before the meeting. He advised her that she would be losing her private office. **Ex. 3**, Parks 85:11-19. 86:10-14. 257:7-9.

During the meeting, Washington announced that the directors present would lose their titles, except for Mr. Diaz. In other words, Defendants singled out Plaintiff to lose her rank and title. *Id.* at 76:1-20. 81:1-7. Plaintiff, who always had a private office, was told to move into a cubicle "immediately". *Id.* at 83:3-22. 88:1-6. The only other person who lost their office was Erica Hill, who had also complained about Washington sexually harassing her. *Id.* at 143:15-18.  Plaintiff denied making derogatory comments during the meeting. *Id.* at 224:21-225:1. She did not recall saying anything other than introducing herself. *Id.* at 232:6-8.

This was, in fact, a demotion. Where previously, Plaintiff held the role of Community Outreach Director, the new Director of Communications, Mara MacDonald, would lead both the communications and community outreach teams. **Ex. 12**, Turner 32:16-33:4. Turner "[didn't] have any idea" what duties the additional three community outreach employees would perform. *Id.* at 76:3-15. 81:3-16. Plaintiff's

reporting structure changed. Now that she was no longer a director, she would report to MacDonald, rather than Turner. **Ex. 12**, Turner, 49:5-9. 77:10-16. There is no evidence that Plaintiff's salary was increased because of the so-called "reorganization" in the Sheriff's Office. Everyone in the county received a raise at that time. **Ex. 3,** Parks 79:15-20.

### D. When Plaintiff Threatened to Expose Defendant Washington's Sexual Harassment, She Was Immediately Terminated

Later that day, Plaintiff spoke to Rashidah Gamble in Plaintiff's office. **Ex. 3**, Parks 232:13-25. Plaintiff was frustrated by the demotion, which was based on her opposition to Defendant Washington's harassment. Plaintiff did not raise her voice when she spoke with Gamb. She did not reference her vagina, gesture towards or pat her crotch. *Id.* at 146:2-5 145:12-13. 147:17-148:4. She told Gamble that she had a recording of Washington sexually harassing her on her cell phone, which was on her desk in front of her, and then, later in her pants pocket, resting on her thigh. *Id.* at 145:12-24. Plaintiff tapped her phone and said, "I got this," "I got this on the recording on my phone," referring to the recording. *Id.* at 144:3-145:16. Plaintiff told Gamble about the October 3, 2023 incidents where Washington had grabbed her buttocks and shown her a pornographic video. *Id.* at 67:5-12. 144:14-25. She asked Gamble what she was going to do about Washington's "sexual harassment". *Id.* at 144:14-25.

Gamble responded to Plaintiff's claims disparagingly, by calling her a "fool", "almost like she didn't want to hear it, like 'I don't want to hear that.' " *Id.* at 236:4-12;

239:6-13. 67:18-68:8. Gamble attempted to discourage Plaintiff from further opposition by telling her that she (Gamble) "didn't need to worry about [Washington's harassment]." *Id.* at 152:2-10. Gamble told Plaintiff to "worry about her daughter", alluding to Plaintiff losing her job over her accusations. *Id.* at 152:10-16.

Plaintiff admitted to using a "four letter word" in her conversation with Gamble "behind closed doors". *Id.* at 230:2-3, 230:18-21; 235:1; 236:4-16. 144:19-21. She testified that venting frustrations in this manner behind closed doors was "our normal behavior all the time." *Id.* at 237:1-8. There is no evidence to the contrary.

Around 4:00, Plaintiff was ready to leave for the day. Because Turner instructed her to speak with him before she left, she went to the Sheriff's Office suite, where she waited for less than 10 minutes. *Id.* at Parks 239:9-20; 241:19-25. Stephens, Whitehead, and Gamble were also present. Plaintiff denied being confrontational with them or interrupting them. *Id.* at 242:16-243:13. Plaintiff stated she was "tired of this", "didn't care about this place", and that, "I don't give a fuck." *Id.* at 150:10-17. These comments referred to Washington's sexual harassment and Plaintiff's intent to expose his behavior, respectively.

Plaintiff was admittedly upset about her demotion but denied being loud or disruptive or engaging in anything but "normal talk" for the group. *Id.* at 245:25-246:23; 243:25-244:13. 243:25-244:13 As far as Plaintiff knew, Turner, MacDonald, and Washington were meeting in the Sheriff's office, separated from her by a door and thin walls. Plaintiff could not have been as loud as Defendants claim without someone

coming out of the meeting to investigate. *Id.* at 241:2-7; 245:25-246:23. She denied "pacing" through the office, "slapping her vaginal area" and that she was ever asked to leave. *Id.* at 247:12-248:20. 245:6-8. 245:11-12.

Turner called Plaintiff during her drive home. They talked very briefly. *Id.* at 259:4-8. Plaintiff told him she was blindsided by the demotion. According to Plaintiff, "I just felt like I was nothing." *Id.* at 250:6-16. Turner never spoke with her about any alleged misconduct. *Id.* at 259:9-24.

Later that evening, Whitehead called Plaintiff and asked if she was okay. **Ex. 16**, Whitehead 67:18-25. Whitehead thought Plaintiff sounded calm. *Id.* Plaintiff then told her that she had a recording of Defendant Washington sexually harassing her. *Id.* at 68:2-7. Plaintiff told Whitehead about the October 3, 2023 incidents of harassment. **Ex. 3**, Parks 69:8-17. As soon as the call ended, Whitehead called Defendant Washington. **Ex. 16**, Whitehead 68:13-16. **Ex. 17**, Whitehead Statement [DEF 22]. **Ex. 3**, Parks 93:13-22.

Whitehead asked Washington if he had, in fact, hit on Plaintiff. **Ex. 16,** Whitehead, 69:13-14. **Ex. 17**, Whitehead Statement [DEF 22]. Whitehead then told him that Plaintiff had stated, "Ray can't fire me. I've got him by the balls. I have a recording." **Ex. 16**, Whitehead, 68:13-69:19 69:15-17; 68:1-4. **Ex. 17**, Whitehead Statement [DEF

22]. Defendant Washington confirmed that he learned of the recording and Plaintiff's allegations of harassment during the call[5]:

> Q: Do you deny that you got a call from Whitehead the night of the meeting telling you that Regina Parks said she had a tape of you hitting on her? Do you disagree with that statement?
> A: I don't disagree with that at all. **Ex. 6,** Washington, 217:12-16

> "A: She told me what Regina said about me hitting on her." *Id.* at 226:17-

20.

Neither Whitehead's testimony nor her written statement states that she informed the Sheriff of Plaintiff's "behavior" during their phone call. To the contrary, Whitehead testified and wrote in her November 21, 2024 statement that she spoke to the Sheriff about one topic: Plaintiff's allegations of sexual harassment and recording. **Ex. 16,** Whitehead, 68:1-69:19. **Ex. 17,** Whitehead Statement [DEF 22]. When Defendant Washington denied the existence of a recording, and hitting on Plaintiff, "[they] ended the conversation." **Ex. 16,** Whitehead, 69:18-19. **Ex. 17,** Whitehead Statement [DEF 22]. Defendant Washington's claim that Whitehead informed him of Plaintiff's "behavior" during their November 13, 2024 call is irrelevant, given that he learned of the recording on the call. **Ex. 16,** Washington, 217:12-16.

---

[5] The County admits the Sheriff learned of the recording during this call. ECF No. 33, PageID.378. Inexplicably, and in direct contrast with his sworn testimony, Defendant Washington disputes this fact.

It is undisputed that Washington decided to terminate Plaintiff's employment during the call with Whitehead. **Ex. 6,** Washington, 208:21-209:15; 215:10-13. He told Whitehead: "I'm going to have to let her go." *Id.* at 215:10-13.

A few minutes after speaking with Whitehead, Plaintiff received a call from Turner. Turner asked Plaintiff, "What did you do?" He told her that he had just received a call from Washington "screaming and hollering at me saying you said that you told Rashaun [Whitehead] that you have a recording or tape of him and that I told you to record him." **Ex. 3**, Parks 94:1-10. 155:8-25.    **Ex. 12**, Turner 93:2-12. 107:2-7. Washington admittedly told Turner, "She's going to be terminated the next day." **Ex. 6,** Washington, 208:24-209:1. Turner demanded that Plaintiff apologize to the Sheriff for her allegations or be terminated. **Ex. 3,** Parks, 156:8-17. **Ex. 12**, Turner, 96:12-25. She refused. **Ex. 3,** Parks, 156:20.

### E. Defendants Later Fabricated their Proffered Reason for Plaintiff's Termination

Like Washington, Turner admitted learning on November 13, 2024 that Plaintiff "made allegations against towards the sheriff, and … that she even shouted out that she had him on tape". **Ex. 12,** Turner, 95:2-21. And, like Washington, Turner did not observe any of Plaintiff's conduct. *Id.* at 97:13-23. Turner's information purportedly also came from Whitehead, who he claimed was the only witness to Plaintiff's alleged "behavior". *Id.* at 127:16-20. No one, including Turner, ever asked Plaintiff about her conduct after the restructuring meeting on November 13, 2024. *Id.* at 108:12-109:3.

Nothing about Plaintiff's alleged "conduct" was placed in writing before she was fired. *Id.* at 97:24-98:2; 103:6-21. Nor did anyone ask Whitehead, Gamble, Hill, and Stephens to write statements before Plaintiff was fired. *Id.* at 103:22-25. Defendant Washington instructed Whitehead, Gamble, Hill, and Stephens to write their statements after he decided to fire Plaintiff. **Ex. 6,** Washington, 222:13-223:10. Washington "did not look" at the statements. *Id.* at 223:19-21.

Defendants have no explanation for why all the written statements they now seek to rely on for firing Plaintiff are dated more than a week after she was fired. **Ex. 12,** Turner, 122:18-123:3. Ex. 18, Nov. 25, 2024 Gamble Statement; **Ex. 19**, Nov. 22, 2024 Hill Statement[6]; **Ex. 17**, Nov. 21, 2024 Whitehead Statement; **Ex. 20**, Nov. 25, 2024 Stephens Statement. According to Turner, his direct report, Venita Terry, Director of Administration, wrote the statements, and had Whitehead, Gamble, Stephens, and Hill sign them. **Ex. 12,** Turner, 124:23-125:4.

According to Defendants' records, including the November 14, 2024 "Expiration of Appointment" letter and other internal personnel records, the reason for Plaintiff's separation was that her "appointment expired". **Ex. 5**, Expiration of Appointment. **Ex. 21**, User Separation Report. **Ex. 6,** Washington, 205:1-10; 218:2-6. Plaintiff was demoted and then fired because she refused to acquiesce to Defendant

---

[6] Hill's statement is devoid of any information supporting Defendants' post hoc reason for firing Plaintiff. Hill saw Parks go into her office with Gamble and shut the door and walk down the hall towards the elevator. Hill "never heard [Plaintiff] say anything." **Ex. 19**, Nov. 22, 2024 Hill Statement.

22

Washington's sexual advances and threatened to expose his conduct. **Ex. 3**, Parks 71:5-17; 80:13-22. 92:17-21.

## II.   LAW AND ARGUMENT

### A. Plaintiff's Retaliation Claim Should Go to a Jury

Under both Title VII and ELCRA, Plaintiff must adduce evidence that she: (1) engaged in protected activity, (2) the defendant was aware of the protected activity, (3) "the defendant took an action that was 'materially adverse' to the plaintiff," and (4) there is a causal connection between the plaintiff's protected activity and the defendant's adverse action. *Jackson v. Genesee Cnty. Rd. Comm'n*, 999 F.3d 333, 343 (6th Cir. 2021)

#### 1.   Plaintiff Engaged in Protected Activity Under Title VII and ELCRA

##### a.   Plaintiff's Repeated Reports to Turner and of her Recording are Protected Activity

An employee need not specifically refer to the ELCRA when making a complaint protected by the act. They must do more than generally assert unfair treatment, and must clearly convey that they are raising the specter of a claim of unlawful discrimination. *Barrett v. Kirtland Cmty. Coll.*, 245 Mich. App. 306, 318–19 (2001). Defendant Washington disputes[7] that Plaintiff's complaints to Turner and report of her recording are specific enough to constitute protected activity.

---

[7] For the purposes of its motion, Defendant County does not dispute that Plaintiff engaged in protected activity; or that she suffered an adverse employment action as defined under Title VII and ELCRA.

This argument fails as a matter of law. A plaintiff need not make a complaint "with absolute formality, clarity, or precision". *Jackson v. Genesee Cnty. Rd. Comm'n*, 999 F.3d 333, 345 (6th Cir. 2021). The only case Washington relies on, *Barrett v. Kirtland Cmty. Coll.*, clearly distinguishes non-actionable "generalized concerns" from actionable complaints like Plaintiff's. The Court describes an actionable complaint as a report of being "subjected to … physical or verbal conduct of a sexual nature". 245 Mich. App. 306, 319 (2001). Here, Plaintiff repeatedly complained to Turner of unwanted sexual touching and sexual comments. As a matter of law, this is far more than a generalized statement about unfair treatment and unquestionably raised the specter of a claim of unlawful discrimination.

Likewise, Plaintiff's report that she had a recording of Washington making sexual advances towards her is more than a generalized concern about unfair treatment. In essence, Plaintiff told Whitehead that she had gathered evidence of Washington making sexual advances towards her, which could be used to prove a claim of harassment. Whitehead immediately raised Plaintiff's opposition conduct to Washington's attention. *See Mulaj v. Sweeping Corp. of Am.*, 728 F. Supp. 3d 672, 683 (E.D. Mich. 2024) (employee engaged in protected activity by advising his management of video footage of harassment).

Defendant Washington further argues that this Court should disregard Plaintiff's sworn testimony of her verbal reports because it supports her claims. ECF No. 32, PageID.219 ("self-serving" testimony). The Court cannot do this at the summary

24

judgment phase, where every reasonable factual inference must be drawn in Plaintiff's favor. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). Moreover, the cases Washington relies on are irrelevant. None involve courts disregarding parties' sworn testimony about their own conduct and events they experienced firsthand, like Plaintiff's here. They involve parties testifying about their unsubstantiated beliefs about facts which they had no firsthand knowledge of.

In *Kinnard v. Rutherford Cnty. Bd. of Educ.*, the plaintiff testified about his unsubstantiated belief that he was the most qualified candidate for a position he was denied. 109 F. App'x 85, 93 (6th Cir. 2004). Likewise, the plaintiff in *Bell v. Ohio State Univ.*, 351 F.3d 240, 253 (6th Cir. 2003) testified about her unsubstantiated belief that third parties were treated differently than her, when she had not witnessed said conduct. In sharp contrast with these cases, Plaintiff proffered admissible evidence, in the form of detailed sworn testimony, of verbal reports she made at specific times.

In *Chandler v. Regions Bank*, the plaintiff admitted that his loans were delayed because his submissions were incomplete, and records objectively showed that all employees experienced delays. In *Leahy v. Trans Jones, Inc.*, 996 F.2d 136, 139 (6th Cir. 1993) the case hinged on what entity changed a retirement plan. The only evidence the plaintiff could muster to support his theory was his own affidavit, relaying an unsubstantiated statement another person made to him; and the affidavit of a third party who likewise stated their unsubstantiated belief on the subject. *Id.* The defendant overcame this evidence with the testimony of an individual who served on the entity

25

that adopted the plan change; and a signed document evidencing the plan change at issue. *Id.* Here, Plaintiff testified about complaints and reports she made. Defendants have nothing but their own "self-serving testimony" that these events did not occur.

### b. Plaintiff Engaged in Protected Activity When She Resisted Defendant Washington's Advances

Plaintiff also engaged in protected activity when she resisted Defendant Washington's advances. For example, when he swatted her on the buttocks, Plaintiff verbally objected and swatted his hand away. Plaintiff told Defendant Washington that he scared her when he said he wanted to "fuck" her. When he hugged her and kissed her on the lips, she attempted to put distance between them. When Washington told Plaintiff that "all I want from you is a kiss from time to time", and asked her for sex, she said, "No." **Ex. 3,** Parks 136:19-138:13. Plaintiff likewise objected when he showed her a video of himself receiving oral sex. According to the Sixth Circuit, "to constitute 'protected activity,' … it is enough that a plaintiff 'resists' a supervisor's sexual advances. *E.E.O.C. v. New Breed Logistics*, 783 F.3d 1057, 1067–68 (6th Cir. 2015)." *Huang v. Ohio State Univ.*, 116 F.4th 541, 562 (6th Cir. 2024) (plaintiff pushing harasser's hands off her, moving away from him, and trying to keep distance between them to minimize opportunities for harassment constituted protected activity under Title VII). Washington, and therefore, the County would also have been on notice of this activity.

### c. Plaintiff's November 13, 2024 Statements Were Protected Activity

After being demoted on November 13, 2024, Plaintiff spoke to Rashidah Gamble in her office and again engaged in protected activity. She told Gamble that she had been sexually harassed by the Defendant Washington, that she had a recording of him harassing her, and asked Gamble what she was going to do about Washington's conduct. Likewise, in the Sheriff's suite, Plaintiff again referenced her recording, said she was "tired of this" and strongly alluded to not caring about the consequences of exposing Washington ("I don't care about this place"; "I don't give a fuck"). **Ex. 3**, Parks 150:10-17.  As the Court held in *Mumm v. Charter Twp. of Superior*, 727 F. App'x 110, 112-113 (6th Cir. 2018), these comments are clear enough to be opposition activity. Just as in *Mumm*, there is a question of fact as to whether Plaintiff's delivery of these comments merited discipline or termination. *Mumm v. Charter Twp. of Superior*, 727 F. App'x 110, 112, 114 (6th Cir. 2018) (plaintiff's account of her conduct is at odds with employer's, and a jury could agree that true reason for termination was protected activity, not delivery of comments).

### 2. Both Defendant Washington and the County had Notice of Plaintiff's Protected Activity

Defendants argue that Plaintiff cannot satisfy the notice element because Defendant Washington did not know of Plaintiff's reports of harassment to Turner when he demoted Plaintiff, removed her office, and terminated her employment. Defendant Washington presented no legal authority to support his argument. The single case Defendant County relied on, *Keller v. Clean Harbors, Inc.*, is uninstructive. First, in

*Keller*, the decisionmaker and highest level of authority was not the harasser. Second, Keller admitted there was no evidence that the decisionmaker in her termination ever learned about her complaints of discrimination. *Keller v. Clean Harbors, Inc.*, No. CV 17-11807, 2019 WL 5800290, at *7 (E.D. Mich. Apr. 30, 2019).

Here, as set forth above, Washington, and thereby, the County, were unquestionably always on notice of Plaintiff's verbal and physical resistance to his sexual advances, including when they demoted Plaintiff, removed her office, and fired her.

Particularly as to the termination, Defendant Washington's assertion that he "did not learn that Plaintiff may have a recording of him on the night of November 13, 2024" (ECF No. 32, PageID.220) contradicts his sworn testimony:

> Q: Do you deny that you got a call from Whitehead the night of the meeting telling you that Regina Parks said she had a tape of you hitting on her? Do you disagree with that statement?
>
> A: I don't disagree with that at all. **Ex. 6,** Washington, 217:12-16
>
> ****

"A: She told me what Regina said about me hitting on her." *Id.* at 226:17-20. Washington likewise admitted learning that Plaintiff said out loud that she had potentially damaging information about him. *Id.* at 221:3-10.

This argument also contradicts Whitehead's sworn testimony and written statement that she told him of the call on the night of November 13, 2024. **Ex. 16**, Whitehead, 68:13-69:19 69:15-17; 68:1-4. **Ex. 17**, Whitehead Statement [DEF 22]. Washington testified that Whitehead's statement was truthful. **Ex. 6,** Washington,

215:14-16. Defendants cite no evidence, nor is there any, that Whitehead, Washington, or anyone else ever doubted that the recording existed.

It is undisputed that Washington decided to terminate Plaintiff's employment during the call with Whitehead. **Ex. 6,** Washington, 208:21-209:15; 215:10-13. In other words, mere moments before deciding to terminate her employment, Defendant Washington learned that Plaintiff, who had repeatedly spurned his verbal and physical advances over the last several years, had gathered damaging evidence of him sexually harassing her.

### 3. Demoting Plaintiff and Removing Her Office Are Adverse Employment Actions

Defendants do not dispute that Plaintiff's termination is an adverse action. They dispute that her demotion and the removal of her office rise to the level of adverse actions. However, they rely on an outdated and incorrect legal standards. In *Patterson v. Kent State Univ.*, 155 F.4th 635, 645 (6th Cir. 2025), the Sixth Circuit held that while, for decades, most circuits required a showing of "significant" harm to establish an adverse employment action in the discrimination or harassment context, the Supreme Court rejected any heightened-showing rule as inconsistent with the text of Title VII, which simply prohibits discrimination on the basis of sex. *See Muldrow v. City of St. Louis*, 601 U.S. 346, 350 (2024). Accordingly, an employer's action need not cause significant or seriously detrimental harm; it need only cause some "disadvantageous change in an employment term or condition." *Id.* at 354, 144 S.Ct. 967 (internal quotation marks

29

omitted). Plaintiff need only "show some harm" that resulted from her loss of rank and office. *Id.* at 350.

Moreover, Defendant Washington applies the wrong legal standard altogether to his analysis of adverse employment actions in the retaliation context. *Aplin v. Faurecia Interior Sys., Inc.*, No. 18-10703, 2020 WL 7017385, at *5 (E.D. Mich. July 30, 2020) sets forth the pre- *Muldrow* standard for adverse actions in a <u>discrimination</u>, not a retaliation, claim. It is well-settled that showing an adverse employment action is less onerous in the retaliation context. *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 595–96 (6th Cir. 2007). An adverse employment action in a retaliation claim can be any action that "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Michael*, 496 F.3d 584, 596 (6th Cir. 2007) (brief paid administrative leave and 90-day performance plan were adverse actions) (citing *Burlington Northern*, 126 S. Ct. at 2415)). In the retaliation context, the Court should also consider that the real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed. *Laster v. City of Kalamazoo*, 746 F.3d 714, 731 (6th Cir. 2014) (quotations and alterations omitted).

Courts have accordingly identified a lateral transfer involving loss of prestige and removal from a private office as an example of an adverse employment action. *Darnell v. Campbell County Fiscal Court*, 731 F. Supp. 1309, 1313 (E.D. Ky. 1990), *aff'd*, 924 F.2d 1057, 1991 WL 11255 (6th Cir. 1991). In *Spees v. James Marine, Inc.*, the Sixth Circuit held

30

that a company took an adverse employment action when it placed a welder in a "more boring" job with lower status. 617 F.3d 380, 391-92 (6th Cir. 2010). Plaintiff's demotion[8] from "Director" and removal from her office are adverse actions. Plaintiff would no longer be the primary liaison between the Sheriff's office and the community at large. She lost the "rank" of Director, and she would be one person on the Community Outreach team. **Ex. 3,** Parks, 84:7-85:7. **Ex. 6**, Washington, 187:5-14; 195:14-23. **Ex. 12,** Turner, 32:16-33:4. She would no longer report directly to the Chief of Staff, but to the Communications Director. *Id.*

The County's Answer to the Complaint confirms the obvious -- the loss of Plaintiff's leadership role also changed her job duties. **Ex. 6,** Washington, 202:25-203:16. ECF No. 13, PageID.56, ¶ 55. Plaintiff alone lost her title in the "reorganization". **Ex. 3,** Parks, 76:14-20; 81:1-5. She was instructed to move from her private, closed office into a cubicle "immediately". *Id.* at 83:3-11. These actions certainly resulted in "some harm" to the terms and conditions of Plaintiff's employment and could certainly dissuade a reasonable employee from opposing her employer's unlawful conduct.

### 4. There is a Causal Nexus Between Plaintiff's Protected Activity and Plaintiff's Demotion, Loss of Office, and Termination

---

[8] Defendants' use of the term "reorganization" or "restructuring" to describe these adverse actions is not controlling. Washington used the word "restructuring" to describe other terminations and adverse actions, such as firing Ed Foxworth, former Communications Director. **Ex. 6,** Washington, 184:1-10.

Defendant County does not appear to dispute that Plaintiff made a *prima facie* showing of causation. Defendant Washington argues in conclusory fashion, with no citation to case law or the record, that there is no evidence of causation. "Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to ... put flesh on its bones." *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir.1997). *See also Kennedy v. Smith*, No. 2:23-CV-13185, 2025 WL 2504839, at *6 (E.D. Mich. Sept. 2, 2025) (two sentence conclusory argument deemed waived).

To the extent causation is in dispute, under Title VII, Plaintiff must show that her protected activity was the but-for cause of the adverse actions taken against her. *Young v. McHugh*, 24 F. Supp. 3d 658, 668 (E.D. Mich. 2014). Under the ELCRA, Plaintiff need only show that her participation in protected activity was a "significant factor" in the employer's adverse employment action. *Barrett v Kirtland Community College*, 245 Mich App 306, 315 (2001).

Under either statute, causation can be established through circumstantial evidence, such as close temporal proximity between the protected activity and adverse actions. *Rymal v Baergen*, 262 Mich App 274, 304 (2004) (citing *Town v Michigan Bell Tel Co*, 455 Mich 688, 697 (1997). "Where an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of [causation]." *Mickey*

*v Zeidler Tool & Die Co*, 516 F3d 516, 525 (6th Cir 2008). No other circumstantial evidence is needed. *Id. See also Maxwell v. FCA US, LLC*, 2023 WL 2636586, at *3 (6th Cir. Mar. 21, 2023) (citing *Render v. FCA US, LLC*, 53 F.4th 905, 921 (6th Cir. 2022) ("causal connection between the protected activity and the adverse employment action…can be established solely on the basis of close temporal proximity.")).

Mere moments after learning that Plaintiff had a recording of him sexually harassing her, Washington decided to terminate her employment. Her termination letter is dated November 14, 2024, the very day after Washington learned of Plaintiff's last protected activity. This extremely close temporal proximity is sufficient to establish causation under both ELCRA and Title VII. Indeed, on the night of November 13, 2024, Turner told Plaintiff that Defendant Washington intended to fire her because he had learned of her recording. This is direct evidence of causation.

Finally, Plaintiff can also show causation with evidence that when she opposed Washington's harassment, Defendants allowed it to continue. *Gaines v. FCA US LLC*, No. CV 18-11879, 2020 WL 1502010, at *11 (E.D. Mich. Mar. 30, 2020), citing *Morris v. Oldham Cty. Fiscal Ct.*, 201 F.3d 784, 791 (6th Cir. 2000); *Meyer v. City of Ctr. Line*, 242 Mich.App. 560, 619 N.W.2d 182, 188-89 (Mich. Ct. App. 2000). At this stage, Plaintiff's burden is minimal. *Nguyen v. City of Cleveland*, 229 F.3d 559, 566 (6th Cir.2000). As set forth above, although Plaintiff complained numerous times and directly resisted Defendant Washington's advances, his conduct persisted. At no time did anyone intervene to stop the behavior.

33

The County's reliance on *Kenney v. Aspen Techs., Inc.*, is misplaced. There, the plaintiff complained of race discrimination within weeks of her hire. The Sixth Circuit found that there were two "intervening causes" of the plaintiff's termination, both of which occurred after her protected activity: two formal complaints of misconduct filed against her, and documented instances of employees quitting because of her. 965 F.3d 443, 446, 450 (6th Cir. 2020). Likewise, days after reporting a sexual comment by her supervisor, the plaintiff in *Wright v. Cellular Sales Mgmt. Grp., LLC*, got into a "public fight" with a co-worker. An investigation resulted in a finding that the plaintiff violated the company's workplace violence policy. 793 F. App'x 409, 410 (6th Cir. 2019).

Nothing remotely analogous has occurred here. Plaintiff disputes the statements about her alleged "conduct" on November 13, 2024, which were all undisputedly written a week or more after she was fired. No complaints were made against Plaintiff. Defendant Washington admitted soliciting the statements. **Ex. 6**, Washington, 222:13-223:10. Nor did anyone quit their job or threaten to do so over her alleged "conduct". *Id.* at 221:24. There is no documentation of any policy Plaintiff violated, and no investigation, or findings of wrongdoing against her. Defendants' official written records state that Plaintiff's employment ended because her "appointment expired". **Ex. 5, Ex. 21.** To the extent that Defendants now take the position she was terminated for cause, it simply makes no sense that this was never formally documented.

Moreover, Plaintiff's alleged "behavior" preceded her final protected activity. Washington claimed that he first learned of Plaintiff's "conduct" on November 13,

34

2024 during his call with Whitehead– at the very same time that he learned of Plaintiff's recording and the very same time he decided to fire her. *Kuhn v. Washtenaw Cnty.*, 709 F.3d 612, 628 (6th Cir. 2013) ("intervening legitimate reason" for termination must come after protected activity); *see also Kenney* and *Wright*, *supra*. Plaintiff's "conduct" cannot break the causal connection between her protected activity and her termination, because it occurred before her last protected activity, and Washington learned of both simultaneously.

### 5. Plaintiff has Ample Evidence of Pretext

"[P]retext is a commonsense inquiry: did the employer [take an adverse action against] the employee for the stated reason or not?" *Blizzard v. Marion Tech. Coll.,* 698 F.3d 275, 285 (6th Cir. 2012). "[T]he question is always whether the employer made up its stated reason to conceal intentional discrimination." *Pelcha v MW Bancorp, Inc,* 988 F 3d 318, 326-27 (6th Cir 2021). Pretext can be shown with evidence that the reasons Defendants proffer (1) had no basis in fact, (2) did not actually motivate the termination, or (3) were insufficient to motivate discharge. *Chattman v. Toho Tenax Am., Inc.,* 686 F.3d 339, 349 (6th Cir.2012). *Dubey v Stroh Brewery Co*, 185 Mich App 561, 565-66 (1990).

Defendants appear to acknowledge that Plaintiff adduced evidence that the reasons now proffered for her termination are factually false. ECF No. 33, PageID.380 (arguing that Plaintiff was fired because of what was reported to Washington, not "what actually happened"). As set forth above, Plaintiff denied the facts set forth in the post

hoc statements of Whitehead, Gamble, Hill, and Stephens, which is Defendants' only evidence of her alleged "conduct". Neither Washington nor Turner had any first-hand knowledge of the alleged "conduct" that they now claim resulted in Plaintiff's termination. Defendants' official records state that Plaintiff's "appointment expired". The statements Defendants now seek to rely on are all inexplicably dated up to ten days after her termination became effective.

Washington admitted that he decided to fire Plaintiff on November 13, 2024, while on the phone with Whitehead. Whitehead confirmed this. Washington could not have relied on any of the written statements when he decided to fire Plaintiff, because they did not exist yet. Even if Washington could have relied on verbal information from witnesses like Whitehead and Gamble, which were later reduced to writing, these statements recount Plaintiff's protected activity. This is all strong evidence that the reasons Defendants now proffer are false, post hoc explanations designed to cover up the fact that Washington fired Plaintiff for her protected activity.

### 6. The "Honestly-Held Belief" Rule is Irrelevant Here

The Sixth Circuit soundly rejected the rigid invocation of the "honestly held belief" principle that Defendants advocate for here. For Defendants' reasons to be considered "honestly held" they must establish Washington's reasonable reliance on the particularized facts before him at the time he decided terminate Plaintiff's employment. *Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998). The question is not whether Defendants' reasons were "right" but rather whether their description of these reasons

36

was "honest". *Smith*, 155 F.3d at 806. Relevant here, the Sixth Circuit rejected an interpretation of this principle that credits an employer's so-called "belief" that is based on "ignorance and mythology" rather than particularized facts. *Id.* Courts may not "blindly assume that an employer's description of its reasons is honest." *Id.* at 807.

Washington did not reasonably rely on any particularized facts about misconduct by Plaintiff when he decided to fire her. He had no particularized facts on the evening of November 13, 2024. Whitehead did not testify or write in her statement that she informed the Sheriff of Plaintiff's "behavior" during their phone call on the evening of November 13, 2024. **Ex. 16,** Whitehead, 68:1-69:19. **Ex. 17**, Whitehead Statement [DEF 22]. Nor would it be reasonable for him to terminate Plaintiff based solely on uncorroborated, brief remarks by one alleged witness.

Washington's untruthful, evasive testimony about his reasons for terminating Plaintiff further undermine any "honestly held belief". *Seay v. TVA,* 339 F.3d 454, 468 (6th Cir.2003) (inconsistencies in manager's explanation for an adverse action raises inference of pretext that must be drawn in favor of the nonmovant). Defendants seek to rely on testimony by Washington that "three people **told** [him] about [Plaintiff's conduct] and so that's what I went on" (**Ex. 6,** Washington, 207:10-12); and that he relied on information that was "**written** by three people" (*Id.* at 207:1-3). None of this can possibly be true.

First, Washington testified that he decided to fire Plaintiff while on the phone with Whitehead on November 13, 2024. The only information he could have possibly

had about Plaintiff's alleged conduct came from that conversation. His purported reliance on partial, unverified information from one witness is unreasonable. It is also highly suspect given that he simultaneously learned of Plaintiff's last protected activity. Furthermore, Turner told Plaintiff that Washington's true motivation was knowledge of her recording.

Second, given that the decision to terminate was made on November 13, 2024, Washington could not possibly have relied written statements made weeks later, or even verbal statements made the next day. Washington testified that he received information from the other witnesses verbally "the next day", November 14, 2024, and that he then told Whitehead, Gamble, Stephens and Hill to write statements. **Ex. 6,** Washington 222:13-223:10. Even by November 14, the decision to fire Plaintiff was over. The written statements were created weeks later. Moreover, Washington testified that he "did not look" at the written statements. *Id.* at 223:19-21.

None of Defendants' witnesses testified that Plaintiff violated any work rule or written policy. Nor are any such findings made in writing. Defendants do not offer any evidence disputing Plaintiff's testimony that "venting", to include using curse words, "was normal. It was our normal behavior all the time. That's what we did." **Ex. 3,** Parks, 237:1-8. Likewise, Washington testified that Plaintiff's "disorderly conduct" included stating out loud that she had damaging information about him. **Ex, 6,** Washington, 221:3-10.

Defendants do not dispute violating their own disciplinary protocols as to Plaintiff. A jury is entitled to consider Defendants' failure to follow their internal policies as evidence of pretext, even if these policies do not use mandatory language or cannot be construed as an absolute guarantee. *See Coburn v. Rockwell Automation, Inc.*, 238 F. App'x 112, 126 (6th Cir. 2007); *Deboer v. Musashi Auto Parts, Inc.*, 124 F. App'x 387, 394 (6th Cir. 2005); *Free v. Fed. Express Corp.,* 2019 WL 332810, at *5 (W.D. Tenn. Jan. 25, 2019); *In re Lewis*, 845 F.2d 624, 632-633 (6th Cir. 1988).

Defendants' Code of Conduct sets forth a progressive discipline system, where violations may result in remedial actions ranging from verbal or written discipline to termination. **Ex. 22**, Code of Conduct at p. 6. Turner testified that during his time as Chief of Staff, he coached and counseled employees before elevating these issues for discipline. **Ex. 12,** Turner, 23:16-25, 24:4-19. There was never a time he had to escalate an employee issue to the Sheriff. *Id.* No investigation or progressive discipline took place as to Plaintiff. An employer's "decision not to use progressive discipline is a relevant factor in any pretext analysis" as a reasonable juror could conclude that the company's decision makes it more probable that the underlying conduct was not the true reason for the termination. *Sommers-Wilson v Samsung SDI Am, Inc,* 2019 WL 3244611 at *5 (ED Mich Jan 4 2019).

Defendants' tolerance of sexual harassment is also evidence of pretext, regardless of whether it occurred before or after Plaintiff's demotion and termination, and regardless of whether Plaintiff was aware of it. *Risch v. Royal Oak Police Dep't*, 581 F.3d

39

383, 393 (6th Cir. 2009) (citing *Ercegovich v. Goodyear Tire & Rubber Co.,* 154 F.3d 344,

356–57 (6th Cir.1998) and *Vincent v. Brewer Co.,* 514 F.3d 489, 498 (6th Cir.2007); *see also*

*Robinson v. Runyon,* 149 F.3d 507, 512–13 (6th Cir. 1998) (evidence of discriminatory

history and work practices is relevant to whether an individual was disparately treated

even when none of that discrimination was aimed at them); *see also Wanchik v. Great*

*Lakes Health Plan, Inc.*, 6 F. App'x 252, 261 (6th Cir. 2001) (court erred by refusing to

consider statements corroborating sexist workplace because plaintiff was not aware of

them).

Finally, the Court may also consider Defendants' false statements about material

issues in this case as evidence of pretext. *Carter v. Toyota Tsusho Am., Inc.*, 529 F. App'x

601, 610 (6th Cir. 2013) (employer's credibility is always important to the question of

pretext). In addition to the false statements set forth above, during his deposition,

Defendant Washington admitted that his Answer to paragraph 59 of Plaintiff's

Complaint was false:

> Q: Read paragraph 59….Read it out loud
> A: "Defendant Washington's executive assistant immediately informed
> Defendant Washington of her conversation with plaintiff."
> Q: Did she do that?
> A: That evening, she did.
> Q: Read your answer out loud.
> A: "Defendant denies as untrue the allegations contained in 59."
> A: …She informed me of it.

**Ex. 6,** Washington 224:23-225:23. ECF No. 8, PageID.57; ECF No. 13, PageID.96.

Likewise, Washington admitted that Whitehead began keeping his office door open and would come into his meetings because of "these previous allegations" of sexual harassment against him, as set forth in paragraph 20 of Plaintiff's Complaint. **Ex. 6,** Washington, 266:11-20. Defendants denied this in their Answers. ECF No. 8, PageID.46; ECF No. 13, PageID.92. Washington also admitted that, in April 2024, he learned of the report of sexual harassment Plaintiff received, as set forth in paragraphs 45-46 and 49 of her Complaint. He further admitted they spoke about it. **Ex. 6,** Washington 273:6-274:2; 294:6-295:6. His Answer falsely "denies any knowledge of such conversation". ECF No. 13, PageID.94-95. ECF No. 8, PageID.53-54. Defendants' demonstrably false answers to multiple material allegations in Plaintiff's Complaint significantly undermines their credibility, which can be considered as evidence of pretext.

### B. Plaintiff's Hostile Work Environment Claim Should Go to a Jury

The same analytical framework applies to hostile environment claims under the ELCRA and Title VII. *See, e.g., Khalaf v. Ford Motor Co.*, 973 F.3d 469, 482, 488 (6th Cir. 2020) (analyzing ELCRA and Title VII hostile work environment claims under the same standard). Plaintiff must show that "(1) she belonged to a protected group, (2) she was subject to unwelcome harassment, (3) the harassment was based on [her protected status], (4) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment, and (5) the defendant knew or should have known about the harassment and failed to act." *Boxill v. O'Grady*, 935

F.3d 510, 520 (6th Cir. 2019) (citing *Waldo v. Consumers Energy Co.*, 726 F.3d 802, 813 (6th Cir. 2013)).

### 1. Plaintiff Experienced a Hostile Work Environment[9]

Conduct need not be both severe *and* pervasive to constitute a hostile environment. *Williams v. CSX Transp. Co.*, 533 F. App'x 637, 641 (6th Cir. 2013) (citing *Berryman v. SuperValu Holdings, Inc.*, 669 F.3d 714, 717 n. 2 (6th Cir.2012)). Severity and pervasiveness is 'quintessentially a question of fact,' " *Jordan v. City of Cleveland*, 464 F.3d 584, 597 (6th Cir.2006) (quoting *O'Shea v. Yellow Tech. Servs., Inc.*, 185 F.3d 1093, 1098 (10th Cir.1999)). The Court should consider the totality of the circumstances, rather than dividing and categorizing individual incidents, which divorces them from their context and deprives them of full force. *Randolph v. Ohio Dep't of Youth Servs.*, 453 F.3d 724, 733 (6th Cir. 2006); *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 562 (6th Cir. 1999). It should also consider the relative size and intimacy of the workspace, and other factors that may impact the influence of the conduct on the environment. *See Radtke*, 442 Mich. 372.

---

[9] Defendant County's argument that allegations of harassment dating back to 2021 are time-barred and cannot be considered as <u>evidence</u> in this case is contrary to well-settled law. For more than a decade, this Court has held that under both the ELCRA and Title VII, claims regarding events that occurred before the relevant statutory period are admissible when relevant in accordance with the traditional rules of evidence and the trial court's discretion to determine whether a hostile work environment exists. *Marotta v. Ford Motor Co.*, 119 F. Supp. 3d 676, 688 (E.D. Mich. 2015) (collecting cases).

The Court must take into account the frequency, severity, physically threatening and humiliating nature of the conduct; and that it unreasonably interfered with Plaintiff's job performance. *Randolph*, 453 F.3d at 733. In particular, the Court must interpret Plaintiffs' evidence of repeated unwanted touching and other physical invasion as more severe than comments alone. *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 334 (6th Cir. 2008) (quoting *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 563 (6th Cir. 1999)).

Contrary to Defendants' arguments, there is no magic number of incidents that will give rise to a question of fact on severity and pervasiveness. Even a single incident of sexual harassment may be sufficient if severe harassment is perpetrated by an employer in a closely knit working environment. *Radtke*, 442 Mich. 372; *see also Doe v. Grand Co., LLC*, No. 18-CV-13123, 2020 WL 806031, at *14 (E.D. Mich. Feb. 18, 2020).

Defendants appear to count the 12 specific instances[10] of unwanted sexual touching as the totality of the hostile environment. They inexplicably disregard a host of other incidents, and Plaintiff's knowledge and observations of Washington's harassment of her colleagues and members of the public. This argument also disregards well-settled law that evidence of offensive or invasive touching will often be sufficient to support a hostile work environment claim at the summary judgment phase. *Scharp v.*

---

[10] *Cf Clark v. United Parcel Serv., Inc.*, 400 F.3d 341, 351 (6th Cir. 2005) (finding that three relatively isolated incidents over two and a half years were not pervasive enough), *Burnett v. Tyco Corp.*, 203 F.3d 980, 984 (6th Cir. 2000) (three incidents over six months insufficient to constitute hostile work environment sexual harassment).

*Van Buren Pub. Schs.*, 2022 WL 480238, at *6 (E.D. Mich. Feb. 16, 2022) (collecting cases). Unwanted and offensive physical touching—particularly when, as in this case, it takes place in an ongoing context of verbal and situational harassment—is often the dispositive factor as to whether conduct is sufficiently severe. *Scharp*, 2022 WL 480238, at *7 (E.D. Mich. Feb. 16, 2022).

Finally, it is well-settled that similar acts of harassment that Plaintiff became aware of during her employment, even if the harassing acts were directed at others or occurred outside of her presence, are relevant to the Court's analysis of the totality of the circumstances. *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 336, 341 (6th Cir. 2008). In *Hawkins*, the Court found evidence of other harassment relevant to the employer's knowledge of a "serial harasser" employee. *Hawkins*, 517 F.3d at 341. This holding is particularly relevant here, in light of Defendant Washington's known history as a serial harasser. *See also Strickland v. City of Detroit*, 995 F.3d 495, 506 (6th Cir. 2021) (holding that a court errs when it deems evidence of conduct towards others irrelevant).

Nearly all the women Plaintiff worked with on a daily basis – Gamble, Hill, Solomon, Erickson – were also sexually harassed by Washington. Plaintiff further testified that his inappropriate sexual conduct also extended to his interactions with the public. Washington's sexual harassment of female employees like Erickson and Solomon was common knowledge and widely discussed. **Ex. 3,** Parks, 46:23-47:10; 49:16-50:5; 132:5-7. 47:20-48:14. The "accumulated effect" of the harassment Plaintiff experienced, in addition to what she witnessed and became aware of, was severe and

44

pervasive enough to be a hostile work environment. *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 563 (6th Cir. 1999). *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 335 -336 (6th Cir. 2008).

Just as here, in *Williams*, the plaintiff's supervisor subjected her to unwanted and humiliating comments, including innuendo. *Id.* at 563. The repeated, aggressive sexual touching Plaintiff experienced was more severe and frequent than the conduct in *Williams*, where the Court found that it was enough for a supervisor's verbal comments to "contain[] an element of physical invasion". *Id.* In *Williams*, the Sixth Circuit found that even non-sexual office pranks were actionable. *Id.* at 564. Here, Plaintiff experienced repeated sexual touching, propositions for sex and sexual favors, as well as lewd comments on par with if not more severe than those in *Williams*. She also learned that many other women suffered the same conduct.

In *Marotta*, the Court found a genuine issue of material fact on severity and pervasiveness because the conduct at issue involved harassing comments as well as physical invasion by one of the supervisors, and because "the conduct and comments were ongoing and continuous", as they were here. 119 F. Supp. 3d at 683–84, 692 (E.D. Mich. 2015). *See also Rymal*, 262 Mich. App. at 281–82, 313 (finding that supervisor's numerous comments of a sexual nature and accusations about plaintiff's sexual activities were a basis for sexual harassment hostile environment claim).

In *Meadows v. Wahler Auto. Sys., Inc.,* 45 F.Supp.3d 645, 656 (E.D.Mich.2014), the Court found that there was a question of fact where, like Plaintiff, Meadows was

subjected to unwanted touching and sexually harassing comments on a continual basis. Likewise, in *Clark v. United Parcel Service, Inc.,* 400 F.3d 341, 352 (6th Cir.2005), the plaintiff testified to an "ongoing pattern of unwanted conduct an attention" by a supervisor analogous to Plaintiff's case. In *Hawkins v. Anheuser–Busch, Inc.,* 517 F.3d 321, 333 (6th Cir.2008), the plaintiffs similarly testified to numerous, ongoing instances of touching and regular lewd comments.

As in *Marotta, Meadows, Williams, Clark,* and *Hawkins,* the physical nature of the harassment Plaintiff experienced heightens its severity. "The totality of the evidence must be viewed in context through this lens." *Marotta,* 119 F. Supp. 3d at 692. Like these cases, plaintiff testified that the conduct and comments towards herself, her colleagues, and the public were ongoing and continuous.

Evidence that Defendants tolerated and/or condoned sexual harassment before and after the events making up Plaintiff's hostile work environment is highly relevant. *Conway v. Electro Switch Corp.,* 825 F.2d 593, 597–98 (1st Cir. 1987), *certified question answered,* 402 Mass. 385, 523 N.E.2d 255 (1988). This evidence illustrates the attitudes of the individuals who did interact with Plaintiff, making the existence of severe and pervasive harassment more probable. *Robinson v. Runyon,* 149 F.3d 507, 512–13 (6th Cir. 1998) (collecting cases).

## 2. Plaintiff Subjectively Perceived the Working Environment as Hostile and Abusive

Defendants' argument that Plaintiff did not show that she subjectively perceived her working environment as hostile because she continued working is contrary to law. According to the Sixth Circuit, instead of requiring a plaintiff to establish that her work was actually affected by the harassment, the adjudicator's inquiry should center, dominantly, on whether the discriminatory conduct unreasonably interfered with her work performance. *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 567 (6th Cir. 1999) (quoting *Harris*, 510 U.S. at 25 (Ginsburg, J. concurring)). To show such interference, Plaintiff need not prove that her productivity declined because of the harassment. She need only show that the harassment made it more difficult to do the job. *Id.* (quoting *Davis v. Monsanto Chem. Co.*, 858 F.2d 345, 349 (6th Cir.1988)). Plaintiff's testimony is undisputed on this point.

### 3. Defendant Washington's Harassment Culminated in Plaintiff's Termination, Which Results in Strict Liability Against the County

If Plaintiff suffered an adverse employment action, such as a demotion, discharge, or undesirable reassignment, then strict liability is automatic and the employer does not have the benefit of the *Ellerth/Faragher* affirmative defense. *Clark v. United Parcel Serv., Inc.*, 400 F.3d 341, 348 (6th Cir. 2005). As long as Plaintiff suffered some tangible employment action, liability is automatic. *Matthews v. Detroit Pub. Schs. Cmty. Dist.*, 2021 WL 4427176, at *6 (E.D. Mich. Sept. 27, 2021) (citing *Clark*, 400 F.3d at 348 n.1.).

Defendant Washington does not dispute his strict liability for a hostile work environment under ELCRA. Defendant County alone disputes strict liability. It argues that the Court should disregard the undisputed fact that Defendant Washington fired Plaintiff because, under its version of events, "the harassment was long over by the time the [termination] occurred." ECF No. 33, PageID.385. It provides no legal authority for its position.

First, the hostile environment did not cease in 2023. The County incorrectly relies on Plaintiff's testimony that the last event of <u>unwanted touching</u> by Washington occurred on October 31, 2023. **Ex. 3,** Parks, 75:14-22. Plaintiff testified to multiple incidents of harassment and retaliation that occurred to herself and others between November 2023 and her termination. Furthermore, she was demoted and "thrown in a cubicle" because she "didn't give in to [Washington's] sexual advances". *Id.* at 80:13-22. Second, as set forth above, the demotion and removal of her office are adverse actions in the harassment context.

The County cites no law for its proposition that, in its opinion, too much time elapsed between the last unwanted touching and Plaintiff's termination. To the contrary, controlling case law states that only where the employer "did not take any tangible adverse employment actions against the plaintiff" can it invoke the *Ellerth/Faragher* defense. *Burlington Industries v. Ellerth*, 524 U.S. 742, 765 (1998); *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998). All Plaintiff must show is an "official act" taken by the harassing supervisor "that "shows beyond question that the supervisor has

48

used his managerial or controlling position to the employee's disadvantage." *Pennsylvania State Police v. Suders*, 542 U.S. 129, 148, (2004) (citing *Ellerth* and *Faragher*); *see also Matthews, Clark, supra.* There can be no serious debate that this standard is met where Washington fired Plaintiff, after demoting her from the title of "Director" and taking away her private office.

### 4. Defendant County's Decision to Ignore Plaintiff's Complaints Eliminates the Faragher-Ellerth Affirmative Defense

Regardless, Defendant County cannot satisfy the requirements of the *Faragher-Ellerth* defense, which also results in strict liability. *Ellerth*, 524 U.S. at 763; *Faragher,* 524 U.S. at 807. The preponderance of the evidence shows that County (1) did not exercise reasonable care to prevent and promptly correct sexually harassing behavior; and (2) unreasonably failed to take advantage of preventive or corrective opportunities to stop Washington's behavior. *Faragher*, 524 U.S. at 807; *Ellerth*, 524 U.S. at 765; *Clark*, 400 F.3d at 348. The County's attempt to blame Plaintiff for its own violation of law is reprehensible.

### a. Defendant County Did Not Exercise Reasonable Care to Prevent and Correct Washington's Harassment

The first prong of the defense gives employers "an affirmative duty to prevent sexual harassment by supervisors." *See Williams,* 187 F.3d at 561. An employer may not stand by and allow an employee to be harassed. Once an employer knows of harassment, it has a legal duty to take reasonable steps to eliminate it. *Torres v. Pisano,* 116 F.3d 625, 636–37 (2d Cir.1997). The County argues that it satisfied the first prong

49

simply because it has a sexual harassment policy[11] on paper that delineates a complaint process and that at some point, training occurred. Significantly, the County concedes that its policy "requires supervisors to report incidents of sexual harassment", as required by law. ECF No. 33, PageID.387. *Clark*, 400 F.3d at 349–50 (citing *Varner v. Nat'l Super Markets, Inc.,* 94 F.3d 1209, 1214 (8th Cir.1996)). Although it acknowledges that it must make a showing --beyond the existence of the policy – of evidence that the policy "was effective in practice" it does not set forth any argument on this point. ECF No. 33, PageID.387-388.

As the Sixth Circuit held, "the effectiveness of an employer's sexual harassment policy depends upon the effectiveness of those who are designated to implement it." *Clark, Inc.*, 400 F.3d 341, 350 (6th Cir. 2005). In *Clark*, the Court examined the record for evidence that UPS's managers acted on their duty to report or take action on known harassment. *Id.* at 350. As in *Clark*, the County's "Preventing Harassment and Discrimination" policy places an "additional responsibility" on all supervisors and managers to not only report incidents of sexual harassment, but to take affirmative steps to "ensure a work environment free from improper conduct" and to "use whatever steps are necessary to resolve" harassment complaints:

---

[11] The last sexual harassment training performed in the Sheriff's Office was in 2018. **Ex. 16**, Whitehead 38:3-20. Turner did not know whether the Sheriff's Office had any written policy about reporting illegal workplace discrimination. **Ex. 12**, Turner 19:18-21.

"All employees have responsibility under the civil rights laws: all employees are responsible for their own conduct, and **management personnel have the additional responsibility to ensure a work environment free from improper conduct…The County will take affirmative steps to prevent sexual harassment** from occurring **and to deal fairly with all reported incidents in a timely manner**…" **Ex. 23**, Employee Handbook at 16 [DEF 219]. **Ex. 24**, Harassment Policy [DEF 188-190]

In addition to a supervisor's responsibility to convey their knowledge of sexual harassment to the County (as required by law), the County's policy specifically charges supervisors who receive reports of harassment to "settle" them "using the informal procedure" whereby "[t]he person taking the complaint will use whatever steps are necessary to resolve it":

"To the extent possible, **efforts should be made to settle all harassment complaints within the department using the informal procedure**. **The employee should go to his or her supervisor**, or the next level of supervision in the department or to P/HR. **The person taking the complaint will use whatever steps are necessary to resolve it.**" Ex. 23, Employee Handbook at 17 [DEF 220]

In *Clark*, the Court held that UPS's affirmative defense failed at the first prong, because its supervisors knew of and witnessed sexual harassment but took no action. *Clark*, 400 F.3d at 350. The same occurred here. Defendant County does not dispute that Plaintiff reported Washington's sexual harassment to Turner, who, along with several other managers witnessed and knew of sexual harassment by Washington. Nor does the County dispute that Turner and other managers took no action whatsoever on these reports, in violation of well-established Sixth Circuit law and County policy. *See Wyatt v. Nissan N. Am., Inc.*, 999 F.3d 400, 415 (6th Cir. 2021) (employer's three-week

51

delay in investigating complaint of unwanted touching eliminated first prong of *Faragher-Ellerth* defense).

Moreover, Defendants' responsibility to prevent future harassment is heightened because Washington was a known serial harasser. Turner admitted, in his conversation with Erickson, that Washington engaged in widespread harassment. Even when Erickson put her complaint in writing, Defendants undisputedly did nothing. *See Ferris v. Delta Air Lines, Inc.,* 277 F.3d 128, 136 (2d Cir.2001) (refusing to grant summary judgment to the employer where a question of fact existed as to whether company's failure to warn other employees was negligent due to its knowledge of the harasser's prior violent act); *Sharp v. City of Houston,* 164 F.3d 923, 931–32 (5th Cir.1999) (affirming verdict of liability where employer with constructive knowledge of past complaints failed to adequately supervise a harasser).

"The best anti-discrimination policy in the world will not help the employer who, rather than fulfill its duty to act on complaints about a serial harasser, lets the known harasser continue to injure new victims." Elizabeth Jubin Fujiwara & Joyce M. Brown, *Causes of Action for Post–Ellerth/Faragher Title VII Employment Sexual Harassment Claims,* § 53, (2008), *available at* 27 COA.2d 1 (Westlaw). Because Washington was a known serial harasser, and Defendants admittedly took no action on Plaintiff's complaints, they are strictly liable. *See Jackson,* 191 F.3d at 663, 666 (Defendants are liable if response to complaints demonstrates an attitude of permissiveness and was not reasonably

calculated to end pattern of harassment); *see also Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 341 (6th Cir. 2008) (same).

### b. Plaintiff Properly Complained to her Supervisor as Contemplated Under Defendant's Sexual Harassment Policy

Defendant County's argument under the second prong overlooks that Plaintiff was harassed by Defendant Washington, who led the Sheriff's Office, and sat at the top of its chain of command. Even as to co-worker harassment, "nowhere [does the *Faragher-Ellerth* defense] specify that the plaintiff … must "report" the offensive conduct of co-workers to the employer. Rather, to succeed, the plaintiff must establish that the employer "knew or should have known" of the offenses." *Jackson v. Quanex Corp.*, 191 F.3d 647, 663 (6th Cir. 1999). Defendant County cannot tenably dispute that it was on notice where Defendant Washington was the harasser.

Even setting this aside, Plaintiff undisputedly complained of sexual harassment to her immediate supervisor, Turner. **Ex. 3,** Parks 45:24-46:5. Defendant County's argument that, in doing so, Plaintiff unreasonably failed to utilize its corrective opportunities is frivolous. Its harassment policy instructs employees to complain to their immediate supervisors and expresses a definitive preference for addressing complaints within the department where they originate ("To the extent possible, **efforts should be made to settle all harassment complaints within the department using the informal procedure**. <u>**The employee should go to his or her supervisor**</u>…" **Ex. 23**, Employee Handbook at 17 (emphasis added). [DEF 220].

53

Defendant' County's argument that Plaintiff's complaints to Turner "prevented [it] from addressing the alleged harassment" likewise ignore the plain text of its policy, which states that supervisors **who "tak[e] the complaint will use whatever steps are necessary to resolve it."** *Id.* (emphasis added). Arguing that Plaintiff didn't properly complain when she followed the letter of the County's policy is specious. Defendant County provides no case law where any court held that such complaints were insufficient to satisfy the second prong.

Moreover, the Sheriff's Office did not have a Human Resources office. **Ex. 3**, Parks 44:6-7. 106:8. LaKeisha Solomon had a very limited personnel role, in which she oversaw the processes of hiring, onboarding, and terminations and facilitated personnel paperwork. **Ex. 16**, Whitehead 35:3-36:3; 36:23-37:15. Moreover, Solomon herself was sexually harassed by Washington. **Ex. 3**, Parks 47:20-48:3. Likewise, Venita Terry, Director of Administration, had, according to Turner, a very limited role, to "check payments, to pay vendors, to process transfers, to oversee the process of transfers, to oversee the process of people coming in, people going out." **Ex. 12,** Turner 15:10-12, 18:1-8. Similarly, Plaintiff did not make a complaint with Wayne County HR because the Sheriff is an elected official. Washington remarked on multiple occasions that "Warren Evans [Wayne County CEO] is not his boss." **Ex. 3**, Parks 44:6-13. The Employee Handbook specifically states that "Administration" divisions play no role with harassment complaints. This function is reserved for "Labor & Employee

Relations", which undisputedly did not exist in the Sheriff's Office. **Ex. 23**, Employee Handbook at p. 3 [DEF 206].

Nor is there any reason the Court should not credit Plaintiff's testimony that she did not complain elsewhere because she believed those avenues would be ineffective and/or subject her to retaliation. **Ex. 3**, Parks 49:2-15; 54:20-55:2. 72:5-16. 74:5-8. *Wyatt v. Nissan N. Am., Inc.*, 999 F.3d 400, 416 (6th Cir. 2021) (credible threat of retaliation where, like here, plaintiff was subjected to adverse action immediately after supervisor harasser learned of her protected activity).

By arguing that Plaintiff "could have – and should have" made complaints elsewhere, it seeks to raise her legal burden to obfuscate the undisputed fact that it failed to carry its own. There is no legal authority holding that Turner's abject refusal to address Washington's illegal conduct subjects Plaintiff to a heightened notice standard. The County cannot escape strict liability by blaming Plaintiff for its own failure to follow law and policy.

### 5. Defendant County Had Actual Notice of the Harassment Under ELCRA

Defendant County's argument that it had no actual notice under ELCRA is frivolous. It is well-settled that an ELCRA plaintiff "needs to prove this element only when the employer is not the person accused of sexual harassment." *Doe v. Grand Co., LLC*, 2020 WL 806031, at *16 (E.D. Mich. Feb. 18, 2020). If the harasser themselves is "higher management," as Washington undisputedly was, knowledge of the

harassment is imputed to the employer under the fairness rationale of *Radtke*. *Doe v. Grand Co., LLC*, 2020 WL 806031, at *16 (E.D. Mich. Feb. 18, 2020) (citing *Radtke*, 442 Mich. at 396).

ELCRA requires that an employee report sexual harassment to the extent that the chain of command provides someone to report it to. If an employee is sexually harassed by her highest-ranking supervisor, knowledge of the harassment is imputed to the employer. *Radtke v. Everett*, 442 Mich. 368, 395 (1993) (where the perpetrator was the employer, recourse to the employer is fruitless). "[I]f an *employer* is accused of sexual harassment, then the respondeat superior inquiry is unnecessary because holding an employer liable for personal actions is not unfair." *Radtke*, 442 Mich. at 396.

Second, even if Plaintiff need to prove actual notice, which, she does not, she must only complain to someone in "higher management". *Sheridan v. Forest Hills Public Sch.*, 637 N.W.2d 536, 542–543 (Mich. Ct. App. 2001); *see also Neview v. D.O.C. Optics Corp.*, 382 F. App'x 451, 456 (6th Cir. 2010) (finding that an employer did not have actual notice when the plaintiff warned a coworker about that coworker's conduct but did not tell her supervisor). *Matthews v. Detroit Pub. Schs. Cmty. Dist.*, No. 19-13277, 2021 WL 4427176, at *7 (E.D. Mich. Sept. 27, 2021). The County does not dispute that Turner was "higher management". Nor does it dispute, for the purpose of its motion, that Plaintiff complained to Turner, and that Turner took no action. Actual notice has therefore been established, as a matter of law.

56

The County cites no legal authority for its specious argument that actual notice was destroyed because Plaintiff and Turner[12] engaged in a brief sexual relationship. In *Elezovic v. Ford Motor Co.*, 472 Mich. 408, 427 (2005), the plaintiff complained only to "low level supervisors" who she asked to keep her report confidential. The County does not present any evidence that Plaintiff requested confidentiality when she complained to Turner—there is none. The fact that Plaintiff and Turner had a relationship does not change that he was "higher management" within the meaning of ELCRA. There is no law holding that the relationship alleviates or even mitigates Turner's legal burden to address unlawful harassment. Nor is there any law holding that their relationship heightens Plaintiff's legal burden to notify her employer. The law is clear that Plaintiff need only take appropriate steps to notify her employer. *Elezovic*, 472 Mich. at 427. She undisputedly did this by notifying her direct supervisor, as contemplated under County policy.

### 6.  Defendant County Had Constructive Notice Under ELCRA

Additionally, actual notice is not required under ELCRA. The test is whether the employer knew or should have known of a substantial probability of harassment, based on the totality of the circumstances. *Elezovic*, 472 Mich. 408, 427 (2005); *Chambers v. Trettco, Inc.*, 463 Mich. 297, 319 (2000). Under the totality of the circumstances, the

---

[12] Contrary to the County's position, Turner testified that he voluntarily retired from his position as Chief of Staff because of his persistent back issues. **Ex. 12**, Turner 60:20-61:14.

County knew or should have known of a substantial probability that Washington was sexually harassing Plaintiff. *See Moore v. KUKA Welding Sys. & Robot Corp.*, 171 F.3d 1073, 1079 (6th Cir. 1999) (notice where offensive conduct was not isolated, but was part of every-day banter on the floor; and where supervisors observed and were in the vicinity of the offensive conduct); *see also Randolph v. Ohio Dep't of Youth Servs.*, 453 F.3d 724, 735 (6th Cir. 2006) (notice where supervisors were aware of harassment, but ignored it).

Defendant Washington, the elected Sheriff, and top of the chain of the command, was the harasser. Furthermore, as set forth above, pervasive harassment took place towards Plaintiff and other female employees. Washington's conduct occurred regularly, out in the open. It was witnessed by Turner and several other appointees and County employees. Based on this evidence, a jury could believe that the sexually hostile atmosphere at the Sheriff's Office was so pervasive that a reasonable employer would know that sexual harassment was occurring. *Doe v. Grand Co., LLC*, 2020 WL 806031, at *17 (E.D. Mich. Feb. 18, 2020); *see also Hawkins*, 517 F.3d at 339 (other acts of harassment highly relevant to showing employer knew or should have known of harassment of plaintiff).

### C. Plaintiff's Assault and Battery Claims Should Go To a Jury

Plaintiff's Complaint specifies that these claims are based on non-consensual acts of sexual touching on dates on and after February 11, 2023. Defendant Washington concedes there is a question of fact as to whether the touching and imminent apprehension of touching alleged took place. As to Plaintiff's assault claim, her

testimony contains facts that could lead a reasonable juror to conclude that Washington's conduct caused her to experience a reasonable apprehension of offensive and unwanted physical contact. Plaintiff's physical and verbal reactions to Washington's conduct, particularly in his office where she attempted to place distance between them and refused to have sex or engage in other acts with him, shows that Plaintiff both feared immediate physical contact and that this contact was offensive and unwanted. Plaintiff told Washington he "scared her" when he said he wanted to "fuck her". "That is all that is required for liability." *Mulaj v. Sweeping Corp. of Am.*, 728 F. Supp. 3d 672, 685 (E.D. Mich. 2024). Plaintiff's testimony likewise demonstrates that Washington's acts of touching that occurred on and after February 11, 2023 were unconsented and offensive. They were demonstrably unwanted by Plaintiff and overtly sexual in nature. *Mulaj v. Sweeping Corp. of Am.*, 728 F. Supp. 3d 672, 684 (E.D. Mich. 2024) (citing *People v. Nickens*, 470 Mich. 622 (2004) and *Lakin v. Rund*, 318 Mich.App. 127 (2016) (putting finger into victim's chest to make a point during an argument was sufficient to impute the offense of battery)).

## III.   CONCLUSION

In sum, Defendants' Motions should be denied in their entirety.


Dated: February 20, 2026                    **DEBORAH GORDON LAW**
                                            ***/s/Deborah L. Gordon (P27058)***
                                            Attorneys for Plaintiffs
                                            33 Bloomfield Hills Parkway, Suite 220

Bloomfield Hills Michigan 48304

(248) 258-2500

dgordon@deborahgordonlaw.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 20, 2026, I electronically filed the foregoing document with the Clerk of the Court using the ECF system which will send notification of such filing and service of said documents to all parties through their counsel of record.

**DEBORAH GORDON LAW**
***/s/Deborah L. Gordon (P27058)***
Attorneys for Plaintiff
33 Bloomfield Hills Parkway, Suite 220
Bloomfield Hills Michigan 48304
(248) 258-2500
dgordon@deborahgordonlaw.com

60