# EXHIBIT 3

## Page 1

```
 1              UNITED STATES DISTRICT COURT
 2              EASTERN DISTRICT OF MICHIGAN
 3                   SOUTHERN DIVISION
 4
   REGINA PARKS, an
 5 individual,
 6          Plaintiff,
                              Case No: 2:25-cv-10409
 7    v.
                         HON. SHALINA D. KUMAR
 8 WAYNE COUNTY, a political
   subdivision of the State
 9 of Michigan, RAPHAEL "RAY"
   WASHINGTON, in his
10 individual and official
   capacities, jointly and
11 severally,
12          Defendants.
13
                  DEPOSITION OF
14
                  REGINA PARKS
15
            Taken by the Defendant
16
             September 16, 2025
17
                   9:00 a.m.
18
               Detroit, Michigan
19
20
21
22
23       Nicole Brooks, 9224
      Certified Electronic Recorder
24    Esquire Deposition Solutions
      Firm Registration Number 8035
25
```

## Page 2

```
 1                  APPEARANCES
 2 For the Defendant: DAVINA BRIDGES, ESQ. (P85597)
                      DICKINSON WRIGHT
 3                    500 Woodward Avenue
                      Suite 4000
 4                    Detroit, Michigan 48226
                      313-223-3500
 5                    dbridges@dickinsonwright.com
 6
   For the Defendant: ANGELINA R. DELMASTRO, ESQ. (P81712)
 7                    DICKINSON WRIGHT
                      500 Woodward Avenue
 8                    Suite 4000
                      Detroit, Michigan 48226
 9                    313-223-3500
                      adelmastro@dickinson-wright.com
10
11 For the Defendant: MARIA F. DWYER, ESQ. (P60946)
                      CLARK HILL PLC
12                    500 Woodward Avenue
                      Suite 3500
13                    Detroit, Michigan 48226
                      313-965-8300
14                    mdwyer@clarkhill.com
15
   For the Defendant: NINA JANKOWSKI, ESQ. (P80558)
16                    CLARK HILL PLC
                      500 Woodward Avenue
17                    Suite 3500
                      Detroit, Mi 48226
18                    313-965-8300
19
   For the Defendant: CLAIRE MASON LEE, ESQ. (P63506)
20                    CHIEF ASSISTANT CORPORATION COUNSEL;
                      LABOR, EMPLOYMENT AND WORKERS
21                    COMPENSATION WAYNE COUNTY
22                    500 Griswold Avenue
                      Floor 30
23                    Detroit, Mi 48226
                      Detroit, Michigan 48226
24                    313-224-2186
25                    cmlee@waynecountymi.com
```

## Page 3

```
   For the Defendant: DAVID MELTON, JR., ESQ. (P63891)
 2                    WAYNE COUNTY SHERIFF'S OFFICE
 3                    5301 Russell Street
                      Suite 4073
 4                    Detroit, Michigan 48211
                      313-224-6888
 5                    dmelton@waynecounty.com
 6
   For the Plaintiff: DEBORAH L. GORDON, ESQ. (P27058)
 7                    DEBORAH GORDON LAW
                      33 Bloomfield Hills Parkway
                      Suite 220
 8                    Bloomfield Hills, Michigan 48304
                      248-258-2500
 9                    dgordon@deborahgordonlaw.com
10
11 Also present:
         Shawn Capron, video technician
12       Sheriff Raphael Washington
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 5

```
 1                  TABLE OF CONTENTS
 2 EXAMINATIONS                              PAGE
 3 Examination by Ms. Delmastro                 8
 4 Examination by Ms. Dwyer                   196
 5
 6                    EXHIBITS
 7 DEPOSITION        DESCRIPTION              PAGE
 8 Exhibit 1    Text thread                    55
 9 Exhibit 2    Complaint and Demand          100
10 Exhibit 3    Wayne County Employee Handbook. 106
11 Exhibit 4    Bates stamp ATT 67-69         166
12 Exhibit 5    Initial Disclosures           169
13 Exhibit 6    Plaintiff's Responses to INTS 175
14
15 (Exhibits 1 through 6 were attached to the original transcript.)
16
17
18
19
20
21
22
23
24
25
```

EXAMINATIONS — PAGE
Examination by Ms. Delmastro — 8
Examination by Ms. Dwyer — 196
EXHIBITS
Exhibit 1 — Text thread — 55
Exhibit 2 — Complaint and Demand — 100
Exhibit 3 — Wayne County Employee Handbook. — 106
Exhibit 4 — Bates stamp ATT 67-69 — 166
Exhibit 5 — Initial Disclosures — 169
Exhibit 6 — Plaintiff's Responses to INTS — 175



REGINA PARKS
REGINA PARKS vs WAYNE COUNTY, et al.

September 16, 2025
7–10

Page 7

1        Detroit, Michigan
2        Tuesday, September 16th, 2025 - 9:00 a.m.
3        THE VIDEOGRAPHER:  We are now on the
4   record.  This is the video-recorded deposition of
5   Regina Parks, being taken on September 16th, 2025.
6   The time is now 9:43 a.m. We are located at 500
7   Woodward Avenue, Detroit, Michigan.  We are here in
8   the matter of Regina Parks v. Wayne County, et al.
9   The case number is 2:25-cv-10409.  This matter is
10  being held in the United States District Court,
11  Eastern District of Michigan, Southern Division.
12  My name is Shawn Capron, video technician.
13        Will the court reporter, Nicole Brooks,
14  swear in the witness, and the attorneys briefly
15  identify themselves for the record?
16        THE RECORDER:  Perfect.  Ma'am, would you
17  raise your right hand, please?
18        Do you solemnly swear or affirm that the
19  testimony you're about to give today, ma'am, will
20  be the truth, the whole truth, and nothing but the
21  truth?
22        THE WITNESS:  Yes.
23        THE RECORDER:  Okay.  Thank you.
24        MS. DELMASTRO:  Lina Delmastro from
25  Dickinson Wright, on behalf of defendant Wayne

Page 8

1   County.
2        MS. DWYER:  Maria Dwyer from Clark Hill,
3   on behalf of defendant Sheriff Washington.
4        MS. GORDON:  Deborah Gordon, on behalf of
5   the plaintiff.
6        REGINA PARKS,
7   called by the defendant and sworn, testified as follows:
8        EXAMINATION
9   BY MS. DELMASTRO:
10  Q   Good morning, Ms. Parks.  As I just said, my name
11      is Lina Delmastro, and I am representing defendant
12      Wayne County.  Sometimes I'm going to refer to
13      Wayne County as "the county" during this
14      deposition.  If I do that, will you understand what
15      I'm referring to?
16  A   Yes.
17  Q   Thank you.  I may also use the term, "the sheriff's
18      office" or "the sheriff's department."  And by
19      that, I'm intending to mean the sheriff's office or
20      the sheriff's department of defendant Wayne County.
21      If I use that shorthand, will you understand what I
22      mean?
23  A   Yes.
24  Q   And finally, if I use the term "the sheriff" or
25      "Sheriff Washington," will you understand that I'm

Page 9

1   referring to defendant Rafael Washington?
2   A   Yes.
3   Q   Thank you.  Please call me Lina for purposes of
4       today's deposition.  How would you like me to
5       address you?
6   A   Regina.
7        MS. DELMASTRO:  Regina.  So the record
8       should reflect that this is the deposition of
9       Regina Parks on behalf of herself, being taken
10      today pursuant to a notice of deposition dated
11      September 4th, 2025.
12  BY MS. DELMASTRO:
13  Q   Ms. Parks, the answers you provide today may be
14      used for any purpose allowable under federal or
15      state law and the Court Rules.  Your attorney has
16      likely gone over the deposition ground rules with
17      you, but I will go over them briefly.  Most
18      importantly, it's that we do not talk over each
19      other.  Please wait for me to finish my question
20      and -- before you begin answering.  And likewise, I
21      will wait to begin my next question until you have
22      finished answering.  It's natural that we will mess
23      up a little bit.  That's okay.  We'll just do our
24      best.
25        As you have done already with saying yes,

Page 10

1   please give verbal responses as opposed to uh-huh
2   or huh-uh, or shaking or nodding of the head.
3   Although this is a video deposition, we want
4   Nicole, our court reporter, to be able to take down
5   verbatim, easily, everything that you're saying and
6   your answers.  Please feel free to ask me if a
7   question I ask is unclear or you're unsure what I'm
8   asking.  If you do respond to a question without
9   asking for clarification, I will assume that you
10  understood the question, and I will take your
11  answer as is; is that fair?
12  A   That's fair.
13  Q   Please feel free to ask for a break if necessary.
14      If there's a pending question, I'll ask you to
15      answer that question.  But otherwise, we can take a
16      break at any time.  This is a marathon, not a
17      sprint, and we want everyone in the room to be
18      comfortable.
19        Are you taking any medication that would
20      affect your memory?
21  A   No.
22  Q   Are you taking any medication that would affect
23      your ability to understand my questions?
24  A   No.
25  Q   Are you taking any medication that would affect

REGINA PARKS
REGINA PARKS vs WAYNE COUNTY, et al.

September 16, 2025
11–14

Page 11

1    your ability to tell the truth?
2  A   No.
3  Q   Have you ever been deposed before?
4  A   No.
5  Q   Have you ever been a party to a litigation before?
6  A   Yes.
7  Q   What was that litigation?
8  A   A --
9  Q   Were you the plaintiff or the defendant in that
10    litigation?
11  A   The defendant.
12  Q   And what were you being sued for?
13  A   A school bill.
14  Q   Okay.  So there was an unpaid bill, and they --
15  A   Yes.
16  Q   -- were suing to collect it?
17  A   Yes.
18  Q   Any other times you've been a party to a case?
19  A   For bankruptcy.
20  Q   So in the -- you filed for bankruptcy at some
21    point?
22  A   Yes.
23  Q   Approximately when was that?
24  A   2018.
25  Q   Any other litigations where you were a party?

Page 12

1  A   Not that I can recall.
2  Q   During either of those proceedings, did you give
3    testimony under oath?
4  A   Yes.
5  Q   In court?
6  A   Yes.
7  Q   Please state and spell your full name for the
8    record.
9  A   Regina, R-E-G-I-N-A.  P-A-R-K-S, Parks.
10  Q   And please tell me your birthday, month, and day,
11    and your current age.
12  A   My birthday is June 15th, 1974.  I'm 51 years old.
13  Q   Are you currently employed?
14  A   No.
15  Q   Where was the last place you were employed?
16  A   Wayne County Sheriff's Office.
17  Q   So you have not held any other employment -- any
18    employment since your separation from employment at
19    Wayne County?
20  A   Self-employment.
21  Q   Tell me about that.
22  A   DoorDash.
23  Q   Okay.  How many hours do you typically work per
24    week for DoorDash?
25  A   It varies.

Page 13

1  Q   What would be the low end, and what would be the
2    high end?
3  A   The low end, 4 hours.  The high end, 22 hours.
4  Q   And how are you -- how are you paid for DoorDash?
5    Is it -- excuse me.  Is it hourly?  Is it based on
6    per delivery?
7  A   It's per delivery, and -- delivery and tips.
8  Q   Roughly, how much do you make per week doing the
9    DoorDash?
10  A   It varies.
11  Q   What's the low end?
12  A   $7.
13  Q   What's the high end?
14  A   Is that net or -- or?
15  Q   A high end of -- of gross.  Just what you take in,
16    on the high end.
17  A   I'm not sure.
18  Q   How long have you been working for DoorDash?
19  A   End of March.
20  Q   Are you an independent contractor for DoorDash?
21  A   Yes.  I'm an independent contractor.
22  Q   So I assume you don't have any health insurance
23    benefits or anything like that with them.
24  A   No.
25  Q   Did you talk to anyone other than your attorney to

Page 14

1    prepare for today's deposition?
2  A   No.
3  Q   Other than -- in connection with speaking with your
4    attorney, did you review any documents?
5  A   Yes.
6  Q   What did you review?
7  A   The -- the information.  The discovery.
8  Q   Okay.  The -- so you reviewed some of the discovery
9    responses?
10  A   Yes.
11  Q   Okay.  Did you review anything else?
12  A   Just whatever my attorney had me look at.
13  Q   Did you bring any documents with you to today's
14    deposition?
15  A   Any documents?
16  Q   Yeah.  Did you bring any documents with you today?
17       MS. GORDON:  She didn't bring any
18    documents --
19       MS. DELMASTRO:  Okay.
20       MS. GORDON:  -- for you guys.
21       MS. DELMASTRO:  That's -- yes.  That's
22    what I mean.
23       MS. GORDON:  Yeah.
24       MS. DELMASTRO:  Okay.
25  BY MS. DELMASTRO:



REGINA PARKS
REGINA PARKS vs WAYNE COUNTY, et al.

September 16, 2025
15–18

Page 15

1  Q   Have you had any other communications about today's
2      deposition?
3          MS. GORDON:  What does that -- that's
4      awfully broad.  What do you mean by that?
5  BY MS. DELMASTRO:
6  Q   Other than speaking with your attorneys, have you
7      talked to anyone about today's deposition?
8          MS. GORDON:  You mean, like, saying she
9      was coming to a dep?  Is that what you're talking
10     about?
11         MS. DELMASTRO:  Yeah.
12         THE WITNESS:  Yes, my mom.
13 BY MS. DELMASTRO:
14 Q   Your mom?
15 A   And my sister.  She brought me here.
16 Q   Did you discuss with them any questions you thought
17     I might ask or any information you thought you
18     might testify about?
19 A   No.
20 Q   Okay.  You began working in the Wayne County
21     Sheriff's Office in 2019; is that correct?
22 A   Yes.
23 Q   What is the first position you held at the
24     sheriff's office?
25 A   The first position I held was the compliance

Page 16

1      disciplinary officer.
2  Q   What were your primary duties in that role?
3  A   My primary duties was to have a disciplinary
4      meeting with -- with -- to have a disciplinary
5      meeting with inmates, and also counsel inmates.
6      Not counsel, but make sure that they -- if they
7      needed anything, if they needed to make a phone
8      call -- I mean, not a phone call, but any issues
9      that they had, they would come to me for that.
10 Q   Did you have any other responsibilities in that
11     role?
12 A   Just to input data from meetings and all compliance
13     -- any compliance issues.
14 Q   Who was your immediate supervisor in that role?
15 A   Wow.  I'm looking right at her.  I can't think of
16     her name offhand.
17 Q   How long did you hold that position?
18 A   Less than three months.
19 Q   What position did you hold next?
20 A   Director of community outreach.
21 Q   How long did you hold the position of director of
22     community outreach?
23 A   To November 14th.
24 Q   Of 2024?
25 A   Yes.  I'm sorry.

Page 17

1  Q   What were your primary duties as director of
2      community outreach when you first undertook the
3      position?
4  A   I was the liaison between the sheriff's office and
5      the community at large.  I represented the sheriff
6      at community events when he could not be present.
7      I worked closely with the Wayne County Sheriff
8      Youth and Senior Board.  I had to facilitate every
9      community event and partnership that the sheriff's
10     office had within and outside -- throughout Wayne
11     County.  I had to create and -- create
12     proclamations, resolutions, certificates, sometimes
13     letters for citizens -- to the public for citizens
14     in Wayne County.  I worked closely with the
15     sheriff's -- the sheriff chaplains.
16 Q   Who was your immediate supervisor when you first
17     became director of community outreach?
18 A   Benny Napoleon.
19 Q   Did you have any other supervisors?
20 A   Yes.
21 Q   Who were your other supervisors?
22 A   Michael Turner.
23 Q   Was he one of your supervisors when you first took
24     on the role of community director -- community
25     outreach director?

Page 18

1  A   It's interesting because he was my direct
2      supervisor, but I -- I -- I pretty much
3      received supervision from Benny Napoleon.
4  Q   What was your salary at the time of your separation
5      from employment at the county?
6  A   95,000.
7  Q   So when you began working at the sheriff's office,
8      Benny Napoleon was the sheriff, correct?
9  A   Correct.
10 Q   And tell me about your relationship with him.
11 A   He was my boss.  I had a lot of respect for him.
12 Q   He died in 2020, correct?
13 A   Correct.
14 Q   Did his death impact you in any way?
15 A   Very much so.
16 Q   Okay.  How did it affect you?
17 A   He was my boss.  He was a -- a great guy.  It -- it
18     affected me.
19 Q   Okay.  Did you ever discuss his death with a mental
20     health professional?
21 A   I did.
22 Q   And was that Dr. Lisa Walker?
23 A   Yes.
24 Q   And was that helpful to you?
25 A   No.



REGINA PARKS                                                September 16, 2025
REGINA PARKS vs WAYNE COUNTY, et al.                        19—22

Page 19

1  Q   Do you have any idea why it wasn't helpful?
2  A   Because we just had an intake.  I didn't speak to
3      her.  We -- she just asked me some questions.  It
4      wasn't -- it was just an intake session.
5  Q   So you only saw her one time?
6  A   I think I may have seen her twice.
7  Q   Okay.  And why did you -- or I guess I should say,
8      was it your decision to -- not to continue seeing
9      her?
10 A   She didn't take my insurance.
11 Q   So I take it then that Sheriff Napoleon's death was
12     difficult for you.  Would you say that it was
13     traumatic?
14         MS. GORDON:  What's your definition of
15     traumatic?  She's already answered the question.
16         MS. DELMASTRO:  This is a -- this is a --
17     in your --
18         MS. GORDON:  What else can she say?
19     She's answered the question.  What do you mean by
20     traumatic?
21 BY MS. DELMASTRO:
22 Q   In your -- would you describe your experience of
23     his death as being traumatic to you?
24 A   It -- his death wasn't traumatic.  It was that we
25     -- we -- we -- I was losing so many people around

Page 20

1      me.  And his death was just -- it just -- you
2      didn't see it coming.  And it was -- it was
3      troubling.  Yeah, it was troubling.
4  Q   Rafael Washington was appointed to the position of
5      sheriff after Sheriff Napoleon's death, correct?
6  A   Correct.
7  Q   And Rafael Washington became the sheriff in January
8      2021, correct?
9  A   Correct.
10 Q   And then Rafael Washington was the sheriff for the
11     remainder of the time you were employed at the
12     sheriff's office, correct?
13 A   Correct.
14 Q   When did you first meet Sheriff Washington?
15 A   I first met the sheriff at the NAACP dinner in
16     2019.
17 Q   So that was before he became the sheriff, correct?
18 A   Correct.
19 Q   How well would you say that you knew him before he
20     became the sheriff?
21 A   Not well.
22 Q   How would you describe your relationship with the
23     sheriff once he became the sheriff?
24 A   Are you asking me in the beginning, like 2021?
25 Q   Yeah.  Let's start there.  How would you describe

Page 21

1      your initial relationship with him when you first
2      started working for him while he was the sheriff?
3  A   It was pleasant.
4  Q   Did that change at some point?
5  A   Yes.
6  Q   When did it change?
7  A   When he started touching me.
8  Q   When did that happen?
9  A   Inappropriately.  When he first touched me
10     inappropriately, it was probably in 2022.
11 Q   And how did you -- how -- in what way did he touch
12     you inappropriately?
13 A   On my buttocks.  He touched me on my buttocks.
14 Q   Where were you?
15 A   Coming in a door of his office suite.  It's a glass
16     door.  And I was coming in the door, and he swatted
17     me on my buttocks.
18 Q   Was anyone else present?
19 A   At that door?  No.
20 Q   Did you have any reaction to him swatting you on
21     your buttocks?
22 A   Yes.
23 Q   What was your reaction?
24 A   I put my hand up and I -- I put my hand up and
25     said, like, MF.  And he said, "Oh, you're so

Page 22

1      violent."
2  Q   What happened next?
3  A   We just walked in the office -- into his office
4      area.
5  Q   Did you report this incident to anyone at the
6      county?
7  Q   Did I report it to anyone at the county?
8  Q   Correct.
9  A   Yes.
10 Q   Who did you report it to?
11 A   Michael Turner.
12 Q   When did you report it to him?
13 A   In 2023.  I'm sorry.  Yes, in 2023.
14 Q   Do you recall what month?
15 A   No.
16 Q   Did you report it to him verbally or in writing?
17 A   Verbally.
18 Q   On the phone or in person?
19 A   In person.
20 Q   Where were the two of you physically, when you
21     reported it in person?
22 A   In his office.
23 Q   As best you can recall, what did you say to him
24     when you made this report?
25 A   It was so many reports.



REGINA PARKS
REGINA PARKS vs WAYNE COUNTY, et al.

September 16, 2025
23—26

Page 23

1   Q    Okay.  As best you can recall, what did you -- did
2        you specifically report the buttocks swat in 2022?
3   A    Repeat that.
4   Q    Did you specifically report to him about this --
5        the buttocks swat that occurred in 2022?
6   A    No.  It was just overall, we were having a
7        conversation of, you know -- you know, the sexual
8        harassment.
9   Q    Do you recall what month in 2022 the buttocks swat
10       occurred?
11  A    Do I recall?
12  Q    What month in 2022 did the sheriff first swat you
13       on the buttocks?
14  A    In '22?  It -- no.  It -- it was -- it was later.
15       It was, like, late -- late in -- like, late in '22,
16       and it occurred again.  It wasn't just one time at
17       that door.
18  Q    But that was the first time it occurred?
19  A    Uh-huh.
20  Q    Okay.  So when you were having this conversation
21       with Michael Turner in 2023, in person in his
22       office, as best you can recall, what did you say to
23       him?
24  A    We were -- we were just having a conversation, and
25       we were talking about incidents, and I brought up

Page 24

1        him hitting me on my rear end.
2   Q    What other incidents were you -- did you discuss?
3   A    What other incidents I discuss?
4   Q    You said you were discussing incidents.
5   A    Uh-huh.
6   Q    Is that right?  Did you discuss incidents other
7        than the buttocks swat?
8   A    Not sure.
9   Q    Did you use the word -- do you -- did you use the
10       words "sexual harassment" in that conversation with
11       Michael Turner?
12  A    Not sure.
13  Q    I'm sorry.  Did -- you said you were not sure?
14  A    Not sure.
15  Q    What was Michael Turner's reaction to this report?
16  A    He usually just called him a stupid motherfucker.
17  Q    And did he do that on that occasion?
18  A    Yes.
19  Q    So you said a moment ago that there were other
20       occasions on which the sheriff touched you
21       inappropriately.
22  A    Yeah.
23  Q    When was the next time after the first buttocks
24       swat -- in late 2022, when was the next time that
25       he touched you inappropriately?

Page 25

1   A    The next time he touched me inappropriately was in
2        February of '23.
3   Q    And what did -- in what manner did he touch you
4        inappropriately?
5   A    He kissed me.
6   Q    Where on your body did he kiss you?
7   A    On my lips.
8   Q    Where were the two of you when that occurred?
9   A    In his office.
10  Q    Was anyone else present?
11  A    In his office?  No.
12  Q    How did you react to him kissing you?
13  A    I was shaken.  I was shaken up.  I -- I was shaken.
14       I -- I felt -- I didn't know what to do.  I -- I --
15       I moved -- I -- I moved.  I was, like, by his door
16       when you first come in his office, and I kind of
17       moved out the way.  And he was -- I walked over to,
18       like, the table -- his -- his -- his table.  He had
19       a table with, like, four chairs and -- and -- and I
20       sat down.  So -- I -- I was in -- I -- I guess I
21       was in shock or something.
22  Q    Did he touch you inappropriately in any other way
23       in that same occurrence?
24  A    Yes.  When -- so when I was sitting down, he was
25       rubbing me on my thigh.

Page 26

1   Q    Were you wearing a -- what were you wearing at that
2        time?
3   A    You know, I don't remember what I was wearing.  I
4        -- I don't recall what I was wearing.
5   Q    Was he -- when he was rubbing it, was it on your
6        skin or was it on top of clothing?
7   A    On top of clothing.
8   Q    And how did you respond to that?
9   A    I was shaken.  I -- I did nothing.
10  Q    Did he touch you in any other way that was
11       inappropriate, during this same incident?
12  A    Did -- I'm sorry.
13  Q    Did he touch you in any other inappropriate way,
14       during this same incident?
15  A    I just remember the kiss, the hug, and him rubbing
16       my thigh.
17  Q    Did you report this incident to anyone at the
18       county?
19  A    Did I report the incident?
20  Q    Correct.
21  A    Yes.
22  Q    Who did you report it to?
23  A    Michael Turner.
24  Q    When did you report it to Michael Turner?
25  A    I don't recall exactly when I reported it to



REGINA PARKS
REGINA PARKS vs WAYNE COUNTY, et al.

September 16, 2025
27–30

Page 27

1    Michael Turner.
2  Q   Did you report this -- when -- was this report in
3        verbal or in writing?
4  A   Verbal.
5  Q   On the phone or in person?
6  A   It -- it was in person.  It was in person.
7  Q   Was it a different occasion than the other
8        discussion we just talked about, that you had with
9        Turner in person in his office?
10  A   Yes.
11  Q   A separate occasion?
12  A   Uh-huh.
13        MS. GORDON:  You have to say, yes.
14        THE WITNESS:  Yes.
15        MS. GORDON:  You nodded your head.
16        THE WITNESS:  Yes, I'm sorry.
17  BY MS. DELMASTRO:
18  Q   Was this separate occasion also in his office?
19  A   I'm not sure.
20  Q   And on this occasion, what -- did Turner respond in
21        any way to you reporting this incident?
22  A   I'm not sure.  I -- I told him so many times.  I'm
23        not for sure.  I don't recall.
24  Q   Did you report this incident to anyone else at the
25        county?

Page 28

1  A   I don't -- no.
2  Q   Did you report the first inappropriate touch of the
3        buttocks swat to anyone else at the county?
4  A   Yes.  Yes.  But that wasn't the first -- that
5        wasn't the first time he touched me.
6  Q   What wasn't the first time he touched you?
7  A   The first time he touched me was -- was -- was in
8        2022 at the -- at the Detroit Public Schools event
9        gala.
10  Q   What month was that?
11  A   That was in May of 2022.
12  Q   And you're saying that he -- that was before the
13        buttocks touch?
14  A   Yes.
15  Q   Okay.  Okay.  And I -- I want -- and I do want to
16        hear more about that, but I want to make sure we
17        close out the buttocks touch in 2022.  Did you
18        report that to anyone at the county other than
19        Michael Turner?
20  A   That one incident?
21  Q   Correct.
22  A   Yes.
23  Q   Who did you report it to at the county?
24  A   Rashaun Whitehead.
25  Q   When did you report it to Rashaun?

Page 29

1  A   And that's the incident in '22?
2  Q   Yes.  The buttocks swat in '22.
3  A   Probably in just general conversation when we were
4        talking about sexual harassment, and what the
5        sheriff was doing.  Not -- not sure when -- it had
6        to probably be in '23.
7  Q   Is that verbally or in writing?
8  A   Verbally.
9  Q   Did Rashaun respond to that?
10  A   Rashaun responded just in disappointment.
11  Q   What do you mean by that?
12  A   Just another incident.
13  Q   Okay.  So the May 2022 Detroit Public Schools
14        event.  What happened at that event --
15  A   What had --
16  Q   -- that you believe was inappropriate?
17  A   The sheriff put his hand up my dress -- up the slit
18        of my -- I had a long black dress on, and it had a
19        slit up the side, and he put his hand up the slit
20        of my dress, and it was inappropriate.
21  Q   Where were you at the event when that occurred?
22  A   We were in a VIP -- it was like a VIP event.  We
23        were just standing, waiting for the event to start.
24        And we were just -- it was -- I guess it was like a
25        -- just this big room.  It was like a VIP area, and

Page 30

1        we were kind of just standing around.
2  Q   Was anyone nearby you?
3  A   Yes.
4  Q   Who was nearby?
5  A   His wife was next -- standing next to him, and
6        Rashaun was -- his wife was on -- the sheriff's
7        wife, Keysha was on the left side of him, and
8        Rashaun was on the right, and I was in front of
9        him.
10  Q   Do you know if Rashaun saw him do this?
11  A   Absolutely.  She saw him.
12  Q   Do you know if Keysha saw him do this?
13  A   I'm not for sure, but she was standing right next
14        to him.
15  Q   And you were in front of him?
16  A   Yes.
17  Q   Was the slit in the back of your dress or in the
18        side?
19  A   It was, like, in the front, like, side -- like --
20        like, the side.  Yeah.  It was just like the side.
21  Q   Were you facing him when he did this, or?
22  A   Yes.
23  Q   Okay.  Is there -- do you think that anyone else
24        saw him do this?
25  A   I'm not sure.  Rashaun saw it.



REGINA PARKS
REGINA PARKS vs WAYNE COUNTY, et al.

September 16, 2025
31–34

Page 31

1  Q   What, if anything, did you do immediately after he
2      did this?
3  A   I took my hand and swatted his hand away.
4  Q   What happened next?
5  A   I just continued to talk, and I was embarrassed.  I
6      was so embarrassed.  I was embarrassed for me.  I
7      was embarrassed for his wife.  I was just -- it was
8      unbelievable.
9  Q   Did anything -- did the sheriff do anything else
10     that you believe was inappropriate at that event?
11 A   No.
12 Q   So between the May of 2022 Detroit Public Schools
13     event and the buttocks swat in 2022, were there any
14     other instances where the sheriff touched you
15     inappropriately?
16 A   Can you repeat the question?
17 Q   Between the May 2022 Detroit Public Schools event
18     and the buttocks squat in 2022 that we talked
19     about, were there any other instances in between
20     those where the sheriff touched you
21     inappropriately?
22 A   Give me that timeline again, one more time.
23     There's so many incidents.  That's why.
24 Q   So between the May 2022 Detroit Public Schools
25     event and the buttocks swat in 2022.

Page 32

1          MS. GORDON:  What month in 2022?  I think
2      that would be helpful, if you could add that to
3      your question.
4          MS. DELMASTRO:  She didn't -- she said
5      she didn't remember --
6          MS. GORDON:  Okay.
7          MS. DELMASTRO:  -- which month in 2022.
8  BY MS. DELMASTRO:
9  Q   Did anything occur between those two incidents?
10 A   Just touching.
11 Q   Correct.  Let's stick with touching.
12 A   I don't recall.
13         THE WITNESS:  Can we take a break?
14         MS. GORDON:  Sure.
15         THE VIDEOGRAPHER:  We're going off the
16     record.  The time is 10:28 a.m.  We're off the
17     record.
18     (A recess was taken.)
19         THE VIDEOGRAPHER:  We're now back on the
20     record.  The time is 10:43 a.m.
21 BY MS. DELMASTRO:
22 Q   Regina, you filed for bankruptcy four times, not
23     one time, correct?
24 A   Yes.  I changed from a 7 to a 13.  Yeah.  From 13
25     to a 7.  So yeah.

Page 33

1  Q   So you filed in 2008, 2010, and then two times in
2      2018, correct?
3  A   That's correct.
4  Q   Okay.  And --
5  A   No.  I'm sorry.  Can you repeat that?
6  Q   You filed for bankruptcy in 2008, correct?
7  A   Yes.
8  Q   Okay.  And you filed for bankruptcy in 2010?
9  A   Yes.
10 Q   And then you filed for bankruptcy in 2018?
11 A   Yes.
12 Q   And there's two different filings.  There were two
13     different filings in 2018, correct?
14 A   Yes.
15 Q   Okay.  So at the beginning of this deposition, when
16     you mentioned that you filed for bankruptcy one
17     time, had you forgotten about the other times?
18         MS. GORDON:  Well, I don't know that
19     that's what the record says.  You asked her, did
20     she ever file a lawsuit?  And she gave --
21         MS. DELMASTRO:  Is that an objection?
22         MS. GORDON:  Yeah.  It's your -- my
23     objection is that you're mischaracterizing,
24     potentially, what she said and suggesting that she
25     will --

Page 34

1          MS. DELMASTRO:  Well, the record will --
2          MS. GORDON:  Hang on.  I'm not done.
3          MS. DWYER:  It's a speaking objection.
4          MS. DELMASTRO:  Yeah.  The record will --
5          MS. DWYER:  So if you could refrain from
6      using speaking --
7          MS. GORDON:  Okay.  There's only one
8      person that's handling the stuff here.
9          MS. DWYER:  I can -- no, I can make
10     statements on the record as well.  As you well
11     know.
12         MS. GORDON:  Okay.  Let's, you know -- we
13     --
14         MS. DWYER:  So if you could refrain from
15     making speaking objections, that'd be helpful.
16         MS. GORDON:  Okay.  Okay.  I think you're
17     trying to kind of misconstrue the way she handled
18     the earlier question.  You did ask her about
19     lawsuits, and she did say she filed the one.  And
20     then you said, was there another one.  And as I
21     recall, she said bankruptcy.  It's not worth
22     getting into an argument about.  But I think you
23     were trying to make a point here that may not have
24     been supported in the record.  And anyway, it's all
25     public record.  So none of it matters.  I mean,



REGINA PARKS
REGINA PARKS vs WAYNE COUNTY, et al.

September 16, 2025
35–38

Page 35

1    it's all very -- it is what it is, and it goes back
2    a long way.
3                 MS. DWYER:  Is that a form objection?
4                 MS. GORDON:  I'm not going to answer your
5    questions.
6                 MS. DWYER:  Please don't make speaking
7    objections.
8                 MS. GORDON:  I'm not here to listen to
9    your direction either.
10                Go ahead.
11   BY MS. DELMASTRO:
12   Q    There was also a PPO, personal protective order,
13        filed against you a couple of years ago, correct?
14   A    I'm sorry?
15   Q    There was also a personal protective order filed
16        against you a couple of years ago, correct?
17   A    I don't know anything about that.
18   Q    Now, so far, we've talked about three different
19        incidents in which you claim that the sheriff
20        touched you inappropriately.  And I just want to
21        confirm.  The first incident in which the sheriff
22        -- you claimed that the sheriff touched you
23        inappropriately, was in May of 2022; is that
24        correct?
25                MS. GORDON:  Okay.  Do we have to relive

Page 36

1    all this?  I mean, we've already covered this two
2    times.  The record is here.
3                 MS. DWYER:  Is that asked and answered?
4                 MS. GORDON:  Haven't we already covered
5    this?
6                 MS. DELMASTRO:  Again, is that an
7    objection?
8                 MS. GORDON:  It's a question.
9                 MS. DELMASTRO:  I'm trying to clarify the
10   witness's testimony.
11                MS. GORDON:  Okay.
12                MS. DELMASTRO:  Because she initially
13   said that the first time was the buttocks swat.
14                MS. GORDON:  Right.
15                MS. DELMASTRO:  She then subsequently
16   said the first time --
17                MS. GORDON:  Right.
18                MS. DELMASTRO:  -- was the Detroit Public
19   Schools event.
20                MS. GORDON:  That's -- so that's on the
21   record.
22   BY MS. DELMASTRO:
23   Q    So I'm trying to understand, is there -- what was,
24        in fact, the first time that you claim he touched
25        you inappropriately?

Page 37

1    A    The first time he touched me inappropriately was at
2         the Detroit Public Schools event.
3    Q    Did you report what occurred at the Detroit Public
4         Schools event to anyone at the county?
5    A    Yes.
6    Q    Who?
7    A    Michael Turner.
8    Q    And when did you report it to him?
9    A    The summer of 2022.
10   Q    At that time, you were having a sexual relationship
11        with Mr. Turner, correct?
12   A    In the summer of 2022, I was not having a sexual --
13        sexual relationship with Turner.
14   Q    When were you having a sexual relationship with Mr.
15        Turner?
16   A    I had a sexual relationship with Turner the summer
17        of '21.  It ended in the end of the summer.  I
18        probably -- I saw him -- I saw him maybe once in
19        '22, and it started back up the summer of '24.
20   Q    So when you say that you saw him once in 2022, do
21        you mean that you had sexual relations with him
22        once in 2022?
23   A    Yes.
24   Q    So you were -- so you had a sexual relationship
25        with him at two different time -- periods of time,

Page 38

1    the summer of 2021 and then the summer of 2024; is
2    that correct?
3    A    Yeah.  It ended.  It -- it -- it -- I had a
4         relationship with him in the summer of '21, and it
5         ended.  And then I recall seeing him at least once
6         time -- one time in '22, and -- and also in '24.
7    Q    Why -- at the time that you were in that
8         relationship with him in 2021, he was your
9         supervisor, correct?
10   A    Uh-huh.
11   Q    Did you report this relationship to anyone at the
12        county?
13   A    No.
14   Q    Why not?
15   A    Because it -- it happened and -- and -- and it
16        wasn't like a relationship.  It just -- it just
17        happened, and -- it just happened.  So no, I
18        didn't.
19   Q    Are you aware of the county's policies regarding
20        interpersonal or sexual relationships among
21        employees?
22                MS. GORDON:  Do you have such a policy
23   that you haven't produced?  I haven't seen that
24   policy, if you guys have something.  Because I've
25   asked for all the policies and I've gotten



Page 39

1  (indiscernible).
2         MS. DELMASTRO:  So is -- if you have a
3  discussion about discovery, let's --
4         MS. GORDON:  No, it's not a discussion
5  about discovery.  Your question -- it sounds like
6  it assumes something, and it makes me think that
7  you haven't turned something over if you're
8  actually referring to policy.  If you're not, and
9  it's just a big picture question, then I have no
10  objection to it.  If it's just a big picture
11  question, fine.  But if it's about a specific
12  policy, then I have a concern.
13         MS. DELMASTRO:  Let's circle --
14         MS. GORDON:  That's all.  Yeah.
15         MS. DELMASTRO:  Let -- okay.  Let's
16  circle back to that question.  But -- okay.
17  BY MS. DELMASTRO:
18  Q    So why did the relationship with him end -- the
19     sexual relationship with him end in 2021?
20  A    Because I didn't want to have a relationship with
21     him.
22  Q    Okay.  So you were the one to end the relationship?
23  A    It just ended, yes.
24  Q    Okay.  So you ended it?
25  A    Yes.  Yes.

Page 40

1  Q    And then you did have a sexual relations encounter
2     with him in 2022.  How did that come about?
3  A    I don't recall.  I don't -- I don't know how it
4     came about.
5  Q    Okay.  During the summer of 2021, how frequently
6     did you see each other?
7  A    A few times.
8  Q    And did you consider it a relationship, a -- just
9     random encounters?  Did you call each other
10     boyfriend, girlfriend?  How would you describe it?
11  A    Just a random encounter.
12  Q    Were you in any other relationships at that time?
13  A    In '21?  Not that I can recall.
14  Q    Mr. Turner was married at that time, correct?
15  A    Yes.
16  Q    Do you know if his wife knew about the encounters
17     you were having with him?
18  A    No.
19  Q    Did -- were you married at that time?
20  A    No.
21  Q    Have you ever been married?
22  A    No.
23  Q    Now, you produced -- in this litigation, you
24     produced text messages between you and Mr. Turner.
25     Were those from your personal cell phone?

Page 41

1  A    Yes.
2  Q    Were they to his personal cell phone?
3  A    Yes.
4  Q    Why was his contact S. Harvey in your cell phone?
5  A    Because it was a joke.  I -- I -- we used to say he
6     looked like Steve Harvey.
7  Q    Okay.  Did you produce all of the text messages
8     that you currently have between you and Mr. Turner?
9  A    Yes.  Everything I have, my attorney has.
10  Q    Okay.  Do you know how Mr. Turner had your phone
11     number saved in his phone?
12  A    No.
13  Q    So how many times did you see him sexually in 2022?
14         MS. GORDON:  Off the -- for the record,
15     we are not making a sexual harassment claim against
16     Mr. Turner, so I don't know what the relevance of
17     this is.
18         MS. DELMASTRO:  Thank you.
19         MS. GORDON:  You're welcome.
20  BY MS. DELMASTRO:
21  Q    So when you reported the -- what -- the alleged
22     inappropriate touching by the sheriff to Mr.
23     Turner, that occurred after you were having a
24     sexual relationship with Mr. Turner, or during?
25  A    Can you repeat that?

Page 42

1  Q    That was a terrible question.  I'm sorry.  Did you
2     ever report the alleged inappropriate touching by
3     the sheriff to Turner while you and Turner were
4     having a sexual relationship?
5  A    I'm -- I -- I don't know how to answer that because
6     yes, I reported him -- yes, I reported it to Turner
7     when we were not in a relationship, but I have also
8     talked about it or said something to him after the
9     fact.
10  Q    Did you ever follow up on your concerns that you
11     raised to Mr. Turner?
12         MS. GORDON:  Follow up?  I'm sorry.  I
13     don't understand the question.  With Turner?
14         MS. DELMASTRO:  Well, I'll let the
15     witness say if she understands the question.
16         MS. GORDON:  It's unclear.  Follow up
17     with Turner or something else?
18         MS. DELMASTRO:  If the witness does not
19     understand the question --
20         MS. GORDON:  Okay.  I don't understand
21     the question.
22         MS. DELMASTRO:  -- the witness can tell
23     me.
24         THE WITNESS:  Can -- can you explain?  I
25     don't understand.



Page 43

1  BY MS. DELMASTRO:
2  Q    Yes.  Did you take any further action after you
3       made your reports to Turner?
4  A    Did I make any further action outside of the
5       county, or -- or -- or -- or -- or did I --
6  Q    Well, Turner -- it's -- do you know if Turner did
7       anything about your complaints?
8  A    Is that a question?
9           MS. GORDON:  Yes.
10 BY MS. DELMASTRO:
11 Q    Yeah.  Do you know?
12          MS. GORDON:  That's a question.
13          THE WITNESS:  Turner told me that he was
14      going to talk to his cousin, Bishop Ellis, about
15      him because it was very concerning, and it was
16      getting out of hand.
17 BY MS. DELMASTRO:
18 Q    Okay.  And when was that?
19 A    That was -- that was October -- it was October the
20      3rd, 2023.
21 Q    Okay.  So that was -- so until that point, Turner
22      hadn't done anything about your complaints?
23 A    Turner didn't do anything about my complaints.  I
24      made multiple -- I -- I said something to him
25      multiple times.

Page 44

1  Q    Okay.  What -- why didn't you follow up with anyone
2       else at the county?
3  A    Why didn't I follow up with anybody else at the
4       county?
5  Q    Correct.
6  A    Oh, that's a -- I -- we don't have a HR in the
7       sheriff's office.  The sheriff is an elected
8       official.  So going to the county is like, what's
9       going to happen?  Nothing happened to him before.
10      He received no discipline.  Warren Evans is not his
11      boss.  He already said multiple times that Warren
12      Evans is not his boss.  So I didn't know what to
13      do.  I -- I -- my brother-in-law told me to call
14      the Attorney General.  I didn't know what to do.  I
15      was scared, and I -- I -- I just didn't know what
16      to do.
17 Q    Did you call the Attorney General?
18 A    I was scared.  I didn't know what to do.
19 Q    Is that a no?
20 A    No.
21 Q    Okay.  So who is this Bishop Ellis person?
22 A    His cousin.
23 Q    Who's cousin?
24 A    The sheriff's cousin.
25 Q    The sheriff's cousin.  Do you know -- do you have

Page 45

1  Q    any idea why Michael Turner would talk to Bishop
2       Ellis about this?
3  A    Because that's his cousin, and he's close to him.
4       And maybe he could talk some sense into him.  I
5       don't know.
6  Q    Okay.  Did -- are -- do you -- does Michael Turner
7       know Bishop Ellis?
8  A    Absolutely.
9  Q    How do they know each other?
10 A    You would probably have to ask Michael Turner how
11      he met Bishop Ellis.  He is -- he -- he has one of
12      the biggest churches in -- in the city.
13 Q    Okay.  So why did you tell Turner if you didn't --
14      if you didn't think Turner could do anything about
15      it?
16          MS. GORDON:  She didn't say that.  She
17      never said that.  She didn't say --
18          MS. DELMASTRO:  Okay.
19          MS. GORDON:  Turner told me he wasn't
20      (indiscernible).
21 BY MS. DELMASTRO:
22 Q    Okay.  Well, then let me ask a different question:
23      why did you tell Turner?
24 A    Why did I tell Turner?
25 Q    Correct.

Page 46

1  A    Because he was my immediate supervisor, and -- he
2       was my immediate supervisor.
3  Q    And what did you want him to do about it?
4  A    I wanted him to do a lot.  I wanted him -- I wanted
5       him to stop.
6  Q    Okay.  Why do you -- so why didn't you tell Turner
7       that he needed to take action?
8          MS. GORDON:  Why did she not tell her
9       boss what to do?
10         MS. DWYER:  You got to stop making
11      speaking -- you're coaching the witness, and that's
12      inappropriate.  If you have an objection, place it
13      on the record.
14         MS. GORDON:  It's not a question.
15         THE WITNESS:  Can you repeat the
16      question?
17         MS. DWYER:  You're coaching the witness.
18 BY MS. DELMASTRO:
19 Q    I'm asking, basically: if you think it was so
20      hopeless to report something to the county, why did
21      you even -- why did you tell Turner in the first
22      place?
23 A    Well, why I -- I told Turner is because in the
24      beginning, it was brought up regarding Erika
25      Erickson, and we were all in a room in -- in



Page 47

1    Turner's -- in 2022, in the summer of 2022, Erika
2    Erickson's accusations came out.  And Erika
3    Erickson's accusations came out, and we were in the
4    room, and we were talking about that, myself,
5    Rashaun Whitehead.  And I told Turner right then
6    and there, that, yeah, he said something to me
7    inappropriately.  And this was before all of the
8    touching started, and that's --
9    Q    Wait, wait, wait.  If this was in the summer of
10        2022, that was after May of 2022 --
11   A    I'm sorry?
12   Q    -- right?
13   A    What?
14   Q    Yeah, it was after the DPS event where you claim
15        that he touched you inappropriately?
16   A    Uh-huh.
17   Q    Okay.  So you just said that that was -- that the
18        summer was before any of the touching started.
19   A    I'm sorry?
20   Q    Did -- so -- do you know Lakeisha Solomon?
21   A    Yes.
22   Q    Are you aware that she is HR for the sheriff's
23        department?
24   A    She wasn't HR.  She was personnel.
25   Q    What's the difference?

Page 48

1    A    It's a whole -- it's a lot -- it's a difference.
2        It was -- it's a difference.  And she was also
3        sexually harassed and nothing happened, so.
4    Q    How do you know that?
5    A    How do I know that?
6    Q    Yeah.
7    A    Because it's -- everyone in the -- in the office
8        knows.  It's just everybody knows about it.
9    Q    Did you ever ask Lakeisha Solomon directly about
10       it?
11   A    No.
12   Q    Did she ever tell you about it herself?
13   A    Well, she did tell me a -- a incident -- another
14       incident.
15   Q    Okay.  Now, so you're saying that because she's
16       personnel, she could not -- she would not have been
17       a proper recipient for a sexual harassment
18       complaint?
19   A    I didn't say that.
20   Q    Okay.  Well so what about her being personnel makes
21       her not HR?
22   A    I just -- I never looked at her -- looked at it as
23       her being HR at all.
24   Q    Okay.
25   A    I never felt like I could come to her with that

Page 49

1        complaint, especially something like that.
2    Q    Do you know Venita Terry?
3    A    Yes.
4    Q    All right.  And are you aware that Venita Terry
5        also serves an HR function for the sheriff's
6        department in the county?
7    A    Correct.
8    Q    So couldn't you have brought your concern to Venita
9        Terry?
10   A    I didn't feel that I could bring my -- that concern
11       to Venita Terry.  And Venita Terry came on later,
12       and I didn't have a relationship with her where I
13       felt like I could come to her.  This is very
14       difficult.  You got to remember, we are appointees,
15       and he's our boss.
16   Q    Okay.  Did you report the incident that occurred at
17       the DPS event to anyone at the county?
18   A    Yes.
19   Q    Who did you report it to?
20   A    Michael Turner.
21   Q    When did you report to him?
22   A    The summer of 2022.
23   Q    And what did you tell him?
24   A    Myself, Rashaun Whitehead were in the office, and
25       we were talking about Erika Erickson's accusations.

Page 50

1        And then it came up, and I told the -- I told
2        Michael Turner that he put his hand up my dress.
3        Rashaun Whitehead said, "Chief, I did see the
4        sheriff put his hand up her dress."  Nothing
5        happened.  We made -- we both reported it to him.
6    Q    At that time, in the summer of '22, when was the
7        most recent time that you had had sexual relations
8        with Mr. Turner?
9    A    Repeat that question again.
10   Q    At that time of summer 2022, when you reported what
11       you allege occurred at the DPS event, when was the
12       last time before then that you'd had a sexual
13       relationship with Turner?
14   A    I -- I don't recall.  It -- it -- it was -- I -- I
15       -- I don't recall.  It was -- but it was not a --
16       it was not in the summer.  It was not in the
17       summer.  I -- I just don't recall.  I -- I know
18       that I was not seeing him.
19   Q    Okay.  In 2023, did you have -- did you see Mr.
20       Turner sexually at all?
21   A    In '23?
22   Q    Uh-huh.
23   A    No.
24   Q    And then in 2024, when did you start having sexual
25       relationships with Mr. Turner again?

REGINA PARKS
REGINA PARKS vs WAYNE COUNTY, et al.

September 16, 2025
51–54

Page 51

1  A   The summer.
2  Q   During the summer.  Okay.  Approximately how long
3      did you see him sexually?
4  A   From sometime in the summer to November.
5  Q   How did that start up again in the summer?
6  A   He just continued to ask me to see him.  Just -- he
7      just kept asking me to see him.
8  Q   And you said yes?
9  A   Yeah.  We went out.
10 Q   Okay.  Was there -- when you say that he continued
11     to ask you to see him, was he continually asking
12     you the whole time between your -- the times that
13     you had sexual relations together?
14 A   He would say things, yeah.
15 Q   And then how often did you see each other during
16     the 2024 sexual relationship?
17 A   Not sure, but a lot -- not a lot.  Just not a lot.
18 Q   How did that sexual relationship end?
19 A   I just didn't want to see him anymore.
20 Q   You ended it?
21 A   Yeah, pretty much.
22 Q   Who initiated the relationship in 2022?
23 A   In '21?
24         MS. GORDON:  You mean at the beginning?
25 BY MS. DELMASTRO:

Page 52

1  Q   Yeah.  At the beginning, was it -- yes.  Sorry.  In
2      2021, who initiated the relationship?
3  A   Michael Turner.
4  Q   Michael Turner.  Okay.  And where was the first
5      time that it occurred?
6  A   At my house.
7  Q   Did he invite himself over?
8  A   He came -- yes.  He -- he -- he said he was going
9      to come over because he wanted to look at -- I had
10     a plumbing issue, a busted pipe.
11 Q   Okay.  Did you ask him to look at the pipe?
12 A   Well, I mean, he said yeah.  He -- he had -- he
13     said, "I'll look at it because I have some --" some
14     people he could refer me, that could do the work.
15 Q   Okay.  When you would have sexual relations with
16     Mr. Turner, where would those occur?
17 A   A hotel, and -- and -- at my house.
18 Q   Did they ever occur at the office?
19 A   Not that I recall.
20 Q   Don't you think you would recall something like
21     that?
22 A   I don't remember having sex with him at the office.
23 Q   Okay.  So you -- don't you think you would remember
24     if you had --
25         MS. GORDON:  Okay, she's answered the

Page 53

1      question.  Now you're just badgering her.  She just
2      told you what she thought.
3         MS. DWYER:  Asked and answered?  Is that
4      what the objection is, Deb?  You continue with the
5      speaking objections, which is inappropriate.
6  BY MS. DELMASTRO:
7  Q   Do you know if Turner ever said anything to the
8      sheriff about your complaints?
9  A   No.
10 Q   Did you ever put your complaints in writing?
11 A   No.
12 Q   When you invited him over to your house to come
13     look at the pipes the first time you guys had sex,
14     was it your --
15         MS. GORDON:  Wait, wait.  She didn't say
16     she invited him over.
17         MS. DELMASTRO:  Okay.  Who --
18         MS. GORDON:  That's not what she said.
19 BY MS. DELMASTRO:
20 Q   Who invited who?
21         MS. GORDON:  She already explained this.
22     Go ahead, Regina.
23         THE WITNESS:  He said he was coming by,
24     so he kind of invited himself.  And I said, "Okay."
25     He -- he -- he seemed like he wanted to help me

Page 54

1      with this situation.
2  BY MS. DELMASTRO:
3  Q   Okay.  And isn't it true that when he came to your
4      house to look at the pipe, you were wearing a
5      bathrobe?
6  A   Absolutely not.
7  Q   What were you wearing?
8  A   My clothes.  I was dressed.
9  Q   Do you know Soumaya Harb?
10 A   Yes.
11 Q   Okay.  And she was Venita Terry's predecessor,
12     correct?
13 A   Yes.
14 Q   Okay.  So she was HR, correct?
15 A   Correct.
16         MS. GORDON:  I'm sorry.  And have we just
17     established what her title is?
18         MS. DELMASTRO:  I guess.
19 BY MS. DELMASTRO:
20 Q   Did you ever report any of your concerns about the
21     sheriff to Soumaya Harb?
22 A   No.
23 Q   Why not?
24 A   Again, it was very, very -- this is very, very
25     sensitive.  I didn't know who to trust to tell this



REGINA PARKS
REGINA PARKS vs WAYNE COUNTY, et al.

September 16, 2025
55–58

Page 55

1    information to.  Again, I was scared, and no, I --
2    I didn't.
3         (Defendant's Exhibit 1 was marked for
4    identification.)
5    BY MS. DELMASTRO:
6    Q    All right.  I'm going to show you a document that
7    I'm going to mark as Deposition Exhibit 1.  Okay.
8    Regina, do you recognize this document?
9    A    Yes.
10   Q    What is this?
11   A    This is the -- the MAC Gala.
12   Q    Okay.  And so are the -- is this a text message
13   exchange between you and Rashaun Whitehead?
14   A    Yes.
15   Q    Are the bubbles on the right side of the page your
16   text messages to Rashaun?
17   A    Yes.
18   Q    And are the bubbles on the left side of the page
19   Rashaun's messages to you?
20   A    Yes.
21   Q    Okay.  And so I think you just said you identified
22   the picture as being from an event, correct?
23   A    Yes.
24   Q    What's that event?
25   A    The MAC Gala.

Page 56

1    Q    The MAC Gala.  Did this event occur before or after
2    the DPS event?
3    A    Before.
4    Q    Before.  Was the DPS event the following weekend?
5    A    Yes.  I think so.
6    Q    Okay.  And what is this picture?
7    A    It's -- it's this -- that 360, like, movie -- not a
8    movie, but a 360 camera where it looks like you're
9    dancing, or you moving and you're not -- you're --
10   you're -- you're standing there and you're kind of
11   doing a movement, and you just kind of going around
12   a circle.  So when you look at the video, it kind
13   of looks like you're dancing.
14   Q    Okay.  And who is standing behind you in this
15   picture?
16   A    Sheriff Raphael Washington.
17   Q    Okay.  Whose idea was it to do this video with him?
18   A    Whose idea?
19   Q    Yes.
20   A    The camera -- the -- the -- the camera people who
21   were, like, out there telling the -- the -- the
22   attendees to come in.
23   Q    Okay.  So they, like, pulled you --
24   A    Yeah, yeah.
25   Q    -- guys in, and were like, "Hey, do this"?

Page 57

1    A    Yeah, yeah.
2    Q    Okay.  Do you claim that there was anything
3    inappropriate about the sheriff's behavior in this?
4    A    There was -- he didn't -- he -- it was nothing --
5    well, no.  It was nothing inappropriate.  He didn't
6    touch me.  He didn't do anything.
7    Q    Okay.  Are there -- other than what we've already
8    discussed, are there any other times that you
9    allege that the sheriff inappropriately touched you
10   inappropriately?
11        MS. GORDON:  You have our complaint.  So
12   you know there's other times.
13        MS. DWYER:  Once again, is that an
14   objection?  That calls --
15        MS. GORDON:  No, it's a question.  I'm
16   not sure whether you're saying you don't --
17        MS. DWYER:  This is coaching.
18        MS. GORDON:  -- you're not familiar with
19   the complaint.
20        MS. DELMASTRO:  Well, I -- Deb, I'm
21   allowed to ask -- that is a completely normal
22   question to ask her.  I'm asking her are there any
23   others?
24        MS. GORDON:  Okay.  I'm not used to
25   hearing it when the complaint already contains

Page 58

1    facts, but go ahead.  That's fine.
2         MS. DELMASTRO:  The complaint doesn't --
3         MS. GORDON:  Go ahead.
4         MS. DELMASTRO:  -- contain facts.  It
5    contains allegations.  And I'm asking her about
6    those allegations.  So I'm asking her --
7         MS. GORDON:  Okay.  Okay.
8         MS. DELMASTRO:  -- are there any other
9    times?
10        THE WITNESS:  Yes.
11   BY MS. DELMASTRO:
12   Q    Okay.  After the incident in 2023 in his office
13   where you alleged that he kissed you, hugged you,
14   and touched your thigh, what was the next time that
15   you claim he touched you inappropriately after
16   that?
17   A    The next time he touched me inappropriately was
18   probably about a week or two later.  The sheriff
19   was coming into his office from the garage.  I was
20   outside of his office, standing next to Rashaun
21   Whitehead's desk, and he came in, and he was, you
22   know, talking a little bit, and he opened his --
23   his -- the door to his office.  And, you know, I
24   was about to go back to my office.  So I asked the
25   sheriff could I get some water, and he said yes.



REGINA PARKS
REGINA PARKS vs WAYNE COUNTY, et al.

September 16, 2025
59–62

Page 59

1  And then when I went to the kitchen -- he has a
2  small kitchen -- I went around to get some water,
3  and he grabbed my butt cheek.
4  Q   What happened next?
5  A   I was -- I was in shock, and I -- I didn't know
6  what to do.  I wanted to scream, and -- but I -- I
7  didn't know what to do.  So I -- I left back -- I
8  kind of -- I left back out.  I left out, and then I
9  came back.  And then I told Rashaun Whitehead, "I
10  just want to let you know that the sheriff just
11  grabbed my butt cheek," and I let her know that he
12  did that to me.
13  Q   What -- was anyone else physically present when you
14  claim he grabbed your butt cheek?
15  A   In that area, it was the sheriff, Ron Johnson, and
16  -- and -- and Rashaun.
17  Q   Where was Ron physically, in relation to you and
18  the sheriff?
19  A   When it happened, I -- it -- I was in his office.
20  So his office -- his office, he has a kitchen.  He
21  had a kitchen that was connected, it -- like,
22  inside his office.  And the kitchen is very, very
23  small.  So I'm inside.  I don't know exactly where
24  Ron is, but Ron -- the last -- yeah, when I walked
25  out, Ron was still in that area where Rashaun's

Page 60

1  desk is.  So he might have been standing between
2  the -- the sheriff's door and the garage door.
3  Q   Do you know if he saw the sheriff?
4  A   He -- no.
5  Q   Anything --
6  A   I don't think he saw it because I was around the
7  corner, and he came behind me.
8  Q   Do you know if he heard you tell Rashaun what
9  happened?
10  A   No.
11  Q   Did you tell anyone else at the county about this
12  alleged occurrence?
13  A   No.
14  Q   What month of 2023 was this?
15  A   March.
16  Q   Did -- why did you get your water from the
17  sheriff's kitchen?
18  A   Why?
19  Q   Yes.
20  A   Because I was standing right there next to
21  Rashaun's door -- I mean, his door.  Sorry.
22  Q   Okay.  Was that -- so I -- by your answer, I'm
23  assuming you're basically saying that it was
24  convenient?
25  A   Yes.

Page 61

1  Q   Are there any other times that you allege that the
2  sheriff touched you inappropriately, after this
3  event in March that we just discussed?
4  A   Yes.
5  Q   When was the next time?
6  A   The next time was October 31st, 2023.
7  Q   And what do you allege happened at that time?
8  A   We were on our way to the centenarian birthday
9  party at Detroit area on agent -- Agency.  And I
10  was in -- I was going with him over there to that
11  party.  And when I was getting in his vehicle, he
12  struck me on my buttocks.
13  Q   Were you going into the same vehicle with him?
14  A   Yes.  So he opened the door, his -- Ron -- Ron
15  Johnson was driving.  The sheriff was getting in
16  the passenger side, but he opened the door for me.
17  But when he opened the door -- when he opened the
18  door for me, when I was getting in, he swatted me
19  on my buttocks.
20  Q   Do you -- was anyone else present other than you,
21  Ron, and the sheriff?
22  A   No.
23  Q   Do you know if Ron observed this occur?
24  A   I'm not sure.
25  Q   And what did you do?

Page 62

1  A   I just did nothing.
2  Q   Did you report that alleged incident to anyone at
3  the county?
4  A   No.
5  Q   What was the next time that you claim that the
6  sheriff touched you inappropriately?
7  A   That was -- I said it was October the 31st, right?
8  Q   Yes.  You mentioned that incident.  What -- was
9  there another time --
10  A   Yeah.
11  Q   -- after that?
12  A   No.  It was the -- it was October the 3rd when we
13  were at the -- October the 3rd, 2023, we were at
14  the Royal Oak Theater.
15  Q   How do you claim -- how did he -- how do you -- how
16  do you claim that he touched you inappropriately
17  there?
18  A   When we were in the elevator.  He -- we were coming
19  out of the elevator, and he hit me on my buttocks
20  in the elevator.
21  Q   The elevator was in the theater?
22  A   Yes.
23  Q   Is it the -- is this at the Imagine Theater?
24  A   Yes.
25  Q   Why were you in the elevator?



REGINA PARKS
REGINA PARKS vs WAYNE COUNTY, et al.

September 16, 2025
63–66

Page 63

1   A   Why was I in the elevator?
2   Q   Correct.
3   A   Because we were going upstairs to the theater.
4   Q   Was anyone else in the elevator?
5   A   Ron Johnson and maybe some other people.
6   Q   And you claim that he hit you on the buttocks.  Do
7       you know if Ron Johnson heard or saw that?
8   A   I'm not sure.
9   Q   And what did you -- what did you do immediately
10      after that?
11  A   Swatted his hand.
12  Q   Did you report that incident to anyone at the
13      county?
14  A   Yes.
15  Q   Who?
16  A   Michael Turner.
17  Q   When did you report it to Michael Turner?
18  A   Immediately when we left the theater, in his car.
19  Q   In Turner's car?
20  A   Yeah.
21  Q   Was Turner at this event?
22  A   Yes.
23  Q   What did you say to Turner?
24  A   I told Turner that the sheriff hit me on my
25      buttocks in the elevator.  And he also showed me a

Page 64

1   -- a -- a -- a video of a woman performing oral sex
2   on him.
3   Q   And did Turner say anything in response?
4   A   Yeah.  He called him a stupid motherfucker.  And he
5       said, "I'm -- I don't -- I don't -- this is just
6       getting out of hand."  He said -- first of all, he
7       said, "Say what?  What?"  And -- and he kind of,
8       like, shook his head in disbelief.  And he -- he --
9       he said, "This is getting out of hand.  I'm going
10      to have to -- I'm going to have to talk to his --
11      his cousin, Bishop Ellis."
12  Q   So how is it that you claim that he showed you the
13      video of the oral sex?
14  A   He took his -- he had his phone out, and he took --
15      he went to a video, and he showed me a -- a -- a
16      video of a woman having -- giving him oral sex.
17  Q   Where were you, the two of you physically, when he
18      --
19  A   Sitting down in the theater.
20  Q   Was he sitting next to you?
21  A   Yes.
22  Q   Which side of you was he sitting on?
23  A   On the right side.
24  Q   Who was sitting to your left?
25  A   No one.

Page 65

1   Q   Were you on an aisle?
2   A   We were, like -- we were, like -- we were, like, in
3       the front row of a section.  We were in the front
4       row of a -- of a section.  So there was nobody to
5       the -- to the left of me sitting, that I can
6       recall.  And then I don't believe that there was --
7       there was nobody sitting, like, right next to him.
8       So I'm not for sure if he was on the end or not.
9           But we had -- there was nobody right,
10      like, around us unless they were in front of us.
11      And then it was a lot of space.  It was like a --
12      it was like a -- a -- like, you -- you could walk.
13      It was like a walking space.  And then you had
14      other, like, chairs, you know, where you could sit.
15  Q   Was there anyone behind -- in the row behind you?
16  A   Not -- no, not behind me that I can recall.  I
17      don't remember.
18  Q   Did you see -- when he showed you his phone, was
19      the video already playing?
20  A   Yeah.
21  Q   Okay.  And how do you know that it was him that was
22      having oral sex performed on him?
23  A   Just -- just -- just because I don't see him
24      showing me another man -- it being another man,
25      and, you know, just by his -- the -- by his body,

Page 66

1   like, you could tell that it was him.
2   Q   Was his face in the video?
3   A   I -- I -- I -- I don't -- I don't really remember
4       if his face was in there.  I just saw his -- a
5       penis and a woman.  And I -- I wasn't trying to
6       look that long at it.
7   Q   Did you recognize the woman?
8   A   No.
9   Q   Was there sound on the video?
10  A   No.
11  Q   What did you -- how did you react to the video?
12  A   I was in -- I was disgusted.  I was just -- I was
13      -- I was -- I was in shock.  Like, I was in shock.
14      I -- I felt terrible.  I -- I felt, like, "Why
15      would you show me this?"  Like, "What do you think
16      of me to even show me something like that?"
17  Q   Did you push the phone away from you?
18  A   No.  I just -- yeah, sort of like, why are you
19      showing me this?
20  Q   Did you say, why did -- why are you showing me
21      this?
22  A   Yeah.  And he said, "You -- you --" he kind of --
23      like, laughed.  Like, "You got to share the love."
24      He thought it was funny.
25  Q   Did you ever tell anyone else at the county about



REGINA PARKS                                        September 16, 2025
REGINA PARKS vs WAYNE COUNTY, et al.                67–70

Page 67

1    what you claim occurred at the Royal Oak Theater on
2    October 3rd, 2023?
3    A    Did I tell anybody at the county?
4    Q    Yeah, other than Turner?
5    A    Yeah.  I told Rashidah.  I told Rashaun.  Yeah,
6    Rashidah and Rashaun.
7    Q    When did you tell Rashidah?
8    A    I told Rashidah the last day -- my last day at
9    work.
10   Q    And who's Rashidah?
11   A    She is executive assistant to the chief of staff
12   now.
13   Q    What was her role at the time that you told her on
14   your last day of work?
15   A    Her role then was -- her role then was recruitment.
16   She did something in recruitment.
17   Q    What did you tell her?
18   A    I told her I had a recording.  No.  I'm sorry.  I
19   told her -- I told her that, but I told her that he
20   showed me a -- a video of a woman giving him oral
21   sex.
22   Q    Did she say anything in response?
23   A    Yeah.
24   Q    What did she say?
25   A    She was, like, you know, like -- like, she didn't

Page 68

1    want to hear it.  I don't know her exact words, but
2    she's like she didn't want to hear it.
3    Q    So you told Rashidah that you had a recording?
4    A    No.  I -- yeah.  I told her that too.
5    Q    Okay.  What's that recording?
6    A    Of him saying, "All I -- " pretty much asking me for
7    a kiss.  "All I want is a kiss from you from time to
8    time."
9    Q    Okay.  Have you produced that recording in this
10   litigation?
11   A    Yes.
12   Q    Why did you tell -- why did you tell Rashidah about
13   what occurred on October 3rd, more than a year
14   later?
15   A    I'm sorry?
16   Q    Why did you tell Rashidah about things you claim
17   occurred on October 3rd, more than a year later, on
18   your last day?
19   A    Because we was just talking about sexual
20   harassment, and I asked her, what is she going to
21   do about him harassing her?
22   Q    Was this conversation just between the two of you?
23   A    Yes.
24   Q    And when did you tell Rashaun about the alleged
25   incidents on October 3rd, 2023?

Page 69

1    A    When did I tell Rashaun?
2    Q    Yes.
3    A    I'm sorry.  Repeat that.
4    Q    When did you tell Rashaun about what you claim
5    happened on October 3rd, 2023?
6    A    I don't -- I don't recall telling -- it's so much.
7    Say that one more time.  I'm sorry.
8    Q    A minute ago, you said you told Rashaun about the
9    October 3rd, 2023 --
10        MS. GORDON:  The video.
11   BY MS. DELMASTRO:
12   Q    -- alleged incidents.  Did you tell Rashaun about
13   that?
14   A    Yeah.  I told her.
15   Q    Okay.  When did you tell her?
16   A    Well, the -- the -- the night -- the night -- the
17   last day I worked, on that phone call.
18   Q    Okay.  Again, why did you wait so long to tell her?
19   A    Why did I wait so long to tell her about that --
20   that incident?
21   Q    Correct.
22   A    It was just -- I just didn't tell her about that
23   one incident.  It was -- you know, there was so
24   many incidents.
25   Q    At that time, did you already know that your

Page 70

1    employment was terminated?
2    A    When I talked to Rashaun?
3    Q    Correct.
4    A    My employment wasn't terminated.
5    Q    Okay.  So at the time that you told her, you did
6    not know that it was going to be your last day of
7    work?
8    A    Correct.
9    Q    Okay.  When you were -- when you were in Turner's
10   car on October 3rd 2023, why were you in his car?
11   A    Why was I in his car?
12   Q    Correct.
13   A    Oh, because we -- I drove with him to the -- to the
14   event -- to the -- the movie --
15   Q    Why did you drive --
16   A    -- theater.
17   Q    Why did you drive together?
18   A    Because I left my car at the office.
19   Q    And why did you do that?
20   A    Because that's just routine.  Why drive two cars
21   when you don't have to?  And -- yeah.
22   Q    So did Turner drive you back to the office to get
23   -- to pick up your car afterwards?
24   A    Yeah.  He took me back to the office.  Yeah.
25   Q    At that time, were you and Turner having sexual



REGINA PARKS
REGINA PARKS vs WAYNE COUNTY, et al.

September 16, 2025
71–74

---

Page 71

1   relations?
2   A   No.
3   Q   Okay.  Did you see Turner at all sexually in 2023?
4   A   No.  No.
5   Q   Do you believe that the county retaliated against
6       you?
7           MS. GORDON:  At any time?
8           MS. DELMASTRO:  Yes, at any time?
9           THE WITNESS:  Yes.
10  BY MS. DELMASTRO:
11  Q   And what did the county do that you believe was
12      retaliatory?
13  A   What do I believe?  I believe that because I didn't
14      give into his sexual -- to the sheriff's sexual
15      favors, that I was demoted and eventually fired.
16      And then also, when I said that I had a -- a -- a
17      -- a recording, I was immediately terminated.
18  Q   So let's start with the alleged demotion.
19          MS. DWYER:  Before we go further, can we
20      just take just a five minute break?
21          MS. DELMASTRO:  Yeah.  Definitely.
22          MS. DWYER:  Okay.
23          THE VIDEOGRAPHER:  We're going off the
24      record.  The time is 11:41 a.m. We're off the
25      record.

---

Page 72

1           (A recess was taken.)
2           THE VIDEOGRAPHER:  We're now back on the
3       record.  The time is 12:07 p.m.
4   BY MS. DELMASTRO:
5   Q   You said earlier that you were afraid to report
6       your concerns about the sheriff to HR at the
7       county, correct?
8           MS. GORDON:  The record says what she
9       said.
10  BY MS. DELMASTRO:
11  Q   Were you afraid -- also, I'll take an answer.
12  A   Was I afraid?
13  Q   Were you -- you said earlier that you were afraid
14      to report your concerns about the sheriff to HR at
15      the county, correct?
16  A   I was afraid, overall.
17  Q   Were you afraid to report your concerns to Turner?
18  A   Yeah.  Yes.
19  Q   And you reported them anyway?
20  A   Yes.
21  Q   Why?
22          MS. GORDON:  She's already answered this.
23      You've already asked her why she did.
24          Go ahead.
25          THE WITNESS:  Because nothing had

---

Page 73

1       happened in the past.  Nothing happened.
2   BY MS. DELMASTRO:
3   Q   So that made you not afraid to report to Turner?
4           MS. GORDON:  Repeat your question.  And
5       --
6   BY MS. DELMASTRO:
7   Q   Is it --
8           MS. GORDON:  -- the witness isn't clear
9       on it.
10  BY MS. DELMASTRO:
11  Q   The fact that nothing happened in the past is why
12      you were -- why you were emboldened to report to
13      Turner even though you were afraid?
14  A   I was afraid -- I think with the -- I think when
15      Rashaun was in that room with me in 2022, I think
16      because she was there and she said, "Yeah, I saw
17      the sheriff put his hand up Regina's dress," I
18      think that's when I felt a little bit better with
19      saying something to him.
20  Q   Was it because you were having a sexual affair with
21      him?
22  A   I'm sorry.  Can you repeat it?
23  Q   Were you less afraid to report to him because you
24      were having a sexual affair with him?
25  A   I -- no, it -- no, that wasn't it.

---

Page 74

1   Q   So you having a sexual affair with him had no
2       impact whatsoever on your reporting your concerns
3       about the sheriff to him?
4   A   No.
5   Q   What were you afraid would happen if you reported
6       to HR?
7   A   I was afraid that they would find something else to
8       fire me on, and I wanted my job.
9   Q   In fact, you asked Michael Turner to ask the
10      sheriff to keep you, correct?
11  A   I'm sorry.  I -- repeat that, please.
12  Q   You asked Michael Turner to ask the sheriff to keep
13      you; isn't that right?
14  A   That is not correct.
15  Q   You never asked Michael Turner to ask the sheriff
16      to keep you on?
17  A   No.
18  Q   So for the October 3rd, 2023 event, were the seats
19      in the theater assigned?
20  A   No.
21  Q   Were you required to sit next to the sheriff?
22  A   No.
23  Q   Why were you sitting next to him?
24  A   Because when you go out with the sheriff, you just
25      pretty much -- I just sat next to him.  I was with

---



Page 75

1      him, walking with him.

2  Q  Where was Turner sitting?

3  A  I have no idea. He wasn't even in the -- he wasn't

4      even in the -- in the -- in the movie theater in

5      that -- that movie theater when it happened.

6  Q  On October 3rd, 2023, you lived in West Bloomfield,

7      correct?

8  A  I'm sorry? Repeat it again.

9  Q  On October 3rd, 2023, you lived in West Bloomfield,

10     correct?

11  A  On October '23 -- '23, no.

12  Q  Where did you live?

13  A  In Detroit.

14  Q  All right. So after the October 31st, 2023,

15     centenarian birthday party, after that, were there

16     any other incidents where you claim the sheriff

17     touched you inappropriately?

18  A  After the October --

19  Q  31st, 2023 centenarian birthday party.

20  A  No. The sheriff did not touch me inappropriately

21     after 2023. It may have been some incidents before

22     that, but no.

23  Q  Okay. So -- all right. Okay. So let's talk about

24     your demotion. What are you referring to when you

25     say that you were demoted?

Page 76

1  A  My title was taken away.

2  Q  And what title was that that was taken away?

3  A  Director of Community Outreach.

4  Q  Okay. And when was -- when did that happen?

5  A  The day we had the community meeting.

6  Q  When was that?

7  A  My last day of work. I don't know. I think it was

8     November the 13th.

9  Q  2024?

10  A  Yes. Sorry.

11  Q  What was your new title going to be?

12  A  I don't know.

13  Q  How did your title get taken away?

14  A  I went to a community meeting, and it was the

15     community -- it's my -- it was community and

16     recruiting. And the sheriff said, "Everyone that

17     has a director's title, except Mark Diaz, will lose

18     their title." And there was only two people in the

19     room that had a director's title, and that was

20     myself and Mark Diaz. And that's how he said it.

21  Q  Okay. Did he say -- did anyone ask what the new

22     titles would be?

23  A  Not sure.

24  Q  Okay. A minute ago, you said that there were --

25     that October 31st, 2023 was the last incident of

Page 77

1     alleged inappropriate touching. Are there -- other

2     than what you've already testified about, were

3     there any other incidences in which you claim the

4     sheriff touched you inappropriately?

5  A  He touched me inappropriately, you know, in -- in

6     '23, around the beginning of the year, touching my

7     stomach, you know, saying, "Can I feel the baby?"

8     And I wasn't pregnant.

9  Q  When was that?

10  A  Around February, March of '23.

11  Q  Where did that occur?

12  A  In his office.

13  Q  And what -- did you report that to anyone?

14  A  Yes. I reported it to Turner, and then I said

15     something to Rashaun about it.

16  Q  Any other instances in which you claim that he

17     touched you inappropriately?

18  A  Yes. In -- in 2022, I was coming -- I don't -- I

19     don't know what month it was, but it was in a cold

20     month because I know what -- what -- what type of

21     pants I had on. And I was coming out of -- and

22     they were, like, wool pants. And I was coming out

23     of Chief Turner's office, and Turner was in front

24     of me. The sheriff was behind me. And he said to

25     me, "You're -- oh, you're wearing those -- those

Page 78

1     pants." And he took his hand and put it down,

2     like, my -- my -- like, at the top of my belt loop.

3     And, like, he touched my skin. He touched my belt

4     loop and my skin. And then he said, "Oops, I

5     wasn't supposed to say that." And then Turner

6     corrected him and said, "No, you wasn't."

7  Q  Okay. Did -- do you know if Turner saw him touch

8     you?

9  A  Turner would not have seen him -- Chief touch me

10     because Turner was in front of me walking out, and

11     the sheriff was in back of me.

12  Q  Okay. And this was in 2022?

13  A  Yes.

14  Q  At this time -- at that time, were you having a

15     sexual relationship with Turner?

16  A  I saw him one time in -- at least one time in '22,

17     but no, not -- not then -- no. No, not that I can

18     recall.

19  Q  Did you tell Turner that he touched you at that

20     incident?

21  A  No. I didn't tell Turner that he -- he touched my

22     belt loop. I don't recall telling him that.

23  Q  So you said that that was in 2022, and it was a

24     cold month. And you said earlier that the May 2022

25     DPS event was the first time that you claim he



**Page 79**

1    touched you inappropriately.  Was this belt loop
2    touch before the May '22 DPS event or after?
3  A   It was after.
4  Q   Okay.  So it was towards the -- it was then the
5    winter of 2022, as in the end of 2022?
6  A   Yes.
7  Q   Okay.  Any other times that you claim that the
8    sheriff touched you inappropriately?
9  A   That's all I can remember.
10  Q   Okay.  So your title was going to be changed.  Did
11    you -- was your salary changed?
12  A   My salary was changed.  Excuse me.  My salary was
13    changed.
14  Q   How was it changed?
15  A   Like, everyone in the county received a -- raise.
16  Q   Okay.  So your salary was increased?
17  A   Yes.
18  Q   Okay.  And were your benefits changed in connection
19    with what you claim was a demotion?
20  A   Not that I know of.
21  Q   Okay.  Why do you believe that what you're calling
22    was a demotion was retaliatory?
23        MS. GORDON:  I think she's already
24    answered that question.  You asked her what the
25    retaliation was a few minutes ago.

**Page 80**

1        MS. DELMASTRO:  Deb, that was -- if you
2    have an objection -- that's asked and answered?
3        MS. GORDON:  Asked and answered.  Yeah.
4    You asked her this already.
5        MS. DELMASTRO:  I do not believe --
6        MS. GORDON:  I'm not objecting to the
7    follow up.  I'm just pointing it out.
8        MS. DELMASTRO:  All right.  Then I would
9    appreciate it if you would say, "Objection, asked
10    and answered."
11        MS. GORDON:  Okay.  That's good.
12  BY MS. DELMASTRO:
13  Q   I will take an answer.  Why do you think that --
14    what makes you believe that the -- what you claim
15    is a demotion was retaliatory?
16  A   Because I don't think that he really wanted me
17    there.  And I -- I didn't give into his sexual
18    advances.
19  Q   And how is -- how does that connect with what you
20    claim is a demotion?
21  A   Because he took away my title and threw me in a
22    cubicle.
23  Q   I thought you said he took away everyone's title
24    except for Mark Diaz?
25        MS. GORDON:  No.

**Page 81**

1        THE WITNESS:  No.  He took -- there were
2    two directors.  There were two directors in the
3    room.  He said, everyone is losing their title
4    that's a director, except Mark Diaz.  And he said
5    it like that, like, I'm chopped liver.
6        MS. DELMASTRO:  Oh, okay.  All right.  I
7    understand now.  I understand now.
8        MS. GORDON:  Okay.
9        MS. DELMASTRO:  Deb, are you testifying
10    today?  Thank you.
11        MS. GORDON:  I'm not answering your
12    questions.
13  BY MS. DELMASTRO:
14  Q   Did anyone at the county ever say anything that
15    makes you think that what you're saying is a
16    demotion was retaliatory?
17  A   Yes.
18  Q   Okay.  Who was that?
19  A   Rashaun Whitehead.
20  Q   What did she say?
21  A   That night when we're on the phone, she said, you
22    know, you're not the only one he demoted.  She said
23    "demoted."  She said "demoted some other people."
24  Q   And that made you think that it was retaliation?
25  A   Huh?

**Page 82**

1  Q   And that made you think it was retaliation?
2  A   Huh?
3  Q   And her saying that made you think it was
4    retaliation.  Why?
5        MS. GORDON:  Listen to the question.  I'm
6    not sure you're answering the same question that
7    she asked, Regina.
8        THE WITNESS:  Okay.
9  BY MS. DELMASTRO:
10  Q   So she's in -- so she's saying -- so Rashaun said
11    you're not the only person that he demoted.  Why
12    did that make you think that your demotion was
13    retaliatory?
14        MS. GORDON:  Okay.  Why don't you go back
15    to your original question?  I think that would be
16    helpful.
17        THE WITNESS:  Yeah.
18        MS. DELMASTRO:  Okay.  I'm sorry.
19    Nicole, could you read my original question?
20        THE RECORDER:  Yes.  Let me go back to
21    it, okay?
22        (The requested question was read back.)
23        THE WITNESS:  Yeah.
24        MS. GORDON:  Do you understand the
25    question?



REGINA PARKS                                      September 16, 2025
REGINA PARKS vs WAYNE COUNTY, et al.              83—86

Page 83

1    THE WITNESS:  Yeah.  No.  So -- so no.
2    BY MS. DELMASTRO:
3    Q    Okay.  Okay.  All right.  You said you were -- you
4         were put in a cubicle.  Had you previously had a
5         closed office?
6    A    Yes.
7    Q    And why were you upset about being put in a
8         cubicle?
9    A    I just lost my director's position.  And then you
10        say -- you tell me, "Yeah, I want you to move into
11        a cubicle immediately."
12   Q    And did you -- why did you not want -- why do you
13        want an office instead?
14   A    Why would anybody want the office?  I guess that
15        would be the question, if you always had a office.
16   Q    Well, I'm asking you, why you --
17   A    I know.  And that's my answer.
18   Q    Because other people had offices?
19   A    No, because I had an office.
20   Q    Okay.  So you were -- you felt that it was sort of
21        a perceived slight?
22   A    Absolutely.
23        MS. GORDON:  She's answered the question.
24        THE WITNESS:  Absolutely.
25        MS. GORDON:  She told you.

Page 84

1         MS. DELMASTRO:  That's a different
2    question.
3         THE WITNESS:  Yeah.  It was.  It
4    definitely was.  And then he -- he took the -- he
5    moved -- he -- he moved certain people to offices.
6    BY MS. DELMASTRO:
7    Q    Isn't it true that you were now going to be working
8         as a part of a team in community outreach?
9    A    We always had sort of a team.  People helped out as
10        a team.
11   Q    Okay.  So -- but you were the only person who had
12        that -- the Community Outreach title before,
13        correct?
14   A    Correct.  Correct, yes.
15   Q    And now there were going to be other people with
16        that same title, correct?
17   A    Ask -- ask -- ask the question again.
18   Q    Now, there were going to be other people who had
19        the Community Outreach title as well, correct?
20   A    No, they wouldn't have.  I had a -- I was the
21        director, and they would come in.
22        MS. GORDON:  No, the question is about
23        after -- sorry to interrupt, but after the
24        announcement.
25        BY MS. DELMASTRO:

Page 85

1    Q    Yeah, I'm saying under this new -- this change, you
2         were saying that you got demoted, there were other
3         people going to be working with you, and they were
4         also going to get that Community Outreach title,
5         correct?
6    A    They would be working in -- as a team, yes.  I
7         don't know what the title was.
8    Q    Oh.  Do you -- were all of you going to be working
9         in cubicles in the same area?
10   A    Not sure.
11   Q    Did you -- how did you first find out that you were
12        going to be losing your office?
13   A    That morning.
14   Q    And how -- and did someone tell you?
15   A    Yes.
16   Q    Who told you?
17   A    Michael Turner.
18   Q    Did he tell you before the meeting?
19   A    Yeah.
20   Q    And what was your occasion to be talking with him
21        at that time?
22   A    I'm sorry?
23   Q    What was your -- what was your occasion to be
24        talking with Turner at that time?
25   A    I don't understand the question.  What was my

Page 86

1    occasion?
2    Q    Yeah.  Why were you talking to him?
3    A    I asked him if I could get -- have a few days off.
4    Q    Okay.  And what did he say?
5    A    He said no.
6    Q    Did you ask why?
7    A    No.
8    Q    Okay.  And then how did it come up that you were
9         losing your office?
10   A    He said -- I asked him if there's anything I need
11        to know before the meeting.
12   Q    Okay.  And that's -- and then he said -- that's
13        what he said, that you're losing your office?
14   A    Yes.
15   Q    Okay.  Did you say anything in response?
16   A    No.  I don't recall.
17   Q    Okay.  Did you ask the sheriff why you were losing
18        your office?
19   A    Did I ask the sheriff?
20   Q    Correct.
21   A    No.
22   Q    Why not?
23   A    Because I didn't see him, and he just -- I -- I
24        just didn't ask him.  He never -- and he never came
25        to me and said, "Hey, Regina, you're getting



Page 87

1    demoted," or, "You're losing your office."
2  Q  I thought he said at the meeting that you were
3    being taken -- that your title was being taken
4    away.
5  A  Yeah.  Oh, I thought you were talking about before.
6    I'm sorry.
7  Q  No, no.  No, I'm saying at the meeting, did you ask
8    the sheriff why you were losing your office?
9  A  No.
10 Q  Did you tell anyone that you didn't want to lose
11   your office?
12 A  Yes.
13 Q  Who did you tell?
14 A  Turner.
15 Q  Was that during the meeting or before?
16 A  It was after.
17 Q  After -- okay.  And what did Turner say?
18 A  I don't -- I don't recall.
19 Q  Did you ever tell the sheriff that you didn't want
20   to lose your office?
21 A  I never -- I didn't meet with him anymore.  I -- I
22   didn't see him.  No.  So I -- no, I hadn't talked
23   to him.
24 Q  Did you tell Vinita Terry (phonetic) that you
25   didn't want to lose your office?

Page 88

1  A  No.  Everything happened so fast.  It -- he said,
2    "Move out immediately."
3  Q  Who said that?
4  A  The sheriff.
5  Q  Was that during the group meeting?
6  A  Yes.
7  Q  All right.  Did you tell anyone at the county that
8    you felt that this -- losing your office and losing
9    the director title, that you believed that it was
10   retaliatory?
11        MS. GORDON:  You mean, during the 24
12   hours she remained there?
13        MS. DELMASTRO:  Yes.
14        MS. GORDON:  If that -- if it was even
15   that long.
16        Go ahead.
17        THE WITNESS:  I'm -- I'm -- I'm -- I'm
18   not -- I'm not sure how I said it.  I'm -- I'm --
19        MS. GORDON:  Okay.
20        THE WITNESS:  I'm not sure how I said it.
21   I -- I just -- I've -- I've voiced concerns that I
22   would -- and I -- you know, that -- yeah, I -- I
23   voiced concerns that I was not pleased with what
24   happened.
25 BY MS. DELMASTRO:

Page 89

1  Q  Okay.  And who did you voice those concerns to?
2  A  To Rashaun and to Rasheeda and to Turner.
3  Q  Okay.  Let's start with when you raised your
4    concerns about what happened, did you say anything
5    to any of them about you believing that it was
6    retaliatory?
7        MS. GORDON:  She's already answered this.
8    She's already said very specifically that she
9    doesn't remember how she put it.
10        MS. DELMASTRO:  Counsel, please don't
11   make --
12        MS. GORDON:  I --
13        MS. DELMASTRO:  -- speaking objections.
14        MS. GORDON:  I'm not.  I'm correcting you
15   because you continue to repeat questions from time
16   to time, and I'm pointing it out.
17        MS. DELMASTRO:  In that case, please say,
18   "Objection, asked and answered."  Please do not
19   make speaking objections.
20        MS. GORDON:  Okay.
21        MS. DELMASTRO:  I am not trying to repeat
22   questions.
23        MS. GORDON:  Okay.  Yeah.  I didn't think
24   you were, that's why I mentioned it.
25        Remember the question, Regina?

Page 90

1        THE WITNESS:  Repeat the question.
2  BY MS. DELMASTRO:
3  Q  When you expressed concerns about losing your
4    director title and being asked to move out of your
5    office, did you say -- did you say that you
6    believed it was retaliatory?
7        MS. GORDON:  Asked and answered.
8        THE WITNESS:  Again, I just addressed
9    that I wasn't pleased.
10 BY MS. DELMASTRO:
11 Q  Okay.  Do you have any evidence other than what
12   you've already described to support your belief
13   that losing the title and moving your office was
14   retaliatory?
15        MS. GORDON:  Hang on a second.  I want to
16   understand this.  Could you repeat that question?
17 BY MS. DELMASTRO:
18 Q  Do you have any evidence other than what you've
19   already testified about to support your belief that
20   losing the title, losing your office were
21   retaliatory?
22 A  Just how I -- just how I was treated.
23 Q  Is there anything else that the county did that you
24   believe was retaliation?
25        MS. GORDON:  Other than what she's



Page 91

1   already told you?
2          MS. DELMASTRO:  Correct.
3          MS. GORDON:  Because she already
4   mentioned --
5          MS. DELMASTRO:  That's --
6          MS. GORDON:  -- something else.
7   BY MS. DELMASTRO:
8   Q   Okay.  What was the other thing that you mentioned?
9   You mentioned your demotion.
10  A   Yes.
11  Q   And what else do you -- did the county do that you
12  believe was retaliatory?
13  A   (No audible response.)
14         MS. GORDON:  You mentioned two things
15  earlier.
16         MS. DELMASTRO:  Deb.
17         MS. DWYER:  Oh, my God.
18         MS. DELMASTRO:  Please stop coaching the
19  witness.  I -- if she does not understand the
20  question --
21         MS. GORDON:  I don't think she -- I think
22  this has been very confusing, the way you've put it
23  to her.  There's already a record on this, about
24  what she said was -- you asked her what was the
25  retaliation, and I won't give the answer.

Page 92

1          MS. DELMASTRO:  Yes.  And I'm asking --
2          MS. GORDON:  Okay.  But now you're -- so
3   now you've covered a lot of other things.
4          MS. DELMASTRO:  Yes.  And that's why I'm
5   asking her.
6          MS. GORDON:  Okay.
7   BY MS. DELMASTRO:
8   Q   What else, if anything, other than the demotion --
9   and what you say is the demotion.  What else, if
10  anything, did the county do that you believe was
11  retaliation?
12  A   (No audible response.)
13  Q   Do you understand the question?
14  A   No.
15  Q   Okay.
16  A   I don't think I'm getting --
17  Q   Do you -- is there anything -- so you said that you
18  believe that losing your title and losing your
19  office was retaliation, or refusing to submit to
20  the sheriff's sexual advances, correct?
21  A   Yes.
22  Q   Okay.  Did the county do anything else to you that
23  you believe was retaliation?
24         MS. GORDON:  Or was it a reason for
25  retaliation or just retaliation?  That's where I

Page 93

1   think the --
2          MS. DELMASTRO:  Oh.
3          MS. GORDON:  Yeah.
4          THE WITNESS:  Demoted?  Getting fired?
5   BY MS. DELMASTRO:
6   Q   Getting fired.  Okay.  You believe that getting
7   fired was retaliation?
8          MS. GORDON:  This has been asked and
9   answered --
10         THE WITNESS:  Yes.
11         MS. GORDON:  -- multiple times.
12  BY MS. DELMASTRO:
13  Q   Okay.  What makes you believe that your that your
14  termination was retaliatory?
15  A   Because as soon as I -- as soon as they found out
16  that I had a recording of the sheriff, or the
17  sheriff found out that I had a recording of him, I
18  was terminated.
19  Q   Okay.  How do you know that the sheriff found out
20  you allegedly had a recording of him?
21  A   Because I told Rashaun, and she immediately got off
22  the phone with me and called the sheriff.
23  Q   Did you hear Rashaun speak to the sheriff?
24  A   Did I hear -- no.
25  Q   How do you know that Rashaun called the sheriff

Page 94

1   immediately after speaking with you?
2   A   Because minutes later, I received a phone call from
3   Michael Turner.  And Michael Turner said to me,
4   "What did you do?"  I said, "What do you mean?"  He
5   said, "I just received a phone call from the
6   sheriff, and he screaming, and hollering at me
7   saying you said -- that you told Rashaun that you
8   have a recording or a tape of him, and you have a
9   -- a recording or tape of him, and you also told
10  him that I said that I told you to record him."
11  Q   Okay.  Did Turner tell you to record the sheriff?
12  A   Yes.
13  Q   When did Turner tell you that?
14  A   Turner told me to record him on February 22nd.
15  Q   Of what year?
16  A   Of '23.
17  Q   When Turner told you this, was it verbally or in
18  writing?
19  A   Verbally.
20  Q   Was it on the phone or in person?
21  A   On the phone.
22  Q   And what was the context surrounding him telling
23  you that -- to do this?
24  A   I told him -- I told Turner that the sheriff asked
25  me to have sex with him.  He said, you know, "I



Page 95

1   want to fuck you."
2   Q   And Turner told you to record the sheriff?
3   A   He's -- he -- he -- yeah.  Yes.
4   Q   And you subsequently did record the sheriff?
5   A   Yes.
6   Q   Did you only record him one time?
7   A   Yes.
8   Q   And what was the date that recording was made?
9   A   February 27th.
10  Q   27?
11  A   Of --
12  Q   2-7?
13  A   -- 2023.
14  Q   Okay.  Okay.  Let's go ahead and pull up that
15  recording.  Lina, are you able to access the
16  recording?
17      THE RECORDER:  Yes. (indiscernible).
18      MS. DELMASTRO:  Okay.  So this is the
19  recording that you produced in discovery.
20      MS. GORDON:  How -- I'm sorry to
21  interrupt.  How long is the recording?
22      MS. DELMASTRO:  It --
23      MS. GORDON:  I don't remember, sitting
24  here right now.
25      MS. DELMASTRO:  It is -- I think it's

Page 96

1   roughly eight minutes.  I'm not seeing that time
2   right --
3       MS. GORDON:  Okay.  Thank you.
4   BY MS. DELMASTRO:
5   Q   Okay.  So why did you -- why did you record this
6   conversation?
7   A   Because that was the first time I had saw the
8   sheriff since the incident.
9   Q   Okay.  So this is the very first time you had --
10  A   Like, the first time.  Like, I may have seen him in
11  crop -- in -- in -- in passing, but that was the
12  first time I had seen him and I was around him,
13  like --
14  Q   Okay.
15  A   -- by myself or something.
16  Q   And it's your position that in this recording, he
17  says to you that he "just wanted a kiss from you
18  from time to time"; is that correct?
19  A   Correct.
20  Q   Okay.  I'm going to go ahead and play the
21  recording, and I'd like you to tell me when you
22  hear him say that.
23      MS. GORDON:  Okay.  A couple of comments.
24  The recording is not a good quality, and she may
25  have to listen to it a couple of times.  That's

Page 97

1   number one.  Number two, I don't -- is there any
2   reason you're going to have the videographer put
3   this on the video?  Is that your plan?
4       MS. DELMASTRO:  I -- I want to --
5       MS. GORDON:  Is he --
6       MS. DELMASTRO:  Oh, you mean showing the
7   --
8       MS. GORDON:  And is the court -- is the
9   reporter is supposed to -- she's not going to take
10  down the recording.
11      MS. DELMASTRO:  No.  I understand.  I
12  just want to say --
13      MS. GORDON:  I just want to say for the
14  record how we're doing this.
15      MS. DELMASTRO:  Okay.  That's fair.
16      MS. GORDON:  I suggest maybe you let the
17  plaintiff listen to it once, and I think she's
18  going to want to -- it's difficult to listen to,
19  so.
20      MS. DELMASTRO:  Yes.
21      MS. GORDON:  That's just the question.
22      MS. DELMASTRO:  Okay.  Would --
23      THE WITNESS:  It is -- it is --
24      MS. DELMASTRO:  Okay.  Actually, I think
25  it is very difficult to listen to.  I think in

Page 98

1   light of that.  What I am going to ask is that
2   rather than try to listen to it into the record per
3   se, I would like Regina to listen to it, as many
4   times as necessary, and for her to identify the
5   timestamp on the video at which she hears the
6   sheriff say that.  Are you able to -- are we able
7   to take a break now and do --
8       MS. GORDON:  Sure.
9       MS. DELMASTRO:  -- go off the record to
10  do that?
11      MS. GORDON:  Sure.
12      THE WITNESS:  Sure.
13      MS. DELMASTRO:  Okay.
14      THE VIDEOGRAPHER:  We're going off the
15  record.  The time is 12:43 p.m. We're off the
16  record.
17      (A recess was taken.)
18      THE VIDEOGRAPHER:  We're now back on the
19  record.  The time is 12:48 p.m.
20  BY MS. DELMASTRO:
21  Q   All right.  What is the -- what was the time stamp
22  at which you hear the sheriff make the comment?
23  A   Around 2:04.
24  Q   And what is the -- what is the comment that you
25  claim that you hear him make?



Page 99

1   A    He says something, "It's just as simple as that. I
2        just want a kiss from time to time."
3   Q    Okay. Is there anything that the sheriff did that
4        you believe was retaliatory?
5        MS. GORDON: I'm sorry. Anything he did?
6        MS. DELMASTRO: Yes, anything that the
7        sheriff did.
8        MS. GORDON: Other than what she's
9        already testified to?
10       MS. DELMASTRO: Well, I haven't asked her
11       anything about what the sheriff did.
12  BY MS. DELMASTRO:
13  Q    I'm asking: is --
14       MS. GORDON: Well --
15  BY MS. DELMASTRO:
16  Q    -- there anything that the sheriff did that you
17       believe was retaliatory?
18  A    I don't understand the question.
19  Q    As opposed to the county, is there anything that
20       the sheriff did personally that you believe was
21       retaliatory?
22       MS. GORDON: She's already said exactly
23       what happened.
24       MS. DELMASTRO: And that's not --
25       THE WITNESS: The sheriff is the county

Page 100

1        -- the -- the -- the -- yeah.
2   BY MS. DELMASTRO:
3   Q    Okay. So you're saying that the sheriff -- when
4        you were saying that the -- you believe that the
5        county did those things, you believe that the
6        sheriff did them as well; is that my understanding?
7        MS. GORDON: Okay. I don't know what
8        your question was, if you used the word "county."
9        MS. DELMASTRO: I did.
10       MS. GORDON: My client explained to you
11       what happened at the meeting and what was said by
12       the sheriff.
13  BY MS. DELMASTRO:
14  Q    Okay. And are you -- so my question then for you
15       is: when you answered my question regarding the
16       county, do you believe that the sheriff also did
17       those things?
18  A    Yes.
19  Q    Okay. All right. I am going to show you a
20       document, and we'll mark this as Deposition Exhibit
21       2.
22       MS. GORDON: So the -- just for the
23       record, that's the complaint that's been marked as
24       Exhibit 2 that was filed with the court.
25       (Defendants' Exhibit 2 was marked for

Page 101

1        identification.)
2   BY MS. DELMASTRO:
3   Q    Okay. So as your attorney just stated, this is the
4        complaint in this matter. Did you authorize your
5        attorneys to file this complaint on your behalf?
6   A    Yes.
7   Q    Did you review this complaint before it was filed?
8   A    Yes.
9   Q    Do you believe it to be accurate, in terms of your
10       allegations against the county and the sheriff?
11  A    Yes.
12  Q    All right. I'm going to ask you to turn to --
13       I'm sorry, there's just one -- it's a date missing
14       in on number 16 -- on number 16.
15  Q    Okay. Paragraph 16?
16  A    Paragraph 16. It should be '22 instead of '21.
17  Q    Okay. All right. So it should read, "In 2022,
18       defendant Washington told plaintiff that he doubted
19       he could sexually penetrate his child's mother
20       because her body was scarred"?
21  A    Correct.
22  Q    Okay. All right. So paragraph 13, who -- I'll
23       give you a second to read it. Who are the several
24       other female employees that you are referring to in
25       this paragraph?

Page 102

1   A    Myself, Rasheeda Gamble, Erika Erickson, Erica
2        Hill.
3   Q    Anyone else?
4   A    That's all I can recall at this time.
5   Q    Did you personally observe the sheriff sexually
6        harass Rasheeda Gamble?
7   A    There was a time when I came out of my office and
8        he -- the sheriff and Rasheeda Gamble was sitting
9        out in some chairs, and he had his arm around her
10       at those chairs in the lobby, and she looked very
11       uncomfortable.
12  Q    When was that?
13  A    You know, I'm not sure. I -- I'm -- I'm not sure
14       what year. It had to be in -- it had to be in '23.
15       It had to be in '23.
16  Q    Was anyone else there?
17  A    Was anyone in the building? Yes.
18  Q    Was anyone else physically near you and Rasheeda
19       and the sheriff?
20  A    I just walked by my office, going towards his
21       office, and they were out in the hallway. So no, I
22       didn't -- I don't recall seeing anyone else.
23  Q    Did you ask -- did you speak to Rasheeda about what
24       you saw?
25  A    No.



Page 103

1   Q   Why not?
2   A   Because it was none of my business.
3   Q   Did you tell anyone at the county what you saw?
4   A   No.
5   Q   Why not?
6   A   I -- I forgot about it.
7   Q   Did Rasheeda ever tell you that the sheriff
8       sexually harassed her?
9   A   Yes.
10  Q   What did she tell you?
11  A   She told me that he -- she -- he sexually harassed
12      her.  She did -- she told me he was saying
13      inappropriate things to her.
14  Q   When did she tell you that?
15  A   Late 2022.  No.  Let me take that back.  I don't --
16      it was -- it was sometime in '22.
17  Q   Were -- did she -- have -- did you have this
18      communication with her verbally or in writing?
19  A   Verbally.
20  Q   Was it in person or on the phone?
21  A   In person.
22  Q   Did you have any other -- did you have any other
23      conversations with Rasheeda in which she told you
24      that the sheriff sexually harassed her?
25  A   She said something to me a few times, over the

Page 104

1       course of '22 and '23.
2   Q   All right.  Were all of those times verbally and in
3       person?
4   A   Yes.  And Rashaun, her as well, told me that he --
5       she was harassing her sister.
6   Q   Is -- who is Rashaun's sister?
7   A   Who is Rasheeda's?  Rashaun and Rasheeda are
8       sisters.  Rashaun is the sheriff's executive
9       assistant.
10  Q   And Rasheeda Gamble is Rashaun's sister?
11  A   That is correct.
12  Q   Okay.  All right.  So when was the first time that
13      Rasheeda told you that the sheriff sexually
14      harassed her?
15  A   It was sometime after Rashaun told me.  So it was
16      sometime in '22.  Rashaun told me first.
17  Q   When did Rashaun tell you?
18  A   Sometime in '22.
19  Q   What did Rashaun tell you?
20  A   Rashaun said that the sheriff was sexually
21      harassing Rasheeda, and if he didn't stop, then she
22      was going to tell her father.
23  Q   Who's her father?
24  A   Rory Gamble.
25  Q   And why would she tell her father?

Page 105

1   A   Because that's her father.
2   Q   Was -- or is her father a county employee?
3   A   Her father is not a county employee.
4   Q   Okay.  So do you have any idea what the purpose of
5       telling her father would be?
6   A   That's her father, and he has a relationship with
7       her father.  He knows her father.
8   Q   Who knows her father?
9   A   The sheriff knows her father, and Chief Turner
10      knows her father.
11  Q   Okay.  So when was -- so the first time that
12      Rasheeda told you that the sheriff sexually
13      harassed you, you said, was in 2022?
14  A   Uh-huh.
15  Q   Do you remember what month?
16  A   I don't remember what month.
17  Q   And that first time, what did Rasheeda say?
18  A   I'm not -- I -- I'm not -- I -- I don't know -- I
19      don't remember what exactly she said back then.
20  Q   Okay.  Now, if she --
21  A   She was visibly upset about it.
22  Q   -- and when she told you about this, why didn't you
23      speak to her when you saw the sheriff with his arm
24      around her?
25          MS. GORDON:  You've already asked this.

Page 106

1       Asked and answered.
2           THE WITNESS:  Because it was none of my
3       business.  It was just none of my business.
4   BY MS. DELMASTRO:
5   Q   Did you tell anyone in HR about what Rasheeda told
6       you about what the sheriff was doing to her,
7       allegedly?
8   A   We don't have a HR in the Sheriff's Department.
9   Q   Did you -- I mean, so --
10  A   I told this executive -- I mean, executive
11      assistant, and nobody saying anything.  It's --
12      it's terrible.
13          (Defendant's Exhibit 3 was marked for
14      identification.)
15  BY MS. DELMASTRO:
16  Q   All right.  I'm going to show you this -- the
17      employee handbook.  I'm going to -- and it's -- I'm
18      showing you Bates number defendants 220.  Could you
19      please read the first sentence of that?
20          MS. GORDON:  Can I see it first, please?
21      I just want to -- (indiscernible).  You want her to
22      read Bates stamp 220, the sentence at the top?
23          MS. DELMASTRO:  Yeah, the first sentence
24      on the page.
25          MS. GORDON:  Okay.  Right there.



REGINA PARKS
REGINA PARKS vs WAYNE COUNTY, et al.

September 16, 2025
107–110

Page 107

1    THE WITNESS:  "If you believe you have
2  been subjected to sexual or other harassment, you
3  may report your concerns or file a complaint with
4  your supervisor, your department -- your department
5  head, or the director of personnel at human
6  resources."
7  BY MS. DELMASTRO:
8  Q   And this is the Wayne County Employee Handbook,
9     correct?
10 A   Correct.
11    MS. DELMASTRO:  I'm going to mark that as
12 Deposition Exhibit 3.
13    THE RECORDER:  All right.  3?
14    MS. DELMASTRO:  Here it is.  Yeah.  Thank
15 you.
16    MS. GORDON:  Are you going to have the
17 exhibits attached to the dep transcript, or no?
18    MS. DELMASTRO:  Yes.
19 BY MS. DELMASTRO:
20 Q   Were there any other times that you personally
21    observed the sheriff sexually harass Rasheeda
22    Gamble?
23 A   No.
24 Q   Did you personally --
25 A   Can -- let me take that back.  I want to -- he had

Page 108

1     -- he -- the sheriff would just say -- he -- he had
2     a way of just nasty talk.  So he would say things
3     around us.  I don't know exactly -- I can't go back
4     to exactly what he said, but I can give an example.
5     An example would be when we were on his -- we were
6     on -- in 2022 when we were campaigning for him, and
7     we were on this bus -- it was a, a gentleman who
8     had a -- like, an RV.  And he made some statements.
9     And I'm not exactly sure what the statements was
10    then, but he -- he -- he said some -- something
11    that made Rasheeda a little uncomfortable.
12 Q   Did you personally witness that?
13 A   Yes.
14 Q   Did you tell the sheriff to stop saying things like
15    that?
16    MS. GORDON:  No foundation --
17    THE WITNESS:  No.
18    MS. GORDON:  -- that she would have any
19 reason to do that.
20 BY MS. DELMASTRO:
21 Q   Did you tell anyone in HR about the -- about that
22    -- about what you heard in that incident?
23 A   No.
24 Q   Are there any other --
25    MS. GORDON:  Hang on a second, please.

Page 109

1    MS. DWYER:  You cannot coach the witness
2  during the deposition.
3    MS. GORDON:  I can talk to my witness.
4    MS. DWYER:  No, you cannot talk to the --
5    MS. GORDON:  Okay.  Maria --
6    MS. DWYER:  There's a question pending --
7    MS. GORDON:  No --
8    MS. DWYER:  -- and you leaned over and
9  you're --
10    MS. GORDON:  Okay, you're --
11    MS. DWYER:  -- talking to the witness.
12    MS. GORDON:  Okay.  First of all, don't
13 be so ramped up.  Number two, there was no question
14 on the table.  Lina had just -- I leaned over to my
15 client.  Lina started talking, and then she
16 stopped.
17    Go ahead.
18    MS. DWYER:  You cannot coach the witness
19 during the deposition.
20    MS. GORDON:  Okay, Maria.
21    MS. DWYER:  Your conduct is
22 inappropriate.
23    MS. GORDON:  Okay.  Well, your comments
24 are inappropriate.
25    MS. DWYER:  They're not.  I'm placing my

Page 110

1     --
2    MS. GORDON:  Okay.  You --
3    MS. DWYER:  -- objections on the record.
4    MS. GORDON:  Go ahead.  Go right -- go --
5  I'll be -- go ahead, if you're -- you know, happy
6  to have you do so.
7    MS. DWYER:  Please refrain from coaching
8  the witness.
9    MS. GORDON:  Okay.  I'm not coaching the
10 witness.
11 BY MS. DELMASTRO:
12 Q   Are there any --
13    MS. GORDON:  Do you want to go back to
14 the question?
15 BY MS. DELMASTRO:
16 Q   Are there any other times that you personally
17    observed the sheriff sexually harass Rasheeda
18    Gamble?
19    MS. GORDON:  Asked and answered.
20    Go ahead.
21    THE WITNESS:  No.
22 BY MS. DELMASTRO:
23 Q   Okay.  Did you ever personally observe the sheriff
24    sexually harass Erika Erickson?
25 A   If -- if staring somebody down and -- and -- and --



REGINA PARKS
REGINA PARKS vs WAYNE COUNTY, et al.

September 16, 2025
111–114

Page 111

1   and making them feel uncomfortable in -- in an
2   intimidating way, would that be sexual harassment?
3   Q   Well, I can't answer your question, but it sounds
4   like you observed the sheriff do -- that you
5   believe was inappropriate?
6   A   Yeah.
7   Q   Okay.  So what did you observe that you believe the
8   sheriff did to Erika Erickson that was
9   inappropriate in some way?
10  A   So we were -- we were at a -- his campaign office,
11  and it was right before his election, a couple of
12  days before the election.  And the sheriff, I was
13  told that they had just came out of a meeting,
14  Erika, and the sheriff.
15  Q   You were told by who?
16  A   Rashaun, or somebody like that.  I don't recall
17  exactly, but all I remember is that Erika Erickson
18  looked very, very -- the sheriff -- we were -- we
19  were all in his -- we were all at this -- this
20  his election campaign office, and all of his
21  appointees were there in the office, sitting
22  around.  And his campaign manager, the sheriff, and
23  Turner were all in the front, and Rashaun was in
24  the front as well.  Erika was sitting down in the
25  -- you know, in the middle, around the tables.  And

Page 112

1   I was sitting on the wall.
2   And I observed the sheriff staring her
3   down -- Erika down.  Like, it was -- she looked
4   petrified.  She looked petrified, and she -- I -- I
5   literally wanted to record it, but I couldn't
6   record it because it was people around me.  And
7   after the meeting, I made a comment, and I said
8   something to Rashaun about it.  Like, "Did you see
9   that?"  And I'm not sure what her comment was after
10  the fact, but she -- yeah, that's what I observed,
11  and it bothered me.
12  Q   Did you ever speak to Erika Erickson about what you
13  observed?
14  A   No.
15  Q   Did you ever report what you observed to anyone at
16  the county?
17  A   Just Rashaun.
18  Q   Were there -- were there any other times that you
19  personally observed the sheriff behave towards
20  Erika Erickson in a way that you believe was
21  inappropriate?
22  A   No.
23  Q   Did Erika Erickson ever tell you that the sheriff
24  sexually harassed her?
25  A   No.

Page 113

1   Q   Did you personally observe the sheriff sexually
2   harass Erica Hill?
3   A   No.
4   Q   Did Erica Hill tell you that the sheriff sexually
5   harassed her?
6   A   No.
7   Q   Then why do you -- did you include Erica Hill as
8   one of the several other female employees in this
9   -- that you're referring to in this paragraph 13?
10  A   Michael Turner told me that he sexually harassed --
11  that the sheriff sexually harassed Erica Hill.
12  Q   When did Mr. Turner tell you that?
13  A   In 2000 -- remember -- one second.  In 2024.
14  Q   Did he -- what month?
15  A   I'm not sure what month it was.
16  Q   Was it before or after your termination?
17  A   Before.
18  Q   What did he tell you?
19  A   He told me that the sheriff put his -- his hand
20  down her dress.
21  Q   Did Turner say that he saw this himself?
22  A   He didn't say that.
23  Q   Do you know if Turner reported that alleged
24  incident to anyone at the county?
25  A   I'm not sure.

Page 114

1   Q   Do you know how Mr. Turner found out about it?
2   A   No.
3   Q   All right.  I'm turning now to paragraph 14.  You
4   allege here that you were subjected to sexual
5   harassment on a routine basis in the form of sexual
6   comments, unwanted physical touching, propositions
7   for sexual activity, and being shown pornographic
8   material.  Are there -- what -- other than what
9   you've already testified about, what are the sexual
10  comments you're referring to here?
11  A   So in -- so at the MAG Gala in 2022, the sheriff
12  made reference to not being able to penetrate his
13  -- his son's mother because she had a lot of scar
14  tissue, and his penis -- he didn't think that his
15  penis could get through the scar -- scar tissue,
16  something in that -- you know, something in that
17  nature.
18  Q   And that was -- how did -- what was happening in
19  the conversation immediately before that statement?
20  A   I have no idea.  I mean, he just kind of, like,
21  what comes up, comes out.  I think he was talking
22  about his son -- and he was talking about his son.
23  And I think he was saying, like, "I don't even know
24  how I even got her pregnant."
25  Q   Okay.  So as best you can recall, those were the



Page 115

1    words he used?
2  A   He said that -- I don't -- I don't -- I don't know
3    how I got my D-I-C-K through her scar tissue to get
4    him pregnant -- her -- her pregnant.
5        MS. GORDON:  Did he spell it out, or use
6    the word?
7        THE WITNESS:  He said "dick."
8  BY MS. DELMASTRO:
9  Q   Did you tell him that comment was inappropriate?
10  A   I just was -- I didn't even -- my expression said
11    it.
12  Q   Did you report that comment to anyone at the
13    county?
14  A   Yes, to Michael Turner, to Rashaun.  I think I told
15    a few people.  I'm not sure, but I -- I told more
16    than -- than those two people, because it was just
17    me.  It became a conversation of, "Did he do this
18    to you?  What did he do to you?"  You know, that's,
19    that's how it kind of -- Rasheeda -- you know, it
20    -- it -- it was like a watercooler of the things
21    that, you know, the sheriff says to you.
22  Q   Was anyone else physically present when he made
23    that alleged comment on May 13th, 2022?
24  A   Oh, I mean, it was a -- it was a lot of people
25    around us.  So that -- that's what really was

Page 116

1    concerning to me, because for him to say something
2    out -- like that out loud in front of a lot of
3    people, it was a few people at the table -- at this
4    round table that we were sitting at.
5  Q   Do you know if anyone heard him say it?
6  A   I'm not sure.
7  Q   When did you report this to Turner?
8  A   In '22.  In -- I'm sorry.  In 2022, when myself and
9    Rashaun Whitehead was in the -- in the office in
10    that meeting, when I -- when Rashaun says yes, I
11    saw the sheriff put his hand on my -- up Regina's
12    dress.
13  Q   Okay.  So the meeting that you had with Turner and
14    Rashaun, was that in person?
15  A   Yes.  In his office -- in Turner's office.
16  Q   In the summer of 2022?
17  A   Correct.
18  Q   And at that meeting, you reported this incident to
19    Turner?
20  A   Yes.
21  Q   Do you know if Turner took any further -- any
22    action in response to that report?
23  A   I'm not sure.
24  Q   Did you report that comment to anyone in HR?
25  A   No.

Page 117

1  Q   Can you think of any -- are there any other sexual
2    comments that the sheriff made that we haven't
3    already discussed?
4        MS. GORDON:  Throughout the entire time
5    period?
6        MS. DELMASTRO:  Yeah.
7        MS. GORDON:  Okay.
8        THE WITNESS:  I was walking down the hall
9    in the new CJC building with LaKeisha Solomon.  And
10    I'm not sure whoever -- who else was there, but I
11    -- I -- I remember LaKeisha Solomon.  She said --
12    we were walking -- we were walking, you know, down
13    the hallway.  And she said to me that the sheriff
14    said to her, I don't -- something in this nature.
15    I don't know, "The ladies in -- that's working up
16    here in -- in this office do not need the lactation
17    room because they have you -- powder coming out of
18    their breast."  But he said just powder coming out
19    of her -- your titties, and she was like, "I know
20    he's not talking to me, and I'm not that old," and,
21    you know, and something in that nature.  And it was
22    disgusting.
23  BY MS. DELMASTRO:
24  Q   Is that something that the sheriff said to you?
25  A   No.  He said it to her, and she told me.

Page 118

1  Q   Okay.  Okay.
2  A   And this was a -- this was the summer of '24, and
3    we hadn't, like, moved into the -- the office yet.
4    So it's a breast-feeding room for staff.
5  Q   Okay.  Are there any other sexual comments that you
6    claim the sheriff made to you --
7  A   Oh, to me?
8  Q   -- that we haven't talked about yet?
9        MS. GORDON:  Or in her presence?
10        THE WITNESS:  Could it be --
11  BY MS. DELMASTRO:
12  Q   I'm going to say: to you?
13  A   To me?  Oh, just, you know, "You wearing that suit.
14    I know you had it -- had all that back there."  You
15    know, some -- you know, he -- you need -- you know,
16    "You're so thin."  He made comments about my
17    weight.
18  Q   All right.  The comment of that he "didn't know you
19    had all that back there," when do you claim that he
20    said that?
21  A   He said that in '23.  So I had -- I was --
22        MS. GORDON:  You answered the question.
23        THE WITNESS:  Yeah, '23.
24        MS. GORDON:  Okay.
25  BY MS. DELMASTRO:



REGINA PARKS
REGINA PARKS vs WAYNE COUNTY, et al.

September 16, 2025
119–122

Page 119

1  Q   Okay.  And was anyone else present when he said
2      that?
3  A   In '23?  I -- I'm not sure.  I don't know who was
4      -- it was people around, but, you know, I don't
5      know if they heard.
6  Q   Where were you when he said that?
7  A   In the office.
8  Q   Do you -- did he say that more than once or just
9      one time?
10 A   I just recall one time.
11 Q   Okay.  And when do you claim that he said that you
12     were really "wearing that outfit"?
13 A   Repeat the question.  I'm sorry.
14 Q   When do you claim that he said that you were
15     "really wearing that outfit"?
16 A   He would -- sometime in '22.
17         MS. GORDON:  Lina, I need to take a break
18     for a few minutes.
19         MS. DELMASTRO:  Okay.
20         MS. GORDON:  I assume you guys aren't
21     taking a lunch break -- formal lunch break.  It's
22     okay.  We can keep going, but I'd like to just take
23     --
24         MS. DELMASTRO:  Okay.
25         MS. GORDON:  -- a few minutes.

Page 120

1         MS. DELMASTRO:  We can take a few
2      minutes.
3         MS. GORDON:  Okay.  Thank you.
4         THE VIDEOGRAPHER:  We're going off the
5      record.  The time is 1:22 p.m.  We're off the
6      record.
7         (A recess was taken.)
8         THE VIDEOGRAPHER:  Right.  Standby,
9      please.  We are now back on the record.  The time
10     is 1:48 p.m.
11 BY MS. DELMASTRO:
12 Q   So before the break, we were discussing the
13     statement that you were really "wearing that
14     outfit."  Do you claim that this sheriff made that
15     statement to you once, or more than once?
16 A   He made that statement.  He -- he made that
17     statement.  He may not have said that exact word,
18     but he -- he made the statement saying, "You're
19     wearing that outfit."  But he said something to me
20     in that nature, in that way, another time.
21 Q   Okay.  So when was the -- when -- so two times
22     total?
23 A   Yeah.
24 Q   When was the first time?
25 A   In '22.  I don't know the -- the day.

Page 121

1  Q   When was the second time?
2  A   In '23.
3  Q   Was anyone else present when you -- when you claim
4      he said it the first time?
5  A   Just people -- just normal people around, and then
6      that time with Turner, when I was coming out of the
7      office and he said something about my -- my pants.
8  Q   So is the comment that he didn't know you had all
9      that back there, and the comment that you were
10     really wearing that outfit, did those occur at --
11     on the same occasion?
12 A   No, that was just different times.  It -- you know,
13     it's just different times in 2023 -- '22 and '23,
14     he said those -- made those comments -- he made
15     those comments to me.
16 Q   Okay.  And did you report those comments to anyone
17     at the county?
18 A   I didn't report it to anyone in -- at the county.
19     It was just conversation with my coworkers when we
20     were talking about what the sheriff said to us that
21     was inappropriate.
22 Q   Did you report those comments to anyone at the
23     sheriff's department?
24 A   I reported it to -- again, to those folks that made
25     comments to -- that were saying that he was saying

Page 122

1      things to them.
2  Q   Who are you referring to?
3  A   Rashidah, Rashaun.
4  Q   Anyone else?
5  A   Turner, just in general, like -- again, he -- the
6      -- the -- the sheriff -- it wasn't like I just
7      said, "Hey, today, he said this inappropriate to
8      me."  That -- it didn't happen like that.  When I
9      talked to him maybe about that -- that incident, it
10     was just -- just overall of -- of what he said to
11     me over time.  I don't know.  I --
12 Q   Okay.  So it sounds like you discussed --
13 A   Just the inappropriateness.
14 Q   Okay.  But you don't recall whether you raised with
15     Turner each specific individual comment; is that
16     accurate?
17 A   That is -- that's what I mean.  Yes.  That's --
18     that's accurate.
19 Q   Okay.  All right.  Paragraph 18 of your complaint
20     says that -- it mentions in the last line, "The
21     highest levels of management."  Who are you
22     referring to there?
23 A   Who am I referring to that is well known throughout
24     the county and through the sheriff's office,
25     including the highest levels of management?



REGINA PARKS
REGINA PARKS vs WAYNE COUNTY, et al.

September 16, 2025
123–126

Page 123

1   Q   Correct.  Who are you referring to?
2   A   All of the appointees -- or most of the appointees
3        -- the sheriff appointees.
4   Q   And who are those people?
5   A   I would need a list of all his appointees, and I
6        would have to go down the list and say, "This
7        person knows.  This person knows.  This person
8        knows.  This person knows."
9   Q   How do you know they know?
10  A   How do I know?  For -- by -- just from those people
11       sitting around listening to the conversation about
12       the sheriff.  Just sitting around -- it -- it -- it
13       -- the whole -- just sitting around listening to
14       people talk about the sheriff's behavior.
15  Q   Did you ever personally report any instances of
16       sexual harassment by the sheriff to these
17       appointees you're describing?
18  A   The only people I -- I told this to, again, is what
19       I stated.
20  Q   Are you aware of any particular person who reported
21       any sexual harassment by the sheriff to any of
22       these appointees?
23  A   Say it again.  I'm sorry.
24  Q   Is there anyone you know of in particular who
25       raised issues of sexual harassment by the sheriff

Page 124

1        to these appointees?
2   A   Rashidah raised it to Rashaun.  Lakeisha Solomon
3        raised it.  I raised it.
4   Q   So are you considering Rashaun one of the highest
5        levels of management?
6   A   She could be considered that based on how the
7        sheriff feels she is.
8   Q   Do you know who Rashaun complained about sexual
9        harassment to?
10  A   No.  Rashaun -- Rashaun complained about Rashidah
11       to me.  And I'm not sure if she complained to
12       Turner about it, but she was pretty loyal to
13       Turner, and she -- she talked to Turner, and talked
14       to Turner about a lot of stuff.
15  Q   Anyone else in the highest levels of management
16       that you know received a report of sexual
17       harassment?
18  A   Reid Chakrabarty.  Captain Reid Chakrabarty.
19  Q   And who reported sexual -- alleged sexual
20       harassment to that person?
21  A   Erika Erickson.
22  Q   How do you know that?
23  A   Because Reid Chakrabarty told me.
24  Q   Who's --
25  A   He used to be internal affairs.

Page 125

1   Q   When did he tell you that?
2   A   He told me that this year.
3   Q   2025?
4   A   Yes.
5   Q   Do you intend to call him?  Do you believe he has
6        information relevant to your lawsuit?
7   A   Not sure.
8   Q   Have you talked to him about your litigation?
9   A   No.  No, I haven't.
10  Q   How did it come to be that he told you this in 2025
11       about Erika Erickson?
12  A   I ran into him.
13  Q   Where?
14  A   In Oakland County.
15  Q   And he just randomly mentioned this to you?
16  A   Yes.
17  Q   What else were you talking about?
18  A   He just pretty much told me, "I saw the story," and
19       he said that -- he told me that the sheriff lied in
20       the last deposition, and he said that Erika
21       Erickson used to come to him crying about being
22       sexually harassed, and she didn't know what to do.
23       And -- and -- and he said that it was some other
24       recordings or tapes.
25  Q   Where were you working in 2016?

Page 126

1   A   In -- I was doing contractual work, and I was
2        working -- I was doing a lot of contractual work.
3        I don't know exactly what I was doing.  And then I
4        was doing some mentoring in -- in the public
5        schools.  Behavior mod, possibly.
6   Q   Were you working in the sheriff's department?
7   A   No.
8   Q   Were you working for Wayne County?
9   A   No.
10  Q   In 2010, were you working in the sheriff's
11       department?
12  A   No.
13  Q   Were you working for Wayne County?
14  A   No.
15  Q   In 2008, were you working for the sheriff's
16       department?
17  A   No.
18  Q   Were you working for Wayne County?
19  A   No.
20  Q   In 2002, were you working for the sheriff's
21       department?
22  A   No.
23  Q   Were you working for Wayne County?
24  A   No.
25  Q   Okay.  Paragraph 20 of your complaint, is Rashaun



Page 127

1    Whitehead the executive assistant you're referring
2    to there?
3    A    That is correct.
4    Q    Are you aware that the sheriff removed Reid, and
5    that Reid is the subject of an internal affairs
6    investigation?
7    A    No.
8    Q    Were you physically present when the high-level
9    executives, the appointees you were describing --
10   were you physically present when these -- you
11   believe these people were talking about the
12   sheriff's behavior?
13           MS. GORDON:  She's already mentioned some
14   of them and testified to it.
15           MS. DWYER:  You need to --
16           MS. GORDON:  So we're not going to
17   repeat.
18   BY MS. DELMASTRO:
19   Q    Or, I guess, are you -- do you believe that they --
20   there was -- that there were, like, group meetings
21   at which these individuals were discussing the
22   sheriff's behavior?
23           MS. GORDON:  Okay.  There's been no such
24   testimony.  Assumes facts not in evidence.
25           THE WITNESS:  Say that one more time.

Page 128

1            MS. GORDON:  Yeah.  It's a --
2            THE WITNESS:  Yeah.
3            MS. GORDON:  Let's rephrase that.
4            THE WITNESS:  Yeah.  Say --
5            MS. GORDON:  You're asking her if she
6    knows that there were group meetings where --
7            MS. DELMASTRO:  No, I'm asking --
8            MS. GORDON:  -- the sheriff was
9    discussed?
10           MS. DELMASTRO:  -- if she believes that.
11           THE WITNESS:  Oh, yes.
12           MS. DWYER:  Well, she testified that
13   there were group meetings.
14           THE WITNESS:  Yes.  As a matter of fact,
15   yes, I can give you an example.
16           MS. DELMASTRO:  Okay.
17           THE WITNESS:  The sheriff executive
18   assistant, Ed Foxworth, his driver, they literally
19   used to sit in the -- in the room -- in -- in the
20   conference room and pretty much talk about the
21   sheriff's behavior.  And -- and sometimes I was in
22   that room.
23   BY MS. DELMASTRO:
24   Q    Ed and who?
25   A    Ed Foxworth used to -- he was the communications

Page 129

1    director.  And it sometimes -- it was talked about
2    how -- you know, how the sheriff acted out in the
3    public, you know, some -- some -- you know, just
4    his behavior, just -- just with citizens and --
5    and, you know -- you know, his behavior.
6    Q    Ed Foxworth and who else?
7    A    Erica Hill, Ron Johnson, Rashaun Whitehead, and
8    another -- one -- another person, his executive --
9    his executive -- his driver, that -- I can't think
10   of his name offhand.
11   Q    Were you present for these meetings?
12   A    I was present at a few.
13   Q    Okay.  And it's your testimony that sexual --
14   allegations of sexual harassment were discussed at
15   these meetings?
16   A    It -- it wasn't so much -- it was outside, like,
17   his conduct outside with -- with -- with citizens.
18   Q    Okay.  And was that or was that not sexual
19   harassment?
20   A    Yeah.  It was -- it was -- it -- it -- it was a
21   little explicit.  You know, just that his conduct
22   was not becoming in -- in a manner -- in a sexual
23   way.
24   Q    Did you report those issues to anyone at the
25   county?

Page 130

1    A    No.
2    Q    Did you report this to anyone at the sheriff's
3    office?
4    A    No.  I mean, you know, report it to the sheriff,
5    that's all -- he's the -- we didn't have anybody to
6    report it to.
7    Q    Was the sheriff present for these meetings?
8    A    No.
9    Q    Was Turner?
10   A    No.
11   Q    Where did these meetings occur?
12   A    In the -- in the conference room.
13   Q    At the office?
14   A    Yes.
15   Q    When?
16   A    Periodically.
17   Q    How -- how often did these occur?
18   A    I'm sorry, I -- I don't understand --
19   Q    How often did these meetings occur?
20   A    You know, I'm not sure how many, because I didn't
21   go to a lot of the meetings.  The meetings -- the
22   meetings were just to talk about the sheriff's
23   schedule, but we would talk about other things that
24   went on, like staying away from Ross Jones and
25   trying -- yeah, things like that.



Page 131

1  Q    Were they regularly scheduled meetings?
2  A    Yes.  His executive assistant put it on -- added
3       that on -- on -- on calendars, yes.
4  Q    How -- were they scheduled at regular intervals?
5  A    Somewhat.
6  Q    Do you remember what that those -- how frequently
7       they were scheduled?
8  A    Probably once -- I would be guessing, so I -- I
9       don't --
10 Q    Okay.
11 A    -- know the answer.
12 Q    Okay.  Were you in -- were you one of the invitees
13      to all of these meetings?
14            MS. GORDON:  She's already answered this,
15      in part.
16            THE WITNESS:  In the beginning, yes.
17 BY MS. DELMASTRO:
18 Q    All right.  Paragraph 23 of your complaint, who is
19      this female executive you're referring to?
20 A    In 20 --
21            MS. GORDON:  Paragraph 20 and 23.
22            THE WITNESS:  Oh, sorry.
23            MS. GORDON:  Yeah.
24            THE WITNESS:  Erika Erickson, director of
25      communications.

Page 132

1  BY MS. DELMASTRO:
2  Q    Now, you already testified that Erika never told
3       you about any alleged harassment, correct?
4  A    That's correct.
5  Q    Okay.  So how did you come to learn about this?
6  A    I learned from Rashaun Whitehead,
7       Michael Turner, Reid Chakrabarty.
8  Q    Did you ever ask Erika Erickson whether these
9       things that you heard from others were true?
10 A    No.
11 Q    Why not?
12            MS. GORDON:  This has been asked and
13      answered.  You've asked her all these questions
14      about, "Did you ask somebody about it?"
15            MS. DELMASTRO:  I'll move on.
16 BY MS. DELMASTRO:
17 Q    Okay.  Paragraph 28 of your complaint, it says, "On
18      the evening of February 21st --"
19            MS. GORDON:  Hang on one second.  Let's
20      make sure she's at -- okay.  Go ahead.  Sorry.
21 BY MS. DELMASTRO:
22 Q    It says, "On the evening of February 21st, 2023,
23      defendant Washington called plaintiff's cell phone
24      and propositioned her for sex, stating that he
25      wanted to fuck her"; did I read that correctly?

Page 133

1  A    Yes.
2  Q    And is that accurate?
3  A    Yes.
4  Q    Paragraph 29 says, "On February 22nd, 2023,
5       defendant Washington repeatedly called and texted
6       plaintiff and stated that although he sent all
7       other employees home due to inclement weather, he
8       wanted plaintiff to come to the office"; did I read
9       that correctly?
10 A    Yes.
11 Q    And is that true?
12 A    Yes.
13 Q    Turning back to the -- so here at paragraph 38, the
14      October 3rd, 2023 event --
15            MS. GORDON:  38.
16            THE WITNESS:  Down here?
17            MS. DELMASTRO:  Uh-huh.
18            MS. GORDON:  Okay.
19 BY MS. DELMASTRO:
20 Q    You testified earlier that you lived in Detroit at
21      that time.  Where in Detroit did you live?
22 A    The address?
23            MS. GORDON:  You can give the street.
24            MS. DELMASTRO:  The region.
25            MS. GORDON:  Neighborhood.

Page 134

1            THE WITNESS:  ▇▇▇▇▇▇▇
2  BY MS. DELMASTRO:
3  Q    And headquarters was in Midtown, correct?
4  A    Correct.
5  Q    Where is ▇▇▇▇▇▇ in relation to headquarters?
6  A    Right down ▇▇▇▇▇▇  I'm right on ▇▇▇▇▇▇
7       right down ▇▇▇▇▇▇
8  Q    Okay.  Was part of the reason -- strike that.
9            Were you drinking at this event on
10      October 3rd, 2023?
11 A    Was I drinking on -- at -- on October the 3rd?
12            MS. GORDON:  At the --
13            MS. DELMASTRO:  Were you drinking
14      alcohol?
15            MS. GORDON:  Paragraph 38, I think, is
16      what Counsel's referring to.  Might want to go to
17      the next -- okay.
18            THE WITNESS:  No, I'm there.
19            MS. GORDON:  Okay.
20            THE WITNESS:  So Turner bought me a --
21      purchased me a drink, but I spilled it, so I never
22      really -- I -- had a drink, so that -- to answer
23      your question.
24 BY MS. DELMASTRO:
25 Q    Was part of your reason for carpooling with Turner



Page 135

1   so that you could drink at the event and have more
2   time before driving home?
3   A   No.  Not at all.
4   Q   Would you character yourself -- how would you
5   characterize your relationship with alcohol?
6           MS. GORDON:  Did you say "your
7   relationship"?
8           MS. DELMASTRO:  Uh-huh.
9           MS. GORDON:  Okay.
10          THE WITNESS:  I don't understand the
11   question.
12   BY MS. DELMASTRO:
13   Q   Would you characterize yourself as a social
14   drinker, a daily drinker, someone who -- an
15   occasional drinker?
16   A   I would put -- it would be between social and -- it
17   just -- no.  Let me answer that question.  When?
18   Like, is -- like, now?
19          MS. GORDON:  You talking about the time
20   frame?
21          THE WITNESS:  Yeah.  Give me a --
22          MS. DELMASTRO:  Oh, okay.
23          THE WITNESS:  -- time frame.
24          MS. GORDON:  The time you worked at the
25   --

Page 136

1           MS. DELMASTRO:  Sure.
2           MS. GORDON:  -- county or something?
3           MS. DELMASTRO:  Sure.  Yeah.  During the
4   -- during the years that you worked at the
5   sheriff's office under Sheriff Washington.
6           THE WITNESS:  Under Sheriff Washington,
7   occasionally and social.
8   BY MS. DELMASTRO:
9   Q   Okay.  Did you ever tell the sheriff that the
10   alleged conduct we've discussed today was unwanted?
11          MS. GORDON:  Can I ask for clarification?
12          THE WITNESS:  Yeah.
13          MS. GORDON:  Do you mean in those words,
14   or do you mean in some -- in any manner?
15          MS. DELMASTRO:  I --
16          MS. GORDON:  Because she's already talked
17   about a couple of things today that she did do.
18   BY MS. DELMASTRO:
19   Q   Sure, I guess, let's say: did you ever say
20   anything to the sheriff verbally to tell him that
21   the conduct we've discussed today was unwelcome by
22   you?
23   A   Yes.
24   Q   What did you say?
25   A   In the -- in the -- in the recording, after he

Page 137

1   asked, you know, "All I want is a kiss," after --
2   after that, he made reference to, like, having sex
3   with me, and I said, "No."  And I said, "Are we
4   good?"  And he said, "We're 100 percent, unless you
5   want to -- unless you want to do it -- unless you
6   want to have sex with me."
7   Q   Where do you -- where in the recording do you hear
8   that?
9   A   That recording -- that's in, like, 3:26.
10   Q   Okay.  Now, going back to the -- in the recording,
11   at around 2 minutes and 34 seconds, the sheriff
12   says, "I didn't say that."  Can you hear that?
13   A   No.  He didn't say that.  He said -- he said -- oh,
14   he -- he said -- he said, "I --" oh, yeah, he did
15   say that.  He said, "Oh, I didn't say that."  I
16   said, "You did -- you did say that."  And yeah, he
17   did say that.  He did say that.
18   Q   Okay.  All right.  Yeah.  Yeah, I think --
19   A   I'm sorry.  When you said, "He didn't say that,"
20   meaning he didn't say that he wanted to fuck me the
21   night before?  Is that what you're saying?
22   Q   No.  I'm asking if you, on the recording, him
23   say the phrase, "I didn't say that."
24   A   So yes, in the recording, I said, "You scared me --
25   you scared me the other day."  And he said, "What

Page 138

1   did I say?"  And I said, "You wanted to fuck me."
2   And he said, "I didn't say that," like, laughing.
3   He said -- I said, "You did say that."  And he
4   said, "I'm sorry."  He said, "I'm sorry.  I didn't
5   mean to scare you."  He said, "All I want is just
6   this simple: all I want from you is a kiss from
7   time to time."  And then -- you know, and then it
8   gets into him saying, you know -- we -- we get into
9   something, and he said something about having sex,
10   and -- and I said, "No."  And he -- you know, and
11   he said, "Are --" you know, I said, "Are we good?"
12   And he said, "Yeah, we're good."  And I -- and he
13   said, "We're 100," and something in that manner.
14   Q   Is what you just described what you're -- what you
15   can hear on the recording, or what you remember
16   from the conversation?
17   A   What I can hear on -- in the recording.
18          MS. GORDON:  Does it also include your
19   memory?
20          THE WITNESS:  And in this there may be a
21   little bit of the -- of memory, but I can -- I can
22   hear it in the recording.
23          MS. DELMASTRO:  Okay.  All right.  Let's
24   take a -- let's take a break because I want to cue
25   the recording up again.



Page 139

1    THE VIDEOGRAPHER:  We're going off the
2  record.  The time is 2:18 p.m. We're off the
3  record.
4       (A recess was taken.)
5    THE VIDEOGRAPHER:  We are now back on the
6  record.  The time is 3:18 p.m.
7    MS. GORDON:  I just want to make a
8  statement for the record.  Lina, I asked you
9  earlier today if you were going to take a lunch
10  break.  You said, "No."  And I said, "That's fine
11  with us."  You then said you were going to take a
12  30-minute break before this break.  I said, "Why?
13  We've already had a lot of breaks."  You said,
14  "Okay.  It'll be 20 minutes."  It's now been over
15  an hour.  Just to make things for the record, I
16  guess you guys ordered food in.  We didn't know you
17  were doing that.  Didn't know you were going to be
18  an hour.  And I'm also noting that I cannot use my
19  cell phone from this building, and I've dropped
20  multiple calls with clients in my office, so I've
21  been unable to make use of the hour.  Just making a
22  record for it's been very inconvenient.
23    MS. DELMASTRO:  I apologize for the
24  inconvenience.  I was not aware that there was an
25  intention to take a lunch break from the rest of my

Page 140

1  team at the time that I said that to you, and I
2  apologize for the miscommunication.
3    MS. GORDON:  Yeah.  But when you left,
4  you didn't mention it.  And I appreciate the
5  apology, but, you know, you obviously were going to
6  have lunch, so we've been sitting here for quite a
7  while.  Anyway, let's keep going.  And as I say,
8  it's -- I don't know what the problem is with your
9  cellular thing, but I can't stay connected with my
10  office or anybody else.
11    MS. DELMASTRO:  Okay.
12    THE WITNESS:  I'm sorry.  Can I stop a
13  second?  I just want to get some water.
14    MS. GORDON:  I'll get it --
15    MS. DELMASTRO:  Yes.
16    MS. GORDON:  -- for you, Regina.  Just
17  keep going.
18  BY MS. DELMASTRO:
19  Q   Okay.  Okay.  So when we broke, we were discussing
20      a conversation that you, Regina, had with the
21      sheriff in his office that you audio recorded,
22      correct?
23  A   Correct.
24  Q   The sheriff took no retaliatory action after that
25      conversation for the next 18 months; isn't that

Page 141

1  right?
2    MS. GORDON:  But you've already asked her
3  multiple times about -- hang on.  Multiple times
4  about when she was retaliated against.  So this has
5  been asked and answered in great detail.  She did
6  not say this --
7    MS. DELMASTRO:  Counsel, I --
8    MS. GORDON:  -- as part of her
9  retaliation list, okay?  So you're just repeating
10  what's already on the record --
11    MS. DELMASTRO:  Okay.  Counsel, I will --
12    MS. GORDON:  -- and eating up more time.
13    MS. DELMASTRO:  -- request that you
14  please not make speaking objections.
15    MS. GORDON:  Well, I -- it's not a
16  substantive thing.  We're -- it's just telling you
17  that you're just repeating territory you've already
18  trod quite extensively.
19    MS. DELMASTRO:  Okay.  Thank you for your
20  comment.
21    MS. GORDON:  You're welcome.
22  BY MS. DELMASTRO:
23  Q   Regina, is it correct that the sheriff took no
24      retaliatory action in the 18 months after that
25      conversation in February of 2023?

Page 142

1  A   That's not correct.
2  Q   How is it not correct?
3  A   I was demoted.  I was put in a cubicle.
4  Q   When did that occur?
5    MS. GORDON:  We've covered all this.
6    THE WITNESS:  In November.
7    MS. GORDON:  Regina, the question was up
8  until that date.  No -- I'm going to just try to
9  move this along for you.  Your question seems to
10  be: was there any retaliation other than what she's
11  already talked about today; is that right?
12    MS. DELMASTRO:  I'll accept that
13  question.
14    MS. GORDON:  Okay.  So other than up
15  until November 3rd, has there been any retaliation?
16  Are you claiming that there was other retaliation?
17    THE WITNESS:  No.
18    MS. DELMASTRO:  Okay.
19    MS. GORDON:  Yeah.
20  BY MS. DELMASTRO:
21  Q   When you spoke with Reid in 2025, what month of
22      2025 was that?
23  A   Again, I don't know -- remember.
24    MS. GORDON:  It's asked and answered.
25  BY MS. DELMASTRO:



Page 143

1   Q   Where in Oakland County did you speak with him?
2   A   In Pontiac.
3   Q   Where in Pontiac?
4       MS. GORDON:  She already answered this.
5       THE WITNESS:  I'm not sure where it was
6   in Pontiac.
7   BY MS. DELMASTRO:
8   Q   You don't remember where you were when you spoke
9   with him?
10  A   I was DoorDashing.  I don't know.  I just ran into
11  him doing a DoorDash.
12  Q   Okay.  That -- thank you.  All right.  I'd
13  like to turn now to the day that your -- the day
14  that ended up being your last day of employment.
15  We've already discussed the meeting.  Isn't it true
16  that Erica Hill was also being relocated from a
17  physical office to a cubicle?
18  A   Yes.
19  Q   You allege in your complaint that you were
20  frustrated about the -- about being relocated to
21  the cubicle.  How did you vent your frustration?
22  A   How did I vent my frustration?  I said something to
23  Rashidah.  A few people asked me how -- how -- you
24  know, a few people were asking me how I was, "How
25  -- how are you?  Are you okay?"  And I was saying,

Page 144

1   "Yes, I'm okay."  So I think I only said something
2   to Rashidah, Rashaun, Turner (indiscernible).
3   Q   What did you say to Rashidah?
4   A   She just asked me if I was good, and she -- she
5   asked me was I -- was I good.
6   Q   And what did you say?
7   A   About the relocation of the cubicle or everything I
8   said to Rashidah?
9   Q   Everything you said to her that day after the
10  meeting.
11  A   She -- we talked about a lot of things.
12      MS. GORDON:  They just want to know what
13  you said.
14      THE WITNESS:  Oh.  I told her about the
15  recording of Sheriff Washington that I had.  I was
16  in my office, and I had my phone on my -- on the
17  table, and I was tapping my phone saying, "I got
18  this."  I told her about how this woman was
19  performing fellatio on him.  And I asked her, "What
20  are you going to do about the sexual harassment?"
21  And what else?  I asked her when was she going to
22  move her belongings, because I was supposed to move
23  into her cubicle, and she didn't move her
24  belongings.  So I was waiting for her to move her
25  belongings, and that never happened.  And I think

Page 145

1   that -- that's all I can remember right this --
2   this -- right now.
3   BY MS. DELMASTRO:
4   Q   You were having this conversation with her very
5   loudly, correct?
6   A   That is not correct.  I was in my office.
7   Q   And you're -- so you're saying your voice was not
8   raised?
9   A   In my office?
10  Q   Correct.
11  A   Absolutely not.
12  Q   After this meeting, did you reference your vagina?
13  A   Absolutely not.
14  Q   Did you say that you had the goods?
15  A   I said, "I got this," talking about my phone.
16  Q   And that was in relation to your phone?
17  A   Yes.  It was in my pocket.
18  Q   Okay.  In your pants pocket?
19  A   No.  I -- I had on a long sweater, and it had two
20  pockets.  And my pocket, it was right here, and I
21  was tapping my thigh with my pocket, just like I
22  tapped my phone in the office.  And I was tapping
23  my -- my thigh saying, "Well, I got this on -- on
24  -- on -- the recording on my phone."
25  Q   Did you say you had the gold?

Page 146

1   A   Absolutely not.
2   Q   Did you gesture towards your crotch?
3   A   No.
4   Q   Did you pat your crotch?
5   A   No.
6   Q   Did you tell anyone that your hustle made four
7   times your Wayne County salary?
8   A   I don't recall saying that.
9   Q   Did you have a side hustle at the time?
10  A   No.
11  Q   So you've seen -- I assume you've probably seen the
12  statements that were provided to Venita Terry in
13  this --
14  A   Yes.
15  Q   -- litigation?
16  A   Yeah.  Yes.
17  Q   And, you know, those statements include various of
18  those questions I just asked you, correct?
19  A   Yes.
20  Q   Do you think that those people were lying?
21      MS. GORDON:  You'd have to show her the
22  statement.
23      MS. DELMASTRO:  I don't have to show her
24  the statement.
25      MS. GORDON:  Well, she can't respond to



REGINA PARKS
REGINA PARKS vs WAYNE COUNTY, et al.

September 16, 2025
147–150

Page 147

1    whether they're lying in a written statement --
2              MS. DELMASTRO:  Well --
3              MS. GORDON:  -- without seeing what the
4    statement says.
5              THE WITNESS:  It's multiple statements,
6    so which statement?
7              MS. DELMASTRO:  Okay.
8              MS. GORDON:  Hold on, Regina.
9              So if you want to ask her about a
10   statement, put it in front of her, or you can read
11   it into the record.
12   BY MS. DELMASTRO:
13   Q    So to the extent --
14             MS. GORDON:  But she can't guess what's
15   in there.
16   BY MS. DELMASTRO:
17   Q    So to the extent that someone reported that you
18   gestured towards your crotch, you're saying that
19   they're lying?
20   A    No.  I'm saying that they -- I don't know what they
21   saw, but that's not what happened.
22   Q    And so you're saying that if somebody was saying
23   that you referenced your vagina and patted your
24   crotch, that that's a lie?
25             MS. GORDON:  This has --

Page 148

1              THE WITNESS:  That --
2              MS. GORDON:  -- now been answered.
3              THE WITNESS:  That is -- that is
4    definitely a lie.
5              MS. GORDON:  She just told you what she
6    was doing, and you're not giving the name of the
7    speaker, so she's --
8              THE WITNESS:  My --
9              MS. GORDON:  Hang on, Regina.  She's
10   guessing here at who you're referring to.  It's a
11   little hard to say whether somebody's wrong if they
12   -- she doesn't know who the somebody is.
13             MS. DELMASTRO:  Okay.  Well, if you're --
14   so you're saying that -- I mean, I -- so you're
15   saying -- I mean, does it -- why does it --
16             MS. GORDON:  You've got your answer.  She
17   said she didn't do any of that.
18             MS. DELMASTRO:  Okay.
19             MS. GORDON:  She didn't touch her vagina.
20   She said that.  She said she patted her thigh where
21   her phone was.
22   BY MS. DELMASTRO:
23   Q    Did you talk to anyone -- you said you also talked
24   to Rashaun.  What did you say to Rashaun at the
25   meeting?

Page 149

1    A    The meeting?
2    Q    Yes.
3    A    Which time?  I -- I saw Rashaun maybe a few times.
4    Like, she might have walked by the door.  I mean --
5    Q    Okay.  Let's start with immediately after the
6    meeting.  What was the first time you saw Rashaun
7    after that?
8    A    Probably walking by or something and -- and, you
9    know, nothing was really said.  Well, she came over
10   to Rashidah's area.
11   Q    Okay.  Did you vent your frustration to Rashaun?
12   A    No.  Not right then.  I said something to her later
13   when I went back to the sheriff -- sheriff suite.
14   Q    Okay.  And then -- and what did you and Rashaun
15   discuss at that point?
16   A    I came in and I said something in the manner of,
17   you know, "Don't listen to what Rashidah is
18   saying," or something like that.  And I asked --
19   Turner asked to see me before I left, and he wasn't
20   there.  He was in the office, I -- I think, with --
21   with Mara MacDonald and the sheriff -- yeah, with
22   the sheriff.  And they continued to ask me was I --
23   you know, "Are you okay?  Are you upset?"  And I
24   said, "No, I'm -- I'm okay."  You know, I -- I was
25   irritated because they kept asking me why -- "Are

Page 150

1    you okay?"  And yeah, I was a little upset, and I
2    was definitely irritated.
3              MS. GORDON:  I think the question was:
4    what did you say to --
5              THE WITNESS:  Oh.
6              MS. GORDON:  -- Rashaun?
7              THE WITNESS:  So --
8              MS. GORDON:  Just to try to keep it on
9    track.
10             THE WITNESS:  So I said probably
11   something in the nature, like, "I'm just tired of
12   this."  You know, tired of this.
13   BY MS. DELMASTRO:
14   Q    Did you say any swear words that day, after the
15   meeting?
16   A    Yeah, I probably said, "I don't give a fuck," or
17   something like that.
18   Q    Were you insisting on waiting to talk to Turner?
19   A    Was I -- I'm sorry.
20   Q    Were you insisting on waiting to talk to Turner?
21   A    Yes.
22   Q    Why?
23   A    Because he asked to see me before I left.
24   Q    Before you left for the day?
25   A    Yes.  And I -- I wanted to go home.  I -- I really



Page 151

1    wanted to go home.
2  Q    Okay.  Now, you said that you did talk to Turner
3        that day after the meeting.
4  A    No.
5  Q    You did not?
6  A    I did not talk to Turner after the meeting until on
7        -- on the phone.  On the phone.  I talked to Turner
8        after the meeting on the phone.
9  Q    Okay.  Have you fully described everything that
10       happened in the office after the meeting?
11            MS. GORDON:  You didn't ask her to fully
12       describe everything that happened in the office, I
13       don't think.
14            MS. DELMASTRO:  No, I didn't.  That's why
15       I'm asking --
16            MS. GORDON:  Could you be -- can you say
17       what you mean by "in the office"?
18  BY MS. DELMASTRO:
19  Q    I'm saying in the office before -- you ultimately
20       left the office for the day, correct?
21  A    Uh-huh.
22  Q    Are there any other communications or anything else
23       that happened after the meeting that you haven't
24       talked about just now?
25  A    Yeah.

Page 152

1  Q    Okay.  What happened?
2  A    I -- I talked to Rashaun -- I mean, Rashidah, and
3        we -- we talked about, you know, I -- you know,
4        moving her stuff out the cubicle.  And she -- you
5        know, I told her about the -- the recording.  I
6        asked her what is she going to do about him -- the
7        sheriff harassing her.  And she said, "He -- he's
8        not going to do that anymore," or, "I don't have to
9        worry -- I don't have to worry about that," or
10       something like that.  And then she told me I need
11       to worry about my daughter, so I was a little
12       offended by that.  I didn't understand what she
13       meant by that.  So that -- I was a little irritated
14       by that comment she made.  She called me a fool.
15       And then going into the -- the office, I just
16       remember being a little irritated.
17  Q    What happened next, after that interaction with
18       Rashidah?  Is that then what happened, where you
19       were sitting there and everyone was asking you if
20       you were okay, and you were saying you were waiting
21       for Turner?  Is that what happened next?
22  A    Can you go back and repeat the -- repeat the
23       question?  You're asking me, did I talk to anybody
24       after the meeting?
25  Q    Yeah.  I want to -- I just want to find out what

Page 153

1        else -- what, if anything, else happened after the
2        meeting other than what you described about talking
3        to Rashidah, and then you're waiting for Turner,
4        and everybody's asking you if you're okay.
5  A    So you want --
6            MS. GORDON:  She also talked about
7        talking to Rashaun.
8            MS. DELMASTRO:  Yeah.
9            THE WITNESS:  So do you want to -- so you
10       want to know, like --
11            MS. DELMASTRO:  Did anything else happen
12       before you went home for the day?
13            MS. GORDON:  Other than what she's
14       already described?
15            MS. DELMASTRO:  Yes.
16            MS. GORDON:  Okay.
17            MS. DELMASTRO:  Correct.
18            THE WITNESS:  I talked to other people in
19       the office.
20  BY MS. DELMASTRO:
21  Q    Okay.  What did you talk to them about?
22  A    After the meeting, I met with Mara MacDonald for
23       about ten minutes.
24  Q    What did you discuss?
25  A    She was pretty much, like, introducing herself and

Page 154

1        saying that, "Turner said that you were -- you get
2        the job done."  That's exactly what she said, "That
3        you get the job done."  And she was like, "I -- I
4        -- I don't have to worry about you."
5  Q    She was going to be one of your new teammates,
6        correct?
7  A    I -- I clearly didn't understand really what was
8        going on.
9  Q    So how did you ultimately decide to go home when
10       you went home?  Did you give up on waiting for
11       Turner?
12  A    Yes.
13  Q    Okay.  But you did talk to Turner on the phone,
14       correct?
15  A    Yes.
16  Q    Okay.  Did you talk to him once that day, or more
17       than once?
18  A    I talked to him twice.
19  Q    Twice.  On the phone twice?
20  A    Yes.
21  Q    When was the first time you talked to him on the
22       phone after the meeting?
23  A    When I left the -- the meeting, I was driving home,
24       and I was on 75, and he called and he said, "Did
25       you leave already?"  I said, "Yes."  And I told



Page 155

1     him, "You didn't -- you didn't advocate for me."
2   Q   Did he say anything in response?
3   A   He said, "I don't have to listen to you."
4   Q   Did you say anything after that?
5   A   I said, "Okay," and I hung up the phone.
6   Q   How long was that phone call, roughly?
7   A   Two minutes, at -- or less.
8   Q   And then how long after that did you have your
9       second phone call with him?
10  A   It was later that night.
11  Q   Did he call you or did you call him?
12  A   He called me.
13  Q   And roughly how long was that conversation?
14  A   It was -- it was -- it was some minutes.  It was --
15      it was -- it was probably at least -- I'll be
16      guessing, but it wasn't a short call.
17  Q   What was discussed on that call?  I said, "What do
18  A   He -- he said, "What did you do?"  I said, "What do
19      you mean?"  He said, "I just got a call from the
20      sheriff, and the sheriff was hollering and
21      screaming, saying that you had a recording of him.
22      And you told -- and -- and Rashaun said that you
23      told him that you told -- you told the sheriff that
24      I said I record him."
25  Q   What did you say?

Page 156

1   A   I said, "You did."
2   Q   What did he say?
3   A   He was -- he was -- he -- he was silent and -- and
4       -- and he -- he said -- he pretty much said, "If
5       you don't --" oh, he -- he said, "I don't know why
6       Rashaun would call --" He said, "I don't know why
7       Rashaun would call him.  She usually will call me
8       first if something happens."  And then he said --
9       you know, he said, "You need to apologize to him."
10      And I said, "I'm not apologizing to -- to -- to the
11      sheriff."  And he said, "If you don't apologize to
12      him, he's going to fire you."  And I -- and then I
13      just was like, "I'm not apologizing to him."  And I
14      said, "He doesn't value me," and this, that, and
15      the other.  And he said, "If you don't --" he -- he
16      said -- he said, "If -- if you don't --
17      if you don't apologize, he'll fire you."
18  Q   And what did you say?  Did you say anything else
19      during that phone call?
20  A   I -- I said, "I'm not apologizing."
21          MS. GORDON:  Anything else you haven't
22      already said was the point, I think.
23          THE WITNESS:  That's -- that's all I
24      remember right this second.
25  BY MS. DELMASTRO:

Page 157

1   Q   Okay.  Was that how the phone call ended, with you
2       saying, "I'm not going to apologize"?
3   A   Yes.
4   Q   Okay.  And when was the next time you had a
5       communication with Turner?
6   A   The next morning.
7   Q   And was that verbal or in writing?
8   A   It was -- it was -- it was verbal.  It was verbal.
9   Q   In person?
10  A   No.  It was -- it was on the phone.
11  Q   On the phone.  What did he say?
12  A   I called him and I asked him, was I terminated?  I
13      called him, and he didn't answer, and he said he'd
14      call me right back by text.  And then I called him,
15      and, you know, he called me back, and I said, "Am I
16      terminated?"  Because all my -- I couldn't use my
17      phone.
18  Q   Your login was inactivated in some way?
19  A   Yeah.
20  Q   And what did he say?
21  A   He said, "I don't know."  He said, "I don't know."
22  Q   He said he didn't --
23  A   He said, "I --"
24  Q   -- know if you were terminated?
25  A   Yeah.  He said, "I don't know."  And he said, "Let

Page 158

1       me call you back."
2   Q   Okay.  And did he call you back?
3   A   He didn't call me back until I called him.
4   Q   Okay.  When was that?
5   A   Like, later in the -- in the afternoon.
6   Q   At this point, were you still at home, or were you
7       in the office?
8   A   I was in the -- I mean, I was at home.
9   Q   Why didn't you go into the office that
10      morning?
11  A   I had told Rashaun the -- the night before that I
12      wasn't coming in the office, and I told Turner I
13      wasn't coming in the office.  I had told him the
14      day before, I wasn't feeling good.
15  Q   Okay.  So you were feeling sick?
16  A   I just didn't feel good.
17  Q   Okay.  So then you -- so you called Turner back and
18      you had a conversation with him about the
19      termination?
20  A   I'm sorry.  Go back.
21  Q   You called Turner back then.  Because you said that
22      he didn't call you back, so you called him back.
23  A   He didn't answer.  He --
24          MS. GORDON:  Hang on a second.  Let the
25      -- let Lina finish the question.



REGINA PARKS
REGINA PARKS vs WAYNE COUNTY, et al.

September 16, 2025
159–162

Page 159

1 BY MS. DELMASTRO:
2 Q   Okay.  And then what happened during that
3     conversation when you did speak with him?
4         MS. GORDON:  She's already described the
5     conversation when she spoke with him.
6         MS. DELMASTRO:  Okay.  I -- all right.
7     I'm sorry.  I was confused.
8         MS. GORDON:  Yeah.
9 BY MS. DELMASTRO:
10 Q   So then there was -- so then there was some phone
11     tag.  Did you ultimately have another conversation
12     with Turner --
13 A   Yeah.
14 Q   -- on that day?
15 A   Yes.
16 Q   Okay.  When was that?
17 A   Probably 2 or 3 o'clock in the afternoon.
18 Q   Okay.  And what did he say to you during that call?
19 A   I said, "I guess I'm terminated."  He said, "Yeah,
20     I was supposed to bring you in the office."  And he
21     never -- he never called or did anything. "The
22     sheriff wanted me to fire you."
23 Q   What did you say?
24 A   I didn't say much.
25 Q   Okay.  How long was that --

Page 160

1         MS. GORDON:  Wait.  I'm sorry.
2     Listen to the questions and shorten your
3     answer, okay?
4         MS. DELMASTRO:  Deb, I'm --
5         MS. DWYER:  You can't coach the witness
6     while she's testifying.
7         MS. DELMASTRO:  What did you just whisper
8     to her, please?
9         MS. GORDON:  Please.
10         MS. DELMASTRO:  I'm --
11         MS. GORDON:  I leaned over to talk to my
12     client.  I told her to listen to the question.
13         MS. DWYER:  You could say that out loud.
14         MS. GORDON:  It's --
15         MS. DWYER:  You don't need to whisper
16     that in her ear.  It's the second time --
17         MS. GORDON:  Okay.  I could --
18         MS. DWYER:  -- now that you've done that.
19         MS. GORDON:  Okay.  Wow, you've got a
20     scolding voice, Maria.  Guys, I'm --
21         MS. DWYER:  You're incredibly --
22         MS. GORDON:  -- going to do what I want
23     --
24         MS. DWYER:  -- condescending in your
25     tone.

Page 161

1         MS. GORDON:  -- I want to -- I'm going to
2     -- I'm going to do --
3         MS. DWYER:  (indiscernible).
4         MS. GORDON:  -- what I need to do.  I've
5     done nothing improper.  And if I want to tell my
6     client to shorten up her answers in her ear, I will
7     do so.  But I wasn't coaching because there was no
8     question.
9     Go ahead.
10         MS. DELMASTRO:  Regina, please -- if you
11     do not understand my question, please feel free to
12     ask me to clarify.
13         THE WITNESS:  Okay.
14         MS. DELMASTRO:  -- or ask me to repeat.
15         THE WITNESS:  Okay.
16         MS. DELMASTRO:  And please do listen
17     carefully to my questions.  I'm not intending to
18     trick you.
19         MS. GORDON:  Okay.  It's late, and the
20     problem is this: it's late in the day, and
21     witnesses get very tired as the day goes on, okay?
22     I have a lot of experience with this, and it's hard
23     to focus.  So I'm asking Regina to listen to your
24     question and answer only the question.
25         MS. DELMASTRO:  Okay.

Page 162

1         MS. GORDON:  Go ahead.
2         MS. DELMASTRO:  Thank you.
3         MS. GORDON:  I mean, you guys have, you
4     know, made this a very long day, so go ahead.
5 BY MS. DELMASTRO:
6 Q   Okay.  So at some point, you had some
7     communications with Venita Terry about your
8     termination, correct?
9 A   Yes.
10 Q   Okay.  And when was that?
11 A   The day after my last day, so I -- I think that may
12     have been the 14th, but I'm not sure.
13 Q   Okay.  And you met with her in person to retrieve
14     your belongings, correct?
15 A   I met with her to bring her my electronics, my
16     phone and computer, and to retrieve some of my
17     property.
18 Q   At that time, did you share with her your concerns
19     about the sheriff's behavior towards you being
20     sexual harassment?
21 A   I didn't say anything regarding that.
22 Q   Did you share with her your concerns that the
23     sheriff or the county may have been retaliating
24     against you?
25 A   No.



Page 163

1  Q   Why not?
2  A   Because at first, I didn't -- I -- I didn't think
3      she was the person to go to about that anyway.
4  Q   And is that why -- is that why you didn't tell her
5      that -- share those things with her during this
6      meeting that you had with her?
7  A   We didn't have a meeting.  Yeah, I was just
8      bringing my belongings.
9  Q   I understand it wasn't a scheduled meeting.  But
10     this interaction that you had with her, is that the
11     reason that you did not share those concerns with
12     her?
13 A   The reason why I met -- met with her is because I
14     brought my belongings, and that's the only reason
15     why I was there.
16 Q   Are you aware that your phone records were
17     subpoenaed in this case?
18 A   Yes.
19 Q   And that AT&T produced records responsive to this
20     subpoena?
21 A   Yes.
22 Q   In February 2023, did you have a phone number that
23     was ▮▮▮▮▮▮▮▮▮▮
24 A   Correct.
25 Q   Did you have another phone number that was

Page 164

1      ▮▮▮▮▮▮▮▮▮▮
2  A   Correct.
3  Q   Do you know what Sheriff Washington's phone numbers
4      were at that time?
5          MS. GORDON:  His personal line, which
6      he's not provided, or his business line?
7          MS. DELMASTRO:  I'm asking --
8          MS. DWYER:  I'm sorry, did you say which
9      he's not provided or which he's now provided?  I
10     didn't hear you.
11         MS. GORDON:  I think it's on the record
12     what I said.
13         MS. DWYER:  What did -- can you please
14     read back what --
15         MS. GORDON:  I said what he's not
16     provided.  He has not -- he's provided his phone
17     number --
18         MS. DELMASTRO:  That's what I'm asking.
19         MS. GORDON:  -- but no phone records.
20     Okay.
21 BY MS. DELMASTRO:
22 Q   I'm asking if you knew at the time -- and I'm not
23     asking you if you have them memorized here today,
24     but did you know, at that time, his phone numbers,
25     work and personal?

Page 165

1  A   Yes.
2          MS. GORDON:  I think we all know that she
3      knew the numbers --
4          MS. DELMASTRO:  Okay.
5          MS. GORDON:  -- because you can see they
6      communicated.
7  BY MS. DELMASTRO:
8  Q   Okay.  Would you agree that ▮▮▮▮▮▮▮ is -- was
9      the sheriff's work phone number?
10         MS. GORDON:  If you remember.
11         THE WITNESS:  I don't know.  I -- I don't
12     --
13 BY MS. DELMASTRO:
14 Q   Okay.  Do you have any reason to dispute that?
15         MS. GORDON:  The records are going
16     to say what his number is.  You don't need to get
17     it from Regina Parks.
18         THE WITNESS:  I can't dispute it or deny
19     it.  I don't know.
20         MS. DELMASTRO:  Okay.  That's fair.
21         MS. GORDON:  You should be able to show
22     the number -- what the numbers are.
23 BY MS. DELMASTRO:
24 Q   I'm going to show you three pages of the document,
25     and we're going to mark this as Deposition Exhibit

Page 166

1      4.  Thank you.  Okay.  So the first page is Bates
2      stamped AT&T Subpoena Response 67.
3          MS. GORDON:  I'll share this with you.
4      Let's look at --
5          (Defendant's Exhibit 4 was marked for
6      identification.)
7  BY MS. DELMASTRO:
8  Q   Have you seen this document before?
9          MS. GORDON:  Hold on one second, please.
10     It's kind of a long document.  We're looking at
11     Bates stamp 67, 68, and 69, for the record.  What's
12     the question?
13 BY MS. DELMASTRO:
14 Q   Have you seen this document before, Regina?
15         MS. GORDON:  (indiscernible).
16         THE WITNESS:  I didn't see this.  I've
17     never seen it.
18 BY MS. DELMASTRO:
19 Q   Okay.  Is it fair to say that this document
20     reflects your phone number of ▮▮▮▮▮▮▮?
21         MS. GORDON:  Okay.  The document speaks
22     for itself.  She's already told you what her number
23     was.
24         THE WITNESS:  Yes.
25 BY MS. DELMASTRO:



Page 167

1 Q    And the sheriff's phone number of ██████?
2         MS. GORDON:  What's your question?  Are
3    those numbers on this document?
4         MS. DELMASTRO:  Yeah.  Is --
5         MS. GORDON:  The numbers are on the
6    document.  We agree that the numbers are on the
7    document.
8  BY MS. DELMASTRO:
9 Q    Okay.  Regina, is there any record of a call
10    between you and the sheriff on February 21st of
11    2023, on this page?
12        MS. GORDON:  Okay.  Are you going to
13    direct her to something, or do you want us to take
14    time, and her to look through this?  If you're
15    telling us it's not on here, just say that, and we
16    can all save time.
17        MS. DELMASTRO:  We -- all right.  I will
18    say that.
19        MS. GORDON:  Okay.
20  BY MS. DELMASTRO:
21 Q    Regina, would you agree with me that there's no
22    call between you and the sheriff --
23        MS. GORDON:  Okay.  We're not going to
24    answer that.  We're going to say the document
25    speaks for itself because we're not going to sit

Page 168

1    here -- these are tiny numbers, and there are
2    hundreds of pages that were produced.  So you can
3    say to the court that per this document, they're
4    not -- my client's not going to agree or disagree.
5    She's not an expert in these records, and she's
6    never seen them.
7         MS. DELMASTRO:  It's not -- are you
8    directing the witness --
9         MS. GORDON:  Yes, I am.
10        MS. DELMASTRO:  -- not to answer?
11        MS. GORDON:  I am, because these are not
12    her documents.  Something's been presented in front
13    of her.  And the document has data on it which you
14    don't need my client to opine on.  You can look at
15    them and say what it is yourself.  She's not going
16    to be any better at it than you are.
17        MS. DELMASTRO:  Okay.  I will have the --
18    I will let the record reflect that you are
19    directing the witness not to answer.
20        MS. GORDON:  It's already reflected.  I
21    just said that.
22        MS. DELMASTRO:  That's -- okay.  Then
23    we're in agreement.
24        MS. GORDON:  Do you have an exhibit?  Oh,
25    this is going to be -- okay.

Page 169

1         MS. DELMASTRO:  Okay.  I'm going to show
2    you now what we're going to mark as Plaintiff's
3    Exhibit Number 5.
4         MS. GORDON:  And what is that, for the
5    record?
6         MS. DELMASTRO:  It is --
7         MS. GORDON:  Oh, I'm sorry.
8         MS. DELMASTRO:  -- plaintiff's Initial
9  Disclosures.
10        MS. GORDON:  Okay.  Thank you.
11        (Plaintiff's Exhibit 5 was marked for
12    identification.)
13  BY MS. DELMASTRO:
14 Q    All right.  Regina, I'm going to ask you a series
15    of questions about the -- some of the individuals
16    identified on this document.  I'm not asking you to
17    rehash anything you've already mentioned today.  My
18    goal here is to ask if there's anything else other
19    than what you've already discussed that you believe
20    that this person has any -- the information, okay?
21    So I'm not asking you to repeat what we've already
22    discussed.
23        MS. GORDON:  Okay.  I'm going to add as a
24    caveat here, Regina Parks did not compile this
25    document.  My office did.  It's signed by a lawyer.

Page 170

1    I'm not sure that she's going to know why
2    everybody's on this list, but of course you're more
3    than free to ask her what she knows.
4  BY MS. DELMASTRO:
5 Q    So Edward Foxworth is listed here as an individual
6    likely to have information related to your claims
7    in this litigation.  We've already discussed Edward
8    Foxworth somewhat today, correct?
9  A   Correct.
10 Q    Okay.  Other than what you've already discussed,
11    does Mr. -- are you -- what information are you
12    aware of that Mr. Foxworth has that relate to this
13    litigation?
14 A   Mr. Foxworth was present when -- Mr. Foxworth was
15    present when he saw the sheriff acting in an
16    inappropriate way.
17 Q    On which occasions?
18 A   We were out at -- in December of '23 in the public,
19    and he made some very explicit remarks regarding
20    the -- someone in the public, and we were both
21    pretty disturbed by what we heard and saw.
22 Q    Have you discussed your lawsuit with Mr. Foxworth?
23 A   I haven't discussed my lawsuit with Mr. Foxworth,
24    but I -- I talked to him, you know, after I
25    terminated.



Page 171

1 Q   When was the last time you talked with Mr.
2      Foxworth?
3 A   A couple weeks ago.
4 Q   And did you -- what did you discuss with him?
5 A   He just was checking on me.
6 Q   Do you have a personal relationship with him?
7 A   No.  He's just a friend, just a coworker.
8 Q   Do you know if he is still employed with the
9      county?
10 A   No, he's not employed with the county.
11 Q   Do you recall when he stopped being employed with
12      the county?
13 A   He was fired the week before I was terminated.
14 Q   Did he -- did you talk about your termination with
15      him?
16 A   Yeah.  Yes.
17 Q   What did you share with him?
18 A   On the day I was terminated, he -- he was -- I
19      think he was the first person who texted me and
20      said, "Are you okay?"  And I didn't even know what
21      -- what he was talking about.  And just pretty much
22      I was terminated.
23 Q   Other than what we've already discussed, does Erica
24      Hill have any information that's relevant to this
25      lawsuit?

Page 172

1 A   To my lawsuit?
2 Q   Yes.
3          MS. GORDON:  Other than what you've
4      already testified to.
5          THE WITNESS:  I'm not sure.
6 BY MS. DELMASTRO:
7 Q   When was the last time you talked to Erica Hill?
8 A   The last day I worked.
9 Q   Okay.  And again, other than what you've already
10      testified about today, does Erika Erickson have any
11      information about your claims in this lawsuit?
12 A   No.
13 Q   When was the last time you talked to Erika
14      Erickson?
15 A   Last time I talked to Erika Erickson was when --
16      last time -- last day I worked.  I mean, the last
17      day she worked.
18 Q   When approximately was that?
19 A   I don't recall.  It was a couple years ago.  Couple
20      years ago.
21 Q   Was it before your employment was terminated?
22 A   Yes, it was -- yes.  Yes.
23 Q   When was the last time you talked to Olivia
24      Townsend?
25 A   The last time I talked to Olivia Townsend by phone

Page 173

1      was -- it was December of '24, and I think I texted
2      her, and she texted me, "Happy New Year."
3 Q   Have you ever talked about your lawsuit with her?
4 A   No.
5 Q   Do you believe that Olivia Townsend has knowledge
6      about the claims you have in this litigation?
7 A   Not sure.
8 Q   When was the last time you communicated with Venita
9      Terry?
10 A   When I picked up my belongings and turned in my
11      equipment, my sheriff -- sheriff stuff, sheriff
12      equipment.
13 Q   And other than what we've already discussed today,
14      do you -- are you aware of any other knowledge that
15      she has about your claims in this litigation?
16 A   Correction.  I spoke to Venita Terry after I was
17      terminated, because she was helpful with me getting
18      some information from the county, like employment
19      stuff.
20          MS. GORDON:  So then there was a
21      follow-up question.
22          THE WITNESS:  Okay.  And say the follow
23      -- I'm sorry.
24 BY MS. DELMASTRO:
25 Q   So did -- other than what we've already discussed

Page 174

1      today, do you believe that she has any other
2      information that's relevant to your claims in this
3      litigation?
4 A   I'm not sure.
5 Q   LaKeisha Solomon.  Other than what you've already
6      discussed today, do you believe she has any other
7      information relevant to your claims in this
8      litigation?
9 A   I'm not sure.
10 Q   Who is Dindi Maloney?
11 A   She -- from the last time I worked, she was a
12      recruiter and promoted the day -- the last day I
13      worked as an assistant to Mara MacDonald, but then
14      returned back into her position.
15 Q   When was the last time you spoke with Dindi
16      Maloney?
17 A   The week -- the last week I worked.
18 Q   Do you think that Dindi Maloney has any knowledge
19      about your claims in this litigation?
20 A   I'm not -- I'm not sure.
21 Q   Okay.  I'm going to show you a document that we're
22      going to label as Exhibit 5.
23          THE RECORDER:  I'm sorry.  Are we on 6?
24          MS. DELMASTRO:  We might be on 6.  Maybe
25      I --



REGINA PARKS
REGINA PARKS vs WAYNE COUNTY, et al.

September 16, 2025
175–178

Page 175

1     MS. GORDON:  That was 5.  The last one
2  was 5.
3     MS. DELMASTRO:  Okay.
4     THE RECORDER:  Okay.  Just wanted to make
5  sure.
6     MS. DELMASTRO:  Thank you.
7     THE RECORDER:  Thank you.
8     (Defendant's Exhibit 6 was marked for
9  identification.)
10 BY MS. DELMASTRO:
11 Q    And this document is titled plaintiff's Responses
12    to defendant Wayne County's First Set of
13    Interrogatories and Request for Production of
14    Documents.  Have you seen this document before,
15    Regina?
16 A   Yes.
17 Q    And did you review this document and confirm that
18    the answers were correct?
19 A   To the best of my ability, yes.
20 Q    Taking a look at page 3, in answer to interrogatory
21    number 3, you identified some companies with whom
22    you have completed an application for employment,
23    and you list a few companies there.  Have you
24    applied for jobs at any other companies?
25 A   Several.

Page 176

1  Q    Where else have you applied?
2  A   Multiple mortgage companies, healthcare,
3     nonprofits.  I just don't know the list offhand.
4     This is a nice list.
5  Q    Okay.  And interrogatory number 5, in answer to
6     that, you identified some sources of income:
7     selling items on Ebay and Poshmark, selling items
8     at resale booths, DoorDash, and unemployment
9     insurance.  Since submitting these answers to your
10    interrogatories, have you -- are there any other
11    sources of income other than those that are listed
12    here?
13 A   That I -- nothing I can recall offhand.
14 Q    Okay.  So in your complaint, you allege that --
15    MS. GORDON:  Are we done with this number
16    6 now, or not?
17    MS. DELMASTRO:  We are, yes.
18    MS. GORDON:  Okay.
19    MS. DELMASTRO:  I may ask her about --
20    MS. GORDON:  Okay.
21    MS. DELMASTRO:  -- some of the companies,
22    but.
23    MS. GORDON:  Yeah.  I get it.
24    MS. DELMASTRO:  So --
25    MS. GORDON:  Okay.  We don't need it in

Page 177

1  front of us.
2  BY MS. DELMASTRO:
3  Q    Now, in your complaint, you allege that you
4     suffered loss of earnings and earning capacity,
5     mental and emotional distress, including anxiety
6     and mental anguish, humiliation and embarrassment,
7     loss of personal and professional reputation, and
8     loss of the ordinary pleasures of everyday life; is
9     that correct?
10 A   That's correct.
11 Q    What loss of earnings have you suffered?
12    MS. GORDON:  Are you talking about other
13    than her paycheck from the county?
14    MS. DELMASTRO:  That's what I'm asking
15    her.
16    MS. GORDON:  Okay.
17 BY MS. DELMASTRO:
18 Q    What loss of earnings have you suffered?
19 A   I lost my job.
20 Q    Okay.  And what earning capacity have you suffered
21    -- loss of earning capacity have you suffered?
22    MS. GORDON:  I'm not sure she knows what
23    that mean.
24    THE WITNESS:  I'm not -- I don't
25    understand.

Page 178

1     MS. GORDON:  It's a legal --
2     MS. DELMASTRO:  Okay.
3     MS. GORDON:  -- term.
4  BY MS. DELMASTRO:
5  Q    So do you believe that loss of your job has harmed
6     your ability to be gainfully employed in the
7     future?
8  A   Absolutely.
9  Q    In what way?
10 A   My name is plastered all over the news and on the
11    internet.  That's one.  I'm 51 years old, and so
12    it's a little different when you get over 50.  It's
13    a little challenging to find employment.  It's just
14    a -- it's harder.  Who -- it seems like it's
15    challenging to find employment while you're in
16    litigation.
17 Q    How would people know that you're in litigation?
18 A   Because they can just look you up on the internet.
19    That's the first thing they do, is look you up on
20    the internet and look your name up.
21 Q    Have you had -- have you experienced any companies
22    telling you that they're aware of your litigation?
23 A   No.
24 Q    Have you suffered emotional distress as a result of
25    your termination?



REGINA PARKS
REGINA PARKS vs WAYNE COUNTY, et al.

September 16, 2025
179–182

Page 179

1   A   Absolutely.
2   Q   Please describe that.
3   A   Stress, anxiety.  I've lost like 25 pounds.
4       Humiliation, nightmares, embarrassment.
5   Q   Have you sought medical treatment in connection
6       with this emotional distress?
7           MS. GORDON:  I'm sorry.  Were you done
8       with your list, or were you -- were not done?
9       Sounded like she was still going through the list.
10          THE WITNESS:  Just relationships.  Just
11      the relationships that I have with friends.  I
12      wouldn't say friends, but just people that I -- I
13      cared about at the county.  It's -- everybody is
14      connected, so it's like -- you don't -- I never --
15      I never had to, like, put in an application for a
16      job.  You just -- people saw your work -- work
17      ethic, and they -- they -- they wanted to hire you,
18      you know?  But it's a little -- it's harder because
19      -- it's harder because you're older now, and I was
20      looking forward to maybe retiring from the county.
21          I don't have any health insurance, and so
22      that's -- that's probably one of the biggest issues
23      because I can't go to the doctor, and so I can't go
24      see any -- I can't -- I can't go see -- I can't go
25      to the doctor and see a therapist or talk to

Page 180

1       somebody.  And then just the relationships with --
2       like, even -- like, even if I want to go and talk
3       to a pastor or something like that.  Like, a lot of
4       these people that I'm close to are his friends or
5       the sheriff's friends or his chaplains that grew
6       fond of me over the years.  And so just not being
7       able to -- I -- I just -- sometimes I just feel
8       like I'm just isolated, and it just -- it takes a
9       -- it -- it's -- it takes a toll on you.
10          THE WITNESS:  Can we stop for a second?
11          MS. DELMASTRO:  Yes.  We can take a
12      break.
13          THE VIDEOGRAPHER:  We're going off the
14      record.  The time is 4:12 p.m. We're off the
15      record.
16          (A recess was taken.)
17          THE VIDEOGRAPHER:  We're now back on the
18      record.  The time is 4:16 p.m.
19  BY MS. DELMASTRO:
20  Q   So I'd like to talk a little bit now, Regina, about
21      your job search efforts since your termination.
22      What resources have you used in conducting your job
23      search?
24  A   The internet.  Michigan Unemployment Agency.  They
25      have something -- you can use their tool, and I

Page 181

1       look over that.  I use Indeed a lot.  I talk to
2       just people that could refer to me.
3   Q   How often do you search for jobs?
4   A   Every day.
5   Q   And approximately how much time would you say, on
6       average, you have spent searching for jobs each
7       day?
8   A   Probably a couple of hours.
9   Q   Roughly, how many jobs in total do you think you've
10      applied for?
11  A   At least 30.
12  Q   Have you had any interviews?
13  A   I had one last week.
14  Q   Where was that?
15  A   It was over the phone.
16  Q   I mean for what company, or what kind of job?
17  A   It was a -- it was a healthcare company.  It was a
18      healthcare company, and it was like a field
19      community person -- field community person for
20      healthcare.
21  Q   Have you heard back about the interview?
22  A   No.
23  Q   Was that the first interview you received?
24  A   I had an interview months ago.  I had an interview
25      months ago for a director's position.

Page 182

1   Q   What types of jobs are you looking for?
2   A   I'm pretty open because of my skill set.  So I'm
3       pretty open to a job that's a living wage.
4   Q   What types of jobs have you applied for?
5   A   I think I just answered that.
6   Q   Have you applied for?  The same?
7   A   Yes.
8   Q   Okay.  Have you received any offers of employment?
9   A   Not -- not as yet.
10  Q   Do you have any salary requirements that you're
11      looking for when you're applying for jobs?
12  A   A living wage, so some -- some -- a job that is at
13      least on my -- my executive job.  But I'm open to
14      something that -- again, that -- that can pay my
15      bills.
16  Q   What does a living wage mean to you?
17  A   A living wage is something that I can pay my bills.
18  Q   Okay.  So are we talking -- is -- is I guess, is there
19      a -- is there a minimum threshold that you're not
20      looking below?
21  A   Nothing -- nothing under 80,000 with benefits.
22  Q   Are you --
23  A   But I'm open.
24  Q   Are you looking for a job where you would be able
25      to work from home?



REGINA PARKS                                     September 16, 2025
REGINA PARKS vs WAYNE COUNTY, et al.                      183–186

| | Page 183 | | Page 185 |

Page 183

1  A   No.
2  Q   In what geographic areas are you applying for jobs?
3  A   In the Metro Detroit area, but I'm open.
4  Q   So the employers that you identified in your answer
5      to interrogatory number 3, did you receive an
6      interview with any of those companies?
7  A   Yes.
8  Q   Which ones?
9  A   New Beginnings.
10 Q   New Beginnings.
11 A   Uh-huh.
12 Q   Okay.  And did you hear back from them on whether
13     you received the job or not?
14 A   The only reason why I'm not working there is
15     because it's -- it's -- it's not open.
16 Q   Do you have an -- do you believe that they're going
17     to offer you a position when they open?
18 A   Possibly.
19 Q   Are there any applications that are currently
20     pending where you're currently waiting to hear
21     back?  You mentioned the one interview.  Are there
22     any other job applications that are currently --
23 A   I can't recall offhand.  I'm pretty sure, but I
24     just -- I can't recall.
25 Q   You mentioned earlier that your name is plastered

Page 184

1      in the news and on the internet.  Who did that?
2          MS. GORDON:  You mean what media outlets?
3      I don't think she knows what you're referring to.
4  BY MS. DELMASTRO:
5  Q   Well, I'm asking -- okay.  Well, do you know how
6      that happened?
7          MS. GORDON:  How what happened?
8          THE WITNESS:  Because --
9          MS. GORDON:  How the media picked up
10     stories?
11 BY MS. DELMASTRO:
12 Q   I'm -- do you know how it is that you find your
13     name in the news and on the internet?
14 A   Do I know --
15 Q   Do you know how that happened?
16         MS. GORDON:  She filed a federal lawsuit.
17     That's the only thing that's happened.  Public
18     lawsuit.
19         MS. DWYER:  Deb, you're testifying again
20     on behalf --
21         MS. GORDON:  Yes, I am --
22         MS. DWYER:  -- of your client.
23         MS. GORDON:  -- because it's -- the
24     question is not well designed.  You know she filed
25     a federal lawsuit.  It's a public document.

Page 185

1          MS. DWYER:  You can --
2          MS. GORDON:  So I assume you mean
3      anything other than that --
4          MS. DELMASTRO:  I'm --
5          MS. GORDON:  -- which you're happy to ask
6      her, but it's a public litigation against an
7      elected sheriff.  So aside from that, she can tell
8      you if she knows any way the media got the story.
9          MS. DELMASTRO:  I'm not assuming
10     anything.  I'm asking --
11         MS. GORDON:  Well, it's just uncontested
12     facts that there is a public lawsuit against the
13     elected sheriff.  So I just want to be sure.  I
14     mean, that's obvious.  So if you mean other than
15     that, sure.
16         MS. DELMASTRO:  Okay.  Respectfully, I
17     would like you to let the witness answer my
18     questions, please.  It's a very -- that was a very
19     straightforward question.  It was asking --
20         MS. GORDON:  It was not.  How the -- when
21     you said, "How did that happen?"  I don't even
22     understand what it means.  I didn't understand the
23     question.
24         MS. DELMASTRO:  Okay.  I think that you
25     did since you're accusing me of trying to trick the

Page 186

1  witness.
2          MS. GORDON:  No, I'm not at all.
3          MS. DELMASTRO:  I'm asking her --
4          MS. GORDON:  I'm just saying -- I said,
5      "Did you mean other than the fact that a public
6      lawsuit was filed?"
7          MS. DELMASTRO:  I'm the one asking --
8          MS. GORDON:  That's what I --
9          MS. DELMASTRO:  -- the questions right
10     now.
11         MS. GORDON:  I didn't --
12         MS. DELMASTRO:  You are welcome to ask --
13         MS. GORDON:  You're not trying to trick
14     her.
15         MS. DELMASTRO:  -- her follow-up
16     questions.  I didn't say --
17         MS. GORDON:  It's just --
18         MS. DELMASTRO:  -- you were trying to
19     trick her.  I said you were --
20         MS. GORDON:  I didn't say you were, Lina.
21     All I'm saying is it's based -- it's obvious facts
22     that the public lawsuit was filed.  Okay.  What is
23     she supposed to tell you to that?  If she knows of
24     anything else that caused -- and I don't know what
25     you mean when you said, "How did this get out?"

REGINA PARKS
REGINA PARKS vs WAYNE COUNTY, et al.

September 16, 2025
187–190

Page 187

1    Can you be more explicit?
2  BY MS. DELMASTRO:
3  Q   Okay.  Well, Regina --
4          MS. GORDON:  It just seems like a --
5  BY MS. DELMASTRO:
6  Q   -- you said earlier --
7          MS. GORDON:  -- crazy question.
8  BY MS. DELMASTRO:
9  Q   -- that your name has been plastered in the news
10    and on the internet, and I want to know: do you
11    know how that happened?
12  A   Yes.
13  Q   Okay.  How did that happen?
14  A   When I filed a federal lawsuit.
15  Q   That -- and that is -- do you have any other reason
16    that you think it happened?
17          MS. GORDON:  I don't understand that
18    question.
19          But if you understand it, you can answer.
20          THE WITNESS:  Yeah.  Can you repeat -- I
21    mean, I --
22  BY MS. DELMASTRO:
23  Q   Do you think that there is any other -- anything
24    else that would have caused that to happen?  Do you
25    think that someone at the county did something?

Page 188

1          MS. GORDON:  What?
2  BY MS. DELMASTRO:
3  Q   Do you think that -- you know --
4          MS. GORDON:  She wouldn't know what
5    anybody in the county did.
6  BY MS. DELMASTRO:
7  Q   Okay.  Okay.  Other than what you've already
8    described, is there any other way in which your
9    termination harmed you?
10          MS. GORDON:  Again, that's a very broad
11    question.
12          MS. DELMASTRO:  Which she is allowed to
13    answer --
14          MS. GORDON:  I didn't say she wasn't.
15          MS. DELMASTRO:  -- if she understands it.
16          MS. GORDON:  You've already asked her
17    about her damages.
18          MS. DELMASTRO:  That's why I said --
19          MS. GORDON:  Are you going back to that
20  --
21          MS. DELMASTRO:  I said --
22          MS. GORDON:  -- or something different?
23          MS. DELMASTRO:  -- other than what she
24    already testified to.
25          MS. GORDON:  Okay.

Page 189

1  BY MS. DELMASTRO:
2  Q   Is there any other way in which your termination
3    harmed you?
4  A   Yes.
5  Q   Okay.  Please tell me about that.
6  A   Financially.
7  Q   And how -- other than what you've already
8    described, how has it harmed you financially?
9  A   Because I can't pay my bills.
10  Q   Okay.  And other than a loss of income, is there
11    any other reason why you're not able to pay your
12    bills?
13  A   It's -- it's a loss of income.  Yeah.  And it's
14    harmed me emotionally.  It has harmed me just --
15    for my family, my -- my daughter is affected.  It's
16    just -- it's -- it's harmed me in every -- you
17    know, I -- no -- I can't travel.  I can't -- it
18    just -- it's -- it's -- it's harmed me.  Just
19    shopping and just -- my over -- everything in my
20    life has changed since I lost my job.  Everything.
21  Q   Do you know why your federal lawsuit made it to the
22    newspaper and the TV news?
23  A   No.
24  Q   Do you know if every federal lawsuit makes it to
25    the news?

Page 190

1          MS. GORDON:  Okay, stop.  That's
2    argumentative, and it doesn't make any sense.  Not
3    every lawsuit sues an elected sheriff of probably
4    the largest county in the state of Michigan.  So
5    it's a harassing question.  She's no expert in why
6    the media picks up stories, but I think we all can
7    see that 2 and 2 makes 4.
8  BY MS. DELMASTRO:
9  Q   Please answer the question.  Do you know if every
10    federal lawsuit --
11          MS. GORDON:  Okay.
12  BY MS. DELMASTRO:
13  Q   -- makes it to the news?
14          MS. GORDON:  Okay.  Don't answer.  We --
15    I mean, that's not a question, Lina.
16          MS. DWYER:  You're instructing the
17    witness not to answer --
18          MS. GORDON:  Sure.
19          MS. DWYER:  -- the question?
20          MS. GORDON:  That's a harassing --
21          MS. DWYER:  On what --
22          MS. GORDON:  -- meaningless --
23          MS. DWYER:  -- basis?
24          MS. GORDON:  -- question.  It's
25    harassment.



Page 191

1    MS. DWYER:  There's no basis under the
2  Court Rules to instruct a witness not to answer a
3  question on the basis of harassment.
4    MS. GORDON:  Oh, really?
5    MS. DWYER:  Really.
6    MS. GORDON:  Okay.  I'll -- I'm over here
7  representing the plaintiff.  You're not.
8    MS. DWYER:  So you are going to maintain
9  your objection to instruct the witness not to
10  answer?
11    MS. GORDON:  Lina, proceed.
12    MS. DWYER:  Okay.
13    MS. GORDON:  We will stipulate that not
14  every federal lawsuit is covered by the media.
15  That -- that's -- we'll stipulate to that.
16    MS. DELMASTRO:  Okay.
17    MS. GORDON:  Not that my client would
18  know anyway, what a federal lawsuit is or how
19  they're covered, but we'll stipulate --
20    MS. DELMASTRO:  That's why I asked her
21  does she know.
22    MS. GORDON:  No.  No, you didn't ask her
23  for that.  You asked her because you're trying to
24  make a different point, and you're trying to
25  suggest something like you've been doing for about

Page 192

1  the last 10 or 12 questions, trying to get at
2  something else about the media.  But to ask a
3  layperson, "Does the media cover every federal
4  lawsuit?"  That's not a real question to a
5  plaintiff.  Unless the plaintiff is in the media,
6  then the person might know, or an editor of a
7  newspaper.
8  BY MS. DELMASTRO:
9  Q   Again, with my next question, I am not asking you
10     to repeat anything you've already said.  I'm
11     wanting to close it out.  Sitting here at this
12     moment, are there any other facts or situations
13     that you can recall related to your claims in this
14     litigation that we haven't already discussed?
15    MS. GORDON:  Okay.  We are not going to
16  answer this because this is kind of a got you.  You
17  are here to ask your questions.  I'm not going to
18  have my client search her memory after all this
19  long day and try to remember what she has said and
20  what she has not said -- she's probably very tired
21  -- and try to think if there's anything you haven't
22  asked her.  All we're here to do today, with all
23  due respect, is to answer the questions you ask.
24  And your question was --
25    MS. DELMASTRO:  And apparently the

Page 193

1  questions --
2    MS. GORDON:  -- extremely broad.
3    MS. DELMASTRO:  -- that you ask.
4    MS. GORDON:  It was extremely broad.  "Can
5  you think of anything else about your claims?"
6  That's way too broad.
7    MS. DELMASTRO:  Again, I am not trying to
8  trick you.
9    MS. GORDON:  It's a -- it's --
10    MS. DELMASTRO:  We are --
11    MS. GORDON:  Listen, it's -- I'm not
12  going to have her be in a situation where it's on
13  Regina Parks to tell you what else might be
14  relevant.  With all due respect, I think that's
15  your job, to ask her questions.  If you have
16  something specific, like, is there something you
17  haven't told me about talking to somebody that's
18  specific, sure.  But we're not going to have a
19  thing where she's going to try to cover the entire
20  case.
21    MS. DWYER:  Are you instructing the
22  witness not to answer?
23    MS. GORDON:  I'm not talking to you.
24  Lina, if you want to ask me a question or something
25  --

Page 194

1    MS. DWYER:  You're not talking to me?
2    MS. GORDON:  -- go ahead.  No, not about
3  this.  You're not handling this witness.
4    MS. DWYER:  I'm about to.
5    MS. GORDON:  Well, you're not yet.
6    MS. DELMASTRO:  All right.  I was trying
7  to shortcut it, but since you insist, I'm going to
8  ask you to turn back to the complaint that was
9  filed in this case.
10    MS. GORDON:  Okay.  What paragraph?
11    MS. DELMASTRO:  Paragraph 1.
12    MS. GORDON:  Okay.
13  BY MS. DELMASTRO:
14  Q   Have you fully testified today about all the facts
15     related to paragraph 1 of your complaint?
16    MS. GORDON:  Okay.  This is a legal
17  statement.  She doesn't -- she can't answer this.
18  And you're just -- this is now just like a game.
19  But go ahead.  This is nothing that she has
20  anything in addition to.  Because it's --
21    MS. DELMASTRO:  Thank you for your
22  testimony, Deb.
23    MS. GORDON:  It's a -- it's a -- it's a
24  legal question.  It requires a legal answer.
25    MS. DELMASTRO:  Okay.



Case 4:25-cv-10409-SDK-CI   ECF No. 38-4, PageID.1206   Filed 02/20/26   Page 50 of 67

REGINA PARKS
REGINA PARKS vs WAYNE COUNTY, et al.
September 16, 2025
195–198

Page 195

1     MS. GORDON:  It sets forth the legal
2  claims for the record.  That's what paragraph 1
3  sets forth.  My client would not know if there's
4  any other legal claims, any legal violations.
5  BY MS. DELMASTRO:
6  Q   Okay.  All right.  Paragraph 13.  Have you fully
7  testified regarding the facts that support your
8  allegations in paragraph 13 of the complaint?
9     MS. GORDON:  For the record, paragraph 13
10  says, "Almost immediately upon assuming the role of
11  sheriff, defendant Washington began sexually
12  harassing plaintiff along with several other female
13  employees."
14     THE WITNESS:  Can you -- I'm not
15  understanding your question.
16  BY MS. DELMASTRO:
17  Q   We discussed paragraph 13 earlier today.
18  A   Yeah.
19  Q   I'm asking you now: are there any other facts that
20  you're aware of, sitting here right now, other than
21  what we already discussed, that support your
22  allegations in paragraph 13?
23  A   Are -- you're asking me, is there any other women
24  that the sheriff sexually harassed?
25     THE WITNESS:  No.  I'm -- your counsel

Page 196

1  asked me to be more specific, so I was trying to be
2  more specific and go paragraph by paragraph, but
3  all I'm --
4     MS. GORDON:  I didn't ask you to do that.
5  BY MS. DELMASTRO:
6  Q   All I'm trying to get at is: have you fully
7  testified about the facts that underlie this
8  paragraph 13?
9     MS. GORDON:  She --
10  BY MS. DELMASTRO:
11  Q   You already told me all about paragraph 13.
12     MS. GORDON:  She can only testify to the
13  facts that she's aware of.
14     MS. DELMASTRO:  Well, obviously, yes.
15     MS. GORDON:  So that's the question: are
16  there any facts that you're aware of as to
17  paragraph 13 that we haven't talked about?
18     THE WITNESS:  I'm not aware of any other.
19     MS. DELMASTRO:  All right.  I will tender
20  the witness to Ms. Dwyer.
21          EXAMINATION
22  BY MS. DWYER:
23  Q   Good afternoon, Ms. Parks.  At the beginning of
24  your deposition, you testified that you lost a lot
25  of people during COVID around the time of Benny

Page 197

1  Napoleon.  Who else did you lose?
2  A   Who else did I lose?
3  Q   Yes.
4  A   I lost -- I lost my father.  I lost one of my best
5  friends.  I just -- I lost several friends.  Yeah.
6  I lost a lot of people.
7  Q   Did that cause you emotional distress at that time?
8  A   It -- it bothered me very much.
9  Q   The sheriff was appointed in 2021 after Benny
10  Napoleon died.  Around that time, did you have
11  people ask the sheriff to keep you on staff?
12  A   Did I ask the sheriff to keep me on staff?
13     MS. GORDON:  No, people.  She said,
14  "People."
15  BY MS. DWYER:
16  Q   Right, yes.  Not the sheriff.  Did you ask people
17  to contact -- let me ask -- let me finish my
18  question: did you ask people to contact or reach
19  out to the sheriff to keep you on staff?
20  A   I don't recall.
21  Q   Is it possible that you did?
22  A   I don't recall.  I don't remember.
23  Q   Did you have a relationship with a gentleman by the
24  name of Kerry Petties?
25     MS. GORDON:  Hang on a second.  Is he a

Page 198

1  county employee?  I'm not going to have my client
2  answer questions about personal relationships
3  unless they're relevant to the case.
4  BY MS. DWYER:
5  Q   Do you know Kerry Petties?
6  A   Kerry Petties?
7  Q   Yes.
8  A   Yes.
9  Q   Is he a former executive protection --
10  A   Yes.
11  Q   -- person at the sheriff's department?
12  A   Yes.
13  Q   Did you have a relationship with him?
14  A   When?
15  Q   Well, my first question is: did you have a
16  relationship with him?
17  A   We are really good friends.
18  Q   Did you have a sexual relationship with him?
19  A   Yes.
20  Q   When?
21  A   '23, '24.
22  Q   2023 and 2024, or were you correcting --
23  A   '23, '24.
24  Q   Is that relationship over now, the sexual
25  relationship?



REGINA PARKS
REGINA PARKS vs WAYNE COUNTY, et al.

September 16, 2025
199—202

Page 199

1  A   He -- he doesn't live here, so we've -- we've --
2      I've been knowing him for years.  So he's -- he's
3      -- he doesn't live in -- lives in Michigan,
4      like, half the time or something.
5  Q   Did you ever tell him about your claims and
6      allegations against the sheriff?
7  A   Yes.
8  Q   When?
9  A   In '23.
10 Q   Were you having a sexual relationship with Mr.
11     Petties at the same time that you were having a
12     sexual relationship --
13 A   No.
14 Q   -- with Mr. Turner?
15 A   No.
16 Q   Is there anyone else at the county that you had a
17     sexual relationship with?
18         MS. GORDON:  Okay.  I'm not -- I think
19     this is harassing.
20         MS. DWYER:  It's not.
21         MS. GORDON:  What do you mean it's not?
22         THE WITNESS:  No.
23         MS. GORDON:  Hang on.
24 BY MS. DWYER:
25 Q   No?  No one else?

Page 200

1  A   No.  That work for the county?  No.
2  Q   You said that you told Mr. Petties in 2023 about
3      your allegations?
4  A   Yeah.
5  Q   Did he make any suggestions to you about reporting
6      it to human resources?
7  A   No.
8  Q   You testified that in late 2022, there -- of an
9      alleged incident where you claim the sheriff
10     touched you on your buttocks.  Do you remember that
11     line of questioning?
12 A   Repeat it.  I'm sorry.
13 Q   Yes, ma'am.  You testified that in late 2022 -- you
14     didn't know the month -- there was an alleged
15     incident where the sheriff touched you on your
16     buttocks, Do you remember --
17 A   Yeah.
18 Q   -- talking about that?  Okay.  And I think you
19     testified that you went into Mr. Turner's office to
20     report this incident; do I have that right?
21 A   You said in -- repeat the question again.  I'm
22     sorry.
23         MS. GORDON:  What's the underlying
24     question?  What's the original question?
25 BY MS. DWYER:

Page 201

1  Q   You testified that in 2022, there was an incident
2      that occurred where you claim Sheriff Washington
3      touched you on your buttocks; are you with me?
4  A   Yeah.
5  Q   Okay.  And then you testified that you reported
6      this to Mr. Turner in 2023; are you with me?
7  A   Yeah.
8  Q   Okay.  You said you went into his office to make
9      this report; do you recall testifying to that?
10 A   I don't remember going exactly in his office, like
11     walking in his office and telling him.
12 Q   Well, you testified earlier that you went into his
13     office to report the incident.  Are you changing
14     your testimony?
15 A   Let me go back.  Let me think.
16 Q   Okay.
17 A   Yeah, I can't -- I don't.
18 Q   Do you recall when you would have reported this
19     incident to Mr. Turner?
20 A   In '22.
21 Q   Okay.  Earlier, you testified that you reported it
22     to Turner in 2023.  Are you changing your
23     testimony?  It's fine if you are.  I'm just trying
24     to understand when you reported --
25         MS. GORDON:  Okay.  If this is already on

Page 202

1      the record, why are you asking her?
2          MS. DWYER:  I have a follow-up question.
3          MS. GORDON:  Okay.  But it's confusing.
4      This was -- is -- we all know that we --
5  BY MS. DWYER:
6  Q   Do you understand my question?
7          MS. GORDON:  I was still talking.
8          MS. DWYER:  You have to put an -- I'm not
9      going to let you do speaking objections.
10         MS. GORDON:  Well --
11         MS. DWYER:  So if you have --
12         MS. GORDON:  -- then I guess you're --
13         MS. DWYER:  -- an objection --
14         MS. GORDON:  -- not going to get any
15     answer.
16         MS. DWYER:  If you have an objection,
17     place it on the --
18         MS. GORDON:  Okay.
19         MS. DWYER:  -- record.
20         MS. GORDON:  Okay.  We've already been
21     here for -- I don't know what it's now, maybe five
22     hours or something like that.  But you're going
23     back to questions from way earlier in the dep.  I
24     know you're trying to lay a groundwork, but I don't
25     think it's fair to ask my -- what she testified to



REGINA PARKS
REGINA PARKS vs WAYNE COUNTY, et al.

September 16, 2025
203–206

Page 203

1  is what she testified to.
2       MS. DWYER:  I'm trying to go back to that
3  point in the deposition.  Now she's changing her
4  testimony.
5       MS. GORDON:  No, she's not.
6       MS. DWYER:  Which, again, Ms. Parks,
7  that's fine.  I just want to understand --
8       MS. GORDON:  She's not changing her
9  testimony.  Just ask the direct question.  And then
10  if you need to go back and refresh her from the
11  testimony --
12       MS. DWYER:  Thank you.
13       MS. GORDON:  -- you can do that.
14       MS. DWYER:  I don't need you --
15       MS. GORDON:  You're welcome.
16       MS. DWYER:  -- to tell me how to ask my
17  questions.  So if you have an objection, put it on
18  the record.  Otherwise, I'm going to go ahead.
19  You're wasting my time.
20  BY MS. DWYER:
21  Q   Ms. Parks, you testified earlier about this
22  incident.  You testified that you reported it to
23  Mr. Turner in 2023.  Are you maintaining that you
24  did make that report in 2023, or are you now saying
25  it was in 2022?

Page 204

1  A   I made a report to -- to Chief Turner in '22, in
2     '23, in '24.
3  Q   I'm asking about this specific incident where you
4     claim in late 2022, he touched you on your
5     buttocks.  You then said that you reported it to
6     him in '23.
7  A   Yes.  I reported it to him in '23.
8  Q   Okay.  I believe you testified that you went into
9     his office to make this report; do I have that
10     right?
11  A   In '22?
12  Q   No.  In '23, did you go into his office to make
13     this report?
14       MS. GORDON:  Okay.  We're not going to
15  repeat questions and answers.  She's already
16  answered this question.
17       MS. DWYER:  She doesn't --
18       THE WITNESS:  Yeah.
19       MS. DWYER:  Go on.
20       THE WITNESS:  Yeah.
21       MS. GORDON:  Yes, she already --
22       MS. DWYER:  She --
23       MS. GORDON:  -- answered it --
24       MS. DWYER:  Okay.
25       MS. GORDON:  -- with Lina.

Page 205

1  BY MS. DWYER:
2  Q   My question is: did you go into the office to make
3     -- go into his office to make the report, or did
4     you go into his office for some other reason?
5  A   I didn't go into his office to just make the
6     report.  We probably was in conversation and it
7     came up.
8  Q   Isn't it true that you had sex with him on that day
9     in his office, Mr. Turner?
10  A   In what office?
11  Q   In Mr. Turner's office.
12  A   No.
13  Q   Do you deny having sex with Mr. Turner in his
14     office?
15  A   Yes.
16  Q   Were you in regular contact with Mr. Turner during
17     the course of the workweek?
18  A   Yes.
19  Q   Were you required to regularly interact with him
20     due to the nature of your duties and his role as
21     the chief of staff?
22  A   Yes.
23       MS. GORDON:  She's already testified to
24  this, that he was her boss, and everything she did.
25  This is a repeat.  It's already been asked and

Page 206

1  answered.
2  BY MS. DWYER:
3  Q   You testified that you made numerous reports to Mr.
4     Turner.  Did you ever follow up with him to check
5     on the status of those reports?
6  A   Yes, we talked about it.
7  Q   You and Mr. Turner?
8  A   Uh-huh.
9  Q   And you didn't testify to any of that earlier.  So
10     tell me when you would --
11       MS. GORDON:  Excuse me.
12  BY MS. DWYER:
13  Q   -- follow up --
14       MS. GORDON:  She wasn't asked about it
15  earlier, whether she followed up.  She was asked in
16  detail about every single conversation.
17       MS. DWYER:  Is that an objection?
18       MS. GORDON:  What I'm doing here is --
19       MS. DWYER:  You can say, "Asked and
20  answered."  You can say, "Form --"
21       MS. GORDON:  Okay.
22       MS. DWYER:  -- or some other objection.
23       MS. GORDON:  If you're not going to allow
24  me to talk --
25       MS. DWYER:  You cannot be speaking --



REGINA PARKS
REGINA PARKS vs WAYNE COUNTY, et al.

September 16, 2025
207–210

Page 207

1       MS. GORDON:  -- then we're just --
2       MS. DWYER:  -- objections, Deb.
3       MS. GORDON:  -- going to end the dep.
4       MS. DWYER:  You know that.  You've been
5   doing this for a long time.
6       MS. GORDON:  It's not a speaking -- it's
7   not an objection.
8       MS. DWYER:  It's a speaking objection.
9   You're coaching --
10      MS. GORDON:  Okay.  I --
11      MS. DWYER:  -- the witness.
12      MS. GORDON:  I'll make a statement on the
13  record here.  I said from the beginning, we are not
14  having duplicate questions to my client.  She's not
15  going to be cross-examined by the county's lawyer
16  and the sheriff's lawyer on the exact same thing
17  she's already answered to.  So that's not going to
18  happen.  Hence, if you are asking duplicative
19  questions that have already been asked and
20  answered, we are not recovering the same ground.
21  So that's my position in this case, and we're going
22  to stick to it.  She's not going to repeat -- we're
23  not going to repeat answers to questions that were
24  previously asked.
25      MS. DWYER:  I'm going to ask my questions

Page 208

1   --
2       MS. GORDON:  Make your record.
3       MS. DWYER:  -- and you can go right ahead
4   --
5       MS. GORDON:  We are --
6       MS. DWYER:  -- and --
7       MS. GORDON:  We are --
8       MS. DWYER:  -- instruct your witness not
9   to answer if that's what you want to do, and I --
10      MS. GORDON:  I will.
11      MS. DWYER:  -- am happy to go before the
12  court with that.
13      MS. GORDON:  Oh, I'm --
14      MS. DWYER:  I'm entitled to ask the --
15      MS. GORDON:  Okay, good.
16      MS. DWYER:  I'm entitled --
17      MS. GORDON:  You're not entitled --
18      MS. DWYER:  -- to -- let me finish.
19      MS. GORDON:  -- to duplicate questions.
20      MS. DWYER:  Let me finish.  I'm entitled
21  to ask questions.  I'm here on behalf of an
22  individually named defendant.  I've properly
23  noticed this deposition, and I'm entitled to ask my
24  questions.  And this is not -- you yourself
25  admitted that she wasn't asked this question, and

Page 209

1   now you're objecting to it because you're coaching
2   the witness.  So let me ask my questions.
3       MS. GORDON:  If you (indiscernible).
4       MS. DWYER:  If you have an objection, put
5   it on the record.
6       MS. GORDON:  I will.
7       MS. DWYER:  Okay.  Thank you.
8       MS. GORDON:  You don't have to help me
9   out here.
10      MS. DWYER:  I feel like I need to because
11  you're --
12      MS. GORDON:  Well --
13      MS. DWYER:  -- making speaking --
14      MS. GORDON:  -- you're talking --
15      MS. DWYER:  -- objections, and I think --
16      MS. GORDON:  You're talking --
17      MS. DWYER:  -- you know better.
18      MS. GORDON:  Okay.
19      MS. DWYER:  I think you know better.
20      MS. GORDON:  Okay.
21      MS. DWYER:  I'm pretty sure.  Okay.
22      MS. GORDON:  Okay.
23      MS. DWYER:  So --
24      MS. GORDON:  This is all on video, Maria.
25      MS. DWYER:  It's fine, Deb.

Page 210

1       MS. GORDON:  Your performance is all on
2   video.  So --
3       MS. DWYER:  I -- my question is --
4       MS. GORDON:  -- try to slow your voice
5   down.  You're talking extremely fast.
6       MS. DWYER:  If -- Ms. Parks, I know you
7   were given instructions when we started earlier
8   today.  But if at any point you don't understand my
9   question, you can ask me to repeat it or rephrase
10  it.  If you don't know the answer, you can tell me
11  you don't know.  If you need a break, tell me you
12  need a break, okay?
13      MS. GORDON:  I just need to understand
14  the question, too, and you talk very quickly.  So
15  go ahead.
16  BY MS. DWYER:
17  Q   My question was if you ever followed up with Mr.
18      Turner to check on the status of those reports.  I
19      think you said yes?
20  A   So that's when I -- I told him in the car that he
21      had shown me explicit -- sexual explicit video.
22      And that's what I'm saying, when did I -- I follow
23      up.  And then that's when Turner said, "You know,
24      I'm going to talk to his cousin about him and his
25      behavior."

REGINA PARKS
REGINA PARKS vs WAYNE COUNTY, et al.

September 16, 2025
211–214

Page 211

1  Q    Okay.  So I'm going to make sure I understand what
2       you're telling me.  In the car when you told him
3       about your alleged interaction -- and I think that
4       was at the theater?
5  A    Yes.
6  Q    Okay.  Did you follow up from that incident, or he
7       said -- I'm not sure I understand what your answer
8       is.  Did you follow up after telling him about that
9       in the car?
10          MS. GORDON:  This has all been testified
11      to --
12          MS. DWYER:  No, he's --
13          MS. GORDON:  -- previously.
14          MS. DWYER:  No, it hasn't.
15          MS. GORDON:  Yes, it has.
16          MS. DWYER:  Go ahead.
17          MS. GORDON:  She just said it.
18          THE WITNESS:  That's the --
19      (indiscernible).
20          MS. DWYER:  You did not follow up with
21      him after --
22          MS. GORDON:  She just told you what she
23      did.  She asked him about the cousin.
24          MS. DWYER:  If that's asked and answered,
25      that's appropriate, but please stop making speaking

Page 212

1  objections.
2          MS. GORDON:  Well, I have -- this is not
3  a speaking objection.
4          MS. DWYER:  It's just, "Asked and
5  answered," Deb.
6          MS. GORDON:  Okay.  See, I -- you're just
7  talking over me continually.  You're going to eat
8  up your seven hours like this.  Go ahead.
9          MS. DWYER:  You're attempting to eat up
10 my seven hours --
11          MS. GORDON:  Well, I'm --
12          MS. DWYER:  -- by making speaking --
13          MS. GORDON:  No, no.
14          MS. DWYER:  -- objections.
15          MS. GORDON:  You --
16          MS. DWYER:  Go ahead, Ms. Parks.
17          MS. GORDON:  You have an agenda.  You
18 like -- you want to spend time.  So I want to be
19 sure that my client is not repeating.  She just got
20 done telling you about the follow-up.
21          MS. DWYER:  I'm not clear --
22          MS. GORDON:  What's your next question?
23          MS. DWYER:  -- on the follow-up.  Go
24 ahead.
25          MS. GORDON:  Well --

Page 213

1  BY MS. DWYER:
2  Q    In the car, in that situation, did you follow up
3       after telling him that that night?
4  A    Did I follow up?
5  Q    Yes.  Did you follow up with Mr. Turner after you
6       shared with him your alleged interaction in the
7       theater that evening?
8          MS. GORDON:  She just answered that.
9          THE WITNESS:  I -- I just told you what
10      he did again.
11 BY MS. DWYER:
12 Q    Okay.  After that, after you told him, did you
13      follow up to say, "Did you tell anyone?  Did you
14      report it to HR?"
15          MS. GORDON:  It's been answered.
16 BY MS. DWYER:
17 Q    Did you follow up with Mr. Turner?
18 A    No.
19 Q    Thank you.  Did you follow up with him after you
20      reported to him -- you claim you reported to him
21      the other incidents?
22          MS. GORDON:  What other incidents?
23 BY MS. DWYER:
24 Q    The incidents that you testified to earlier and
25      were questioned at length about.  Did you follow up

Page 214

1  with Mr. Turner --
2          MS. GORDON:  She's given --
3  BY MS. DWYER:
4  Q    -- after reporting those incidents --
5          MS. GORDON:  Okay.
6  BY MS. DWYER:
7  Q    -- to him?
8          MS. GORDON:  She's given extensive
9  testimony already about all of her conversations
10 with Turner.
11          MS. DWYER:  Go ahead.
12          THE WITNESS:  I just told him again what
13 he did to me.
14 BY MS. DWYER:
15 Q    So would you repeat the prior incident to him, or
16      -- I'm trying to understand if you asked him, "Did
17      you --"
18          MS. GORDON:  Your answer was fine.
19 BY MS. DWYER:
20 Q    "-- report this to HR, Mike?  What have you done
21      about my concerns?"  Did you ever have these --
22          MS. GORDON:  She just answered --
23 BY MS. DWYER:
24 Q    -- conversations with him?
25          MS. GORDON:  She just answered the



Page 215

1    question.
2         MS. DWYER:  Go ahead.
3         MS. GORDON:  She just answered already.
4         MS. DWYER:  Go ahead.
5         MS. GORDON:  She answered the question.
6         MS. DWYER:  Go ahead.
7         MS. GORDON:  Don't answer further.  You
8    already answered.
9         MS. DWYER:  You're instructing the
10   witness not to answer?
11        MS. GORDON:  Yeah.  She already answered
12   your question.  It's on the record.
13   BY MS. DWYER:
14   Q   You testified that you were afraid of the sheriff,
15       yet you admit that in March of 2023, you went into
16       his office to get water.  Do you remember that
17       testimony?
18   A   Yeah.
19   Q   Okay.  Isn't it true that there's a watercooler
20       near where your office was?
21        MS. GORDON:  It's a yes or no.
22        THE WITNESS:  I don't know where our
23   watercooler is in that --
24        MS. GORDON:  Do you need some water?
25   Okay.  Go ahead.

Page 216

1         THE WITNESS:  I don't know where --
2    BY MS. DWYER:
3    Q   Is the answer, "I don't know"?  You don't know?
4    A   No, no.  I don't know where the watercooler is.
5        And I never said I was afraid of the sheriff.  I
6        was afraid of what could happen in terms of losing
7        my job and --
8    Q   Okay.  Thank you for that clarification.  You were
9        not afraid of him personally, is what you're
10       clarifying?
11   A   Right.  I was afraid of what --
12        MS. GORDON:  Okay.  You answered the
13   question.
14   BY MS. DWYER:
15   Q   You said you drove home.  We just talked about
16       driving home from the theater event with Mr.
17       Turner.  Actually, I think you testified that he
18       brought you back to the downtown office; is that
19       right?
20        MS. GORDON:  Yes, that's what she said.
21   BY MS. DWYER:
22   Q   And you were asked about your address, but I don't
23       think we got your address in ▉▉▉▉▉
24        MS. GORDON:  We're not --
25   BY MS. DWYER:

Page 217

1    Q   Can you please share --
2         MS. GORDON:  We're not putting --
3    BY MS. DWYER:
4    Q    -- your address?
5         MS. GORDON:  You guys don't want
6    addresses on the record, and we're going to do the
7    same.
8         MS. DWYER:  No.  Actually, you put my
9    client's address on the record, and I agreed to
10   designate it as confidential.
11   BY MS. DWYER:
12   Q   And I'm happy to do that here, Ms. Parks, as well.
13        Could you please give us your ▉▉▉▉
14       address?
15   A   Yes.
16   Q   Please go ahead.
17   A   ▉▉▉▉▉▉▉▉▉▉▉▉▉▉
18   Q   And in relation to where you were in ▉▉▉▉▉
19       about how far was your home from the theater in
20       Royal Oak?
21   A   I'm not for sure.
22   Q   Was it more than 15 minutes?
23   A   I don't know because I don't go to Royal Oak
24       Theatre too much.
25   Q   Do you need to pass by your ▉▉▉▉ address in

Page 218

1    order to get back to the Detroit office?
2    A   Not sure.
3    Q   You're not sure from where the theater was?
4    A   You could possibly pass it.  Yeah.
5    Q   You testified that you sat around with the
6        appointees and talked about the sheriff's
7        behaviors.  I'm trying to understand where this
8        was.  Was it in a conference room?
9    A   It was in a -- it was various occasions.  But you
10       -- oh, you're talking about -- which time -- which
11       time?
12   Q   Well, this was in relation to paragraph 18 in your
13       complaint.  I'm trying to understand: where would
14       these conversations occur?
15        MS. GORDON:  Which conversation are you
16   talking about?  What conversations are you
17   referring to?
18   BY MS. DWYER:
19   Q   Do you understand my question?
20   A   No, because I don't know which conversation you're
21       talking about.
22   Q   Okay.  You testified that you sat around with
23       appointees and others and talked about the
24       sheriff's behaviors as it relates to paragraph --
25        MS. GORDON:  Well, she said --



Page 219

1 BY MS. DWYER:
2 Q -- 18 in your complaint.
3 MS. GORDON: -- she did that on one
4 occasion, I think she testified to. But are you
5 asking the location?
6 MS. DWYER: Yes.
7 BY MS. DWYER:
8 Q Where did that occur?
9 A Where did the -- where did -- it's different -- I
10 need you to repeat it again. I am so sorry.
11 Q Okay. You testified -- do you recall testifying
12 that you sat around with appointees and others and
13 talked about the sheriff's behaviors?
14 MS. GORDON: She already said yes to
15 that. So we want -- you wanted to know the
16 location, I think.
17 THE WITNESS: The location where we sat
18 and talked about --
19 MS. GORDON: Yeah.
20 THE WITNESS: One particular time was,
21 you know, in the boardroom, in the conference room.
22 BY MS. DWYER:
23 Q Okay. And is this, like, an open area?
24 A It's a conference room with a closed door.
25 Q Did you share any of your allegations that you

Page 220

1 talked about today in this open conversation in the
2 conference room?
3 A No, because this particular time was -- these
4 particular times was when we were talking about the
5 sheriff's schedule, and it was brought up with his
6 staff, again, how he may have acted or reacted with
7 people in the public. Is that what you're talking
8 about?
9 Q Well, I'm trying to clarify your testimony --
10 A Okay.
11 Q -- from earlier, and I --
12 MS. GORDON: Okay.
13 BY MS. DWYER:
14 Q -- wanted to understand if you, during those -- it
15 sounds like it was during one meeting, shared any
16 of the claims you're making in this lawsuit during
17 that open conference meeting.
18 A I -- I don't remember.
19 Q Have you reviewed the declaration of Michael T.
20 Turner as -- which was produced to your counsel in
21 this case?
22 A Yes.
23 Q Okay. Earlier, you were asked about your frequency
24 in drinking, and you -- I think you testified that
25 you're a social drinker.

Page 221

1 MS. GORDON: She said more than that, but
2 that was part of it. Go ahead.
3 BY MS. DWYER:
4 Q Are you more than a social drinker?
5 MS. GORDON: She's already testified to
6 this.
7 THE WITNESS: I'm a social drinker and a
8 sometimes drinker.
9 BY MS. DWYER:
10 Q In Mr. Turner's declaration, he states that,
11 "Plaintiff appeared to struggle with alcohol," that
12 you would "come to work intoxicated." Do you admit
13 that you would come to work intoxicated or deny
14 that?
15 A Deny it. Never.
16 Q Would you call Mr. Turner after hours intoxicated?
17 A No.
18 Q Would you call Mr. Turner's staff members after
19 hours while intoxicated?
20 A No.
21 Q And despite his sworn statement saying that you
22 would do these things, your testimony is that these
23 things did not happen?
24 A No.
25 Q Earlier, you testified that Mr. Turner initiated

Page 222

1 your sexual relationship. In his sworn
2 declaration, Mr. Turner states that you initiated
3 the relationship. Did you see that in his
4 declaration?
5 A Yes.
6 Q And despite his sworn statement saying that you
7 initiated it, are you maintaining that it was Mr.
8 Turner who initiated the relationship?
9 A That is correct.
10 Q You were questioned and you spoke at length today
11 about the BMF event. Okay. In Mr. Turner's sworn
12 affidavit, he states that you did not complain to
13 him regarding any harassing behavior from the
14 sheriff following the BMF event. Did you see that
15 in his affidavit?
16 A Yes.
17 Q Okay. Despite his sworn testimony in his
18 declaration, do you maintain that you did complain
19 to him regarding the sheriff's behavior after the
20 BMF event?
21 A 100 percent, yes.
22 Q Have you reviewed the statements that were
23 presented in this case regarding the November 25th
24 --
25 MS. GORDON: It's not the 25th. That's



Page 223
1    the date on the document.  I think you're talking
2    about the -- that's November 13th --
3            MS. DWYER:  Thank you.
4            MS. GORDON:  -- but they're dated the
5    25th.
6    BY MS. DWYER:
7    Q    On November 13th, the sheriff held the reorg
8    meeting.  You talked and were questioned at length
9    about that.  Have you reviewed the statements that
10   were submitted by Rashidah Gamble, Rashaun
11   Whitehead, Danielle Stephens, and Erica Hill
12   regarding --
13   A    Yes.
14   Q    -- that day?
15   A    Yes.
16   Q    I'm going to ask you some questions about that.
17   Prior to going into that meeting, had Mike Turner
18   told you about the sheriff's plans to reorganize
19   the community and recruitment department?
20   A    No, not really.
21   Q    You testified that you talked to Rashidah.  Was it
22   on the date of the meeting or after the date of the
23   meeting?
24           MS. GORDON:  She's already testified to
25   this.

Page 224
1            MS. DWYER:  Go ahead.
2            THE WITNESS:  Can you repeat it?
3            MS. DWYER:  Yes.
4            THE WITNESS:  I'm so sorry.
5    BY MS. DWYER:
6    Q    You testified that you talked to Rashidah Gamble.
7    And I'm trying to understand: was this on the day
8    of the reorg meeting or after the day of --
9            MS. GORDON:  Lina already covered this.
10   BY MS. DWYER:
11   Q    -- the reorg meeting?  Go ahead.
12           MS. GORDON:  Go ahead.  You can --
13           THE WITNESS:  It was on the day.
14   BY MS. DWYER:
15   Q    Okay.  In Rashidah's statement, she says that you
16   "demonstrated notable emotional distress" upon your
17   arrival to the meeting.  Do you agree that you were
18   exhibiting notable emotional distress that day, or
19   do you deny that?
20   A    I deny it.
21   Q    Rashidah goes on to say that throughout the
22   announcements during the meeting, you made "audible
23   disparaging comments."  Do you deny making audible
24   disparaging comments, or do you agree that you were
25   doing that?

Page 225
1    A    I deny.  I was pretty quiet.
2            MS. GORDON:  We don't know what she means
3    by her definition of disparaging.
4    BY MS. DWYER:
5    Q    Rashidah goes on to say, after the meeting's
6    conclusion, you "became visibly agitated" upon
7    learning that you would be relocating your office
8    to a cubicle.  Do you admit that you became visibly
9    agitated, or do you deny that?
10           MS. GORDON:  We don't know what she means
11   by visibly agitated; do you?  I mean, what's your
12   definition of that?
13           MS. DWYER:  (indiscernible).
14           MS. GORDON:  Shaking her head, frowning,
15   what's --
16           THE WITNESS:  Yeah, I don't --
17           MS. GORDON:  What's the definition?
18           MS. DWYER:  If you have an objection,
19   once again, Deb --
20           MS. GORDON:  Yeah.  The objection is
21   there's no definition, and the person that's making
22   that comment is not here.  We don't know what she
23   means by it, so it can't be answered.
24           MS. DWYER:  I don't understand what that
25   objection is.

Page 226
1            MS. GORDON:  I'm sorry.
2            MS. DWYER:  Is this a form objection?
3    What are you --
4            MS. GORDON:  It's what I --
5            MS. DWYER:  -- trying to do here --
6            MS. GORDON:  It's what I said.
7            MS. DWYER:  -- besides coaching the
8    witness once again?
9            MS. GORDON:  No, I'm trying to tell you
10   that you're asking her questions about what
11   somebody else's verbiage is about what they
12   consider --
13           MS. DWYER:  These are speaking
14   objections.
15           MS. GORDON:  I was --
16           MS. DWYER:  They're inappropriate --
17           MS. GORDON:  I was talking.
18           MS. DWYER:  -- under the Federal Court
19   Rules --
20           MS. GORDON:  I was talking.
21           MS. DWYER:  -- and you have been doing
22   that since we got here at --
23           MS. GORDON:  Okay.  I was talking.
24           MS. DWYER:  -- 9:30 this morning.
25           MS. GORDON:  Okay.  I'm sorry.  This --



Page 227

1  it's -- I'm going to tell my client and you if
2  you're asking her questions about what somebody
3  else's perception is and we don't have a definition
4  from you -- if you want to describe for us what --
5  and ask, "Did you do this?"  Regina will happily
6  answer it.  But you're asking her to adopt somebody
7  else's words.  She doesn't know what this --
8          MS. DWYER:  I'm not doing that.
9          MS. GORDON:  Yes, you are.
10         MS. DWYER:  I'm asking her how --
11         MS. GORDON:  Whether she adopts this --
12         MS. DWYER:  I think that the --
13         MS. GORDON:  -- statement's definition.
14         MS. DWYER:  -- word "frustration" is a
15 pretty common term.
16         MS. GORDON:  You didn't use the word
17 "frustration."
18         MS. DWYER:  If you have any questions --
19         MS. GORDON:  You said "visibly
20 frustrated."  What did that mean to that speaker?
21         MS. DWYER:  Okay.  Ms. Parks --
22         MS. GORDON:  It's not fair to ask my
23 question if she's lying.  Ask my client if she was
24 visibly frustrated, not if that's what the witness
25 --

Page 228

1          MS. DWYER:  It appears that you're
2  becoming visibly frustrated, Deb, and I --
3          MS. GORDON:  I am because --
4          MS. DWYER:  -- ask that you please lower
5  your tone.
6          MS. GORDON:  Because --
7          MS. DWYER:  It's inappropriate.  It's
8  unprofessional.
9          MS. GORDON:  You're funny.
10         MS. DWYER:  Okay.
11         MS. GORDON:  Go ahead.
12 BY MS. DWYER:
13 Q   Ms. Parks, once again, if you don't understand my
14    question or need me to repeat it or rephrase it,
15    please, I'm happy to do that, okay?
16         MS. GORDON:  It's not that she doesn't
17    understand the question.  It's that I'm objecting
18    that she does not know what that individual meant
19    by "visibly frustrated."  If you want to ask the
20    witness what her definition of visibly frustrated
21    would be, then she could answer the question.
22         MS. DWYER:  Once again, Deb, we've been
23    doing this a long time, you and I.  I think that is
24    "calls for speculation," and then you can place
25    that objection on the record, and your client can

Page 229

1  go ahead and answer it.  What you're doing is
2  coaching the witness, as you've been doing all day.
3  I'll ask that you stop doing that.  It's
4  inappropriate under the Court Rules.
5  BY MS. DWYER:
6  Q   Go ahead (indiscernible).
7          Okay.  I'm going to ask you again.
8      Rashidah reports that you vocalized your
9      frustration after this meeting and that --
10 A   Okay.
11 Q   -- you "used inappropriate language."  Did you use
12     inappropriate language after the meeting?
13 A   After the meeting?
14 Q   Yes, ma'am.
15 A   I don't know what inappropriate language would be.
16     Was it between me and her talking and behind the
17     closed door, or?
18 Q   She labels this as "post-meeting interaction," so
19     this would be between you and her.  Did you curse?
20 A   Did I curse?
21 Q   Yes, ma'am.
22 A   Yes.
23 Q   You did.  What did you say?
24 A   Which time?
25 Q   After the meeting and before you went into the

Page 230

1      executive suite, and we'll get to that.
2  A   I'm pretty sure I probably used a four-letter word
3      while I was talking to her behind closed doors.
4  Q   Did you go into a smaller office after the general
5      announcements were made by the sheriff?
6  A   I'm sorry.  Repeat it again.  I'm so sorry.
7  Q   Yes, ma'am.  You said you might have used a
8      four-letter word in an office after -- in privately
9      to her.  So my --
10 A   Yeah.
11 Q   -- question is: did you and Rashidah go into a
12     private office or a private area to talk about what
13     had occurred during the meeting?
14 A   No.  I mean, I just went over to the sheriff's
15     suite.
16 Q   Okay.
17 A   Yeah.
18 Q   So let's do this.  You --
19 A   I said, "Fuck."
20 Q   You said, "Fuck."  Thank you.
21 A   Yeah.
22 Q   Thank you.  You go into this meeting with the
23     sheriff, and the reorganization is discussed.
24 A   Yes.
25 Q   Okay.  About how long did that meeting last?



REGINA PARKS                                                September 16, 2025
REGINA PARKS vs WAYNE COUNTY, et al.                               231–234

Page 231

1  A   45 minutes, maybe.
2  Q   Okay.  Who spoke during the meeting?
3  A   The sheriff.
4  Q   Did anyone else speak?
5  A   Michael Turner.
6  Q   Did you speak?
7  A   Yes.
8  Q   Okay.  What did you say during the meeting?
9  A   I said very little.
10 Q   What do you recall saying?
11 A   I was just asked something -- I just introduced
12     myself and what I did before or something.
13 Q   Okay.
14 A   Yeah.
15 Q   Did other people do the same thing?
16 A   Yes.
17 Q   Did you go around?
18 A   Uh-huh.
19 Q   Okay.  And then did anyone else say anything else?
20     Other than the sheriff doing his presentation, was
21     -- were there other speakers there?
22         MS. GORDON:  You mean other than what
23     she's already said --
24         MS. DWYER:  Yes, ma'am.
25         MS. GORDON:  -- like everybody going

Page 232

1      around?
2          MS. DWYER:  Yes.
3          THE WITNESS:  Other people said a few
4      things, but not a lot.
5  BY MS. DWYER:
6  Q   Other than you sharing who you were and what you
7      did, did you say anything else during that meeting?
8  A   No.  I was pretty quiet.
9  Q   Okay.  And you said it lasted about 45 minutes?
10 A   Uh-huh.
11 Q   Okay.  Where did you go immediately after the
12     meeting ended?
13 A   I went straight to my office.
14 Q   Okay.  And you went into your office.  Did you shut
15     the door?
16 A   No.
17 Q   What did you do next?
18 A   I was just, like, sorting some papers in my office.
19 Q   Did Rashidah come into your office?
20 A   No.
21 Q   Okay.  When did you -- when did you first come
22     across Rashidah after that meeting?
23 A   I'm not sure.
24 Q   She didn't come into your office, though?
25 A   She came to my office, like, later in the day.

Page 233

1  Q   Okay.  How long were you in your office before you
2      went up to the executive suite?
3  A   How long was I in my office?
4  Q   Yes, ma'am.
5  A   Pretty much all day.  I -- I was moving things from
6      -- from the storage room into my car and stuff like
7      that.  But I was pretty much in my office majority
8      of the day.
9  Q   Why were you moving things from the storage room to
10     your car?
11 A   Because I had some of my personal belongings in the
12     storage room.
13 Q   Okay.  Were you trying to downsize so you could
14     move your things into the cubicle?  Trying to --
15 A   Yes, I had a lot of stuff.
16 Q   Okay.  About how long did it take you to move the
17     items from the storage to your car?
18 A   It took a -- a while because it was, like, a dolly
19     or something, and someone else was using it.  Erica
20     Hill was using it.
21 Q   At --
22 A   So -- so I -- I -- I don't know the time.
23 Q   At what point did you run into or see Rashidah
24     during the course of this day?
25 A   Not sure.

Page 234

1  Q   Was it hours after the meeting, close in time from
2      the meeting?
3  A   When -- say it again one more time.
4  Q   Yes, ma'am.  So you leave the meeting, you go into
5      your office, and you're packing up and taking
6      things to your car.  At what point do you run into
7      Rashidah?  Is it in the middle of the day, shortly
8      after you get into your office?
9  A   Well, I see Rashidah because she's right in front
10     of my -- she -- her cubicle is right in front of my
11     office.  So it's on the wall right in front of my
12     office, so I can kind of see her.
13 Q   Were you discussing with her, from your office to
14     where she's at, what happened in that meeting?
15 A   No.
16 Q   Okay.  When did you use the F-word to Rashidah?
17 A   I didn't use the F-word to Rashidah.  I -- I said
18     it inside the -- the office, inside the --
19     sheriff's office.  So it wasn't really directed at
20     Rashidah or, like, me talking.  I just -- I mean,
21     it was just me kind of talking.
22 Q   Okay.  So Rashidah says you "used inappropriate
23     language."  You said you used the F-word.
24 A   Yeah.
25 Q   In what context did you use the F-word?



REGINA PARKS
REGINA PARKS vs WAYNE COUNTY, et al.

September 16, 2025
235–238

Page 235

1  A    I -- I said, "I don't give a fuck."
2  Q    Okay. And she says that you voiced that your
3       concerns were not primarily about your title or
4       compensation but about your workspace preferences.
5       Did you tell Rashidah that you were concerned about
6       your workspace being changed?
7  A    Yes.
8  Q    What did you say to her?
9  A    From what I remember, I said, you know -- the first
10      thing is she wouldn't move her belongings, so I'm
11      just -- the sheriff said, "You need to move your
12      belongings immediately, like, today." And he made
13      sure, "today." So she didn't move her belongings,
14      so I'm just, like, stuck with my stuff in my -- my
15      office. Mark Diaz is moving in my office, so it's
16      like, "Move your stuff." And that was -- the --
17      the -- the first time was when she was in my office
18      with me, and I asked her to move her stuff, and she
19      said, "You have to wait."
20 Q    And what did you say?
21 A    I just waited.
22 Q    At some point that day, did Rashidah move her
23      things so that you could --
24 A    No.
25 Q    -- move to her area?

Page 236

1  A    No.
2  Q    Were you taking over her cubicle space?
3  A    Yes.
4  Q    Okay. Did you make provocative statements to
5       Rashidah, including verbal threats towards the
6       sheriff?
7  A    No. I just told her that I have this -- this
8       recording. I was tapping the -- the phone, and I
9       told her that he had showed me a -- a -- the
10      video of the woman performing oral sex on him.
11 Q    What did Rashidah say to you?
12 A    She was like, "Girl, you a fool."
13 Q    At some -- when she called you a fool, was this
14      because you were -- you had sworn? And she says,
15      "using inappropriate language." Is that the only
16      swear words you used, the F-word?
17         MS. GORDON: Okay. You just asked two
18      different questions.
19         MS. DWYER: Yeah. Let me fix that
20      question.
21 BY MS. DWYER:
22 Q    The only swear words you used, was it the F-word,
23      and was it on one occasion?
24 A    I remember saying the F-word in -- in the sheriff's
25      -- in the office -- I mean, in his suite. And I --

Page 237

1         I probably said another curse word inside my
2         office. You know, I -- I probably -- it was
3         between me and her. We talk, you know. She -- she
4         vents to me. I vent to her. Rashaun vents to me.
5         I vent to her. They come to my office when they
6         want to get away from the sheriff and vent to me
7         about what's going on. It was normal. It was our
8         normal behavior all the time. That's what we did.
9  Q    She describes your demeanor as being "highly
10      agitated." Would you --
11         MS. GORDON: Let's just --
12 BY MS. DWYER:
13 Q    -- agree?
14         MS. GORDON: I'm going to show her the
15      document.
16         MS. DWYER: We have to take a break
17      because the videographer has to change the memory
18      card.
19         MS. GORDON: Can I ask the videographer
20      how long we've been on?
21         THE VIDEOGRAPHER: Yes. Just a second.
22      Let me read us off the record real quick.
23         We're going off the record. The time is
24      5:13 p.m. We're off the record.
25         (A recess was taken.)

Page 238

1         THE VIDEOGRAPHER: We are now back on the
2         record. The time is 5:21 p.m.
3  BY MS. DWYER:
4  Q    Ms. Parks, before we took a break, I was asking you
5       about your interaction with Ms. Rashidah Gamble.
6       She writes in her statement that she "attempted to
7       deescalate the situation" and that you "remained
8       highly agitated." Do you agree that you were
9       highly agitated after the sheriff's announcement?
10         MS. GORDON: Here, here. Take a look at
11      what she said right here.
12         THE WITNESS: Yeah. I was agitated.
13 BY MS. DWYER:
14 Q    You said she called you a fool. Is that -- what
15      did you say? How -- what --
16         MS. GORDON: "Girl, she's a -- you're a
17      fool."
18         THE WITNESS: She said -- and she didn't
19      say, "fool." She said, "Girl, you a fool."
20 BY MS. DWYER:
21 Q    Okay. Do you know what --
22 A    I got a problem --
23 Q    -- she meant by that?
24 A    I don't know, but I got a problem with somebody
25      calling me a fool. That's, like, a whole Bible



REGINA PARKS
REGINA PARKS vs WAYNE COUNTY, et al.

September 16, 2025
239–242

Page 239

1    thing.  You don't call people fools.
2  Q   What did you say to her when she said that to you?
3  A   You know, I didn't say anything.  I -- I -- we had
4      a decent relationship.  I -- I -- I didn't -- I
5      didn't check her on it.  I didn't.
6  Q   Do you believe she was -- she made that statement,
7      "Girl, you a -- you're a fool," because you were
8      highly agitated after the sheriff's announcement?
9  A   No.  She made that statement when we were in the --
10     in my office.  And when I -- when I told her about
11     the -- the -- the video, she was like, "I --" like,
12     almost like she didn't want to hear it, like, "I
13     don't want to hear that."
14 Q   Okay.  At some point, did you go into the sheriff
15     and the chief's executive suite?
16 A   Yes, I did.
17 Q   Okay.  Do you know about what time in the day did
18     you go into the sheriff's and the chief's executive
19     suite?
20 A   Around 4:00-ish, somewhere around that.
21 Q   So help me understand: who's in that suite area?
22     Is it just the sheriff and the chief?  Who's in
23     there?
24 A   So --
25 Q   And by that, I mean, not on that day.  What's the

Page 240

1      setup of that suite -- executive suite space?
2  A   So when you first come in the -- the -- the office,
3      you have Rashaun's -- you have Rashaun's desk right
4      when you first come in.  To the left, at that time,
5      you had Olivia's desk.  And then when you going
6      towards further left, you had Danielle's desk.  And
7      then on the back walls -- and I'm -- I'm still
8      trying to remember.  It was the undersheriff's
9      office to the back left, like, to the end.  David
10     Melton's office, like, maybe in the middle, maybe,
11     I think.  Then you have Michael Turner's desk -- I
12     mean, office almost, like, behind Rashaun's, like,
13     on the wall.  They're all on this wall.  And then
14     you have the sheriff's office at the end.
15 Q   Corner office?
16 A   The corner office.
17 Q   Okay.  Is there a seating area when you walk into
18     the executive suite?
19 A   No.
20 Q   Okay.  So you walk into the executive suite.  About
21     what time of the day is this?
22 A   Again, around, like, 4:00-ish.
23 Q   4 o'clock.
24 A   I think.
25 Q   Okay.  When you walked in, who's in the executive

Page 241

1      suite at that time?
2  A   From my understanding, when I came back there,
3      Danielle was to the left in her -- at her desk, and
4      Rashaun was sitting at her desk, and Rashidah was
5      standing up.  Michael Turner, Mara MacDonald, and
6      the sheriff was all together in his office, in the
7      corner office on the end.
8  Q   Okay.  So you walk into the office.  Did you remain
9      standing at --
10 A   Yeah, I was --
11 Q   -- all times?
12 A   I'm sorry.
13 Q   Go ahead.
14 A   No, I'm --
15 Q   Do you remain standing at all times when you were
16     in the office suite?
17 A   Not -- not at all times.
18 Q   Okay.  How long were you in the office suite?
19 A   It was not long.  Less than ten minutes.
20 Q   Why did you go in there?
21 A   Because Michael Turner said, "I need to see you
22     before you leave."
23 Q   When did he tell you that?
24 A   Earlier in the day, I think when he walked by or
25     something.  "Make sure you see me before you leave."

Page 242

1      That was something that he would say to people.
2  Q   Was this before the sheriff's reorganization
3      meeting or after the sheriff's reorganization
4      meeting?
5  A   After.
6  Q   That Mike told you this?
7  A   Yes.
8  Q   Okay.  So Rashidah goes on to say that you
9      "interrupted and confronted the group."  Would you
10     describe your conduct as confrontational when you
11     walked into the office suite?
12 A   Was it -- say it again one time.  I'm sorry.
13 Q   Sure.
14     MS. GORDON:  It's right here.
15 BY MS. DWYER:
16 Q   Would you describe your conduct as confrontational?
17 A   No.
18 Q   Your demeanor, your conduct when you --
19 A   No.
20 Q   -- walked in?
21 A   No.
22 Q   Okay.  So you disagree with Rashidah?
23 A   I disagree with "confrontational."
24 Q   Okay.  Did you interrupt Rashaun Whitehead and
25     Danielle Stephens when you went into the executive



REGINA PARKS
REGINA PARKS vs WAYNE COUNTY, et al.

September 16, 2025
243–246

Page 243

1   suite?
2   A    I don't believe that I was interrupting.  I didn't
3        know that I was interrupting.  I was buzzed in.
4        Danielle was in her cubicle, and Rashaun --
5        Rashidah was just standing up, you know, at the
6        desk with Rashaun.  So I did not believe that I was
7        interrupting anything.  I just came in like I
8        normally do.
9   Q    She goes on to say that you used "aggressive and
10       inappropriate language."  Were you aggressive when
11       you went into the executive suite?
12  A    I wouldn't say I was aggressive at all, but I
13       probably was a little agitated and irritated.
14  Q    Did you use inappropriate language?
15  A    I said, "I don't give a fuck."
16  Q    Did you say it one time?
17  A    I'm not -- I don't recall.  I don't -- I don't
18       remember how many times I said it.
19  Q    Okay.  Other than saying, "I don't give a fuck,"
20       and you're not sure how many times --
21  A    Yeah.
22  Q    -- did you say anything else, any other curse
23       words?  We'll start there.
24  A    No.  I -- I -- I don't -- I don't remember.
25  Q    Were you loud?

Page 244

1   A    No.  The -- the -- the -- those -- they're so thin,
2        the walls there.  I -- I wouldn't even be loud to
3        disrespect -- she told me that he -- that the
4        sheriff was in a meeting.  So I would never do
5        anything like that, be -- just being there just
6        loud like that.  It was our normal talk.  Like, I
7        was upset -- a little upset, but that was our
8        normal -- when we get together and kind of talk,
9        like, that's -- that's what we did when -- when we
10       vented, myself and Rashaun and Rashidah.  I didn't
11       really talk much to Danielle.  I didn't talk to her
12       about much of anything.  But yeah, that's kind of
13       how we -- how we work.
14  Q    She says that you became increasingly loud.  While
15       you were in the executive suite, did you raise your
16       voice?
17  A    I'm not sure if I raised my voice -- got -- if it
18       got, like, louder or --
19  Q    Okay.
20  A    -- you know, I was -- I was a little upset.
21  Q    Were you using your arms?  She says you were
22       "demonstrative," so were you failing your arms at
23       all?
24  A    I -- I don't remember.
25  Q    Is it possible?

Page 245

1   A    I -- I just don't remember.
2   Q    She goes on to say that you slapped your vaginal
3        area while stating, "I do not need this shit.  I
4        have this."  Do you deny saying that?
5   A    I probably said, "I -- I don't need this shit."
6   Q    Did you slap your vaginal area?
7            MS. GORDON:  This has been covered --
8            THE WITNESS:  No.
9            MS. GORDON:  -- extensively by Lina.
10  BY MS. DWYER:
11  Q    Did someone ask you to leave the executive suite?
12  A    No.  No.
13  Q    I'm going to turn now to Rashaun Whitehead's
14       statement.  She says -- in addition to what you
15       shared, that you said, "I don't give a fuck," she
16       says that you said, "I am fine.  I don't care about
17       this place"; did you say that?
18  A    Yeah.
19  Q    Did you say, "I'm mad at losing the lottery because
20       my friend's birthday came up"?
21  A    Yeah, it was 6220.  His number came -- his birthday
22       came up.
23  Q    Were you pacing back and forth while you were in
24       the executive suite?
25  A    Yeah, I was walking.  Yeah, I was walking.  I don't

Page 246

1   know if it was pacing, but I was walking.
2   Q    She describes your tone as being "angry."  Were you
3        talking in an angry tone?
4   A    I probably was angry a little, yeah.
5   Q    Now, while Rashidah says you were "increasingly
6        loud and demonstrative," Rashaun describes your
7        conduct as "yelling."  Were you yelling?
8            MS. GORDON:  You already asked this, I
9        believe.
10           THE WITNESS:  Like I said, I -- my voice
11       might have been a little -- little -- a little --
12       like, I was upset.  But I knew that the sheriff and
13       Turner was in that office, and I -- that's not my
14       demeanor to do something like that and to
15       disrespect his office like that.  And -- and they
16       would have came out, especially Turner.  They --
17       somebody would have came out like, "What the heck
18       is going on?"  So -- and -- and the walls is so
19       thin in there.  So that's very surprising that --
20       you know, to -- to hear that.  Was I angry?  I was
21       a little angry, yeah.  But to -- to be disruptive,
22       no, I -- that's just -- I wouldn't do that.  That's
23       just not me.
24  BY MS. DWYER:
25  Q    Did you say, "This is bullshit"?



REGINA PARKS
REGINA PARKS vs WAYNE COUNTY, et al.

September 16, 2025
247–250

Page 247

1    MS. GORDON:  She already answered this, I
2    think, a few minutes ago.
3    THE WITNESS:  I don't -- I don't -- I
4    don't recall saying "bullshit."
5  BY MS. DWYER:
6  Q   Did Rashaun tell you to sit down and cool off?
7  A   Yeah.  Rashaun said, "Sit down -- girl, sit down
8    and cool off."  She said, "Sit your ass down."
9    That's exactly what she said.
10  Q   Did she tell you to cool off?
11  A   She said, "Sit your ass down."  She didn't say,
12    "Cool off."  She said, "Sit your ass down."
13  Q   She said you sat in a few -- in the -- in the chair
14    for a few seconds and then began pacing the suite
15    again.
16  A   I got up.
17  Q   Did you do that?
18  A   Yeah.  I got -- I got up.  Yeah.  I didn't want to
19    --
20  Q   Did you --
21  A   I didn't want to sit down.
22  Q   Did you --
23  A   I'm sorry.
24  Q   Sorry.  I'm sorry, too.  You know, I don't mean to
25    talk over you.  So you said you got up, but then

Page 248

1    did you begin pacing again?
2  A   I -- I didn't sit there long, so I know I got up
3    and just --
4    MS. GORDON:  She never said she paced
5    earlier.  She said she walked.
6    THE WITNESS:  Yeah.  I -- I just -- I
7    just got up and, you know, like, I was waiting for
8    him, and he -- and I was just ready to leave, but I
9    didn't want to leave and he -- he would have said,
10    "Well, why did you leave?  I told you -- I gave you
11    a directive to stay."
12  BY MS. DWYER:
13  Q   So when you got up, did you walk back and forth?
14  A   Yeah.  I walked over to get some candy or something
15    that was over at the end where -- like, the kitchen
16    part.
17  Q   Did you stay over there, or did you walk back over
18    to a different area?
19  A   I possibly could have walked back, but it wasn't,
20    like, a pace, like a -- yeah, it wasn't like a --
21  Q   How would you describe it?  Was it a walking --
22  A   I --
23  Q   -- back and forth?
24  A   It was just -- it was like I was about to walk back
25    over and sit down, but I didn't want to stay.

Page 249

1  Q   She says that you stayed for another 15 minutes.
2    You shared earlier you thought it was about 10.  Is
3    it possible it was longer than that?
4  A   No, I don't remember staying in there that long.
5  Q   She says that you said to Danielle and Rashidah
6    that you "don't care about this place, changes that
7    just happened," and you "just wanted your office."
8    Did you say those things?
9  A   I said, "I don't care about this," and I said
10    something -- I'm -- I'm pretty sure I said
11    something about a office.
12  Q   And then you shared with -- earlier with Sister
13    Counsel about calling Rashaun that evening.
14  A   Yes.
15  Q   Okay.  Now, you testified that you called Mike
16    Turner that evening, I believe; is that right?
17  A   Mike Turner called me.
18  Q   Okay.  Thank you for that clarification.  And you
19    testified earlier that you said to him, "You didn't
20    advocate for me"; is that right?
21  A   That was when I left -- when I left the office.  He
22    -- he called my cell phone and said, "You left --"
23    I mean, "Are you still in the office?  You -- did
24    you leave?"  He said -- he said, "You -- are you
25    still in the office?  Did you leave?"  Just, like

Page 250

1    -- like, something like that.
2  Q   And what did you say to him?
3  A   I said, "I left."
4  Q   And then what did he say?
5  A   I'm not sure.
6  Q   You testified earlier that you said to him, "You
7    didn't advocate --"
8  A   Yeah.
9  Q   "-- for me."  Do you remember testifying to that?
10  A   Yeah.
11  Q   What did you mean when you said that to Mike
12    Turner?
13  A   Just everything.
14  Q   What do you mean by "everything"?
15  A   Just -- just you -- I just felt -- I just felt like
16    I was nothing.
17  Q   Anything else?
18  A   I -- I just -- I just -- I felt like my -- I don't
19    know.  I just -- I just -- I just felt bad.
20  Q   Did you feel that because of your sexual
21    relationship with Mike Turner, he should have done
22    something to keep you as the director?
23  A   No, no -- it -- it had nothing to do with that.
24    It was -- it was -- I -- I thought that -- I just
25    felt like he should have told me that I was getting



REGINA PARKS
REGINA PARKS vs WAYNE COUNTY, et al.

September 16, 2025
251–254

Page 251

1    demoted.  And -- and just the way it went down, I
2    just thought that he would give me some type of
3    heads-up, and I just thought he would say something
4    or help just -- just -- yeah, just tell -- would
5    have gave me -- told me something.
6   Q    I mean -- and you use the term "demotion."  I know
7    you covered this with Sister Counsel earlier, but
8    you kept your same salary.  There was no discussion
9    about a salary reduction; is that right?
10        MS. GORDON:  Okay.  We're not going to
11   recover this.  We -- the facts are here.  We all
12   know them.
13        MS. DWYER:  Go ahead.
14        MS. GORDON:  No, don't answer it.  We --
15        MS. DWYER:  Are you -- you're instructing
16   the witness --
17        MS. GORDON:  Yeah.
18        MS. DWYER:  -- not to answer?
19        MS. GORDON:  We've covered this, and you
20   know what she said.  It's not in dispute what
21   happened to her salary and her title.  It's not in
22   dispute.
23   BY MS. DWYER:
24   Q    Why do you believe it was a demotion?
25        MS. GORDON:  She's already explained

Page 252

1    this.
2        Go ahead, Regina.  Say it again.
3        THE WITNESS:  Because I had a director's
4    position, which -- which is a -- a rank, and I was
5    -- to nothing -- to -- to no -- to no title
6    whatsoever.  And even when I spoke to Venita Terry
7    --
8        MS. GORDON:  You going to add something?
9        THE WITNESS:  She -- she said, "I -- I
10   didn't know you was upset."
11   BY MS. DWYER:
12   Q    So you were upset with Turner because he didn't
13   give you a heads-up?
14        MS. GORDON:  Okay.  She said what she
15   said.  That's not a question.  You just made a
16   statement.
17        Regina, just wait for the question and
18   answer only the question.
19   BY MS. DWYER:
20   Q    Is that right?
21        MS. GORDON:  What's the question?
22   BY MS. DWYER:
23   Q    You were upset because he didn't give you a
24   heads-up; is that --
25        MS. GORDON:  Okay.  She was --

Page 253

2   Q    -- what you're telling me?
3        MS. GORDON:  She was upset about a lot of
4    things that she's already testified to.
5        Go ahead, Regina.  It's already been
6    answered.
7        THE WITNESS:  I was upset because I -- it
8    was just thrown at me.  Like, it was just thrown at
9    me.
10   BY MS. DWYER:
11   Q    Are you done with your answer?
12   A    Uh-huh.
13   Q    Okay.  Thank you.  Did you know if Mike Turner
14   spoke to anyone else about the restructure before
15   the meeting?
16   A    No.
17   Q    Did you expect him to tell you about the substance
18   of this meeting before it happened?
19   A    No.
20   Q    And again, you say it's a demotion, but isn't it
21   true that you received a $4,000 salary increase?
22        MS. GORDON:  She already testified to
23   this.  It was very explicit.
24        MS. DWYER:  Go ahead.
25        MS. GORDON:  She said everybody got an

Page 254

1    increase, including her.  That's what she said
2    earlier today.
3        MS. DWYER:  Is that asked and answered,
4    Deb?
5        MS. GORDON:  Yes, it is.
6        MS. DWYER:  Okay.  Go ahead.
7        MS. GORDON:  And she doesn't need to
8    answer again.
9        MS. DWYER:  Are you instructing the
10   witness --
11        MS. GORDON:  Yes, yes.
12        MS. DWYER:  -- not to answer my question?
13        MS. GORDON:  We all know the answer.  In
14   fact, your records show what happened.
15        MS. DWYER:  Just clarifying that you are
16   --
17        MS. GORDON:  Yes.
18        MS. DWYER:  -- again telling --
19   instructing your client not to answer the question
20   based on asked and answered; is that right?
21   BY MS. DWYER:
22   Q    I'm going to ask the question again: isn't it true
23   that you received a $4,000 salary increase at that
24   time?
25        MS. GORDON:  This has been testified to



REGINA PARKS
REGINA PARKS vs WAYNE COUNTY, et al.

September 16, 2025
255–258

Page 255

1  previously.  It's been asked and answered.  This is
2  needlessly prolonging a dep in a very long day.  I
3  consider it harassment.  Your own documents show
4  what the increase was.
5          MS. DWYER:  Your client is claiming to
6  have suffered a demotion that in fact --
7          MS. GORDON:  She -- it's uncontested.
8          MS. DWYER:  -- did not occur.
9          MS. GORDON:  Okay.
10         MS. DWYER:  It's not uncontested.
11         MS. GORDON:  That's your argument.  You
12 can argue that to the Jury, okay?  Her title was
13 taken away.  It's already admitted that her salary
14 was not affected, nor -- and that she got an
15 increase.  We all know this.
16         MS. DWYER:  You --
17         MS. GORDON:  Where are we alleging that
18 in our complaint?
19         MS. DWYER:  You testified earlier that
20 Turner told you about the meeting before the
21 meeting, and I think now you're telling me you
22 didn't know about it.
23         MS. GORDON:  Just ask her a question.
24 Don't tell her what she said before.  It's all too
25 confusing.

Page 256

1          MS. DWYER:  I'm trying to understand
2  which is correct.
3          MS. GORDON:  No.  It's too confusing of a
4  question.
5          MS. DWYER:  If you're confused by my
6  question --
7          MS. GORDON:  I'm confused, and she's not
8  going to answer.
9          MS. DWYER:  You're not answering my
10 questions today.  The witness is.
11         MS. GORDON:  Okay.  Well, I'm going to
12 understand --
13         MS. DWYER:  If you're confused --
14         MS. GORDON:  -- your question before she
15 answers it.  So just ask the question without doing
16 the backstory.
17         MS. DWYER:  Ms. Parks, if you're
18 confused, as I said earlier --
19         MS. GORDON:  Okay.
20         MS. DWYER:  -- I'm happy to --
21         Please don't interrupt me.
22         I'm happy to rephrase or repeat my
23 question.
24         MS. GORDON:  Okay.  We're asking you to
25 rephrase it.

Page 257

1  BY MS. DWYER:
2  Q    Okay.  So earlier, you testified that Mike Turner
3        told you about the meeting before the meeting
4        occurred.  I think you just shared with me that you
5        did not know about the meeting before it occurred.
6        I'm trying to understand: which is true?
7  A    He didn't tell me about the meeting.  He told me
8        that I was going to lose my office right before the
9        meeting.
10         MS. GORDON:  (indiscernible).
11 BY MS. DWYER:
12 Q    Do you know when Mike Turner found out about the
13       restructuring that the sheriff was --
14         MS. GORDON:  It's been asked and
15 answered.
16 BY MS. DWYER:
17 Q    -- proposing?  Okay.  Let's turn to your
18       conversation with Mr. Turner.  So you leave the
19       sheriff's office.
20 A    Yeah.
21 Q    Did you drive home?
22 A    Yeah.
23 Q    Okay.  When did Mike Turner call you?  Were you
24       driving home, or had you already arrived at home?
25         MS. GORDON:  This has been asked and

Page 258

1  answered.
2          MS. DWYER:  No, it hasn't.  And I haven't
3  --
4          MS. GORDON:  Yes, it was.
5          MS. DWYER:  -- asked the question.
6          So go ahead.
7          MS. GORDON:  Okay.  Well, they're now
8  duplicating questions, so I'm making my record --
9          MS. DWYER:  That's your own rule that
10 you're making up.
11         MS. GORDON:  Okay.  Maria, you need to
12 let me get my words out.
13         MS. DWYER:  It's a lot of words, Deb, and
14 you keep doing it.
15         MS. GORDON:  It doesn't matter.
16         MS. DWYER:  And it's inappropriate under
17 the --
18         MS. GORDON:  Okay.
19         MS. DWYER:  -- Federal Court Rules.
20         MS. GORDON:  I'm going to make my record.
21         MS. DWYER:  You can put your objection --
22         MS. GORDON:  Okay.  See --
23         MS. DWYER:  -- on the record.
24         MS. GORDON:  See, again -- well, let me
25 finish my statement.  So go ahead.  You keep



Page 259

1    talking, and then when you're done, I'll say my --
2    what I'm going to say.
3    BY MS. DWYER:
4    Q    When did you talk to Mr. Turner?  Were you already
5         at home, or were you driving home?
6    A    I had just left the office, so I was -- I was close
7         to the office.  Like, it was minutes after I left,
8         so -- on 75, so yeah.
9    Q    In his declaration, he says that when he called you
10        -- well, that he spoke with you regarding your
11        behavior, and he told you that you were
12        "unprofessional, unacceptable, a violation of our
13        standards of conduct, and could potentially lead to
14        termination."  Did he say those things to you?
15   A    We never had a conversation about that at all.
16   Q    So despite his sworn statement --
17             MS. GORDON:  Oh, God.
18   BY MS. DWYER:
19   Q    -- you're denying that he --
20   A    Totally.
21   Q    -- said these things to you?
22   A    Totally.  We never had a conversation.  We just had
23        a conversation about the -- the -- the call from
24        the sheriff.
25   Q    What did -- and I think you covered this with Lina,

Page 260

1    so I won't cover it all.  You denied this.  You
2    testified that you haven't talked to Erika Erickson
3    since Erika was fired.  Do you know that your --
4    that there's a document that was exchanged between
5    us in this case, and in that document, your
6    attorney represents that Erika Erickson can only be
7    contacted through her office; do you know that?
8    A    Say it again.  I'm so sorry.
9    Q    Yes, ma'am.
10            MS. GORDON:  I don't know what document
11        you're talking about.
12            MS. DWYER:  Your initial disclosures.
13   BY MS. DWYER:
14   Q    You testified that you haven't talked to Erika
15        Erickson since Erika was fired; are you with me?
16   A    Uh-huh.
17   Q    Okay.  Do you know that your attorney and you --
18        well, I shouldn't say your attorney.  Do you know
19        that in a document that was exchanged in this case,
20        we cannot contact Erika Erickson unless we go
21        through your attorney; do you --
22            MS. GORDON:  Okay.
23   BY MS. DWYER:
24   Q    -- know that?  No?
25   A    No.

Page 261

1    Q    Are you aware that your attorney did a news
2         interview and provided your name to the media?
3             MS. GORDON:  Okay.  I -- this is outside
4         the scope of the case.  I don't mind her answering
5         it.  I don't know what you mean by I "provided her
6         name to the media."  The media had her name from
7         the federal court papers that were filed prior to
8         --
9             MS. DWYER:  I'm not -- I'm --
10            MS. GORDON:  Okay.  I'm still talking.
11            MS. DWYER:  You're making a speaking
12        objection, which, once again, is inappropriate.
13            MS. GORDON:  No.  It doesn't --
14            MS. DWYER:  It's inappropriate.
15            MS. GORDON:  -- matter what you think.
16        I'm --
17            MS. DWYER:  No, it's the Federal Court
18        Rules.  I didn't draft them.
19            MS. GORDON:  Okay.  Maria, either you're
20        going to let me talk or we're just going to walk
21        out of the dep, because you think that I'm not
22        allowed to say anything no matter what you say or
23        ask that's inappropriate.
24            MS. DWYER:  This is coaching.
25            MS. GORDON:  Yes.  See, again --

Page 262

1             MS. DWYER:  You're coaching the witness.
2             MS. GORDON:  See, again --
3             MS. DWYER:  You're coaching the witness.
4             MS. GORDON:  See, again, you're just --
5             MS. DWYER:  It's inappropriate.
6             MS. GORDON:  You're just interrupting me
7         again.
8             MS. DWYER:  It's inappropriate, and you
9         know it.
10            MS. GORDON:  Okay.  Okay.  See, again,
11        you're just talking.
12            MS. DWYER:  You're just talking.  I'm
13        asking questions here today.
14            MS. GORDON:  Okay.  We're going to --
15        we're going to go in a few minutes if this
16        continues.  For you to ask about her attorney
17        giving her name to the media is a false underlying
18        statement.  You know that the media had her
19        complaint.  So it's got nothing to do with the
20        lawsuit, and you're trying really hard to create a
21        situation where somehow Regina and I are
22        responsible for media coverage.  But your
23        underlying question is based on a false premise,
24        and she's not going to answer it.  You can't ask
25        somebody that has a false premise.



Page 263

1  BY MS. DWYER:
2  Q   Are you aware that your attorney did a news
3      interview?
4         MS. GORDON:  You can answer that.
5         THE WITNESS:  Yes.
6  BY MS. DWYER:
7  Q   Did you contact Ross Jones concerning this lawsuit?
8  A   Absolutely not.
9  Q   Did you watch the news interview that your attorney
10     participated in?
11  A   Yes.
12  Q   And as part of that news interview, was your name
13     stated on the interview?
14        MS. GORDON:  The interview speaks for
15  itself.
16        THE WITNESS:  Yes.
17        MS. GORDON:  You can look at the
18  interview and find out.
19        MS. DWYER:  I'm just going to take a
20  short break and see --
21        MS. GORDON:  Okay.
22        MS. DWYER:  -- if I have any more
23  questions --
24        MS. GORDON:  Sounds good.
25        MS. DWYER:  -- and then we'll be right

Page 264

1  back, but we're almost done.
2        MS. GORDON:  Okay.
3        MS. DWYER:  Thank you for your time.
4        THE VIDEOGRAPHER:  We're going off the
5  record.  The time is 5:50 p.m. We're off the
6  record.
7     (A recess was taken.)
8        THE VIDEOGRAPHER:  We are now back on the
9  record.  The time is 5:54 p.m.
10        MS. DWYER:  I have no further questions.
11  Thank you for your time.
12        MS. GORDON:  Okay.  Thanks, guys.
13        THE VIDEOGRAPHER:  This concludes the
14  videotaped deposition.  We are now going off the
15  record.  The time is 9:55 p.m. We're off the
16  record.
17        MS. DWYER:  No, I think it's 5:55.
18        THE VIDEOGRAPHER:  I'm sorry.  5:55.
19        MS. DWYER:  Yeah.
20        THE VIDEOGRAPHER:  I thought I said 5:55.
21        MS. DWYER:  You said 9.
22        THE VIDEOGRAPHER:  We're off the record
23  at 5:55 p.m.
24     (The deposition concluded at 5:55 p.m.)
25

Page 265

1              CERTIFICATE
2         I, NICOLE BROOKS, a Certified Electronic
3  Recorder and Notary Public within and for the State of
4  Michigan do hereby certify:
5         That this transcript consisting of 265 pages,
6  is a complete, true, and correct record of the testimony
7  of REGINA PARKS, given in this case on Tuesday,
8  September 16th, 2025, and that the deponent was duly
9  sworn to tell the truth.
10         I further certify that I am not related to any
11  of the parties to this action by blood or marriage; and
12  that I am not interested in the outcome of this matter,
13  financial or otherwise.
14         IN WITNESS THEREOF, I have hereunto set my
15  hand this 25th of September, 2025.
16
17
18
19  _____
    Nicole Brooks, 9224
20  Notary Public, State of Michigan
    County of Macomb
21  My commission expires: December 20, 2028
22
23
24
25

