# EXHIBIT 14

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF MICHIGAN

SOUTHERN DIVISION


REGINA PARKS, an individual,

     Plaintiff,         Case No. 2:25-cv-10409

     vs.

WAYNE COUNTY, a political

subdivision of the State of

Michigan, RAPHAEL "RAY"

WASHINGTON, in his individual and

official capacities, Jointly and

Severally,

     Defendants.

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _/


DEPONENT:  ERIKA ERICKSON

DATE:       Friday, December 12, 2025

TIME:       10:18 AM

LOCATION:  Deborah L. Gordon PLC

            33 Bloomfield Hills Parkway, Suite 220

            Bloomfield Hills, Michigan 48304

REPORTER:  Kristen N. Trachet, CSR-16330

JOB NO.:   48843

Fortz Legal Support

www.FortzLegal.com

844.730.4066

FORTZ Legal

1           UNITED STATES DISTRICT COURT

2           EASTERN DISTRICT OF MICHIGAN

3                 SOUTHERN DIVISION

4

5    REGINA PARKS, an individual,

6         Plaintiff,          Case No. 2:25-cv-10409

7         vs.

8    WAYNE COUNTY, a political

9    subdivision of the State of

10   Michigan, RAPHAEL "RAY"

11   WASHINGTON, in his individual and

12   official capacities, Jointly and

13   Severally,

14        Defendants.

15   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _/

16

17   DEPONENT:  ERIKA ERICKSON

18   DATE:      Friday, December 12, 2025

19   TIME:      10:18 AM

20   LOCATION:  Deborah L. Gordon PLC

21              33 Bloomfield Hills Parkway, Suite 220

22              Bloomfield Hills, Michigan 48304

23   REPORTER:  Kristen N. Trachet, CSR-16330

24   JOB NO.:   48843

25

REGINA PARKS v WAYNE COUNTY                                          Job 48843
ERICKSON, ERIKA 12/12/2025                                                27

```
 1          own words?
 2    A.    No.
 3    Q.    Did it require you to report harassment to some
 4          place?
 5    A.    I believe so.
 6    Q.    Do you recall where you were report harassment?
 7    A.    I was told to my direct supervisor.  And that was
 8          Chief Turner.
 9    Q.    Outside of Chief Turner, did you report to anyone
10          else?
11                    ATTORNEY GORDON:  Other than
12          Chakrabarty?
13                    ATTORNEY SHEKELL:  Oh.  I'm --
14          other than Chakrabarty, yes.
15                    ATTORNEY GORDON:  And Turner?
16                    THE WITNESS:  No.  I thought
17          about going to HR, but was discouraged from
18          that because I was told he also sexually
19          harassed the woman in the HR role at that time.
20    BY ATTORNEY BURRELL:
21    Q.    Okay.
22    A.    I was also discouraged from going to the county
23          because the sheriff said his best friend was
24          Kym Worthy.
25    Q.    All right.  So you're discouraged, you said, from
```

REGINA PARKS v WAYNE COUNTY                          Job 48843
ERICKSON, ERIKA 12/12/2025                                 28

```
 1          going to HR.
 2                    Who discouraged you?
 3    A.    Chakrabarty.  And then later turner.
 4    Q.    So what did Chakrabarty say about going to HR?
 5    A.    He said it wouldn't go anywhere.
 6    Q.    Did he say why?
 7    A.    It was known that the sheriff had sexually harassed
 8          the woman in that role.
 9    Q.    Was the woman in the role -- who was the woman in
10          the role?
11                       THE WITNESS:  Can I say her
12          name?
13                       ATTORNEY GORDON:  Yeah.  Her
14          name has already been referenced.
15                       THE WITNESS:  Lakeisha Solomon.
16    BY ATTORNEY BURRELL:
17    Q.    And you say it has been "known" that the sheriff
18          harassed her.
19                    How has it been known?
20    A.    Chief Turner even admitted that he tried to keep
21          the sheriff away from her.
22    Q.    When did he admit that?
23    A.    When I complained to him about the sheriff he
24          called the sheriff a womanizer.
25    Q.    Chief Turner said that?
```

REGINA PARKS v WAYNE COUNTY                                    Job 48843
ERICKSON, ERIKA 12/12/2025                                          29

```
 1   A.     Yes.  He said he's long-time been a womanizer.
 2   Q.     And this --
 3   A.     He said the relationship he's seen -- the
 4          interaction he's seen with him and Lakeisha makes
 5          him uncomfortable.
 6   Q.     Chief Turner said that the interaction that he's
 7          seen visually between Lakeisha Solomon and the
 8          sheriff, you said, makes him uncomfortable?
 9   A.     Yes, and I have a recording of him saying that.
10   Q.     You have it recorded?
11   A.     Yes.
12   Q.     You mentioned that Lakeisha Solomon was harassed.
13               Did you hear that from anyone other than
14          Chief Turner?
15   A.     Yes.
16   Q.     Who did you hear that from?
17   A.     Captain Chakrabarty.  And it was -- Lakeisha
18          mentioned it once in a very -- she hinted toward it
19          so I can't really say specifics.
20   Q.     What did she say?
21   A.     I -- I can't remember exactly.
22   Q.     When did she have this discussion with you?
23   A.     We were at a golf outing.
24   Q.     Do you recall when that happened?
25   A.     It was the Benny Napoleon memorial picnic.
```

```
 1           like, the sheriff didn't tell me don't go to HR at
 2           the county; Captain Chakrabarty did.  The sheriff
 3           would say constantly, that Kym Worthy is his best
 4           friend.
 5   Q.      Captain Chakrabarty also told you that sheriff was
 6           best friends, quote/unquote, with the prosecutor?
 7   A.      That it wouldn't go anywhere because I guess there
 8           had been other complaints too that didn't, but I
 9           don't know if that's true or not.
10   Q.      And you mentioned the prosecutor is Kym Worthy?
11   A.      Yes.
12   Q.      Kym Worthy, did she have any role in HR at
13           Wayne County to your knowledge?
14   A.      I don't know.
15   Q.      Do you know if the Wayne County prosecutor had any
16           role in investigating HR complaints at
17           Wayne County?
18   A.      Not that I know of.
19   Q.      All right.  So you had this discussion with --
20           we'll talk about Chief Turner first, and I don't
21           recall if you remember the date that it happened?
22   A.      It was in June, I believe.
23   Q.      Of 2022?
24   A.      No, that would've been 2021.
25   Q.      Okay.
```

REGINA PARKS v WAYNE COUNTY                                    Job 48843
ERICKSON, ERIKA 12/12/2025                                          32

```
 1    A.     I think.  No, 2022.
 2    Q.     And how did the conversation start?
 3    A.     It was, I tried to be very casual about it.  I just
 4           said, Hey, can -- basically -- can you say
 5           something to the sheriff?  He's making me
 6           uncomfortable.
 7    Q.     And what did he say in response to that?
 8    A.     He asked me a couple of questions about why and
 9           what is he doing.  And then kind of said, Do you
10           want to say something?  Do you want me to say
11           something?
12    Q.     So he has --
13    A.     He wanted to -- oh.
14                      ATTORNEY GORDON:  Go ahead.
15           Finish your answer.
16                      THE WITNESS:  He wanted to wait
17           until after the election.  And then he asked me
18           to chew on it over the weekend, but then I
19           believed I asked him again to say something.
20           That's when he admitted -- or he said in that
21           conversation that the sheriff was a womanizer.
22    BY ATTORNEY BURRELL:
23    Q.     You mentioned that chief said why.
24                      And what did you respond to when he asked
25           you why and what?
```

```
 1    A.    Remarks he made.  He -- most people called me

 2          director by my first name and the sheriff

 3          constantly referred to me as babe or baby.  He

 4          asked me to wear dresses to work to show off my

 5          legs 'cause he said I have nice legs.  Made

 6          comments like that.

 7    Q.    And you told that to the chief?

 8    A.     (No verbal response.)

 9    Q.    Did you say anything else to the chief?

10    A.    I don't remember specifically in that conversation.

11    Q.    He told you to "chew on it" for a weekend?

12    A.    Told me to chew on it over the weekend.

13    Q.    So what happened with Chief Turner specifically?

14                Did you have another discussion with him

15          after this call?

16    A.    Nothing was said and it kept happening.  And then

17          we were at an event and he something else to me.

18          And I called Chief Turner crying, and he said

19          something like, Why do you keep bringing this up?

20          And then I wrote an email.

21    Q.    So when did this second discussion happen with

22          Chief Turner?

23    A.    I think it was a month later.

24    Q.    When you said the behavior kept "happening," that's

25          in reference to the sheriff?
```

REGINA PARKS v WAYNE COUNTY                                    Job 48843
ERICKSON, ERIKA 12/12/2025                                          73

```
 1        your testimony.
 2              Is there anything else about the incident
 3        itself?
 4   A.   At the substation?
 5   Q.   Correct.
 6   A.   No.  I just called Chief Turner.  And he basically
 7        said -- asked me why I kept bringing it up.
 8   Q.   So he told you, if I recall, that you would chew on
 9        it over the weekend.
10              What did you take that to mean?
11   A.   That's not how it ended.  I was under the
12        impression that he was going to say something to
13        the sheriff.  That's not how it ended.
14   Q.   What did he say?
15   A.   That he would talk to him, but he also wanted me to
16        chew on it, too.
17   Q.   But he mentioned that he would talk to the sheriff
18        about the behavior you mentioned?
19   A.   Yes.
20   Q.   So that weekend passes.  Did the chief reach out to
21        you again?
22   A.   About this, I don't recall him doing that.  Oh,
23        wait.  No, he did.  He said he was -- I don't
24        remember the word he used.  He couldn't sleep after
25        what I told him and that he was going to tell him,
```

```
 1              but he was concerned because of the election and
 2              the stress that the sheriff was under.
 3    Q.        So this was maybe the following Monday or Tuesday?
 4              Was it the next week after?
 5    A.        This was a couple days later.
 6    Q.        And was that a phone call?  He called you or was
 7              that an in-person meeting?
 8    A.        There was a phone call and then we were at an
 9              event.  It was -- I can't remember what the event
10              was, but he pulled me aside and so did Jaafar.
11              Jaafar knew about it, also.
12    Q.        So Chief Turner and Jaafar pulled you aside at an
13              event?
14    A.        Jaafar hinted that he knew about it.  Chief Turner
15              pulled me aside and told him -- told me that he was
16              really bothered by it and that he was going to say
17              something, but that the sheriff was under a lot of
18              stress because of the election.  And I think he was
19              out of town at that time, and he wanted to wait
20              until me was back in town, but he was very
21              reassuring that he was going to say something to
22              him.
23    Q.        And do you recall what event that was?
24    A.        I can't remember.
25    Q.        So did Jaafar say anything during that discussion
```

```
 1              or was he part of that discussion at all, I should
 2              ask?
 3    A.    No, that was just me and Chief Turner.
 4    Q.    So after this complaint was made, you had the
 5              discussion with Chief Turner at the event.
 6                      Was there any further follow up after the
 7              complaint was made?
 8    A.    No.
 9    Q.    You used the term "complaint."  You said that the
10              complaint, that was the verbal discussion with the
11              chief?
12    A.    Yeah.
13    Q.    Was that writing at time to the chief?
14    A.    Was there a?
15    Q.    Was there a writing in -- a complaint in written
16              form?
17    A.    Just that email that I sent.
18    Q.    Was this the same time you had the discussion
19              with -- I'm going to say his -- Chakrabarty?
20    A.    Chakrabarty.
21    Q.    Chakrabarty.
22    A.    I had been talking to Chakrabarty about the same
23              thing throughout this whole time.
24    Q.    So when you had the discussion rather with
25              Chief Turner, did you also have a discussion with
```

REGINA PARKS v WAYNE COUNTY                                    Job 48843
ERICKSON, ERIKA 12/12/2025                                          77

```
1              discussion about the issue?

2    A.    No.  His demeanor changed.

3    Q.    Who's "his"?

4    A.    Chief Turner, after that call from the substation.

5    Q.    So was there any follow up from Chakrabarty after

6          you had that discussion with him?

7    A.    What do you mean "follow up"?

8    Q.    Did he say that, I addressed this in some way with

9          the sheriff or anyone else?

10   A.    I don't know why Chakrabarty would.

11   Q.    So he did not?

12   A.    No.

13   Q.    So Turner's, you said, demeanor changes.

14              He had no further discussions with you at

15         all about that incident?

16   A.    I sent the email and then a meeting was scheduled.

17   Q.    Okay.  When did you send the email?

18   A.    I don't recall the specific date.

19   Q.    And who was the email to?

20   A.    I believe it was to Chief Turner.  And I was

21         specifically told to use personal emails because

22         the election was going on.

23   Q.    So you were specifically told by whom?

24   A.    Chief Turner and the sheriff and his assistant and

25         Chief Turner's assistant who were using personal
```

```
 1          emails a lot.
 2   Q.     So you're using personal emails for all --
 3   A.     A lot of things.
 4   Q.     Beyond --
 5   A.     I was not only the director of communications, I
 6          was also on the communications team for his
 7          election during this time.
 8   Q.     And you were using your personal email for -- was
 9          it all professional communications you were having?
10   A.     Not all.
11   Q.     So when would you use your sheriff's office emails?
12   A.     For nonelection-related business.  Just sheriff's
13          office business.
14                     ATTORNEY GORDON:  We're gonna
15          need to take a break.  How much longer do you
16          have?
17                     ATTORNEY BURRELL:  I'd say
18          probably, you know, about an hour.
19                     ATTORNEY GORDON:  About an hour,
20          okay.
21                     THE WITNESS:  Another hour?
22                     ATTORNEY BURRELL:  Yup.
23                     THE WITNESS:  Oh.
24                     ATTORNEY BURRELL:  Shortest that
25          I possibly can.  We're almost done with
```

REGINA PARKS v WAYNE COUNTY                                    Job 48843
ERICKSON, ERIKA 12/12/2025                                            79

```
 1          substance.  We've just got a few more topics.
 2                     (Recess off the record at 12:05 PM.)
 3                     (Back on the record at 12:26 PM.)
 4     BY ATTORNEY BURRELL:
 5     Q.    All right.  So before the break, Erika, we were
 6           talking about an email that you wrote and you
 7           mentioned to Chief Turner and Jaafar -- or Jaafar,
 8           rather.
 9                     Did you write the email to anyone else?
10     A.    I don't recall.  I think it was those two, but I
11           don't recall.
12     Q.    Okay.  We don't have a copy of that email today.
13           Give us your recollection of what the email said.
14     A.    I had been complaining about the sheriff's
15           behavior.  Essentially what we've discussed here:
16           Calling me babe, baby, asking me to stay in his
17           hotel room.  And a conversation essentially needed
18           to be had.  I was sick of it.
19     Q.    So you requested a conversation in the email?
20     A.    I believe so.
21     Q.    Did you request a conversation with the two people
22           to Turner and Sheriff?
23     A.    I wanted them to have a conversation with the
24           sheriff.
25     Q.    So you were requesting that they have a
```

REGINA PARKS v WAYNE COUNTY                                    Job 48843
ERICKSON, ERIKA 12/12/2025                                          80

```
 1              conversation with the sheriff?
 2    A.        Something needed to be done, yes.
 3    Q.        Were you requesting a conversation with anyone in
 4              the email?
 5    A.        No.  I wanted the matter addressed.
 6    Q.        Did they respond to this email?
 7    A.        No.
 8    Q.        Do you know if they received the email?
 9    A.        Common sense would say they received it because a
10              meeting was scheduled.
11    Q.        So when was the meeting scheduled?
12    A.        I don't recall.  It was pretty -- I don't remember.
13    Q.        Was it a week after?
14    A.        No.  It was within days.
15    Q.        Who contacted you to schedule the meeting?
16    A.        I just got an email.  I think it was from Turner's
17              assistant.  I didn't even know what it was about.
18              I felt ambushed, frankly.
19    Q.        Ambushed by the invitation to the meeting?
20    A.        I felt ambushed because it appeared they had
21              already discussed everything and I had to face the
22              person who I felt was harassing me.
23    Q.        So you received a meeting invitation from Turner's
24              assistant or was it an email?
25    A.        It was a meeting invitation that I had to be --
```

REGINA PARKS v WAYNE COUNTY                              Job 48843
ERICKSON, ERIKA 12/12/2025                                    81

```
 1              that I had to go to.
 2    Q.    And you received that email, you said, within days
 3          of your email to the chief?
 4    A.    I think it was the following business day.  I don't
 5          remember.
 6    Q.    So when was the meeting scheduled for?
 7    A.    I think it was first thing that morning.
 8    Q.    So the meeting did take place, I imagine?
 9    A.    Yes.
10    Q.    Was it in the office?
11    A.    The sheriff's office.
12    Q.    So who was present for the meeting?
13    A.    The sheriff, Undersheriff Jaafar, Chief Turner.
14    Q.    How did the meeting start?
15    A.    I remember that very well.  I believe it was
16          Chief Turner said, Well, you wanted this meeting.
17    Q.    That's what Chief Turner said.
18                   Did he say anything else?
19    A.    So essentially I had the floor, so.
20    Q.    So how did you respond?
21    A.    I was terrified.
22    Q.    What did you say?
23    A.    I started telling the sheriff that what he'd been
24          doing was making me uncomfortable.  I felt alone
25          and afraid and like they had already discussed
```

REGINA PARKS v WAYNE COUNTY                                    Job 48843
ERICKSON, ERIKA 12/12/2025                                          82

```
 1            everything before I had gotten there.
 2   Q.    Do you know if they had a discussion about this
 3         issue before you arrived?
 4   A.    It appeared so because the sheriff was already in
 5         the know.
 6   Q.    Do you have any information or facts that will
 7         support that?
 8   A.    He was responding to things I hadn't told him that
 9         made me uncomfortable and he was bringing them up
10         with knowledge of them.
11   Q.    Give me an example.
12   A.    I believe the photo was brought up.  And I can't
13         remember specifics.
14   Q.    And you suggested that the sheriff brought the
15         photo up?
16   A.    I can't remember who brought it up.
17   Q.    You mentioned Chief Turner said you wanted this
18         meeting.
19                How did you respond to that?
20   A.    I don't remember.  I just remember I was shaking.
21   Q.    So you said something, though?
22   A.    I started telling -- I knew -- I could tell what it
23         was about.  Or he said something about why we're
24         there.
25                Oh, maybe it was Jaafar or the
```

REGINA PARKS v WAYNE COUNTY                                    Job 48843
ERICKSON, ERIKA 12/12/2025                                          83

```
 1            Chief Turner said, The sheriff makes you feel
 2            uncomfortable.  And I had to address the sheriff
 3            myself.
 4   Q.    What did you say to the sheriff?
 5   A.    It was a very long conversation.  I don't remember
 6            everything.
 7   Q.    High level, we need to know.  So tell us what he --
 8   A.    So essentially what I had been complaining about:
 9            The baby, the comments about my attire, that he
10            asked me to stay in his hotel room, and it was
11            inappropriate that we had even gotten into fights
12            about my boyfriend.  He asked me about my
13            relationship with my boyfriend.
14                  I confronted him with a lot of things.
15   Q.    So fights about the boyfriend I don't think we've
16            discussed other than the one incident at Mackinac.
17                  Were there any other issues with the
18            boyfriend?
19   A.    No.
20   Q.    Okay.  Did at some point you alert the sheriff of
21            these issues with the boyfriend?
22                  Did you tell him about them?
23   A.    I told him before Mackinac.
24   Q.    What did you say to him about that?
25   A.    I said, You need to stop asking me.  My boyfriend
```

REGINA PARKS v WAYNE COUNTY                                    Job 48843
ERICKSON, ERIKA 12/12/2025                                          85

```
 1        meeting?
 2    A.    Yes.
 3                    ATTORNEY GORDON:  She already
 4        answered this.
 5    BY ATTORNEY BURRELL:
 6    Q.    So what did the sheriff say in response?
 7    A.    He got very defensive.
 8    Q.    What did he say?
 9    A.    That he was joking.
10    Q.    Did he say anything else?
11    A.    About what?
12    Q.    About the baby, babe issue.
13    A.    I don't remember about that specifically.
14    Q.    Did he mention to you that he uses that term more
15        broadly than just to you?
16    A.    Possibly.  I don't remember.
17    Q.    Did he mention at any time that he knew you felt
18        uncomfortable about the term "baby" or "babe"?
19    A.    I don't know.
20    Q.    At any time did he bring up a particular instance
21        where he said baby or babe to you during this talk
22        he had?
23                    ATTORNEY GORDON:  Did he bring
24        up any incident?
25
```

```
 1   BY ATTORNEY BURRELL:

 2   Q.    Correct.  Did the sheriff?

 3   A.    No.

 4   Q.    Did he ever say that he -- what his intention was

 5         for using the term "baby" or "babe"?

 6   A.    Again, he always acted like he was just joking and

 7         it was a joking manner.  And not just the joking

 8         with that, but with a lot of the comments or he'd

 9         deny them.

10   Q.    Did you mention to the sheriff the incident that

11         occurred at Mackinac Island?  The issues -- the

12         issues, rather?

13   A.    Yes.

14   Q.    What did you say to him, if you recall, about the

15         Mackinac Island issues at this meeting?

16   A.    I told him -- I don't remember the exact words, but

17         I brought it up and he defended himself.

18   Q.    Did you mention the hotel request or the --

19   A.    Yes.

20   Q.    -- hotel room?

21   A.    Yes.

22   Q.    What did he say in response to you mentioning the

23         hotel issue at Mackinac?

24   A.    He made it sound like it wasn't a big deal.  And

25         that it was -- he was gonna sleep on the floor or
```

```
 1          something and Chief Turner hadn't addressed it, but
 2          I don't really remember.
 3  Q.      You mentioned that Chief Turner -- you said that --
 4          you said you told Chief Turner during this meeting
 5          that he didn't address something?
 6  A.      Yeah.  Yes.
 7  Q.      What did he not address?
 8  A.      This whole thing with the sheriff and his behavior.
 9  Q.      You told him that during the meeting?
10                       ATTORNEY GORDON:  She just
11      answered that.
12  BY ATTORNEY BURRELL:
13  Q.      How did he respond?
14  A.      I don't remember.
15  Q.      How long was the meeting?
16  A.      I'm guessing.  I don't really want to guess, but
17          probably an hour.
18  Q.      So how did your allegations regarding babe, baby,
19          the boyfriend, how did all that resolve at the
20          conclusion of this meeting?
21  A.      I wouldn't even say they resolved.
22  Q.      How did the meeting end?
23  A.      The sheriff said it was my duty to protect him, and
24          I should've come to him and told him to stop
25          because my job is to protect the sheriff.
```

REGINA PARKS v WAYNE COUNTY                                    Job 48843
ERICKSON, ERIKA 12/12/2025                                          90

```
 1   Q.    This is the sheriff talking at the end of the
 2         meeting?
 3   A.    Yes.  And then he said if he does it again, then I
 4         need to let him know because that's my job.
 5   Q.    And if he does what again?
 6   A.    Makes me feel uncomfortable.
 7   Q.    Did he say he would stop the behavior?
 8   A.    I think he said something like he was sorry if I
 9         felt that way, but it was kind of a lot of joking
10         and defensiveness.  It was a lot of that.
11   Q.    Do you know what he said after the "but"?  Sorry
12         you felt that way, "but"?
13   A.    I wouldn't say that's verbatim either.  I can't
14         remember verbatim.  He did apologize at one point,
15         but there was a lot of joking and defensiveness.
16         He kept saying he was joking and that I should've
17         interpreted a lot of his behaviors and words as
18         jokes.
19   Q.    That apology you're referencing, is different than
20         the, Sorry if you felt that way?
21               That was a different time during this
22         meeting?
23                     ATTORNEY GORDON:  If you can --
24         if you can parse them out.
25                     THE WITNESS:  He said it a
```

```
 1   A.     Again, I felt ambushed and trapped.  I felt
 2          defeated leaving that meeting.
 3   Q.     Did you tell anyone that you felt ambushed or
 4          trapped?
 5   A.     Yes.
 6   Q.     Who did you tell?
 7   A.     My therapist, my friends, Chakrabarty.
 8   Q.     Did Chakrabarty do anything in response to you
 9          telling him that?
10   A.     What do you mean "in response"?
11   Q.     Did he notify anyone or take any action?
12   A.     I'm not sure.
13   Q.     You mentioned that you had a discussion with Jaafar
14          after the meeting.
15                  What was the conversation about?
16   A.     I wouldn't say a discussion.  He just pulled me
17          aside and said something to the effect of, he was
18          proud or was a good job doing that, and he has my
19          back or something, which I didn't feel he did at
20          all.  Actually, I felt quite the opposite.
21   Q.     Did you tell him that during the discussion?
22   A.     No.  It wasn't a discussion.  He just said that and
23          I didn't say anything.
24   Q.     It was like when you were walking away from the
25          meeting?
```

REGINA PARKS v WAYNE COUNTY                                          Job 48843
ERICKSON, ERIKA 12/12/2025                                               94

```
 1   BY ATTORNEY BURRELL:
 2   Q.    "It's my understanding that Turner advised
 3         Defendant Washington of my complaint about him."
 4               Outside of that meeting, do you know of
 5         any discussion between Turner and Washington?
 6   A.    I don't know specifically.  But I went into the
 7         meeting and they had -- the sheriff was clearly
 8         briefed on things because he had knowledge of some
 9         things I complained about that I hadn't told him;
10         someone did.
11   Q.    Did you mention the clothing issue during this
12         meeting?
13   A.    I believe so.
14   Q.    What was the sheriff's response to it?
15   A.    I don't remember.
16   Q.    All right.  After this meeting did anything change
17         with respect to the sheriff?
18   A.    He was kind of kept away from me.  Even though I
19         usually worked with him and would ride with him in
20         the car, I was rarely around him.
21   Q.    And you say "kept away," do you mean --
22   A.    Physically, yes.
23   Q.    Who did the keeping away?
24   A.    I'm not exactly sure.  Usually, it would be
25         Chief Turner.
```

```
 1   Q.    After that meeting did anyone take any adverse

 2         employment action against you?  I don't know if you

 3         know what that means.

 4                       ATTORNEY GORDON:  Okay.  She

 5    doesn't have a complaint here.

 6                       But go ahead.  If you know what

 7    an adverse employment action is, please define

 8    it.

 9  BY ATTORNEY BURRELL:

10   Q.    Did you ever receive a writeup of any kind?

11   A.    No.

12   Q.    Did you receive a demotion?

13   A.    Not officially.

14   Q.    Was there any change to your compensation?

15   A.    No.

16   Q.    So you said that Turner was keeping you away from

17         the sheriff --

18   A.    And their assistants.  It was observed by many

19         people.

20   Q.    Did the sheriff ever speak to you again in your

21         term there?

22                       I mean, how was -- he never spoke to you

23         again; is that your testimony?

24                       ATTORNEY GORDON:  She didn't say

25         that.
```

REGINA PARKS v WAYNE COUNTY                               Job 48843
ERICKSON, ERIKA 12/12/2025                                      97

```
 1   BY ATTORNEY BURRELL:
 2   Q.     So when did he speak to you again after the
 3          meeting?
 4   A.     Very little.  We had very little interaction.
 5   Q.     Do you recall a time when you spoke to the sheriff
 6          after the meeting?
 7   A.     There were a few times, but it was very little.
 8   Q.     Would that have been in the office?
 9   A.     In the office, but it was in group settings and at
10          events.  Group settings.
11   Q.     Did you experience any harassment -- or alleged
12          harassment, rather, from the sheriff after the
13          meeting?
14   A.     Again, I was rarely around him so I don't recall.
15          I was glad to not be around him.
16   Q.     When did you first meet Regina Parks?
17   A.     When I began working in the office.  I don't
18          remember what month that was exactly in 2022 --
19          early 2022.
20   Q.     Did you work closely with Ms. Parks?
21   A.     Not really close, but we did community stuff.  And
22          it wasn't like an everyday thing.
23   Q.     Did you have a relationship at all with Ms. Parks
24          outside of work?
25   A.     Not really.
```

scheduling@fortzlegal.com          fortzlegal.com          Toll Free: 844.730.4066

REGINA PARKS v WAYNE COUNTY                                      Job 48843
ERICKSON, ERIKA 12/12/2025                                          141

```
 1    A.    Yes.

 2    Q.    Okay.  And no one from HR attended that meeting; is

 3          that correct?

 4    A.    Correct.

 5    Q.    Okay.  And as far as you aware.  Was any

 6          documentation made of that meeting?

 7    A.    No.

 8    Q.    Okay.

 9    A.    Not that I'm aware of.

10    Q.    And as far as you're aware, was there any written

11          follow-up to you about the meeting or your

12          allegations?

13    A.    No.

14    Q.    Okay.  And as far as you're aware, no investigation

15          by the sheriff's office or the county of your

16          investigations -- or I'm sorry, of your

17          allegations?

18    A.    No.

19    Q.    Okay.  And were you ever -- I understand you had

20          the conversation, you know, with the person who you

21          say is harassing you and your supervisors, but you

22          were never interviewed or asked questions privately

23          about your allegations by anyone from the county or

24          the sheriff's office; is that correct?

25    A.    You said interviewed?
```

```
 1   Q.    Interviewed or asked any questions in a private
 2         one-on-one?
 3   A.    No.
 4   Q.    And your attendance at the meeting with Washington
 5         was mandatory as you understood it, is that
 6         correct?
 7   A.    Absolutely.
 8   Q.    Okay.  And as far as you know, did anyone from the
 9         sheriff's office report your allegations to the
10         county executive as far as you're aware?
11   A.    No, not that I know of.
12   Q.    And you testified that the meeting was intimidating
13         to you; is that correct?
14   A.    Incredibly.
15   Q.    Okay.  And were you concerned about retaliation
16         after that meeting?
17   A.    Incredibly.  I didn't mention that -- I live in
18         Oakland County and I had Wayne County -- I had
19         Wayne County deputy cars driving by my house and I
20         thought I was going crazy.
21   Q.    So you were concerned about retaliation in your
22         employment after the meeting; is that right?
23                   ATTORNEY SHEKELL:  Objection,
24         asked and answered, and leading.
25                   THE WITNESS:  Yes.
```

REGINA PARKS v WAYNE COUNTY                                   Job 48843
ERICKSON, ERIKA 12/12/2025                                         146

1                          CERTIFICATE

2      STATE OF MICHIGAN

3      COUNTY OF OAKLAND

4

5      I do hereby certify the witness, whose attached

6      testimony was taken in the above matter, was first

7      duly sworn to tell the truth; the testimony

8      contained herein was reduced to writing in the

9      presence of the witness, by means of stenography;

10     afterwards transcribed; and is a true and complete

11     transcript of the testimony given.  I further

12     certify that I am not connected by blood or

13     marriage with any of the parties, their attorneys

14     or agents, and that I am not interested directly,

15     indirectly or financially in the matter of

16     controversy.  In witness whereof, I have hereunto

17     set my hand at Royal Oak, Michigan, December 19, 2025.

18
       *Kristen Trachet*
19     _____

20     Kristen N. Trachet, CSR-16330

21     Notary Public, Oakland County, Michigan

22     My commission expires 8/31/2026

23

24

25